ACCEPTED
01-15-00126-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 6:22:24 PM
CHRISTOPHER PRINI
CLERK

**No. 01-15-00126-CV**

**In the Court of Appeals for the First District of Texas**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 6:22:24 PM
CHRISTOPHER A. PRINE
Clerk

In re TMX Finance of Texas, Inc.; TitleMax of Texas, Inc.; and TMX Finance LLC

Original Proceeding from the 152nd Judicial District Court, Harris County, Texas, Trial Court Cause No. 2013-33584, the Honorable Robert Schaffer, Presiding Judge

**REAL PARTIES IN INTEREST'S RESPONSE TO RELATORS' PETITION FOR WRIT OF MANDAMUS**

SUTHERLAND ASBILL &
BRENNAN LLP
Daniel Johnson
Texas State Bar No. 24046165
daniel.johnson@sutherland.com
Robert A. Lemus
Texas State Bar No. 24052225
robert.lemus@sutherland.com
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301

WARGO & FRENCH LLP
Sarah F. Powers
California State Bar No. 238184
spowers@wargofrench.com
(*Pro Hac* Admission Pending)
1888 Century Park East, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6300
Facsimile: (310) 853-6333

COUNSEL FOR REAL PARTIES IN INTEREST

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF THE CASE.....................................................................v

ISSUE PRESENTED ................................................................................ vii

I.    INTRODUCTION ...........................................................................1

II.   STATEMENT OF FACTS................................................................4

      A.    Relators Engaged In Repeated Criminal Acts For The
            Purpose Of Converting LoanStar's Customers While
            Mr. Bielss Oversaw Relators' Operations In Texas............................4

      B.    The District Court Finds That Mr. Bielss Is A Fact
            Witness Who Has Relevant Testimony, And
            Denies Relators' Motion ......................................................6

      C.    The District Court's Decision Is Supported By
            Evidence Demonstrating That Mr. Bielss Was
            Personally Involved In Relators' Aggressive
            Growth And Marketing Strategies That Led To
            Their Illegal Conduct..........................................................8

III.  APPLICABLE STANDARD .......................................................11

IV.   DISCUSSION....................................................................................12

      A.    The Apex Deposition Doctrine Does Not Apply
            To Preclude Discovery From Fact Witnesses Such
            As Mr. Bielss ......................................................................12

      B.    LoanStar Is Entitled To Depose Mr. Bielss Because
            He Possesses Unique Or Superior Personal
            Knowledge Of Discoverable Information...........................14

      C.    LoanStar Is Also Entitled To Depose Mr. Bielss Because
            His Deposition Will Lead To The Discovery Of Admissible
            Evidence For Which Other Discovery Is Insufficient........................18

V.    PRAYER.......................................................................................19

CERTIFICATION ............................................................................21

CERTIFICATE OF COMPLIANCE...................................................22

CERTIFICATE OF SERVICE .........................................................22

APPENDIX ......................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alcatel USA, Inc.*,
11 S.W.3d 173, 176 (Tex. 2000) ................................................................. 14, 17

*Baxter v. Palmigiano*,
425 U.S. 308 (1976).......................................................................................10

*Boales v. Brighton Builders, Inc.*,
29 S.W.3d 159 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)...............13

*In re BP Products North America, Inc.*,
No. 01-06-00613-CV, 2006 WL 2192546 (Tex. App.—Houston
[1st Dist.] Aug. 4, 2006, orig. proceeding)........................................................16

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002).............................................................................12

*City of Houston v. Harrison*,
778 S.W.2d 916 (Tex. App.—Houston [14th Dist.] 1989, no writ)...................12

*In re Continental Airlines*, *Inc.,*
305 S.W.3d 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ...................16

*Crown Cent. Petroleum Corp. v. Garcia*,
904 S.W.2d 125 (Tex. 1995) ..................................................................... 12, 13

*Johnson v. Fourth Court of Appeals,*
700 S.W.2d 916 (Tex. 1985) ...........................................................................12

*Simon v. Bridewell*,
950 S.W.2d 439 (Tex. App.—Waco 1997, no writ)..........................................13

*Wilz v. Flournoy*,
228 S.W.3d 674 (Tex. 2007) ...........................................................................10

**Statutes**

TEX. TRANS. CODE §§ 730.007, 730.015 ................................................................5

## Rules

TEX. R. EVID. 513(c) .........................................................................................10

TEX. R. CIV. P. 199.1(a).....................................................................................12

## STATEMENT OF THE CASE

**Nature of Underlying Proceeding**

This case involves claims by LoanStar against Relators for misappropriation of trade secrets, tortious interference with contracts, and tortious interference with prospective business relations. (R.0001–0014.)

Throughout the underlying action, Relators have resisted discovery. (*See* R.0741–0751; R.0980–0981.) Indeed, the instant petition is the second filed in this case. In December 2014, Relators filed their first petition for writ of mandamus seeking reversal of the District Court's denial of Relators' motion for "apex" protection as to the deposition of Mr. Tracy Young, the sole employee, member and manager of Defendant TMX Finance LLC. (R.0161, n.2; *cf.* R.0498.) That petition remains pending.

The current mandamus proceeding relates to the deposition of Mr. Otto Bielss, who served as the Senior Vice President of Operations and oversaw Relators' Texas market at the time that Relators' employees were engaged in their illegal marketing scheme to convert LoanStar's customer relationships. (R.0173–0184). Despite previously agreeing to present Mr. Bielss for his deposition, in December 2014, Relators reversed course and filed a Motion for Protective Order to prevent Mr. Bielss' deposition. As with Mr. Young, Relators have asserted that the "apex" deposition doctrine shields Mr. Bielss from deposition. (R.0160–0240.) Upon consideration of the pleadings and argument, the District Court, the Honorable Robert Schaffer presiding, denied Relators' Motion and ordered the deposition of Mr. Bielss. (R.0481:18–19.) In doing so, the District Court found that "[Mr. Bielss] was, if not intimately, actively involved in what [TitleMax] was doing" and LoanStar sought to depose Mr. Bielss' "as a fact witness." (R.0477:4–6; R.0479:19–20.) The Court supported its finding with record evidence, for example, that Mr. Bielss "could be somewhat heavy handed in pushing people to perform and reach certain goals" and "was involved in

v

conversations where the subject matter of this lawsuit was discussed or may have been discussed." (R.0477:18–25; R.0478:18–20.)

**Respondent**          Honorable Robert Schaffer
152nd Judicial District Court
Harris County, Texas

**Order and Ruling at Issue**          January 23, 2015 Order Denying Defendants' Motion for Protective Order Regarding the Deposition of Otto Bielss. (R.0481:18–19) (no written order was entered).

# ISSUE PRESENTED

Whether the District Court, the Honorable Robert Schaffer presiding, properly exercised its discretion by denying Relators' Motion for Protection from "Apex" Deposition of Otto Bielss, a mid-level manager who has personal knowledge of Relators' practice of illegally searching of DMV records to identify and steal LoanStar's customers, was intimately involved in the operations in Texas, and was also responsible for Relators' aggressive growth strategy in Texas that led Relators to engage in that illegal conduct.

# I.    INTRODUCTION

The District Court, the Honorable Robert Schaffer presiding, properly exercised its discretion in denying Relators' Motion for Protection from "Apex" Deposition of Otto Bielss (the "Motion"). Under the facts of this case, Relators cannot carry the heavy burden of establishing that not even "some" evidence reasonably supported the District Court's decision below.

In their "Issue Presented" and throughout their Petition, Relators misstate and attempt to minimize the evidence before the District Court, which showed Mr. Bielss' personal knowledge of facts material to this litigation. In this regard, LoanStar presented the District Court with evidence that Mr. Bielss: (1) personally met with Relators' employees throughout Texas to discuss the performance of their stores, including having conversations regarding marketing tactics; (2) was personally aware of and had communications regarding reports that Relators' employees were illegally using Department of Motor Vehicle ("DMV") records to solicit LoanStar's customers; (3) personally conducted operations conference calls during which he aggressively questioned district managers regarding their performance, operations, and marketing efforts; (4) personally implemented an aggressive growth strategy that placed tremendous pressure on employees to sell Relators' loans, including buyouts of competitors' loans; and (5) personally oversaw Relators' rapid expansion in the Texas title loan market.

1

When faced with this evidence, Judge Schaffer correctly noted that LoanStar was seeking Mr. Bielss' deposition "testimony as a fact witness, not as a corporate rep[resentative]," (R.0479:19–20) and that "[Mr. Bielss] was, if not intimately, actively involved in what [TitleMax] was doing." (R.0477:4–6.)

In their Petition, Relators assert that Mr. Bielss is a protected "apex" deponent because he is <u>now</u> the Chief Operating Officer of TMX Finance LLC. (Pet. at 11.) Relators, however, fail to disclose that Mr. Bielss was only recently installed in that position. Indeed, until recently, Mr. Bielss was a Senior Vice President of Operations with "direct supervisory authority over the folks that are accused of wrong doing in this case." (R.0476:23–25.) LoanStar is entitled to depose Mr. Bielss regarding what he did (or did not do) to supervise these individuals, many of whom have conceded engaging in the illegal conduct forming the foundation of this case. For these reasons, Relators previously <u>agreed</u> to produce Mr. Bielss for deposition, both as a corporate representative for TitleMax and in his individual capacity. (R.0400–0402 [Emails from TitleMax counsel to LoanStar counsel dated August 16, 2014 agreeing to produce Mr. Bielss for deposition].) Upon retaining new counsel, however, TitleMax switched tack and for the first time asserted its erroneous "apex" argument. (*Id.*)

In an effort to support this argument, Relators mischaracterize the evidence that establishes Mr. Bielss' direct involvement in Relators' marketing activities in

2

Texas. For example, Relators assert that LoanStar did "not show that Mr. Bielss was involved in marketing strategies at the store level." (Pet. at 11.) Putting aside that Mr. Bielss does not have to be involved in marketing at the store level in order to have relevant personal knowledge, Relators' statement is contradicted by Relators' general manager James Griffin, who testified about a meeting in which he discussed the store's marketing efforts with Mr. Bielss. (R.0381–0383.)

Relators further rely on Mr. Bielss' affidavit, by which he claims not to have "firsthand personal knowledge" concerning Relators' illegal marketing activities, although he admits that he has "limited knowledge regarding this information." (R.0186, ¶¶ 3–4.) Mr. Bielss' admitted "limited knowledge" itself precludes application of the "apex" doctrine. Moreover, Mr. Bielss' assertion that he lacks "firsthand" knowledge is contradicted by the sworn testimony of other of Relators' employees (including, but not limited to, Mr. Griffin). LoanStar is entitled to discover the credibility of Mr. Bielss' affidavit, and in particular the extent of his knowledge and approval of Relators' wrongful conduct.

Additionally, LoanStar is entitled to take Mr. Bielss' deposition in order to controvert Relators' argument that their employees' illegal marketing activities were not approved by management and instead were the result of the conduct of rogue employees. LoanStar will demonstrate for the jury that Relators' position in this regard is simply incredible, as their employees' illegal conduct occurred across

3

their Texas regional operations (each headed by a different regional manager). To do so, LoanStar must depose Mr. Bielss, who was one of only two of Relators' employees who oversaw and implemented the marketing strategies across their Texas regions. Even if Mr. Bielss denies directing or encouraging Relators' illegal marketing activities, LoanStar is entitled to explore the credibility of such an unbelievable denial.

Accordingly, Relators have failed to establish that the District Court abused its discretion. In denying Relators' Motion for Protection, the District Court properly determined that Mr. Bielss is a fact witness, and accordingly that the "apex" doctrine does not apply to prevent LoanStar from taking his deposition. LoanStar thus respectfully requests that the Court deny Relators' Petition.

## II.    STATEMENT OF FACTS

### A.    Relators Engaged In Repeated Criminal Acts For The Purpose Of Converting LoanStar's Customers While Mr. Bielss Oversaw Relators' Operations In Texas

Both Relators and LoanStar operate title-lending businesses that involve the issuance of loans secured by a customer's vehicle. (*See* R.0001–0014.) From 2011 to 2013, Relators implemented an aggressive growth strategy across the state of Texas, by which they expanded from two to 230 stores over a two-year period, splitting the state into multiple regions. (*See* R.0507–0510; R.0593–0595 & n.5.) To foster their rapid growth, Relators illegally accessed DMV records to obtain

4

personal information from thousands of Texas citizens and LoanStar customers and market to those same individuals. (*Id.*; *see also* R.0001–0014.) A list of potentially stolen customers, prepared by Special Master Judge David Peeples, includes over 140,000 line entries. Facing not only civil, but also criminal penalties,[1] numerous employees of Relators have invoked their Fifth Amendment right to avoid self-incrimination, including one of Relators' Regional Managers.[2]

During the pertinent time frame, Mr. Bielss served as the Senior Vice President of Operations[3] for the entire Texas market, overseeing all of the employees who engaged in the illegal conduct. (R.0280; R.0287–0290; R.0321–0323.) Mr. Bielss personally played an active role in Relators' aggressive marketing strategies used to grow its operations in Texas. (R.0287–0290, ¶¶ 6–9; R.0321–0323, ¶¶ 4–5; R.0477:4–6.) Additionally, in 2012, Mr. Bielss communicated with other TitleMax employees regarding allegations that TitleMax employees were canvassing competitors' parking lots and illegally searching DMV

---

[1] *See* TEX. TRANS. CODE §§ 730.007, 730.015.

[2] To date, four of Relators' employees have exercised their Fifth Amendment rights: Felix DeLeon, Lucia Grajeda, and Ishmael Hernandez, all General Managers, and James Batterson, a Regional Manager. (*See* R.0846–0853 [Felix DeLeon Dep.]; R.0854–0858 [Lucia Grajeda Dep.]; R.0859–0872 [Ishmael Hernandez Dep.]; R.0576–0590 [James Batterson Dep.]; *see also* R.0993:17–24; R.1039:5–9.)

[3] As the Senior Vice President of Operations, Mr. Bielss reported directly to Tracy Young. (R.0288, ¶ 5.)

databases. (R.0539–0540 [McDonald Dep. 78–80 ("I received a call from [Mr. Bielss] saying that allegations were made, that we were—that an employee was going to a parking lot of a competitor. . . . In 2012 there was also another allegation that we were using or an employee was using a DMV database search.")])[4]; *see also* (R.0287–0290 [Affidavit of Donald H. ("Landers Affidavit"), ¶¶ 7–8]; R.0377–0384 [James Griffin (General Manager) Dep. 172–176 ("The sales were good, so he just wanted to know what we were doing marketingwise [sic] to get the sales to where they were")].)

LoanStar accordingly seeks to depose Mr. Bielss regarding his personal knowledge of these matters, and the direction employees received as to the illegal conduct in which multiple employees engaged.

**B.** **The District Court Finds That Mr. Bielss Is A Fact Witness Who Has Relevant Testimony, And Denies Relators' Motion**

In August 2014, LoanStar and Relators first discussed scheduling the deposition of Mr. Bielss. Recognizing that Mr. Bielss has unique knowledge relevant to the present case, Relators' former counsel <u>agreed</u> to produce Mr. Bielss for deposition. (R.0400–0402.) LoanStar accordingly noticed Mr. Bielss' deposition in December 2014. (R.0256–266; R.0267–0278.) Rather than present

---

[4] Realtors inaccurately assert that LoanStar improperly submitted into the Court record testimony from Ms. McDonald that was marked "Attorney's Eyes Only." However, none of the deposition testimony LoanStar cited was so designated. (*See* R.0575 [reflecting the "Attorney's Eyes Only" designations].)

Mr. Bielss for deposition consistent with the Parties' prior discussions and agreement, Relators' new counsel reversed course and filed the Motion to prevent his deposition.  (*See* R.0160–0243; R.0412–0419.)

At the January 23, 2015 hearing on the Motion, the District Court found that LoanStar was "seeking Mr. Bielss' testimony as a fact witness, not as a corporate rep[resentative]."  The Court concluded that Mr. Bielss had "direct supervisory authority over the folks that are accused of wrong doing in this case" and it seemed like "he was, if not intimately, actively involved in what [TitleMax] was doing." (R.0476–0477.)  In doing so, the Court noted that TitleMax employees provided sworn testimony indicating that Mr. Bielss "could be somewhat heavy handed in pushing people to perform and reach certain goals" and "was involved in conversations where the subject matter of this lawsuit was discussed or may have been discussed."  (R.0477–0478.)  Additionally, the Court observed that Mr. Bielss "was at meetings" where high-pressure marketing tactics were discussed and LoanStar "want[ed] to know what went on in those meetings."  (R.0479–0480; R.0321–0323, ¶ 5]; R.0287–0290, ¶ 8].)  The District Court accordingly denied Relators' Motion and ordered Mr. Bielss to appear for deposition.  (R.0481.)

Unsatisfied with the District Court's ruling, for the second time in this case,[5] Relators filed a Petition for Writ of Mandamus.

**C.     The District Court's Decision Is Supported By Evidence Demonstrating That Mr. Bielss Was Personally Involved In Relators' Aggressive Growth And Marketing Strategies That Led To Their Illegal Conduct**

LoanStar presented evidence to the District Court showing that Mr. Bielss has unique, firsthand knowledge of material facts relevant to this lawsuit. As the Senior Vice President of Operations for Relators, Mr. Bielss oversaw Relators' rapid expansion in the Texas market and implemented an aggressive growth strategy that placed tremendous pressure on employees to sell Relators' loans, including buyouts of competitors' loans. (R.0280–0285; R.0287–0290 [Landers Affidavit, ¶¶ 6, 9]; R.0507–0510 [Linda McDonald Dep. 10–11 (expansion from two to 230 stores over a two year period), 14–15]; R.0299–0303 [Richard Todd Hale (General Manager) Dep. 23–24]; R.0304–0309 [James Griffin (General Manager) Dep. 131, 140–141]; R.0310–0314 [Joshua Hadden (General Manager)

---

[5] On October 24, 2014, LoanStar noticed the deposition of Tracy Young, the sole employee, member, and manager of Defendant TMX Finance. (R.0161–0168.) LoanStar seeks his deposition to discover TMX Finance's involvement in Relators' illegal marketing activities. As with Mr. Bielss, Relators filed a Motion for Protection in an attempt to prevent Mr. Young's deposition on the ground that he is an "apex" deponent—thereby, completely ignoring that the inapplicability of the doctrine to Mr. Young and disregarding Mr. Young's knowledge of relevant information. (*Cf.* R.0158–0159.) On November 24, 2014, the District Court denied Relators' Motion for Protection as to Mr. Young. (*Id.*) Relators then filed a Petition for Writ of Mandamus, which is currently pending before this Court as Case No. 01-14-00964-CV. (*See* R.0161, n.2.)

Dep. 62–63]; *see* R.0315–0319 [Ernest Page (General Manager) Dep. 79–80]; R.0321–0323 [Baker Affidavit, ¶¶ 4–5].) It was during Mr. Bielss' direct oversight and management of the Texas market that Relators' employees began engaging in illegal marketing practices to identify and convert LoanStar's customer relationships throughout the state of Texas, and continued to do so over several years. (*See, e.g.*, R.0325–0334 [Randy Rainey (General Manager) Dep. 37–44]; R.0335–0342 [Hale Dep. 23–24, 42–44]; R.0343–0348 [Griffin Dep. 129–131].)

As the individual overseeing operations for the state of Texas, Mr. Bielss was aware of reports that Relators' employees were soliciting customers of competitors in parking lots and using DMV databases for marketing purposes. In late 2012, Mr. Bielss was in contact with Ms. McDonald regarding these allegations. (R.0539–0540 [relating a call from Mr. Bielss regarding TitleMax's use of DMV databases].) Mr. Bielss also consulted with Relators' in-house counsel regarding the allegations, and communicated with the legal department regarding Relators' marketing practices before and after LoanStar initiated litigation against Relators. (R.0392–0396 [TitleMax Privilege Log entries TMX0013–0014 (Email from Vin Thomas to Otto Bielss dated November 26, 2012 "for the purpose of facilitating the rendition of legal advice related to correspondence from [LoanStar's in-house counsel]") and TMX0017 (Email from Otto Bielss to Vin Thomas dated November 27, 2012 "for the purpose of

9

facilitating the rendition of legal advice regarding marketing practices")]; R.0395 [TitleMax Privilege Log entries TMX0015; TMX0016].)[6]

Mr. Bielss' knowledge of Relators' illegal marketing conduct is unsurprising. As the Senior Vice President of Operations, Mr. Bielss was involved with Relators' marketing efforts as Relators aggressively expanded operations in the Texas market. Multiple current and former TitleMax employees have testified that Mr. Bielss actively monitored operations in Texas and personally fostered an environment where employees were likely to "engage in improper practices in order to meet the performance goals." (R.0287–0290, ¶ 9; *see generally* R.0322.) On regular conference calls, Mr. Bielss would question regional and district managers regarding their performance, and "berate" them, "even if they met performance metrics, in order to remind them that [they] were all expendable and

---

[6] Mr. Bielss also may have been in contact with other employees regarding the illegal marketing practices. One of Relators' regional managers asserted his Fifth Amendment privilege when questioned about his interactions with Mr. Bielss, including discussion of marketing practices and the use of DMV databases. (R.0576–0590 [James Batterson Dep.].) Mr. Bielss thus presumptively interacted with Mr. Batterson concerning marketing practices and the use of DMV databases. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (allowing adverse presumption because "the [Fifth] Amendment does not preclude the inference where the privilege is claimed by a party to a Civil cause.") (citation omitted); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) ("jury in this civil case was free to draw negative inferences from the Flournoys' repeated invocations of the Fifth Amendment"); TEX. R. EVID. 513(c) (excepting "civil cases" from rule prohibiting adverse inferences).

numbers were king." (R.0322, ¶ 5; R.0289, ¶¶ 7–8.) Mr. Bielss also personally met with Relators' employees throughout the state to discuss the performance of their stores, including having conversations regarding marketing tactics (R.0287–0290, ¶¶ 7–8; R.0377–0384.)

Further, Mr. Bielss' responsibilities as Senior Vice President of Operations necessitated his involvement in and awareness of Relators' employees' day-to-day operations. In this regard, Mr. Bielss maintained and worked out of an office in Dallas, Texas (R.0536); supervised and coordinated with the Divisional Vice President, Linda McDonald, regarding opening new stores and hiring employees (R.0536–0537]); attended training sessions of new hires (R.0359–0362 [Page Dep. 90]; R.0363–0367 [Arturo Guerrero (General Manager) Dep. 27–28]; R.0368–0371 [Gilberto Hernandez (General Manager) Dep. 26]); and sent emails to Relators' employees directing them to maximize resources to grow the business (R.0372–376 [Antonio Amado (General Manager) Dep. 46–47]). There is accordingly no question that Mr. Bielss has unique and superior personal knowledge of relevant facts, and that the District Court properly concluded that Mr. Bielss should be deposed as a fact witness

### III. APPLICABLE STANDARD

Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law. *City of*

*Houston v. Harrison*, 778 S.W.2d 916, 918 (Tex. App.—Houston [14th Dist.] 1989, no writ) (citing *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916 (Tex. 1985)).  A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.  *Id.*  A relator who attacks the ruling of a trial court as an abuse of discretion labors under a heavy burden.  *Id.*  The relator must establish, under the circumstances of the case, that the facts and law permit the trial court to make but one decision.  *Id.*; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) ("The trial court does not abuse its discretion if *some evidence reasonably supports* the trial court's decision.") (emphasis added).  Here, Relators have entirely failed to meet this strict burden.

## IV.   DISCUSSION

### A.    The Apex Deposition Doctrine Does Not Apply To Preclude Discovery From Fact Witnesses Such As Mr. Bielss

The apex deposition doctrine provides an exception to the general rule favoring broad discovery of relevant matters; it protects high-level executive officers from deposition where the officers lack knowledge of relevant facts and were noticed for deposition based upon their corporate positions.  *See Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128–29 (Tex. 1995).  *Cf.* TEX. R. CIV. P. 199.1(a).  Where a party seeks to depose an officer because he has knowledge of a discoverable matter, the apex deposition doctrine does not shield the officer from

12

deposition. *See Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 168 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("First, we note that the 'apex' doctrine does not apply. Appellants do not seek to depose Krugh merely because of his corporate position. Rather they seek to depose him because they allege he has first-hand knowledge of certain facts[.]"); *Simon v. Bridewell*, 950 S.W.2d 439, 442 (Tex. App.—Waco 1997, no writ) ("A corporate officer is not exempt from deposition by the 'apex' doctrine merely because he is a corporate official. Rather, the doctrine may be invoked only when the deponent has been noticed for deposition *because of his corporate position*.") (emphasis added).

Indeed, notwithstanding the "apex" status of a high-level executive officer, the officer may be deposed if: (1) the noticing party has arguably shown that the officer has any unique or superior personal knowledge of discoverable information, or (2) the noticing party has made a good faith effort to obtain discovery through less intrusive methods, there is a reasonable indication that the officer's deposition is calculated to lead to the discovery of admissible evidence, and the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate. *See Crown Cent. Petroleum Corp.*, 904 S.W.2d at 128 (if the party seeking the deposition has "arguably shown that the official has any unique or superior personal knowledge of discoverable information," the trial court should deny a motion for apex

13

protection) (emphasis added); *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 176 (Tex. 2000) (same).

As discussed below, Mr. Bielss has firsthand knowledge of facts relevant to the underlying litigation and LoanStar seeks his deposition for this purpose. Consequently, the District Court properly concluded that the apex deposition does not shield Mr. Bielss from deposition in this case.

**B.      LoanStar Is Entitled To Depose Mr. Bielss Because He Possesses Unique Or Superior Personal Knowledge Of Discoverable Information**

LoanStar noticed the deposition of Mr. Bielss because he possesses knowledge of facts relevant to the claims and defenses in this case, and not because of his current corporate position.  Indeed, Mr. Bielss has sworn that he has actual knowledge of discoverable information.  (*See* R.0186, ¶¶ 3–4 ("I have limited knowledge regarding this information[.]").)  Notwithstanding Mr. Bielss' characterization of his knowledge as "limited," the evidence demonstrates that Mr. Bielss possesses unique or superior personal knowledge of discoverable information about which he can be deposed.  (*See supra* Section II.C.)

Mr. Bielss was the <u>only</u> Senior Vice President of Operations for the Texas market, and was in charge of Relator's operations and marketing strategy throughout Texas.  He occupied a unique role in which he not only monitored all of Relators' operations and marketing efforts across Texas, but also had "direct supervisory authority over the folks that are accused of wrong doing in this case."

14

(R.0476:23–25; *see also supra* Section II.C.) Relators' attempt to misdirect the Court regarding Mr. Bielss' role as the Senior Vice President of Operations and the knowledge he acquired through that position, by directing the Court solely to his new position as the Chief Operating Officer of TMX Finance LLC, is unavailing. (Pet. at 11.) Regardless of his current title, LoanStar is entitled to discover Mr. Bielss' personal knowledge regarding Relators' operations in Texas and his involvement with the aggressive growth strategy that fostered the environment in which the illegal marketing practices arose.[7] (*See supra,* Section II.C.)

Furthermore, although Relators have taken the position that their employees' illegal marketing activities were "not approved by corporate" and only engaged in by a few rogue employees (R.0977; R.1080), LoanStar is entitled to discover evidence proving that the widespread nature of the activity demonstrates otherwise. (*See* R.0593–0595.) LoanStar is similarly entitled to obtain evidence proving that the pattern of Relators' illegal conduct across separate regions throughout the State of Texas—even in stores that are hundreds of miles apart—is not coincidental given that one man controlled marketing for the entire State. Thus, Mr. Bielss'

---

[7] In fact, if LoanStar were only interested in deposing Mr. Bielss because of his status as Chief Operating Officer, LoanStar would not have sought to depose him before he assumed that position. (*Compare* R.400–402 [Emails from TitleMax counsel to LoanStar counsel dated August 16, 2014 regarding Mr. Bielss deposition] *with* R.0280 [reflecting Bielss' executive appointment in October 2014].)

15

involvement in and knowledge of Relators' illegal marketing practices is a matter that LoanStar is entitled to explore through his deposition.

Based on the evidence described herein, the District Court properly rejected Relators' attempts to present a corporate representative in Mr. Bielss' place, observing that LoanStar was seeking Mr. Bielss' deposition "testimony as a fact witness, not as a corporate representative." (R.0479:19–20.) Mr. Bielss' monitoring of Relators' operations and marketing efforts through meetings with regional and district managers across the Texas market, puts him in a unique position to testify about the scope and spread of the illegal conduct in Relators' stores. (R.0322, ¶ 5; R.0287–0290.) As the District Court noted, LoanStar "want[s] to know what went on in those meetings." (R.0481:4–5.)

Mr. Bielss' position as the Senior Vice President of Operations afforded him the opportunity to assess and understand the operations—including marketing activities—of all of Relators' stores in Texas. Thus, unlike the executives in *In re Continental Airlines, Inc.*, 305 S.W.3d 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.), and *In re BP Products North America, Inc.*, No. 01-06-00613-CV, 2006 WL 2192546 (Tex. App.—Houston [1st Dist.] Aug. 4, 2006, orig. proceeding), who did not have any personal knowledge of relevant matters and were noticed for deposition based upon their corporate positions, Mr. Bielss' role as the Senior Vice President of Operations afforded him superior personal

16

knowledge of Relators' operations than any lower-level employees. Accordingly, the District Court properly concluded that Mr. Bielss should be required to testify about these matters.

In an effort to bolster Relators' apex argument and distance himself from his prior responsibilities as the Senior Vice President of Operations, Mr. Bielss executed an Affidavit.[8] The Affidavit is insufficient in the first instance to invoke the "apex" doctrine, however, because through it Mr. Bielss does <u>not</u> "deny any knowledge of relevant facts" or deny that he has "superior knowledge" of Relators' marketing activities across Texas. *In re Alcatel USA, Inc.*, 11 S.W.3d at 175–76. Instead, Mr. Bielss simply attests that he has no "firsthand" personal knowledge of Relators' "marketing or soliciting customers of competitors" or the "day-to-day operations or marketing activities of any TitleMax store in Texas." (R.0186, ¶¶ 2, 3.) Whether Mr. Bielss ever personally marketed to or solicited any customers is inconsequential, (*cf.* Pet. at 11) as Mr. Bielss' knowledge of Relators' operations and marketing efforts is at issue.

---

[8] Mr. Bielss submitted a pro forma affidavit substantially similar to the affidavit submitted by Tracy Young in support of Relators' Motion for Protective Order regarding Mr. Young's deposition. The paragraphs in which both men deny any firsthand knowledge of relevant facts are nearly identical. (*Compare* R.0186, ¶¶ 3–4 [Affidavit of Otto Bielss] *with* R.0501, ¶ 3 [Affidavit of Tracy Young].)

Although Mr. Bielss' Affidavit implies that he has no such knowledge, LoanStar presented evidence to the District Court demonstrating otherwise. (*See supra*, Section II.C [deposition testimony of Relators' employees].) For example, LoanStar presented the deposition testimony of Relators' general manager James Griffin, who testified that he discussed his store's marketing efforts in detail with Mr. Bielss during his visit to the store. (R.0381–0383.) Given the discrepancies between Mr. Bielss' Affidavit and the other evidence presented, LoanStar is entitled to depose Mr. Bielss to discover the actual extent of his personal knowledge so that the jury can evaluate his credibility.

Because Mr. Bielss has unique or superior knowledge of facts relevant to this case, the District Court thus correctly denied Relators' Motion for Protection.

## C. LoanStar Is Also Entitled To Depose Mr. Bielss Because His Deposition Will Lead To The Discovery Of Admissible Evidence For Which Other Discovery Is Insufficient

Additionally, LoanStar is entitled to depose Mr. Bielss because his deposition is likely to lead to the discovery of admissible evidence that other methods of discovery are unsatisfactory, insufficient, or inadequate to obtain. Through the deposition of Mr. Bielss, LoanStar seeks information regarding the scope of his knowledge of and involvement in Relators' marketing practices, and the discrepancies between the testimony of Relators' employees and his Affidavit. The other available methods of discovery are insufficient to address these

18

inquiries. The full details of Mr. Bielss' knowledge could not be obtained through interrogatories, and depositions of other employees would only reflect their personal knowledge.[9] Furthermore, LoanStar already has served requests for production of documents on Relators and issued a subpoena for Mr. Bielss, but has not yet received a document production. Assuming documents are eventually produced, only Mr. Bielss will be able to testify regarding his knowledge and actions taken with respect to the documents. Given that Mr. Bielss' deposition is likely to lead to discovery of admissible evidence, the apex deposition doctrine does not shield him from deposition. Accordingly, the District Court correctly denied Relators' Motion for Protection, and the Court should deny the Petition.

## V.     PRAYER

The District Court did not abuse its discretion by ordering the deposition of Mr. Bielss. The evidence demonstrates that the apex deposition doctrine does not protect Mr. Bielss because he is a fact witness and his current executive position is unrelated to LoanStar's bases for deposing him. Indeed, as the only Senior Vice President of Operations in Texas, Mr. Bielss was personally aware of and had discussions about Relators' illegal marketing conduct, and was responsible for Realtors' aggressive growth strategy in Texas that led to such conduct. LoanStar

---

[9] Additionally, Relators' employees may assert their Fifth Amendment privileges if questioned about their interactions with Mr. Bielss. (*See supra* n.2.)

19

thus may depose Mr. Bielss regarding his knowledge of and involvement in the spread of Realtors' illegal conduct throughout the state. Because the District Court properly exercised its discretion in rejecting Relators' apex deposition argument and denying their Motion, LoanStar respectfully requests that the Court deny Relators' Petition for Writ of Mandamus in its entirety and affirm the decision of the District Court.

Respectfully submitted,

SUTHERLAND ASBILL & BRENNAN LLP

By: _____ */s/ Daniel Johnson* _____
Daniel Johnson (SBN 24046165)
Robert A. Lemus (SBN 24052225)
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

And

WARGO & FRENCH LLP
Sarah F. Powers (CA No. 238184)
(*Pro Hac* Admission Pending)
1888 Century Park E, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6300
Facsimile: (310) 853-6333
E-mail: spowers@wargofrench.com

*Attorneys for Real Parties In Interest*
*Wellshire Financial Services, LLC, d/b/a LoanStar*
*Title Loans, d/b/a MoneyMax Title Loans, and d/b/a*

*LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP*

**<u>CERTIFICATION</u>**

I certify that I have reviewed this petition and have concluded that every factual statement in this response to the petition is supported by competent evidence included in the appendix or record.

*/s/ Daniel Johnson*
Daniel Johnson

21

## CERTIFICATE OF COMPLIANCE

This response contains 4,544 words, excluding the parts exempted by Texas Rule of Appellate Procedure 9.4(i)(1) with regard to other filings.

*/s/ Daniel Johnson*
Daniel Johnson

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the within and foregoing instrument in accordance with the Texas Rules of Appellate Procedure 6.3 and 9.5(b), (d), (e), to all counsel of record on this 18th day of March 2015.

*Via e-filing and/or U.S. Mail*
Roland Garcia, Jr.
L. Bradley Hancock
Mary Olga Lovett
Christopher David Johnsen
GREENBURG TRAURIG, LLP
1000 Louisiana, Suite 1700
Houston, Texas 77002
*(Attorneys for Relators TMX Finance of Texas, Inc.;*
*TitleMax of Texas, Inc.)*

*Via e-filing and/or U.S. Mail*
Geoff Gannaway
Bryon Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010
*(Attorneys for Relator TMX Finance, LLC)*

*/s/ Daniel Johnson*
Daniel Johnson

# APPENDIX

**TAB**

**Real Parties In Interest's Mandamus Record**

Defendants' Motion for Protection From Apex Deposition of
Tracy Young, Exhibit B (R.0498-0501) ....................................................................P

Plaintiffs' Response to Defendant's Motion for Protective Order
Regarding the Deposition of Otto Beilss, Exhibits D and G and
Email from Relators' Counsel Regarding Attorney Eyes Only
Designations of Deposition of Linda McDonald (R.0502-0575) ..............................Q

Deposition of James Batterson and Email from Relators' Counsel
Regarding Attorney Eyes Only Designations of Deposition of
James Batterson (R.0576-0590) ...............................................................................R

Plaintiffs' Omnibus Response to Defendants' Motions for
Protective Order, Discovery Limits, to Compel Disclosure of
Damages Calculations, and Mediation filed July 16, 2014
(R.0591-0740) ..........................................................................................................S

Plaintiffs' Motion to Compel Discovery Responses from
Defendants TMX Finance LLC, TMX Finance of Texas, Inc., and
TitleMax of Texas, Inc. to Requests for Production of
Documents (R.0741-0890) ........................................................................................T

Transcript from Hearing on November 21, 2014 (R.0891-1077) ..............................U

Transcript from Hearing on July 18, 2014 (Excerpt) (R.1078-1081) ........................V

**Cases Cited**

*In re Alcatel USA, Inc.*,
11 S.W.3d 173 (Tex. 2000) ......................................................................................1

*Baxter v. Palmigiano*,
425 U.S. 308 (1976) ..................................................................................................2

*Boales v. Brighton Builders, Inc.*,
29 S.W.3d 159 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ..............................3

*In re BP Products North America, Inc.*,
No. 01-06-00613-CV, 2006 WL 2192546 (Tex. App.—Houston
[1st Dist.] Aug. 4, 2006, orig. proceeding) ................................................................4

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002) ........................................................................................5

*City of Houston v. Harrison*, 778 S.W.2d 916 (Tex. App.—Houston
[14th Dist.] 1989, no writ) ..........................................................................................6

*In re Continental Airlines, Inc.*,
305 S.W.3d 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ............................7

*Crown Cent. Petroleum Corp. v. Garcia*,
904 S.W.2d 125 (Tex. 1995) ......................................................................................8

*Simon v. Bridewell*,
950 S.W.2d 439 (Tex. App.—Waco 1997, no writ) ....................................................9

*Wilz v. Flournoy*,
228 S.W.3d 674 (Tex. 2007) ....................................................................................10

# Tab P

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| | § | |
| Defendants. | § | 152ND JUDICIAL DISTRICT |

## DEFENDANTS' MOTION FOR PROTECTION
## FROM APEX DEPOSITION OF TRACY YOUNG

TO THE HONORABLE ROBERT SCHAFFER:

Defendants TMX Finance of Texas, Inc., TitleMax of Texas, Inc., and TMX Finance LLC ("Defendants" or "TitleMax") file this Motion for Protection from Apex Deposition of Tracy Young and in support thereof would respectfully show the Court as follows.

## I.
## INTRODUCTION

On October 24, 2014, Plaintiffs noticed the deposition of Tracy Young for November 24, 2014. *See* Notice of the Oral and Videotaped Deposition of Tracy Young, attached as **Exhibit A**. Defendants object to presenting Mr. Young for a deposition. He is the CEO of the Defendants, and falls squarely within the definition of an "apex" deponent, because he has not been shown to have the requisite "unique or superior personal knowledge" to justify his

1730.00001/551776.v1 1

0498

# EXHIBIT B

0499

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS, and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| | § | |
| Defendants. | § | 152ND JUDICIAL DISTRICT |

## DECLARATION OF TRACY YOUNG

STATE OF GEORGIA    §

COUNTY OF CHATHAM    §

I, Tracy Young, declare as follows:

1.    My name is Tracy Young. I am over eighteen years of age, and I am fully competent to make this affidavit. Each statement of fact contained in this declaration is within my personal knowledge and is true and correct.

2.    I am the CEO of TMX Finance LLC, TitleMax of Texas, Inc., and TMX Finance of Texas, Inc. The latter two entities have approximately 950 employees and 366 stores in Texas.

1

0500

3.     I do not have any first-hand personal knowledge of relevant facts concerning the subject matter of the above-captioned lawsuit, including facts and allegations relating to: (a) marketing to or soliciting customers of competitors, including Plaintiffs; (b) use of databases in an attempt to locate customers of competitors, including Plaintiffs; (c) soliciting Plaintiffs' customers in parking lots; (d) acquiring VIN or license plate numbers in parking lots; and (e) lists of Plaintiffs' customers. While I have knowledge of some facts relating to some of these issues by reason of my position as CEO, all of those facts were relayed to me in the course of privileged communications by counsel representing the Defendants.

4.     I do not possess any unique or superior personal knowledge regarding the issues set forth in the preceding paragraph beyond that of other of Defendants' personnel.

## JURAT

My name is Tracy Young, my date of birth is __11-7-57__, and my address is __10 Cedar Point Drive Savannah, GA 31405__, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Chatham County, State of Georgia, on the __29th__ day of October, 2014.

_____
Tracy Young, Declarant

2

0501

# Tab Q

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| *Plaintiffs*, | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC., | § | |
| | § | |
| *Defendants*. | § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER REGARDING THE DEPOSITION OF OTTO BIELSS

COME NOW, Plaintiffs Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP, (collectively, "LoanStar") and hereby file this response to Defendants TMX Finance LLC, TMX Finance of Texas, Inc., and TitleMax of Texas, Inc.'s (collectively, "TitleMax") Motion for Protective Order regarding the Deposition of Otto Bielss ("Motion"), and respectfully show the Court as follows:

### I.     INTRODUCTION

TitleMax is improperly asserting the apex deposition doctrine in an attempt to prevent LoanStar from proceeding with the deposition of a TitleMax employee who possesses knowledge of discoverable information—Otto Bielss.  Mr. Bielss served as the Senior Vice

25373482.1

0502

# EXHIBIT D

0503

ATTORNEYS' EYES ONLY

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES, IN THE DISTRICT COURT
LLC., d/b/a LOANSTAR TITLE
LOANS and INTEGRITY TEXAS
FUNDING, LP,

        Plaintiffs,
VS.                                    OF HARRIS COUNTY, TEXAS
TMX FINANCE HOLDINGS, INC.;
TMX FINANCE, LLC.; TMX
FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.;
FELIX DeLEON; and ISHMAEL
HERNANDEZ,

        Defendants.
_____/


                ATTORNEYS' EYES ONLY
        VIDEOTAPE DEPOSITION OF LINDA McDONALD


        TAKEN:    Pursuant to Notice by
                  Counsel for the Plaintiffs
        PLACE:    Hunter MacLean
                  200 E. Saint Julian Street
                  Savannah, GA  31401
        DATE:     Thursday, May 1, 2014
        TIME:     Began:  8:57 a.m.
                  Ended:  12:34 p.m.

        BEFORE:   TRACIE L. THOMPSON, RPR, CRR, CLR
                  Notary Public
                  State of Florida at Large

ATTORNEYS' EYES ONLY

APPEARANCES

For the Plaintiffs:          SARAH F. POWERS, ESQ.
                             CHRISTINA GOEBELSMANN, ESQ.
                             Wargo French
                             1888 Century Park East
                             Suite 1520
                             Los Angeles, CA   90067
                             305-913-8587
                             spowers@wargofrench.com
                             cgoebelsmann@wargofrench.com


For the Defendants:          STEPHEN T. LaBRIOLA, ESQ.
                             Fellows LaBriola, LLP
                             225 Peachtree Street, NE
                             Suite 2300, South Tower
                             Atlanta, GA   30303
                             404-586-9200
                             slabriola@fellab.com

                             VICTORIA H. NEWMAN, ESQ.
                             TMX Finance
                             15 Bull Street
                             Suite 200
                             Savannah, GA   31401
                             912-503-2824
                             victoria.newman@titlemax.com

Also Present:                Diana Gundelfinger,
                             Videographer


                    *  *  *  *  *  *

I-N-D-E-X

WITNESS          DIRECT      CROSS       REDIRECT    RECROSS

LINDA McDONALD

By Ms. Powers          5                       129

By Mr. LaBriola              128

* * * * * *

E-X-H-I-B-I-T-S

DESCRIPTION                                        PAGE

Exhibit 1    Letter dated 5-14-13 ...............88

Exhibit 2    Packet of various documents ........92

Exhibit 3    E-mail chain .....................117

Exhibit 4    Notice of Deposition .............120

* * * * * *

A     Yes.

Q     Okay.   By whom?

A     By TMX Finance of Texas.

Q     Is that TMX Finance of Texas, Inc.?

A     LLC.

Q     And how long were you in that position?

A     I was in that position from March of 2011 until April -- until November 18th, 2013.

Q     And what was your job title there?

A     Divisional vice president.

Q     And what were your duties and responsibilities as divisional vice president?

A     To oversee operations.

Q     Okay.   And in that position, were you overseeing the operations of TitleMax stores?

A     Yes.

Q     Okay.   How many stores?

A     It fluctuated throughout my tenure, but when I left, when I resumed new responsibilities in November; approximately 230 in Texas.

Q     And all of the stores were in Texas?

A     Yes.

Q     Were you responsible for all of the stores in Texas?

A     Yes.

Q    And during the entire time that you were employed as a divisional vice president of TMX Finance of Texas, were you responsible for all of the stores in Texas?

A    Yes.

Q    And you said that the number of stores varied.  Approximately how many stores were there when you started in that position?

A    Two.

Q    And during the tenure of your time as a divisional vice president of TMX Finance of Texas, you've stated your duties and responsibilities were to oversee operations, but can you define that a little bit further and give me an idea of what that means?

A    To oversee operations is to oversee staffing.  So staffing, hiring, training and profit and loss duties.

Q    Okay.  And what did your profit and loss duties entail?

A    Performance management.

Q    Were you responsible for marketing in any way?

A    Yes, for training of marketing, yes.

Q    Before March of 2011, were you employed by

before, left and went to CheckSmart and then came back and were a regional manager again?

A    Correct.

Q    How long were you a regional manager in that time before CheckSmart?

A    I was hired -- January of 2007 was my official hire date.

Q    Okay.  And prior to January '07, did you work for any of the TitleMax entities?

A    No.

Q    As a regional manager from that time, January '07 through April '09, was that in Georgia?

A    I started in Georgia and trained in Georgia for approximately three months and then I moved to Columbia, South Carolina and I was a regional manager for CheckMax, which was our company's payday loan division.

Q    Why did you leave TitleMax to go to CheckSmart for that brief period of time?

A    Our company went through a bankruptcy and I was laid off.

Q    Today I'm going to focus on the time in which you were a divisional vice president for TMX Finance of Texas, LLC, during that period of time from March 2011 through November 2013, who did you

report to during that time?

A    Otto Biells.

Q    Who is Mr. Biells?

A    Senior vice president.

Q    Of TMX Finance of Texas?

A    Correct.

MR. LaBRIOLA:  You probably want a spelling for his last name.  It's unusual.

BY MS. POWERS:

Q    Yes.  How do you Biells?

A    B-I-E-L-L-S.

Q    B-E-I-E --

A    B-I-E-L-L-S.

Q    B-I-E-L-L-S, okay.

A    I had to think of it for a second.

Q    Now we've been discussing TMX Finance of Texas, LLC, is there also a TMX of Texas, Inc.?

A    Yes.

Q    How are the two different, if you know?

A    They're two different business entities.

Q    What is the difference between the two's operations?

A    The difference, I'm not sure I understand.

Q    What do they do differently, if anything?

A    They do the same, it's just a different

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs | *<br>* |
| VS. | * HARRIS COUNTY, TEXAS<br>* |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>*<br>* |
| Defendants | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD TODD HALE

MAY 15, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD TODD HALE, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 15th of MAY, 2014 from 9:06 a.m. to 2:50 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Sutherland Asbill & Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis

County, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

> Sarah F. Powers, Attorney at Law
>      -and-
> Christina Goebelsmann, Attorney at Law
> WARGO FRENCH
> 1888 Century Park East, Suite 1520
> Los Angeles, California 90067
> (305) 913-8587
> spowers@wargofrench.com

FOR THE DEFENDANTS:

> Geoff Gannaway, Esq.
> BECK REDDEN, LLP
> 1221 McKinney, Suite 4500
> Houston, Texas 77030
> (713) 951-6263
> ggannaway@beckredden.com

ALSO PRESENT:

> Cody Hall, Videographer

two documents in there that are e-mails that were sent -- well, it was a conversation between myself and. Mr. Sudduth regarding marketing specifically with what this case I think is involved in, which has to do marketing using public databases. Okay. And in those e-mails, one of them -- And I'm paraphrasing. I don't know it off the top of my head. But we have the e-mail, so we can demonstrate it. Mr. Sudduth -- Mr. Sudduth -- well, let me go back -- let me -- Can I go back? Let me go back to this because to answer to your question ties in with -- with the chronological stuff here.

Q. Absolutely. Please continue.

MR. GANNAWAY: Object to form.

A. Do you remember -- Going back to where he says let's explore different types of marketing, after this audit when the store was not meeting goals and I just got there is when Mr. Sudduth had a conversation with me and said, Todd, you're going to have to start doing more buyouts. That's the way all of the successful stores are -- are getting it done. You're going to have to -- you're going to have to do more buyouts.

And there was an extreme amount of pressure. And it was very apparent that -- you know, it was -- it was you're going to have to do this or else. I mean, it was that type of conversation. And it was

during that when I was like, okay.

Again, also keep in mind, I'd never worked in the title loan industry before. I've never worked for another title loan company. So I know really nothing about how it worked, the laws, statutes that regulate it. Everything I did learn about it, I learned from the vantage point of TitleMax or what TitleMax believed was right and what should be done.

It was during that conversation that Mr. Sudduth instructed me to -- about the Public Database and to -- to use the -- how to use the Public Database and to be able to look up information on that to be able to market specifically and target potential customers -- clients that already had an existing title loan.

Q. Okay. Now, let me --

MR. GANNAWAY: Okay. I'm going to object to the responsiveness before your next question.

Q. Let me stop you there for just a second. When was it that Mr. Sudduth first introduced to you the concept of using a database to look up customers that had title loans with TitleMax's competitors?

MR. GANNAWAY: Object to form.

A. I don't remember the exact date. I know it was roughly around -- it was -- after -- right roughly after this. So Sept -- late September, 2012.

NO. 2013-33584

| WELLSHIRE FINANCIAL SERVICES, | * IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE | * |
| LOANS and INTEGRITY TEXAS | * |
| FUNDING, LP | * |
| | * |
| VS. | * HARRIS COUNTY, TEXAS |
| | * |
| TMX FINANCE HOLDINGS, INC.; | * |
| TMX FINANCE, LLC; TMX FINANCE | * |
| OF TEXAS, INC.; TITLEMAX OF | * |
| TEXAS, INC.; FELIX DELEON; | * |
| AND ISHMAEL HERNANDEZ | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES ARTHUR GRIFFIN

MAY 23, 2014

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JAMES ARTHUR GRIFFIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 9:08 a.m. to 2:09 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:

          MS. CHRISTINA GOEBELSMANN
          MS. SARAH F. POWERS
          WARGO FRENCH
          1888 Century Park East, Suite 1520
          Los Angeles, California  90067
          310-853-6807/310-853-6859 (fax)
          cgoebelsmann@wargofrench.com
          spowers@wargofrench.com

FOR THE DEFENDANTS:

          MR. GEOFF GANNAWAY
          BECK REDDEN
          1221 McKinney Street, Suite 4500
          Houston, Texas  77010
          713-951-6263/713-951-3720 (fax)
          ggannaway@beckredden.com
          --and--
          MS. VICTORIA NEWMAN (Via Telephone)
          TMX FINANCE
          15 Bull Street, Suite 200
          Savannah, Georgia  31401
          912-503-2824/912-629-1538 (fax)
          victoria.newman@titlemax.biz

ALSO PRESENT:
          Mr. Manuel Martin, Videographer

INDEX

PAGE

Appearances....................................  2

JAMES ARTHUR GRIFFIN
      Examination by Ms. Goebelsmann.............  6
      Examination by Mr. Gannaway................ 190
      Further Examination by Ms. Goebelsmann...... 214
      Further Examination by Mr. Gannaway........ 217
      Further Examination by Ms. Goebelsmann...... 217
Changes and Corrections........................ 219
Signature...................................... 220
Reporter's Certificate......................... 221

EXHIBITS

NO. DESCRIPTION                    PAGE/LINE REFERENCED

Exhibit 1.....................................  7/2
      Notice of the Oral and Videotaped
      Deposition of James A. Griffin and Subpoena
      Duces Tecum
Exhibit 2..................................... 56/9
      Lists of names with loans

Exhibit 3..................................... 99/9
      E-mails dated September 15, 2012, with
      attachment

Exhibit 4..................................... 133/22
      E-mails dated November 27, 2012
Exhibit 5..................................... 145/5
      E-mails dated October 20, 2012, with
      attachments

over the "so many extra," but I don't remember the exact number. As I remember it, the account would actually shut down and you weren't allowed to do anything until the new month rolled around, as I remember it.

Q. Did you record any of the buyouts that you performed of LoanStar loans?

A. There may have been notations on the marketing sheet just because there's a lot of pressure or emphasis being put on that and I wanted to be able to talk to whoever came in and asked me how it was going. I've sent out X number of letters and I've got this many responses back. It may have been notated on the marketing sheets, but it was nothing formal.

Q. And those were the sheets contained in the marketing binder?

A. Correct.

Q. Would any of the general records maintained by TitleMax reflect the buyouts made to LoanStar?

MR. GANNAWAY: Object to form.

THE WITNESS: Based upon the record keeping that was in place when I was there I would say yes.

Q. (By Ms. Goebelsmann) And why is that?

A. Well, as you see in this e-mail, we

A.   No, I don't think so.

Q.   Do you know if any other stores in Texas had similar gentleman's agreements?

A.   I don't know for sure.

Q.   Did you make any other requests for lists based upon zip codes similar to the e-mail that's in Exhibit 4?

MR. GANNAWAY:   Object to form.

THE WITNESS:   Because I had heard that Felix had a second list, which was more of a list from the one that Patrick had dropped off to me, yes, I did go to Felix and ask him for -- for my zip codes.

Q.   (By Ms. Goebelsmann)   Did anyone come to you asking you for a zip code list?

A.   HR and I may have talked about it.   Actually I think I did give HR some zip codes from the first list that Patrick gave me.

Q.   And why is that?

A.   Because HR and I were so close in proximity. I think there was less than a mile between our two stores.   There's an incredible amount of pressure to get loans and an incredible amount of pressure to -- to market to get the loans.   As I said, the belief at TitleMax is that if you're not getting loans it's not because of anything other than poor marketing.

MR. GANNAWAY: Object to the responsiveness.

Q. (By Ms. Goebelsmann) Did you ever search the DMV databases using the names of lenders?

A. No.

Q. Did you come up with any other marketing practices in order to increase your loan volume?

A. Of course, we had banners that we would hang on the side of our trucks or on our windows that advertised no-interest loans, and we would park at an angle next to the street. Just anything to visually try to get a customer's -- a potential customer's attention as they came through.

Q. And why did you come up with those additional marketing practices?

A. As I mentioned earlier, there's an incredible amount of pressure. We were, for the most part -- I mentioned that Todd and I had a bit of a disagreement over marketing boundaries, but for the most part we were a pretty close-knit group. And if one guy said, man, I'm kind of feeling some pressure here, you know, we would kind of brainstorm and come up with different ideas to try to get people's attention. So these are ideas that were shared amongst us.

Q. Were those marketing ideas that you came up

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | ) ) ) ) ) | IN THE DISTRICT COURT |
| Plaintiffs, | ) ) | |
| vs. | ) ) | OF HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | ) ) ) ) ) ) ) | |
| Defendants. | ) | 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL VIDEOTAPED DEPOSITION

JOSHUA HADDEN

June 18th, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL VIDEOTAPED DEPOSITION OF JOSHUA HADDEN, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on June 18th, 2013, from 10:03 a.m. to 1:07 p.m., before Margaret Raiford, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Sutherland Asbill & Brennan; 600 Congress Ave., Suite

2000; Austin, TX 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFFS:
     Mr. Joseph D. Wargo
     Wargo French
     999 Peachtree St., NE
     26th Floor
     Atlanta, Georgia 30309
     Telephone: 404.853.1500
     Fax:   404.853.1506
     E-mail: jwargo@wargofrench.com

FOR CORPORATE DEFENDANTS:
     Mr. David J. Beck
     Beck Redden
     1221 McKinney St., Suite 4500
     Houston, TX 77010
     Telephone: 713.951.6209
     Fax:   713.951.3720
     E-mail: dbeck@beckredden.com

FOR CORPORATE DEFENDANTS:
     Mr. Bryon A. Rice
     Beck Redden
     1221 McKinney St., Suite 4500
     Houston, TX 77010
     Telephone: 713.951.6256
     Fax:   713.951.3720
     E-mail: brice@beckredden.com

FOR CORPORATE DEFENDANTS, TMX FINANCE OF TEXAS, INC.,
AND TITLEMAX OF TEXAS, INC.:
     Mr. Stephen T. LaBriola
     Fellows LaBriola
     Suite 2300, South Tower
     225 Peachtree Street, NE
     Atlanta, Georgia 30303
     Telephone: 404.586.9200
     Fax:   404.529.4028
     E-mail: slabriola@fellab.com

to you whether that customer came through the process that you've identified here today?

A.   Yes.

Q.   And did it?

A.   Yes.

Q.   Did you ever express to anyone any discomfort you had with the -- this process?

A.   Are you talking about during the -- when -- when we were doing them?

Q.   What -- yes, sir.

A.   No.

Q.   Okay.  What about upon your departure or close to when you -- when you were deciding to leave, did you ever tell anyone internally that you had some kind of discomfort with this process?

A.   I did send out an e-mail when I resigned -- the day that I resigned kind of explaining some of my frustrations with TitleMax, and the buyout letter process was -- was one of those.  How, you know, we were instructed to do something that was, you know, unethical and possibly illegal, and that it was one of the few things that was actually working and with all the pressure, you know, of the new loans, we finally found something that was working and then we were told to stop; so, there was a lot of frustration there.  So,

yeah, I mean, I guess I kind of expressed my frustration on that to the Austin region and to Linda McDonald.

Q. Who is Linda McDonald?

A. She is the divisional president. She's over, like, all of Texas and possibly some other areas.

Q. You used the words "unethical" and "illegal." Was it your belief at that time that you just testified about that this process was unethical or illegal?

A. At that time, yes.

Q. And -- and what -- what gave you that belief?

A. Just the fact that there was a lawsuit, you know, regarding it.

Q. Okay. Earlier you testified that -- and I'm -- I just want to get you back to that testimony, something about not telling people when they showed up in town or something like that?

A. Yes.

Q. That's not exactly what you said, but do you remember what you said?

A. Yes. There --

Q. What were you referring to there?

A. -- there -- there was a time, I believe it was probably sometime in February, where we got a phone call from the store manager on the Riverside store; they called him Rad -- I think his name was Rademez or

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP | * IN THE DISTRICT COURT<br>*<br>*<br>* |
| | * |
| VS. | * HARRIS COUNTY, TEXAS |
| | * |
| TMX FINANCE HOLDINGS, INC.;<br>TMX FINANCE, LLC; TMX FINANCE<br>OF TEXAS, INC.; TITLEMAX OF<br>TEXAS, INC.; FELIX DELEON;<br>AND ISHMAEL HERNANDEZ | *<br>*<br>*<br>*<br>* 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

ERNEST PAGE

MAY 23, 2014

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF ERNEST PAGE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 3:38 p.m. to 6:17 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:

MS. CHRISTINA GOEBELSMANN
MS. SARAH F. POWERS
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California  90067
310-853-6807/310-853-6859 (fax)
cgoebelsmann@wargofrench.com
spowers@wargofrench.com

FOR THE DEFENDANTS:

MR. GEOFF GANNAWAY
BECK REDDEN
1221 McKinney Street, Suite 4500
Houston, Texas  77010
713-951-6263/713-951-3720 (fax)
ggannaway@beckredden.com

ALSO PRESENT:

Mr. Manuel Martin, Videographer

INDEX

PAGE

Appearances....................................   2

ERNEST PAGE

Examination by Ms. Powers...................   4

Examination by Mr. Gannaway................ 102

Further Examination by Ms. Powers.......... 112

Reporter's Certificate....................... 119

EXHIBITS

NO. DESCRIPTION                    PAGE/LINE REFERENCED

Exhibit 1....................................   5/25

First Amended Notice of the Oral and

Videotaped Deposition of Ernest Page and

Subpoena Duces Tecum

Exhibit 2....................................  36/8

E-mails dated September 15, 2012

Exhibit 3....................................  56/12

E-mails dated October 20, 2012, with

attachment

Exhibit 4....................................  66/20

E-mails dated September 15, 2012, with

attachment

had three different regionals that were all also basically in training.

Q. And who was there from corporate during your training in Dallas?

A. I couldn't tell you the names. I mean, I couldn't.

Q. Were there written materials involved in your training?

A. Yes.

Q. And did you take those written materials with you when you went to your store?

A. Yes.

Q. Where were those materials kept?

A. Actually those were kept -- some of it was kept at the store, and a lot of it was training stuff, just at my house. I'd keep it in my home.

Q. Do you still have any of those materials --

A. No.

Q. -- at your home?

A. Not at all.

Q. And you said you spent a week training in Savannah, correct?

A. Yes, ma'am.

Q. What occurred there?

A. That's more of a -- that training -- you're

basically done with the rest of the training. That's more of -- it's -- 99 percent is how to sell. It's -- they weed you out. They're very aggressive about -- you can go three months of training and get terminated in that one week if you're not -- if you're not really gung ho, if you're not real fiery. They don't want real mellow people. They don't want subdued people.

If -- they put you in scenario after scenario after scenario day in and day out. It's like your apt in front of everybody else and they're grading you. It's eight hours every day of -- of hanging from chandeliers and standing and dancing. I mean, that's what we used to call it because that's what they want to see.

I mean, I -- we started -- in my class when I was there from all over the United States there was probably 27 of us. Like 21, 22 made it. We lost about five, six maybe -- I couldn't tell you exact number -- just because they weren't -- they weren't excited enough. They weren't fired up enough. And that was basically -- that week was -- it wasn't training you on anything else other than just have a lot of get-up-and-go.

Q. Did that week include role-playing?

A. There was a lot of role-playing.

# EXHIBIT G

Page 1

ATTORNEYS' EYES ONLY

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES,     IN THE DISTRICT COURT
LLC., d/b/a LOANSTAR TITLE
LOANS and INTEGRITY TEXAS
FUNDING, LP,

    Plaintiffs,

VS.         OF HARRIS COUNTY, TEXAS

TMX FINANCE HOLDINGS, INC.;
TMX FINANCE, LLC.; TMX
FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.;
FELIX DeLEON; and ISHMAEL
HERNANDEZ,

    Defendants.

_____/

ATTORNEYS' EYES ONLY

VIDEOTAPE DEPOSITION OF LINDA McDONALD

TAKEN:     Pursuant to Notice by
           Counsel for the Plaintiffs

PLACE:     Hunter MacLean
           200 E. Saint Julian Street
           Savannah, GA  31401

DATE:      Thursday, May 1, 2014

TIME:      Began:  8:57 a.m.
           Ended:  12:34 p.m.

BEFORE:    TRACIE L. THOMPSON, RPR, CRR, CLR
           Notary Public
           State of Florida at Large

ATTORNEYS' EYES ONLY

APPEARANCES

For the Plaintiffs:      SARAH F. POWERS, ESQ.
CHRISTINA GOEBELSMANN, ESQ.
Wargo French
1888 Century Park East
Suite 1520
Los Angeles, CA  90067
305-913-8587
spowers@wargofrench.com
cgoebelsmann@wargofrench.com

For the Defendants:     STEPHEN T. LaBRIOLA, ESQ.
Fellows LaBriola, LLP
225 Peachtree Street, NE
Suite 2300, South Tower
Atlanta, GA  30303
404-586-9200
slabriola@fellab.com

VICTORIA H. NEWMAN, ESQ.
TMX Finance
15 Bull Street
Suite 200
Savannah, GA  31401
912-503-2824
victoria.newman@titlemax.com

Also Present:     Diana Gundelfinger,
Videographer

* * * * * *

I-N-D-E-X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LINDA McDONALD | | | | |
| By Ms. Powers | 5 | | 129 | |
| By Mr. LaBriola | | 128 | | |

\* \* \* \* \* \*

E-X-H-I-B-I-T-S

DESCRIPTION                                      PAGE

Exhibit 1    Letter dated 5-14-13 ...............88

Exhibit 2    Packet of various documents ........92

Exhibit 3    E-mail chain ......................117

Exhibit 4    Notice of Deposition .............120

\* \* \* \* \* \*

frequently, because I oversaw 250 stores, but if I was going to visit a region, a particular region, I might pick three of the underperforming stores to visit, versus, you know, out of five stores, and visit two top performing stores. I always mixed it up, but in 250 stores, you can only see every store possibly once a year.

Q    During this time period that we're discussing did either TMX Finance of Texas, Inc. or TitleMax of Texas, Inc. have a central corporate office?

A    Our company has two corporate offices. One in Dallas and one in Savannah.

Q    Are those offices also stores?

A    No.

Q    And if you know, who works out of the Dallas office that you've just described?

MR. LaBRIOLA:  Can you put a time frame on that?

BY MS. POWERS:

Q    Yes.  During the time period from March 2011 through November '13, and if it changed during that time period, please let me know.

A    Otto Biells officed out of the Dallas office, the corporate office, but he also officed out

an ASM, an SM and a GM?

A    Yes.

Q    Are those larger stores?

A    Yes.

Q    And then they have CSRs under them; is that correct?

A    Yes.

Q    What's the maximum number of CSRs that any of your stores had during that time period?

MR. LaBRIOLA:  Objection as to form.

THE WITNESS:  If you're speaking about the highest volume store that we had, I'm guessing, to be honest --

BY MS. POWERS:

Q    Yeah, don't guess.

A    I can give you a range of five to seven.

Q    Okay.

A    But again, I'm not 100 percent sure.

Q    Okay.  Did you ever discuss your marketing strategies with Otto Biells?

A    No.

Q    When did you speak with Otto Biells, and I believe you've testified that was on a weekly basis, correct?

A    Approximately.

Q     Okay.

A     There were weeks that I didn't talk to him, but in general, I spoke to him once a week.

Q     Okay.  When you did speak to him, what did you discuss?

A     Our business, operations.

Q     And was it just you reporting what you were doing?

A     Not necessarily.  Just talking about the business, discussing the regional managers, their performance, their leadership opportunities.  Sometimes it would be about opening markets, that we were opening stores and planning on staffing.

Q     And did Otto Biells ever give you any sort of instruction?

A     Yes.

Q     And what did he instruct you on?

A     He would instruct me on hiring people, how many people we needed to hire.

Q     Anything else?

A     I'm trying to think.  I can't think of anything else really, what he would instruct me on.

Q     During the time period that we've been discussing, the March 2011 to November 2013, did you ever speak with Tracy Young?

it's not an ethical practice. So our president has encouraged us to make sure that's not happening. So I haven't heard of it happening. I've been coached not to allow it to happen.

BY MS. POWERS:

Q    Okay. Did you ever hear of any TitleMax employee doing that practice prior to November 2011?

A    No.

Q    And do you know which employee or employees were accused of doing that in November of 2011?

A    No, I don't.

Q    Do you know which region or store was involved?

A    No.

Q    After November 2011, did you ever hear of this practice occurring?

A    After 2011, the following year in November I received a call from my supervisor saying that allegations were made, that we were -- that an employee was going to a parking lot of a competitor.

Q    Was your supervisor who called you Otto Biells?

A    Yes.

Q    And do you know who the employee or employees involved were?

A    No.

Q    What did you do in response to that November 2012 call?

A    In 2012 there was also another allegation that we were using or an employee was using a DMV database search and he asked me to call individually each regional manager and make sure, first, to find out if it was occurring, that it needed to be reported back.

Second, to make sure our -- each employee understood that we don't condone that. It's not allowed. It's against policy, and to make sure to reiterate that.

Q    And did you call each regional manager individually?

A    I did call each regional manager individually. I did discuss with them that it was not allowed. It was a violation of policy and that they needed to check with their district managers and make sure they understood the policy, also make sure and ask them if they were aware of either of these practices happening. The district managers were then instructed to call each general manager and communicate the same thing and then it needed to be communicated back to me if anybody was aware of it

happening and that everybody had been reminded of the policies and the proper practices. And that's what happened.

Q    And when you made these calls to the regional managers, did that also occur in November 2012?

A    Yes.

Q    And when you made these calls, were you able to reach all of your regional managers?

A    I was.

Q    And did any of them say anything to you about that practice occurring?

A    No.

Q    And did you ever receive a report back from anyone about that practice occurring?

A    No.

Q    In the November 2011 incident, did you ever hear about the DMV database being utilized?

A    I'm sorry, say that again.

Q    You mentioned that in November 2012 there was an additional allegation that the DMV database had been searched, correct?

A    Correct.

Q    Was that also an issue in November 2011?

A    No.

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES,  * IN THE DISTRICT COURT

LLC, d/b/a LOANSTAR TITLE  *

LOANS and INTEGRITY TEXAS  *

FUNDING, LP  *

  *

VS.  * HARRIS COUNTY, TEXAS

  *

TMX FINANCE HOLDINGS, INC.;  *

TMX FINANCE, LLC; TMX FINANCE *

OF TEXAS, INC.; TITLEMAX OF  *

TEXAS, INC.; FELIX DELEON;  *

AND ISHMAEL HERNANDEZ  * 152ND JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

ERNEST PAGE

MAY 23, 2014

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF ERNEST PAGE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 3:38 p.m. to 6:17 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:

> MS. CHRISTINA GOEBELSMANN
> MS. SARAH F. POWERS
> WARGO FRENCH
> 1888 Century Park East, Suite 1520
> Los Angeles, California 90067
> 310-853-6807/310-853-6859 (fax)
> cgoebelsmann@wargofrench.com
> spowers@wargofrench.com

FOR THE DEFENDANTS:

> MR. GEOFF GANNAWAY
> BECK REDDEN
> 1221 McKinney Street, Suite 4500
> Houston, Texas 77010
> 713-951-6263/713-951-3720 (fax)
> ggannaway@beckredden.com

ALSO PRESENT:

> Mr. Manuel Martin, Videographer

INDEX

PAGE

Appearances................................... 2

ERNEST PAGE
    Examination by Ms. Powers................... 4
    Examination by Mr. Gannaway................ 102
    Further Examination by Ms. Powers.......... 112
Reporter's Certificate........................ 119

EXHIBITS

NO. DESCRIPTION                      PAGE/LINE REFERENCED
Exhibit 1.................................... 5/25
    First Amended Notice of the Oral and
    Videotaped Deposition of Ernest Page and
    Subpoena Duces Tecum

Exhibit 2.................................... 36/8
    E-mails dated September 15, 2012
Exhibit 3.................................... 56/12
    E-mails dated October 20, 2012, with
    attachment
Exhibit 4.................................... 66/20
    E-mails dated September 15, 2012, with
    attachment

Q. And did you ever speak with Mr. Bielss?

A. No. He spoke to us. He went up there and gave a little pep talk and how he started, gave us his history and all.

Q. Did you personally have any conversations with Mr. Bielss?

A. No, ma'am.

Q. Okay. Did you meet Tracy Young?

A. The name sounds familiar.

Q. Do you recall any conversations with Tracy Young?

A. Maybe during training, yeah. I mean, just again, there was a lot of them up there talking to us and giving us information and this is what we're going to do today, this is the role-play we're going to do. Other than that --

Q. Do you recall any specifics conversations you may have had with Tracy Young?

A. No, ma'am.

Q. Did anyone ever tell you about conversations they had with Otto Bielss?

MR. GANNAWAY: Object to form.

THE WITNESS: Not that I'm aware of.

Q. (By Ms. Powers) Did anyone ever tell you about any conversations they had with Tracy Young?

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>* |
| Plaintiffs | * |
| VS. | * HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>* |
| Defendants | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

ARTURO R. GUERRERO

JUNE 4, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF ARTURO R. GUERRERO, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 4th of JUNE, 2014 from 2:37 p.m. to 5:47 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Beck Redden, 515 Congress Avenue, Suite 1750, Austin, Travis County,

Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES


FOR THE PLAINTIFFS:

        Sarah F. Powers, Attorney at Law
                -and-
        Christina Goebelsmann, Attorney at Law
        WARGO FRENCH
        1888 Century Park East, Suite 1520
        Los Angeles, California 90067
        (305) 913-8587
        spowers@wargofrench.com
        cgoebelsmann@wargofrench.com



FOR THE DEFENDANTS:

        Bryon Rice, Esq.
                -and-
        Geoff Gannaway, Esq.
        BECK REDDEN, LLP
        1221 McKinney, Suite 4500
        Houston, Texas 77030
        (713) 951-6263
        ggannaway@beckredden.com



ALSO PRESENT:

        Jeremy Garrett, Videographer
        Victoria Newman, Attorney at Law
        (Present Telephonically)

name?

A.    I don't, to be honest with you.  I really don't remember who they were.

Q.    While you were training in Savannah, did you meet anyone from corporate?

A.    I did.  I met Otto Bielss (pronouncing Bliss) and Tracy Young.

Q.    And what context did you meet Otto I think, is it, Biells?

A.    No.  It's Otto -- It may be Otto Bielss.  Otto -- I thought it was Otto Bielss (pronouncing Bliss.)  I'm not sure.

Q.    Okay.  We'll call him -- we'll call him Otto.

A.    Mr. Otto.  I mean, the first day of our training, they get up, introduce themselves and, you know, welcomed us, you know, to the -- to the training.

Q.    Okay.  And that was both Otto and Tracy Young?

A.    Yes, ma'am.

Q.    Did you have any conversations with Otto or Tracy Young?

A.    Separately, no, ma'am.

Q.    So other than the occasion that you've described where they got up and introduced themselves, did you have any other contact with Otto or Tracy Young during your training?

A.    During my training, no, ma'am.

Q.    Did you have any contact with Otto or Tracy Young at any other point?

A.    I haven't had any contact with Tracy Young. Otto has been to this area -- to the Austin area visiting stores.

Q.    Okay.    And has Otto ever visited your store?

A.    Yes, ma'am, he visited my store at 8505 Springdale Road.

Q.    What number is that?

A.    23.

Q.    And when he visited, was anyone else with him?

A.    It was him, my D.M. at the time, Mike Ryan, our R.M. at the time -- Oh, what was his name.    I can't remember his name.    I only met him, like, twice.    He was out of Houston.    I don't remember his name.    And Linda McDonald was with him.

Q.    Was the regional manager who was there Darren Lewis?

MR. RICE:    Object to form.

A.    I'm not quite sure of his name.    I don't remember.

Q.    It was a man?

A.    Yeah, it was man.

Q.    Could you describe to me what he looks like?

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs | *<br>* |
| VS. | * HARRIS COUNTY, TEXAS<br>* |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>* |
| Defendants | * 152ND JUDICIAL DISTRICT |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

GILBERTO HERNANDEZ

JUNE 4, 2014

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF GILBERTO HERNANDEZ, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 4th of JUNE, 2014 from 9:04 a.m. to 1:57 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Beck Redden, 515 Congress Avenue, Suite 1750, Austin, Travis County,

Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

                    A P P E A R A N C E S


FOR THE PLAINTIFFS:

        Sarah F. Powers, Attorney at Law
              -and-
        Christina Goebelsmann, Attorney at Law
        WARGO FRENCH
        1888 Century Park East, Suite 1520
        Los Angeles, California 90067
        (305) 913-8587
        spowers@wargofrench.com
        cgoebelsmann@wargofrench.com



FOR THE DEFENDANTS:

        Bryon Rice, Esq.
              -and-
        Geoff Gannaway, Esq.
        BECK REDDEN, LLP
        1221 McKinney, Suite 4500
        Houston, Texas 77030
        (713) 951-6263
        ggannaway@beckredden.com



ALSO PRESENT:

        Jeremy Garrett, Videographer
        Victoria Newman, Attorney at Law
        (Present Telephonically)

yes, a lady.

Q. Could one of the trainers been named Jill Johns?

A. I don't remember.

Q. Could one of the male trainers been named Kevin Hart?

A. Don't remember.

Q. Could one of the male trainers have been named Kevin Long?

A. Don't remember.

Q. Could one of the male trainers have been named Otto Bielss?

A. Otto Bielss wasn't a trainer.

Q. Who was Otto Bielss?

A. He is I think the C.E.O. for part of the company.

Q. Was he present for your training while you were there in Savannah in April of 2012?

A. He just came in once.

Q. And what did he do while he was there at training?

A. A short speech for 15 minutes.

Q. Did you have the opportunity to speak with him?

A. Not one on one.

Q. Do you know if anyone had the opportunity to

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP,<br><br>          Plaintiffs,<br><br>vs.<br><br>TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC.,<br><br>          Defendants. | IN THE DISTRICT COURT<br><br><br><br><br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br><br><br><br>152ND JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
VIDEOTAPED ORAL DEPOSITION OF
ANTONIO AMADO
July 9, 2014
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          THE VIDEOTAPED ORAL DEPOSITION of ANTONIO AMADO, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 9th day of July, 2014, from 8:23 a.m. to 10:23 a.m., before RACHELLE K. YOUNG, RPR, CRR, Certified Shorthand Reporter in and

for the State of Texas, reported by stenographic and computer-aided transcription, in the offices of Kim Tindall & Associates, 645 Lockhill Selma, Suite 200, San Antonio, Texas 78216, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.


                          APPEARANCES

FOR THE PLAINTIFF(S):

     Ms. Sarah F. Powers
     WARGO & FRENCH
     1888 Century Park East
     Suite 1520
     Los Angeles, California   90067
     (310) 913-8587
     Spowers@wargofrench.com


FOR THE DEFENDANT(S):


     Mr. Bryon A. Rice
     BECK REDDEN, LLP
     1221 McKinney Street
     Suite 4500
     Houston, Texas   77010
     (713) 951-3700
     Brice@beckredden.com



ALSO PRESENT:

     Louis Soucie, Videographer

INDEX

WITNESS                                                    PAGE

ANTONIO AMADO

Appearances                                         2
Examination by Ms. Powers                           5
Examination by Mr. Rice                            72
Further Examination by Ms. Powers                  91
Reporter's Certification                           95

EXHIBITS

Deposition
Exhibits                    Description                     Page

Exhibit 1      Subpoena Duces Tecum                         6

remembered.

Q. Did you ever receive any communication from Tracy Young regarding marketing or how to market?

A. No. That type of correspondence would come from our vice president of operations, Otto Biells, and they were more generalized e-mails. They weren't directives. Those were more communicated through our district and regional managers.

Q. When you say "they were more generalized e-mails," what do you mean?

A. We needed to increase marketing, the company exposure in certain cities, maximizing, you know, your -- the resources that were made available to us, but not specifics.

Q. When you say maximizing resources available to us, what do you mean?

A. Using the fliers, we had -- we had a company that would fax us leads, EZ -- EZ Money. EZ Money, I think. EZ Money would fax us a lead and/or -- because we did no cold calling. All of our leads were either walk-ins from marketing tactics that we had utilized and/or leads that we were provided by our headquarters, who had called the 800 number or gone online, and/or EZ Money, or EZ Loan would send us an e-mail followed by a fax, where we would have to call an 888 number

with a reference number. And once we provided that, they would give us the name, telephone number, year, make, and model of the vehicle, and the loan that they were interested, amount, and we would, in turn, contact that customer and solicit them.

Q. And do you know where those leads came from?

A. I do not. EZ Loan, EZ Money.

Q. Do you -- but do you know where EZ Loan or EZ Money got the leads?

A. No, ma'am.

Q. Okay. Did you ever discuss marketing or marketing practices with Otto Biells?

A. No, ma'am.

Q. How many e-mails did you receive from Otto Biells during your time as TitleMax regarding -- at TitleMax regarding marketing?

A. Two, maybe.

Q. Do you recall what they said?

A. As I had just stated, utilize our marketing. The company had invested a lot of money in our fliers, window sticker decals, to -- you know, of that nature.

Q. Do you know a Linda McDonald?

A. I do.

Q. And who is that?

A. She is our former vice president. Linda was

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, | * | IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE | * | |
| LOANS and INTEGRITY TEXAS | * | |
| FUNDING, LP | * | |
| | * | |
| VS. | * | HARRIS COUNTY, TEXAS |
| | * | |
| TMX FINANCE HOLDINGS, INC.; | * | |
| TMX FINANCE, LLC; TMX FINANCE | * | |
| OF TEXAS, INC.; TITLEMAX OF | * | |
| TEXAS, INC.; FELIX DELEON; | * | |
| AND ISHMAEL HERNANDEZ | * | 152ND JUDICIAL DISTRICT |

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES ARTHUR GRIFFIN

MAY 23, 2014

VOLUME 1

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF JAMES ARTHUR GRIFFIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 9:08 a.m. to 2:09 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:

MS. CHRISTINA GOEBELSMANN
MS. SARAH F. POWERS
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California 90067
310-853-6807/310-853-6859 (fax)
cgoebelsmann@wargofrench.com
spowers@wargofrench.com

FOR THE DEFENDANTS:

MR. GEOFF GANNAWAY
BECK REDDEN
1221 McKinney Street, Suite 4500
Houston, Texas 77010
713-951-6263/713-951-3720 (fax)
ggannaway@beckredden.com
--and--
MS. VICTORIA NEWMAN (Via Telephone)
TMX FINANCE
15 Bull Street, Suite 200
Savannah, Georgia 31401
912-503-2824/912-629-1538 (fax)
victoria.newman@titlemax.biz

ALSO PRESENT:
Mr. Manuel Martin, Videographer

INDEX

PAGE

Appearances.................................  2

JAMES ARTHUR GRIFFIN
        Examination by Ms. Goebelsmann.............  6
        Examination by Mr. Gannaway................  190
        Further Examination by Ms. Goebelsmann......  214
        Further Examination by Mr. Gannaway........  217
        Further Examination by Ms. Goebelsmann......  217
Changes and Corrections......................  219
Signature....................................  220
Reporter's Certificate.......................  221


                        EXHIBITS


NO. DESCRIPTION                   PAGE/LINE REFERENCED

Exhibit 1.....................................  7/2
        Notice of the Oral and Videotaped
        Deposition of James A. Griffin and Subpoena
        Duces Tecum
Exhibit 2.....................................  56/9
        Lists of names with loans

Exhibit 3.....................................  99/9
        E-mails dated September 15, 2012, with
        attachment

Exhibit 4..................................... 133/22
        E-mails dated November 27, 2012
Exhibit 5..................................... 145/5
        E-mails dated October 20, 2012, with
        attachments

A.    Correct.

Q.    What about the regional manager?

A.    The regional manager occasionally, but most of your conversations were had with your DM.

Q.    Would corporate discuss your marketing practices with you?

MR. GANNAWAY:  Object to form.

THE WITNESS:  When you say "corporate," I'm thinking corporate office, and in that case no. Linda or your regional manager would occasionally have a conversation with you, but again, most of it was through your district manager.

Q.    (By Ms. Goebelsmann)  When you're thinking of corporate office, who are you thinking of?

A.    Leadership team at the Savannah, Georgia, office.

Q.    What are the names of the people on that team?

A.    Gosh, I can't believe I don't remember their names.  Otto, O-t-t-o, Bielss, I think, B-i-e-l-s. That's the only one that stands out.  And I'm going to sound like I'm making fun of this.  The only reason it stands out is because it's like automobile and we were doing title loans.  That's the only reason it stands out.

Q.    Do you remember how many other people were

part of the leadership team?

A. No. Obviously -- Tracy Young I think is the owner of the company, and then he had his team that reported to him, but I don't remember how many people were on that team.

Q. Did they have any conversations with you regarding your marketing practices?

A. I met Otto once in the -- maybe twice. I met him once for sure in the Arlington store, maybe once at the Austin 5 store. Both times the stores were doing really well, so it was more of a, "well, tell me how you're doing it" type thing, not so much a "how can you get better" type thing.

Q. What do you mean "tell me how you're doing it"?

MR. GANNAWAY: Object to form.

THE WITNESS: The sales were good, so he just wanted to know what we were doing marketingwise to get the sales to where they were.

Q. (By Ms. Goebelsmann) Do you know why he asked you what you were doing?

MR. GANNAWAY: Same objection.

THE WITNESS: I don't know specifically. I have my beliefs, but I don't know specifically.

Q. (By Ms. Goebelsmann) What's your belief?

MR. GANNAWAY: Object to form.

THE WITNESS: All stores were not performing well, so the belief was that if it's working at this store, then we should just transplant or transpose those practices to this store and this store will do the same thing.

Q. (By Ms. Goebelsmann) Did you mention PublicData to him?

A. No.

Q. Do you know if anyone else did?

MR. GANNAWAY: Object to form.

THE WITNESS: I don't know.

MR. GANNAWAY: I'm sorry. Could you repeat your answer?

THE WITNESS: I don't know.

Q. (By Ms. Goebelsmann) Who else were part of those conversations with Otto?

A. Gary Jackson would have been part of the conversations in Arlington. Annette would have been part of the conversations in Austin.

Q. So were there two separate times that you spoke with Otto?

A. Yes.

Q. When were those times?

A. The one in Arlington would have been November

or December of 2011. The one in Austin 5 would have been, gosh, January, February of 2012.

Q. Did you explain to Otto what you were doing to attract new customers?

A. They were very generic answers, but yes. We talked about how great we were at marketing, the B-to-B marketing, and how many fliers we put out. Just really generic answers and --

Q. Can you describe to us what your generic answer was?

A. We concentrate on fliers, and we put out X number of fliers per day, per week, per month. We've got several auto repair shops that we work with, and A-1 Transmission sends me a couple customers a month. Just real generic answers. Just answers that fall in line with what TitleMax has said is already the proven method for marketing.

Q. And what was the proven method?

A. Just kind of that three-pronged attack that we had talked about earlier.

Q. Did you mention to him that you were sending fliers or letters directly to prospective customers?

A. No. At the time in -- in Arlington that was not a practice at that store or that general manager was using, so it didn't come up in our conversations.

Q.   What about for Austin 5?

A.   I don't know that that was brought up then.  I don't believe it was because we didn't start using the PublicData immediately right off the bat in Austin 5.

Q.   Why did Harold and Gary visit Austin 5 in the beginning of 2012?

MR. GANNAWAY:  Object to form.

THE WITNESS:  We were a new market, so there were only two stores in Austin.  Austin was projected to be a really high-performing market.  Lack of tenure, so when you have new managers, new market, you're going to pay extra attention to it.

Q.   (By Ms. Goebelsmann)  Do you know how long Harold worked with TitleMax?

A.   I don't know for sure.

Q.   What about Gary?

A.   Gary had worked for the company a year, year and a half.

Q.   From early 2012?

A.   Early 2012, yes.

Q.   Did anyone ever tell you to stop sending out the buyout letters or the fliers that you were sending directly to customers?

A.   We were told to stop sending out our in-store or in-house-created fliers, yes.

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs | *<br>* |
| VS. | * HARRIS COUNTY, TEXAS<br>* |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>*<br>* |
| Defendants | * 152ND JUDICIAL DISTRICT |

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS B. KIRK

JUNE 5, 2014

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF THOMAS B. KIRK, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 5th of JUNE, 2014 from 9:10 a.m. to 12:29 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Beck Redden, 515 Congress Avenue, Suite 1750, Austin, Travis County,

Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Sarah F. Powers, Attorney at Law
        -and-
Christina Goebelsmann, Attorney at Law
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California 90067
(305) 913-8587
spowers@wargofrench.com
cgoebelsmann@wargofrench.com


FOR THE DEFENDANTS:

Bryon Rice, Esq.
(Not Present)
        -and-
Geoff Gannaway, Esq.
BECK REDDEN, LLP
1221 McKinney, Suite 4500
Houston, Texas 77030
(713) 951-6263
ggannaway@beckredden.com


ALSO PRESENT:

Jeremy Garrett, Videographer
Victoria Newman, Attorney at Law
(Present Electronically)

binder that was someone other than the general manager or the store managers who were in Austin 2?

A. Yes.

MR. GANNAWAY: Object to form.

A. Well, yes.

Q. And who would review the binder?

A. Mike Ryan.

Q. And what was the purpose of Mike Ryan's review of the binder?

MR. GANNAWAY: Object to form.

A. During monthly audits at our store, it was part of his job.

Q. And what are the monthly audits?

A. Just seeing how we were doing, making sure our folders were correct, making sure that, you know, we were doing our normal business properly.

Q. Did anyone else at TitleMax perform audits of the marketing binder?

A. To my knowledge, no.

Q. Did Jim Batterson ever review the marketing binder?

MR. GANNAWAY: Object to form.

A. To my knowledge, no.

Q. Did you ever receive any visits from anyone in corporate while you were at Austin 2?

A. Yes.

Q. Who did you receive visits from?

A. Linda and Otto.

Q. And who is Linda?

A. I don't know her title.

Q. Do you remember is it Linda McDonald?

A. I believe so.

Q. And Otto, do you remember his last name?

A. I do not.

Q. Does Otto Bielss sound correct to you?

A. I don't remember his last name.

Q. Do you remember his title?

A. No.

Q. And when did Linda and Otto visit you?

A. I want to say early '13.

Q. And they visited you in Austin 2 at the same time?

A. Yes.

Q. And who was present for that visit?

A. Myself, Lucia and Mike Ryan was with them when they visited.

Q. And what happened during that visit?

A. They walked in and introduced themselves and asked how we were doing as far as numbers, and then they left.

Q. Did they review the marketing binder?

A. No.

Q. Did they review any sort of documents that you had in Austin 2?

A. No.

Q. Did they do anything else?

A. No.

Q. Was that the first time that you had met Linda?

A. Yes.

Q. And what about Otto, had you met him previously?

A. No.

Q. Did you have any other binders in Austin 2 where you maintained documents related to the operations of the store?

A. There's a deposit binder. There was a binder that showed monthly results.

Q. Monthly results of what?

A. How we did last month dollar wise, reviews, such as that.

Q. Would that be called a performance binder?

A. Yes; yes. Sorry.

Q. Were there any other binders that you maintained that documented the operations in Austin 2?

A. No.

| | |
|---|---|
| **From:** | Karen Prouty Conklin <kconklin@fellab.com> |
| **Sent:** | Monday, June 23, 2014 8:36 AM |
| **To:** | ppiccolo@veritext.com; kent.sullivan@sutherland.com; Johnson, Daniel; Lemus, Robert; Wargo, Joseph D.; Powers, Sarah; Goebelsmann, Christina; Romero, Abigail Stecker; Castaneda, Elizabeth; carla.kelley@sutherland.com |
| **Cc:** | Steve LaBriola; Geoff Gannaway; Gail Fuller; Sonia Saum; Byron Rice; Christina Baugh |
| **Subject:** | Wellshire Financial Services, LLC et al. v. TMX Finance Holdings, Inc. et al. |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Ms. Piccolo:

Per the agreement among counsel, counsel for Defendants designates the following page and line numbers of Linda McDonald's deposition as Attorneys' Eyes Only ("AEO"):

Pg. 35, Ln. 14 to Pg. 40, Ln. 12
Pg. 40, Ln. 23 to Pg. 41, Ln. 8
Pg. 41, Lns. 16-19
Pg. 46, Ln. 25 to Pg. 47, Ln. 17
Pg. 53, Ln. 19 to Pg. 56, Ln. 3
Pg. 56, Lns. 14-22
Pg. 58, Ln. 20 to Pg. 59, Ln. 3
Pg. 81, Ln. 15
Pg. 85, Lns. 4-5
Pg. 86, Lns. 8-9
Pg. 87, Lns. 1-4
Pg. 90, Ln. 18 to Pg. 92, Ln. 3
Pg. 93, Ln. 19 to Pg. 94, Ln. 17
Pg. 96, Ln. 2 to Pg. 99, Ln. 6
Pg. 101, Ln. 7 to Pg. 102, Ln. 9
Pg. 102, Ln. 22 to Pg. 103, Ln. 3
Pg. 103, Ln. 9 to Pg. 107, Ln. 17
Pg. 113, Ln. 1 to Pg. 114, Ln. 18
Pg. 115, Lns. 7-19
Pg. 116, Lns. 1-25
Pg. 117, Ln. 24 to Pg. 118, Ln. 10
Pg. 128, Lns. 2-9
Pg. 129, Lns. 4-13

Please confirm receipt of this email by reply, and please let us know if you have any questions.

Sincerely,



Karen Prouty Conklin, RP

0574

Paralegal
FELLOWS LABRIOLA LLP
Peachtree Center | Suite 2300 South Tower
225 Peachtree Street, NE | Atlanta, GA 30303
404.586.9200 [main]
404.586.2039 [direct dial]
404.586.9201 [fax]
www.fellab.com

CONFIDENTIAL MEMORANDUM

The information contained in this transmission is privileged and confidential information intended for the use of the recipient(s) named above. If you are not an intended recipient, you are hereby notified that any review, disclosure, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

0575

# Tab R

IN THE DISTRICT COURT OF HARRIS COUNTY, TEXAS

152ND JUDICIAL DISTRICT

_____

WELLSHIRE FINANCIAL SERVICES, )

LLC, d/b/a LOANSTAR TITLE )

LOANS, et al., ) No. 2013-33584

         Plaintiffs, )

        vs. )

TMX FINANCE HOLDINGS, INC., )

et al., )

        Defendants. )

_____

VIDEOTAPED DEPOSITION OF JAMES BATTERSON

Los Angeles, California

Tuesday, July 29, 2014

Volume I

Reported by:

JUDITH A. MANGO

CSR No. 5584

Job No. 1902035

PAGES 1 - 247

IN THE DISTRICT COURT OF HARRIS COUNTY, TEXAS

152ND JUDICIAL DISTRICT

WELLSHIRE FINANCIAL SERVICES, )

LLC, d/b/a LOANSTAR TITLE )

LOANS, et al., ) No. 2013-33584

          Plaintiffs, )

      vs. )

TMX FINANCE HOLDINGS, INC., )

et al., )

         Defendants. )

Videotaped Deposition of JAMES BATTERSON, Volume I, taken on behalf of defendants, at 400 South Hope Street, Los Angeles, California, beginning at 10:08 a.m. and ending at 12:45 p.m. on Tuesday, July 29, 2014, before JUDITH A. MANGO, Certified Shorthand Reporter No. 5584.

APPEARANCES:


For Plaintiffs:

WARGO & FRENCH LLP

BY:  SARAH F. POWERS

CHRISTINA L. GOEBELSMANN

Attorneys at Law

1888 Century Park East, Suite 1520

Los Angeles, California  90067

(310) 853-6800

spowers@wargofrench.com

cgoebelsmann@wargofrench.com


For Defendants TMX Finance, LLC; TMX Finance of

Texas, Inc. and TitleMax of Texas, Inc.:

FELLOWS LA BRIOLA LLP

BY:  STEPHEN T. LA BRIOLA

Attorney at Law

Peachtree Center

225 Peachtree Street, N.E.

Suite 2300, South Tower

Atlanta, Georgia  30303-1731

(404) 586-9200

slabriola@fellab.com

APPEARANCES (CONTINUED):


For the Witness:

        HOLLAND & KNIGHT LLP

        BY:  SHELLEY G. HURWITZ

        Attorney at Law

        400 South Hope Street, 8th Floor

        Los Angeles, California  90071

        (213) 896-2400

        shelley.hurwitz@hklaw.com


Also Present:

        VICTORIA NEWMAN (VIA TELEPHONE)

        GILBERT MIRANDA, VIDEOGRAPHER

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.          10:30:54

Q    Did you have any conversations with Otto Bielss, the vice-president of operations, during the time that you were employed as a regional manager?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United          10:31:03 States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Did you have any conversations with Charles Cole during the time that you were employed as a          10:31:08 regional manager in Texas?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that          10:31:12 my answer may tend to incriminate me.

Q    And what did you discuss with Mr. Biells or Mr. Cole?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United          10:31:16

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.                10:37:08

Q    Did you have conversations with Linda McDonald regarding marketing practices in your region?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United        10:37:13 States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Did you have conversations with Otto Bielss regarding marketing practices in your region?        10:37:17

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.                10:37:20

Q    What were the purposes of any conversations that you had with Mike Ryan with respect to marketing practices in your region?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United        10:37:28

decline to answer that question on the grounds that my answer may tend to incriminate me.

Q How many times did you speak with Otto Bielss regarding marketing practices in your region?

A On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q When did you have conversations with Otto Bielss regarding marketing practices in your region?

A On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q Did you have any discussions with Otto Bielss regarding the propriety of any marketing techniques or practices used in your region?

A On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q And when did you have that conversation

with Otto Bielss?

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that     10:38:59 my answer may tend to incriminate me.

Q     When you were regional manager, did your district manager send you marketing plans for you to review?

A     On the advice of counsel and pursuant to my     10:39:08 rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q     Who sent you those marketing plans?     10:39:08

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.     10:39:12

Q     Did Mike Ryan send you marketing plans?

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that     10:39:15

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.                11:14:01

Q    How many individuals were involved in going to parking lots of LoanStar to record the license plate numbers of the cars parked in LoanStar parking lots?

A    On the advice of counsel and pursuant to my    11:14:12 rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Did you ever go to the parking lots of any    11:14:13 competitors of TitleMax to solicit the customers of those competitors?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully    11:14:22 decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    How many times did you go to the parking lots of competitors to solicit the customers of those competitors?                                          11:14:29

A      On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.          11:14:30

Q      Which competitors did you go to in order to solicit the business of competitors from the competitors' parking lots?

A      On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United          11:14:38 States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q      How many customers did you record license plate information when you went to the -- strike          11:14:46 that.

Did you ever go to the parking lots of competitors to record the license plate numbers of cars parked in those parking lots?

A      On the advice of counsel and pursuant to my          11:14:57 rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q      And which competitors' parking lots did you          11:14:58

use in the direct mailer program?

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that    11:26:42 my answer may tend to incriminate me.

Q     Who created the new marketing materials?

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully    11:26:47 decline to answer that question on the grounds that my answer may tend to incriminate me.

Q     Who approved the new marketing materials?

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United    11:26:50 States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q     Did you create the new marketing materials used as part of the direct mailer program?    11:26:53

A     On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.    11:26:57

decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Did you use the search results that you obtained from DataTrax to solicit customers of competitors?                                                    11:43:07

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.                  11:43:08

Q    Did you ever search DataTrax or PublicData for information related to liens held by competitors?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United      11:43:18 States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Did you ever search DataTrax or PublicData for information related to liens held by LoanStar?    11:43:24

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.                  11:43:27

decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Were those employees district managers in Houston, Texas?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Were those employees district managers in Dallas, Texas?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Were those employees district managers in El Paso?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Were those employees district managers in Waco?

BY MR. LA BRIOLA:

Q    Indeed, such activity would violate company policy, correct?

A    On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

Q    Isn't it true that you told Linda McDonald that you did exactly as she had instructed and that you were not aware of any TitleMax employee in your region who was doing what Linda McDonald told you LoanStar was alleging?

MS. GOEBELSMANN:  Object to form.

THE WITNESS:  On the advice of counsel and pursuant to my rights under the Fifth Amendment of the United States and California Constitution, I respectfully decline to answer that question on the grounds that my answer may tend to incriminate me.

BY MR. LA BRIOLA:

Q    Isn't it true that you told Linda McDonald that you do not know of any TitleMax employee who was writing down license plate numbers from competitor parking lots and soliciting them for business?

| From: | Karen Prouty Conklin <kconklin@fellab.com> |
|---|---|
| Sent: | Tuesday, September 02, 2014 11:14 AM |
| To: | ppiccolo@veritext.com; kent.sullivan@sutherland.com; Johnson, Daniel; Lemus, Robert; Wargo, Joseph D.; Powers, Sarah; Goebelsmann, Christina; Stecker, Abigail; Castaneda, Elizabeth; carla.kelley@sutherland.com |
| Cc: | Steve LaBriola; Geoff Gannaway; Gail Fuller; Sonia Saum; Byron Rice; Christina Baugh; Angela Torres |
| Subject: | Wellshire Financial Services, LLC et al. v. TMX Finance Holdings, Inc. et al. |

Dear Ms. Piccolo:

Per the agreement among counsel, counsel for Defendants designate Page 77, line 21 through Page 103, line 13 of James Batterson's deposition as Attorneys' Eyes Only.
Please confirm receipt of this email by reply, and please let us know if you have any questions.

Sincerely,

**FELLOWS LABRIOLA** LLP

Karen Prouty Conklin, RP
Paralegal
FELLOWS LABRIOLA LLP
Peachtree Center | Suite 2300 South Tower
225 Peachtree Street, NE | Atlanta, GA 30303
404.586.9200 [main]
404.586.2039 [direct dial]
404.586.9201 [fax]
www.fellab.com

CONFIDENTIAL MEMORANDUM
The information contained in this transmission is privileged and confidential information intended for the use of the recipient(s) named above. If you are not an intended recipient, you are hereby notified that any review, disclosure, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

1

0590

# Tab S

CAUSE NO. 2013-33584

| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| *Plaintiffs,* | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC., | § | |
| | § | |
| *Defendants.* | § | 152nd JUDICIAL DISTRICT |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR PROTECTIVE ORDER, DISCOVERY LIMITS, TO COMPEL DISCLOSURE OF DAMAGES CALCULATIONS, AND MEDIATION**

COME NOW, Plaintiffs Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP, (collectively, "LoanStar") and hereby file this omnibus response to the discovery motions ("Omnibus Motion") filed by Defendants TMX Finance, LLC, TMX Finance of Texas, Inc. and TitleMax of Texas, Inc. (collectively, "TitleMax"), and respectfully show the Court as follows:

**I.     INTRODUCTION**

TitleMax's Omnibus Motion should be rejected, as it is an attempt to prematurely and improperly curtail discovery before LoanStar has an opportunity to discover the true scope of TitleMax's misconduct and ascertain the damages caused thereby.  Contrary to TitleMax's

unfounded accusations, the amount of discovery taken to date, as well as the discovery that still needs to be completed, is dictated **not** by "Rambo" tactics on the part of LoanStar, but by the remarkable scope of TitleMax's illegal scheme to purloin LoanStar's customers and TitleMax's refusal to be forthcoming in discovery.

In fact, LoanStar learned just this week (July 14, 2014) – *only through a third-party subpoena* – that TitleMax's illegal conduct continues to this day, despite the entry of a temporary injunction order ("TIO") prohibiting it. Specifically, records produced by "The Source for PublicData, LP" ("PublicData") documenting searches performed by 20 TitleMax employees shows that at least four of them conducted at least 14 illegal searches directed at LoanStar customers, as recently as May 19, 2014.[1] LoanStar's discovery of these recent illegal searches, only through a third-party subpoena, has been typical of the discovery process in this case, as LoanStar has had to build its case by continuing to dig for the truth, one deposition at a time, because TitleMax refuses to be forthcoming in discovery and continually misrepresents the facts to LoanStar. Indeed, discovery has revealed that the illegal searches at the heart of this case occurred during a period nearly <u>double</u> that represented by TitleMax and that its management was aware of and directed this conduct.

In light of such circumstances, TitleMax's motions and requests for relief are without merit. First, TitleMax's proposed 50 hour deposition limit is actually an attempt to entirely shut down the deposition process, as LoanStar is already at that limit. TitleMax would prevent LoanStar from (among other things) deposing employees who continue to conduct illegal searches, as well as taking depositions to establish the extent to which TitleMax's corporate policies or practices dictated the illegal behavior. Second, TitleMax cannot complain that LoanStar has not provided detailed damages calculations when TitleMax has prevented LoanStar

---

[1] True and correct, redacted copies of these search results are attached hereto as Exhibit A.

2

from discovering information relevant to its damages. Third, there is no merit to TitleMax's request for a protective order as to a deposition notice that has never been served and was significantly modified by LoanStar at TitleMax's request. Fourth, TitleMax's demand that the Court order the parties to mediation is obviously premature, as TitleMax has denied LoanStar the information needed to make any mediation productive.

The Court should therefore deny TitleMax's Omnibus Motion in its entirety.

## II.   RELEVANT BACKGROUND

The record in this case demonstrates that, from the very outset of this dispute, TitleMax has sought to conceal the vast scope of its illegal scheme to steal LoanStar's customers. This has required LoanStar to painstakingly uncover the truth by continuing to turn over stone after stone, exposing additional evidence of misconduct and additional leads. For example:

- In November 2012, more than six months before the filing of this case, TitleMax flatly (and falsely) denied that it was engaging in the illegal searching and marketing to LoanStar customers at the heart of this case.[2] Expedited depositions taken at the outset of the case were required to prove the falsity of TitleMax's representation.[3]

- TitleMax later admitted that its employees engaged in illegal searches, but denied that this conduct occurred prior to June 2012, and thus refused to supplement the Overlap List to provide information prior to that date. LoanStar was forced to take

---

[2] *See* December 6, 2012 letter from Vin Thomas (TitleMax in-house counsel) to John McCloskey (LoanStar in-house counsel) filed as Exhibit B to Plaintiffs' Motion to Compel Discovery Responses filed on July 7, 2014 ("TMX denies the allegations in your letter. Specifically, TMX employees are neither monitoring [LoanStar's] Texas store parking lots for the purposes of obtaining license plate numbers from [LoanStar's] customers through improper searching of lien information in Texas state-maintained motor vehicle records.")

[3] *See* Deposition Excerpts filed as Exhibit C to Plaintiffs' Motion to Compel Discovery Responses filed on July 7, 2014 [Felix DeLeon Dep. 12:2-8, 14:10-15, 15:13-24; Jarrod Dozier Dep.19:9-13, 34:9-25; Lucia Grajeda Dep.17:8-2; Ismael Hernandez Dep.12:6-20:9; Joshua Hadden Dep.15:7-21:3; Mike Ryan Dep.23:15-28:9; Patrick Sudduth Dep. 23:1-36:21].

3

0593

depositions to prove that, as well, and then had to file a motion to compel supplementation of the Overlap List.[4]

- TitleMax failed to disclose numerous individuals with knowledge that the illegal conduct was occurring throughout Texas, instead forcing LoanStar to painstakingly uncover such evidence one deposition at a time. Only LoanStar's efforts in noticing the depositions of individuals and subpoenaing the records of a third party exposed the true facts in this regard.[5]

- Given that TitleMax tried to portray its illegal conduct as the acts of a few rogue employees, LoanStar has had to take depositions of former TitleMax employees to prove that TitleMax's management was not only aware of the misconduct, but also actively encouraged or even required it.[6]

- In June 2014, PublicData produced over 22,000 pages of searches conducted by 20 TitleMax employees. An analysis of these records, ongoing since the production and completed only on July 14 reveals that at least four TitleMax employees have conducted at least 14 searches directed at LoanStar customers, as recently as May 19, 2014, despite the Court's TIO prohibiting such conduct. These searches include queries by license plate number and zip code, demonstrating that TitleMax employees

---

[4] *See, e.g.*, Plaintiffs' Reply In Support of Plaintiffs' Discovery Motions filed July 10, 2014 Exhibits B [Miguel Martinez Dep. Rough Transcript [July 8, 2014] 14, 33-34, 79], C [James Griffin Dep. 10-12, 86-90], & D [Randy Rainey Dep. Rough Transcript [July 8, 2014] 36-44].

[5] *See, e.g.*, Depositions Excerpts attached hereto as Exhibit D [Griffin Dep. 10-13, 48-49, 88-89 (James Griffin, Harold Landers, Gary Jackson); Rainey Dep. Rough Transcript [July 8, 2014] 36-37 (Randy Rainey, Tom Griffin); Martinez Dep. Rough Transcript [July 8, 2014] 33-14 (Miguel Martinez, Wanda "Wendy" Payne, "Ray from Euless"); Antonio Amado Dep. Rough Transcript [July 9, 2014] 19, 21 ( "Denny" from "Northwest Military", "Brigitte" from "281 and Blanco")]; *see also* Exhibit A.

[6] *See, e.g.*, Exhibit D [Griffin Dep. 101-03, 105-07; Hale Dep. 121-24].

4

continue to use illegal marketing practices to identify customers of TitleMax's competitors (including LoanStar). (Exhibit A.)

In short, the record shows that TitleMax has attempted to conceal the scope of its unlawful scheme at virtually every turn, and that LoanStar has been able to uncover the facts of this case only through deposing numerous former TitleMax employees and through third party discovery. The record is also clear that LoanStar requires further discovery regarding the true extent of TitleMax's unlawful conduct, the source thereof, and the damages caused thereby.

## III. ARGUMENT

### A. TitleMax Cannot Show That Its Discovery Limitations Are Appropriate at This Time

In its Omnibus Motion, TitleMax recognizes that, in considering whether to limit discovery, the Court should take into account: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4) the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues. (TEX. R. CIV. P.192.4.) Notably, however, TitleMax fails to analyze these factors in its Omnibus Motion, undoubtedly because all of these factors dictate denial of TitleMax's attempt to prematurely curtail discovery.

First, the record amply demonstrates that the needs of this case have not only required significant discovery to date, but that significant additional discovery is necessary. Such discovery is required to ascertain, among other things, the scope and extent of the misconduct at issue, the extent to which such misconduct reflects corporate policies or practices rather than the actions of a handful of rogue employees, and the damages caused by TitleMax's conduct. The record further shows that the need for such discovery has largely been dictated by TitleMax's own attempts to hide the truth. TitleMax cannot complain about the need for additional discovery when it has sown the seeds of its own dilemma.

5

Second, the amount in controversy here is significant. Although LoanStar cannot yet calculate damages because TitleMax has refused to provide the discovery necessary for LoanStar to do so, it is readily apparent that LoanStar's damages will be significant. Indeed, TitleMax admits to a potential universe of more than 7,500 stolen customers—a universe that will expand when TitleMax supplements the Overlap List as ordered by the Court. Given that TitleMax's illegal conduct resulted in the conversion of thousands of customers who otherwise would have provided continuing revenue streams to LoanStar, damages will be substantial.

Third, the parties' resources do not suggest that discovery should be limited. TMX Finance LLC is a behemoth, with over 1200 stores in 22 states, and in 2012 reported interest and fee income of $656 million. (Exhibit B [TitleMax 2012 10-k].)

Fourth, the importance of the issues at stake in the litigation weighs against TitleMax's attempt to severely curtail discovery at this point. This case involves egregious conduct that TitleMax admits was improper (as well as criminal) – conduct that not only allowed TitleMax to steal countless LoanStar customers, but also violated the privacy rights of tens of thousands of individuals. Indeed, discovery to date demonstrates that TitleMax has accessed the personal information for over 10,700 individuals through the database searches—including records of over 1,600 individuals in Texas since the TIO was entered in this case in July 2013.

Finally, there is no question that the fifth factor – the importance of the proposed discovery in resolving the issues – also militates towards denial of TitleMax's Omnibus Motion. As shown above, it is only through discovery – particularly the depositions of former employees and other third party discovery – that LoanStar has begun to uncover the truth. TitleMax has resisted that discovery at every turn, and has failed to be forthcoming with the true facts regarding (among other things) the number of employees involved in its illegal scheme and the

6

extent to which TitleMax's management were both aware of and involved in that scheme. It is only through significant additional discovery that the full extent of such facts will be revealed, and the true nature and amount of LoanStar's damages can be determined. Accordingly, **none** of the five factors support TitleMax's attempt to curtail discovery at this time.

Further, as shown below, TitleMax's Omnibus Motion should also be denied because the individual components thereof are without merit.

**B. TitleMax Has No Grounds to Seek a Protective Order Regarding a Corporate Deposition Notice That Has Never Been Served and Has Already Been Narrowed**

TitleMax's motion for protective order as to a corporate deposition notice that has never been served is a red herring. Indeed, TitleMax fails to inform the Court that LoanStar agreed to narrow the notice before TitleMax ever filed its motion. Thus, the *draft* notice of which TitleMax complains no longer even exists. More than one month ago, LoanStar provided the proposed corporate deposition topics to counsel for TitleMax, requesting deposition dates and inviting discussion on the topics. Counsel for TitleMax delayed in responding for weeks, ultimately refusing to produce any witness for deposition and instead threatening to file the instant motion claiming, without specification, that the noticed topics were too broad. At LoanStar's insistence, a meet and confer was held during which counsel for TitleMax complained of overbreadth as to nearly all of LoanStar's proposed topics. LoanStar thereafter provided a substantially narrowed proposed notice, *eliminating more than half of the proposed topics and adding language to narrow several others.* (*See* Meet and Confer Email dated July 2, 2014, attached hereto as Exhibit C.) LoanStar also requested that TitleMax further discuss the topics. Instead, TitleMax filed the instant motion, vaguely referencing a purportedly "overbroad" notice it does not attach, and referencing topics that were already removed or

7

0597

narrowed by LoanStar. The Court should not enter a protective order regarding a deposition that has never been noticed and about which TitleMax has failed to meaningfully meet and confer.

## C.   TitleMax's Proposal to Shutdown Deposition Discovery Must Be Rejected

TitleMax's proposed 50 hour limit on depositions actually seeks to end deposition discovery, as TitleMax knows that LoanStar is already at that limit. Importantly, however, it is only through deposition testimony that LoanStar has been able to uncover facts demonstrating that TitleMax's illegal conduct spanned a much longer timeframe and involved far more employees than TitleMax ever disclosed, including management level employees. Indeed, every stone LoanStar turns over results in additional evidence and witnesses supporting its claims. Given LoanStar's success in using depositions of former employees to uncover the truth to date, it is not surprising that TitleMax seeks to end deposition discovery to prevent LoanStar from discovering the full extent of the misconduct and damages at issue here.

The need for further deposition testimony is readily apparent. For example, once corrected, the Overlap List will provide a basis for discovery of the illegal conduct that occurred during the actual time period at issue. TitleMax will be required to supplement its earlier discovery responses tied to the Overlap List, and to the extent additional employees with knowledge are disclosed, LoanStar is entitled to depose them. Likewise, LoanStar must be allowed to depose the four employees who were exposed by the PublicData records as continuing to conduct unlawful searches for LoanStar customers. As the history of this case proves, those employees will likely reveal additional witnesses and leads.

Further, TitleMax's own arguments highlight the need for additional deposition discovery regarding its corporate policies and practices with regard to the illegal searches. TitleMax attempts to take the sting out of its illegal scheme by suggesting that one of the websites it used to conduct its illegal searches – PublicData – misled TitleMax's employees into believing they

8

can search DMV records "[f]or any use in the normal course of business . . ." That argument is disingenuous, as the language it highlights is actually a hyperlink which, when clicked on, displays the full text of the exemption— *text which clearly prohibits the searches executed by TitleMax*. In any event, at the same time TitleMax represents that its employees did not know their searches were illegal, TitleMax seeks to deny LoanStar discovery regarding TitleMax's corporate policies, practices, and training with respect to, among other things, the permissible uses of such databases and whether their use is considered an acceptable marketing practice by TitleMax. It is absurd for TitleMax to make its "innocent user" argument while at the same time attempting to foreclose discovery regarding these issues.

In short, while it is clear why TitleMax wants the Court to end deposition discovery, it is equally clear that the Court should decline to do so at this time.

**D. TitleMax Cannot Demand LoanStar's Damages Calculations and Mediation While Simultaneously Frustrating LoanStar's Efforts to Obtain the Information Necessary to Calculate Damages and Participate in Meaningful Mediation**

TitleMax's request for LoanStar's damages calculation is especially ironic, given TitleMax's failure and refusal to provide LoanStar with information necessary to that very calculation. As the Court knows, TitleMax attempted to artificially cutoff disclosure of potentially stolen customers, necessitating a motion to compel by LoanStar and ultimately resulting in the Court ordering TitleMax to provide additional information to expand the Overlap List. As LoanStar's counsel has repeatedly informed counsel for TitleMax, LoanStar is not in a position to provide a damages calculation until TitleMax produces the information enabling it to do so.

Additionally, as pleaded by LoanStar in its Second Amended Petition, LoanStar seeks to recover from TitleMax ill-gotten profits earned as a result of TitleMax's illegal conduct. In order

9

to calculate those damages, outside counsel for LoanStar[7] must have access to certain TitleMax financial records. TitleMax has categorically refused to provide such information.

Likewise, TitleMax demands mediation, but is unwilling to provide LoanStar with information necessary for such a mediation to be at all meaningful. Indeed, without complete information from which to determine the proper scope of damages, LoanStar would be flying blind and have no basis from which to adequately negotiate.[8]

## IV.   PRAYER

Accordingly, LoanStar respectfully requests that this Court deny the relief TitleMax seeks through its discovery motions.

DATED: July 16, 2014

Respectfully submitted,

**SUTHERLAND ASBILL & BRENNAN LLP**

By: */s/ Daniel Johnson*
    Kent C. Sullivan (SBN 19487300)
    Daniel Johnson (SBN 24046165)
    Robert A. Lemus (SBN 24052225)
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

And

**WARGO FRENCH LLP**
Joseph D. Wargo (GA No. 738764)

---

[7] The parties' Rule 11 confidentiality agreement contemplates protection of commercially sensitive information through an "Attorney's Eyes Only" designation, by which even the parties' in-house counsel are prohibited from viewing information so designated.

[8] Notably, despite its purported eagerness to mediate, TitleMax has never once made an effort to commence negotiations or made any settlement offer.

10

0600

(Admitted *Pro Hac Vice*)
Joseph W. Ozmer II (GA No. 001542)
(Admitted *Pro Hac Vice*)
999 Peachtree Street, N. E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: jozmer@wargofrench.com

Sarah F. Powers (CA. No. 238184)
(Admitted *Pro Hac Vice*)
Christina L. Goebelsmann (CA No. 273379)
(Admitted *Pro Hac Vice*)
1888 Century Park E, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6300
Facsimile: (310) 853-6333
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com
*Attorneys for Wellshire Financial Services,
LLC, d/b/a LoanStar Title Loans, d/b/a
MoneyMax Title Loans, and d/b/a LoanMax;
Meadowwood Financial Services, LLC, d/b/a
LoanStar Title Loans, and d/b/a MoneyMax
Title Loans; and Integrity Texas Funding, LP*

11

**0601**

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the within and foregoing

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR**

**PROTECTIVE ORDER, DISCOVERY LIMITS, TO COMPEL DISCLOSURE OF**

**DAMAGES CALCULATIONS, AND MEDIATION** has been forwarded to all counsel of

record in accordance with TEX. R. CIV. P. 21 and 21a on this 16th day of July 2014.

David Beck
Geoff Gannaway
Bryon Rice
BECK REDDEN LLP
1221 McKinney St., Suite 4500
Houston, Texas 77010.

Stephen LaBriola
Christina Baugh
FELLOWS LABRIOLA LLP
Peachtree Center
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731

*Attorneys for TMX Finance LLC,*
*TMX Finance of Texas, Inc. and*
*TitleMax of Texas, Inc.*

DATED: July 16, 2014

                                        /s/ *Daniel Johnson*
                                        Daniel Johnson

12

0602

# EXHIBIT A

| Date | User Name | Type of Search | Search (Term) | Results (List of Names) | Display (Selection From List) | Lien Holder Listed | PD Bates Number |
|---|---|---|---|---|---|---|---|
| 8/23/2013 | Pdobney01 | Partial Zip Code | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_012493 to PD_012495 |
| 10/28/2013 | Pdobney01 | Plate | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_012980 to PD_012981 |
| 11/1/2013 | TMX Fort Worth 4 | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_018688 to PD_018689 |
| 12/3/2013 | Pdobney01 | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_013191 to PD_013192 |
| 12/16/2013 | Pdobney01 | Plate | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_013247 to PD_013248 |
| 12/17/2013 | Taylor Sullivan | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_017988 to PD_017990 |
| 1/17/2014 | Pdobney01 | Partial Zip Code | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_013545 to PD_013546 |
| 2/20/2014 | Pdobney01 | Plate | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_014014 to PD_014015 |
| 2/20/2014 | Pdobney01 | Partial Zip Code | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_014016 to PD_014019 |
| 2/26/2014 | Pdobney01 | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_014084 to PD_014086 |
| 2/28/2014 | TMX Fort Worth 4 | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_018814 to PD_018816 |
| 3/8/2014 | Pdobney01 | Plate | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_014220 to PD_014223 |
| 4/2/2014 | Pdobney01 | VIN | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_014360 to PD_014362 |
| 5/19/2014 | James Schafer | Partial Zip Code | REDACTED | REDACTED | REDACTED | Integrity Texas Funding | PD_006477 to PD_006478 |

0604

| ACCOUNT_IDENTIFIER | ACCOUNT | ACCOUNTID | EMAILID | STATUS | ACCOUNTTYPE | BILLTYPE | BILLEXPDATE | LNAME | FNAME |
|---|---|---|---|---|---|---|---|---|---|
| 10503349 | 1399113 | TX | ernest.page@titlemax.biz | 0 | C | 2 | 2016-08-01 | Page | Ernest |
| 10506290 | 3633225 | TX | richard.hale@titlemax.biz | 0 | C | 2 | | Hale | Todd |
| 10506333 | 9205388 | TX | tmx-austin-tx10@titlemax.biz | 1 | C | 3 | 2015-04-01 | Arellano | Gabriel |
| 10500436 | 9569219 | TX | estela.bravo@titlemax.biz | 0 | C | 2 | | Bravo | Estela |
| 10506079 | 9636450 | TX | joshua.howells@titlemax.biz | 0 | C | 2 | 2013-08-01 | Howells | Joshua |
| 10494788 | 11324669 | TX | curtis.berry@titlemax.biz | 0 | C | 2 | 2013-09-01 | Berry | Curtis |
| 10511025 | 11988406 | TX | tm-fortworth-tx4@titlemax.biz | 1 | C | 9 | 2015-12-01 | Lira | Ricardo |
| 10509475 | 12522566 | TX | felixd66@yahoo.com | 0 | C | 3 | | DELEON | FELIX |
| 10505537 | 12605197 | TX | james.griffin@titlemax.biz | 0 | C | 2 | 2015-02-01 | Griffin | Jim |
| 10503873 | 14918914 | TX | blaine.deleon@titlemax.biz | 0 | C | 2 | 2013-04-01 | DeLeon | Blaine |
| 10509978 | 16440562 | TX | taylor.sullivan@titlemax.biz | 0 | C | 2 | | Sullivan | Taylor |
| 10503108 | 20994108 | TX | pdobney01@aol.com | 1 | C | 2 | 2017-02-01 | Dobney | Penny |
| 10507788 | 23012910 | TX | skyler.wooten@titlemax.biz | 0 | C | 2 | 2014-02-01 | Wooten | Skyler |
| 10524421 | 23115630 | TX | james.schafer@titlemax.biz | 1 | C | 2 | 2017-05-01 | Schafer | James |
| 10496806 | 23643523 | TX | kevin.willis@titlemax.biz | 0 | C | 9 | | Willis | Kevin |
| 10527270 | 33163845 | TX | mister1031@yahoo.com | 0 | C | 2 | 2016-07-01 | Tucciarone | Gerald |
| 10505301 | 33371030 | TX | alysia.easton@titlemax.biz | 0 | C | 2 | 2014-02-01 | Easton | Alysia |
| 10497454 | 35031270 | TX | scott.damico@titlemax.biz | 0 | C | 2 | 2014-08-01 | Damico | Scott |
| 10500881 | 237693958 | TX | annette.martinez@titlemax.biz | 0 | C | 2 | | MARTINEZ | ANNETTE |
| 10514374 | O165-523-78-954-0 | FL | lindsay.obrien@titlemax.biz | 0 | C | 2 | 2013-10-01 | OBrien | Lindsay |
| 10507313 | TITLEM001 | CORP | dspillers73@gmail.com | 0 | I | F | | Matthews | William |

20130823154943154943 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
p1=75241652546
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?db=txdmv&rec=4547397218&ed=111&dlnumber=020994108&dlstate=TX&id=&identifier=&sessionid=&tacdmv=DPPA-04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20130823-SHADOW105.html|844866846

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners]

Results for "75241652546" on 1 database(s) Searched by ZIP Code

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]
Redacted DALLAS, TX 75241-6525

Redacted
Texas - Department of Motor Vehicles [Owners]

Redacted DALLAS, TX 75241-6525

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75241-6525

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75241-6525

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75241-6525

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75241-6525

1

*Your account 020994108-TX has been charged 1 'Look-up' on August 23, 2013 at 15:49:43.*
Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2013 - PublicData.com

| Aug 23 2013, 15:49:55 |
| --- |

20130823154955154955 020994108 TX DETAIL
DB=txdmv
ed=111
rec=4492187720
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?Type=Zip&input=txdmv&p1=75241652546&id=&dlnumber=020994108&dlstate=TX&identifier=&sessionid=&tacdmv=DPPA-04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20130823-SHADOW105.html|845379706

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
| --- | --- | --- | --- |
| Redacted | Redacted | DALLAS | TX |
| Owner ZipCode | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75241- | Redacted | GARLAND | TX |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice Zip |
|  |  |  |  |
| Renewal Notice Zip4 | License Plate Number | Texas Plate Number | Previous License Plate Number |
|  | Redacted | Redacted | Redacted |
| Previous Expiration Month | Previous Expiration Year | Registration Effective | Title Date |
| 03 | 2011 | Apr 1 2011 | Apr 19 2012 |
| Ownership Information | Model Year | Make | Model |
| 01 = TEXAS TITLE | 2000 | DODG | STS |
| Vehicle Body Type | Vehicle Major Color[Color Group] | Vehicle Minor Color[Color Group] | Vehicle Class Code |
| 4D = 4-DOOR SEDAN | WHITE (Color Group WHITE) |  | PASS |
| Vehicle Tonnage | Vehicle Sales Price | Vehicle Sold Date | Vehicle Empty Weight |
| 0000 | 0000000000 | 00000000 | 003200 |
| Vehicle Gross Weight | Vin Number | Bonded Title Information | Document Type Information |
| 003200 | Redacted | none found | 01 = REGULAR TITLE |
| Vehicle Odometer Information | Diesel Information | DOT Standards Information | DPS Stolen Indicator |
| NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | 0 = VEHICLE IS NOT DIESEL POWERED | 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN |
| Registration Exemption | Fixed Bed Weight Information | Flood Damage Information | Government Ownership Information |
| 0 = VEHICLE IS NOT EXEMPT FROM | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY | 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT GOVERNMENT OWNED |

| REGISTRATION FEES | MOUNTED EQUIPMENT | | |
|---|---|---|---|
| *Title Hot Check Information*<br>0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | *Inspection Waived Information*<br>0 = TEXAS SAFETY INSPECTION IS NOT WAIVED | *Junk Title Information*<br>0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information*<br>0 = NO PERMIT REQUIRED |
| *Rebuilt Information*<br>0 = NEVER SALVAGED | *Reconstructed Information*<br>0 = NOT A RECONSTRUCTED VEHICLE | *Survivorship Agreement Information*<br>0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information*<br>0 = TEXAS TITLE IS NOT REVOKED |
| *DPS Suspension Information*<br>0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information*<br>0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX | *Registration Validity Information*<br>0 = REGISTRATION IS VALID | *Registration Hot Check Information*<br>0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE |
| *License Plate Seizure Information*<br>0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information*<br>0 = REGISTRATION STICKER NOT SEIZED | *Electronic Title Information*<br>2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information*<br>0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS |

*Above information as provided by state - below are our annotations*

| *Click here for more vehicles at this address*<br>Redacted<br>Dallas,TX 75241-6525 | *Click here for more vehicles in this area*<br>Redacted TX 75241-6525 | | |
|---|---|---|---|

## Lien Holders

| *Lien Holder Postion*<br>1 | *Lien Date*<br>20120316 |
|---|---|

### Lien Holder Information

| *Lien Holder Name*<br>INTEGRITY TEXAS FUNDING | *Lien Holder Number*<br>078050967 | *Street*<br>2075 S BUCKNER BLVD | *Street (cont)* |
|---|---|---|---|
| *City*<br>DALLAS | *State*<br>TX | *Zip Code*<br>75217- | *Country* |

| Aug 23 2013, 17:01:29 |
|---|

20130823170129170129 020994108 TX SEARCH
Type=plate
LN=GRP_DMV_PLATE
DB=grp_dmv_plate
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://ibsearch.publicdata.com/pdquery.php?o=grp_dmv_plate&dbnumber=020994108&distate=TX
server=ibsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20130823-SHADOW105.html|946492170

➡ DMV License Plate Search

Results for Redacted on 16 database(s) Searched by PLATE

Redacted

*Texas - Department of Motor Vehicles [Owners]* ⊡

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on October 28, 2013 at 15:17:45.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2013 - PublicData.com

---

| Oct 28 2013, 15:17:46 |
|---|

20131028151746151746 020994108 TX DETAIL
DB=txdmv
ed=114
rec=5172222739
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=57cty8&input=grp_dmv_plate&tacDMV=DPPA-04&type=plate&dlnumber=020994108&dlstate=TX&id=&identifier=&sessionid=&o=grp_dmv_plate
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131028-SHADOW106.html|822796216

---

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | MESQUITE | TX |
| **Owner ZIP Code** 75149- | **Previous Owner Name** Redacted | **Previous Owner City** CARROLLTON | **Previous Owner State** TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
| **Renewal Notice ZIP+4** | **License Plate Number** Redacted | **Previous License Plate Number** Redacted | **Previous Expiration Month** 07 |
| **Previous Expiration Year** 2012 | **Registration Expiration Year** 2014 | **Registration Expiration Month** 05 | **Registration Effective** Jun 6 2013 |
| **Title Date** Sep 26 2012 | **Ownership Information** 01 = TEXAS TITLE | **Model Year** 2000 | **Make** GENERAL MOTOR CORP. |
| **Model** YUK | **Model Description** GENERAL MOTOR CORP. YUKON | **Vehicle Body Type** LL = SUBURBAN/SUV | **Vehicle Major Color[Color Group]** GOLD (Color Group YELLOW) |
| **Vehicle Minor Color[Color Group]** | **Vehicle Class Code** PASS-TRK | **Vehicle Tonnage** 0050 | **Vehicle Sales Price** 0000000000 |
| **Vehicle Sold Date** 00000000 | **Vehicle Empty Weight** 005400 | **Vehicle Gross Weight** 006400 | **Vin Number** Redacted |
| **Bonded Title Information** none found | **Document Type Information** 01 = REGULAR TITLE | **Vehicle Odometer Information** NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | **Diesel Information** 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** 0 = VEHICLE DOES NOT MEET STANDARDS | **DPS Stolen Indicator** 0 = VEHICLE IS NOT STOLEN | **Registration Exemption** 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | **Fixed Bed Weight Information** 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** | **Government Ownership Information** | **Title Hot Check Information** | **Inspection Waived Information** |

PD-012980

0609

| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
|---|---|---|---|
| *Junk Title Information*<br>0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information*<br>0 = NO PERMIT REQUIRED | *Rebuilt Information*<br>0 = NEVER SALVAGED | *Reconstructed Information*<br>0 = NOT A RECONSTRUCTED VEHICLE |
| *Surviorship Agreement Information*<br>0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information*<br>0 = TEXAS TITLE IS NOT REVOKED | *DPS Suspension Information*<br>0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information*<br>0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| *Registration Validity Information*<br>0 = REGISTRATION IS VALID | *Registration Hot Check Information*<br>0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | *License Plate Seizure Information*<br>0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information*<br>0 = REGISTRATION STICKER NOT SEIZED |
| *Electronic Title Information*<br>2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information*<br>0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| *Click here for more vehicles at this address*<br>Redacted ▓▓▓▓ TX 75149-1760 | *Click here for more vehicles in this area*<br>Redacted ▓▓▓▓ TX 75149-1760 | *Plate Number*<br>Redacted ▓ |
|---|---|---|

## Lien Holders

| *Lien Holder Postion*<br>1 | *Lien Date*<br>20120825 |
|---|---|

### Lien Holder Information

| *Lien Holder Name*<br>INTEGRITY TEXAS FUNDING | *Lien Holder Number*<br>067491478 | *Street*<br>3639 GUS THOMASSON RD | *Street (cont)* |
|---|---|---|---|
| *City*<br>MESQUITE | *State*<br>TX | *Zip Code*<br>75150- | *Country* |

---

**Oct 28 2013, 15:17:59**

20131028151759151759 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
p!=75149176029
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?db=txdmv&rec=5172222739&cd=114&dlnumber=020994108&dlstate=TX&id=&identifier=&sessionid=&tacdmv=DPPA-04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131028-SHADOW106.html|823422467

➡ Texas - Department of Motor Vehicles [Owners]

Results for **Redacted** on 1 database(s) Searched by VIN

**Redacted**

*Texas - Department of Motor Vehicles [Owners]* ⊞

**Redacted**

1

*Your account 011988406-TX has been charged 1 'Look-up' on November 1, 2013 at 17:13:43.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2013 - PublicData.com

| Nov 1 2013, 17:13:45 |
|---|

20131101171345171345 011988406 TX DETAIL
DB=txdmv
ed=114
rec=17061266284
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=3fafp31341r175598&input=txdmv&tacDMV=DPPA-
01&type=vin&dlnumber=011988406&dlstate=TX&id=&identifier=&sessionid=&o=grp_dmv_vin
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20131101-SHADOW105.html|733536647

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| **Redacted** | **Redacted** | FORT WORTH | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 76116- | **Redacted** | N RICHLAND | TX |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | **Redacted** | **Redacted** | 04 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2012 | 2013 | 04 | May 1 2012 |
| Title Date | Ownership Information | Model Year | Make |
| Feb 5 2009 | 01 = TEXAS TITLE | 2001 | FORD |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color[Color Group] |
| FOC | FORD FOCUS | 2D = 2-DOOR SEDAN | GRAY (Color Group GRAY) |
| Vehicle Minor Color[Color Group] | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| | PASS | 0000 | 0000619400 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 002600 | 002600 | **Redacted** |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE | 0 = TEXAS SAFETY INSPECTION NOT WAIVED |

PD5P018088

0611

|  |  | APPLICATION |  |
| --- | --- | --- | --- |
| *Junk Title Information*<br>0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information*<br>0 = NO PERMIT REQUIRED | *Rebuilt Information*<br>0 = NEVER SALVAGED | *Reconstructed Information*<br>0 = NOT A RECONSTRUCTED VEHICLE |
| *Surviorship Agreement Information*<br>0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information*<br>0 = TEXAS TITLE IS NOT REVOKED | *DPS Suspension Information*<br>0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information*<br>0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| *Registration Validity Information*<br>0 = REGISTRATION IS VALID | *Registration Hot Check Information*<br>0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | *License Plate Seizure Information*<br>0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information*<br>0 = REGISTRATION STICKER NOT SEIZED |
| *Electronic Title Information*<br>2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information*<br>0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS |  |  |

*Above information as provided by state - below are our annotations*

| *Click here for more vehicles at this address*<br>Redacted<br>Worth,TX 76116-7004 | *Click here for more vehicles in this area*<br>Redacted TX 76116-7004 | *Plate Number*<br>Redacted |
| --- | --- | --- |

## Lien Holders

| *Lien Holder Postion*<br>1 | *Lien Date*<br>20090119 |
| --- | --- |

### Lien Holder Information

| *Lien Holder Name*<br>INTEGRITY TEXAS FUNDING | *Lien Holder Number*<br>066996863 | *Street*<br>6700 GRAPEVINE HWY | *Street (cont)* |
| --- | --- | --- | --- |
| *City*<br>RICHLAND HILLS | *State*<br>TX | *Zip Code*<br>76180- | *Country* |

### Certified Lien Holders

---

| Nov 5 2013, 12:22:32 |
| --- |

20131105122232122233 011988406 TX SEARCH
Type=vin
LN=TXDMV
DB=txdmv
pl=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?o=grp_dmv_vin&dlnumber=011988406&dlstate=TX
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20131105-SHADOW105.html|406272015

---

## PublicData.com

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by VIN

Redacted

*Texas - Department of Motor Vehicles [Owners]*

Redacted

1

*Your account 011988406-TX has been charged 1 'Look-up' on November 5, 2013 at 12:22:33.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2013 - PublicData.com

---

| Nov 5 2013, 12:22:34 |
| --- |

20131105122234122235 011988406 TX DETAIL

PD_018689

Type=vin
LN=GRP_DMV_VIN
DB=grp_dmv_vin
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_vin&dlnumber=020994108&dlstate=TX&id=B4C3E45183D5244E2D8666D114EA418C&identifier=10503108&sessionid=36B5BD800A2016629AFD4BAEC1A8AD2F
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131203-SHADOW104.html|418314717

# PublicData.com

Home | My Account | Account History | Autosearch | Refer Friends & Earn Lookups | Logout

➡ DMV VIN Search

Results for Redacted on 19 database(s) Searched by VIN

Redacted

*Texas - Department of Motor Vehicles [Owners]* ☐

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on December 3, 2013 at 12:23:49.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2013 - PublicData.com

Dec 3 2013, 12:23:50

20131203122350122351 020994108 TX DETAIL
DB=txdmv
ed=114
rec=4921882320
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=1d4hd48n05f614794&input=grp_dmv_vin&tacDMV=DPPA-
04&type=vin&dlnumber=020994108&dlstate=TX&id=B4C3E45183D5244E2D8666D114EA418C&identifier=10503108&sessionid=36B5BD800A2016629AFD4BAEC1A8AD2F&o=grp_dmv
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131203-SHADOW104.html|418457319

# PublicData.com

Home | My Account | Account History | Autosearch | Refer Friends & Earn Lookups | Logout

➡ Texas - Department of Motor Vehicles [Owners] Detail

*Record Details*

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | ROYSE CITY | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75189- | Redacted | GARLAND | TX |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 07 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2013 | 2014 | 07 | Aug 1 2013 |
| Title Date | Ownership Information | Model Year | Make |
| May 21 2010 | 01 = TEXAS TITLE | 2005 | DODGE |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color(Color Group) |
| DUR | DODGE DURANGO | LL = SUBURBAN/SUV | BLUE (Color Group BLUE) |
| Vehicle Minor Color(Color Group) | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |

PD013191
0613

| *Vehicle Major Color/Color Group* | *Vehicle Class Code* PASS-TRK | *Vehicle Tonnage* 0050 | *Vehicle Seats Fact* 0000000000 |
|---|---|---|---|
| *Vehicle Sold Date* 00000000 | *Vehicle Empty Weight* 004800 | *Vehicle Gross Weight* 004800 | *Vin Number* Redacted |
| *Bonded Title Information* none found | *Document Type Information* 01 = REGULAR TITLE | *Vehicle Odometer Information* A = ACUTAL MILEAGE | *Diesel Information* 0 = VEHICLE IS NOT DIESEL POWERED |
| *DOT Standards Information* 0 = VEHICLE DOES NOT MEET STANDARDS | *DPS Stolen Indicator* 0 = VEHICLE IS NOT STOLEN | *Registration Exemption* 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | *Fixed Bed Weight Information* 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| *Flood Damage Information* 0 = VEHICLE HAS NO FLOOD DAMAGE | *Government Ownership Information* 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | *Title Hot Check Information* 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | *Inspection Waived Information* 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| *Junk Title Information* 0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information* 0 = NO PERMIT REQUIRED | *Rebuilt Information* 0 = NEVER SALVAGED | *Reconstructed Information* 0 = NOT A RECONSTRUCTED VEHICLE |
| *Survivorship Agreement Information* 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information* 0 = TEXAS TITLE IS NOT REVOKED | *DPS Suspension Information* 0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information* 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| *Registration Validity Information* 0 = REGISTRATION IS VALID | *Registration Hot Check Information* 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | *License Plate Seizure Information* 0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information* 0 = REGISTRATION STICKER NOT SEIZED |
| *Electronic Title Information* 2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information* 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| *Click here for more vehicles at this address* Redacted Royse City,TX 75189-4670 | *Click here for more vehicles in this area* Redacted Royse City,TX 75189-4670 | *Plate Number* Redacted |
|---|---|---|

## Lien Holders

| *Lien Holder Position* 1 | *Lien Date* 20100501 |
|---|---|

## Lien Holder Information

| *Lien Holder Name* INTEGRITY TEXAS FUNDING | *Lien Holder Number* 072154393 | *Street* 5501 BROADWAY BLVD., STE. 105 | *Street (cont)* |
|---|---|---|---|
| *City* GARLAND | *State* TX | *Zip Code* 75043- | *Country* |

**Dec 3 2013, 12:24:06**

20131203122406122407 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
pl=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?
db=txdmv&rec=4921882320&ed=114&dlnumber=020994108&dlstate=TX&id=B4C3E45183D5244E2D8666D114EA418C&identifier=10503108&sessionid=36B5BD800A2016629AFD4BAE04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131203-SHADOW104.html418874965

DB=grp_dmv_plate
p1=CL8D826
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_plate&dlnumber=020994108&dlstate=TX&id=0D6471A1FB14011C84BA00ABCE4B04F0&identifier=10503108&sessionid=9155711FAB2E79143279A5CBA5C4A625
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131216-SHADOW106.html|592210690

# PublicData.com

Home | My Account | Account History | Autosearch | Refer Friends & Earn Lookups | Logout

➡ DMV License Plate Search

Results for Redacted on 16 database(s) Searched by PLATE

Redacted

*Texas - Department of Motor Vehicles [Owners]* 🔲

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on December 16, 2013 at 14:11:38.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2013 - PublicData.com

| Dec 16 2013, 14:11:39 |
|---|

20131216141139141140 020994108 TX DETAIL
DB=txdmv
ed=114
rec=5036072056
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=cl8d826&input=grp_dmv_plate&tacDMV=DPPA-04&type=plate&dlnumber=020994108&dlstate=TX&id=0D6471A1FB14011C84BA00ABCE4B04F0&identifier=10503108&sessionid=9155711FAB2E79143279A5CBA5C4A625&o=grp_dm
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20131216-SHADOW106.html|592340136

PD_013247

0615

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | DALLAS | TX |
| **Owner ZIP Code** | **Previous Owner Name** | **Previous Owner City** | **Previous Owner State** |
| 75243- | Redacted | MESQUITE | TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
| | | | |
| **Renewal Notice ZIP+4** | **License Plate Number** | **Previous License Plate Number** | **Previous Expiration Month** |
| | Redacted | Redacted | 03 |
| **Previous Expiration Year** | **Registration Expiration Year** | **Registration Expiration Month** | **Registration Effective** |
| 2013 | 2014 | 03 | Apr 5 2013 |
| **Title Date** | **Ownership Information** | **Model Year** | **Make** |
| Jun 26 2013 | 12 = CERTIFIED COPY OF TEXAS TITLE | 2010 | TOYOTA |
| **Model** | **Model Description** | **Vehicle Body Type** | **Vehicle Major Color[Color Group]** |
| CBA | TOYTCBA | 4D = 4-DOOR SEDAN | WHITE (Color Group WHITE) |
| **Vehicle Minor Color[Color Group]** | **Vehicle Class Code** | **Vehicle Tonnage** | **Vehicle Sales Price** |
| | PASS | 0000 | 0001669500 |
| **Vehicle Sold Date** | **Vehicle Empty Weight** | **Vehicle Gross Weight** | **Vin Number** |
| 00000000 | 003400 | 003400 | Redacted |
| **Bonded Title Information** | **Document Type Information** | **Vehicle Odometer Information** | **Diesel Information** |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** | **DPS Stolen Indicator** | **Registration Exemption** | **Fixed Bed Weight Information** |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** | **Government Ownership Information** | **Title Hot Check Information** | **Inspection Waived Information** |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| **Junk Title Information** | **Permit Required Information** | **Rebuilt Information** | **Reconstructed Information** |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| **Survivorship Agreement Information** | **Title Revoked Information** | **DPS Suspension Information** | **Heavy Use Tax Information** |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| **Registration Validity Information** | **Registration Hot Check Information** | **License Plate Seizure Information** | **Registration Sticker Seizure Information** |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| **Electronic Title Information** | **Lemon Law Information** | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number | |
|---|---|---|---|
| Redacted<br>75243-7122 | Redacted | Redacted | |

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20130603 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 081001660 | 4401 LEMMON AVENUE | |
| **City** | **State** | **Zip Code** | **Country** |
| DALLAS | TX | 75219- | |

# PublicData.com

➡ Dallas County(Texas) - Civil Court [Prior to Nov. 2005] Detail

## Record Details

| Court | | Case Number | Case Description | File Date |
|---|---|---|---|---|
| Redacted | . | Redacted | Redacted | Redacted |
| Estate Status | | Creation Code | Record Status | . |
| | | C | 1 | |

## Plaintiff(s)

| Name | Process Date | Active Date |
|---|---|---|
| Redacted | Redacted | |

| Name | Process Date | Active Date |
|---|---|---|
| Redacted | Redacted | |

## Defendant(s)

| none found |
|---|

*Your account 016440562-TX has been charged 1 'Look-up' on December 17, 2013 at 10:32:07.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2013 - PublicData.com

---

### Dec 17 2013, 10:32:46

20131217103246103252 016440562 TX SEARCH
Type=vin
LN=GRP_DMV_VIN
DB=grp_dmv_vin
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_vin&dlnumber=016440562&dlstate=TX&id=0B78E034E53D372BC33E8F90D5D3F557&identifier=10509978&sessionid=7523B0A51487BF75FD79864CA1B4F4C0
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
lacdmv=DPPA-01
webfile=20131217-SHADOW104.html|224079201

---

# PublicData.com

➡ DMV VIN Search

Results for Redacted on 19 database(s) Searched by VIN

Redacted
*Texas - Department of Motor Vehicles [Owner] □*
Redacted

1

*Your account 016440562-TX has been charged 1 'Look-up' on December 17, 2013 at 10:32:52.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2013 - PublicData.com

---

### Dec 17 2013, 10:32:54

20131217103254103254 016440562 TX DETAIL
DB=txdmv
ed=114
rec=4678405910

ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=Redacted &input=grp_dmv_vin&tacDMV=DPPA-
01&type=vin&dlnumber=016440562&dlstate=TX&id=0B78E034E53D372BC33E8F90D5D3F557&identifier=10509978&sessionid=7523B0A51487BF75FD79864CA1B4F4C0&o=grp_dmv_v
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20131217-SHADOW104.html|224123033

PD_017989
**0618**

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | GARLAND | TX |
| **Owner ZIP Code** | **Previous Owner Name** | **Previous Owner City** | **Previous Owner State** |
| 75043- | Redacted | RICHARDSON | TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
|  |  |  |  |
| **Renewal Notice ZIP+4** | **License Plate Number** | **Previous License Plate Number** | **Previous Expiration Month** |
|  | Redacted | Redacted | 08 |
| **Previous Expiration Year** | **Registration Expiration Year** | **Registration Expiration Month** | **Registration Effective** |
| 2012 | 2013 | 08 | Feb 13 2013 |
| **Title Date** | **Ownership Information** | **Model Year** | **Make** |
| Aug 20 2013 | 12 = CERTIFIED COPY OF TEXAS TITLE | 2006 | DODGE |
| **Model** | **Model Description** | **Vehicle Body Type** | **Vehicle Major Color(Color Group)** |
| CHA | DODGE CHARGER (AND SHELBY CHARGER) | 4D = 4-DOOR SEDAN | SILVER (Color Group SILVER) |
| **Vehicle Minor Color(Color Group)** | **Vehicle Class Code** | **Vehicle Tonnage** | **Vehicle Sales Price** |
|  | PASS | 0000 | 0000000000 |
| **Vehicle Sold Date** | **Vehicle Empty Weight** | **Vehicle Gross Weight** | **Vin Number** |
| 00000000 | 004000 | 004000 | Redacted |
| **Bonded Title Information** | **Document Type Information** | **Vehicle Odometer Information** | **Diesel Information** |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** | **DPS Stolen Indicator** | **Registration Exemption** | **Fixed Bed Weight Information** |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** | **Government Ownership Information** | **Title Hot Check Information** | **Inspection Waived Information** |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| **Junk Title Information** | **Permit Required Information** | **Rebuilt Information** | **Reconstructed Information** |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| **Survivorship Agreement Information** | **Title Revoked Information** | **DPS Suspension Information** | **Heavy Use Tax Information** |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| **Registration Validity Information** | **Registration Hot Check Information** | **License Plate Seizure Information** | **Registration Sticker Seizure Information** |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| **Electronic Title Information** | **Lemon Law Information** |  |  |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS |  |  |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
|---|---|---|
| Redacted | Redacted | Redacted |

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20130730 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 067491478 | 3639 GUS THOMASSON RD |  |
| **City** | **State** | **Zip Code** | **Country** |
| MESQUITE | TX | 75150- |  |

PD_017990

Jan 17 2014, 15:14:39

20140117151439151439 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
p1=75211311241
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?db=txdmv&rec=5969473794&ed=114&dlnumber=020994108&dlstate=TX&id=&identifier=&sessionid=&tacdmv=DPPA-04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140117-SHADOW104.html|687669119

# PublicData.com

⇨ Texas - Department of Motor Vehicles [Owners]

Results for "75211311241" on 1 database(s) Searched by ZIP Code

Redacted Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted , DALLAS, TX 75211-3112

Redacted Redacted Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted Redacted DALLAS, TX 75211-3112

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75211-3112

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75211-3112

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75211-3112

Redacted Redacted Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75211-3112

Redacted Redacted Redacted Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted Redacted DALLAS, TX 75211-3112

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted DALLAS, TX 75211-3112

1

*Your account 020994108-TX has been charged 1 'look-up' on January 17, 2014 at 15:14:39.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

Jan 17 2014, 15:14:44

20140117151444151445 020994108 TX DETAIL
DB=txdmv
ed=114
rec=5088724667
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?Type=Zip&input=txdmv&p1=75211311241&id=&dlnumber=020994108&dlstate=TX&identifier=&sessionid=&tacdmv=DPPA-04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04

PD_013545
0620

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | DALLAS | TX |
| **Owner ZIP Code** 75211- | **Previous Owner Name** Redacted | **Previous Owner City** DALLAS | **Previous Owner State** TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
| **Renewal Notice ZIP+4** | **License Plate Number** Redacted | **Previous License Plate Number** Redacted | **Previous Expiration Month** 10 |
| **Previous Expiration Year** 2007 | **Registration Expiration Year** 2008 | **Registration Expiration Month** 10 | **Registration Effective** Nov 1 2007 |
| **Title Date** Dec 12 2008 | **Ownership Information** 01 = TEXAS TITLE | **Model Year** 1996 | **Make** FORD |
| **Model** MGT | **Model Description** FORDMGT | **Vehicle Body Type** 2D = 2-DOOR SEDAN | **Vehicle Major Color[Color Group]** |
| **Vehicle Minor Color[Color Group]** | **Vehicle Class Code** PASS | **Vehicle Tonnage** 0000 | **Vehicle Sales Price** 0000450000 |
| **Vehicle Sold Date** 00000000 | **Vehicle Empty Weight** 003400 | **Vehicle Gross Weight** 003400 | **Vin Number** Redacted Redacted |
| **Bonded Title Information** none found | **Document Type Information** 01 = REGULAR TITLE | **Vehicle Odometer Information** NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | **Diesel Information** 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** 0 = VEHICLE DOES NOT MEET STANDARDS | **DPS Stolen Indicator** 0 = VEHICLE IS NOT STOLEN | **Registration Exemption** 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | **Fixed Bed Weight Information** 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** 0 = VEHICLE HAS NO FLOOD DAMAGE | **Government Ownership Information** 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | **Title Hot Check Information** 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | **Inspection Waived Information** 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| **Junk Title Information** 0 = VEHICLE HAS NO JUNK RECORDS | **Permit Required Information** 0 = NO PERMIT REQUIRED | **Rebuilt Information** 0 = NEVER SALVAGED | **Reconstructed Information** 0 = NOT A RECONSTRUCTED VEHICLE |
| **Survivorship Agreement Information** 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | **Title Revoked Information** 0 = TEXAS TITLE IS NOT REVOKED | **DPS Suspension Information** 0 = SUSPENSION NOT ISSUED | **Heavy Use Tax Information** 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| **Registration Validity Information** 0 = REGISTRATION IS VALID | **Registration Hot Check Information** 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | **License Plate Seizure Information** 0 = REGISTRATION PLATES NOT SEIZED | **Registration Sticker Seizure Information** 0 = REGISTRATION STICKER NOT SEIZED |
| **Electronic Title Information** 2 = NEGOTIABLE TITLE ON PAPER | **Lemon Law Information** 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number | |
|---|---|---|---|
| Redacted Dallas, TX 75211-3112 | Redacted Dallas, TX 75211-3112 | Redacted | |

## Lien Holders

| Lien Holder Position | Lien Date |
|---|---|
| 1 | 20081115 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 067727776 | 3306 IRVING BLVD | |

PD_013546

➡ DMV License Plate Search

Results for **Redacted** on 16 database(s) Searched by PLATE

**Redacted**

*Texas - Department of Motor Vehicles [Owners]* ⊞

**Redacted**

1

*Your account 020994108-TX has been charged 1 'Look-up' on February 20, 2014 at 15:23:23.*

Terms of Use I Frequently Asked Questions I Contact Us I Policies and Positions I About PublicData

All information contained herein © Copyright 1997-2014 - PublicData.com

---

| Feb 20 2014, 15:23:24 |
|---|

20140220152324152325 020994108 TX DETAIL
DB=txdmv
ed=116
rec=13571116831
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=**Redacted**&input=grp_dmv_plate&tacDMV=DPPA-
04&type=plate&dlnumber=020994108&dlstate=TX&id=95A55D0CC33DBAB93F984714665D55CC&identifier=10503108&sessionid=E971124B55B8E2F488CAC3D0626D2436&o=grp_dm
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140220-SHADOW106.html|843806141

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | GREENVILLE | TX |
| *Owner ZIP Code* | *Previous Owner Name* | *Previous Owner City* | *Previous Owner State* |
| 75402- | Redacted | ROCKWALL | TX |
| *Renewal Notice Street* | *Renewal Notice City* | *Renewal Notice State* | *Renewal Notice ZIP Code* |
|  |  |  |  |
| *Renewal Notice ZIP+4* | *License Plate Number* | *Previous License Plate Number* | *Previous Expiration Month* |
|  | Redacted | Redacted | 03 |
| *Previous Expiration Year* | *Registration Expiration Year* | *Registration Expiration Month* | *Registration Effective* |
| 2013 | 2014 | 03 | Apr 1 2013 |
| *Title Date* | *Ownership Information* | *Model Year* | *Make* |
| Jul 19 2013 | 01 = TEXAS TITLE | 2000 | CHEVROLET |
| *Model* | *Model Description* | *Vehicle Body Type* | *Vehicle Major Color[Color Group]* |
| MLS | CHEVMLS | CP = COUPE | WHITE (Color Group WHITE) |
| *Vehicle Minor Color[Color Group]* | *Vehicle Class Code* | *Vehicle Tonnage* | *Vehicle Sales Price* |
|  | PASS | 0000 | 0000250000 |
| *Vehicle Sold Date* | *Vehicle Empty Weight* | *Vehicle Gross Weight* | *Vin Number* |
| 00000000 | 004000 | 004000 | Redacted |
| *Bonded Title Information* | *Document Type Information* | *Vehicle Odometer Information* | *Diesel Information* |
| none found | 01 = REGULAR TITLE | NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | 0 = VEHICLE IS NOT DIESEL POWERED |
| *DOT Standards Information* | *DPS Stolen Indicator* | *Registration Exemption* | *Fixed Bed Weight Information* |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| *Flood Damage Information* | *Government Ownership Information* | *Title Hot Check Information* | *Inspection Waived Information* |
| 0 = VEHICLE HAS NO | 0 = VEHICLE IS NOT U.S. GOVERNMENT | 0 = NO HOT CHECK | 0 = TEXAS SAFETY INSPECTION IS |

PD 014014
0622

| FLOOD DAMAGE | OWNED | | EXISTS FOR TITLE APPLICATION | NOT WAIVED |
|---|---|---|---|---|
| *Junk Title Information* <br> 0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information* <br> 0 = NO PERMIT REQUIRED | | *Rebuilt Information* <br> 0 = NEVER SALVAGED | *Reconstructed Information* <br> 0 = NOT A RECONSTRUCTED VEHICLE |
| *Survivorship Agreement Information* <br> 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information* <br> 0 = TEXAS TITLE IS NOT REVOKED | | *DPS Suspension Information* <br> 0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information* <br> 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| *Registration Validity Information* <br> 0 = REGISTRATION IS VALID | *Registration Hot Check Information* <br> 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | | *License Plate Seizure Information* <br> 0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information* <br> 0 = REGISTRATION STICKER NOT SEIZED |
| *Electronic Title Information* <br> 2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information* <br> 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | | |

*Above information as provided by state - below are our annotations*

| *Click here for more vehicles at this address* <br> Redacted Greenville, TX 75402-9034 | *Click here for more vehicles in this area* <br> Redacted Greenville, TX 75402-9034 | *Plate Number* <br> Redacted |
|---|---|---|

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20130705 |

## Lien Holder Information

| Lien Holder Name | | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|---|
| INTEGRITY TEXAS FUNDING | | 081181376 | 6210 WESLEY STREET | |
| City | | State | Zip Code | Country |
| GREENVILLE | | TX | 75402- | |

| Feb 20 2014, 15:45:45 |
|---|

20140220154545154546 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
p1=75402903404
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?
db=txdmv&rec=13571116831&ed=116&dlnumber=020994108&dlstate=TX&id=95A55D0CC33DBAB93F984714665D55CC&identifier=10503108&sessionid=E971124B55B8E2F488CAC3104
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140220-SHADOW106.html|882004136

PD_014015

0623

⇨ Texas - Department of Motor Vehicles [Owners]

Results for "75402903404" on 1 database(s) Searched by ZIP Code

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted
*Texas - Department of Motor Vehicles [Owners]* 🔲
Redacted GREENVILLE, TX 75402-9034

Redacted Redacted
Redacted GREENVILLE, TX 75402-9034

1

*Your account 020994108-TX has been charged 1 'Look-up' on February 20, 2014 at 15:45:46.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2014 - PublicData.com

---

**Feb 20 2014, 15:45:48**

20140220154548154548 020994108 TX DETAIL
DB=txdmv
ed=116
rec=5682118919
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?
Type=Zip&input=txdmv&p1=75402903404&id=95A55D0CC33DBAB93F984714665D55CC&dlnumber=020994108&dlstate=TX&identifier=10503108&sessionid=E971124B55B8E2F488CA
04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140220-SHADOW106.html|882142886

---

⇨ Texas - Department of Motor Vehicles [Owners] Detail

*Record Details*

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | GREENVILLE | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75402- | Redacted | GARLAND | TX |

PD_014016

0624

| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
|---|---|---|---|
| Renewal Notice ZIP+4 | License Plate Number<br>**Redacted** | Previous License Plate Number<br>**Redacted** | Previous Expiration Month<br>05 |
| Previous Expiration Year<br>2011 | Registration Expiration Year<br>2012 | Registration Expiration Month<br>11 | Registration Effective<br>Dec 12 2011 |
| Title Date<br>Jul 19 2001 | Ownership Information<br>06 = MANUFACTURER'S CERTIFICATION OF ORIGIN | Model Year<br>2001 | Make<br>CHEVROLET |
| Model<br>BZR | Model Description<br>CHEVBZR | Vehicle Body Type<br>UT = UTILITY | Vehicle Major Color(Color Group)<br>WHITE (Color Group WHITE) |
| Vehicle Minor Color(Color Group) | Vehicle Class Code<br>PASS-TRK | Vehicle Tonnage<br>0050 | Vehicle Sales Price<br>0002639999 |
| Vehicle Sold Date<br>00000000 | Vehicle Empty Weight<br>004000 | Vehicle Gross Weight<br>004000 | Vin Number<br>**Redacted** |
| Bonded Title Information<br>none found | Document Type Information<br>01 = REGULAR TITLE | Vehicle Odometer Information<br>A = ACUTAL MILEAGE | Diesel Information<br>0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information<br>0 = VEHICLE DOES NOT MEET STANDARDS | DPS Stolen Indicator<br>0 = VEHICLE IS NOT STOLEN | Registration Exemption<br>0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | Fixed Bed Weight Information<br>0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information<br>0 = VEHICLE HAS NO FLOOD DAMAGE | Government Ownership Information<br>0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | Title Hot Check Information<br>0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | Inspection Waived Information<br>0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| Junk Title Information<br>0 = VEHICLE HAS NO JUNK RECORDS | Permit Required Information<br>0 = NO PERMIT REQUIRED | Rebuilt Information<br>0 = NEVER SALVAGED | Reconstructed Information<br>0 = NOT A RECONSTRUCTED VEHICLE |
| Survivorship Agreement Information<br>0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | Title Revoked Information<br>0 = TEXAS TITLE IS NOT REVOKED | DPS Suspension Information<br>0 = SUSPENSION NOT ISSUED | Heavy Use Tax Information<br>0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| Registration Validity Information<br>0 = REGISTRATION IS VALID | Registration Hot Check Information<br>0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | License Plate Seizure Information<br>0 = REGISTRATION PLATES NOT SEIZED | Registration Sticker Seizure Information<br>0 = REGISTRATION STICKER NOT SEIZED |
| Electronic Title Information<br>2 = NEGOTIABLE TITLE ON PAPER | Lemon Law Information<br>0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number | |
|---|---|---|---|
| **Redacted** Greenville,TX 75402-9034 | **Redacted** Greenville,TX 75402-9034 | **Redacted** | |

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20010611 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| COMMUNITY CREDIT UNION | 032726377 | P.O. BOX 867239 | |
| City | State | Zip Code | Country |
| PLANO | TX | 75086- | |

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20010611 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| COMMUNITY CREDIT UNION | 032726377 | P.O. BOX 867239 | |
| City | State | Zip Code | Country |
| PLANO | TX | 75086- | |

ed=116
rec=13571163021
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?
Type=Zip&input=txdmv&p1=75402903404&id=95A55D0CC33DBAB93F984714665D55CC&dlnumber=020994108&dlstate=TX&identifier=10503108&sessionid=E971124B55B8E2F488CA(
04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140220-SHADOW106.html|882338697

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | GREENVILLE | TX |
| **Owner ZIP Code** | **Previous Owner Name** | **Previous Owner City** | **Previous Owner State** |
| 75402-9034 | Redacted | DALLAS | TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
| | | | |
| **Renewal Notice ZIP+4** | **License Plate Number** | **Previous License Plate Number** | **Previous Expiration Month** |
| | Redacted | Redacted | 12 |
| **Previous Expiration Year** | **Registration Expiration Year** | **Registration Expiration Month** | **Registration Effective** |
| 2013 | 2014 | 12 | Jan 8 2014 |
| **Title Date** | **Ownership Information** | **Model Year** | **Make** |
| Aug 9 2013 | 01 = TEXAS TITLE | 2001 | HONDA |
| **Model** | **Model Description** | **Vehicle Body Type** | **Vehicle Major Color[Color Group]** |
| ULX | HONDULX | 4D = 4-DOOR SEDAN | GOLD (Color Group YELLOW) |
| **Vehicle Minor Color[Color Group]** | **Vehicle Class Code** | **Vehicle Tonnage** | **Vehicle Sales Price** |
| | PASS | 0000 | 0002098668 |
| **Vehicle Sold Date** | **Vehicle Empty Weight** | **Vehicle Gross Weight** | **Vin Number** |
| 00000000 | 003300 | 003300 | Redacted |
| **Bonded Title Information** | **Document Type Information** | **Vehicle Odometer Information** | **Diesel Information** |
| none found | 01 = REGULAR TITLE | NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** | **DPS Stolen Indicator** | **Registration Exemption** | **Fixed Bed Weight Information** |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** | **Government Ownership Information** | **Title Hot Check Information** | **Inspection Waived Information** |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| **Junk Title Information** | **Permit Required Information** | **Rebuilt Information** | **Reconstructed Information** |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| **Survivorship Agreement Information** | **Title Revoked Information** | **DPS Suspension Information** | **Heavy Use Tax Information** |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| **Registration Validity Information** | **Registration Hot Check Information** | **License Plate Seizure Information** | **Registration Sticker Seizure Information** |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| **Electronic Title Information** | **Lemon Law Information** | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number | |
|---|---|---|---|
| Redacted Greenville,TX 75402-9034 | Redacted Greenville,TX 75402-9034 | Redacted | |

PD_014018

0626

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20130724 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 071608359 | 6210 WESLEY STREET | |
| City | State | Zip Code | Country |
| GREENVILLE | TX | 75402- | |

| Feb 20 2014, 15:46:27 |
|---|

20140220154627154627 020994108 TX DETAIL
DB=txdmv
ed=116
rec=13582131475
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?
Type=Zip&input=txdmv&p1=75402903404&id=95A55D0CC33DBAB93F984714665D55CC&dlnumber=020994108&dlstate=TX&identifier=10503108&sessionid=E971124B55B8E2F488CA
04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140220-SHADOW106.html|883415419

PD_014019
0627

server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140226-SHADOW105.html|202675907

# PublicData.com

⇨ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | Redacted | Redacted |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| Redacted | Redacted | Redacted | Redacted |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| Redacted | Redacted | Redacted | Redacted |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | Redacted |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| Redacted | Redacted | Redacted | Dec 10 2013 |
| Title Date | Ownership Information | Model Year | Make |
| Redacted | Redacted | Redacted | Redacted |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color[Color Group] |
| Redacted | Redacted | Redacted | Redacted |
| Vehicle Minor Color[Color Group] | Vehicle Class Code | | |
| | Redacted | | |

---

**Feb 26 2014, 12:07:08**

20140226120708120708 020994108 TX SEARCH
Type=vin
LN=GRP_DMV_VIN
DB=grp_dmv_vin
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_vin&dlnumber=020994108&dlstate=TX&id=2084C1F2360F65AF73125C328B3FC041&identifier=10503108&sessionid=DE6692C0A76299B923l9873B030E7256
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140226-SHADOW106.html|464772373

---

# PublicData.com

⇨ DMV VIN Search

Results for Redacted on 19 database(s) Searched by VIN

Redacted

Texas - Department of Motor Vehicles [Owners] 1

Redacted

1

Your account 020994108-TX has been charged 1 'Look-up' on February 26, 2014 at 12:07:08.
Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

---

**Feb 26 2014, 12:07:14**

20140226120714120715 020994108 TX DETAIL
DB=txdmv
ed=116

PD_014084

0628

rec=5156016994
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=jnras08u03x101721&input=grp_dmv_vin&tacDMV=DPPA-04&type=vin&dlnumber=020994108&dlstate=TX&id=2084C1F2360F65AF73125C328B3FC041&identifier=10503108&sessionid=DE6692C0A76299B923 19873B030E7256&o=grp_dmv_vin
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140226-SHADOW106.html|464890969

# PUBLICDATA.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | ROWLETT | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75089- | Redacted | PLANO | TX |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 05 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2013 | 2014 | 08 | Sep 11 2013 |
| Title Date | Ownership Information | Model Year | Make |
| Sep 12 2012 | 01 = TEXAS TITLE | 2003 | INFINITI |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color/Color Group |
| FX3 | INFINITY FX35 | LL = SUBURBAN/SUV | WHITE (Color Group WHITE) |
| Vehicle Minor Color/Color Group | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| | PASS | 0000 | 0001296879 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 004000 | 004000 | Redacted |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| Junk Title Information | Permit Required Information | Rebuilt Information | Reconstructed Information |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| Survivorship Agreement Information | Title Revoked Information | DPS Suspension Information | Heavy Use Tax Information |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| Registration Validity Information | Registration Hot Check Information | License Plate Seizure Information | Registration Sticker Seizure Information |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| Electronic Title Information | Lemon Law Information | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
|---|---|---|
| Redacted<br>Rowlett, TX 75089-2866 | Redacted Rowlett, TX 75089-2866 | Redacted |

## Lien Holders

| Lien Holder Position | | Lien Date |
|---|---|---|

PD 014085

0629

*Lien Holder Information*

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 071144553 | 1529B W BUCKINGHAM BLVD | |
| City | State | Zip Code | Country |
| GARLAND | TX | 75042- | |

*Certified Lien Holders*

| Feb 26 2014, 12:07:51 |
|---|

20140226120751120751 020994108 TX SEARCH
Type=zip
LN=TXDMV
DB=txdmv
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pddetails.php?
db=txdmv&rec=5156016994&cd=116&dbnumber=020994108&dlstate=TX&id=2084C1F2360F65AF73125C328B3FC041&identifier=10503108&sessionid=DE6692C0A76299B92319873B0:
04
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140226-SHADOW106.html465892918

LN=TXDMV
DB=txdmv
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?o=grp_dmv_vin&dlnumber=011988406&dlstate=TX
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140205-SHADOW104.html|500873931

---

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by VIN

No Records Matching Search Criteria. Please Try Again

*Your account 011988406-TX has been charged 1 'Look-up' on February 5, 2014 at 12:53:06.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

---

## Feb 28 2014, 11:11:56

20140228111156111156 011988406 TX SEARCH
Type=vin
LN=TXDMV
DB=txdmv
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?o=grp_dmv_vin&dlnumber=011988406&dlstate=TX
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140228-SHADOW104.html|351259453

---

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by VIN

Redacted

*Texas - Department of Motor Vehicles [Owners]*

Redacted

1

*Your account 011988406-TX has been charged 1 'Look-up' on February 28, 2014 at 11:11:56.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

---

## Feb 28 2014, 11:12:01

20140228111201111201 011988406 TX DETAIL
DB=txdmv
ed=116
rec=11276263142
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=Redacted-&input=txdmv&tacDMV=DPPA-01&type=vin&dlnumber=011988406&dlstate=TX&id=&identifier=&sessionid=&o=grp_dmv_vin

PD_018814

0631

server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140228-SHADOW104.html|351378969

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted  Redacted | HOUSTON | TX |
| **Owner ZIP Code** 77042- | **Previous Owner Name** Redacted | **Previous Owner City** ROSENBERG | **Previous Owner State** TX |
| **Renewal Notice Street** | **Renewal Notice City** | **Renewal Notice State** | **Renewal Notice ZIP Code** |
| **Renewal Notice ZIP+4** | **License Plate Number** Redacted | **Previous License Plate Number** Redacted | **Previous Expiration Month** 01 |
| **Previous Expiration Year** 2013 | **Registration Expiration Year** 2013 | **Registration Expiration Month** 09 | **Registration Effective** May 31 2013 |
| **Title Date** Jul 11 2013 | **Ownership Information** 01 = TEXAS TITLE | **Model Year** 2004 | **Make** FORD |
| **Model** | **Model Description** FORD | **Vehicle Body Type** 4D = 4-DOOR SEDAN | **Vehicle Major Color/Color Group** GRAY (Color Group GRAY) |
| **Vehicle Minor Color/Color Group** | **Vehicle Class Code** PASS | **Vehicle Tonnage** 0000 | **Vehicle Sales Price** 0000000000 |
| **Vehicle Sold Date** 00000000 | **Vehicle Empty Weight** 003500 | **Vehicle Gross Weight** 003500 | **Vin Number** Redacted |
| **Bonded Title Information** none found | **Document Type Information** 01 = REGULAR TITLE | **Vehicle Odometer Information** A = ACUTAL MILEAGE | **Diesel Information** 0 = VEHICLE IS NOT DIESEL POWERED |
| **DOT Standards Information** 0 = VEHICLE DOES NOT MEET STANDARDS | **DPS Stolen Indicator** 0 = VEHICLE IS NOT STOLEN | **Registration Exemption** 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | **Fixed Bed Weight Information** 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| **Flood Damage Information** 0 = VEHICLE HAS NO FLOOD DAMAGE | **Government Ownership Information** 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | **Title Hot Check Information** 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | **Inspection Waived Information** 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| **Junk Title Information** 0 = VEHICLE HAS NO JUNK RECORDS | **Permit Required Information** 0 = NO PERMIT REQUIRED | **Rebuilt Information** 0 = NEVER SALVAGED | **Reconstructed Information** 0 = NOT A RECONSTRUCTED VEHICLE |
| **Survivorship Agreement Information** 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | **Title Revoked Information** 0 = TEXAS TITLE IS NOT REVOKED | **DPS Suspension Information** 0 = SUSPENSION NOT ISSUED | **Heavy Use Tax Information** 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| **Registration Validity Information** 0 = REGISTRATION IS VALID | **Registration Hot Check Information** 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | **License Plate Seizure Information** 0 = REGISTRATION PLATES NOT SEIZED | **Registration Sticker Seizure Information** 0 = REGISTRATION STICKER NOT SEIZED |
| **Electronic Title Information** 2 = NEGOTIABLE TITLE ON PAPER | **Lemon Law Information** 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
|---|---|---|
| Redacted  Houston,TX 77042-3333 | Redacted  Houston,TX 77042-3333 | Redacted |

## Lien Holders

| Lien Holder Position | Lien Date |
|---|---|
| 1 | 20130615 |

### Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|

PD 018815

0632

| INTEGRITY TEXAS FUNDING | 081071028 | 12903 WESTHEIMER RD | |
|---|---|---|---|
| *City* HOUSTON | *State* TX | *Zip Code* 77077- | *Country* |

*Certified Lien Holders*

---

| Mar 12 2014, 16:10:29 |
|---|

20140312161029161030 011988406 TX SEARCH
Type=vin
LN=TXDMV
DB=txdmv
p1 Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?o=grp_dmv_vin&dlnumber=011988406&dlstate=TX
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140312-SHADOW106.html|820406046

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by VIN

Redacted
*Texas - Department of Motor Vehicles [Owners]* ⊞
Redacted

1

*Your account 011988406-TX has been charged 1 'Look-up' on March 12, 2014 at 16:10:30.*
Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

---

| Mar 12 2014, 16:10:46 |
|---|

20140312161046161046 011988406 TX DETAIL
DB=txdmv
ed=116
rec=11554471564
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1= Redacted &input=txdmv&tacDMV=DPPA-
01&type=vin&dlnumber=011988406&dlstate=TX&id=&identifier=&sessionid=&o=grp_dmv_vin
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140312-SHADOW106.html|820860747

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners] Detail

*Record Details*

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | Redacted | Redacted |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| Redacted | Redacted | Redacted | Redacted |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 10 |

PD_018816
0633

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by PLATE

Redacted

*Texas - Department of Motor Vehicles [Owners]* □

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on March 8, 2014 at 11:40:00.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2014 - PublicData.com

---

| Mar 8 2014, 11:40:02 |
|---|

20140308114002114002 020994108 TX DETAIL
DB=txdmv
cd=116
rec=5823756578
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=cb51256&input=txdmv&tacDMV=DPPA-04&type=plate&dlnumber=020994108&dlstate=TX&id=00CB55FC3BBE7F339B7FC43C709449CA&identifier=10503108&sessionid=BA05E4A0E6DA5CE870D3E71AECEFA59B&o=grp_c
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140308-SHADOW105.html|118691299

---

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | ROCKWALL | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75087- | Redacted | LEXINGTON | MD |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 07 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2011 | 2014 | 10 | Nov 8 2013 |
| Title Date | Ownership Information | Model Year | Make |
| Nov 18 2013 | 03 = OUT-OF-STATE TITLE | 1996 | JEEP |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color(Color Group) |
| | JEEP | LL = SUBURBAN/SUV | GREEN (Color Group GREEN) |
| Vehicle Minor Color(Color Group) | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| | PASS | 0000 | 0000100000 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 003700 | 003700 | Redacted |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO | 0 = VEHICLE IS NOT U.S. GOVERNMENT | 0 = NO HOT CHECK | 0 = TEXAS SAFETY INSPECTION IS |

PD 014220
0634

| FLOOD DAMAGE | OWNED | EXISTS FOR TITLE APPLICATION | NOT WAIVED |
|---|---|---|---|
| *Junk Title Information*<br>0 = VEHICLE HAS NO JUNK RECORDS | *Permit Required Information*<br>0 = NO PERMIT REQUIRED | *Rebuilt Information*<br>0 = NEVER SALVAGED | *Reconstructed Information*<br>0 = NOT A RECONSTRUCTED VEHICLE |
| *Survivorship Agreement Information*<br>0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | *Title Revoked Information*<br>0 = TEXAS TITLE IS NOT REVOKED | *DPS Suspension Information*<br>0 = SUSPENSION NOT ISSUED | *Heavy Use Tax Information*<br>0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| *Registration Validity Information*<br>0 = REGISTRATION IS VALID | *Registration Hot Check Information*<br>0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | *License Plate Seizure Information*<br>0 = REGISTRATION PLATES NOT SEIZED | *Registration Sticker Seizure Information*<br>0 = REGISTRATION STICKER NOT SEIZED |
| *Electronic Title Information*<br>2 = NEGOTIABLE TITLE ON PAPER | *Lemon Law Information*<br>0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |
| *Above information as provided by state - below are our annotations* | | | |
| *Click here for more vehicles at this address*<br>Redacted<br>Rockwall, TX 75087-2809 | *Click here for more vehicles in this area*<br>Redacted Rockwall, TX 75087-2809 | *Plate Number*<br>Redacted | |

## Lien Holders

| *Lien Holder Position* | *Lien Date* |
|---|---|
| 1 | 20131105 |

### Lien Holder Information

| *Lien Holder Name* | *Lien Holder Number* | *Street* | *Street (cont)* |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 082000419 | 2819 S GARLAND AVE | |
| *City* | *State* | *Zip Code* | *Country* |
| GARLAND | TX | 75041- | |

### Certified Lien Holders

| Mar 8 2014, 12:00:08 |
|---|

20140308120008120008 020994108 TX SEARCH
Type=plate
LN=TXDMV
DB=txdmv
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_plate&dlnumber=020994108&dlstate=TX&id=00CB55FC3BBE7F339B7FC43C709449CA&identifier=10503108&sessionid=BA05E4A0E6DA5CE870D3E71AECEFA59B
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140308-SHADOW105.html]128866110

# PublicData.com

➡ Texas - Department of Motor Vehicles [Owners]

Results for Redacted on 1 database(s) Searched by PLATE

Redacted

 *Texas - Department of Motor Vehicles [Owners]* [1]

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on March 8, 2014 at 12:00:08.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

20140308120009120009 020994108 TX DETAIL
DB=txdmv
ed=116
rec=5823756578
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=cb51256&input=txdmv&tacDMV=DPPA-
04&type=plate&dlnumber=020994108&dlstate=TX&id=00CB55FC3BBE7F339B7FC43C709449CA&identifier=10503108&sessionid=BA05E4A0E6DA5CE870D3E71AECEFA59B&o=grp_c
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140308-SHADOW105.html|128876747

# PublicData.com

➾ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | ROCKWALL | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75087- | Redacted | LEXINGTON | MD |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 07 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2011 | 2014 | 10 | Nov 8 2013 |
| Title Date | Ownership Information | Model Year | Make |
| Nov 18 2013 | 03 = OUT-OF-STATE TITLE | 1996 | JEEP |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color[Color Group] |
| | JEEP | LL = SUBURBAN/SUV | GREEN (Color Group GREEN) |
| Vehicle Minor Color[Color Group] | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| | PASS | 0000 | 0000100000 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 003700 | 003700 | Redacted |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | NO MILEAGE (BEFORE ODOMETER BRAND LAWS) | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| Junk Title Information | Permit Required Information | Rebuilt Information | Reconstructed Information |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| Survivorship Agreement Information | Title Revoked Information | DPS Suspension Information | Heavy Use Tax Information |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| Registration Validity Information | Registration Hot Check Information | License Plate Seizure Information | Registration Sticker Seizure Information |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| Electronic Title Information | Lemon Law Information | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number | |
|---|---|---|---|
| Redacted | Redacted | Redacted | |

PD_014222

0636

Redacted
Rockwall, TX 75087-2809

Redacted
2809

Rockwall, TX 75087-2809

Redacted

## Lien Holders

| Lien Holder Position | Lien Date |
|---|---|
| 1 | 20131105 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 082000419 | 2819 S GARLAND AVE | |
| City | State | Zip Code | Country |
| GARLAND | TX | 75041- | |

## Certified Lien Holders

---

### Mar 8 2014, 12:36:55

```
201403081236551123655 020994108 TX SEARCH
Type=plate
LN=GRP_DMV_PLATE
DB=grp_dmv_plate
p1=Redacted
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_plate&dlnumber=020994108&dlstate=TX&id=00CB55FC3BBE7F339B7FC43C709449CA&identifier=10503108&sessionid=BA05E4A0E6DA5CE870D3E71AECEFA59B
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140308-SHADOW106.html|168045648
```

---

# PublicData.com

➡ DMV License Plate Search

Results for Redacted on 16 database(s) Searched by PLATE

Redacted

*Texas - Department of Motor Vehicles [Owners]* ⊡

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on March 8, 2014 at 12:36:55.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

---

### Mar 8 2014, 12:36:56

```
20140308123656123657 020994108 TX DETAIL
DB=txdmv
ed=116
rec=18445040384
ip=174.141.1.220
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=Redacted&input=grp_dmv_plate&tacDMV=DPPA-
04&type=plate&dlnumber=020994108&dlstate=TX&id=00CB55FC3BBE7F339B7FC43C709449CA&identifier=10503108&sessionid=BA05E4A0E6DA5CE870D3E71AECEFA59B&o=grp_d
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140308-SHADOW106.html|168076124
```

20140402083417083418 020994108 TX SEARCH
Type=vin
LN=GRP_DMV_VIN
DB=grp_dmv_vin
p1=Redacted
ip=216.207.175.4
method=GET
refer=http://lbsearch.publicdata.com/pdquery.php?
o=grp_dmv_vin&dlnumber=020994108&dlstate=TX&id=5BAE647D09AA2F310999FAF058C174A3&identifier=10503108&sessionid=1517717BDE37E5C187FD09BEB29F96FB
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140402-SHADOW106.html|97120199

# PublicData.com

Home | My Account | Account History | Autosearch | Refer Friends & Earn Lookups | Logout

➡ DMV VIN Search

Results for Redacted on 19 database(s) Searched by VIN

Redacted
*Texas - Department of Motor Vehicles [Owners]*

Redacted

Redacted
*Texas - Department of Motor Vehicles [Owners]*

Redacted

1

*Your account 020994108-TX has been charged 1 'Look-up' on April 2, 2014 at 8:34:18.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData
All information contained herein © Copyright 1997-2014 - PublicData.com

20140402083420083421 020994108 TX DETAIL
DB=txdmv
cd=116
rec=5191934224
ip=216.207.175.4
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=Redacted &input=grp_dmv_vin&tacDMV=DPPA-
04&type=vin&dlnumber=020994108&dlstate=TX&id=5BAE647D09AA2F310999FAF058C174A3&identifier=10503108&sessionid=1517717BDE37E5C187FD09BEB29F96FB&o=grp_dmv_
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140402-SHADOW106.html|97264245

# PublicData.com

Home | My Account | Account History | Autosearch | Refer Friends & Earn Lookups | Logout

➡ Texas - Department of Motor Vehicles [Owners] Detail

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | DALLAS | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75217- | CINTRON AUTO SALES | DALLAS | TX |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
|  |  |  |  |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
|  | Redacted | Redacted | 04 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2014 | 2014 | 07 | Aug 26 2013 |

PD_014360
0638

| Title Date | Ownership Information | Model Year | Make |
|---|---|---|---|
| Oct 11 2013 | 01 = TEXAS TITLE | 2005 | DODGE |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color/Color Group |
| CAR | DODGCAR | VN = BOX TRAILER | GRAY (Color Group GRAY) |
| Vehicle Minor Color/Color Group | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| PASS | | 0000 | 0000138000 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 004000 | 004000 | Redacted |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| Junk Title Information | Permit Required Information | Rebuilt Information | Reconstructed Information |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 2 = REBUILT SALVAGE: DAMAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| Survivorship Agreement Information | Title Revoked Information | DPS Suspension Information | Heavy Use Tax Information |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| Registration Validity Information | Registration Hot Check Information | License Plate Seizure Information | Registration Sticker Seizure Information |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| Electronic Title Information | Lemon Law Information | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

*Above information as provided by state - below are our annotations*

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
|---|---|---|
| Redacted 75217-2100 | Redacted TX 75217-2100 | Redacted |

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20130916 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 081762388 | 3639 GUS THOMASSON RD. | |
| City | State | Zip Code | Country |
| MESQUITE | TX | 75150- | |

## Certified Lien Holders

**Apr 2 2014, 08:34:30**

20140402083430083431 020994108 TX DETAIL
DB=txdmv
ed=116
rec=10372090924
ip=216.207.175.4
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=Redacted &input=grp_dmv_vin&tacDMV=DPPA-04&type=vin&dlnumber=020994108&dlstate=TX&id=5BAE647D09AA2F310999FAF058C174A3&identifier=10503108&sessionid=1517717BDE37E5C187FD09BEB29F96FB&o=grp_dmv_
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-04
webfile=20140402-SHADOW106.html|97448850

PD_014361

0639

## Record Details

| Owner Name | Owner Street | Owner City | Owner State |
|---|---|---|---|
| Redacted | Redacted | HOUSTON | TX |

| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
|---|---|---|---|
| 77084- | Redacted | KATY | TX |

| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
|---|---|---|---|
| | | | |

| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
|---|---|---|---|
| | Redacted | Redacted | 04 |

| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
|---|---|---|---|
| 2013 | 2014 | 04 | May 1 2013 |

| Title Date | Ownership Information | Model Year | Make |
|---|---|---|---|
| May 20 2005 | 06 = MANUFACTURER'S CERTIFICATION OF ORIGIN | 2005 | DODGE |

| Model | Model Description | Vehicle Body Type | Vehicle Major Color(Color Group) |
|---|---|---|---|
| CAR | DODGCAR | VN = BOX TRAILER | BLUE (Color Group BLUE) |

| Vehicle Minor Color(Color Group) | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
|---|---|---|---|
| | PASS | 0000 | 0001989300 |

| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
|---|---|---|---|
| 00000000 | 004000 | 004000 | Redacted |

| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
|---|---|---|---|
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |

| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
|---|---|---|---|
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |

| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
|---|---|---|---|
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |

| Junk Title Information | Permit Required Information | Rebuilt Information | Reconstructed Information |
|---|---|---|---|
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |

| Survivorship Agreement Information | Title Revoked Information | DPS Suspension Information | Heavy Use Tax Information |
|---|---|---|---|
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |

| Registration Validity Information | Registration Hot Check Information | License Plate Seizure Information | Registration Sticker Seizure Information |
|---|---|---|---|
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |

| Electronic Title Information | Lemon Law Information | | |
|---|---|---|---|
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

| Above information as provided by state - below are our annotations | | |
|---|---|---|
| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
| Redacted <br> Houston, TX 77084-5962 | Redacted TX 77084-5962 | Redacted |

## Lien Holders

| Lien Holder Position | Lien Date |
|---|---|
| 1 | 20050430 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| DC SERVICES NA LLC | 056009292 | PO BOX 977 | |
| City | State | Zip Code | Country |
| ROANOKE | TX | 76262-0977 | |

➡ Texas - Department of Motor Vehicles [Owners]

Results for "75071628901" on 1 database(s) Searched by ZIP Code

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

Redacted
*Texas - Department of Motor Vehicles [Owners]*
Redacted MCKINNEY, TX 75071-6289

1

*Your account 023115630-TX has been charged 1 'Look-up' on May 19, 2014 at 15:51:58.*

Terms of Use | Frequently Asked Questions | Contact Us | Policies and Positions | About PublicData

All information contained herein © Copyright 1997-2014 - PublicData.com

| May 19 2014, 16:06:24 |
| --- |

20140519160624160624 023115630 TX DETAIL
DB=txdmv
ed=117
rec=3999180183
ip=216.207.175.4
method=GET
refer=http://lbsearch.publicdata.com/PDSearch.php?Type=Zip&input=txdmv&p1=75071628901&id=&dlnumber=023115630&dlstate=TX&identifier=&sessionid=&tacdmv=DPPA-01
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140519-SHADOW105.html|800810290

➡ Texas - Department of Motor Vehicles [Owners] Detail

*Record Details*

| Owner Name | Owner Street | Owner City | Owner State |
| --- | --- | --- | --- |
| Redacted | Redacted | MCKINNEY | TX |
| Owner ZIP Code | Previous Owner Name | Previous Owner City | Previous Owner State |
| 75071-6289 | Redacted | GRAND BLANC | MI |
| Renewal Notice Street | Renewal Notice City | Renewal Notice State | Renewal Notice ZIP Code |
| | | | |
| Renewal Notice ZIP+4 | License Plate Number | Previous License Plate Number | Previous Expiration Month |
| | Redacted | Redacted | 02 |
| Previous Expiration Year | Registration Expiration Year | Registration Expiration Month | Registration Effective |
| 2014 | 2015 | 02 | Mar 1 2014 |

PD_006477

0641

| Title Date | Ownership Information | Model Year | Make |
|---|---|---|---|
| Aug 9 2012 | 03 = OUT-OF-STATE TITLE | 2003 | CADILLAC |
| Model | Model Description | Vehicle Body Type | Vehicle Major Color(Color Group) |
| CT | CADICT | 4D = 4-DOOR SEDAN | SILVER (Color Group SILVER) |
| Vehicle Minor Color(Color Group) | Vehicle Class Code | Vehicle Tonnage | Vehicle Sales Price |
| | PASS | 0000 | 0000000000 |
| Vehicle Sold Date | Vehicle Empty Weight | Vehicle Gross Weight | Vin Number |
| 00000000 | 003800 | 003800 | Redacted |
| Bonded Title Information | Document Type Information | Vehicle Odometer Information | Diesel Information |
| none found | 01 = REGULAR TITLE | A = ACUTAL MILEAGE | 0 = VEHICLE IS NOT DIESEL POWERED |
| DOT Standards Information | DPS Stolen Indicator | Registration Exemption | Fixed Bed Weight Information |
| 0 = VEHICLE DOES NOT MEET STANDARDS | 0 = VEHICLE IS NOT STOLEN | 0 = VEHICLE IS NOT EXEMPT FROM REGISTRATION FEES | 0 = VEHICLE DOES NOT HAVE OVER 2/3 OF BED WITH PERMANENTLY MOUNTED EQUIPMENT |
| Flood Damage Information | Government Ownership Information | Title Hot Check Information | Inspection Waived Information |
| 0 = VEHICLE HAS NO FLOOD DAMAGE | 0 = VEHICLE IS NOT U.S. GOVERNMENT OWNED | 0 = NO HOT CHECK EXISTS FOR TITLE APPLICATION | 0 = TEXAS SAFETY INSPECTION IS NOT WAIVED |
| Junk Title Information | Permit Required Information | Rebuilt Information | Reconstructed Information |
| 0 = VEHICLE HAS NO JUNK RECORDS | 0 = NO PERMIT REQUIRED | 0 = NEVER SALVAGED | 0 = NOT A RECONSTRUCTED VEHICLE |
| Survivorship Agreement Information | Title Revoked Information | DPS Suspension Information | Heavy Use Tax Information |
| 0 = SURVIORSHIP AGGREEMENT IS NOT PART OF THE VEHICLE'S TITLE | 0 = TEXAS TITLE IS NOT REVOKED | 0 = SUSPENSION NOT ISSUED | 0 = VEHICLE IS EXEMPT FROM PROOF OF PAYMENT FOR THE HEAVY VEHICLE USE TAX |
| Registration Validity Information | Registration Hot Check Information | License Plate Seizure Information | Registration Sticker Seizure Information |
| 0 = REGISTRATION IS VALID | 0 = NO HOT CHECK ISSUED FOR REGISTRATION OF VEHICLE | 0 = REGISTRATION PLATES NOT SEIZED | 0 = REGISTRATION STICKER NOT SEIZED |
| Electronic Title Information | Lemon Law Information | | |
| 2 = NEGOTIABLE TITLE ON PAPER | 0 = VEHICLE HAS NOT BEEN IDENTIFIED AS BEING REAQUIRED TO DO LEMON LAW COMPLAINTS | | |

Above information as provided by state - below are our annotations

| Click here for more vehicles at this address | Click here for more vehicles in this area | Plate Number |
|---|---|---|
| Redacted  Mckinney, TX 75071-6289 | Redacted  TX 75071-6289 | Redacted |

## Lien Holders

| Lien Holder Postion | Lien Date |
|---|---|
| 1 | 20120725 |

## Lien Holder Information

| Lien Holder Name | Lien Holder Number | Street | Street (cont) |
|---|---|---|---|
| INTEGRITY TEXAS FUNDING | 072205028 | 1600 WEST UNIVERSITY DRIVE | |
| City | State | Zip Code | Country |
| MCKINNEY | TX | 75069- | |

## Certified Lien Holders

| May 19 2014, 16:06:36 |
|---|

20140519160636160637 023115630 TX DETAIL
DB=txdmv
ed=117
rec=3913412516
ip=216.207.175.4
method=GET
refer=http://lbsearch.publicdata.com/pdsearch.php?p1=+3HGCM56373G706271+&input=grp_dmv_vin&tacDMV=DPPA-01&type=vin&dlnumber=023115630&dlstate=TX&id=&identifier=&sessionid=&o=grp_dmv_vin
server=lbsearch.publicdata.com
requestagent=PDdisplay-20110111cc
tacdmv=DPPA-01
webfile=20140519-SHADOW105.html||801152654

PD_006478
0642

# EXHIBIT B

# TMX Finance LLC · 10-K · For 12/31/12

Filed On 3/27/13, 4:40pm ET   ·   Accession Number 1104659-13-24898   ·   SEC File 333-172244

[ Find ]   in [ this entire Filing.   ▼ ]   Show [ Docs searched ▼ ]  and [ every "hit".   ▼ ]

Help...   *Wildcards:*  ? (any letter), * (many).  *Logic:* for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | For/On/As | Docs:Size | Issuer | Agent |
|--------|-------|--------|-----------|-----------|--------|-------|
| 3/27/13 | TMX Finance LLC | 10-K | 12/31/12 | 78:14M | | Merrill Corp-MD/FA |

## Annual Report — Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|------------------|-------------|-------|------|
| 1: 10-K | Annual Report | HTML | 1.42M |
| 2: EX-10.2 | Material Contract | HTML | 34K |
| 3: EX-10.21 | Material Contract | HTML | 42K |
| 4: EX-10.22 | Material Contract | HTML | 107K |
| 5: EX-10.23 | Material Contract | HTML | 175K |
| 6: EX-21.1 | Subsidiaries of the Registrant | HTML | 47K |
| 7: EX-31.1 | Certification per Sarbanes-Oxley Act (Section 302) | HTML | 31K |
| 8: EX-31.2 | Certification per Sarbanes-Oxley Act (Section 302) | HTML | 32K |
| 9: EX-32.1 | Certification per Sarbanes-Oxley Act (Section 906) | HTML | 26K |
| 10: EX-32.2 | Certification per Sarbanes-Oxley Act (Section 906) | HTML | 26K |
| 32: EXCEL | XBRL IDEA Workbook -- Financial Report (.xls) | XLS | 2.56M |
| 55: R1 | Document and Entity Information | HTML | 51K |
| 44: R2 | Consolidated Balance Sheets | HTML | 128K |
| 53: R3 | Consolidated Balance Sheets (Parenthetical) | HTML | 29K |
| 57: R4 | Consolidated Statements of Income | HTML | 87K |
| 72: R5 | Consolidated Statements of Member's Equity and Noncontrolling Interests | HTML | 44K |
| 46: R6 | Consolidated Statements of Cash Flows | HTML | 163K |
| 52: R7 | Nature of Business, Principles of Consolidation and Significant Accounting Policies | HTML | 91K |
| 40: R8 | Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans | HTML | 81K |
| 31: R9 | Concentration of Credit Risk | HTML | 32K |
| 73: R10 | Property and Equipment | HTML | 60K |
| 59: R11 | Other Assets | HTML | 47K |
| 58: R12 | Acquisitions | HTML | 36K |
| 63: R13 | Senior Secured Notes, Revolving Credit Facility and Notes Payable | HTML | 92K |
| 64: R14 | Accounts Payable and Accrued Expenses | HTML | 47K |
| 62: R15 | Other Operating and Administrative Expenses | HTML | 58K |
| 65: R16 | Fair Value Measurement and Fair Value of Financial Instruments | HTML | 53K |
| 54: R17 | Employee Benefit Plans | HTML | 29K |
| 56: R18 | Related Party Transactions | HTML | 32K |
| 61: R19 | Commitments | HTML | 69K |
| 78: R20 | Contingencies | HTML | 32K |
| 68: R21 | Phantom Stock Plan | HTML | 28K |
| 49: R22 | Chapter 11 Bankruptcy Filing | HTML | 29K |
| 60: R23 | Guarantor Condensed Consolidating Financial Statements | HTML | 781K |
| 51: R24 | Nature of Business, Principles of Consolidation and Significant Accounting Policies (Policies) | HTML | 129K |
| 24: R25 | Nature of Business, Principles of Consolidation and Significant Accounting Policies (Tables) | HTML | 53K |
| 69: R26 | Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans (Tables) | HTML | 83K |
| 75: R27 | Property and Equipment (Tables) | HTML | 54K |
| 35: R28 | Other Assets (Tables) | HTML | 46K |
| 34: R29 | Senior Secured Notes, Revolving Credit Facility and Notes Payable (Tables) | HTML | 70K |
| 38: R30 | Accounts Payable and Accrued Expenses (Tables) | HTML | 46K |
| 39: R31 | Other Operating and Administrative Expenses (Tables) | HTML | 58K |

0644

| | | | | |
|---|---|---|---|---|
| 41: R32 | Fair Value Measurement and Fair Value of Financial Instruments (Tables) | HTML | 41K |
| 22: R33 | Commitments (Tables) | HTML | 67K |
| 66: R34 | Guarantor Condensed Consolidating Financial Statements (Tables) | HTML | 677K |
| 48: R35 | Nature of Business, Principles of Consolidation and Significant Accounting Policies (Details) | HTML | 47K |
| 50: R36 | Nature of Business, Principles of Consolidation and Significant Accounting Policies (Details 2) | HTML | 37K |
| 28: R37 | Nature of Business, Principles of Consolidation and Significant Accounting Policies (Details 3) | HTML | 46K |
| 77: R38 | Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans (Details) | HTML | 50K |
| 17: R39 | Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans (Details 2) | HTML | 49K |
| 42: R40 | Concentration of Credit Risk (Details) | HTML | 29K |
| 71: R41 | Property and Equipment (Details) | HTML | 48K |
| 27: R42 | Other Assets (Details) | HTML | 49K |
| 33: R43 | Acquisitions (Details) | HTML | 46K |
| 37: R44 | Senior Secured Notes, Revolving Credit Facility and Notes Payable (Details) | HTML | 110K |
| 45: R45 | Senior Secured Notes, Revolving Credit Facility and Notes Payable (Details 2) | HTML | 71K |
| 21: R46 | Senior Secured Notes, Revolving Credit Facility and Notes Payable (Details 3) | HTML | 50K |
| 30: R47 | Senior Secured Notes, Revolving Credit Facility and Notes Payable (Details 4) | HTML | 35K |
| 19: R48 | Accounts Payable and Accrued Expenses (Details) | HTML | 50K |
| 70: R49 | Other Operating and Administrative Expenses (Details) | HTML | 50K |
| 26: R50 | Fair Value Measurement and Fair Value of Financial Instruments (Details) | HTML | 36K |
| 67: R51 | Employee Benefit Plans (Details) | HTML | 38K |
| 29: R52 | Related Party Transactions (Details) | HTML | 35K |
| 43: R53 | Commitments (Details) | HTML | 61K |
| 18: R54 | Commitments (Details 2) | HTML | 53K |
| 20: R55 | Phantom Stock Plan (Details) | HTML | 35K |
| 36: R56 | Chapter 11 Bankruptcy Filing (Details) | HTML | 25K |
| 23: R57 | Guarantor Condensed Consolidating Financial Statements (Details) | HTML | 136K |
| 74: R58 | Guarantor Condensed Consolidating Financial Statements (Details 2) | HTML | 96K |
| 47: R59 | Guarantor Condensed Consolidating Financial Statements (Details 3) | HTML | 130K |
| 76: XML | XBRL XML File -- Filing Summary | XML | 121K |
| 11: EX-101.INS | XBRL Instance -- tmxf-20121231 | XML | 3.16M |
| 13: EX-101.CAL | XBRL Calculations -- tmxf-20121231_cal | XML | 286K |
| 14: EX-101.DEF | XBRL Definitions -- tmxf-20121231_def | XML | 762K |
| 15: EX-101.LAB | XBRL Labels -- tmxf-20121231_lab | XML | 2.49M |
| 16: EX-101.PRE | XBRL Presentations -- tmxf-20121231_pre | XML | 1.27M |
| 12: EX-101.SCH | XBRL Schema -- tmxf-20121231 | XSD | 240K |
| 25: ZIP | XBRL Zipped Folder -- 0001104659-13-024898-xbrl | Zip | 232K |

---

10-K — Annual Report
Document Table of Contents

| Page | (sequential) | (alphabetic) | Top |
|---|---|---|---|

1 1st Page - Filing Submission
" Table of Contents
" Part I
" Item 1
" Business
" Item 1A
" Risk Factors
" Item 1B
" Unresolved Staff Comments
" Item 2
" Properties
" Item 3

- Alternative Formats (Word, et al.)
- Business
- Certain Relationships and Related Transactions, and Director Independence
- Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
- Consolidated Balance Sheets as of December 31, 2012 and 2011
- Consolidated Statements of Cash Flows for the Years Ended December 31, 2012, 2011 and 2010
- Consolidated Statements of Income for the Years Ended December 31, 2012, 2011 and 2010

"   Legal Proceedings
"   Item 4
"   Mine Safety Disclosures
"   Part Ii
"   Item 5
"   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities
"   Item 6
"   Selected Financial Data
"   Item 7
"   Management's Discussion and Analysis of Financial Condition and Results of Operations
"   Item 7A
"   Quantitative and Qualitative Disclosures About Market Risk
"   Item 8
"   Financial Statements and Supplementary Data
"   Report of Independent Registered Public Accounting Firm
"   Consolidated Balance Sheets as of December 31, 2012 and 2011
"   Consolidated Statements of Income for the Years Ended December 31, 2012, 2011 and 2010
"   Consolidated Statements of Member's Equity and Noncontrolling Interests for the Years Ended December 31, 2012, 2011 and 2010
"   Consolidated Statements of Cash Flows for the Years Ended December 31, 2012, 2011 and 2010
"   Notes to Consolidated Financial Statements
"   Item 9
"   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
"   Item 9A
"   Controls and Procedures
"   Item 9B
"   Other Information
"   Part Iii
"   Item 10
"   Directors, Executive Officers and Corporate Governance
"   Item 11
"   Executive Compensation
"   Item 12
"   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters
"   Item 13
"   Certain Relationships and Related Transactions, and Director Independence
"   Item 14
"   Principal Accountant Fees and Services
"   Part Iv
"   Item 15
"   Exhibits and Financial Statement Schedules
"   Signatures

• Consolidated Statements of Member's Equity and Noncontrolling Interests for the Years Ended December 31, 2012, 2011 and 2010
• Controls and Procedures
• Directors, Executive Officers and Corporate Governance
• Executive Compensation
• Exhibits and Financial Statement Schedules
• Financial Statements and Supplementary Data
• Item 1
• Item 10
• Item 11
• Item 12
• Item 13
• Item 14
• Item 15
• Item 1A
• Item 1B
• Item 2
• Item 3
• Item 4
• Item 5
• Item 6
• Item 7
• Item 7A
• Item 8
• Item 9
• Item 9A
• Item 9B
• Legal Proceedings
• Management's Discussion and Analysis of Financial Condition and Results of Operations
• Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities
• Mine Safety Disclosures
• Notes to Consolidated Financial Statements
• Other Information
• Part I
• Part Ii
• Part Iii
• Part Iv
• Principal Accountant Fees and Services
• Properties
• Quantitative and Qualitative Disclosures About Market Risk
• Report of Independent Registered Public Accounting Firm
• Risk Factors
• Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters
• Selected Financial Data
• Signatures
• Table of Contents
• Unresolved Staff Comments

*This is an HTML Document rendered as filed. [ Alternative Formats ]*

### Access Blocked - Content Alert

The URL: http://googleads.g.doubleclick.net/pagead/ads?client=ca-pub-4542361383993039&format=728x90_as&output=html&h=90&adk=4280065175&w=7288 was blocked

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

0646

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2012

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to

Commission File Number 333-172244

## TMX Finance LLC
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 20-1106313 |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| 15 Bull Street, Savannah, Georgia | 31401 |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (912) 525-2675

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☒ No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

(Note: The registrant has filed all reports pursuant to the Securities Exchange Act of 1934 as applicable for the preceding 12 months)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☒ No ☐

The Company has 100 outstanding limited liability company membership units, all of which are held by TMX Finance Holdings Inc.

Table of Contents

TMX FINANCE LLC
AND AFFILIATES
FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2012

| | | Page |
|---|---|---|
| PART I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |

0647

| Item 4. | Mine Safety Disclosures | 18 |
|---|---|---|
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | Selected Financial Data | 19 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 8. | Financial Statements and Supplementary Data | 31 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 61 |
| Item 9A. | Controls and Procedures | 61 |
| Item 9B. | Other Information | 61 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 62 |
| Item 11. | Executive Compensation | 64 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 70 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 70 |
| Item 14. | Principal Accountant Fees and Services | 72 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 73 |
| **SIGNATURES** | | 76 |

2

Table of Contents

## FORWARD-LOOKING STATEMENTS

*This report contains "forward-looking statements" that involve risks and uncertainties. Forward-looking statements provide current expectations of future events based on certain expectations, assumptions, estimates and projections. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and frequently contain words such as "anticipate," "assume," "believe," "budget," "continue," "could," "estimate," "expect," "future," "intend," "may," "plan," "potential," "predict," "project," "will" and other similar terms. All statements that address operating performance, events or developments that we expect or anticipate will occur in the future — including statements relating to demand for our products and services, sales growth, comparable store sales, store openings, state of the economy, capital allocation and expenditures, liquidity and the effect of adopting certain accounting standards — are forward-looking statements. Forward-looking statements involve risk and are not guarantees of future performance. The Company's actual results may differ significantly from current expectations as expressed or implied in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in "Item 1A. Risk Factors" in this report. The Company assumes no obligation to revise or update any forward-looking statements, except as required by law.*

## PART I

### ITEM 1. BUSINESS.

#### Introduction

TMX Finance LLC is a privately-owned automobile title lending company with 1,035 company-owned stores in 12 states as of December 31, 2012. We provide our customers with access to funds through loans secured by a first or second lien on the customer's automobile. Our loan products allow our customers to meet their liquidity needs by borrowing against the value of their vehicles while allowing the customer to retain use of the vehicle during the term of the loan.

TMX Finance LLC is a limited liability company that was formed in Delaware in 2003 and exists solely as a holding company to own the equity interests of its subsidiaries. TMX Finance LLC changed its name from TitleMax Holdings, LLC to TMX Finance LLC effective June 21, 2010. Effective September 30, 2012, Tracy Young, the former sole member of TMX Finance LLC, transferred 100% of his membership interests to newly-formed TMX Finance Holdings Inc., or our "Parent," in exchange for shares of common stock of our Parent. Mr. Young is the sole beneficial owner of the common stock of the Parent. We refer to Mr. Young in this report as the "Sole Shareholder." Unless the context indicates otherwise, references in this report to "TMX Finance," the "Company," "we," "us," "our" or similar terms represent TMX Finance LLC and its consolidated affiliates.

Our principal corporate offices are located at 15 Bull Street, Suite 200, Savannah, Georgia 31401, and our telephone number is (912) 525-2675. Our website address is www.titlemax.biz. The information on our website is not a part of this report.

#### Overview

Our automobile title lending business provides a simple, quick and confidential way for consumers to meet their liquidity needs. We offer title loans in amounts ranging from $100 to $5,000 to customers who generally have limited access to consumer credit from banks, thrift institutions, credit card lenders and other traditional sources of consumer credit. As of December 31, 2012, we had approximately 470,000 customers and $577.2 million in title loans receivable. We believe we are the largest automobile title lender in the United States based on title loans receivable.

We principally operate under two brands: TitleMax and TitleBucks. TitleMax requires a minimum appraised vehicle value of more than $500 and offers interest rates that we believe,

0648

based on market research, are up to 50% less than those offered by other comparable title lenders. TitleBucks provides loans to customers with less valuable vehicles and charges interest rates that are comparable to those charged by competitors for such loans. TitleBucks was created to capture customers who do not meet TitleMax's minimum vehicle value requirement and who would otherwise use a competitor. We refer non-qualifying customers from TitleMax to TitleBucks when possible.

We also offer a second lien automobile product, with operations conducted within 77 TitleMax stores in Georgia under the EquityAuto Loan, or *"EAL,"* brand and through 53 standalone stores in Georgia and Florida under the InstaLoan, or *"INL,"* brand as of December 31, 2012. EAL and INL also offer a first lien product in certain situations. In addition, EAL and INL sell insurance products in connection with their loans as agents for an unaffiliated insurance company. The Company is in the process of moving the EAL business into exclusively standalone stores under the InstaLoan brand with separate management and additional loan products. As of December 31, 2012, EAL and INL had approximately $17.1 million of combined gross title loans receivable.

In each of 2012, 2011, and 2010, 87.4%, 85.8% and 86.1%, respectively, of our interest and fee income was attributable to our TitleMax brand and 11.6%, 13.3% and 13.3%, respectively, of our interest and fee income was attributable to our TitleBucks brand. In each of these years, less than 1.0% of our interest and fee income was attributable to our EAL and INL brands.

3

Table of Contents

## 2012 Highlights

- We grew our business significantly by opening or acquiring 281 new stores while closing only two stores, representing a net increase in stores of 36.9% in 2012. These new store openings include 46 new InstaLoan stores that previously operated under the EquityAuto Loan brand within TitleMax stores in Georgia.

- We increased our title loans receivable to $577.2 million at December 31, 2012, representing an increase of 17.8% compared to December 31, 2011.

- In June 2012, we entered into a credit agreement, or the *"Credit Agreement,"* to obtain a $25.0 million senior secured revolving credit facility. In July 2012, the Sole Shareholder made an equity contribution of $14.0 million. In November 2012, our Parent made an equity contribution to us of $44.8 million.

## Growth Strategy

A key objective of our growth strategy is to establish a leading position as a title lender in each market in which we operate. The three elements of our growth strategy are as follows:

### *Grow Existing Store Receivables.*

Our store title loans receivable have grown at a compound annual rate of 19.0% over the first four years of the stores' lives and 5.5% thereafter. Originations for 2012 increased 26.6% compared to 2011. We believe there are significant opportunities to grow earnings at substantially all of our existing stores. Our store managers have a strong incentive to continue the growth of our stores because they are evaluated and compensated in significant part based on their achievement of certain operating and growth goals, which we adjust each year to account for the continued improvement in our business. We believe that by focusing on these specific goals and tying them to employee compensation, we can further enhance the operating efficiency of our stores as well as overall operating margins.

### *Open New Stores Within Our Current Footprint.*

We seek to develop a large presence in each of the markets in which we operate, and we believe we have significant room to grow by opening additional stores in most of the markets in which we currently operate. When considering whether we should open new stores in these markets, we examine a number of factors, including consumer demand for our products, the extent that new stores will be able to leverage existing stores' marketing efforts and the extent to which new stores might detract from sales from existing stores.

### *Continued Expansion Into Newer Markets.*

We have identified several key geographic areas or markets for the potential opening or acquisition of additional stores. These markets were identified following a review of demographics, a determination of whether state regulation is favorable and an internal evaluation of each market's ability to support our store development program. Based on this review, we have expanded into markets in the southern and western regions of the United States, including Florida, Arizona and Nevada. As is the case with our strategy to open new stores in our more established markets, we believe we have management and capital resources sufficient to support our growth strategy in our new markets.

## Industry Overview

We operate in the alternative financial services industry, providing automobile title loans to consumers who own, in most instances, their vehicle free and clear and need convenient and simple access to funds. Other products offered in this industry include other forms of consumer loans, check cashing, money orders and money transfers. Consumers who use alternative financial services are often referred to as *"underserved"* or *"underbanked"* by banks and other traditional financial institutions. Customers use the services provided by the alternative financial services industry for a variety of reasons, including that they often:

- do not have access to traditional credit-based lenders like banks, thrift institutions and credit card companies;

- have a sudden and unexpected need for cash due to common financial challenges like medical emergencies, vehicle repairs, divorce and job changes;

- are self-employed small business owners with an immediate need for short-term working capital;

- need a small amount of cash immediately and do not have time to wait for a traditional lender to approve a loan; and

- see such services as a sensible alternative to potentially higher costs and negative credit consequences of other alternatives, such as overdraft fees, bounced check fees or late fees.

4

Table of Contents

We believe that the underbanked consumer market, and in particular the automobile title loan segment of the alternative financial services industry, will continue to grow as a result of a diminishing supply of competing banking services for this segment of the population, as well as underlying demographic trends, including an overall increase in the population and an increase in the number of self-employed, small business and service sector jobs as a percentage of the total workforce. We believe automobile title loans are particularly well-suited to grow in the current regulatory environment of the markets in which we operate, which we view as stable with respect to our loan products and hostile to other alternative financial services products, such as payday loans.

0649

Services

Our automobile title lending business provides a customer who is 18 years of age or older (except in Alabama where the customer must be 19 years of age or older) with a loan ranging from $100 to $5,000 that is secured in most cases by a first lien on the customer's automobile. We determine the loan amount based upon the customer's need and our appraisal of the wholesale value of his or her automobile. We do not run a credit check on the customer when approving the loan application for our first lien title loan product, and performance on the loan does not impact the customer's credit.

Upon approval of a customer's application, we provide the customer with the determined loan amount, and the customer provides us with a certificate of title to the appraised automobile; however, the customer retains full use and possession of the automobile. We provide our customers with loan funds primarily through the issuance of a check and do not keep a significant amount of cash on hand at any of our stores. The customer is able to cash the check at a nearby partnered bank that does not require payment of a check cashing fee. Following our receipt from the customer of full repayment of the loan, along with interest and fees, we release the lien on the customer's vehicle and return the certificate of title to the customer.

If a customer fails to remit payment to us when due, we may repossess the customer's automobile. However, we consider the remedy of repossession as a last resort, and we do not repossess a customer's vehicle unless we have first exhausted all options for repayment. As a result, we first undertake to contact the customer to obtain payment. Only if the customer is unresponsive or it is otherwise clear that the customer will not be able to meet his or her obligations will we initiate repossession. A regional or district manager must approve all repossessions in advance, and only approved third-party companies handle the repossession. Even when permitted by state law, we typically do not repossess a customer's automobile until the account is at least 14 days past due. Store managers are responsible for arranging vehicle sales. A repossessed vehicle may only be sold to a licensed used car dealer; our employees may not purchase a repossessed vehicle. As required by state regulations in certain states in which we operate, we return any excess proceeds to the customer if the vehicle sells for an amount in excess of the loan value plus expenses.

We conduct business in Texas and certain other states through wholly-owned subsidiaries, each of which is registered in the applicable state as a Credit Services Organization, or "CSO." These CSOs have entered into credit services organization agreements, or "CSO Agreements," with third-party lenders, or the "CSO Lenders," that make the loans to our customers. The CSO Agreements govern the terms by which we perform servicing functions and refer customers to the CSO Lenders for a possible extension of a loan. We process loan applications and commit to reimburse the CSO Lenders for any loans or related fees that are not collected from those customers.

Underwriting and Risk Management

All underwriting decisions related to our first lien title loan product offered by TitleMax and TitleBucks are made based on the appraised "rough" wholesale value of a customer's vehicle, as adjusted by store employees' appraisal of the vehicle based on the following characteristics: year, make, model, exterior, interior and mechanical condition, and mileage. We believe this adjustment process reduces the overall risk of our title loans receivable as compared to other first lien title lenders by having more conservative loan to value ratios which results in more security for each loan and less overall risk for our Company. Prior to approval, a customer must present the vehicle, a lien-free title to the vehicle, a government-issued picture identification and proof of income (except in Alabama). We verify that such title is the correct title for the customer's vehicle based on a review of the vehicle identification number. Upon completion of the transaction, we send the title to the applicable state Department of Motor Vehicles to have the Company named as the first lien holder for the vehicle. We release the lien only when the customer's account balance is fully paid.

Underwriting of our EAL and INL title loan products is based primarily on the customer's credit report and the payment history of the first lien loan on the vehicle when applicable. Upon completion of the transaction, we have the Company named typically as the second lien holder for the vehicle and we release the lien only when the customer's account balance is fully paid.

We balance the individual store's autonomy in the underwriting process with a company-wide risk management system supported primarily by our district and regional managers' periodic underwriting reviews and store audits. Underwriting reviews include a random review of new loan files and their supporting documentation to confirm the appraisals and related documentation adhere to Company policy. Our district managers' audits of each store twice per month include document inspection (title, picture, contract and key) and new loan review (verifying appraisal of vehicles and completeness of files). Further, our regional managers typically spend one day each week with a different district manager to review the underwriting process and other matters.

5

---

Table of Contents

Customers

We serve individuals who typically have limited access to consumer credit from banks, thrift institutions, credit card lenders and other traditional sources of consumer credit. Our typical customers rely on all, or nearly all, of their current income to cover immediate living expenses. Thus, we believe that when unexpected expenses arise, these customers value the convenient, immediate, simple and transparent access to funds that we provide. In addition, our customers who are small business owners often use title lending as a source of operating capital.

Advertising and Marketing

We market our title loans primarily through network television advertising. Clustering of our stores in geographic regions magnifies the effect of our regional television commercials. Further, we market title loans through online pay per click programs, billboards, electronic message centers located in front of our stores and telemarketing to leads generated through our website. In addition, we create customer loyalty through special incentive programs such as Thanksgiving turkey giveaways and customer referral incentive programs. Individual stores employ telemarketing to current and past customers and distribute flyers to local businesses and apartment complexes.

Competition

We compete with a limited number of businesses that exclusively provide title loans, as well as with many providers of other alternative financial services, such as payday lenders, installment lenders and pawnbrokers. We believe that the principal competitive factors in the title loan industry and the broader alternative financial services industry are interest rates, fees, loan size, location, customer service and convenience. We believe that we offer a more affordable alternative to late payment fees and overdraft fees, and significantly lower annual percentage rates, or "APRs," than most other title lenders and other providers of alternative financial services, such as payday lenders.

We believe that both the title loan industry and the broader alternative financial services industry in the United States are highly fragmented. Historically, there have been low barriers to entry, creating fragmentation and enabling small operators to compete with national chains.

Employees

As of December 31, 2012, we had 4,335 employees, comprised as follows:

| | |
|---|---|
| Stores and Field Management | 3,949 |
| Corporate | 386 |
| Total | 4,335 |

0650

We consider our employee relations to be good. None of our employees are covered by collective bargaining agreements, and we have never experienced any organized work stoppage, strike or labor dispute.

Table of Contents

Regulation

Our automobile title lending operations are primarily regulated at the state level and are subject to laws, regulations and supervision in each of the states in which we operate. We are also subject to federal and state laws and regulations related to the recording and reporting of certain financial transactions and the privacy of customer information. The following is a general description of significant regulations affecting our automobile title lending business.

*State and Local Regulation.*

Each of the states in which we operate has specific state or local licensing requirements applicable to offering loans secured by title to personal property, whether through a traditional loan, title loan or pawn transaction. We obtain state or local licenses where required.

We are subject to various state regulations governing the terms of the automobile title loans we offer. Several state regulations limit our recourse against the customer and the amount that we may lend or provide, as well as restrict the amount of finance or service charges or fees that we may assess and, in certain situations, limit a customer's ability to renew any such loans. For example, we are prohibited from providing automobile title loans in excess of $2,500 in Mississippi and Tennessee, and $4,000 in Illinois (under certain circumstances). In addition, we may not provide an automobile title loan to a customer under the age of 19 in Alabama. In some states, we are required to meet minimum bonding or capital requirements and are subject to various transaction recordkeeping requirements. In several states, we are subject to periodic examination by state regulators, including examination at the discretion of, and without notice by, such state regulators. We must also comply with various consumer disclosure requirements, which are typically similar or equivalent to the federal Truth in Lending Act and corresponding federal regulations. In the states in which we have recourse against the customer for payment of the obligation, our collection activities regarding past due loans may also be subject to consumer debt collection laws and regulations adopted by the various states. In addition, we must comply with general consumer protection laws in each state, including laws governing the repossession and foreclosure of collateral.

Our business operates under a variety of state statutes and regulations, including those relating to:

- licensing and posting of fees;

- lending practices, including disclosure requirements such as those contained in state truth in lending laws and related consumer protection laws;

- interest rates and fees;

- currency reporting;

- recording and reporting of certain financial transactions;

- privacy and data security of personal consumer information;

- prompt remittance of excess proceeds from the sale of repossessed automobiles in certain states in which we operate; and

- serving as a credit services organization, or "CSO," in certain states in which we may expand our operations.

In addition to state laws and regulations, our business is subject to various local rules and regulations such as local zoning regulation and permit licensing. For example, the Austin, Dallas, El Paso and San Antonio, Texas city councils passed ordinances that restrict extensions of consumer credit by title lenders within city limits by, among other things, linking maximum allowable loan size to 3% of a consumer's gross annual income, mandating a 25% principal reduction requirement on refinances or renewals and limiting the term of a loan to no more than four installments or renewals. Our subsidiary TitleMax of Texas, Inc. is challenging the legality of the ordinances in Austin and Dallas. The Austin, Dallas and San Antonio ordinances went into effect on May 1, 2012, June 18, 2012 and January 1, 2013, respectively. We are complying with the ordinances in each of these markets. The El Paso ordinance will be effective July 1, 2013.

Table of Contents

*Federal Regulation.*

Our lending activities are also subject to several federal statutes and regulations, including the following:

- The Dodd-Frank Wall Street Reform and Consumer Protection Act, or the *"Dodd-Frank Act,"* and implementing regulations thereunder, which may impact the marketing and regulation of the products and services offered by the Company, depending on the extent to which the Company and its products and services are ultimately determined to be subject to such Act and regulations. The Consumer Financial Protection Bureau, or the *"CFPB,"* was established pursuant to the Dodd-Frank Act as a federal authority responsible for administering and enforcing the laws and regulations for consumer financial products and services. The Dodd-Frank Act does not specifically target title lending, traditional pawn lending or installment lending for CFPB regulation. However, the CFPB is currently in the process of developing rules that could subject the Company to some form of regulatory oversight. The CFPB is specifically prohibited from instituting federal usury interest rate caps.

- The Gramm-Leach-Bliley Act and its underlying regulations, which relate to privacy and data security and require us to disclose to our customers our privacy policy and practices, including those relating to the sharing of a customer's nonpublic personal information with third parties. This disclosure must occur when establishing the customer relationship and, in some cases, at least annually thereafter. We must ensure that our systems are designed to protect the confidentiality of customers' nonpublic personal information, and we have policies and procedures in place to address unauthorized disclosure of a customer's nonpublic personal information.

- The Bank Secrecy Act, or *"BSA,"* as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, or *"USA PATRIOT Act,"* which imposes a range of anti-money laundering, or *"AML,"* and anti-terrorism obligations on covered financial institutions. As required by the BSA and USA PATRIOT Act, we undertake certain AML and anti-terrorism compliance measures, including steps to verify the identity of our customers, and we may be required to employ other measures to ensure our compliance with requirements that we report and maintain records regarding transactions that satisfy certain thresholds. In addition, the Office of Foreign Assets Control, or *"OFAC,"* is responsible for administering and enforcing economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction and other threats to the national security, foreign policy or economy of the U.S. to insure that U.S. entities do not engage in transactions with

certain prohibited parties, as defined by various Executive Orders and Acts of Congress. OFAC publishes, and routinely updates, lists of names of persons and organizations suspected of aiding, harboring or engaging in terrorist acts, including the Specially Designated Nationals and Blocked Persons. If we find a name on any transaction, account or wire transfer that is on an OFAC list, we must undertake certain specified activities, which could include blocking or freezing the transaction requested, and we must notify the appropriate authorities.

- The Equal Credit Opportunity Act, or *"ECOA,"* which prohibits discrimination against any credit applicant on the basis of any protected category, such as race, color, religion, national origin, sex, marital status, age, whether the applicant receives public assistance and whether the applicant has exercised a right under the Consumer Credit Protection Act. The ECOA requires us to notify credit applicants of any action taken on the individual's credit application. We must provide a loan applicant a Notice of Adverse Action, or *"NOAA,"* when we deny an application for credit, which must include, among other things, a statement of the ECOA's prohibition on discrimination and an explanation of the applicant's rights under the ECOA.

- The Fair Credit Reporting Act, or *"FCRA,"* which requires that we give certain notices to customers if we deny credit based upon a credit report or offer a customer less favorable credit terms based upon information in a credit report. Further, the FCRA requires us to implement and follow a *"Red Flags Policy"* to detect and prevent identity theft.

- The Truth in Lending Act and its underlying regulations, which impose specific requirements on our disclosure to customers of credit terms, including the annual percentage rate, finance charge, amount financed, total of payments, payment schedule, security, late charges, prepayment and default, related to each automobile title lending transaction.

- Federal laws which cap the annual percentage rate that may be charged on consumer loans made to active duty military personnel and their immediate families at 36% per year. This 36% annual cap applies to automobile title loans that have terms of 181 days or fewer. In addition, we are subject to the Servicemembers Civil Relief Act, which limits the amount of interest we can charge and our right to repossess collateral from military customers.

8

---

Table of Contents

ITEM 1A. RISK FACTORS.

*Our business faces a variety of risks and uncertainties, including those described below, that could materially and adversely affect our business, financial condition and results of operations and could cause actual results to differ materially from our expectations and projections. You should read these risk factors in conjunction with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes in "Item 8. Financial Statements and Supplementary Data."*

*Our industry is strictly regulated at the state, federal and local levels. Our failure to comply with applicable laws and regulations governing consumer protection, lending practices and other aspects of our business, as well as changes in applicable laws and regulations, could have a significant adverse impact on our business, results of operations, financial condition and ability to service our debt obligations.*

Our business and products are subject to extensive regulation by state, federal and local governments that do or may impose significant costs or limitations on the way we conduct or expand our business. In general, these regulations are intended to protect consumers, rather than our investors or creditors. See *"Item 1. Business—Regulation"* for a summary of the many significant state, federal and local laws and regulations governing our business and industry. Furthermore, the laws and regulations governing our business are subject to change.

Our failure or the failure of any of our employees to comply with applicable state, federal and local requirements, whether voluntary or involuntary, could require us to discontinue our automobile title lending business in applicable jurisdictions, which could negatively impact our business. Failure to comply with applicable laws or regulations could result in sanctions by regulatory agencies, civil money penalties or reputational damage, which could have a material adverse effect on our business, financial condition, results of operations and ability to service our debt obligations.

*The Dodd-Frank Act, as well as potential legislation in various states if adopted, creates significant uncertainty about various important aspects of our business.*

The Dodd-Frank Act that took effect on July 21, 2010 is extensive and significant legislation that, among other things:

- creates a liquidation framework for the resolution of large bank holding companies and systemically significant nonbank financial companies;

- creates a new framework for the regulation of over-the-counter derivatives activities;

- strengthens the regulatory oversight of securities and capital markets activities by the Securities and Exchange Commission, or *"SEC;"* and

- creates the CFPB, a new federal authority responsible for administering and enforcing the laws and regulations for consumer financial products and services.

The Dodd-Frank Act will impact the offering, marketing and regulation of consumer financial products and services offered by financial institutions, which may include the products and services offered by the Company. The CFPB has supervision, examination and enforcement authority over the consumer financial products and services of certain non-depository institutions, which could include the Company. Compliance with the regulations implemented under the Dodd-Frank Act or the oversight of the SEC or CFPB may impose costs on, create operational constraints for or place limits on pricing with respect to finance companies such as the Company. Until implementing regulations are issued, no assurance can be given that these new requirements imposed by the Dodd-Frank Act will not increase our cost of doing business, impose new restrictions on the way in which we conduct our business or add significant operational constraints that might impair our profitability. The CFPB also has the power to define and ban *"unfair, deceptive or abusive"* practices in connection with consumer products.

We are currently following legislative and regulatory developments in Congress and in individual states where we conduct business. It is difficult to assess the likelihood of the enactment of any unfavorable federal or state legislation, and there can be no assurance that additional legislative or regulatory initiatives will not be enacted which would severely restrict, prohibit or eliminate our ability to offer title loans. Any federal or state legislative or regulatory action that would serve to restrict the types of activities in which the Company is engaged could have a material adverse impact on our business, prospects, results of operations, financial condition and cash flows and could impair our ability to service our debt obligations and to continue current operations. For example, certain consumer advocacy groups and federal and state legislators have asserted that laws and regulations should be tightened to severely limit, if not eliminate, the availability of certain consumer loan products, including title loans. Additional possible restrictive actions include, among others, the imposition of limits on APRs on consumer loan transactions or the prohibition of cash advance and similar services. The extent of the impact of any future legislative or regulatory changes will depend on the nature of the legislative or regulatory change, the jurisdictions to which the new or modified laws would apply and the amount of business we do in that jurisdiction. Moreover, similar actions by states in which we do not currently operate could limit our opportunities to pursue our growth strategies.

9

---

Table of Contents

In addition to state and federal laws and regulations, our business is subject to various local rules and regulations such as local zoning regulation and permit licensing. Local jurisdictions' efforts to restrict the business of alternative financial services product providers through the use of local zoning and permitting laws have been on the rise. Actions taken in the future by local governing bodies to require special use permits or impose other restrictions on such lenders could have a material adverse effect on us. See *"Business—Regulation"* in Item 1 of this report.

*Failure to maintain certain criteria required by state and local regulatory bodies could result in fines or the loss of our licenses to conduct business.*

Most states in which we operate require licenses to conduct our business. These states or their respective regulatory bodies have established criteria we must meet in order to obtain, maintain and renew those licenses. For example, many of the states in which we operate require us to maintain a minimum amount of net worth or equity. From time to time, we are subject to audits in these states to ensure we are meeting the applicable requirements to maintain these licenses. Failure to meet these requirements could result in the revocation of our existing licenses, the denial of our new licensing requests or the imposition of fines, which could adversely affect our results of operations, cash flows and ability to service our debt obligations. We also cannot guarantee that future license applications or renewals will not be denied. If we were to lose any of our licenses to conduct our business, it could result in the temporary or permanent closure of stores, which could adversely affect our results of operations, cash flows and ability to service our debt obligations.

*Media reports and public perception of consumer loans, such as automobile title loans, as being predatory or abusive could decrease the demand for our automobile title loans and lead to more restrictive regulation.*

Certain consumer advocacy groups and federal and state legislators have asserted that laws and regulations should be tightened to severely limit, if not eliminate, the availability of certain loan products, such as automobile title loans, to consumers. The consumer advocacy groups and media reports generally focus on the cost to a consumer for this type of loan, which is often alleged to be higher than the interest typically charged by banks or similar lending institutions to consumers with better credit histories. The consumer advocacy groups and media reports characterize these consumer loans as predatory or abusive. If the negative characterization of these types of loans becomes increasingly accepted by consumers, demand for automobile title loans could significantly decrease, which could have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations. Additionally, if the negative characterization of these types of loans is accepted by legislators and regulators, we could become subject to more restrictive laws and regulations, which could have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations.

*Legal proceedings may increase our costs and distract our management team.*

In the past, we and our competitors have been subject to regulatory proceedings, class action lawsuits and other litigation regarding the offering of alternative financial services. We are currently a defendant in multiple legal proceedings. See *"Item 3. Legal Proceedings."* It is likely that in the future, we will be subject to currently unforeseen legal proceedings. The adverse resolution of any current or future legal proceeding could cause us to have to refund fees and interest collected, refund the principal amount of advances, pay damages or other monetary penalties or modify or terminate our operations in certain local, state or federal jurisdictions. The defense of such legal proceedings, even if successful, requires significant time and attention of our senior officers and other management personnel that would otherwise be spent on other aspects of our business and requires the expenditure of substantial amounts for legal fees and other related costs. Settlement of lawsuits may also result in significant cash payouts and modifications to our operations. Due to the uncertainty surrounding the litigation process, except for those matters for which an accrual has been provided, we are unable to reasonably estimate the range of loss, if any, at this time in connection with the legal proceedings in which we are currently involved. An adverse judgment or settlement of a legal proceeding may substantially exceed any amount currently accrued and could have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations.

10

*Judicial decisions, CFPB rule-making or amendments to the Federal Arbitration Act could render the arbitration agreements we use illegal or unenforceable.*

We include pre-dispute arbitration provisions in our loan agreements. These provisions are designed to allow us to resolve any customer disputes through individual arbitration rather than in court. Our arbitration provisions explicitly provide that all arbitrations will be conducted on an individual basis and not on a class basis. Thus, our arbitration agreements, if enforced, have the effect of shielding us from class action liability. They do not generally have any impact on regulatory enforcement proceedings.

We take the position that the Federal Arbitration Act requires the enforcement in accordance with the terms of arbitration agreements containing class action waivers of the type we use. While many courts, particularly federal courts, have agreed with this argument in cases involving other parties, an increasing number of courts, including courts in California, Missouri, Washington, New Jersey, and a number of other states, have concluded that arbitration agreements with class action waivers are *"unconscionable"* and hence unenforceable, particularly where a small dollar amount is in controversy on an individual basis.

While the U.S. Supreme Court recently ruled in the *AT&T Mobility v. Concepcion* case that consumer arbitration agreements meeting certain specifications are enforceable, our arbitration agreements differ in several respects from the agreement at issue in that case, thereby potentially limiting the precedential effect of the decision on our business. In addition, Congress has considered legislation that would generally limit or prohibit mandatory pre-dispute arbitration in consumer contracts and has adopted such a prohibition with respect to certain mortgage loans and also certain consumer loans to members of the military on active duty and their dependents. Further, the Dodd-Frank Act directs the CFPB to study consumer arbitration and report to Congress and authorizes the CFPB to adopt rules limiting or prohibiting consumer arbitration, consistent with the results of its study. Any such rule would apply to arbitration agreements entered into more than six months after the final rule becomes effective (and not to prior arbitration agreements).

Any judicial decisions, legislation or other rules or regulations that impair our ability to enter into and enforce pre-dispute consumer arbitration agreements could significantly increase our exposure to class action litigation as well as litigation in plaintiff-friendly jurisdictions. Such litigation could have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations.

*Our insurance coverage limits may be inadequate to cover our liabilities or one or more of our insurance carriers could default on their obligations.*

As a result of the liability risks inherent in our line of business, we maintain liability insurance intended to cover various types of property, casualty and other risks. The types and amounts of insurance that we obtain vary from time to time, depending on availability, cost and our decisions with respect to risk retention. The policies are subject to deductibles and exclusions that result in our retention of a level of risk on a self-insured basis. Our insurance policies are subject to annual renewal. The coverage limits of our insurance policies may not be adequate, and we may not be able to obtain liability insurance in the future on acceptable terms or at all. In addition, our insurance premiums may be subject to increases in the future which may be material. Furthermore, the losses that are insured through commercial insurance are subject to the credit risk of those insurance companies. While we believe our commercial insurance providers are currently credit worthy, we cannot assure you that such insurance companies will remain so in the future. Inadequate insurance coverage limits, increases in our insurance costs or losses suffered due to one or more of our insurance carriers defaulting on their obligations, could have a material adverse effect on our financial condition, results of operations and ability to service our debt obligations.

*A significant portion of our revenue is generated by our stores in Georgia, Alabama, Tennessee and South Carolina.*

Approximately 28%, 12%, 11% and 8% of our stores are located in Georgia, Alabama, Tennessee and South Carolina, respectively, which accounted for approximately 36%, 16%, 13% and 13% of our revenue, respectively, for the year ended December 31, 2012. As a result, if any of the events noted in these risk factors were to occur in these states, including changes in the regulatory environment or worsening of economic conditions, it could significantly reduce our revenue and cash flow and could have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations.

11

0653

*If we lose key management or are unable to attract and retain quality management talent, we may be unable to profitably operate and grow our business.*

Our continued growth and future success will depend on our ability to retain the members of our senior management team, who possess valuable knowledge of, and experience with, the legal and regulatory environment of our industry and who have been instrumental in developing our strategic plans and procuring capital to enable the pursuit of those plans. The loss of the services of members of senior management, together with any inability to attract new skilled management, could harm our business and future development.

*The interests of our Parent's sole beneficial owner may be different than those of our investors.*

Tracy Young is our founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of our parent holding company, TMX Finance Holdings Inc. As a result, subject to the limitations in the agreements governing our indebtedness, including the indenture governing our senior secured notes, or the *"Indenture,"* Mr. Young has the ability to control substantially all matters of significance to the Company, including the strategic direction of our business, the election and removal of the managers of TMX Finance LLC, the appointment and removal of our officers, the approval or rejection of a sale, merger, consolidation or other business combination, the issuances of additional equity or debt securities, amendments of our organizational documents, the entering into of related party transactions and the dissolution and liquidation of the Company, regardless of whether the holders of the senior secured notes, or our *"bondholders,"* believe that any such action is in their best interests.

As a result of Mr. Young's complete beneficial ownership and control of our Company, his interests could conflict with the interests of our bondholders. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, Mr. Young's interests as the sole equity owner of our Parent might conflict with the interests of our bondholders. Mr. Young might also have an interest in pursuing transactions that, in his judgment, could enhance his equity investment, even though such transactions might involve risks to our bondholders. In addition, Mr. Young could cause us to make acquisitions that increase the amount of our indebtedness or sell assets, either of which may impair our ability to make payments under the notes.

*Economic recession, unemployment and other factors could result in a reduction in demand for our products and services, and we may be unable to adapt to any such reduction.*

Factors that influence demand for our products and services include macroeconomic conditions such as employment, personal income and consumer sentiment. If consumers become more pessimistic regarding the outlook for the economy and therefore spend less and save more, demand for title loans may decline. In addition, weakened economic conditions may result in an increase in loan defaults and loan losses. We can give no assurance that we will be able to sustain our current charge-off rates or that we will not experience increasing difficulty in collecting defaulted loans. Further, in an economic slowdown, we could be required to tighten our underwriting standards, which likely would reduce our loan balances.

Should we fail to adapt to any significant declines in consumers' demand for our products or services, our revenues could decrease significantly and our operations could be harmed. Even if we do make changes to existing products or services or introduce new products or services to fulfill consumer demand, consumers may resist or may reject such products or services.

*We are subject to liabilities for claims related to repossession of automobiles.*

We use licensed third-party providers in connection with the repossession of defaulting customers' automobiles. We typically enter into agreements with these providers in which they indemnify us for all losses related to claims arising from a repossession and warrant that they maintain insurance sufficient to cover such claims and indemnification obligations; however, we do not enter into these agreements with every third-party provider. We are subject to the risk that any third-party provider that we use may not have sufficient insurance to cover such claims or indemnification obligations. In such event, we may be subject to claims of customers related to repossession, which could have an adverse effect on our business.

12

*Disruptions in the credit and capital markets could negatively impact the availability and cost of borrowing.*

Borrowed funds represent a significant portion of our capital. We rely on borrowed capital, together with cash flows from operations, to fund our working capital needs, including making title loans. Disruptions in the credit and capital markets, such as those experienced in 2008 and 2009, could adversely affect our ability to obtain cash to make title loans and to refinance existing debt obligations. Efficient access to these markets is critical to our ongoing financial success; however, our future access to the credit and debt capital markets could become restricted due to a variety of factors, including a deterioration of our earnings, cash flow, balance sheet quality or overall business or industry prospects, a sustained disruption or further deterioration in the state of the credit or capital markets or a negative bias toward our industry by market participants. Our ability to obtain additional financing in the future will depend in part upon prevailing credit and capital markets conditions. The credit and capital markets are volatile and a decline in those markets may adversely affect our efforts to arrange additional financing on satisfactory terms. If adequate funds are not available on acceptable terms, we may not be able to make future title loans, take advantage of acquisitions or other opportunities or respond to competitive challenges.

*Changes in credit ratings issued by statistical rating organizations could adversely affect our costs of financing.*

Credit rating agencies rate our indebtedness based on factors that include our operating results, actions that we take, their view of the general outlook for our industry and their view of the general outlook for the economy. Actions taken by the rating agencies can include maintaining, upgrading or downgrading the current rating or placing us on a watch list for possible future downgrading. Downgrading the credit rating of our indebtedness or placing us on a watch list for possible future downgrading could limit our ability to access the capital markets to meet liquidity needs and refinance maturing liabilities or increase the interest rates and our cost of financing.

*The Indenture and Credit Agreement impose significant operating and financial restrictions, which may prevent us from pursuing certain business opportunities and taking certain actions.*

The Indenture and Credit Agreement impose, and future debt agreements may impose, operating and financial restrictions on us. These restrictions limit or prohibit, among other things, our ability to:

- incur additional indebtedness unless certain financial tests are satisfied;

- issue disqualified capital stock;

- pay dividends, redeem subordinated debt or make other restricted payments;

- make certain investments or acquisitions;

- issue stock of subsidiaries;

- grant or permit certain liens on our assets;

- enter into certain transactions with affiliates;

- merge, consolidate or transfer substantially all of our assets;

- incur dividend or other payment restrictions affecting certain of our subsidiaries;

- transfer, sell or acquire assets, including capital stock of our subsidiaries; and

- change the business we conduct.

These covenants could adversely affect our ability to finance our future operations or capital needs, withstand a future downturn in our business or the economy in general, engage in new business activities, including future opportunities that may be in our interest, and plan for or react to market conditions or otherwise execute our business strategies. A breach of any of these covenants could result in a default with respect to the related indebtedness. If a default occurs, the relevant lenders or holders of such indebtedness could elect to declare the indebtedness, together with accrued interest and other fees, to be immediately due and payable and proceed against any collateral securing that indebtedness. Acceleration of our other indebtedness could result in a default under the terms of the Indenture and Credit Agreement.

13

---

Table of Contents

*Competition in the financial services industry could cause us to lose market share and revenues.*

The industry in which we operate has low barriers to entry and is highly fragmented and very competitive. We encounter significant competition from other automobile title lending companies, pawnshops, installment lending companies, online lenders, consumer finance companies and providers of other forms of alternative financial services, many of which have significantly greater financial resources than we do. Significant increases in the number or size of competitors or other changes in competitive influences could cause us to lose market share and experience slowing or declining revenues, thereby affecting our ability to generate sufficient cash flow to fund our operations and service our indebtedness. We cannot assure you that we will be able to compete successfully with our competitors.

Competition for market share will likely intensify. Increased competition could lead to consolidation within the industry. If our competitors get stronger through consolidation and we are unable to identify attractive consolidation opportunities, we could be at a competitive disadvantage and experience declining market share and revenue. If these events materialize, they could negatively affect our ability to generate sufficient cash flow to fund our operations and service our indebtedness.

In addition to increasing competition among traditional providers of alternative financial services to consumers, there is a risk of losing market share to new market entrants such as banks and credit unions. Several large financial institutions have introduced payday-like products in the last few years. Broad consumer adoption of these alternatives could reduce the number of loans we make and adversely affect our cash flows.

Our growth strategy calls for opening additional stores, both in states in which we currently operate and states into which we are looking to expand. If our competitors aggressively pursue store expansion, competition for store sites could result in a failure to open the planned number of stores and could result in increased costs to procure desired locations, both of which could impair our results of operations.

*External factors and other circumstances over which we have limited control or that are beyond our control could adversely affect our ability to grow through the opening of new stores.*

Our expansion strategy includes opening new stores. The success of this strategy is subject to numerous external factors, including, but not limited to:

- the availability of sites with acceptable restrictions and suitable terms;

- our ability to attract, train and retain qualified store management personnel;

- our ability to access capital;

- our ability to obtain required government permits and licenses;

- the prevailing laws and regulatory environment of each state or jurisdiction in which we operate or seek to operate, which are subject to change at any time; and

- the degree of competition in new markets and its effect on our ability to attract new customers and our ability to adapt our infrastructure and systems to accommodate our growth.

Some of these factors are outside of our control. The failure to execute our expansion strategy would adversely affect our ability to expand our business and could materially adversely affect our business, results of operations, financial condition and ability to service our debt obligations.

*Our allowance for loan losses and our accrual for losses on loans we process and guarantee for an unconsolidated third-party lender are only estimates and may not be adequate to fully absorb losses.*

We maintain an allowance for loan losses for estimated probable losses on our title loans. We also maintain an accrual for losses related to loans we process for an unconsolidated third-party lender that we guarantee. See *"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies"* for factors considered by management in estimating the allowance for loan losses and accrual for losses related to our unconsolidated third-party lender. These reserves are estimates, and if actual losses are greater than our reserves, our results of operations and financial condition could be adversely affected.

14

---

Table of Contents

*Our business and results of operations may be adversely affected if we are unable to manage our growth effectively.*

There can be no assurance that we will be able to continue to grow our business or that our current business, results of operations and financial condition will not suffer if we fail to prudently manage our growth. Failure to grow the business and generate estimated future levels of cash flow could inhibit our ability to service our debt obligations. Our expansion strategy, which contemplates growing our title loans receivable in existing stores, opening new stores in existing markets and opening new stores in new markets, is subject to significant

risks. Our current business and results of operations and any future growth depend upon a number of factors, including the ability to obtain and maintain financing to support these opportunities, the ability to hire, train and retain an adequate number of qualified employees, the ability to obtain and maintain any required government permits and licenses, the ability to successfully integrate any acquired operations as well as other factors, some of which are outside of our control, such as the continuation of favorable regulatory and legislative environments. Further, expansion into additional states will increase our regulatory and legal risks. Regulatory and legal actions could divert management's attention away from executing our growth strategy. The profitability of our current operations could suffer as management's attention is diverted toward our expansion plans.

*If we are not successful at entering new businesses or broadening the scope of our existing product and service offerings, we may not achieve our expected growth rate or recoup our investment.*

We may enter into new businesses that are adjacent or complementary to our existing businesses and that broaden the scope of our existing product and service offerings. We may not achieve our expected growth if we are not successful in these efforts. In addition, entering into new businesses and broadening the scope of our existing product and service offerings may require significant upfront expenditures that we may not be able to recoup in the future. These efforts may also divert management's attention and expose us to new risks and regulations which may have a material adverse effect on our business, results of operations, financial condition and ability to service our debt obligations.

*In certain states, we rely on third parties to make loans to our customers, and the loss of access to any of these third parties could significantly increase our costs and change the way we operate in these states.*

In certain states, particularly including Texas, we operate as a Credit Services Organization and therefore arrange for an unrelated third party to make loans to our customers. There are a limited number of third parties that make these types of loans, and there is significant demand and competition for the services of these third parties. These third parties rely on borrowed funds in order to make consumer loans. If these third parties lose their ability to make loans or become unwilling to make loans and we are unable to find another lending partner, our cost of arranging loans in these states may increase significantly and we could be forced to change the way we operate in these states, which may have a material adverse effect on our financial results, make it difficult to operate profitably in these locations and negatively affect our ability to service our debt obligations.

*The lack of availability of an adequate number of hourly employees to run our business could negatively impact our growth, and any increases in wages, benefits or other costs associated with hourly employees could significantly increase our labor costs.*

Our workforce is comprised primarily of employees who work on an hourly basis. In certain areas where we operate, there is significant competition for employees. The lack of availability of an adequate number of hourly employees or an increase in wages and benefits to current employees could adversely affect our business, results of operations, cash flows, financial condition and ability to service our debt obligations. We are subject to applicable rules and regulations relating to our relationship with our employees, including minimum wage and break requirements, health benefits, unemployment and sales taxes, overtime and working conditions and immigration status. Accordingly, legislated increases in the federal minimum wage, as well as increases in additional labor cost components such as employee benefit costs, workers' compensation insurance rates and compliance costs and fines, would increase our labor costs, which could have a material adverse effect on our business, prospects, results of operations and financial condition.

15

Table of Contents

*Any disruption in the availability or security of our information systems could cause us to lose customers and revenue, subject us to significant liability and cause us to incur significant expense.*

We rely heavily upon our information systems to process customer loan transactions, account for our business activities and generate the reporting used by management for analytical and decision-making purposes. Each of our stores is part of an integrated data network designed to facilitate underwriting decisions, reconcile cash balances and report revenue and expense transaction data. Our back-up systems and security measures could fail to prevent a disruption in the availability or performance of our information systems. Any disruption in the availability or performance of our information systems could significantly disrupt our operations and cause us to lose customers and revenue. Further, a security breach of our information systems could also interrupt or damage our operations or harm our reputation. We could be subject to liability if confidential customer information is misappropriated from our information systems. Despite the implementation of significant security measures, our information systems may still be vulnerable to physical break-ins, computer viruses, programming errors, employee misappropriation and attacks by third parties or similar disruptive problems, which could require us to incur significant expense to eliminate these problems and address related data security concerns.

*We may be unable to protect our proprietary technology or keep up with that of our competitors.*

The success of our business depends to a significant degree upon the protection of our software and other proprietary intellectual property rights. We may be unable to deter misappropriation of our proprietary information, detect unauthorized use or take appropriate steps to enforce our intellectual property rights. In addition, competitors could, without violating our proprietary rights, develop technologies that are as good as or better than our technology. Our failure to protect our software and other proprietary intellectual property rights or to develop technologies that are as strong as our competitors' could put us at a disadvantage to our competitors. Any such failures could have a material adverse effect on our business, prospects, results of operations, financial condition and ability to service our debt obligations.

*Our business may suffer if our trademarks or service marks are infringed.*

We rely on trademarks and service marks to protect our various brand names in our markets. Many of these trademarks and service marks have been a key part of establishing our business in the communities in which we operate. We believe these trademarks and service marks have significant value and are important to the marketing of our services. We cannot assure you that the steps we have taken or will take to protect our proprietary rights will be adequate to prevent misappropriation of our rights or the use by others of features based upon, or otherwise similar to, ours. In addition, although we believe we have the right to use our trademarks and service marks, we cannot assure you that our trademarks and service marks do not or will not violate the proprietary rights of others, that our trademarks and service marks will be upheld if challenged or that we will not be prevented from using our trademarks and service marks, any of which occurrences could harm our business.

*Adverse real estate market fluctuations could affect our profits.*

We currently lease all of our locations except one. A significant rise in real estate prices or real property taxes could result in an increase in store lease costs as we open new locations and renew leases for existing locations. Any such increase, especially in Georgia, Texas, Alabama or Tennessee, could have a material adverse effect on our business, prospects, results of operations and financial condition.

*Our business is seasonal, which causes our revenues to fluctuate and may adversely affect our ability to service our debt.*

Our business typically declines slightly in the first quarter as a result of customers' receipt of tax refund checks. Demand for our services is generally greatest during the fourth quarter. This seasonality requires us to manage our cash flows over the course of the year. If the state or federal government were to pursue economic stimulus actions or issue additional tax refunds or tax credits at other times during the year, such actions could have a material adverse effect on our business, prospects, results of operations and financial condition during those periods. If our revenues were to fall substantially below what we would normally expect during certain periods, our annual financial results would be adversely impacted and our ability to service our debt may also be adversely affected.

16

0656

*Our substantial level of indebtedness could adversely affect our financial condition and prevent us from fulfilling our obligations under the senior secured notes.*

We have substantial indebtedness. As of December 31, 2012, TMX Finance LLC had approximately $370.5 million of total debt outstanding. Subject to restrictions in the Indenture, we may incur additional indebtedness.

Our substantial level of indebtedness could have important consequences to our bondholders and significant effects on our business, including the following:

- it may be more difficult for us to satisfy our financial obligations, including with respect to the notes;

- our ability to obtain additional financing for working capital, capital expenditures, strategic acquisitions or general corporate purposes may be impaired;

- we must use a substantial portion of our cash flow from operations to pay interest on the notes and our other indebtedness as well as to fund excess cash flow offers on the notes, which will reduce the funds available to use for operations and other purposes;

- our ability to fund a repurchase of our outstanding senior secured notes upon the occurrence of a change of control of the Company or other event as specified in the Indenture may be limited;

- our substantial level of indebtedness could place us at a competitive disadvantage compared to our competitors that may have proportionately less debt;

- our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate may be limited; and

- our substantial level of indebtedness may make us more vulnerable to economic downturns and adverse developments in our business.

We expect to obtain the funds to pay our expenses and repay our indebtedness primarily from our operations and, in the case of our indebtedness, from a refinancing thereof. Our ability to meet our expenses and make these payments therefore depends on our future performance, which will be affected by financial, business, economic and other factors, many of which we cannot control. Our business may not generate sufficient cash flow from operations in the future, and our currently anticipated growth in revenue and cash flow may not be realized, either or both of which could result in our being unable to repay indebtedness, including the notes, or to fund other liquidity needs. If we do not have enough funds, we may be required to refinance all or part of our then existing debt, sell assets or borrow more funds, which we may not be able to accomplish on terms acceptable to us, or at all. In addition, the terms of existing or future debt agreements may restrict us from pursuing any of these alternatives.

*Despite our current indebtedness level, we and any of our existing or future subsidiaries may still be able to incur substantially more debt, which could exacerbate the risks associated with our substantial leverage.*

We and any of our existing and future subsidiaries may be able to incur substantial additional indebtedness in the future. Although the terms of the Indenture contain limitations on our ability to incur additional indebtedness, these restrictions are subject to a number of qualifications and exceptions. If we incur any additional indebtedness that ranks equally with the notes, the holders of that additional debt will be entitled to share ratably with the holders of the notes in any proceeds distributed in connection with any insolvency, liquidation, reorganization, dissolution or other winding up of the Company, subject to any collateral securing the notes. If new debt is added to our or any of our existing and future subsidiaries' current debt levels, the related risks that we now face could be exacerbated.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

None.

17

## ITEM 2. PROPERTIES.

Our stores generally range in size from approximately 1,800 to 2,400 square feet. Most of our stores are located in highly visible, accessible locations with arterial roadways that we believe have high daily traffic volume and high concentration of retail users, typically with retailers serving comparable customer bases such as national auto parts and rent-to-own companies. We prefer our stores to be freestanding single tenant buildings, but we also use retail strip shopping center stores, preferably on an end unit or with a bay with high road visibility. We believe that our stores provide a welcoming, personal environment for conducting our business. .

All but one of our stores are leased, with typical lease terms of five years and two options to renew at the end of the lease, with an average gross monthly rent of $3,800. Our leases usually require that we pay all maintenance costs, insurance costs and property taxes.

The following table shows the composition of our store network at December 31, 2012:

| State | Store Count |
| --- | --- |
| Alabama | 124 |
| Arizona | 62 |
| Florida | 2 |
| Georgia | 290 |
| Illinois | 48 |
| Mississippi | 3 |
| Missouri | 67 |
| Nevada | 26 |
| South Carolina | 81 |
| Tennessee | 109 |
| Texas | 161 |
| Virginia | 62 |
| Total | 1,035 |

We believe that our facilities, equipment, furniture and fixtures are in good condition and well maintained and that our facilities are sufficient to meet our present needs.

## ITEM 3. LEGAL PROCEEDINGS.

0657

We are involved in a number of active lawsuits, including the legal proceeding discussed below as well as a number of routine litigation and administrative proceedings arising in the ordinary course of business. Due to the uncertainty surrounding the litigation process, except for those matters for which an accrual has been provided, we are unable to reasonably estimate the probability of an unfavorable outcome or the range of loss, if any, at this time in connection with these proceedings. While the outcome of many of these matters is currently not determinable, we believe we have meritorious defenses to the claims in these proceedings and that the ultimate cost to resolve these matters will not have a materially adverse effect on our consolidated financial position, results of operations or cash flows.

*Justin Johnson, et al v. TitleMax of Missouri, Inc. (f/k/a Mignon Norfolk, et al v. TitleMax of Missouri, Inc.)*

On February 10, 2011, Mignon Norfolk filed a putative class action lawsuit in the Circuit Court of Jefferson County, Missouri against TitleMax of Missouri, Inc., or "*TMM*," and a TMM District Manager. On July 27, 2012, the named plaintiff changed from Mignon Norfolk to Justin Johnson. The complaint alleges, among other things, that TMM failed to pay certain employees overtime compensation as required by Missouri law. The plaintiff seeks, among other things, a judgment for an amount equal to plaintiff's unpaid compensation, as well as liquidated damages. The litigation is currently in the discovery phase, and it is too early to determine the likelihood of an unfavorable outcome or the ultimate liability, if any, resulting from this action.

ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

18

Table of Contents

PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Tracy Young, the founder, Chairman of the Board, Chief Executive Officer and President of TMX Finance LLC, is the sole beneficial owner of the common stock of TMX Finance Holdings Inc., which owns all 100 of the outstanding limited liability company interests in TMX Finance LLC. There is no established public trading market for common equity of TMX Finance Holdings Inc. or TMX Finance LLC. For information about cash dividends paid by TMX Finance LLC for the past two fiscal years (including certain restrictions that limit the payment of dividends), see "*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources.*"

ITEM 6. SELECTED CONSOLIDATED FINANCIAL DATA.

The following table sets forth selected historical consolidated financial data for the Company as of and for the fiscal years ended December 31, 2012, 2011, 2010, 2009 and 2008. The financial information for the years ended December 31, 2012, 2011 and 2010, and as of December 31, 2012 and 2011, has been derived from our audited financial statements included elsewhere in this report. The financial information for the years ended December 31, 2009 and 2008, and as of December 31, 2010, 2009, and 2008, has been derived from our audited financial statements not included in this report.

The historical selected financial information may not be indicative of our future performance and should be read in conjunction with the information contained in "*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations*" and the consolidated financial statements and related notes in "*Item 8. Financial Statements and Supplementary Data.*"

| (in thousands) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2012 | | 2011 | | 2010 | | 2009 | | 2008 |
| Statements of Income Data: | | | | | | | | | | |
| Interest and fee income | $ | 656,755 | $ | 505,865 | $ | 389,449 | $ | 312,022 | $ | 262,635 |
| Provision for loan losses | | (144,749) | | (99,542) | | (63,932) | | (51,184) | | (45,318) |
| Net interest and fee income | | 512,006 | | 406,323 | | 325,517 | | 260,838 | | 217,317 |
| Costs, expenses and other: | | | | | | | | | | |
| Salaries and related expenses | | 201,899 | | 159,201 | | 116,090 | | 90,234 | | 78,046 |
| Occupancy costs | | 64,727 | | 48,556 | | 34,939 | | 33,366 | | 32,698 |
| Depreciation and amortization (1) | | 17,210 | | 13,813 | | 10,353 | | 9,027 | | 8,670 |
| Advertising | | 22,227 | | 15,512 | | 10,243 | | 6,206 | | 13,242 |
| Other operating and administrative expenses | | 77,469 | | 58,696 | | 41,407 | | 33,720 | | 30,345 |
| Interest expense, net (2) | | 49,293 | | 42,610 | | 26,251 | | 11,674 | | 13,286 |
| Total expenses | | 432,825 | | 338,388 | | 239,283 | | 184,227 | | 176,287 |
| Income from continuing operations before reorganization items | | 79,181 | | 67,935 | | 86,234 | | 76,611 | | 41,030 |
| Reorganization items (3) | | — | | — | | 4,548 | | 6,655 | | — |
| Income before discontinued operations | | 79,181 | | 67,935 | | 81,686 | | 69,956 | | 41,030 |
| (Loss) gain from discontinued operations (4) | | — | | — | | — | | 145 | | (2,184) |
| Net income | | 79,181 | | 67,935 | | 81,686 | | 70,101 | | 38,846 |
| Net income (loss) attributable to noncontrolling interests | | 19 | | (1,627) | | (1,906) | | (4,031) | | (1,977) |
| Net income attributable to member's equity | $ | 79,162 | $ | 69,562 | $ | 83,592 | $ | 74,132 | $ | 40,823 |

19

Table of Contents

| (in thousands) | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2009 | 2008 |
| Non-GAAP Financial Measures (5) (unaudited): | | | | | |

0658

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net income | S | 79,181 | S | 67,935 | S | 81,686 | S | 70,101 | S | 38,846 |
| Interest expense, net | | 49,293 | | 42,610 | | 26,251 | | 11,674 | | 13,286 |
| Taxes | | 948 | | 638 | | 1,917 | | 756 | | 13 |
| Depreciation and amortization | | 17,210 | | 13,813 | | 10,353 | | 9,027 | | 8,999 |
| EBITDA | S | 146,632 | S | 124,996 | S | 120,207 | S | 91,558 | S | 61,144 |

| | | | | | | December 31, | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (in thousands) | | 2012 | | 2011 | | 2010 | | 2009 | | 2008 |
| Balance Sheet Data: | | | | | | | | | | |
| Cash and cash equivalents | S | 90,794 | S | 38,141 | S | 53,585 | S | 27,008 | S | 10,188 |
| Title loans receivable | | 577,172 | | 490,093 | | 360,325 | | 282,917 | | 232,450 |
| Allowance for loan losses | | (94,561) | | (73,103) | | (52,048) | | (40,280) | | (29,885) |
| Unamortized loan origination costs | | 3,716 | | 2,829 | | 2,139 | | 1,160 | | 1,251 |
| Title loans receivable, net | | 486,327 | | 419,819 | | 310,416 | | 243,797 | | 203,816 |
| Total assets | | 767,783 | | 604,748 | | 470,331 | | 338,763 | | 283,648 |
| Total debt | | 395,454 | | 346,054 | | 273,401 | | 178,353 | | 193,884 |
| Total liabilities | | 456,795 | | 408,410 | | 329,195 | | 207,489 | | 208,550 |
| Member's equity | | 318,365 | | 202,484 | | 145,876 | | 133,198 | | 73,904 |
| Member's equity and noncontrolling interests | | 310,988 | | 196,338 | | 141,136 | | 131,274 | | 75,098 |
| Statement of Cash Flow Data: | | | | | | | | | | |
| Net cash provided by operating activities | S | 222,321 | S | 175,159 | S | 176,211 | S | 144,225 | S | 105,208 |
| Net cash used in investing activities | | (254,528) | | (246,453) | | (154,651) | | (95,964) | | (75,120) |
| Net cash provided by (used in) financing activities | | 84,860 | | 55,850 | | 5,017 | | (31,441) | | (28,120) |

(1) Represents depreciation and amortization of property and equipment.

(2) Includes amortization of debt issuance costs and discount/premium of S3,481, S3,633, S2,035, S1,210 and S3,144 for the fiscal years ended December 31, 2012, 2011, 2010, 2009 and 2008, respectively.

(3) Reorganization items refer to expenses incurred in connection with our reorganization pursuant to Chapter 11 of the U.S. Bankruptcy Code. See Note 16 of Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data." These items include professional fees and interest earned on accumulated cash resulting from the Chapter 11 proceeding.

(4) References to discontinued operations relate to payday-lending subsidiaries that were discontinued in April 2008 and had no activity in the fiscal years ended December 31, 2012, 2011 or 2010.

(5) We disclose our earnings before interest expense, taxes, depreciation and amortization, or "EBITDA," which is a "non-GAAP financial measure" as defined under the rules of the SEC. It is intended as a supplemental measure of our performance that is not required by, or presented in accordance with, U.S. generally accepted accounting principles, or "GAAP." We present EBITDA because we believe that, when viewed with the Company's GAAP results and the accompanying reconciliation, EBITDA provides useful information about our operating performance and period-over-period growth, as well as information that is helpful for evaluating the operating performance of our core business without regard to potential disruptions. Additionally, we believe that EBITDA is commonly used by securities analysts, investors and other interested parties in the evaluation of high yield issuers, many of which present EBITDA when reporting their results. However, EBITDA should not be considered as an alternative to income from continuing operations or any other performance measure derived in accordance with GAAP or as an alternative to cash flows from operating activities or any other liquidity measure derived in accordance with GAAP. Our presentation of EBITDA should not be construed to imply that our future results will be unaffected by unusual or nonrecurring items.

20

Table of Contents

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

*This section is intended to provide information that will assist you in understanding our consolidated financial statements, the changes in those financial statements from period to period and the primary factors contributing to those changes. The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes in "Item 8. Financial Statements and Supplementary Data."*

*In addition to historical financial information, the following discussion and analysis contains forward-looking statements that reflect our plans, estimates and beliefs but that also involve risks and uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements. Please see "Forward-Looking Statements" and "Item 1A. Risk Factors" for discussions of the uncertainties, risks and assumptions associated with these statements.*

Company Overview

We are a privately-owned automobile title-lending company with 1,035 company-owned stores in 12 states as of December 31, 2012. We serve individuals who generally have limited access to consumer credit from banks, thrift institutions, credit card lenders and other traditional sources of consumer credit. We provide our customers with access to loans secured by a lien on the customers' automobiles while allowing the customers to retain use of the vehicles during the term of the loans. As of December 31, 2012, we served more than 470,000 customers and had approximately S577.2 million in title loans receivable. We believe that we are the largest automobile title lender in the United States based on title loans receivable.

Our business provides a simple, quick and confidential way for consumers to meet their liquidity needs. We offer title loans in amounts ranging from S100 to S5,000 at rates that we believe, based on market research, are up to 50% less than those offered by other comparable title lenders, with an average loan size of approximately S1,300. Our title loans do not impact our customers' credit ratings as we do not run credit checks on our TitleMax and TitleBucks customers, and we do not make negative credit reports if we are unable to collect loan balances.

We conduct business in Texas and certain other states through wholly-owned subsidiaries, each of which is registered in the applicable state as a Credit Services Organization, or "CSO." These CSOs have entered into credit services organization agreements, or "CSO Agreements," with third-party lenders, or the "CSO Lenders," that make the loans to our customers. The CSO Agreements govern the terms by which we perform servicing functions and refer customers to the CSO Lenders for a possible extension of a loan. We process loan applications and commit to reimburse the CSO Lenders for any loans or related fees that are not collected from those customers.

Our growth strategy includes increasing our title loans receivable in our existing stores, opening new stores in existing markets and expanding our store base into new markets with favorable characteristics. We seek to develop and maintain a large presence in each of the markets in which we operate. Our strategy has enabled consistent growth throughout the Company's history that has included fluctuating market conditions.

0659

During the year ended December 31, 2012, we continued to execute our growth strategy and opened or acquired 281 new stores while closing only two stores. The new stores opened include 84 in Texas, 49 in Arizona, 36 in Virginia and 62 in Georgia (48 of which were opened under the InstaLoan brand). For the year ended December 31, 2012, the Company had revenues of $656.8 million, an increase of $150.9 million or 29.8%, and net income of $79.2 million, an increase of $11.3 million or 16.6%, from the corresponding results for the year ended December 31, 2011. The increase in net income for 2012 compared to 2011 was the result of strong same-store performance and several of our newer stores becoming profitable, partially offset by costs related to the addition of the new stores discussed above and an increase in our net charge-off rates.

Table of Contents

Key Performance Indicators

We measure our performance through certain key performance indicators, or *"KPIs,"* that drive our revenue and profitability. Our KPIs include total originations, average originations per store, total title loans receivable balance, average receivable balance per store and net charge-off rate as a percent of aggregate originations over the period. We influence our KPIs through operational execution, information systems and proper incentives for our field-level employees. Externally, our KPIs are affected by competition and macroeconomic conditions, including availability of credit, consumer confidence, consumer spending habits, unemployment and state and federal regulations.

The following table reflects our results as measured by these KPIs:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| (dollars in thousands) | 2012 | | 2011 | | 2010 | |
| Originations | $ | 794,159 | $ | 627,485 | $ | 441,222 |
| Average originations per store | | 910 | | 930 | | 785 |
| Total title loans receivable | | 577,172 | | 490,093 | | 360,325 |
| Average title loans receivable per store | | 662 | | 648 | | 611 |
| Net charge-offs as a percent of originations | | 15.1% | | 12.3% | | 11.8% |

In addition, we closely monitor same-store interest and fee income. The Company considers interest and fee income from stores open more than 13 months in its calculation of same-store interest and fee income. The following summarizes the Company's same-store interest and fee income for the fiscal years ended December 31, 2012, 2011 and 2010:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| (dollars in thousands) | 2012 | | 2011 | | 2010 | |
| Interest and fee income | $ | 552,692 | $ | 483,285 | $ | 385,160 |
| Interest and fee income growth | | 14.4% | | 25.3% | | 29.1% |
| Number of stores open more than 13 months | | 611 | | 554 | | 540 |

Table of Contents

Results of Operations

*Store Software System*

In May 2012, our new proprietary store software system, which is used in approximately 21.4% of our stores as of December 31, 2012, incurred significant service outages. These outages caused us to review the status of the system as a long-term solution for our existing and future stores. Based on this review, we initially determined and announced that we would discontinue further development of the system and write-off the related capitalized costs. However, after the service outages in May, we stabilized the platform and obtained vendor quotes to correct technical deficiencies. Based on this additional information, we decided to reevaluate whether we will continue development of the proprietary system or purchase a new packaged software system to meet our future needs. This evaluation remains on-going. We determined that we are not required to record an impairment charge related to our proprietary store software during the year ended December 31, 2012 because the undiscounted future cash flows from the asset group are greater than the carrying amount. However, depending on the outcome of our full evaluation, it is reasonably possible that we could decide to implement a different store software system and discontinue the development of our proprietary system. This decision could result in a one-time, non-cash expense that could range from $13.0 million to $18.0 million.

*Year Ended December 31, 2012 Compared to Year Ended December 31, 2011*

Interest and fee income

Interest and fee income was $656.8 million for 2012 compared to $505.9 million for 2011. The increase of $150.9 million, or 29.8%, was primarily due to the addition of a significant number of new stores over the last 12 months and strong same-store performance. Interest and fee income from stores open less than 13 months increased $81.5 in 2012 compared to 2011 and accounted for 54% of the total increase in 2012. Same-store interest and fee income increased $69.4 million, or 14.4%, for 2012 compared to 2011. The Company considers interest and fee income from stores open more than 13 months in its calculation of same-store interest and fee income.

Provision for loan losses

Our provision for loan losses was $144.7 million for 2012 compared to $99.5 million for 2011, an increase of $45.2 million, or 45.4%. The provision for loan losses is based on loan loss experience, contractual delinquency of title loans receivable, economic and other qualitative considerations and management's judgment. Approximately $12.0 million of the increase relates to a 26.6% increase in loan originations, and the remaining increase of $33.2 million was due to an increase in our loan loss charge-off rate. Net charge-offs as a percent of originations increased to 15.1% for 2012 from 12.3% for 2011. The net charge-offs and originations include loans made by our CSO Lenders that we guarantee. Our net charge-off rate has increased during the last twelve months, due primarily to the addition of a significant number of new stores and rapid loan growth. During this period, we have worked to manage our charge-offs in the face of the significant increase in new stores and loan volume and we will continue to monitor net charge-off rates and make adjustments as necessary to maximize loan portfolio growth and long-term profitability.

Costs, expenses and other

*Salaries and related expenses*

Salaries and related expenses were $201.9 million for 2012 compared to $159.2 million for 2011. This represents an increase of $42.7 million, or 26.8%. This increase was mostly due to growth-related increases in headcount, primarily related to operational personnel necessary to service the higher volume of loans and as a result of opening new stores. Also contributing to the increase was higher corporate headcount, primarily in the areas of operations, construction and real estate. In addition, a significant portion of our operations employees' compensation is incentive-based, which increased $12.1 million due to higher profitability at the store, district and regional levels.

*Occupancy costs*

Occupancy costs were $64.7 million for 2012 compared to $48.6 million for 2011. This increase of $16.1 million, or 33.1%, was primarily due to increases in rent, utilities, and maintenance costs associated with opening new stores as well as expanding corporate office space.

*Depreciation and amortization*

Depreciation and amortization for 2012 was $17.2 million compared to $13.8 million for 2011. The increase of $3.4 million, or 24.6%, was primarily attributable to remodeling and relocating stores, fitting out new stores and expanding corporate office space.

*Advertising*

Advertising expense for 2012 was $22.2 million compared to $15.5 million for 2011. The increase of $6.7 million, or 43.2%, was primarily due to increased internet advertising and online lead generation related to our upgraded website.

*Other operating and administrative expenses*

Other operating and administrative expenses for 2012 were $77.5 million compared to $58.7 million for 2011. The increase of $18.8 million, or 32.0%, was primarily attributable to growth-related increases in costs associated with collateral collection, technology services and office supplies and postage.

*Interest expense, net, including amortization of debt issuance costs*

Interest expense, net, including amortization of debt issuance costs, was $49.3 million for 2012 compared to $42.6 million for 2011. This represents an increase of $6.7 million, or 15.7%. During 2012, we incurred $4.4 million of additional interest compared to 2011 on $60.0 million aggregate principal amount of our 13.25% senior secured notes issued on July 22, 2011. We also incurred interest of $1.3 million in the second half of 2012 on our $25.0 million revolving line of credit obtained on June 27, 2012. Also contributing to the increase in interest expenses was an increase in notes payable issued by TMX Finance LLC and our consolidated CSO Lenders. We expect interest expense to increase in the future relative to prior periods due to the higher average outstanding debt balance.

Net income

As a result of the above factors, net income was $79.2 million for 2012, an increase of 16.6% over net income of $67.9 million for 2011.

*Year Ended December 31, 2011 Compared to Year Ended December 31, 2010*

Interest and fee income

Interest and fee income was $505.9 million for 2011 compared to $389.4 million for 2010. The increase of $116.5 million, or 29.9%, is primarily due to strong same-store performance as customers turned more to title lending because of a contraction of credit from other sources. Same-store interest and fee income increased $101.2 million, or 26.3%, for the year ended December 31, 2011 compared to the same period in 2010. The Company considers interest and fee income from stores open more than 13 months in its calculation of same-store interest and fee income. Interest and fee income also was higher in the year ended December 31, 2011 due to an increase of approximately $15.3 million from stores open less than 13 months. The increase from stores open less than 13 months accounted for 13% of the total increase in interest and fee income.

Provision for loan losses

Our provision for loan losses was $99.5 million for 2011 compared to $63.9 million for 2010. The provision increased $35.6 million, or 55.7%. Approximately $15.0 million of the increase relates to the 29.9% increase in loan originations, and the remaining increase of $20.6 million was due to an increase in our loan loss charge-off rate. Net charge-offs as a percent of originations increased to 12.3% for the year ended December 31, 2011 from 11.8% for the comparable period in 2010. The increase in our net charge-off rate was a result of a shift toward growth in our store management incentive plans, which led to an increase in loan originations.

Costs, expenses and other

*Salaries and related expenses*

Salaries and related expenses were $159.2 million for 2011 compared to $116.1 million for 2010. This represents an increase of $43.1 million, or 37.1%. Approximately $24.1 million of the increase was due to growth-related increases in headcount, primarily related to operational personnel necessary to service the higher volume of loans and as a result of opening new stores. Also contributing to the increase was higher corporate headcount, primarily in the areas of information technology, recruiting and real estate and construction. In addition, a significant portion of our operations employees' compensation is incentive-based, which increased $18.9 million due to higher profitability at the store, district and regional levels.

*Occupancy costs*

Occupancy costs were $48.6 million for 2011 compared to $34.9 million for 2010. This increase of $13.7 million, or 39.3%, was primarily due to increases in rent, utilities, and maintenance costs associated with opening new stores as well as expanding corporate office space.

*Depreciation and amortization*

Depreciation and amortization for 2011 was $13.8 million compared to $10.4 million for 2010. The increase of $3.4 million, or 32.7%, was primarily attributable to remodeling and relocating stores, fitting out new stores, expanding corporate office space and the acquisition of an aircraft in the fourth quarter of 2010. Also contributing to the increase was depreciation expense related to an upgrade to our proprietary loan system, which was placed in service in the second quarter of 2011.

*Advertising*

Advertising expense for 2011 was $15.5 million compared to $10.2 million for 2010. The increase of $5.3 million, or 52.0%, was primarily due to increased television advertising costs in

2011 related to airtime for our *"short on cash"* marketing campaign.

*Other operating and administrative expenses*

Other operating and administrative expenses for 2011 were $58.7 million compared to $41.4 million for 2010. The $17.3 million increase was primarily driven by growth-related increases in costs associated with recruiting and relocation, collateral collection, accounting and legal services, travel, and office supplies and postage.

*Interest expense, net, including amortization of debt issuance costs*

Interest expense, net, including amortization of debt issuance costs, was $42.6 million for 2011 compared to $26.3 million for 2010. This represents an increase of $16.3 million, or 62.0%. During 2011, we incurred $15.6 million of additional interest compared to 2010 on the $250.0 million aggregate principal amount of our 13.25% senior secured notes issued on June 21, 2010. In addition, during 2011, we incurred interest of $3.5 million on $60.0 million aggregate principal amount of our 13.25% senior secured notes issued on July 22, 2011. These increases were partially offset by interest incurred in 2010 on our term loan at the default rate during our bankruptcy proceedings

Reorganization items

There were no reorganization items in 2011 compared to $4.5 million for 2010. On June 16, 2011, the final Chapter 11 decree closing the bankruptcy case was signed and filed with the court. See Note 16 of Notes to Consolidated Financial Statements in *"Item 8. Financial Statements and Supplementary Data."*

Net income

As a result of the above factors, net income was $67.9 million for 2011 compared to $81.7 million for 2010.

25

---

Table of Contents

Liquidity and Capital Resources

We manage our liquidity and capital positions to satisfy several objectives. Near-term liquidity is managed to ensure adequate working capital is available to fund seasonal growth in loans and related interest receivable in an amount that exceeds increases in accounts payable and accrued expenses. Growth in working capital is driven by demand for our loan products and is funded on a near-term basis through operating cash flows without the need for reliance on other sources. Long-term capital needs are managed by assessing the growth capital needs of the Company and balancing those needs against the available internal and external capital resources. Long-term capital needs have historically been funded through credit facilities and issuances of debt securities. We manage the risk that we may not be able to refinance our debt securities through proper timing of refinancing transactions ahead of scheduled maturities and, to a lesser extent, as market conditions permit.

Our principal sources of near-term liquidity are cash on hand, working capital, cash flows from operations and borrowings under our new $25.0 million secured revolving credit facility described below. Cash and cash equivalents were $90.8 million at December 31, 2012 as compared to $38.1 million at December 31, 2011.

In June 2010 and July 2011, we issued $250.0 million and $60.0 million, respectively, of senior secured notes due 2015. These senior secured notes, or *"the Notes,"* were offered only to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended, or the *"Securities Act,"* and to non-U.S. persons outside of the United States in compliance with Regulation S under the Securities Act.

The indenture governing our Notes, or the *"Indenture,"* limits our ability to incur additional indebtedness. However, we were permitted to obtain a $25.0 million senior secured revolving loan facility that is equal in priority with the Notes. In June 2012, we entered into a credit agreement, or the *"Credit Agreement,"* to obtain a senior secured revolving credit facility of up to $25.0 million, or the *"Revolving Credit Facility,"* that matures June 15, 2015. Subject to certain exceptions, the obligations under the Revolving Credit Facility are fully and unconditionally guaranteed by TMX Finance LLC, TitleMax Finance Corporation and each of their existing and future domestic subsidiaries. The Revolving Credit Facility and the guarantees rank equal in right of payment with the Notes. The Credit Agreement contains certain covenants that are substantially similar to those in the Indenture. The Credit Agreement also contains a financial covenant that requires the maintenance of a minimum earnings to fixed charge ratio of 2:1.

The Indenture and Credit Agreement permit us to incur additional debt as long as the new debt does not cause us to maintain less than a 3:1 earnings to fixed charge ratio, as defined in the Indenture. In addition, if our earnings to fixed charge ratio is below 3:1, we are permitted to incur up to $10.0 million of additional indebtedness and an incremental $25.0 million of guarantees under our CSO Agreements. As of December 31, 2012, our earnings to fixed charge ratio was below 3:1. We may seek to draw on the additional permitted sources of borrowing in the foreseeable future to continue to facilitate our growth strategy. For a description of our outstanding borrowings, see *"—Other Indebtedness."*

Additional covenants in the Indenture and Credit Agreement restrict, among other things, our ability to dispose of assets, incur guarantee obligations, prepay other indebtedness, make dividends and other restricted payments, create liens, make equity or debt investments, make acquisitions, modify terms of the Indenture, engage in mergers or consolidations, change the business we conduct, engage in certain transactions with affiliates and make distributions to the Sole Shareholder. Such restrictions, together with our highly leveraged nature, could limit our ability to respond to changing market conditions, fund our capital spending program, provide for unexpected capital investments or take advantage of business opportunities.

We are in compliance with the covenants in the Indenture as of December 31, 2012. The Indenture requires us to maintain an earnings to fixed charge ratio above 3:1 for us to incur additional indebtedness, including the issuance of guarantees under our CSO Agreements. We do not anticipate a significant decline in demand for our products and services, but any such decline or other unexpected changes in financial condition could cause our earnings to fixed charge ratio to remain below 3:1 for an extended period of time. If we are unable to incur additional indebtedness for growth in our CSO operations, our net income may decrease due to impairment of assets and less revenue from CSO operations, which could adversely affect our ability to obtain new credit under favorable terms. To the extent that we experience short-term or long-term funding disruptions, we have the ability to address these risks through various means, including adjustments to short-term lending to customers, reductions in capital spending, reductions in expenses and potential equity contributions from our Parent, all of which could be expected to generate additional liquidity.

To the extent permitted by the Indenture and Credit Agreement, we expect to make periodic distributions to our Parent in amounts sufficient to pay some or all of the taxes due on the Company's items of income, deductions, losses and credits which have been allocated for reporting on the Sole Shareholder's income tax return. We may also make distributions to our Parent in addition to those required for personal income taxes. Total distributions were approximately $23.3 million, $13.0 million and $75.4 million for the years ended December 31, 2012, 2011 and 2010, respectively. The 2012 amount includes distributions of approximately $0.5 million by our consolidated CSO Lenders. The 2011 amount includes a noncash distribution of approximately $0.3 million related to leasehold improvements in store location properties sold by TY Investments, LLC, which is owned by the Sole Shareholder. See "Item 13. Certain Relationships and Related Transactions, and Director Independence—Real Estate Leases. We anticipate making distributions to the Parent for estimated income taxes for 2012 totaling approximately $23.0 to $26.0 million. At December 31, 2012,

26

---

Table of Contents

the availability of permitted distributions for purposes other than estimated income tax payments was approximately $5.0 million (calculated net of an estimate for income taxes).

0662

The indenture requires us, in the first quarter of each year, to make *"excess cash flow offers"* (as defined in the indenture) to all holders of Notes to purchase the maximum principal amount of Notes that may be purchased with the lesser of $30.0 million or 75% of our excess cash flow (as defined in the indenture) for the applicable fiscal year. We made an excess cash flow offer in March 2012 at 102% of the principal amount of the Notes, but no holders of the Notes accepted the offer. We will make another excess cash flow offer in March 2013 at 102% of the principal amount of the notes. An investment banking firm makes a market for our Notes and the volume of transactions is relatively small. Historically, the market price for our Notes based on the limited trading that occurs has been well above the price we must offer in the excess cash flow offer. Therefore, we do not expect a significant amount of cash to be used to fund the 2013 excess cash flow offer.

In May 2010, the IRS initiated an examination of the income tax return of TitleMax of Georgia, Inc., or *"TMG."* The examination was expanded to cover all of the Company's wholly-owned subsidiaries and TitleMax Aviation, or *"Aviation,"* an entity owned by our Parent that we consolidate because we have determined it is a variable interest entity of which we are the primary beneficiary. See *"Item 13. Certain Relationships and Related Transactions, and Director Independence—Airplane Payments."* The IRS completed its fieldwork and issued its report in April 2011. We paid approximately $0.9 million in 2011 for agreed adjustments related to the IRS examination. We successfully contested other proposed adjustments, and the examination was closed in September 2012.

In November 2010, we acquired an aircraft for $17.5 million that satisfied the requirements of Section 1031 of the Internal Revenue Code to complete the like-kind exchange for an aircraft we sold in May 2010. The purchase of the aircraft was funded by notes payable to the Sole Shareholder. In February 2011, these notes were refinanced into one note payable to the Sole Shareholder with a principal balance of $17.4 million bearing interest at 10%. In December 2011, this note was refinanced into two notes payable to the Sole Shareholder. As of December 31, 2012, these notes have principal balances of $11.4 million and $5.4 million and bear interest at 5.12% and 10%, respectively. See *"Item 13. Certain Relationships and Related Transactions, and Director Independence—Airplane Payments."*

In July 2012, the Sole Shareholder made an equity contribution of $14.0 million to the Company. In November 2012, the Parent made an equity contribution of $44.8 million to the Company. The November 2012 contribution was funded by proceeds from the sale of $100 million of 11.0% PIK Notes due October 15, 2015, or the *"PIK Notes,"* by the Parent to unrelated parties. Under the terms of the indenture governing the PIK Notes, interest on the PIK Notes is payable in cash to the extent distributions are available under the terms of the indenture governing the Company's Notes. If distributions are not permitted under the terms of the indenture governing the Company's Notes, the Parent may issue additional PIK notes in a principal amount to satisfy the interest due. Distributions from the Company to the Parent, when permitted, will provide the primary means for the Parent to make any cash interest payments on the PIK Notes. The maximum potential amount of distributions for purposes of funding the Parent's interest payments is $11.0 million for each of the years ending December 31, 2013, 2014 and 2015.

### Cash flows from operating activities

Net cash provided by operating activities was $222.3 million for 2012 compared to $175.2 million for 2011. The increase of $47.1 million, or 26.9%, was due to an $11.3 million increase in net income, as well as a $35.8 million increase in adjustments to reconcile net income to cash provided by operating activities. The increase in adjustments to reconcile net income to cash provided by operating activities was primarily driven by a $45.2 million increase in the provision for loan losses, which resulted from increased demand for our loan products and an increase in our net charge-off rate, as well as a $3.4 million increase in depreciation and amortization expense. These increases were partially offset by decreases in cash from changes in other assets and accounts payable. The decrease in cash from changes in other assets was primarily attributable to $7.1 million more cash used for deposits related to our unconsolidated CSO Lender and an increase of $4.1 million in prepaid expenses. The decrease in cash from changes in accounts payable was due to timing of payments.

### Cash flows from investing activities

Net cash used in investing activities was $254.5 million for 2012 compared to $246.5 million for 2011. The increase of $8.0 million, or 3.2%, was primarily attributable to an $8.7 million increase in capital expenditures and a $5.3 million increase in net title loan originations. The increase in capital expenditures was related to ongoing projects to upgrade our technology and to manage our store portfolio through remodels or movement of locations, fitting out new stores and installing new signs. These increases were partially offset by $8.0 million of cash paid for acquisitions during 2011.

### Cash flows from financing activities

Net cash provided by financing activities for 2012 was $84.9 million compared to $55.9 million for 2011. The increase of $29.0 million, or 51.9%, was primarily the result of proceeds of $58.8 million from equity contributions and $25.0 million from the

27

Revolving Credit Facility in 2012 compared with proceeds of $64.2 million from the Notes issued in 2011. Also contributing to the increase in cash provided by financing activities was a decrease of $11.8 million in repayments of notes payable and capital leases. These increases were partially offset by a $10.6 million increase in cash used for distributions.

Other Indebtedness

As of December 31, 2012, we have $57.0 million of notes payable in the aggregate, consisting of one unsecured note payable to a bank, three unsecured notes payable to other unrelated entities, three unsecured notes payable to the Sole Shareholder and several notes payable to third parties issued by our two consolidated CSO Lenders.

The note payable to a bank and the three notes payable to the Sole Shareholder are payable by Aviation. The note payable to a bank has a principal balance of $0.4 million as of December 31, 2012 and incurs interest at 4.4%. The three notes payable to the Sole Shareholder are in the amounts of $11.4 million, $5.4 million and $2.8 million as of December 31, 2012. The $11.4 million note has a fixed interest rate of 5.12% and is payable in monthly installments of $104,000, including interest and principal, with a final payment of $8.4 million due in December 2016. The $5.4 million note has a fixed interest rate of 10% payable monthly, with the full principal amount due in December 2015. The $2.8 million note is collateralized by an aircraft owned by Aviation and guaranteed by the Company. This note has a fixed interest rate of 6.35% and is payable in monthly installments of $35,000, including interest and principal, with a final payment of $2.1 million due in October 2015.

The three notes payable to other unrelated entities are in the amounts of $6.0 million, $5.0 million and $1.0 million as of December 31, 2012. Each of these notes bears interest at 13% with interest payable monthly. The principal amount of each of these notes is due in July 2013, although the $5.0 million note and the $1.0 million note may be extended for up to one additional year at our sole discretion.

As of December 31, 2012, our consolidated CSO Lenders had outstanding a total of $25.0 million of notes payable to third parties. One consolidated CSO Lender had 41 notes due in 2013 that bear interest ranging from 10% to 15% and are secured by the assets of the consolidated CSO Lender. These notes allow the consolidated CSO Lender to take one or more draws up to a total maximum principal of $17.1 million. As of December 31, 2012, a total of $14.1 million was drawn under these notes. As of December 31, 2012, the other consolidated CSO Lender had 22 unsecured notes due in 2013 that bear interest ranging from 12% to 14% and allow draws up to a total maximum principal of $11.9 million. As of December 31, 2012, a total of $10.9 million was drawn under these notes. Each of these notes has an automatic annual renewal provision.

Management believes that our available short-term and long-term capital resources will be sufficient to fund our anticipated cash requirements, including working capital requirements, capital expenditures, scheduled principal and interest payments, payments pursuant to any excess cash flow offers and income tax obligations of our Sole Shareholder, for at least the next 12 months.

0663

## Capital Expenditures

Capital expenditures as of December 31, 2012, 2011 and 2010 were $40.3 million, $32.0 million and 18.6 million, respectively, which we used to open new stores and develop our software systems. We do not have any material capital expenditure commitments as of December 31, 2012. However, we will continue to open additional stores and further improve our software systems, which will require ongoing capital expenditures.

28

Table of Contents

### Contractual Payment Obligations

The following table summarizes our material contractual payment obligations, including periodic interest payments, as of December 31, 2012. These contractual requirements include payments required for our debt obligations, operating leases and contractual purchase obligations.

| (in thousands) | | Payments due by December 31, | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | | Thereafter | |
| Senior secured notes(1) | $ | 433,225 | $ | 41,075 | $ | 41,075 | $ | 351,075 | $ | — | $ | — | $ | — | |
| Revolving credit facility | | 31,966 | | 2,535 | | 2,535 | | 26,896 | | — | | — | | — | |
| Notes payable | | 13,400 | | 13,004 | | 47 | | 47 | | 47 | | 255 | | — | |
| Notes payable issued by consolidated | | | | | | | | | | | | | | | |
| CSO Lenders | | 26,620 | | 26,620 | | — | | — | | — | | — | | — | |
| Notes payable to Sole Shareholder | | 29,264 | | 2,771 | | 3,340 | | 11,317 | | 11,836 | | — | | — | |
| Obligations under capital leases | | 3,105 | | 261 | | 267 | | 272 | | 277 | | 283 | | 1,745 | |
| Obligations under operating leases | | 206,998 | | 46,333 | | 41,862 | | 36,039 | | 27,741 | | 17,806 | | 37,217 | |
| Total | $ | 744,578 | $ | 132,599 | $ | 89,126 | $ | 425,646 | $ | 39,901 | $ | 18,344 | $ | 38,962 | |

(1) The Indenture requires us to make excess cash flow offers in the first quarter of each year for the lesser of $30 million or 75% of our excess cash flow (as defined in the Indenture). The contractual payments shown in the table do not include the effects of any such excess cash flow payments as the amounts, if any, are not presently determinable.

### Seasonality

Our business is seasonal due to fluctuating demand for our title loans during the year. Historically, we have experienced our highest demand in the fourth quarter of each fiscal year, with approximately 30% of our annual originations occurring in this period. Also, we have historically experienced a reduction of 9% to 15% in our title loans receivable in the first quarter of each fiscal year, primarily associated with our customers' receipts of tax refund checks. Accordingly, we typically experience a higher use of cash in the fourth quarter while generating more cash in the first quarter (exclusive of any other capital usage). Due to the seasonality of our business, results of operations for any fiscal quarter are not necessarily indicative of the results of operations that may be achieved for the full fiscal year or any future period.

### Critical Accounting Policies

The preparation of the Company's financial statements requires management to make estimates, assumptions and judgments that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting periods. Management bases its estimates on historical experience, empirical data and various assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results may differ using different estimates or under different assumptions or conditions.

Management believes the following critical accounting policies affect its more significant estimates, assumptions and judgments used in the preparation of its consolidated financial statements. The development and selection of these critical accounting policies and the related summaries of them below have been reviewed with the Board of Managers of the Company.

#### Allowance for Loan Losses and Accrual for CSO Lender Loan Losses

The most significant estimates made in the preparation of our accompanying consolidated financial statements are the determination of an allowance for loan losses and an accrual for losses related to loans we process for our unconsolidated CSO Lender. The allowance for loan losses and accrual for loan losses related to our unconsolidated CSO Lender represent management's estimate of losses on title loans receivable and loans processed for our unconsolidated CSO Lender that we guarantee under CSO Agreements. These estimates are based on an analytical model that contemplates several factors, including historical delinquencies, charge-offs and recovery rates. Additional factors, such as length of time stores have been open in a state, relative mix of new stores within a state and other relevant factors, are evaluated on a periodic basis to determine the adequacy of the reserve. Based on the results of this analytical model, we record an allowance for loan losses on our consolidated balance sheets. In addition, we record a liability for estimated losses related to the guaranteed loans owned by our unconsolidated CSO Lender in accounts payable and accrued expenses on our consolidated balance sheets. Loans that are deemed to be uncollectible are charged-off against the allowance when they become 61 days contractually past due. Recoveries on losses previously charged to the allowance are credited to the

29

Table of Contents

allowance when collected. For the years ended December 31, 2012 and 2011, if default rates had been 2.5% higher or lower, the allowance for loan losses would have changed by approximately $14.4 million and $12.2 million, respectively.

#### Income Recognition

Interest and fee income is recognized using the interest method. Accrual of interest and fee income on title loans receivable is discontinued when no payment has been received for 35 days or more. Effective October 1, 2009, management changed its accounting estimate related to the suspension of interest and fee income. Prior to this date, accrual of interest and fee income on title loans receivable ceased when no payment was received for 30 days or more pursuant to contractual terms. Based on additional information and analysis of customer trends, management determined that the likelihood of receiving a payment from a customer diminishes when no payment is received for 35 days. The accrual of income is not resumed until the account is less than five days past due on a contractual basis, at which time management considers collectability to be probable.

#### Recent Accounting Standards

In October 2012, the Financial Accounting Standards Board, or the "FASB," issued ASU 2012-04 to provide technical corrections and improvements to a wide range of Topics in the Accounting Standards Codification, including conforming amendments related to fair value measurements. The amendments in this guidance will be effective for fiscal periods beginning after December 15, 2012. The adoption of this guidance is not expected to have a material impact on the Company's financial position, results of operations or cash flows.

0664

Off-Balance Sheet Arrangements with Unconsolidated CSO Lender

Under the terms of the CSO Agreements with non-exclusive third-party lenders, we are contractually obligated to reimburse the lenders for the full amounts of the loans and certain related fees that are not collected from the customers. In certain cases, the lenders sell the related loans, and our obligation to reimburse for the full amounts of the loans and certain related fees that are not collected from the customers extends to the purchasers. As of December 31, 2012, the total amount of loans and related fees guaranteed by us was approximately $26.9 million. The value of the related liability at December 31, 2012 was approximately $4.6 million and is included in accounts payable and accrued expenses on the consolidated balance sheets and provision for loan losses on the consolidated statements of income.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company does not have any financial instruments that expose it to material cash flow or earnings fluctuations as a result of market risks.

---

Table of Contents

## ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 32 |
| Consolidated Balance Sheets as of December 31, 2012 and 2011 | 33 |
| Consolidated Statements of Income for the Years Ended December 31, 2012, 2011 and 2010 | 34 |
| Consolidated Statements of Member's Equity and Noncontrolling Interests for the Years Ended December 31, 2012, 2011 and 2010 | 35 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2012, 2011 and 2010 | 36 |
| Notes to Consolidated Financial Statements | 38 |

---

Table of Contents

Report of Independent Registered Public Accounting Firm

To the Board of Directors and Sole Member
TMX Finance LLC and Affiliates

We have audited the accompanying consolidated balance sheets of TMX Finance LLC and Affiliates (collectively the *"Company"*) as of December 31, 2012 and 2011, and the related consolidated statements of income, member's equity and noncontrolling interests, and cash flows for the three years in the period ended December 31, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of TMX Finance LLC and Affiliates as of December 31, 2012 and 2011, and the results of their operations and their cash flows for the three years in the period ended December 31, 2012 in conformity with U.S. generally accepted accounting principles.

/s/ *McGladrey LLP*

Raleigh, North Carolina
March 27, 2013

---

Table of Contents

### TMX FINANCE LLC
### AND AFFILIATES

Consolidated Balance Sheets
December 31, 2012 and 2011
(in thousands)

| | | 2012 | | 2011 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ | 90,794 | $ | 38,141 |
| | | | | |
| Title loans receivable | | 577,172 | | 490,093 |
| Allowance for loan losses | | (94,561) | | (73,103) |
| Unamortized loan origination costs | | 3,716 | | 2,829 |
| Title loans receivable, net | | 486,327 | | 419,819 |
| | | | | |
| Interest receivable | | 38,055 | | 31,517 |

0665

| | | | |
|---|---|---|---|
| Property and equipment, net | | 95,239 | 72,571 |
| Debt issuance costs, net of accumulated amortization of $9,526 and $5,445 as of December 31, 2012 and December 31, 2011, respectively | | 10,570 | 14,042 |
| Goodwill | | 5,975 | 5,975 |
| Intangible assets, net | | — | 140 |
| Note receivable from Sole Shareholder | | 1,077 | 1,549 |
| Other assets | | 39,746 | 20,994 |
| Total Assets | $ | 767,783 | $ 604,748 |
| | | | |
| **Liabilities and Equity** | | | |
| Senior secured notes, net | $ | 311,519 | $ 312,120 |
| Revolving credit facility | | 25,000 | — |
| Notes payable | | 37,336 | 11,370 |
| Notes payable to related parties | | 19,628 | 20,512 |
| Obligations under capital leases | | 1,971 | 2,052 |
| Accounts payable and accrued expenses | | 61,341 | 62,356 |
| Total Liabilities | | 456,795 | 408,410 |
| Commitments and contingencies (Notes 13 and 14) | | | |
| Member's equity and noncontrolling interests: | | | |
| Total member's equity (with retained earnings of $243,835 and $186,704 at December 31, 2012 and December 31, 2011, respectively) | | 318,365 | 202,484 |
| Noncontrolling interests | | (7,377) | (6,146) |
| Total member's equity and noncontrolling interests | | 310,988 | 196,338 |
| Total Liabilities and Equity | $ | 767,783 | $ 604,748 |

See notes to consolidated financial statements.

33

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Consolidated Statements of Income
For the Years Ended December 31, 2012, 2011 and 2010
(in thousands)

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Interest and fee income | $ 656,755 | $ 505,865 | $ 389,449 |
| Provision for loan losses | (144,749) | (99,542) | (63,932) |
| Net interest and fee income | 512,006 | 406,323 | 325,517 |
| | | | |
| Costs, expenses and other: | | | |
| Salaries and related expenses | 201,899 | 159,201 | 116,090 |
| Occupancy costs | 64,727 | 48,556 | 34,939 |
| Depreciation and amortization | 17,210 | 13,813 | 10,353 |
| Advertising | 22,227 | 15,512 | 10,243 |
| Other operating and administrative expenses | 77,469 | 58,696 | 41,407 |
| Interest, including amortization of debt issuance costs | 49,293 | 42,610 | 26,251 |
| Total expenses | 432,825 | 338,388 | 239,283 |
| Income before reorganization items | 79,181 | 67,935 | 86,234 |
| | | | |
| Reorganization items: | | | |
| Professional fees | — | — | 4,548 |
| Net income | 79,181 | 67,935 | 81,686 |
| Net income (loss) attributable to noncontrolling interests | 19 | (1,627) | (1,906) |
| Net income attributable to member's equity | $ 79,162 | $ 69,562 | $ 83,592 |

See notes to consolidated financial statements.

34

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Consolidated Statements of Member's Equity and Noncontrolling Interests
For the Years Ended December 31, 2012, 2011 and 2010
(in thousands)

| | Member's Equity | Noncontrolling Interests | Total Member's Equity and Noncontrolling Interests |
|---|---|---|---|
| Balance, December 31, 2009 | $ 133,198 | $ (1,924) | $ 131,274 |
| Net income (loss) | 83,592 | (1,906) | 81,686 |
| Contributions | 3,146 | 420 | 3,566 |

0666

| | | | |
|---|---:|---:|---:|
| Distributions | (74,060) | (1,330) | (75,390) |
| **Balance, December 31, 2010** | 145,876 | (4,740) | 141,136 |
| Net income (loss) | 69,562 | (1,627) | 67,935 |
| Consolidation of variable interest entities | — | 221 | 221 |
| Distributions | (12,954) | — | (12,954) |
| **Balance, December 31, 2011** | 202,484 | (6,146) | 196,338 |
| Net income | 79,162 | 19 | 79,181 |
| Contributions | 58,750 | — | 58,750 |
| Distributions | (22,031) | (1,250) | (23,281) |
| **Balance, December 31, 2012** | $ 318,365 | $ (7,377) | $ 310,988 |

See notes to consolidated financial statements.

35

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Consolidated Statements of Cash Flows
For the Years Ended December 31, 2012, 2011 and 2010
(in thousands)

| | 2012 | 2011 | 2010 |
|---|---:|---:|---:|
| **Cash Flows from Operating Activities** | | | |
| Net income | $ 79,181 | $ 67,935 | $ 81,686 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Provision for loan losses | 144,749 | 99,542 | 63,932 |
| Depreciation and amortization | 17,210 | 13,813 | 10,353 |
| Amortization of discount, premium, debt issuance and upfront lease costs | 3,832 | 3,887 | 2,230 |
| Amortization of acquired intangibles | 140 | 160 | — |
| Net loss on disposal of property and equipment | 427 | 128 | 264 |
| Loss on disposal of aircraft held for sale, net of selling expenses | — | — | 13 |
| Changes in assets and liabilities: | | | |
| Interest receivable | (6,538) | (8,082) | (7,462) |
| Other assets | (14,778) | (7,288) | (1,256) |
| Net change in loan origination costs | (887) | (690) | (979) |
| Accounts payable and accrued expenses | (1,015) | 5,754 | 27,430 |
| Net cash provided by operating activities | 222,321 | 175,159 | 176,211 |
| **Cash Flows from Investing Activities** | | | |
| Net title loans originated | (210,370) | (205,098) | (129,572) |
| Payments for acquisitions, net of cash acquired | — | (8,032) | (400) |
| Purchase of property and equipment | (41,128) | (32,409) | (18,713) |
| Proceeds from disposal of property and equipment | 823 | 399 | 112 |
| Proceeds from sale of aircraft held for sale, net of selling expenses | — | — | 12,700 |
| Purchase of aircraft | — | — | (17,657) |
| (Increase) decrease in restricted cash | (4,325) | (3,525) | 846 |
| Issuance of note receivable from Sole Shareholder | — | — | (2,000) |
| Receipt of payments on note receivable from Sole Shareholder | 472 | 418 | 33 |
| Cash from consolidation of CSO Lenders | — | 1,794 | — |
| Net cash used in investing activities | (254,528) | (246,453) | (154,651) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from senior secured notes | — | 64,200 | 247,695 |
| Proceeds from revolving credit facility | 25,000 | — | — |
| Proceeds from notes payable to related parties | — | 12,000 | 17,750 |
| Proceeds from notes payable issued by consolidated CSO Lenders | 15,307 | 9,080 | — |
| Proceeds from notes payable | 12,376 | — | — |
| Repayments of notes payable to related parties | (884) | (13,844) | (5,647) |
| Repayments of notes payable and capital leases | (1,797) | (667) | (14,762) |
| Payments of debt issuance costs | (611) | (2,291) | (17,195) |
| Repayments of term loan, net | — | — | (151,000) |
| Proceeds from contributions to consolidated CSO Lenders | — | 76 | — |
| Proceeds from contributions | 58,750 | — | 3,566 |
| Distributions by consolidated variable interest entities | (1,250) | — | — |
| Distributions to Sole Shareholder | (22,031) | (12,704) | (75,390) |
| Net cash provided by financing activities | 84,860 | 55,850 | 5,017 |
| Net increase (decrease) in cash and cash equivalents | 52,653 | (15,444) | 26,577 |
| Cash and cash equivalents at beginning of period | 38,141 | 53,585 | 27,008 |
| Cash and cash equivalents at end of period | $ 90,794 | $ 38,141 | $ 53,585 |

See notes to consolidated financial statements.

36

0667

TMX FINANCE LLC
AND AFFILIATES

Consolidated Statements of Cash Flows, continued
(in thousands)

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Supplemental disclosure of cash flow information: | | | |
| Interest paid | $ 45,962 | $ 38,251 | $ 7,694 |
| Leasehold improvements distributed to Sole Shareholder | $ — | $ 250 | $ — |
| Supplemental disclosure of reorganization items: | | | |
| Professional fees paid for services rendered in connection with the Chapter 11 proceeding | $ — | $ — | $ 6,457 |

See notes to consolidated financial statements.

37

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(1) Nature of Business, Principles of Consolidation and Significant Accounting Policies

Nature of Business

TMX Finance LLC and affiliates (collectively, unless the context indicates otherwise, the *"Company"*) is a specialty finance company that originates and services automobile title loans through 1,035 title-lending stores in 12 states as of December 31, 2012. Affiliates include wholly-owned subsidiaries and consolidated variable interest entities (*"VIEs"*) as described below. The Company operates as TitleMax in 831 stores, and in 151 stores, the Company operates under a TitleBucks brand. The Company also offers a second lien automobile product in Georgia and Florida, with operations conducted within 77 TitleMax stores under the EquityAuto Loan brand, and through 53 standalone stores under the InstaLoan brand. The Company is in the process of fully separating the EquityAuto Loan business into standalone stores under the InstaLoan brand with separate management and the addition of other loan products. Segment information is not presented since all of the Company's revenue is attributed to a single reportable segment: specialty financial services.

TMX Finance LLC changed its name from TitleMax Holdings, LLC to TMX Finance LLC effective June 21, 2010. Effective September 30, 2012, the former sole member of TMX Finance LLC transferred 100% of his membership interests to TMX Finance Holdings Inc. (*"Parent"*) in exchange for shares of common stock in the Parent. The former sole member of TMX Finance LLC is the sole beneficial owner of the common stock of the Parent (the *"Sole Shareholder"*).

The Company is subject to laws, regulations and supervision in each of the states in which it operates. Most states have laws that specifically regulate the Company's products and services to establish allowable fees, interest and other economic terms. The terms of products and services offered by the Company vary between states to comply with each state's specific laws and regulations. In addition to state laws and regulations, the Company's business is subject to various local rules and regulations such as zoning regulation and permit licensing.

The interest rates and fees for the Company's products and services are not currently regulated directly at the federal level, but laws and regulations governing the business are subject to change. On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was enacted into law. This act established the Consumer Financial Protection Bureau (*"CFPB"*) as a federal authority responsible for administering and enforcing the laws and regulations for consumer financial products and services. The legislation does not specifically target title lending, traditional pawn or installment lending for CFPB regulation. However, the CFPB is currently in the process of developing rules that could subject the Company to some form of regulatory oversight. The CFPB is specifically prohibited from instituting federal usury interest rate caps.

Principles of Consolidation

TMX Finance LLC is a single member Delaware limited liability company that, through its subsidiaries, is engaged primarily in the origination and servicing of automobile title loans.

In April 2006, the Sole Shareholder formed EAL. On June 21, 2010, the Sole Shareholder transferred 100% of his membership interests in EAL to TMX Finance LLC. The Company consolidated EAL effective January 1, 2010 in accordance with accounting standards related to consolidation. This transfer between entities under common control has been accounted for at the historical cost of the assets and liabilities transferred.

The Company conducts business in Texas and certain other states through wholly-owned subsidiaries, each of which is registered in the applicable state as a Credit Services Organization (*"CSO"*). These CSOs have entered into credit services organization agreements (*"CSO Agreements"*) with third-party lenders (the *"CSO Lenders"*) that make the loans to our customers. The CSO Agreements govern the terms by which the Company performs servicing functions and refers customers to the CSO Lenders for a possible extension of a loan. The Company processes loan applications and commits to reimburse the CSO Lenders for any loans or related fees that are not collected from those customers. Two of the CSO Lenders operate on an exclusive basis with the Company, and the Company has determined that they are VIEs of which the Company is the primary beneficiary. Therefore, the Company has consolidated these VIEs.

38

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(1) Nature of Business, Principles of Consolidation and Significant Accounting Policies (continued)

The Company is associated with several other entities that it must evaluate as potential variable interest entities. TY Investments (*"TY"*) and Parker-Young (*"PY"*) are owned 100% and 50%, respectively, by the Sole Shareholder. Each of these entities owns certain real estate that is leased to the Company. The Company evaluated these entities and determined

0668

that the Company does not have a variable interest and that neither has characteristics of a variable interest entity pursuant to the applicable accounting guidance. Both entities have sufficient equity at risk without the need for any additional subordinated financial support. The Company has therefore determined that TYI and PY are not variable interest entities. TitleMax Aviation, Inc., a Delaware corporation ("*Aviation*"), and TitleMax Construction, LLC ("*Construction*") are other entities evaluated as potential variable interest entities. Aviation is owned by our Parent and has three aircraft and related debt. The aircraft are used by the Company to conduct its business. The Company and certain subsidiaries guarantee certain debt of Aviation. Construction is owned by the Sole Shareholder and directly handles the store improvement work for the Company. Aviation and Construction are VIEs of which the Company is the primary beneficiary; therefore, these entities have been consolidated.

## Significant Accounting Policies

The accounting and reporting policies of the Company are in accordance with accounting principles generally accepted in the United States of America and conform to general practices within the consumer finance industry. The following is a description of significant accounting policies used in preparing the consolidated financial statements.

### *Basis of Presentation*

The accompanying consolidated financial statements include the accounts of the Company, its wholly-owned subsidiaries and its consolidated VIEs. All significant intercompany transactions and balances have been eliminated in consolidation.

### *Use of Estimates*

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of income and expenses during the reporting period. Actual results could differ from those estimates. Material estimates that are particularly susceptible to change relate to the determination of the allowance for loan losses and the valuation of repossessed assets.

### *Cash and Cash Equivalents*

The Company maintains amounts in bank accounts which, at times, may exceed federally insured limits. The Company has not experienced losses in such accounts. Management believes the Company's exposure to credit risk is minimal for these accounts.

### *Goodwill and Intangible Assets*

Goodwill and indefinite-life intangible assets acquired in a business combination are recorded using the acquisition method of accounting and are tested for impairment annually, or more frequently if circumstances indicate potential impairment, on a reporting unit level. In testing for impairment, the Company first assesses qualitative factors as a basis for determining whether it is necessary to perform the two-step goodwill impairment test. The first step of the impairment test, if necessary, is to compare the estimated fair value of the reporting unit to its carrying value. If the fair value is less than the carrying value, then a second step is performed to determine the fair value of goodwill and the amount of impairment loss, if any. In addition, intangible assets with finite lives are amortized over their estimated useful lives and reviewed for impairment whenever events or circumstances indicate the carrying value may not be fully recoverable.

39

---

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(1)  Nature of Business, Principles of Consolidation and Significant Accounting Policies (continued)

### *Loan Losses*

Provisions for loan losses are charged to income in amounts sufficient to maintain an adequate allowance for loan losses and an adequate accrual for losses related to guaranteed loans processed for our unconsolidated CSO Lender. Factors used in assessing the overall adequacy of the allowance for loan losses, the accrual for losses related to guaranteed loans processed for our unconsolidated CSO Lender and the resulting provision for loan losses include loan loss experience, contractual delinquency of title loans receivable, economic and other qualitative considerations and management's judgment. While management uses the best information available to make its evaluation, future adjustments to the allowance may be necessary if there are significant changes in economic conditions. The Company charges-off an account when the customer is 61 days contractually past due.

### *Loan Origination Costs*

Direct costs incurred for the origination of loans, which consist mainly of employee-related costs, are deferred and recognized as a reduction of the related interest and fee income over the average life of the loan using a method that approximates the interest method.

### *Repossessed Assets*

The Company may initiate repossession proceedings according to the respective state law if an account becomes past due. Repossessed collateral is valued at the lower of the receivable balance of the loan prior to repossession or estimated net realizable value. Management estimates net realizable value as the projected cash value upon liquidation less costs to sell the related collateral.

### *Property and Equipment*

Property and equipment, including capitalized interest, are carried at cost. The cost of property retired or sold and the related accumulated depreciation are removed from the accounts, and any resulting gain or loss is recognized in the consolidated statements of income. Depreciation of property and equipment is provided by the straight-line method over the estimated useful lives of the assets once they are placed in service, as shown in the chart below. Leasehold improvements are amortized using the straight-line method over the lesser of the useful lives of the improvements or the life of the lease. Repairs and maintenance are expensed as incurred.

|  | Useful Lives (years) |
| --- | --- |
| Computers and software | 3 to 5 |
| Furniture and fixtures | 7 |
| Leasehold improvements (a) | 5 |
| Signs | 5 |
| Vehicles | 5 |

0669

| | |
|---|---|
| Aircraft | 15 |
| Capital lease assets—buildings (b) | 15 |
| Building | 30 |

(a) Leasehold improvements are depreciated over the terms of the lease agreements with a maximum of five years.
(b) The depreciation expense on assets acquired under capital leases is included with depreciation expense on owned assets.

*Impairment of Long-Lived Assets*

The Company annually or more frequently, if appropriate, evaluates whether events or circumstances have occurred that indicate the carrying amount of long-lived assets may warrant revision or may not be recoverable. When factors indicate that these long-lived assets should be evaluated for possible impairment, the Company assesses the recoverability by determining whether the carrying value of such long-lived assets will be recovered through the future undiscounted cash flows expected from uses of the assets and their eventual disposition.

40

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(1) Nature of Business, Principles of Consolidation and Significant Accounting Policies (continued)

*Debt Issuance Costs*

Costs incurred to obtain debt financing are amortized over the life of the related debt using a method that approximates the interest method. Amortization is included as a component of interest expense in the consolidated statements of income.

*Income Recognition*

Interest and fee income is recognized using the interest method. Accrual of interest and fee income on title loans receivable is discontinued when no payment has been received for 35 days or more. The accrual of income is not resumed until the account is less than five days past due on a contractual basis, at which time management considers collectability to be probable.

*Advertising Costs*

The Company incurs advertising costs principally related to advertising on television, the internet, billboards and yellow pages. These costs are expensed as incurred.

*Income Taxes and Distributions*

The Company, with the consent of the Sole Shareholder, elected in prior years to be taxed under sections of the federal and state income tax laws, which provide that, in lieu of corporate income taxes, the Parent separately accounts for the Company's items of income, deduction, losses and credits. The consolidated financial statements generally do not include a provision for income taxes as long as these elections remain in effect. Certain subsidiaries operate in states that impose an entity-level tax that is a percentage of income.

Given the Company's income tax elections, the assets and liabilities with significant estimated net differences between the tax bases and the reported amounts are presented below as of December 31, 2012 and 2011. The estimated net differences disregard the assets and liabilities of the consolidated CSO Lenders.

The tax bases were less than the carrying amounts as follows:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Title loans receivable, net | $ | (25,763) | $ | (27,812) |
| Property and equipment, net | | (71,023) | | (47,142) |
| Goodwill | | (5,975) | | (5,975) |
| Total estimated net differences | $ | (102,761) | $ | (80,929) |

While the Company's tax status and income tax elections remain in effect, the Company may occasionally make distributions to the Parent in amounts sufficient to pay some or all of the taxes due on the Company's items of income, deductions, losses and credits. The Company anticipates making distributions of $23.0 to $26.0 million to the Parent to pay 2012 federal and state income taxes. The Company may make future distributions to the Parent in addition to those required for income taxes. To the extent distributions are permitted under the terms of the indenture governing the Company's senior secured notes, distributions from the Company to the Parent will provide the primary means for the Parent to make interest payments on its $100.0 million of 11.0% senior notes issued in October 2012 and due in October 2015. The maximum potential amount of distributions for purposes of funding the Parent's interest payments is $11.0 million for each of the years ending December 31, 2013, 2014 and 2015. At December 31, 2012, the availability of permitted distributions for purposes other than estimated income tax payments was approximately $5.0 million (calculated net of an estimate for income tax distributions).

*Phantom Stock Plan*

The Company accounts for share-based employee compensation by measuring all share-based payments to employees using the intrinsic value method and recording the resulting expense in the consolidated statements of income. The Company measures the liability for grants of phantom stock by using an agreed-upon calculation defined by the terms of the phantom stock plan.

41

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

(1)   Nature of Business, Principles of Consolidation and Significant Accounting Policies (continued)

*Recent Accounting Standards*

In October 2012, the FASB issued ASU 2012-04 to provide technical corrections and improvements to a wide range of Topics in the Accounting Standards Codification, including conforming amendments related to fair value measurements. The amendments in this guidance will be effective for fiscal periods beginning after December 15, 2012. The adoption of this guidance is not expected to have a material impact on the Company's financial position, results of operations or cash flows.

(2)   Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans

The Company loans cash to customers in exchange for a fee and an agreement to repay the amount loaned. The Company's loan portfolio includes balances outstanding from all title loans, including short-term single payment loans and multi-payment installment loans. The Company utilizes a variety of underwriting criteria to specifically monitor the performance of its portfolio of title loans and maintains an allowance at a level estimated to be adequate to absorb loan losses inherent in the portfolio. The allowance for losses on title loans receivable is presented in the consolidated balance sheets. In addition, the Company maintains a liability for estimated losses related to loans processed for the Company's unconsolidated CSO Lender that are guaranteed under CSO Agreements. The liability for estimated losses related to these guaranteed loans is included in accounts payable and accrued expenses in the consolidated balance sheets.

The Company does not stratify the title loan portfolio when evaluating performance of the loans. Rather, the total portfolio is assessed for losses based on contractual delinquency, the value of underlying collateral, economic and other qualitative considerations and management's judgment. The Company uses historical collection performance adjusted for recent portfolio performance trends to develop the expected loss rates used to establish the allowance and liability for loan losses. Increases in the allowance and liability for loan losses are recorded as provision for loan losses in the consolidated statements of income. The Company charges-off an account when the customer is 61 days contractually past due. Charge-offs on title loans receivable are equal to the loan balance (including interest and fees). Recoveries on losses previously charged to the allowance are credited to the allowance when collected.

Delinquency experience of title loans receivable at December 31, 2012 and 2011 was as follows:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| 1-30 days past due | $ | 91,699 | $ | 57,494 |
| 31-60 days past due | | 16,471 | | 11,291 |
| Total past due | | 108,170 | | 68,785 |
| Current | | 469,002 | | 421,308 |
| Total | $ | 577,172 | $ | 490,093 |

Title loans receivable on the consolidated balance sheets is net of unearned interest and fees of $3.9 million and $2.9 million as of December 31, 2012 and 2011, respectively.

Accrual of interest and fee income on title loans receivable is discontinued when no payment has been received for 35 days or more. The accrual of income is not resumed until the account is less than five days past due on a contractual basis, at which time management considers collectability to be probable. Title loans receivable in non-accrual status at December 31, 2012 and 2011 were as follows:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Nonaccrual loans | $ | 84,520 | $ | 54,198 |

42

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(2)   Credit Quality Information, Allowance for Losses on Title Loans Receivable and Liability Related to Unconsolidated CSO Lender Loans (continued)

Changes in the allowance for loan losses for the years ended December 31, 2012, 2011 and 2010 were as follows:

| (in thousands) | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 73,103 | $ | 52,048 | $ | 40,280 |
| Provision for loan losses | | 141,145 | | 98,536 | | 63,932 |
| Charge-offs | | (162,222) | | (103,552) | | (70,932) |
| Recoveries | | 42,535 | | 26,071 | | 18,768 |
| Ending balance | $ | 94,561 | $ | 73,103 | $ | 52,048 |

Changes in the liability for losses on loans processed for the Company's unconsolidated CSO Lender for the years ended December 31, 2012 and 2011 were as follows:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Beginning balance | $ | 1,006 | $ | — |
| Provision for loan losses | | 3,604 | | 1,006 |
| Ending balance | $ | 4,610 | $ | 1,006 |

The aggregate provision for loan losses for the years ended December 31, 2012, 2011 and 2010 was $144,749, $99,542 and $63,932, respectively.

(3)   Concentration of Credit Risk

The Company's portfolios of automobile title loans receivable are with consumers living primarily in Georgia, Alabama, South Carolina, Tennessee, Missouri, Mississippi, Virginia, Texas, Illinois, Nevada, Arizona and Florida. Consequently, such consumers' abilities to honor their contracts may be affected by economic conditions in these areas. The Company is exposed to a concentration of credit risk inherent in providing alternate financing to borrowers who cannot obtain traditional bank financing. In the event of default of the title loans receivable, the Company has access to automobiles supporting these title loans receivable through repossession. As of December 31, 2012, all title loans receivable were collateralized by the related consumers' automobiles. The ability to repossess collateral mitigates this risk. At December 31, 2012, approximately 36%, 14%, 12% and 11% of title loans

**0671**

receivable were in Georgia, Alabama, South Carolina and Tennessee, respectively.

The Company also has a risk that its customers will seek protection from creditors by filing under the bankruptcy laws. When a customer files bankruptcy, the Company must cease collection efforts and petition the Bankruptcy Court to obtain their collateral or establish a court-approved bankruptcy plan involving the Company and all other creditors of the customer. It is the Company's experience that such plans can take an extended period of time to conclude and usually involve a reduction in the interest rate from the rate in the contract to a court-approved rate.

Table of Contents

## TMX FINANCE LLC
## AND AFFILIATES

### Notes to Consolidated Financial Statements

(4) Property and Equipment

Property and equipment at December 31, 2012 and 2011 consisted of the following:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Leasehold improvements | $ | 55,009 | $ | 39,165 |
| Computers and software | | 26,667 | | 23,569 |
| Aircraft | | 23,288 | | 23,288 |
| Furniture and fixtures | | 20,761 | | 15,370 |
| Signs | | 19,971 | | 15,792 |
| Assets not placed in service | | 17,456 | | 7,022 |
| Assets under capital leases | | 2,240 | | 2,240 |
| Vehicles | | 335 | | 339 |
| Building | | 285 | | — |
| Land | | 70 | | — |
| Subtotal | | 166,082 | | 126,785 |
| Accumulated depreciation and amortization | | (70,843) | | (54,214) |
| Net property and equipment | $ | 95,239 | $ | 72,571 |

Capitalized interest at December 31, 2012 and 2011 was $0.9 million and $0.5 million, respectively.

During the second quarter of 2012, the Company temporarily decided to stop development of a new proprietary store software system and explore other options for its store software solution. As of December 31, 2012, the Company is continuing to evaluate the best long-term solution for its store software system. It is reasonably possible that the Company could decide to implement a different store software system in the near term. This decision could require the Company to reevaluate the carrying amount of the proprietary store software system, which could result in a one-time, non-cash expense that could range from $13.0 million to $18.0 million.

(5) Other Assets

Other assets at December 31, 2012 and 2011 consisted of the following:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Deposits related to unconsolidated CSO lender | $ | 9,230 | $ | 2,112 |
| Restricted cash (a) | | 8,600 | | 4,275 |
| Repossessed assets | | 6,355 | | 4,785 |
| Prepaid rent | | 4,887 | | 1,857 |
| Deposits, primarily on leased office space | | 4,671 | | 3,071 |
| Other prepaid expenses | | 3,413 | | 2,349 |
| Sign and supplies inventory | | 1,605 | | 1,327 |
| Other | | 985 | | 1,218 |
| Total other assets | $ | 39,746 | $ | 20,994 |

(a) The Company deposited money in accounts that were restricted to satisfy various state licensing requirements.

Table of Contents

## TMX FINANCE LLC
## AND AFFILIATES

### Notes to Consolidated Financial Statements

(6) Acquisitions

In May 2011, the Company acquired all of the title loans and assumed all of the operating leases related to 19 locations in Nevada for an aggregate cash purchase price of $6.8 million. The Company recorded goodwill of $5.0 million as a result of this transaction. In addition, the Company allocated $0.3 million of the purchase price to customer relationships, which was amortized over 15 months. Amortization of the customer relationships intangible asset was $0.1 million and $0.2 million during the years ended December 31, 2012 and 2011, respectively, and is included in other operating and administrative expenses on the consolidated statements of income.

In July 2011, the Company acquired all of the title loans and assumed all of the operating leases related to eight locations in Missouri and six locations in Nevada for an aggregate cash purchase price of $1.6 million. The Company recorded goodwill of $1.0 million as a result of this transaction.

The goodwill that resulted from these transactions reflects the fact that the transactions expanded the Company's number of stores and provided a presence in a new market.

(7) Senior Secured Notes, Revolving Credit Facility and Notes Payable

Senior Secured Notes

On June 21, 2010, TMX Finance LLC and TitleMax Finance Corporation, as co-issuers (the "*Issuers*"), issued $250.0 million of Senior Secured Notes (the "*2010 Notes*") at 99.078% of par. The 2010 Notes mature July 15, 2015 and bear interest at 13.25% per year, payable semi-annually, in arrears, on July 15 and January 15 of each year. The discount of approximately $2.3 million is being accreted over the life of the 2010 Notes as a component of interest expense using the interest method. The accretion of discount was $0.5 million, $0.5 million and $0.2 million for the years ended December 31, 2012, 2011 and 2010, respectively.

On July 22, 2011, the Issuers issued $60.0 million aggregate principal amount of their 13.25% Senior Secured Notes due 2015 (the "*2011 Notes*"). The 2011 Notes were issued with terms substantially identical to the 2010 Notes and at 107% of par for a $4.2 million premium, which resulted in gross proceeds to the Company of $64.2 million. The premium is being amortized over the life of the 2011 Notes as a component of interest expense using the interest method. The amortization of premium was $1.1 million and $0.5 million for the years ended December 31, 2012 and 2011, respectively.

In connection with the issuance of the 2010 Notes and 2011 Notes (collectively, the "*Notes*"), the Company capitalized approximately $19.5 million in issuance costs, which primarily consisted of underwriting fees, legal fees and other professional expenses. The issuance costs are being amortized over the life of the Notes as a component of interest expense. The amortization of issuance costs related to the Notes was $4.0 million, $3.6 million and $1.8 million for the years ended December 31, 2012, 2011 and 2010, respectively.

The Issuers may, at their option, redeem some or all of the Notes on or after July 15, 2013 at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest to the redemption date.

| Year | Percentage |
| --- | --- |
| 2013 | 106.625% |
| 2014 and thereafter | 100.000% |

Prior to July 15, 2013, the Issuers may redeem up to 35% of the aggregate principal amount of the Notes originally issued at a redemption price of 113.25% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date if:

- such redemption is made with the proceeds of one or more equity offerings;

- at least 65% of the aggregate principal amount of the Notes originally issued remains outstanding immediately after the occurrence of such redemption; and

- the redemption occurs within 90 days of such equity offering.

45

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(7) Senior Secured Notes, Revolving Credit Facility and Notes Payable (continued)

The Company must make excess cash flow offers in the first quarter of each year for the lesser of $30.0 million or 75% of excess cash flow as defined in the Notes. The redemption offer price is 102% of the principal amount of the Notes. The Company made an excess cash flow offer in March 2012 at 102% of the principal amount of the notes. The offer expired in April and no holders of the notes accepted the 2012 excess cash flow offer.

The Issuers entered into registration rights agreements and were required to file registration statements to exchange the Notes for substantially identical registrable notes. The Notes require the Issuers to post consolidated financial statements and Management Discussion and Analysis of Financial Condition and Results of Operations on its website or with the Securities and Exchange Commission ("*SEC*") within 60 days of each quarter end and within 90 days of each year end. In addition, the Issuers must provide current reports for material items and must hold and participate in quarterly conference calls with holders of the Notes.

The Issuers may incur unsecured indebtedness subject to certain restrictions in the Notes. In addition, the Notes contain covenants that restrict transactions with affiliates, repayments of subordinated debt, distributions to the Sole Shareholder, compensation for the Sole Shareholder and relatives, the incurrence of liens, the issuance of dividends and the sale of assets. According to these covenants, effective July 1, 2010, general distributions to the Sole Shareholder are permitted under certain circumstances and are limited based on certain restrictions as defined in the Notes. At December 31, 2012, the availability of such distributions to the Sole Shareholder was $5.0 million under the terms of the Notes. The Company is in compliance with the covenants of the indenture governing the Notes as of December 31, 2012.

Revolving Credit Facility

On June 27, 2012, TMX Finance LLC and TitleMax Finance Corporation entered into a credit agreement (the "*Credit Agreement*") that provides a senior secured revolving credit facility of up to $25.0 million (the "*Revolving Credit Facility*") that matures June 15, 2015. Borrowings under the Revolving Credit Facility bear annual interest at LIBOR plus 8.5% with a LIBOR floor of 1.5%. The Credit Agreement contains certain restrictive covenants that are substantially similar to those in the indenture governing the senior secured notes. The Credit Agreement also contains a financial covenant that requires the maintenance of a minimum fixed charge ratio of 2:1. In connection with the completion of the Credit Agreement, the Company capitalized approximately $0.6 million in issuance costs, which primarily consisted of legal fees and other professional expenses. The issuance costs are being amortized over the life of the Revolving Credit Facility as a component of interest expense. The amortization of issuance costs related to the Revolving Credit Facility was $0.1 million for the year ended December 31, 2012.

Notes Payable

The Company had notes payable of $37.3 million and $11.4 million at December 31, 2012 and 2011, respectively. Notes payable at December 31, 2012 includes three notes payable by TMX Finance LLC, a note payable by Aviation and 63 notes issued by our consolidated CSO Lenders.

The three notes payable by TMX Finance LLC are in the amounts of $6.0 million, $5.0 million and $1.0 million, and each bears interest at 13.0% with interest payable monthly. The principal amount of each of these notes is due in July 2013, although the $5.0 million note and $1.0 million note may each be extended for up to one additional year at the Company's

0673

sole discretion.

The note payable by Aviation has a principal balance of $0.4 million as of December 31, 2012 and bears interest at 4.4% with payments of principal and interest due monthly.

Our consolidated CSO Lenders had a total of $25.0 million of notes payable outstanding as of December 31, 2012. These notes bear interest ranging from 10% to 15% and allow the consolidated CSO Lenders to take one or more draws up to a total maximum principal of $29.0 million. The aggregate principal amount of all of these notes is due in 2013, but 22 notes with an aggregate principal amount of $11.9 million available for borrowing have automatic annual renewal provisions. The effect of these renewal provisions has not been reflected in the debt maturities table below. One of the consolidated CSO Lenders has issued six notes payable to its sole member with an aggregate balance of $5.8 million as of December 31, 2012.

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(7) Senior Secured Notes, Revolving Credit Facility and Notes Payable (continued)

Notes Payable to Related Parties

The Company had notes payable to related parties of $19.6 million and $20.5 million at December 31, 2012 and 2011, respectively. Notes payable to related parties at December 31, 2012 includes three notes payable by Aviation to the Sole Shareholder in the amounts of $2.8 million, $11.4 million and $5.4 million. The $2.8 million note bears interest at 6.33% and is payable in monthly installments of $35,000 with a final payment of $2.1 million due in October 2015. The $11.4 million note bears interest at 5.12% and is payable in monthly installments of $104,000 with a final payment of $8.4 million due in December 2016. The $5.4 million note bears interest at 10% payable monthly, with the full principal amount due in December 2015.

Debt maturities during each of the next five years ending December 31 are as follows:

| (in thousands) | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Senior secured notes payable | $ — | $ — | $ 310,000 | $ — | $ — | $ 310,000 |
| Revolving credit facility | — | — | 25,000 | — | — | 25,000 |
| Notes payable | 12,031 | 32 | 33 | 35 | 245 | 12,376 |
| Notes payable to Sole Shareholder | 937 | 988 | 8,508 | 9,195 | — | 19,628 |
| Notes payable issued by consolidated CSO Lenders | 24,960 | — | — | — | — | 24,960 |
| Total | $ 37,928 | $ 1,020 | $ 343,541 | $ 9,230 | $ 245 | $ 391,964 |

Guarantees

*Senior Secured Notes*

The Notes are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by the Issuers and each of their existing and future domestic restricted subsidiaries, other than immaterial subsidiaries. This guarantee arose from the issuance of the Notes for the purpose of additional financing. The Notes are secured by first-priority liens on substantially all of the Issuers' assets and require performance under the guarantee if there is a default on the Notes. Under this guarantee, the maximum potential amount of future, undiscounted payments is $433.2 million. The current carrying amount of the related liability at December 31, 2012 is $310.0 million.

*Revolving Credit Facility*

Subject to certain exceptions, the obligations under the Revolving Credit Facility are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by the Issuers and each of their existing and future domestic subsidiaries. This guarantee arose from entering into the credit agreement that provides the Revolving Credit Facility for the purpose of additional financing. The Revolving Credit Facility and the guarantees will rank senior in right of payment to all of the Issuers' and the guarantors' existing and future subordinated indebtedness and equal in right of payment with all of the Issuers' and guarantors' existing and future senior indebtedness, including the Notes. The obligations under the Revolving Credit Facility and the guarantees are secured by substantially all of the Issuers' assets, subject to certain limitations. Under this guarantee, the maximum potential amount of future, undiscounted payments is approximately $31.4 million. The current carrying amount of the related liability at December 31, 2012 is $25.0 million.

*CSO Agreements*

Under the terms of the CSO Agreements with non-exclusive third-party lenders, the Company is contractually obligated to reimburse the lenders for the full amounts of the loans and certain related fees that are not collected from the customers. In certain cases, the lenders sell the related loans, and the Company's obligation to reimburse for the full amounts of the loans and certain related fees that are not collected from the customers extends to the purchasers. Under this guarantee, the maximum potential amount of future, undiscounted payments is approximately $26.9 million. The value of the related liability at December 31, 2012 is approximately $4.6 million and is included in accounts payable and accrued expenses on the consolidated balance sheets and provision for loan losses on the consolidated statements of income.

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(7) Senior Secured Notes, Revolving Credit Facility and Notes Payable (continued)

*Aircraft*

The Sole Shareholder has a note payable to a finance company originating from the purchase of an aircraft. The note payable is unconditionally and absolutely guaranteed by TMX Finance LLC and certain of its wholly-owned subsidiaries. The note payable is collateralized by a security interest in the aircraft and requires performance under the guarantee if there

0674

is a default on the note payable and the collateral and Sole Shareholder's guarantee are not sufficient to pay the entire amount of the note. The maximum potential amount of future, undiscounted payments for the note is $3.3 million. The current carrying amount of the related liability at December 31, 2012 is $2.8 million.

(8)  Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses at December 31, 2012 and 2011 consisted of the following:

| (in thousands) | 2012 | | 2011 | |
|---|---|---|---|---|
| Interest | $ | 19,749 | $ | 19,085 |
| Salaries and benefits | | 13,444 | | 15,839 |
| Phantom stock award | | — | | 9,776 |
| Trade payables | | 11,513 | | 6,567 |
| Rent | | 5,686 | | 4,247 |
| Accrual for losses on loans processed for unconsolidated CSO Lender | | 4,610 | | 1,006 |
| Taxes payable | | 2,781 | | 3,595 |
| Other | | 3,558 | | 2,241 |
| Total accounts payable and accrued expenses | $ | 61,341 | $ | 62,356 |

(9)  Other Operating and Administrative Expenses

Other operating and administrative expenses for the years ended December 31, 2012, 2011 and 2010 consisted of the following:

| (in thousands) | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| Collateral collection expenses | $ | 16,952 | $ | 10,533 | $ | 7,881 |
| Technology services, software licensing and hosting expenses | | 11,039 | | 5,505 | | 4,062 |
| Office supplies and postage expenses | | 8,217 | | 6,535 | | 4,639 |
| Recruiting, relocation and training expenses | | 7,079 | | 6,537 | | 1,479 |
| Travel and related expenses | | 7,033 | | 6,682 | | 4,264 |
| Bank processing fees | | 2,762 | | 3,325 | | 2,838 |
| Legal fees | | 2,722 | | 2,385 | | 1,710 |
| Accounting, audit and tax fees | | 2,056 | | 2,630 | | 1,128 |
| Business licensing expenses | | 1,656 | | 1,191 | | 1,021 |
| Other | | 17,953 | | 13,373 | | 12,385 |
| Total other operating and administrative expenses | $ | 77,469 | $ | 58,696 | $ | 41,407 |

48

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(10)  Fair Value Measurement and Fair Value of Financial Instruments

Fair value is the price that would be received for an asset or paid to transfer a liability in an orderly transaction between market participants on the measurement date. The fair value hierarchy requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. The fair value hierarchy describes three levels of inputs that may be used to measure fair value:

Level 1: Quoted prices (unadjusted) for identical assets or liabilities in active markets that the entity has the ability to access as of the measurement date.

Level 2: Significant other observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active and other inputs that are observable or can be corroborated by observable market data.

Level 3: Significant unobservable inputs that reflect a company's own assumptions about the assumptions that market participants would use in pricing an asset or liability.

The Company has loans that are transferred to repossessed assets and are measured at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when there is evidence of impairment).

The following table presents the repossessed assets value carried on the consolidated balance sheets by level within the fair value hierarchy (as described above) for which a nonrecurring change in fair value has been recorded:

| (in thousands) | Total | | Active Markets For Identical Assets (Level 1) | | Observable Inputs (Level 2) | | Unobservable Inputs (Level 3) | | Total Losses | |
|---|---|---|---|---|---|---|---|---|---|---|
| Repossessed assets — December 31, 2012 | $ | 6,355 | $ | — | $ | — | $ | 6,355 | $ | 3,803 |
| Repossessed assets — December 31, 2011 | $ | 4,785 | $ | — | $ | — | $ | 4,785 | $ | 1,755 |

The fair value of repossessed assets was determined based on comparable recent used vehicle sales and known changes in the broad used vehicle market.

The Company's financial instruments consist primarily of cash and cash equivalents, restricted cash, title loans receivable (net), a note receivable from the Sole Shareholder, the Revolving Credit Facility, the Notes and other notes payable. For all such instruments, other than the Notes, the carrying amounts in the consolidated financial statements approximate their fair values.

The fair values of cash and cash equivalents are measured using level 1 inputs. Title loans receivable are originated at prevailing market rates. Given the short-term nature of these loans, they are continually repriced at current market rates. The fair values of title loans receivable are measured using level 3 inputs. The fair values of the Revolving Credit Facility and notes payable and receivable are estimated using level 2 inputs based on rates currently available for debt with similar terms and remaining maturities. The fair value of the Notes is estimated using level 2 inputs based on the market yield on trades of the Notes at the end of each reporting period. The fair value of the Notes was $390.8 million and $360.6 million as of December 31, 2012 and 2011, respectively.

0675

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(11) Employee Benefit Plans

Incentive Savings Plan

The Company has a 401(k) Employees' Incentive Savings Plan that covers all employees who have completed six months of service. The Company's match of employee contributions is discretionary and determined annually. Beginning January 1, 2009, the Company initiated a new matching program whereby eligible employees' contributions are matched 50% by the Company up to 6% of the employees' earnings. The cost of such contributions totaled approximately $1.0 million, $0.8 million and $0.5 million for the years ended December 31, 2012, 2011 and 2010, respectively.

Health Insurance Plan

Effective December 1, 2011, the Company adopted a self-insured health plan available to all full-time salaried employees after six months of service. The Company has stop-loss insurance coverage for individual and aggregate claim levels. The total expenses related to this plan are included in salaries and related expenses on the consolidated statements of income and were approximately $3.3 million and $0.3 million for the years ended December 31, 2012 and 2011, respectively. Prior to December 2011, the Company offered reimbursements for health premium costs incurred by employees in obtaining outside medical coverage. The amounts reimbursable varied between employees and were determined by position or through negotiations between the Company and the employees.

(12) Related Party Transactions

The Company leases the corporate office from PY and various retail spaces from TYI and certain employees. Rental payments paid to these entities for operating leases amounted to approximately $0.5 million for the year ended December 31, 2012 and $0.8 million for each of the years ended December 31, 2011 and 2010.

The Company also leased certain retail spaces under capital lease agreements from certain employees with total payments of $38,000 for the year ended December 31, 2012 and $0.1 million for each of the years ended December 31, 2011 and 2010. As of December 31, 2012, the Company did not have any capital lease agreements with related parties.

Interest expense on notes payable to related parties totaled $1.3 million, $2.2 million and $0.9 million for the years ended December 31, 2012, 2011 and 2010, respectively. Interest income on the note receivable from Sole Shareholder was approximately $0.2 million for each of the years ended December 31, 2012 and 2011, and $20,000 for the year ended December 31, 2010.

(13) Commitments

Operating Lease Commitments

The Company leases retail space under non-cancelable agreements that require various minimum annual rent payments plus the payment of property taxes and insurance. In addition, the Company leases certain equipment under non-cancelable operating lease agreements, which require set rent payments and payments of property taxes. Future minimum rental commitments under all non-cancelable operating leases with terms of one year or more are due in calendar years ending December 31 as follows:

| (in thousands) Year Ending December 31, | Related Party | | Other | | Total | |
|---|---|---|---|---|---|---|
| 2013 | S | 638 | S | 45,695 | S | 46,333 |
| 2014 | | 552 | | 41,310 | | 41,862 |
| 2015 | | 362 | | 35,677 | | 36,039 |
| 2016 | | 339 | | 27,402 | | 27,741 |
| 2017 | | 227 | | 17,579 | | 17,806 |
| Thereafter | | 311 | | 36,906 | | 37,217 |
| Total obligations under operating leases | S | 2,429 | S | 204,569 | S | 206,998 |

The total rent expense was approximately $40.0 million, $29.6 million and $22.2 million, respectively, for the years ended December 31, 2012, 2011 and 2010. Rent expense is recorded on a straight-line basis over the life of the lease.

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(13) Commitments (continued)

Capital Lease Commitments

The Company leases several retail spaces under capital lease agreements with terms of 15 years. Future minimum lease payments under capital leases, together with the present value of the net minimum lease payments as of December 31, 2012, are due in calendar years ending December 31 as follows:

| (in thousands) Year Ending December 31, | Total | |
|---|---|---|
| 2013 | S | 261 |
| 2014 | | 267 |

**0676**

| | | |
|---|---|---:|
| 2015 | | 272 |
| 2016 | | 277 |
| 2017 | | 283 |
| Thereafter | | 1,745 |
| | | |
| Subtotal | | 3,105 |
| Less: amount representing interest | | (1,134) |
| | | |
| Total obligations under capital leases | $ | 1,971 |

## (14) Contingencies

The Company is involved in various legal proceedings. These proceedings are, in the opinion of management, ordinary routine matters incidental to the normal business conducted by the Company. Legal proceedings brought against the Company include, but are not limited to, allegations of violations of state or federal consumer protections, disputes regarding repossessions, and employment related matters. For example, TitleMax of Missouri, Inc. is a party to a putative class action lawsuit alleging that the entity failed to pay certain employees overtime compensation as required by Missouri law. In the opinion of management, an appropriate accrual has been established related to the above referenced legal matters. Outcomes of such proceedings are not expected to have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

## (15) Phantom Stock Plan

The Company has a Phantom Stock Plan which authorizes the grant of long-term incentive awards in the form of phantom stock units, or "PSUs" or phantom stock appreciation rights, or "PSARs." The phantom unit awards do not constitute ownership of any membership or other equity interests of the Company or any of its subsidiaries, nor do they give the holder any voting rights. PSUs entitle the holder to receive a cash payment equal to the fair value of the underlying shares of stock in TMX Credit, Inc., subject to certain restrictions and to risk of forfeiture. The PSARs entitle the holder to receive a cash amount determined by the appreciation in the fair value of the underlying shares of stock in TMX Credit, Inc. between the grant date of the shares and the date of exercise. The fair value of the phantom shares is equal to three times the earnings before interest, taxes, depreciation and amortization ("EBITDA") of TMX Credit, Inc. for the 12 months preceding any valuation date, as computed by the Company. The value of the PSUs and PSARs is zero at December 31, 2012 and 2011.

A former officer of the Company had an employment agreement which included a phantom stock award that became payable on December 31, 2011. The incremental increases in the reported value of this award of $0.1 million and $5.7 million are included in salaries and related expenses in the consolidated statements of income for the years ended December 31, 2011 and 2010, respectively. The total calculated value of $9.8 million is included in accounts payable and accrued expenses in the consolidated balance sheets at December 31, 2011. The phantom stock award was paid during 2012.

51

---

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements (unaudited)

## (16) Chapter 11 Bankruptcy Filing

On April 20, 2009, the Company filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court in the Southern District of Georgia. The filing occurred due to the inability to reach an agreement to extend a term loan agreement or to obtain replacement financing with a new lender. During the pendency of the bankruptcy proceedings, the Company continued to profitably operate its business. The Company exited bankruptcy protection on April 12, 2010. All principal and interest payments ordered by the Bankruptcy Court were made on time and in full, and no creditors were impaired as a result of the proceedings.

## (17) Guarantor Condensed Consolidating Financial Statements

The payment of principal and interest on the Notes is guaranteed by the wholly-owned subsidiaries of the Issuers other than immaterial subsidiaries (the "Subsidiary Guarantors"). It is not guaranteed by Construction, Aviation or the Company's consolidated CSO Lenders (the "Non-Guarantor Subsidiaries"). The separate financial statements of the Subsidiary Guarantors are not included herein because the Subsidiary Guarantors are the Company's wholly-owned consolidated subsidiaries and are jointly, severally, fully and unconditionally liable for the obligations represented by the Notes. The Company believes that the consolidating financial information for the Issuers, the combined Subsidiary Guarantors and the combined Non-Guarantor Subsidiaries provide information that is more meaningful in understanding the financial position of the Subsidiary Guarantors than separate financial statements of the Subsidiary Guarantors.

The following consolidating financial statements present consolidating financial data for the Issuers, the combined Subsidiary Guarantors, the combined Non-Guarantor Subsidiaries and an elimination column for adjustments to arrive at the information for the Company on a consolidated basis as of December 31, 2012 and 2011 and for each of the years in the three year period ended December 31, 2012. Investments in subsidiaries are accounted for by the Company using the equity method for purposes of this presentation. Results of operations of subsidiaries are therefore reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions.

52

---

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

## (17) Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Balance Sheet
December 31, 2012
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|

0677

**Assets**

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ — | $ 88,801 | $ 1,993 | $ — | $ 90,794 |
| | | | | | |
| Title loans receivable | — | 542,771 | 34,401 | — | 577,172 |
| Allowance for loan losses | — | (88,986) | — | (5,575) | (94,561) |
| Unamortized loan origination costs | — | 3,716 | — | — | 3,716 |
| | | | | | |
| Title loans receivable, net | — | 457,501 | 34,401 | (5,575) | 486,327 |
| | | | | | |
| Interest receivable | — | 37,893 | 162 | — | 38,055 |
| Property and equipment, net | — | 75,474 | 19,765 | — | 95,239 |
| Debt issuance costs, net of accumulated amortization | 10,570 | — | — | — | 10,570 |
| Goodwill | — | 5,975 | — | — | 5,975 |
| Note receivable from Sole Shareholder | 1,077 | — | — | — | 1,077 |
| Other assets | 29 | 48,841 | 1,996 | (11,120) | 39,746 |
| Investment in affiliates | 729,325 | — | — | (729,325) | — |
| | | | | | |
| Total Assets | $ 741,001 | $ 714,485 | $ 58,317 | $ (746,020) | $ 767,783 |
| | | | | | |
| **Liabilities and Equity** | | | | | |
| Senior secured notes, net | $ 311,519 | $ — | $ — | $ — | $ 311,519 |
| Revolving credit facility | 25,000 | — | — | — | 25,000 |
| Notes payable | 12,000 | — | 25,336 | — | 37,336 |
| Notes payable to related parties | — | — | 19,628 | — | 19,628 |
| Obligations under capital leases | — | 1,971 | — | — | 1,971 |
| Accounts payable and accrued expenses | 19,547 | 46,540 | 11,970 | (16,716) | 61,341 |
| | | | | | |
| Total Liabilities | 368,066 | 48,511 | 56,934 | (16,716) | 456,795 |
| | | | | | |
| Total member's equity and noncontrolling interests | 372,935 | 665,974 | 1,383 | (729,304) | 310,988 |
| | | | | | |
| Total Liabilities and Equity | $ 741,001 | $ 714,485 | $ 58,317 | $ (746,020) | $ 767,783 |

53

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17)  Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Balance Sheet
December 31, 2011
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ — | $ 37,220 | $ 921 | $ — | $ 38,141 |
| | | | | | |
| Title loans receivable | — | 475,263 | 14,830 | — | 490,093 |
| Allowance for loan losses | — | (70,955) | — | (2,148) | (73,103) |
| Unamortized loan origination costs | — | 2,829 | — | — | 2,829 |
| | | | | | |
| Title loans receivable, net | — | 407,137 | 14,830 | (2,148) | 419,819 |
| | | | | | |
| Interest receivable | — | 31,452 | 65 | — | 31,517 |
| Property and equipment, net | — | 51,437 | 21,134 | — | 72,571 |
| Debt issuance costs, net of accumulated amortization | 14,042 | — | — | — | 14,042 |
| Goodwill | — | 5,975 | — | — | 5,975 |
| Intangible assets, net | — | 140 | — | — | 140 |
| Note receivable from Sole Shareholder | 1,549 | — | — | — | 1,549 |
| Other assets | 10 | 37,883 | 1,374 | (18,273) | 20,994 |
| Investment in affiliates | 541,614 | — | — | (541,614) | — |
| | | | | | |
| Total Assets | $ 557,215 | $ 571,244 | $ 38,324 | $ (562,035) | $ 604,748 |
| | | | | | |
| **Liabilities and Equity** | | | | | |
| Senior secured notes, net | $ 312,120 | $ — | $ — | $ — | $ 312,120 |
| Notes payable | — | — | 11,370 | — | 11,370 |
| Notes payable to related parties | — | — | 20,512 | — | 20,512 |
| Obligations under capital leases | — | 2,052 | — | — | 2,052 |
| Accounts payable and accrued expenses | 18,940 | 44,582 | 5,698 | (6,864) | 62,356 |
| | | | | | |
| Total Liabilities | 331,060 | 46,634 | 37,580 | (6,864) | 408,410 |
| | | | | | |
| Total member's equity and noncontrolling interests | 226,155 | 524,610 | 744 | (555,171) | 196,338 |

0678

| Total Liabilities and Equity | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| S | 557,215 | S | 571,244 | S | 38,324 | S | (562,035) | S | 604,748 |

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17) Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Income
Year Ended December 31, 2012
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Interest and fee income | S — | S 652,205 | S 4,550 | S — | S 656,755 |
| Provision for loan losses | — | (144,749) | — | — | (144,749) |
| Aircraft service revenue | — | — | 3,745 | (3,745) | — |
| Net interest and fee income and aircraft service revenue | — | 507,456 | 8,295 | (3,745) | 512,006 |
| Costs, expenses and other: | | | | | |
| Salaries and related expenses | — | 201,881 | 18 | — | 201,899 |
| Occupancy costs | — | 64,336 | 391 | — | 64,727 |
| Other operating and administrative expenses | 316 | 116,042 | 4,293 | (3,745) | 116,906 |
| Interest, including amortization of debt issuance costs | 46,273 | (554) | 3,574 | — | 49,293 |
| Total expenses | 46,589 | 381,705 | 8,276 | (3,745) | 432,825 |
| Net (loss) income before equity in income of affiliates | (46,589) | 125,751 | 19 | — | 79,181 |
| Equity in income from affiliates | 125,751 | — | — | (125,751) | — |
| Net income (loss) | S 79,162 | S 125,751 | S 19 | S (125,751) | S 79,181 |

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17) Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Income
Year Ended December 31, 2011
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Interest and fee income | S — | S 504,965 | S 900 | S — | S 505,865 |
| Provision for loan losses | — | (99,542) | — | — | (99,542) |
| Aircraft service revenue | — | — | 3,840 | (3,840) | — |
| Net interest and fee income and aircraft service revenue | — | 405,423 | 4,740 | (3,840) | 406,323 |
| Costs, expenses and other: | | | | | |
| Salaries and related expenses | — | 159,017 | 184 | — | 159,201 |
| Occupancy costs | — | 48,236 | 320 | — | 48,556 |
| Other operating and administrative expenses | 337 | 88,096 | 3,428 | (3,840) | 88,021 |
| Interest, including amortization of debt issuance costs | 40,212 | (37) | 2,435 | — | 42,610 |
| Total expenses | 40,549 | 295,312 | 6,367 | (3,840) | 338,388 |
| Net (loss) income before equity in income of affiliates | (40,549) | 110,111 | (1,627) | — | 67,935 |
| Equity in income from affiliates | 110,111 | — | — | (110,111) | — |
| Net income (loss) | S 69,562 | S 110,111 | S (1,627) | S (110,111) | S 67,935 |

0679

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17) Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Income
Year Ended December 31, 2010
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Interest and fee income | $ — | $ 389,449 | $ — | $ — | $ 389,449 |
| Provision for loan losses | — | (63,932) | — | — | (63,932) |
| Aircraft service revenue | — | — | 1,493 | (1,493) | — |
| Net interest and fee income and aircraft service revenue | — | 325,517 | 1,493 | (1,493) | 325,517 |
| Costs, expenses and other: | | | | | |
| Salaries and related expenses | — | 115,821 | 269 | — | 116,090 |
| Occupancy costs | — | 34,793 | 146 | — | 34,939 |
| Other operating and administrative expenses | — | 61,038 | 2,458 | (1,493) | 62,003 |
| Interest, including amortization of debt issuance costs | 25,771 | (46) | 526 | — | 26,251 |
| Total expenses | 25,771 | 211,606 | 3,399 | (1,493) | 239,283 |
| (Loss) income from continuing operations before reorganization items | (25,771) | 113,911 | (1,906) | — | 86,234 |
| Reorganization items: | | | | | |
| Professional fees | — | 4,548 | — | — | 4,548 |
| Net (loss) income before equity in income of affiliates | (25,771) | 109,363 | (1,906) | — | 81,686 |
| Equity in income from affiliates | 109,363 | — | — | (109,363) | — |
| Net income (loss) | $ 83,592 | $ 109,363 | $ (1,906) | $ (109,363) | $ 81,686 |

57

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17) Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Cash Flows
Year Ended December 31, 2012
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Consolidated |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | $ (42,519) | $ 257,899 | $ 6,941 | $ 222,321 |
| Cash Flows from Investing Activities | | | | |
| Net title loans originated | — | (190,799) | (19,571) | (210,370) |
| Purchase of property and equipment | — | (41,128) | — | (41,128) |
| Proceeds from disposal of property and equipment | — | 823 | — | 823 |
| Increase in restricted cash | — | (4,325) | — | (4,325) |
| Receipt of payments on note receivable from Sole Shareholder | 472 | — | — | 472 |
| Net activity with affiliates | 5,658 | (7,528) | 1,870 | — |
| Net cash provided by (used in) investing activities | 6,130 | (242,957) | (17,701) | (254,528) |
| Cash Flows from Financing Activities | | | | |
| Proceeds from revolving credit facility | 25,000 | — | — | 25,000 |
| Proceeds from notes payable | 12,000 | — | 15,683 | 27,683 |
| Proceeds from contributions | — | 58,750 | — | 58,750 |
| Repayments of notes payable and capital leases | — | (80) | (2,601) | (2,681) |
| Payments of debt issuance costs | (611) | — | — | (611) |
| Distributions | — | (22,031) | (1,250) | (23,821) |
| Net cash provided by financing activities | 36,389 | 36,639 | 11,832 | 84,860 |
| Net increase in cash and cash equivalents | — | 51,581 | 1,072 | 52,653 |
| Cash and cash equivalents at beginning of period | — | 37,220 | 921 | 38,141 |

0680

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents at end of period | S | — | S | 88,801 | S | 1,993 | S | 90,794 |

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17)  Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Cash Flows
Year Ended December 31, 2011
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Consolidated |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | S (35,454) | S 206,652 | S 3,961 | S 175,159 |
| | | | | |
| Cash Flows from Investing Activities | | | | |
| Net title loans originated | — | (190,537) | (14,561) | (205,098) |
| Payments for acquisitions, net of cash acquired | — | (8,032) | — | (8,032) |
| Purchase of property and equipment | — | (31,930) | (479) | (32,409) |
| Proceeds from disposal of property and equipment | — | 399 | — | 399 |
| Increase in restricted cash | — | (3,525) | — | (3,525) |
| Receipt of payments on note receivable from Sole Shareholder | 418 | — | — | 418 |
| Cash from consolidation of variable interest entities | — | — | 1,794 | 1,794 |
| Net activity with affiliates | (24,838) | 23,380 | 1,458 | — |
| | | | | |
| Net cash used in investing activities | (24,420) | (210,245) | (11,788) | (246,453) |
| | | | | |
| Cash Flows from Financing Activities | | | | |
| Proceeds from senior notes | 64,200 | — | — | 64,200 |
| Repayments of notes payable and capital leases | (2,035) | (68) | (12,408) | (14,511) |
| Proceeds from notes payable | — | — | 21,080 | 21,080 |
| Payments of debt issuance costs | (2,291) | — | — | (2,291) |
| Proceeds from contributions to consolidated variable interest entities | — | — | 76 | 76 |
| Distributions | — | (12,704) | — | (12,704) |
| | | | | |
| Net cash provided by (used in) financing activities | 59,874 | (12,772) | 8,748 | 55,850 |
| | | | | |
| Net (decrease) increase in cash and cash equivalents | — | (16,365) | 921 | (15,444) |
| Cash and cash equivalents at beginning of period | — | 53,585 | — | 53,585 |
| | | | | |
| Cash and cash equivalents at end of period | S — | S 37,220 | S 921 | S 38,141 |

Table of Contents

TMX FINANCE LLC
AND AFFILIATES

Notes to Consolidated Financial Statements

(17)  Guarantor Condensed Consolidating Financial Statements (continued)

Consolidating Statement of Cash Flows
Year Ended December 31, 2010
(in thousands)

| | Issuers | Guarantors | Non-Guarantors | Consolidated |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | S (6,320) | S 183,578 | S (1,047) | S 176,211 |
| | | | | |
| Cash Flows from Investing Activities | | | | |
| Net title loans originated | — | (129,572) | — | (129,572) |
| Payments for acquisitions | — | (400) | — | (400) |
| Purchase of property and equipment | — | (18,700) | (13) | (18,713) |
| Proceeds from disposal of property and equipment | — | 112 | — | 112 |
| Decrease in restricted cash | — | 846 | — | 846 |
| Proceeds from sale of aircraft held for sale, net of selling expenses | — | — | 12,700 | 12,700 |
| Purchase of aircraft | — | — | (17,657) | (17,657) |
| Issuance of note receivable to Sole Shareholder | (2,000) | — | — | (2,000) |
| Receipt of payments on note receivable from Sole Shareholder | 33 | — | — | 33 |
| Net activity with affiliates | (65,275) | 61,685 | 3,590 | — |

0681

| | | | |
|---|---|---|---|
| Net cash used in investing activities | (67,242) | (86,029) | (1,380) | (154,651) |

**Cash Flows from Financing Activities**

| | | | | |
|---|---|---|---|---|
| Payments on term loan | (151,000) | — | — | (151,000) |
| Proceeds from senior notes | 247,695 | — | — | 247,695 |
| Proceeds from contributions | — | 3,146 | 420 | 3,566 |
| Repayments of notes payable and capital leases | (5,938) | (58) | (14,413) | (20,409) |
| Proceeds from notes payable | — | — | 17,750 | 17,750 |
| Payments of debt issuance costs | (17,195) | — | — | (17,195) |
| Distributions | — | (74,060) | (1,330) | (75,390) |
| Net cash provided by (used in) financing activities | 73,562 | (70,972) | 2,427 | 5,017 |
| Net increase in cash and cash equivalents | — | 26,577 | — | 26,577 |
| Cash and cash equivalents at beginning of period | — | 27,008 | — | 27,008 |
| Cash and cash equivalents at end of period | $ — | $ 53,585 | $ — | $ 53,585 |

. 60

Table of Contents

ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None.

ITEM 9A.  CONTROLS AND PROCEDURES.

**Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures, as defined in Rule 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the *"Exchange Act,"* that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure. The Company's management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Accounting Officer, of the effectiveness of our disclosure controls and procedures as of December 31, 2012. Based on the evaluation, our Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were effective as of December 31, 2012.

**Management's Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2012.

**Changes in Internal Control Over Financial Reporting**

There were no changes in the Company's internal control over financial reporting, as defined in Rule 15d-15(f) under the Exchange Act, during the year ended December 31, 2012 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

ITEM 9B.  OTHER INFORMATION.

None.

61

Table of Contents

**PART III**

ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

Set forth below are the names and ages of, and the positions held by our executive officers and by our managers (which are similar to directors, subject to certain limitations contained in TMX Finance LLC's operating agreement). Executive officers serve at the pleasure of Tracy Young, who is our Chairman of the Board, Chief Executive Officer and President, subject to the terms of any applicable employment agreement. Pursuant to TMX Finance LLC's amended and restated operating agreement, managers serve until their death, permanent disability, resignation or removal by Mr. Young.

| Name | Age | Position |
|---|---|---|
| Tracy Young | 55 | Chairman of the Board, Chief Executive Officer and President |
| Elizabeth C. Nelson | 47 | Chief Accounting Officer |
| Otto W. Bielss, III | 50 | Senior Vice President of Operations |
| Douglas W. Marolin | 40 | Senior Vice President of Operations |
| Arthur Tretyak | 34 | Senior Vice President of Operations |
| Robert F. Pirkle, Sr. | 58 | Manager |

0682

Mr. Young founded our Company in 1998 and has since served as Chief Executive Officer. He was appointed as the Company's President on March 22, 2013. Prior to founding our Company, Mr. Young owned and operated Patriot Loan Co., a consumer installment lending company with locations in four states. Mr. Young has been a manager or director of the Company or its predecessor since 1998. Mr. Young's current position as our Chief Executive Officer and President combined with his past management experience in the consumer lending business provide him with leadership skills and a practical and informed perspective on matters related to the Company's business and industry.

Elizabeth C. Nelson was appointed as the Company's Chief Accounting Officer in August 2012. Ms. Nelson joined the Company as Corporate Controller in December 2009. She was promoted to Vice President of Financial Operations in December 2011 and served in this capacity until her appointment as Chief Accounting Officer. Prior to joining the Company, Ms. Nelson held various positions in financial management with Centex Corporation, a construction and real estate company. Ms. Nelson started with Centex Corporation in 2002 and served as a Division Controller from 2006 to 2009.

Otto W. Bielss, III joined us in January 2010 as Senior Vice President of Operations of TMX Finance LLC and serves in such capacity for our other companies as well. Prior to joining us, Mr. Bielss spent nine years with Ace Cash Express as a Division Vice President. Prior to Ace Cash Express, Mr. Bielss held various management positions with Blockbuster Inc., Michaels Stores, Inc., RadioShack Corporation and Eagle Sound Production, a privately-owned sound production company in Irving, Texas. Mr. Bielss brings over 29 years of management experience to the Company.

Douglas W. Marohn joined us in August 2011 and is currently serving as a Senior Vice President of Operations. Mr. Marohn oversees our EAL and INL brands. Prior to joining the Company, Mr. Marohn served as Senior Vice President of Operations at Nicholas Financial, Inc., where he held various management positions from April 1998 through July 2011. Mr. Marohn has extensive experience in operational management and development in the consumer lending industry.

Arthur Tretyak joined us in May 2011 as a Senior Vice President of Operations. Prior to joining the Company, Mr. Tretyak spent three years as a Vice President with Enova Financial, the e-commerce division of Cash America International. Prior to Enova Financial, Mr. Tretyak served two years as a consultant with McKinsey & Company. Mr. Tretyak's specialized knowledge and experience in online lending enable him to provide valuable leadership to the Company as it develops its online title lending business.

Honorable Robert F. Pirkle, Sr. was elected a manager of TMX Finance LLC in December 2011. Judge Pirkle has been a judge and in the private practice of law since 1984. Throughout the past 10 years, Judge Pirkle has and continues to serve as Chief Judge in three Municipal Courts in Georgia, as well as an Associate Judge for the State Court and Judge Pro Tempore for the Juvenile Court. Prior to holding these positions, Judge Pirkle was the elected Solicitor General for Long County, Georgia for 12 years. Judge Pirkle holds a Bachelor of Business Administration from the Terry School of Business of the University of Georgia, a Masters Degree from

62

---

Table of Contents

Georgia Southern University and a Juris Doctor Law Degree from Samford University. He has extensive training and experience in all Federal and State Courts. His knowledge in the different areas of law enables him to provide guidance and insight to the Company and the Board of Managers in matters related to business and government.

John G. Kennedy, III previously served as a manager of TMX Finance LLC from June 2010 through December 2011 and was again elected a manager of TMX Finance LLC in December 2012. Mr. Kennedy serves as Managing Director and Head of Capital Markets at Tudor, Pickering, Holt & Co. Securities, Inc., where he has been employed since January 2010. Mr. Kennedy has more than 25 years of experience in investment banking. Mr. Kennedy served as a Managing Director of Deutsche Bank's investment banking group and served as a Managing Director of Donaldson, Lufkin & Jennrette until its sale to Credit Suisse First Boston. Mr. Kennedy serves on the Board of Directors of Roadrunner Transportation Systems Inc. Mr. Kennedy has served or currently serves as trustee or director of various private companies, foundations and not-for-profit institutions. Mr. Kennedy earned a Bachelor of Science, cum laude, from Washington and Lee University and a Masters in Business Administration from the Amos Tuck School of Business at Dartmouth College. Mr. Kennedy has spent much of his career in the investment banking industry and has significant finance experience, which allows him to contribute a valuable and informed perspective on business and finance-related matters. Additionally, Mr. Kennedy's experiences as a trustee or director of other entities have exposed him to a wide array of best practices, which enable him to provide unique insight and guidance.

Two of our three managers, Messrs. Pirkle and Kennedy, are independent managers (with independence being determined in accordance with the New York Stock Exchange's definition of independence, as if it applied to us), meaning that they do not have, and have never had, any material transactions, relationships, or arrangements with us, either directly or as a shareholder, partner or officer of another organization that has or had a relationship with us.

The Company's managers have not created an audit, compensation or nominating committee and do not have any other committee performing such functions. Tracy Young, our Chairman of the Board, Chief Executive Officer and President, performed the function of a compensation committee during the fiscal year ended December 31, 2012; however, no managers acted as a nominating committee or an audit committee during 2012. The managers believe that Mr. Young is most properly suited to consider and decide matters typically falling within the authority of a compensation and a nominating committee.

Additionally, we have adopted a Code of Conduct and Ethics that is applicable to all of our employees, including our Chief Executive Officer, Chief Accounting Officer and Corporate Controller. The Code of Conduct and Ethics is posted on our website at www.titlemax.biz. We intend to satisfy the disclosure requirement regarding any amendment to, or waiver of, a provision of the Code of Conduct and Ethics for our Chief Executive Officer or Chief Accounting Officer by posting such information on our website.

The Company's operating agreement places significant limitations on the authority, role and responsibilities of the managers other than Mr. Young, as the sole beneficial owner of our parent company, and subjects them to the authority of Mr. Young in many respects. For example, the operating agreement provides that the executive officers serve at the pleasure of Mr. Young rather than the managers and restricts the ability of the managers to, among other things, amend TMX Finance LLC's operating agreement and require additional capital contributions from Mr. Young.

Manager Compensation

A manager who is also one of our employees does not receive any additional compensation for his services as a manager. Each non-executive manager is paid for his services and does not receive any separate meeting fees, equity awards or incentive compensation. In addition, non-executive managers are reimbursed for any reasonable out of pocket expenses incurred in connection with rendering their service as managers. The following table describes the compensation earned by non-executive managers during 2012:

2012 Manager Compensation

| Name | Fees Earned or Paid in Cash | All Other Compensation | Total |
|------|---------|---------|---------|
| Robert F. Pirkle, Sr. | 100,000 | — | 100,000 |
| John W. Robinson, III | 200,000 | — | 200,000 |

Effective December 31, 2012, our parent company approved a change to our Board of Managers. The three managers are Messrs. Young, Pirkle, and Kennedy.

Table of Contents

ITEM 11. EXECUTIVE COMPENSATION.

Compensation Discussion and Analysis

*General*

This compensation discussion and analysis provides an overview of our compensation program and policies, the material compensation decisions we have made with respect to the Company's top executive officers and the material factors that we considered in making those decisions. The tables and disclosures following this compensation discussion and analysis contain specific data about the compensation earned in 2012, 2011 and 2010, as applicable, by the following individuals, whom we refer to as our named executive officers:

- Tracy Young, our Chief Executive Officer and President (a),

- Elizabeth C. Nelson, our Chief Accounting Officer,

- Otto W. Bielss, III, a Senior Vice President of Operations,

- Douglas W. Marohn, a Senior Vice President of Operations, and

- Arthur Tretyak, a Senior Vice President of Operations.

(a) Effective March 22, 2013, Mr. Young's title was changed to Chief Executive Officer and President.

In addition, this discussion addresses the compensation provided to our former Chief Financial Officer, Donald E. Thomas, whose employment with the Company ended on August 21, 2012.

We hired two individuals who were expected to take the role of President in 2012, but each separated from the Company in 2012 prior to completing their field training programs or assuming the full duties of the President role. This discussion does not address the compensation of these former employees.

Our compensation programs are intended to attract and retain vital employees and to incentivize high level talent to work for and ultimately add value to our business. Our compensation structure is relatively simple, combining base salaries with a mix of cash-based bonuses and incentive awards, perquisites and severance protection. We do not have a formal Compensation Committee. All decisions related to compensation are approved by our Chief Executive Officer.

*Executive Pay Policy*

The elements of our executive compensation policy are intended to meet the following objectives:

| | |
|---|---|
| Base salary | • Provide the fixed element of the compensation package |
| | • Be competitive in order to recruit and retain the best talent for our business and industry |
| | • Reinforce our business strategies, management process and overall performance |
| Profit bonus | • Incentivize the achievement of specific profit goals over the short term |
| Guaranteed bonus | • Aid in long-term retention through establishment of specified amounts for certain executives |
| Long-term incentives | • Incentivize executives to achieve superior returns |
| | • Aid in retention of key individuals |
| Perquisites | • Aid in retention of key individuals |
| Severance Benefits | • Aid in retention of key individuals |

Table of Contents

*Specific Compensation Elements*

The principal components of our executive compensation program are base salary and a combination of guaranteed bonuses, profit bonuses and/or long-term incentive compensation, as well as 401(k) matching contributions and health care allowances. Certain executives are also entitled to severance benefits upon a termination of employment under certain circumstances. We do not maintain supplemental retirement programs or defined benefit pension plans for our executive officers because we believe that the existing compensation arrangements enable our executive officers to adequately plan for their retirement.

*Base Salary:* Base salaries are paid to our executive officers to compensate them for the performance of their respective job duties and responsibilities. Base salaries of our executive officers are typically reviewed on an annual basis. In setting annual base salaries, the following are the primary factors taken into consideration: the executive officer's performance, the performance of the operations and departments for which he or she is responsible, changes in the scope of the executive officer's job responsibilities and current compensation practices and trends in our industry. These factors are reviewed on a wholly subjective basis, and no specific criteria are established with respect to individual, company or department performance. Our Chief Executive Officer, as the sole beneficial owner of our parent company, has historically set the salaries for all of the executives, including his own.

*Profit Bonus:* Mr. Bielss is entitled to receive a bonus based on a percentage of monthly profitability based on internal measures as set by the Company. During 2012, Mr. Bielss' monthly profit bonus was based on 0.15% of an internal profit metric that measured the fee and interest income from the applicable stores for which Mr. Bielss was responsible, less direct costs of those stores and less an allocated amount for corporate overhead expenses. This profit bonus is intended to directly align Mr. Bielss' pay with the performance of the stores that he is responsible for managing. The amount of Mr. Bielss' profit bonus earned for 2012 is reflected in the Non-Equity Incentive Plan Compensation column of the Summary Compensation Table.

*Guaranteed Bonus:* Guaranteed bonuses for executives are determined individually for each person. The bonuses are paid either monthly or annually. Ms. Nelson participates in a guaranteed bonus award incentive equal to 25% of her base salary on an annual bonus, and Mr. Marohn received a guaranteed bonus of $125,000 upon completion of his initial training period. The Company paid Mr. Marohn an additional bonus of $125,000 in 2012 in lieu of a profit-based bonus, with an expectation that he will move to a profit-based bonus in future years. During 2012, on Mr. Thomas' two-year anniversary with the Company, he received a guaranteed bonus of $135,000. These guaranteed bonuses are reflected in the Bonus column of the Summary Compensation Table.

*Long-term Incentives:* In 2011, we adopted the AutoCash Inc. (replaced by TMX Credit, Inc.) Phantom Stock Plan, which authorizes the grant of long-term incentive awards in the

form of phantom stock units, or *"PSUs"* or phantom stock appreciation rights, or *"PSARs."* The phantom unit awards do not constitute ownership of any membership or other equity interests of the Company or any of its subsidiaries, nor do they give the holder any voting rights. PSUs entitle the holder to receive a cash payment equal to the fair value of the underlying shares of stock in TMX Credit, Inc., subject to certain restrictions and to risk of forfeiture. The PSARs entitle the holder to receive a cash amount determined by the appreciation in the fair value of the underlying shares of stock in TMX Credit, Inc. between the grant date of the shares and the date of exercise. The fair value of the phantom shares is equal to three times the EBITDA of TMX Credit, Inc. for the 12 months preceding any valuation date. Mr. Tretyak was issued 50 PSUs in 2011, which vest over three years from the date of May 16, 2012 and become mature and payable on the fourth anniversary of the grant date.

*Perquisites:* The Company provides limited perquisites to its named executive officers, such as relocation assistance. The named executive officers also receive health care benefits that are generally made available to other employees. In addition, the Chief Executive Officer is entitled to use the Company's aircraft for non-business purposes. Incremental variable operating costs associated with such personal use and paid by the Company totaled $298,057 in 2012.

### Mix of Compensation Elements

Other than the TMX Credit, Inc. PSUs described above with respect to Mr. Tretyak, the Company does not have any equity component to its compensation arrangements for the named executive officers. As such, the Company believes that it is necessary to provide a highly competitive cash based compensation package, as described above, to attract and retain top talent. In addition, as recruiting talent with consumer finance and/or multi-unit experience often requires the relocation of executives from other geographic markets, the Company offers relocation assistance to certain employees.

### Severance and Termination Arrangements

### Current Named Executive Officers

Messrs. Marohn and Tretyak have offer letters that provide for payments upon a termination of employment due to involuntary termination. These arrangements are described in the section entitled *"Employment Agreements/Terms of Employment."* The Company believes that these arrangements aid in attracting and retaining qualified executives to build value without the fear of losing employment for situations other than for cause or voluntary termination.

65

Table of Contents

## Executive Compensation

### Summary Compensation Table

The following table summarizes the total compensation earned in 2012, 2011 and 2010 by our named executive officers. In addition, the following table includes our former Chief Financial Officer, Donald E. Thomas, whose employment with the Company ended on August 21, 2012.

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($)(1) | Non-Equity Incentive Plan Compensation ($)(3) | All Other Compensation ($)(4) | Total |
|---|---|---|---|---|---|---|
| Tracy Young | 2012 | $ 250,000 | $ — | $ — | $ 304,691 | $ 554,691 |
| Chief Executive Officer and | 2011 | 250,000 | — | — | 325,997 | 575,997 |
| President | 2010 | 250,000 | — | — | 125,081 | 375,081 |
| Elizabeth C. Nelson | 2012 | 182,726 | 50,000 | — | 1,164 | 233,890 |
| Chief Accounting Officer | | | | | | |
| Otto W. Bielss, III | 2012 | 150,000 | — | 359,470 | 25,135 | 534,605 |
| Senior Vice President of Operations | 2011 | 150,000 | — | 291,914 | 6,789 | 448,703 |
| | 2010 | 185,000 | 62,500 | 72,665 | 83,812 | 403,977 |
| Douglas W. Marohn | 2012 | 262,500 | 250,000 | — | 8,024 | 520,524 |
| Senior Vice President of Operations | | | | | | |
| Arthur Tretyak | 2012 | 500,000 | — | — | 2,502 | 502,502 |
| Senior Vice President of Operations | | | | | | |
| Donald E. Thomas* | 2012 | 231,346 | 42,058(2) | — | 5,495 | 278,899 |
| Former Chief Financial Officer | 2011 | 316,058 | 172,942 | — | 17,046 | 506,046 |
| | 2010 | 191,538 | 35,000 | — | 97,920 | 324,458 |

\*    For services performed from April 2010 through August 2012.

(1)    Represents guaranteed bonus amounts based on the arrangement outlined in each person's offer letter, as applicable.

(2)    The amount of Mr. Thomas' bonus represents the portion of his guaranteed bonus for his second year of employment that was earned in 2012.

(3)    Represents profit bonus amounts earned monthly or annually based on the arrangement outlined in each person's employment agreement or offer letter.

(4)    The following table reflects the items that are included in the All Other Compensation column for 2012:

66

Table of Contents

### All Other Compensation Detail

Perquisites
Health

0685

| Name | Relocation Assistance | Care Allowance (b) | Personal Use of Aircraft | 401(k) Match | Severance | Total All Other Compensation |
|---|---|---|---|---|---|---|
| Tracy Young | $ — | $ — | $ 298,056(c) | $ 6,635 | $ — | $ 304,691 |
| Elizabeth C. Nelson | — | — | — | 1,164 | — | 1,164 |
| Otto W. Bielss, III | 22,591(a) | — | — | 2,544 | — | 25,135 |
| Douglas W. Marohn | — | 2,250 | — | 5,774 | — | 8,024 |
| Arthur Tretyak | — | — | — | 2,502 | — | 2,502 |
| Donald E. Thomas | — | — | — | 5,495 | — | 5,495 |

(a) Mr. Bielss was provided with a housing allowance in connection with his pending relocation to Texas, where he will continue to serve as a Senior Vice President of the Company.

(b) Prior to December 2011, the Company offered reimbursements for health premium costs incurred by employees in obtaining outside medical coverage. In 2012, Mr. Marohn was provided with three months of health care allowances until he was eligible to join the Company's new health plan.

(c) The Company calculates the aggregate incremental costs of Mr. Young's personal use of the aircraft based on an hourly charge that includes the costs of fuel, contract labor, crew travel and onboard catering. Since the Company's aircraft are primarily used for business travel, the calculation excludes fixed costs that do not change based on usage, such as pilots' salaries and the costs to acquire and maintain the aircraft.

67

Table of Contents

## Grants of Plan-Based Awards

The following table summarizes information regarding plan-based awards granted to each of our named executive officers in 2012:

| Name | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | |
|---|---|---|---|
| | Threshold | Target | Maximum |
| Tracy Young | $ — | $ — | $ — |
| Elizabeth C. Nelson | — | — | — |
| Otto W. Bielss, III | — | 291,914(1) | — |
| Douglas W. Marohn | — | — | — |
| Arthur Tretyak | — | — | — |
| Donald E. Thomas | — | — | — |

(1) Represents a cash incentive opportunity based upon a percentage of an internal profit metric for the areas of the business he is responsible for managing on a monthly basis. For Mr. Bielss, the percentage equals 0.15% of his assigned regions. By nature of the award, the threshold, target and maximum payout are undeterminable at the time of grant. Accordingly, as required under SEC rules, the amounts reflected in the table above are representative amounts based upon performance in 2011.

### Employment Agreements/Terms of Employment

Each named executive officer, except for our Chief Executive Officer, has an employment agreement, written offer letter or verbal agreement that specifies the terms of his or her overall compensation package as described below.

*Elizabeth C. Nelson:* Ms. Nelson joined us in December 2009 and was appointed Chief Accounting Officer in August 2012. The terms of Ms. Nelson's employment as Chief Accounting Officer were determined in an oral compensation agreement entered into on August 21, 2012. Pursuant to the agreement, Ms. Nelson's base salary was specified at an annual rate of $200,000 and an annual bonus in the amount of 25% of her base salary.

*Otto W. Bielss, III:* Mr. Bielss joined us as a Senior Vice President of Operations in January 2010. We executed an offer letter with Mr. Bielss that specifies his base salary for 2010 at an annual rate of $200,000 and an annual bonus in the amount of $75,000, paid in monthly installments. During 2010, Mr. Bielss agreed to a reduction in salary to $150,000 and a discontinuance of his annual bonus. In return, Mr. Bielss was made eligible to participate in a profit bonus which is based on 0.15% of an internal monthly profit metric as determined by the Company. The internal monthly profit metric measures the interest and fee income from the applicable stores for which Mr. Bielss is responsible for managing, less direct costs of those stores and less an allocated amount for corporate overhead expenses. In February 2013, Mr. Bielss agreed to a discontinuance of his profit bonus in exchange for a fixed annual bonus amount of $400,000 to be paid on a monthly basis.

*Douglas W. Marohn:* Mr. Marohn joined us as a Senior Vice President of Operations in August 2011. We executed an offer letter with Mr. Marohn that specifies the terms of his base salary at an annual rate of $262,500. Mr. Marohn's offer letter specifies a guaranteed bonus of $125,000 paid upon completion of his training period and a profit bonus equal to a fixed percentage of profit for the area of the Company for which he is responsible. The profit bonus has not yet been implemented. Mr. Marohn's offer letter also provides for severance upon involuntary termination without cause in the amount of six months of base salary, which would be contingent upon execution of a separation agreement including a general release.

*Arthur Tretyak:* Mr. Tretyak joined us as a Senior Vice President of Operations in May 2011. We executed an employment agreement with Mr. Tretyak that specifies his base salary at an annual rate of $500,000. Mr. Tretyak is eligible to receive an annual cash incentive opportunity equal to 5.0% of the EBITDA for the preceding fiscal year for TMX Credit, Inc. In addition, Mr. Tretyak is eligible to receive phantom stock awards under the TMX Credit Phantom Stock Plan. The employment agreement with Mr. Tretyak also provides that in the event of a termination without Cause, or his resignation for Good Reason, he will be entitled to severance equal to six months' base salary, plus a pro-rated annual bonus for the year of termination. In such an event, Mr. Tretyak would retain any PSUs which were vested at the time of termination. Mr. Tretyak would be required to execute a separation agreement including a general release of claims, reaffirmation of certain restrictive covenants contained in his employment agreement, and certain other promises, in a form acceptable to the Company.

68

Table of Contents

Potential Payments Upon Termination or Change of Control

The information below describes the estimated value of the potential payments that would have become payable to each named executive officer assuming a termination of employment and/or change of control had occurred on December 31, 2012, given the named executive officers' compensation as of such date. For information regarding the employment agreements with each named executive officer, including a description of rights upon termination of employment under different circumstances and of the non-competition covenants

0686

contained in the employment agreements, see the section entitled *"Employment Agreements/Terms of Employment."*

*Payments Due to Termination by the Company Without Cause*

*Termination without cause (and, for Mr. Tretyak, resignation for Good Reason):*

| Name | Severance (1) | | Bonus (2) | | Total | |
|---|---|---|---|---|---|---|
| Tracy Young | $ | — | $ | — | $ | — |
| Elizabeth C. Nelson | | — | | — | | — |
| Otto W. Bielss, III | | — | | — | | — |
| Douglas W. Marohn | | 131,250 | | — | | 131,250 |
| Arthur Tretyak | | 250,000 | | — | | 250,000 |

(1) Based on six months of then-current base salary, as specified in the respective individual's offer letter or employment agreement.

(2) Mr. Tretyak would be entitled to a pro-rated bonus upon termination without cause or for good reason. For 2012, the amount of such pro-rated bonus would be $0.

In the event of a termination for cause or a change in control without any termination of employment, no executives would be entitled to any severance amounts or special payments.

### Risk Assessment of Compensation Policies and Practices

The design and operation of our incentive compensation arrangements for our employees, including the named executive officers, were reviewed for the purpose of determining whether such programs might encourage inappropriate risk-taking that would be reasonably likely to have a material adverse effect on the Company. In conducting its review, management considered the performance objectives and target levels used in connection with these incentive arrangements and also the features of the Company's compensation program that are designed to mitigate compensation-related risk. Management concluded that the Company's compensation plans, programs and policies, considered as a whole, including applicable risk-mitigation features, are not reasonably likely to have a material adverse effect on the Company.

69

Table of Contents

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

Tracy Young, the founder, Chairman of the Board, Chief Executive Officer and President of TMX Finance LLC, is the sole beneficial owner of the common stock of TMX Finance Holdings Inc., which owns all 100 of the outstanding limited liability company interests in TMX Finance LLC. Mr. Young's address is 15 Bull Street, Suite 200, Savannah, Georgia 31401.

No director, officer or employee of the Company, or any other person, has any option, warrant or other right to acquire any ownership interest in TMX Finance LLC and there are no compensation plans that provide for the issuance of equity compensation to any person.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

### Transactions with TMX Finance Holdings Inc.

Effective September 30, 2012, Mr. Young transferred 100% of his membership interests in TMX Finance LLC to newly-formed TMX Finance Holdings Inc., or the *"Parent,"* in exchange for shares of common stock of the Parent. On October 17, 2012, the Company distributed $350,000 to the Parent. On October 31, 2012, the Parent issued $100.0 million of senior PIK notes, or the *"PIK Notes,"* that bear interest at 11% per year and are due October 15, 2015. Under the terms of the indenture governing the PIK Notes, interest on the PIK Notes is payable in cash to the extent distributions are available under the terms of the indenture governing the Company's Notes. If distributions are not permitted under the terms of the indenture governing the Company's Notes, the Parent may issue additional PIK notes in a principal amount to satisfy the interest due. Distributions from the Company to the Parent, when permitted, will provide the primary means for the Parent to make any cash interest payments on the PIK Notes.

### Real Estate Leases

We lease our corporate headquarters from Parker-Young, LLC, or *"PY."* PY is owned 50% by the Sole Shareholder and 50% by an unrelated third party. The initial term of this lease expires in 2015, followed by two ten-year options to renew. As of December 31, 2012, we leased four retail spaces from TY Investments, LLC, or *"TYI,"* which is wholly-owned by the Sole Shareholder, and two retail spaces from TMX Investments, LLC, or *"TMXI,"* a wholly-owned subsidiary of TYI. These retail spaces were acquired by TYI and TMXI, as applicable, and subsequently leased to us because they are located in areas where we could not secure satisfactory leases from other parties. We also lease two condominium units in Savannah, Georgia from TYI, which are primarily used as a relocation benefit to attract new management.

Rental payments to PY were approximately $0.2 million for the year ended December 31, 2012. Rental payments to TYI and TMXI totaled approximately $0.2 million for the year ended December 31, 2012.

### Airplane Payments

TMG is a party to an Aircraft Reimbursement Agreement with Aviation. Under this agreement, we reimburse Aviation for all costs it incurred in connection with the ownership and operation of aircraft used by us, including debt servicing for an airplane and hangar, insurance, a full time pilot and fuel and maintenance costs. The reimbursement agreement limits our reimbursement obligations to $3.0 million per year. Total payments to Aviation under this agreement were approximately $1.3 million for the year ended December 31, 2012.

In January 2011, TMG entered into a Non-Exclusive Aircraft Lease Agreement with Aviation. Under this agreement, Aviation leases to TMG an aircraft owned by Aviation on a non-exclusive basis for a rental charge of $200,000 per month beginning in April 2011. Total payments to Aviation under this agreement were approximately $2.4 million for the year ended December 31, 2012.

An airplane owned by Aviation is collateral for a loan to the Sole Shareholder from a third party with a balance as of January 1 and December 31, 2012 of approximately $3.1 million and $2.8 million, respectively, with repayment of the loan guaranteed by us. The note is payable in monthly installments of $35,000, including interest and principal. The note has a fixed interest rate of 6.35% and has a final payment of $2.1 million due in October 2015. The total amounts of principal and interest paid on this loan by the Sole Shareholder were approximately $0.2 million and $0.2 million, respectively, for the year ended December 31, 2012.

Related to Aviation's purchase of an additional airplane in November 2010, we loaned the Sole Shareholder $2.0 million at 12% interest, due in November 2014. The balance of this note at January 1 and December 31, 2012 was approximately $1.5 million and $1.1 million, respectively. The total amounts of principal and interest paid by the Sole Shareholder on this loan were approximately $0.5 million and $0.2 million, respectively, for the year ended December 31, 2012.

0687

Table of Contents

Working Capital Indebtedness

A former President of TMX Finance had an employment agreement with TMX Finance with a term through December 31, 2011. Pursuant to the employment agreement, our former President was entitled to receive, in addition to his base salary, an annual profit sharing bonus equal to 1.5% of our earnings before interest, taxes, amortization and depreciation. The employment agreement included a provision granting our former President the option to exchange $2.0 million of debt for a 3% interest in TMX Finance. The employment agreement was amended effective as of January 1, 2010 to replace this equity option with a grant of phantom units. The phantom units, which were fully vested, represented the right to receive a cash payment equal to the difference, if positive, between $2.0 million and an amount equal to 3% of the fair market value of the outstanding membership interests of TMX Finance. This amount was paid during 2012.

In May 2010, in response to significant demand for our product, the Sole Shareholder made an interim equity contribution of $2.9 million to the Company to ensure adequate cash availability for the business. Following the issuance of $250.0 million of Notes in June 2010, TMX Finance made a distribution to the Sole Shareholder in an amount equal to the amount of this interim equity contribution. In July 2012 and November 2012, the Sole Shareholder made additional equity contributions of $14.0 million and $44.8 million, respectively, to Company.

For more information regarding related-party activities, see Note 12 to our consolidated financial statements in *"Item 8. Financial Statements and Supplementary Data"* and *"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Other Indebtedness."*

Policies and Procedures for Review, Approval and Ratification of Related Party Transactions

The Board of Managers of TMX Finance is drafting a related party transaction policy. Currently, the Board of Managers must conform to the related party requirements included in the Indenture for the senior secured notes. The Indenture requires related party transactions to (1) be no less favorable than an arm's length transaction with a person who is not a related party, (2) be approved by a majority of the non-employee managers if the transaction is greater than $3 million and (3) for transactions greater than $7.5 million, be determined to be fair from a financial point of view based upon an opinion provided by a third party firm of national standing. The Board of Managers will examine all related party transactions using the terms of the Indenture until such time as the Company's own policy is formally adopted.

Compensation Interlocks and Insider Participation

The Sole Shareholder determined the compensation of our executive officers for the fiscal year ended December 31, 2012. No executive officer of the Company served during 2012 on the Board of Directors or Compensation Committee of any other entity that had an executive officer who served as a manager or director of the Company or on any Compensation Committee of ours at any time during 2012.

Table of Contents

ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The following table presents fees and expenses billed for professional services provided by McGladrey LLP and RSM McGladrey, Inc. (through November 30, 2011) for 2012 and 2011.

| Fee Category | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2012 | | 2011 |
| Audit Fees | $ | 680,883 | $ | 698,176 |
| Audit-Related Fees | | 36,191 | | 509,879 |
| Tax Fees | | 3,300 | | 364,175 |
| All Other Fees | | — | | 13,159 |
| Total Fees | $ | 720,374 | $ | 1,585,389 |

*Audit Fees:* Consists of fees and expenses for professional services rendered for the audit of our consolidated financial statements, review of the interim consolidated financial statements included in quarterly reports, and services normally provided in connection with statutory and regulatory filings.

*Audit-Related Fees:* Consists of fees and expenses for professional services provided in connection with our Notes offering (in 2011) and audit of our retirement savings plan.

*Tax Fees:* Consists of fees and expenses for professional services provided relating to tax planning and compliance services, and assistance with tax audits and appeals.

*All Other Fees:* Consists of fees other than the professional services reported above. The services provided in 2011 were related to unclaimed property research.

All audit and non-audit services provided by McGladrey LLP and RSM McGladrey, Inc. (through November 30, 2011) are pre-approved by the Chairman of the Board of Managers and Chief Executive Officer, who considers whether the provision of the non-audit services is compatible with the maintenance of that firm's independence in the conduct of its auditing functions. The non-audit services provided by McGladrey LLP and RSM McGladrey, Inc. (through November 30, 2011) in 2012 and 2011 were pre-approved in accordance with this policy and communicated to the remainder of the Board of Managers.

Table of Contents

PART IV

ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)(1) Financial Statements

The information required by this Item is included in *"Item 8. Financial Statements and Supplementary Data."*

(a)(2) Financial Statement Schedules

All schedules, for which provision is made in the applicable accounting regulations of the SEC, have been omitted because they are not required under the related instructions, are not applicable or the information has been provided in the consolidated financial statements or the notes thereto, included in "Item 8. Financial Statements and Supplementary Data.

(a)(3) Exhibits

Exhibits marked with an asterisk (*) are incorporated by reference to exhibits or appendices previously filed with the SEC, as indicated by the references in parentheses. All other exhibits are filed or furnished herewith. Our current, quarterly and annual Reports are filed with the SEC under File No. 333-172244. Our Registration Statements have the file numbers noted wherever such statements are identified in the following list of exhibits.

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.1* | Certificate of Formation of TMX Finance LLC, dated September 25, 2003 (Exhibit 3.1 to TMX Finance LLC's Registration Statement on Form S-4, dated February 14, 2011, is incorporated herein by this reference) |
| 3.2* | First Amendment to the Certificate of Formation of TMX Finance LLC, dated June 18, 2010 (Exhibit 3.2 to TMX Finance LLC's Registration Statement on Form S-4, dated February 14, 2011, is incorporated herein by this reference) |
| 3.3* | Amended and Restated Operating Agreement of TMX Finance LLC, dated June 21, 2010 (Exhibit 3.3 to TMX Finance LLC's Registration Statement on Form S-4, dated February 14, 2011, is incorporated herein by this reference) |
| 4.1* | Indenture, dated June 21, 2010, among TMX Finance LLC and TitleMax Finance Corporation as Issuers, the guarantors party thereto, and Wells Fargo Bank, National Association as Trustee and Collateral Agent, including the guarantee and the form of 13.25% senior secured note due 2015 (Exhibit 4.1 to TMX Finance LLC's Registration Statement on Form S-4, dated February 14, 2011, is incorporated herein by this reference) |
| 4.2* | First Supplemental Indenture, dated May 13, 2011, among TMX Finance LLC and TitleMax Finance Corporation as Issuers, the guarantors party thereto, and Wells Fargo Bank, National Association as Trustee and Collateral Agent, including the guarantee and the form of 13.25% senior secured note due 2015 (Exhibit 4.2 to TMX Finance LLC's Registration Statement on Form S-4, dated September 16, 2011, is incorporated herein by this reference) |
| 4.3* | Second Supplemental Indenture, dated June 5, 2012, among TMX Finance LLC and TitleMax Finance Corporation as Issuers, the guarantors party thereto, and Wells Fargo Bank, National Association as Trustee and Collateral Agent (exhibit 4.3 to TMX Finance LLC's Quarterly Report on Form 10-Q, dated August 20, 2012, is incorporated herein by this reference) |
| 4.4* | Third Supplemental Indenture, dated July 20, 2012, among TMX Finance LLC and TitleMax Finance Corporation as Issuers, the guarantors party thereto, and Wells Fargo Bank, National Association as Trustee and Collateral Agent (exhibit 4.4 to TMX Finance LLC's Quarterly Report on Form 10-Q, dated August 20, 2012, is incorporated herein by this reference) |
| 10.1* | Aircraft Reimbursement Agreement dated January 1, 2011, by and among TitleMax of Georgia, Inc., a Georgia corporation, TitleMax Aviation, Inc., a Delaware corporation, and TMXA, LLC, a Delaware limited liability company (Exhibit 10.3 to TMX Finance LLC's Registration Statement on Form S-4, dated February 14, 2011, is incorporated herein by this reference) |
| 10.2 | First Amendment to Aircraft Reimbursement Agreement dated January 1, 2012, by and among TitleMax of Georgia, Inc., a Georgia corporation, and TitleMax Aviation, Inc., a Delaware corporation |

73

Table of Contents

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.3* | Non-Exclusive Aircraft Lease Agreement dated January 1, 2011 by and between TitleMax Aviation, Inc. and TitleMax of Georgia, Inc. (Exhibit 10.4 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.4* | Servicing Agreement dated April 19, 2009 by and between EquityAuto Loan, LLC and TitleMax of Georgia, Inc. (Exhibit 10.5 to Amendment No. 2 to TMX Finance LLC's Registration Statement on Form S-4, dated April 19, 2011, is incorporated herein by this reference) |
| 10.5* | Real Estate Lease Agreement dated January 1, 2009 by and between TMX Investments, LLC and TitleMax of Missouri, Inc. (Exhibit 10.6 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.6* | Real Estate Lease Agreement dated September 1, 2008 by and between TY Investments, LLC and TitleMax of Georgia, Inc. (Exhibit 10.7 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.7* | Real Estate Lease Agreement dated September 1, 2008 by and between TY Investments, LLC and TitleMax of Georgia, Inc. (Exhibit 10.8 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.8* | Sublease Agreement dated August 29, 2008 by and among TitleMax of Georgia, Inc., EquityAuto Loan, LLC, and National Retail Properties LP (Exhibit 10.9 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.9* | Real Estate Lease Agreement dated September 1, 2008 by and between TY Investments, LLC and TitleMax of Missouri, Inc. (Exhibit 10.10 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.10* | Real Estate Lease Agreement dated January 1, 2009 by and between TY Investments, LLC and TitleMax of Mississippi, Inc. (Exhibit 10.11 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.11* | Real Estate Lease Agreement dated August 3, 2007 by and between TY Investments, LLC and TitleMax of Illinois, Inc. (Exhibit 10.12 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.12* | Real Estate Lease Agreement dated September 1, 2007 by and between TY Investments, LLC and TitleMax of Virginia, Inc. (Exhibit 10.13 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.13* | Real Estate Lease Agreement dated July 1, 2007 by and between TY Investments, LLC and TitleMax of Georgia, Inc. (Exhibit 10.14 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |

0689

| 10.14* | Real Estate Lease Agreement dated September 1, 2007 by and between TY Investments, LLC and TitleMax of Missouri, Inc. (Exhibit 10.15 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.15* | Real Estate Lease Agreement dated July 21, 2007 by and between TY Investments, LLC and TitleMax of South Carolina, Inc. (Exhibit 10.16 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.16* | Real Estate Lease Agreement dated November 20, 2007 by and between TY Investments, LLC and TitleMax of Missouri, Inc. (Exhibit 10.17 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.17* | Real Estate Lease Agreement by and between TY Investments, LLC and TitleMax of South Carolina, Inc. (Exhibit 10.18 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.18* | Real Estate Lease Agreement dated April 30, 2008 by and between TY Investments, LLC and TitleMax of Georgia, Inc. (Exhibit 10.19 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |

74

Table of Contents

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.19*† | Employment Offer Letter of Otto Bielss dated December 14, 2009 (Exhibit 10.22 to Amendment No. 1 to TMX Finance LLC's Registration Statement on Form S-4, dated March 30, 2011, is incorporated herein by this reference) |
| 10.20*† | Oral Compensation Agreement with Elizabeth C. Nelson, entered into on August 21, 2012 (TMX Finance LLC's Current Report on Form 8-K, dated August 27, 2012, is incorporated herein by this reference) |
| 10.21† | Employment Offer Letter of Douglas Marohn dated June 9, 2011 |
| 10.22† | Employment Agreement of Arthur Tretyak dated May 16, 2011 |
| 10.23† | Amended and Restated Phantom Stock Plan dated June 17, 2011 |
| 21.1 | Subsidiaries of TMX Finance LLC |
| 31.1 | Certification Pursuant to Rule 15d-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by the Chief Executive Officer |
| 31.2 | Certification Pursuant to Rule 15d-14(a) as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by the Chief Financial Officer |
| 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by the Chief Executive Officer |
| 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by the Chief Financial Officer |
| 101 | Interactive Data File: (i) Consolidated Balance Sheets as of December 31, 2012 and December 31, 2011; (ii) Consolidated Statements of Income for the Years Ended December 31, 2012, 2011 and 2010; (iii) Consolidated Statements of Cash flows for the Years Ended December 31, 2012, 2011 and 2010; and (iv) Notes to Consolidated Financial Statements |

† Executive compensation plan or agreement.

75

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: March 27, 2013

TMX FINANCE LLC
By: /s/ TRACY YOUNG
Tracy Young
Chief Executive Officer and Manager

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Tracy Young<br>Tracy Young | Chief Executive Officer and Manager (principal executive officer) | March 27, 2013 |
| /s/ Elizabeth C. Nelson<br>Elizabeth C. Nelson | Chief Accounting Officer (principal financial and accounting officer) | March 27, 2013 |
| /s/ Robert E. Pirkle | Manager | March 27, 2013 |

0690

Robert F. Pirkle

/s/ *John G. Kennedy, III*       Manager              March 27, 2013
John G. Kennedy, III

76

## Dates Referenced Herein *and* Documents Incorporated By Reference

| *This 10-K Filing* | *Date* | *Other Filings* |
|---|---|---|
| | 9/25/03 | |
| | 7/1/07 | |
| | 7/21/07 | |
| | 8/3/07 | |
| | 9/1/07 | |
| | 11/20/07 | |
| | 4/30/08 | |
| | 8/29/08 | |
| | 9/1/08 | |
| | 12/31/08 | |
| | 1/1/09 | |
| | 4/19/09 | |
| | 4/20/09 | |
| | 10/1/09 | |
| | 12/14/09 | |
| | 12/31/09 | |
| | 1/1/10 | |
| | 4/12/10 | |
| | 6/18/10 | |
| | 6/21/10 | |
| | 7/1/10 | |
| | 7/21/10 | |
| | 12/31/10 | |
| | 1/1/11 | |
| | 2/10/11 | |
| | 2/14/11 | S-4 |
| | 3/30/11 | S-4/A |
| | 4/19/11 | S-4/A |
| | 5/13/11 | |
| | 5/16/11 | |
| | 6/9/11 | |
| | 6/16/11 | |
| | 6/17/11 | |
| | 7/22/11 | |
| | 9/16/11 | S-4 |
| | 11/30/11 | |
| | 12/1/11 | |
| | 12/31/11 | 10-K, 8-K |
| | 1/1/12 | |
| | 5/1/12 | |
| | 5/16/12 | |
| | 6/5/12 | |
| | 6/18/12 | |
| | 6/27/12 | 8-K |
| | 7/20/12 | |
| | 7/27/12 | |
| | 8/20/12 | 10-Q |
| | 8/21/12 | 8-K |
| | 8/27/12 | 8-K |
| | 9/30/12 | 10-Q |
| | 10/17/12 | |
| | 10/31/12 | 8-K |
| | 12/15/12 | |

0691

# EXHIBIT C

0692

| | |
|---|---|
| **From:** | Powers, Sarah |
| **Sent:** | Wednesday, July 02, 2014 8:12 PM |
| **To:** | 'Geoff Gannaway'; Goebelsmann, Christina |
| **Cc:** | 'daniel.johnson@sutherland.com'; Wargo, Joseph D. |
| **Subject:** | RE: My motion |
| **Attachments:** | TMax--30b6 deposition notice to TMX Finance LLC.docx |

Geoff-

On June 25, you indicated that you intended to file a motion. We insisted on a meet and confer and you refused to change your position. When pressed as to the proposal for deposition limits, you only agreed to consider a "modest" increase from a proposal that would have resulted in LoanStar being able to take only approximately one or two additional depositions. Given your indication that you would only agree to a "modest" limitation, we cannot agree, especially as additional evidence of TitleMax's wrongdoing continues to emerge. If you are willing to change your position, we may be able to come to an agreement.

However, in a good-faith effort to compromise, we have significantly revised and narrowed the proposed 30(b)(6), attached in redline for your convenience. This draft is directed to TMX Finance LLC; if we are able to come to an agreement, we will also prepare similar notices to TMX Finance TX and TitleMax TX. As discussed before, we may be able to further narrow the topics if you are willing to agree to accept additional interrogatories in the alternative.

We remain willing to discuss.

Sincerely,


**Sarah F. Powers**
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6453 (direct)
Facsimile: (310) 853-6333
E-Mail: spowers@wargofrench.com
Website: www.wargofrench.com


WARGO
FRENCH
Atlanta I Los Angeles I Miami

The information in this message is intended for the addressee only and may contain privileged and confidential information. If you are not the intended recipient, please immediately stop reading this message, delete it from your system and notify the sender at spowers@wargofrench.com that it has been deleted. Any unauthorized reading, distribution, dissemination, copying, or other use of the information in this message is strictly prohibited.


**From:** Geoff Gannaway [mailto:ggannaway@beckredden.com]
**Sent:** Wednesday, July 02, 2014 5:19 PM
**To:** Powers, Sarah; Goebelsmann, Christina

1

**Cc:** 'daniel.johnson@sutherland.com'
**Subject:** My motion

Is there any word yet on any alternate proposal for deposition limits, or on a revised list of corporate rep topics, per our discussion on Monday? As I indicated, I would like to get my motion on file this week, so I need to hear from you soon.

**GEOFF GANNAWAY**
Partner

# Beck|Redden

Beck Redden LLP
1221 McKinney St., Suite 4500
Houston, TX 77010
Phone 713.951.6263
Fax    713.951.3720
ggannaway@beckredden.com
www.beckredden.com

2

0694

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE LOANS; | § | |
| and INTEGRITY TEXAS FUNDING, LP, | § | |
| | § | |
| | § | OF HARRIS COUNTY, TEXAS |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC., | § | 152nd JUDICIAL DISTRICT |

Defendants.

## PLAINTIFFS' NOTICE OF THE ORAL AND VIDEOTAPED DEPOSITION OF THE CORPORATE REPRESENTATIVE OF TMX FINANCE, LLC

To: Defendant, TMX FINANCE, LLC, by and through its attorney of record, David Beck, BECK REDDEN LLP, 1221 McKinney St., Suite 4500, Houston, Texas 77010.

Please take notice that, in accordance with Rule 199.2(b)(1) of the Texas Rules of Civil Procedure the deposition of one or more corporate representatives of TMX Finance, LLC ("TMX Finance") will be taken by Wargo & French LLP, counsel for Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans and Integrity Texas Funding, LP, at _____, on _____.

The deposition will continue from day to day until completed and will be taken by stenographic, as well as videographic, means by a certified court reporter.

TMX Finance's corporate representative will be requested to testify on behalf of the corporation on the topic(s) listed on the attached Exhibit A.

Respectfully submitted this \_\_\_\_ day of June, 2014.

SUTHERLAND ASBILL & BRENNAN LLP

By: _____

    Kent C. Sullivan (SBN 19487300)
    Daniel Johnson (SBN 24046165)
    Robert A. Lemus (SBN 24052225)
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

And

WARGO & FRENCH LLP
    Joseph D. Wargo (GA No. 738764)
    (Admitted *Pro Hac Vice*)
    Abigail J. Stecker (CA No. 284534)
    (*Pro Hac Vice* in Process)
999 Peachtree Street, N.E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: astecker@wargofrench.com

    Sarah F. Powers (CA No. 238184)
    (Admitted *Pro Hac Vice*)
    Christina L. Goebelsmann (CA No. 273379)
    (Admitted *Pro Hac Vice*)
1888 Century Park E Suite 1520
Los Angeles. California 90067
Telephone: (310) 853-6300
Facsimile: (310) 853-6333
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com

*Attorneys for Plaintiff*
*Wellshire Financial Services, LLC d/b/a*
*LoanStar Title Loans and*
*Integrity Texas Funding, LP*

2

0696

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the foregoing Notice of Oral and Videotaped Deposition in accordance with Rules 21a and 191.5 of the Texas Rules of Civil Procedure on June __, 2014.

_____

Daniel Johnson

3

0697

EXHIBIT "A"

## INSTRUCTIONS AND DEFINITIONS

1. The relevant timeframe for the topics listed is November 2010~~September 2011~~ to the present, unless otherwise indicated.

~~1.~~2. "Customers of Competitors" means the customers of any non-TitleMax car title lender in the state of Texas.

~~2.~~3. "Integrity" means Integrity Texas Funding, LP.

~~3.~~4. "LoanStar" means LoanStar Title Loans.

4. "TMX Finance TX" means Defendant TMX Finance of Texas, Inc. its successors, predecessors, divisions, subsidiaries, affiliates, present and former officers, agents, employees, and all other persons acting on behalf of Defendant TMX Finance of Texas, Inc. or its successors, predecessors, divisions, subsidiaries, and affiliates.

5. "TitleMax TX" means Defendant Titlemax of Texas, Inc. its successors, predecessors, divisions, subsidiaries, affiliates, present and former officers, agents, employees, and all other persons acting on behalf of Defendant Titlemax of Texas, Inc. or its successors, predecessors, divisions, subsidiaries, and affiliates.

6. "You," "your," or "TMX Finance" means Defendant TMX Finance, LLC, its successors, predecessors, divisions, present and former officers, agents, employees, and all other persons acting on behalf of Defendant TMX Finance, LLC or its successors, predecessors, or divisions.

~~4.~~5. "DataTrax" means www.Datatraxonline.com, betadatatraxdotnet.zebec.net, or any website used for the purpose of accessing DMV records that either (1) includes the term "datatrax" or (2) is owned or operated by Zebec, Inc.

~~5.~~6. "PublicData" means www.publicdata.com or any website used for the purpose of accessing DMV records that is owned and operated by The Source for Public Data, LP.

~~6.~~7. "DMV Databases" means any database or website that contains DMV Records, including but not limited to the following:

 a. DataTrax, www.Datatraxonline.com, betadatatraxdotnet.zebec.net, or any website used for the purpose of accessing DMV Records that either (1) includes the term "Datatrax" or (2) is owned or operated by Zebec, Inc.;

 b. PublicData, www.publicdata.com, or any website used for the purpose of accessing DMV records that is owned and operated by The Source for Public Data, LP; and

4

0698

c.  the Texas Department of Motor Vehicles website.

7.  "DMV Records" means records available through the DMV, no matter whether accessed through a third-party vendor or otherwise, and including personal information about an individual, such as home address and the holder of any liens on the individual's vehicle.

7.8.  "Litigation" means any action or proceeding in which You are alleged to have misappropriated or otherwise interfered with Customers of Competitors or lists of Customers of Competitors.

8.9.  "Loan" or "loans" means a loan secured by the title to a vehicle.

9.10.  "Marketing" means the action or business of promoting and selling products or services, including market research and advertising.  To "Market" means to promote or sell products or services.

10.11.  "Overlap List" means the overlap list of customers prepared by the Special Master appointed in this action and transmitted to the parties on or about December 16, 2013.

11.12.  "Refinance" or "refinances" means a loan secured by the title to a vehicle that involves the replacement of an existing loan on the vehicle.

12.13.  "Parent Company" means any company or companies that hold an ownership interest in You, whether through ownership of stock, membership interests, or otherwise.

14.  "Subsidiary" means any company with operations and/or offices in Texas in which You own more than 50% of the stock or membership interests, or that You otherwise control..

13.15.  "TitleMax" means the car title loan company or companies operating under the brand name TitleMax.

14.16.  "Affiliate" means any company with operations and/or offices in Texas that is not a Parent Company or Subsidiary, but that is related to You in one or more of the following ways:

a.  Any company in which You own less than 50% of the stock or membership interests; or

b.  Any company that is controlled or more than 50% owned by Your Parent Company.

15.17.  "TMX StoreNumber" means the number appearing on the Overlap List under the column labeled "TMX StoreNumber."

16.18.  "Person" means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

5

0699

17.19. "Possession, custody, or control" of an item means that the person either has physical possession of the item or has a right to possession equal or superior to that of the person who has physical possession of the item.

18.20. "Refer" or "relate to" means as well as tenses thereof, mean, refer to and include any tangible thing which is in any way relevant, refers, reflects, memorializes, evidences, contains, embodies, constitutes, states, identifies, describes or pertains to all, or any portion of, the specified facts, contentions, statements and describe categories of documents requested and subject matters thereof.

19.21. "Document" means all written, typed, or printed matters, and all magnetic, electronic, or other records or documentation of any kind or description in your actual possession, custody, or control, including those in the possession, custody, or control of any and all present or former directors, officers, employees, consultants, accountants, attorneys or other agents, whether or not prepared by you, that constitute or contain matters relevant to the subject matter of the action.

20.22. "Identify" or "describe," when referring to a person, means you must state the following:

    a.    The full name.

    b.    The present or last known residential address and residential telephone number.

    c.    The present or last known office address and office telephone number.

    d.    The occupation, job title, employer, and employer's address at the time of the event or period referred to in each particular interrogatory.

    e.    In the case of an entity, identify the officer, employee, or agent most closely connected with the subject matter of the interrogatory and the officer who is responsible of supervising that officer or employee.

21.23. "Identify" or "describe," when referring to a document, means you must state the following:

    a.    The nature of the document (e.g., letter, handwritten note).

    b.    The title or heading that appears on the document.

    c.    The date of the document and date of each addendum, supplement or other addition or change.

    d.    The identities of the author, signer of the document, and persons on whose behalf or at whose request or direction the document was prepared or delivered.

0700

e.    The present location of the document and the name, address, position or title, and telephone number of the person or persons having custody of the document.

~~22.~~24.  The terms "all," "any," and "each" shall each be construed as encompassing any and all.

## CORPORATE REPRESENTATIVE TOPICS

~~1.  Your authority to conduct business in the State of Texas.~~

~~2.~~1.  ~~Your corporate structure, including but not limited to:~~

    ~~a.  The ownership of Your stock;~~

    ~~b.  The identification of Your Parent Company;~~

    ~~c.  The structural relationship between You and Your Parent Company;~~

    ~~d.  Your ownership of stock in Subsidiaries and Affiliates;~~

    ~~e.  The identification of Your Subsidiaries and Affiliates;~~

    f.  The structural relationship between You and <u>TMX Finance TX and/or TitleMax TX</u>~~Your Subsidiaries and Affiliates~~;

        ~~The overlap of officer, director, managerial or other employment positions between You and Your Parent Company;~~

    ~~g.  and~~

~~h.~~ 2.    The overlap of officer, director, managerial or other employment positions between You and <u>TMX Finance TX and/or TitleMax TX</u>~~Your Subsidiaries and Affiliates~~.

Formatted: Indent: Left: 1", No bullets or numbering

Formatted: Indent: Left: 0.75", No bullets or numbering

Formatted: Indent: Left: 1", No bullets or numbering

Formatted: Indent: Left: 0.25", No bullets or numbering

~~3.  Your financial reporting in relation to Parent Company and Your Subsidiaries and Affiliates, including but not limited to:~~

    ~~a.  The frequency, nature, and content of Your Subsidiaries' and Affiliates' income, taxation, quarterly, and annual reports;~~

    ~~b.  The manner and method of preparing Your Subsidiaries' and Affiliates' income, taxation, quarterly, and annual reports;~~

    ~~c.  Your involvement in the preparation or oversight of Your Subsidiaries' and Affiliates' income, taxation, quarterly, and annual reports; and~~

    ~~d.  Any of Your income, taxation, quarterly and annual reports that is consolidated with that of Your Subsidiaries or Affiliates.~~

~~4.~~2.  Your board of directors, officers, and managers, including but not limited to:

    a.  The identification of Your directors, officers, and managers;

7

b. The responsibilities of Your directors, officers, and managers relating to ~~TMX Finance TX and/or TitleMax TX~~Your Subsidiaries and Affiliates and/or Your Parent Company~~;

c. The relationship between Your directors, officers, and managers and the directors, officers, and managers of ~~TMX Finance TX and/or TitleMax TX~~Your Subsidiaries and Affiliates and/or Your Parent Company~~;

d. The date, length, participants, substance and content of any discussions at any of Your board of director meetings regarding any of Your marketing practices with respect~~, including but not limited~~ to solicitation of Customers of Competitors~~competitors' customers~~, buyouts of Customers of Competitors~~competitors'~~ loans, refinances of Customers of Competitors~~competitors'~~ loans, and searches of the DMV databases.

~~5.~~3.      The operations of TitleMax stores in Texas, specifically~~nature of Your business and daily operations in Texas, including but not limited to~~:

~~a. Your operations;~~

~~b. The identification of Your business units or departments;~~

~~c. The identification of Your business units or departments that share operations with Your Subsidiaries and Affiliates or Your Parent Company;~~

~~d.~~a. The locations of each TitleMax~~of Your~~ stores in Texas;

~~e.~~b. The dates that each TitleMax~~of Your~~ stores in Texas opened and, if applicable, closed;

~~f.~~c. The name and number of the district and region in which each TitleMax store is located;

~~g.~~d.      The annual, quarterly, and monthly performance and profitability of each of Your stores in Texas;

~~h. Identification of general managers and store managers that were paid any performance-based bonuses, including but not limited to any "profit bonus" or "new loan volume" bonus;~~

~~i.~~e. The identification by name, number, and geographical scope of each of Your districts in Texas;

~~j.~~f. The annual, quarterly, and monthly performance and profitability of each of Your districts in Texas;

~~k. Identification of district managers that were paid any performance-based bonuses, including but not limited to any "profit bonus" or "new loan volume" bonus;~~

~~l. The date(s) that district managers were paid any performance-based bonuses, including but not limited to any "profit bonus" or "new loan volume" bonus;~~

~~m.~~g.      The identification by name, number, and geographical scope of each of Your regions in Texas;

8

0702

n.h.    The annual, quarterly, and monthly performance and profitability of each of Your regions in Texas;

o.   ~~Identification of regional managers that were paid any performance-based bonuses, including but not limited to any "profit bonus" or "new-loan-volume" bonus;~~

p.   ~~The date(s) that regional managers that were paid any performance-based bonuses, including but not limited to any "profit-bonus" or "new-loan-volume" bonus;~~

q.   ~~Your source of revenue earned in Texas, including identification of all fees and charges associated with Your loans in Texas; and~~

r.   ~~Any trade or business that You refer, delegate, or otherwise submit to Your Parent Company, Your Subsidiaries or Affiliates, or any third party vendors.~~


6.4.    Your corporate policies and procedures with respect to marketing to Customers of Competitors, including but not limited to:

a.   Your method and manner of developing and adopting Your corporate policies and procedures with respect to marketing to Customers of Competitors;

b.   The identification of individuals and entities, including employees of TMX Finance TX and/or TitleMax TX~~Your Parent Company and/or Subsidiaries and Affiliates~~, involved in the development and/or adoption of Your corporate policies and/or procedures with respect to marketing to Customers of Competitors;

c.   ~~Your method and manner of developing and adopting corporate policies and procedures with Your Parent Company and/or Subsidiaries and Affiliates;~~

d.c. Your policies and procedures regarding the use of DMV Databases and DMV Records;

e.d. Your policies and procedures regarding the development, creation, drafting, review, and approval of marketing materials directed to Customers of Competitors, such as direct marketing mailers and flyers;

f.   ~~Your policies and procedures regarding budgeting, evaluating, analyzing performance metrics, and auditing of marketing plans and/or programs, specifically involving direct marketing with mailers and flyers;~~

g.e. Your policies and procedures relating to the creation, maintenance, and destruction of information in "marketing binders" or "buyout binders";

h.f. Your policies and procedures regarding audits of TitleMax~~Your~~ stores and the "marketing binders" located in each of the stores;

i.g. Your policies and procedures regarding buyouts of competitors' loans, marketing practices regarding buyouts of competitors' loans, and solicitation of competitors' customers in order to buyout competitors' loans;

9

0703

j.h. Your policies and procedures regarding ~~refinances of competitors' loans,~~ marketing practices regarding refinances of competitors' loans, and solicitation of Customers of Competitors~~competitors' customers~~ in order to refinance competitors' loans;

k.i. Your policies and procedures regarding the development of marketing practices by regional managers, district managers, store managers, assistant store managers, and customer service representatives;

l.j. The identity of each of Your employees who was responsible for or involved in the development, implementation, and/or approval of Marketing strategies, such as cold calling or lien searching with respect to marketing to Customers of Competitors;

~~m. The interaction of Your legal department and Your marketing department regarding the initiation and discontinuation of marketing practices, including practices involving the buyouts of competitors' loans, refinances of competitors loans, and searches of the DMV Databases by employees or third-party vendors for marketing purposes;~~

~~n. The interaction of Your legal department and Your marketing department Your Parent Company and/or Your Subsidiaries and Affiliates regarding the initiation and discontinuation of marketing practices, including practices involving the buyouts of competitors' loans, refinances of competitors loans, and searches of the DMV Databases by employees or third-party vendors for marketing purposes;~~

o.k. The sales or Marketing training or instruction You provided to Your employees and/or the employees of TMX Finance TX and/or TitleMax TX with respect to marketing to Customers of Competitors;

p.l. The compliance or noncompliance of Your employees and/or employees of TitleMax TX or TitleMax Finance TX with Your policies, rules, and/or codes of conduct related to marketing to Customers of Competitors~~sale and/or of Marketing of car title loans in the state of Texas~~;

q.m. Your policies and procedures regarding "customer tracker[s]" or "marketing trackers";[1]

r.n. Your policies and procedures regarding the retention of physical loan or customer files;

~~s. The compliance or noncompliance of Your employees and/or employees of TitleMax TX or TitleMax Finance TX with Your policies, rules, and/or codes of conduct related to the retention of physical or electronic documents and/or information.~~

7.5. Your policies and procedures relating to information technology, including but not limited to:

---

[1] *See* Ryan Dep. 16:7-12; 81:5-11; Sudduth Dep. 67:18-68:5.

10

a. Your policies and procedures regarding the retention of computer hard drives and the information and documents contained thereon;

b. Your policies and procedures regarding the use of computers and laptops that You own, possess, and/or control; and

c. Your policies and procedures regarding the maintenance of computers and laptops that You own, possess, and/or control, including but not limited to maintenance of the hardware and software;

d. Your policies and procedures regarding the retention and destruction of information contained on computers and laptops that You own, possess, and/or control when an employee discontinues his or her employment with You;

e. Your policies and procedures regarding the use of e-mail addresses You provide to Your employees;

f. Your policies and procedures regarding the maintenance of the accounts and e-mail addresses You provide to Your employees;

g. Your policies and procedures regarding the retention and destruction of sent, received, deleted, and draft email correspondence and documents received through the accounts for the e-mail addresses You provide to Your employees;

h. Your policies and procedures regarding the termination of access to computers and laptops that You own, possess, and/or control, and to e-mail addresses You provide to Your employees when an employee discontinues his or her employment with You.

~~9.~~6. Your knowledge of and the actions taken in response to your knowledge of Your employees and/or the employees of TitleMax TX or TitleMax Finance TX searching DMV Databases (using license plate numbers, lien holder information, or other similar information) for Marketing purposes, including but not limited to:

a. The scope of Your knowledge concerning Your employee's or and/or the employees of TitleMax TX or TitleMax Finance TX's use of DMV Databases to market to Customers of Competitors~~potential customers~~, including but not limited to the practice of obtaining license plate numbers from vehicles located in LoanStar parking lots and the prevalence of searching DMV Databases by lien holder;

b. The date and manner in which You acquired such knowledge;

c. Identification by name, title, position, and store of all of Your employees and/or the employees of TitleMax TX or TitleMax Finance TX that searched the DMV Databases for marketing purposes;

d. Identification of by name, title, position, and store of all of Your employees and/or the employees of TitleMax TX or TitleMax Finance TX that used the results of the searches of the DMV Databases for marketing purposes, including but not limited to the identification of all employees that sent Marketing materials to the individuals on the Overlap List;

11

0705

e. Your reimbursement or denial of reimbursement requests for expenses incurred by Your employees and/or the employees of TitleMax TX or TitleMax Finance TX ~~for the~~relating to use of the DMV Databases, ~~including but not limited to access fees, late fees, printing fees, report fees, and postage for mailing letters or flyers to prospective customers~~;

f. The actions taken, if any, in response to acquiring such knowledge and the identification by name, title, position, and store of all of Your employees and/or the employees of TitleMax TX or TitleMax Finance TX involved in carrying out those actions;

g. ~~The existence and identification of any of Your accounts with DMV Databases, including but not limited to any agreements between You and the DMV Databases; and~~

h. ~~The existence and identification of any accounts of of Your employees and/or the employees of TitleMax TX or TitleMax Finance TX with DMV Databases, including but not limited to any agreements between Your employees and/or the employees of TitleMax TX or TitleMax Finance TX, on the one hand, and the DMV Databases, on the other hand.~~

9. ~~Your efforts to investigate the conduct described in the November 15, 2012 letter from John McCloskey of Select Management Resources, LLC, to Vin Thomas of TMX Finance, LLC (the "Cease and Desist Letter"), and attached hereto as Exhibit A, including but not limited to:~~

a. ~~The dates of the each investigation;~~

b. ~~Identification of Your directors, officers, managers, regional managers, district managers, general managers, store managers, assistant store managers, customer service representative, or employees involved or participating in any such investigation;~~

c. ~~Individuals with whom Your directors, officers, managers, regional managers, district managers, general managers, store managers, assistant store managers, customer service representative, or employees communicated in the course of any such investigation;~~

d. ~~Internal discussions by and between any of Your directors, officers, managers, regional managers, district managers, general managers, store managers, assistant store managers, customer service representative, or employees relating to any such investigation;~~

e. ~~Facts discovered during any such investigation that support or undermine in any way the claims made by John McCloskey in the Cease and Desist Letter; and~~

f. ~~All communications with Your Subsidiaries or Affiliates, and/or employees relating to or as a result of any such investigation, including "remind[ing] all Texas managers" of Your position on the practices described in the Cease and~~

12

0706

~~Desist Letter, as set forth in the December 6, 2012 letter from Vin Thomas of TMX Finance, LLC to John McCloskey of Select Management Resources, LLC.~~

~~10. All financial information concerning each of Your loans on the Overlap List from the date each loan was originated to the present, including but not limited to:~~

~~a. Your revenue (in dollars) for each of Your loans on the Overlap List;~~

~~b. Your expenses (in dollars) for each of Your loans on the Overlap List;~~

~~c. Your total gross revenue and net profit (in dollars) for all of Your loans on the Overlap List from the earliest date that a loan on the Overlap List was originated to the present;~~

~~d. The identification of all documents or reports in Your possession, custody, or control evidencing or reflecting that You disbursed funds or issued checks to pay off any of Plaintiffs' loan when You originated each of Your loans on the Overlap List;~~

~~e. The disbursement of funds or issuance of checks to pay off Plaintiffs' loans for each of the loans on the Overlap List;~~

~~f. Monthly or other reports disclosing the volume (i.e., the total number) of new loans and refinances for each of Your stores on the Overlap List;~~

~~g.~~7. ~~The number and/or dollar amount of monthly sales for each of Your stores on the Overlap List;~~

~~h. Reports ranking employees by "new loan volume" or "sales" for all of the TitleMax TX or TMX Finance TX stores appearing on the Overlap List;[2]~~

~~i. Your monthly volume (i.e., the total number) of new loans and refinances for each of the TitleMax TX or TMX Finance TX stores on the Overlap List.~~

~~11.~~8. Your involvement in ~~l~~Litigation in the state of Texas, including but not limited to:

   a. Identification of ~~L~~litigation currently pending in the state or federal courts located in Texas in which You are a named party;

   b. The causes of action in the ~~l~~Litigation currently pending in the state or federal courts located in Texas in which You are a named party;

   c. The current status of the ~~L~~litigation currently pending in the state or federal courts located in Texas in which You are a named party;

   d. Identification of ~~L~~litigation filed or pending in the state or federal courts located in Texas in the last five (5) years in which You were a named party;

   e. The causes of action in the ~~L~~litigation filed or pending in the state or federal courts located in Texas in the last five (5) years in which You were a named party; and

---

~~[2] See Hadden Dep. 22:16-24.~~

13

0707

f. The status of the Litigation filed or pending in the state or federal courts located in Texas in the last five (5) years in which You were a named party.

12. The identification of the entity paying legal bills associated with the above-captioned litigation, and the source of the funds used to pay such legal bills.

14

0708

# EXHIBIT D

0709

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES,   *  IN THE DISTRICT COURT
LLC, d/b/a LOANSTAR TITLE        *
LOANS and INTEGRITY TEXAS       *
FUNDING, LP                         *
                             *
VS.                        *  HARRIS COUNTY, TEXAS
                             *
TMX FINANCE HOLDINGS, INC.;     *
TMX FINANCE, LLC; TMX FINANCE *
OF TEXAS, INC.; TITLEMAX OF     *
TEXAS, INC.; FELIX DELEON;      *
AND ISHMAEL HERNANDEZ       *  152ND JUDICIAL DISTRICT

************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES ARTHUR GRIFFIN

MAY 23, 2014

VOLUME 1

************************************************

ORAL AND VIDEOTAPED DEPOSITION OF JAMES ARTHUR GRIFFIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 9:08 a.m. to 2:09 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Q. What did you discuss?

A. What I thought this was all about.

Q. And what did you think this was about?

A. Aggressive marketing tactics.

Q. What other discussions did you have with your family?

A. That's it. Just the fact that I had to come down and talk about aggressive marketing tactics.

Q. Who in your family was present for that conversation?

A. My wife and my middle daughter.

Q. And what are their names?

A. Cathy, with a C, Griffin.

Q. And your daughter's name?

A. Devin Montiel, M-o-n-t-i-e-l.

Q. You had mentioned that you spoke with your family about aggressive marketing tactics. What did you mean by that?

A. Because I saw the name LoanStar on the -- on the paperwork, I assumed that we were going to talk about PublicData.com and targeting their specific customers.

Q. And why did you make that assumption?

A. We had been using PublicData.com for I'm going to guess a year or so, and then we had been asked to

not do that anymore, and rumor had it it was because LoanStar was upset with us for doing that..

Q. When you say "we," who are you referring to?

A. TitleMax stores in general.

Q. All the stores in Texas?

A. I don't know about all the stores in Texas.

MR. GANNAWAY: Object to form. I'm sorry.

THE WITNESS: I'm not sure that all the stores in Texas were using it, but it was a -- it was a directive that was given to stores and a tool that was out there.

Q. (By Ms. Goebelsmann) Which stores was that directive given to?

MR. GANNAWAY: Object to form.

THE WITNESS: For sure the stores in Austin. It was a -- it was used some when I was in training in the Dallas/Fort Worth area, as well.

Q. (By Ms. Goebelsmann) You had indicated that PublicData had been used for one year. When did it start to be used?

MR. GANNAWAY: Object to form.

THE WITNESS: I don't know when it started. I interviewed with the company in late September, early October of 2011, and I asked

specifically about marketing plans, and I was told then during the interview process that we had access to a program that would tell us if a customer had a loan somewhere else and we could then target that customer, so I know it was at least in use or known of at that time.

Q. (By Ms. Goebelsmann) Who did you speak with that told you this?

A. Harold Landers.

Q. Who is Harold Landers?

A. He was a regional manager at the time.

Q. Regional manager where?

A. For TitleMax.

Q. Was he in a particular district or region?

A. Texas. I don't -- I don't remember how the entire Texas market broke out, but he was DFW and Austin for sure.

Q. Was there anyone else present for this conversation?

A. There was not.

Q. When did you start using PublicData?

A. I'm going to guess March or April of 2012.

Q. When did you stop using PublicData?

A. February, late February, early March of 2013.

Q. Why did you stop using PublicData?

A.    I left the company.  Can I elaborate on that?

Q.    Yes.

MR. GANNAWAY:  Object to form.

THE WITNESS:  The last two months or so, two or three months, it was not used for targeting specifically LoanStar customers.  PublicData.com, if you're not familiar with it, allows you to key in a license plate number, and it will tell you if anyone has a lien on their vehicle.  So I would ride through parking lots and jot down license plate numbers in places that those types of customers might frequent, just to have some type of database to work off of.

MR. GANNAWAY:  I'll object to responsiveness.

Q.    (By Ms. Goebelsmann)  Did anyone tell you to stop using PublicData?

A.    For targeting LoanStar customers, yes.

Q.    Who told you that?

A.    That I believe came out in an e-mail from our district manager, Patrick Sudduth.

Q.    When did he tell you that?

A.    I'm going to guess November, December 2012.

Q.    Do you have a copy of that e-mail with you?

A.    I do not.

Q.    Do you have a copy of that e-mail in your

A. Mayumi, who I'm still friends with, shared with me that she had an attractive assistant manager that worked for her and she felt like Gary was flirting and hitting on not only her, but the other ladies that worked for -- that worked for him.

Q. Who was the assistant manager who worked with Mayumi?

A. I don't remember her name.

Q. When you were working with TitleMax, how often did you communicate with your supervisors?

A. Daily for the most part.

Q. And how would you communicate?

A. It's probably 50/50 split between e-mail and telephone.

Q. Did you send e-mails to Andy H?

A. When I was in training in Arlington I would have sent e-mails to him, yes.

Q. Would you have asked questions about marketing practices?

A. We would have reviewed marketing practices. At the time I was so new that I don't know that I would have been in a position to ask good, intelligent questions about marketing.

Q. Did you send e-mails to Gary Jackson?

A. Absolutely.

Q. Did you send him e-mails regarding marketing practices?

A. Sure.

Q. Did you send any e-mails to him regarding PublicData?

A. I'm sure that information would have been in my marketing practices. I don't recall sending an e-mail to him just about PublicData.

Q. What do you mean that information would have been in your marketing practices?

A. We had to break down by day what our marketing plan was and PublicData was a -- was a big part of our marketing plan.

Q. When you say you have a breakdown by day, what is that?

A. Monday through Saturday. We were expected to market six days a week, and we had to explain on what day and approximately what time and for how long we were going to do what activities.

Q. Was this a written schedule?

A. It was a written plan. Business oftentimes dictated how closely you stuck to that, but it was a -- it was an estimate on what your next week's marketing practices would be.

Q. Did you share this with your district manager?

kind of a novelty to be able to get into PublicData and use it for the first time.

Q. Why was it a novelty?

A. At the time it seemed like an easy way to start generating a lot of business.

Q. What did Harold Landers tell you about PublicData during your interview in November 2011?

A. He did not call it PublicData. I asked about marketing plans and how stores would market their business, and he said that we now have the capability of going into a program, typing in a license plate number, and it will tell us if a person has a loan and at what competitor and we can go -- in his words, we can actually go knock on the customer's door and talk to them about our services. I didn't feel comfortable doing that, so I did the mailers.

MR. GANNAWAY: Object to responsiveness.

Q. (By Ms. Goebelsmann) I may have misstated earlier. When did you have your conversation with Harold Landers?

A. Late September, early October.

Q. So this conversation you just conveyed was in late September 2011?

A. Or early October, correct.

Q. Did you speak with Harold again about

PublicData or using the license plate information in the manner that he had described?

A.    Not directly, no.

Q.    Did you ask anyone about it during your training period?

A.    I did.

Q.    Who did you ask?

A.    Gary Jackson at the time was my training GM, and again, I did not know the name of the other website, but I just -- I mentioned to him that Harold had brought this up, and he said, yes, that's something that some guys are using.

Q.    Did he indicate to you who was using it?

A.    He did not.

Q.    Do you know what areas the PublicData database was being used in?

MR. GANNAWAY:  Object to form.

THE WITNESS:  Not for sure.

Q.    (By Ms. Goebelsmann)  Where did you believe it was being used?

MR. GANNAWAY:  Object to form.

THE WITNESS:  The Dallas/Fort Worth area.

Q.    (By Ms. Goebelsmann)  And why did you believe that?

A.    Because in asking Gary about it he had

No. 2013-33584

District Court of Harris County, Texas

152nd District

Wellshire Financial Services, LLC dba Loanstar Title Loans and Integrity Texas Funding, LP

Vs.

TMX Finance Holdings, Inc.,

TMX Finance LLC; TMX Finance of Texas Inc.; Titlemax of Texas, Inc.

Excerpts from the

ROUGH TRANSCRIPT OF THE DEPOSITION OF RANDY RAINEY

July 8, 2014 at 9am

Christina Goebelsmann, Wargo French LLP for Plaintiffs

Bryon Rice, Beck Redden for Defendants

0719

"yes"?

A. Yes.

Q. Okay. And did you ever hear of a technique of writing down license plate numbers in parking lots?

A. Yes.

Q. And who did you hear that from?

A. Tom Griffin.

Q. And when did you hear that?

A. Within a week or so after being hired.

Q. So did Tom tell you about the writing down of license plate numbers as part of your training?

MR. RICE: Objection, form.

A. He stated that this was something he was doing, and I actually went with him several times to do it at a couple of different locations. So I actually -- he actually showed me how to do that.

Q. And where did you go on those several times that you accompanied him?

A. There was -- We went probably two times -- maybe three, but I think at least two times to a competitor that's on Forest Lane and Central Expressway, and that's the -- that's Texas Title, like red and yellow. It's really close to where I live. I live on the other side of the freeway.

And another place, I believe it's on

Buckingham and Belt Line, same company.

And another place on Central Expressway somewhere between -- it's on the west side of Central Expressway, somewhere between, like, Spring Valley and Alpha, somewhere in -- somewhere around there, within a mile or half mile. And it was, like, a little odd -- very odd little mom-and-pop kind of place. It was, like, in a weird little office at the end of, like, a motel. I don't know the name of that place.

Q. Was that an auto title loan company?

A. I don't know everything -- They did auto loans, the title loans, but I -- they may have had other loan services as well. I'm not sure.

Q. Were there any other places that you accompanied Tom where you would be writing down license plate numbers?

A. If there is, I don't recall. Just those the three that I recall.

Q. Okay. And those three times you accompanied him, during what month and year did that occur?

A. It would have been within the couple weeks after I was -- within a week to two weeks after I was hired; and I would say somewhere between the second and fourth, fifth week --

Q. Okay. You --

0721

No. 2013-33584

District Court of Harris County, Texas

152nd District

Wellshire Financial Services, LLC dba Loanstar Title Loans and Integrity Texas Funding, LP

Vs.

TMX Finance Holdings, Inc.,

TMX Finance LLC; TMX Finance of Texas Inc.; Titlemax of Texas, Inc.


Excerpts from the

ROUGH TRANSCRIPT OF THE DEPOSITION OF MIGUEL MARTINEZ

July 8, 2014 at 2pm

Christina Goebelsmann, Wargo French LLP for Plaintiffs

Bryon Rice, Beck Redden for Defendants

searches?

A. No.

Q. Do you remember who first told you about the PublicData searches?

A. There was a guy named Ray. He told Wendy and Wendy told me. And then it was discussed at -- on one of our conferences -- on one of our conference calls, and I know -- I know at least Andy was aware of it.

Q. So you discussed the PublicData searches with Wendy and the other --

A. Yeah. She's the one that told me that that's what she was going to start doing, and that I should start doing it over at -- at the other North Richland Hills location.

Q. So to make sure that I have this clear: You first learned about the PublicData searches from Wendy?

A. Um-hmm.

MR. RICE: Objection, form.

A. Yes.

Q. (BY MS. GOEBELSMANN) And when did you have that conversation with Wendy?

A. When I was there training.

Q. And Wendy was your trainer?

A. Well, yeah, for the Texas -- I guess kind of

0723

just getting me introduced to how to do loans in Texas, so for those couple weeks. So basically I got there and the first thing they did was make me go out and market for Wendy. So I was out there marketing.

And then we were discussing my move to the new store when -- you know, when I was going to be taking over that, and she was telling me that, "Hey, this is what Ray in Euless is doing."

Q. Okay. So you first learned about PublicData when you were working with Wendy in or about August or September 2011 --

A. Yes.

Q. -- is that right?

MR. RICE: Objection, form.

Q. (BY MS. GOEBELSMANN) And had Wendy been using the PublicData searches prior to that point in time?

MR. RICE: Objection, form.

A. No. She wasn't using it through her computer. She was actually getting -- She would call Ray and Ray would pull up the information for her, because Ray's the one that had, I guess, the access to that PublicData.

Q. (BY MS. GOEBELSMANN) Okay. How long had Wendy been receiving search results from Ray, to your knowledge?

MR. RICE: Objection, form.

No. 2013-33584

District Court of Harris County, Texas

152nd District

Wellshire Financial Services, LLC dba Loanstar Title Loans and Integrity Texas Funding, LP

Vs.

TMX Finance Holdings, Inc.,

TMX Finance LLC; TMX Finance of Texas Inc.; Titlemax of Texas, Inc.

Excerpts from the

ROUGH TRANSCRIPT OF THE DEPOSITION OF ANTONIO AMADO

July 9, 2014 at 8am

Sarah Powers, Wargo French LLP for Plaintiffs

Bryon Rice, Beck Redden for Defendants

A. Before I had started, there is a general manager, Denny, I think his first name was. I don't recall his last name. I was told that he had done that.

Q. Okay. What store was Denny at, if you recall?

A. He was on the store on North -- Northwest Military, just up the road from here.

Q. Do you know what number that is?

A. Not off the top of my head, I'm sorry. I want to say 5, maybe SA-5, SA- -- SA-5 -- perhaps SA-5. I know SA-1 is on San Pedro. SA-7 was on Blanco, and that was not in our district under Bill Kretschmer. That was under Eric Bullis. He was our district manager, different district.

Q. From -- from whom did you hear that Denny was using the practice of locating lic- -- or using license plate numbers to locate customers?

A. CSRs, CSRs that had worked in different stores that had known him, that had been through my store. I'm trying to remember their names. And the reason that came up is the company had sent out -- I was no longer at SA-18. I was then promoted to Castle Hills 1, which is in a different district, here on Blanco. And the company had sent out an e-mail, a company-wide e-mail, advising of litigation between Integrity and TitleMax. So there was

employees collecting license plate numbers to locate

prospective customers by employees at the Windcrest store?

MR. RICE: Objection. Form.

THE WITNESS: Windcrest store, no, ma'am.

BY MS. POWERS:

Q. Okay. And what about the Stone Oak store?

MR. RICE: Objection. Form.

THE WITNESS: Stone Oak, I'm trying -- no, ma'am.

BY MS. POWERS:

Q. And what -- what store is San Antonio 3, if you recall?

MR. RICE: Objection. Form.

THE WITNESS: I believe SA-3 is Stone Oak, if I'm not mistaken.

BY MS. POWERS:

Q. Other than Denny, did you ever hear of any TitleMax employee using license plate numbers to locate prospective customers?

MR. RICE: Objection. Form.

THE WITNESS: Yes. Brigitte. Brigitte, but I don't know -- I don't remember her last name either, and she was at the store on 281 and Blanco. And we had heard that from her store manager, Nick, but I don't know Nick's

NO. 2013-33584

| WELLSHIRE FINANCIAL SERVICES, | * | IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE | * | |
| LOANS and INTEGRITY TEXAS | * | |
| FUNDING, LP | * | |
| | * | |
| VS. | * | HARRIS COUNTY, TEXAS |
| | * | |
| TMX FINANCE HOLDINGS, INC.; | * | |
| TMX FINANCE, LLC; TMX FINANCE | * | |
| OF TEXAS, INC.; TITLEMAX OF | * | |
| TEXAS, INC.; FELIX DELEON; | * | |
| AND ISHMAEL HERNANDEZ | * | 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES ARTHUR GRIFFIN

MAY 23, 2014

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JAMES ARTHUR GRIFFIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 9:08 a.m. to 2:09 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

which has a Bates number at the bottom of TMX_001338,
the bottom two-thirds of that page appears to be an
e-mail from Patrick Sudduth, correct?

MR. GANNAWAY: Object to form.

THE WITNESS: No. I'm on the second
page. The bottom two-thirds appears to be an e-mail
sent from Todd to Patrick.

Q. (By Ms. Goebelsmann) I'm sorry. You appear
to be correct. So the bottom two-thirds of this page
is dated September 15, 2012, at 1:33 p.m. from
TMX-Austin-TX20, correct?

A. Correct.

Q. And who is TMX-Austin-TX20?

A. The store on South Lamar.

Q. And you mentioned Todd. Who is Todd?

A. Todd is another general manager that I bounced
ideas off of, marketing ideas.

Q. Can you please read the text of Todd's e-mail
into the record?

A. "I created a database using the data that we
got from PublicData.com" --

THE REPORTER: Could you read a little
slower, please?

THE WITNESS: "I created a database using
the data that we got from PublicData.com using the

license plates from cars parked at our competition, Texas Title next door. I have about 20 names and addresses in that database, and all have liens on their titles according to PublicData. I then created this form letter and used mail merge to merge in the names and addresses information from the Excel database to personalize the letter. I'm mailing them out today. Todd."

Q. (By Ms. Goebelsmann) The e-mail directly above that towards the middle of the page is from Patrick Sudduth, correct?

A. Correct.

Q. And it appears to be a response to TMX-Austin-TX20, correct?

A. It is.

Q. Can you please read what that e-mail states?

A. "Good idea. Do you mind sharing this with everybody?"

Q. If you turn back to the first page of Exhibit 3, all the way at the bottom there's a date line of September 15, 2012, at 1:40 p.m. Can you please read what that e-mail states?

A. "Patrick asked me to share this idea with everyone." Smiley face. "Feel free to call me if you have questions on how to set it up. Todd."

Q. And immediately above that there is an e-mail from Patrick Sudduth dated September 15, 2012, at 1:42 p.m. Can you please read into the record what that response states?

A. "Call Todd. There is no reason not to do this."

Q. And then finally at the top of the page is an e-mail from TMX-Austin-TX13. Was that you?

A. It was.

Q. What did your e-mail say?

A. "Same thing here. We had our first buyout from this last month. We continue to work our competitors' parking lots, and on single coverage days we check license plates of cars that come into our parking lot."

Q. What did you mean when you said, "Same thing here"?

A. That we are using PublicData.com to generate a mailing list based upon license plate numbers that we get from our competition.

Q. So you were doing the same thing that Todd indicated that he was doing at the bottom of page 2 of Exhibit 3?

A. Correct.

Q. And that involved the use of PublicData,

correct?

A. Correct.

Q. Collecting license plate information from cars parked in the lots of competitors?

A. Correct.

Q. Creating a database of information based upon those license plates?

A. Correct.

Q. Sending letters to customers?

A. Correct.

Q. Using mail merge to send those letters?

A. I did not use mail merge.

Q. How did you send letters?

A. On the last page is an example of a -- an insert that I created, and as I put in the data I would put checkmarks, yes for instant approval; yes for no credit check; yes, you get your money in 30 minutes or less; yes, you can get money for car repairs, rent, vacation, or cash for peace of mind.

Q. So page 4 of this exhibit is a mailer that you had created?

A. Yes.

Q. And that mailer was attached to your e-mail dated September 15, 2012?

A. Yes.

A. Well, I would print out a screen shot from PublicData anytime I got one that had a competitor's lien information on it. So I would -- if it was Jim Griffin, it would be Jim Griffin. It was addressed specifically to that person at that address.

Q. When did you start collecting license plate information from cars parked in competitors' parking lots?

A. As early as February of 2012 when I was working at Austin 5 through Annette Martinez's account.

Q. How did you get the idea to obtain information using the license plates in competitors' parking lots?

A. This was, again, an idea that was brought up in an interview that I had with Harold Landers as early as September, October 2011.

Q. Why did you wait until February 2012 to start using that practice?

A. That was the first time that the actual nuts and bolts of the practice had been explained to us. As I mentioned earlier, Harold didn't even give me the name of the website that they were using. He just walked me through how they were kind of using this website to get competitors' information. When I asked Gary about it he said yes, he was aware of it, but he wasn't using it, but he knew of other guys in the

district that were.

So finally in roughly February -- January, February of 2012 the information was shared with Annette who then shared it with us and that --

Q. How did you know the information was shared with Annette?

A. There was a visit that day. As I remember it, it was Gary Jackson and Harold Landers, and they had encouraged her to sign up for a PublicData.com account.

Q. Were you present for that visit?

A. I was in the store, but I was not part of the conversation.

Q. Did you hear the conversation?

A. I did not.

Q. How did you know what happened during the conversation?

A. Annette recapped it once the -- once everyone left.

Q. When did you first hear the name PublicData?

A. I'm thinking it was that same conversation.

Q. And why do you think that?

A. Again, Harold couldn't even articulate the name of the website, and when I brought it up to Gary because I had not yet heard the name of the website, I couldn't tell him what it was either. I just explained

to him what I had been told by Harold, and he said yes, some people are using it, but it was not being used there by him.

Q. When Annette recapped the conversation that she had with Harold and Gary, what did she tell you?

A. There's a lot of excitement in her voice. Again, we felt like it was a -- it was going to be an easy way to start driving a lot of business, and she said, hey, this is what everyone's been talking about. It's PublicData.com. You sign up for an account, and you can key in license plate numbers and you'll get lien information. And she signed up for the account right there. I mean, we did it in the store looking over her shoulder just to see how it was going to work.

Q. When you said "we did" --

MR. GANNAWAY: Object to responsiveness. I'm sorry.

Q. (By Ms. Goebelsmann) When you said "we did it in the store looking over her shoulder," who is the "we"?

A. I believe Paul Walton was part of that conversation, as well, or part of that group.

Q. Were Harold or Gary present?

A. Not at the time I don't believe they were, no.

Q. Did Annette report back to Harold and Gary

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT * * * * * |
| Plaintiffs | * * |
| VS. | * HARRIS COUNTY, TEXAS * |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | * * * * * * |
| Defendants | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD TODD HALE

MAY 15, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD TODD HALE, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 15th of MAY, 2014 from 9:06 a.m. to 2:50 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Sutherland Asbill & Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis

A.    No, ma'am.  I took that form of letter and customized it as I was instructed to do with my store's contact information.  But I did not create the original letter.

Q.    Do you know who did create it?

A.    No, ma'am.

Q.    When you say you took it and customized it as you were instructed to do, who gave it to you and instructed you to customize it?

A.    I -- I don't remember exactly.  I really don't.  I mean, it came from -- I don't even remember if it came from one of the general managers or if Patrick gave it to me.  But somehow I got a copy of one of the letters that one of the other stores was using, and Patrick instructed me to customize it with my store's information.

Q.    Okay.  You don't know who gave the letter to you, but Patrick was the one who instructed you to customize it; is that correct?

A.    Well, yes.  And not only that -- I'm just -- again, to clarify it, Patrick was the one that instructed me to do all this stuff as is evident by all of the other documents.

            MR. GANNAWAY:  Object as nonresponsive.

            (Brief interruption.)

            MR. GANNAWAY:  Oh, I'm sorry.  Thank you.

Q. And so Patrick approved of the use of this letter, correct?

A. Oh, absolutely.

MR. GANNAWAY: Object to the form; leading.

Please repeat your answer.

A. Yes, he did.

Q. Okay. And turning back to the very first page of this exhibit marked 1337 at the bottom, in fact, Patrick Sudduth forwarded this plan to all of the Austin stores; correct?

A. Yes, ma'am. And I would clarify again reading through the e-mail, he specifically says, "Call Todd. There is no reason not to do this."

MR. GANNAWAY: Object as nonresponsive.

Q. And when he says there is no reason not to do this, the this was canvassing parking lots to obtain license plate numbers of competitors' customers and then looking up their D.M.V. information in order to market it them?

MR. GANNAWAY: Object to form and leading.

A. Yes.

Q. And as we discussed earlier, there's a strict chain of command at TitleMax; correct?

A. Yes, ma'am.

Q. So if your district manager tells you that it's okay, you understand that this is consistent with company policy; correct?

A. Yes, ma'am.

Q. Okay. And, in fact, you weren't just receiving approval from your manager; he was telling everybody he supervised right in front of you to do the same thing; correct?

A. Exactly, which is --

MR. GANNAWAY: Object to form and leading before you respond.

A. Okay. That's fair enough. But and that's why I feel confident in being able to say as I'd said earlier when I would say we were because there's a lot of documentation that demonstrates that it wasn't just me that was being asked and required to do this. It was this was clearly going out to everybody was being asked and required to do this.

MR. GANNAWAY: I'll object as nonresponsive.

Q. And when he says, "Call Todd; there's no reason not to do this," did anyone ever call you in response to this?

A. Yes, ma'am.

Q. Okay. Who did?

A.    I don't remember specifically.  I think Jim did.  And, again, just to clarify on what he was referring to call Todd about, that was calling Todd about how to be able to use the information that we were already instructed to be using from the database and just mail it out easier by using the EXCEL spreadsheet and the mail merge.  That's the part that I played in terms of just making it easier to -- to mail it out.

Q.    So then was it your understanding that all of these stores that Patrick was e-mailing here were already using Public Data to get personal information of customers of competitors?

MR. GANNAWAY:  Object to form and leading.

A.    Yes, ma'am.

Q.    Okay.  And how did you develop that understanding?

A.    Well, several different ways.  I mean, clearly through all of the e-mail chains that everybody already has copies of, that's pretty evident.  And then just from talking to them.  As a matter of fact, there is one of the other -- and that's documented in one of the other e-mails.  I'm paraphrasing.  But one of the other -- and in response to this e-mail, one of the other managers says -- And I'm paraphrasing -- we're already doing that. I got that idea from somebody else a long time ago.

# Tab T

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS, and d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP, | § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | OF HARRIS COUNTY, TEXAS |
| v. | § § § | |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX OF TEXAS, INC., | § § § § § | |
| *Defendants.* | § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANTS TMX FINANCE LLC, TMX FINANCE OF TEXAS, INC., AND TITLEMAX OF TEXAS, INC. TO REQUESTS FOR PRODUCTION OF DOCUMENTS

COME NOW Plaintiffs Wellshire Financial Services, LLC d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans and Integrity Texas Funding, LP, (collectively, "LoanStar") and hereby move this Court for an order compelling Defendants TMX Finance LLC, TMX Finance of Texas, Inc., and TitleMax of Texas, Inc. (collectively, "TitleMax") to respond to requests for production of documents, and show the Court as follows:

### I.   INTRODUCTION

By now, it is patently clear that TitleMax has no compunction about wasting this Court's resources, and instead seeks only to obstruct LoanStar's discovery efforts at every turn, in furtherance of its mission to halt the progress of this case. Indeed, once again TitleMax refuses

to produce information directly relevant to LoanStar's claims, raising meritless relevancy and breadth objections as to requests narrowly tailored to lead to the discovery of admissible evidence. Specifically, TitleMax refuses to provide any substantive response to requests seeking documents and communications directly reflecting TitleMax's illegal conduct as alleged in LoanStar's Petition, and the knowledge of and reaction to that conduct by TitleMax management. Similarly, TitleMax refuses to produce the hard drives for computers used by three employees who engaged in the marketing practices at issue, even though counsel for TitleMax has admitted in open court that at least one of the hard drives at issue appears to contain responsive information not produced in the litigation.

Given that the discovery requests seek information going to the core of LoanStar's claims, TitleMax's objections must be seen for what they are—the latest step in its campaign to delay the litigation and prejudice LoanStar's efforts to establish its case. LoanStar should not be forced to turn to the Court and consume valuable Court resources each and every time TitleMax defaults on its obligations under the Rules of Civil Procedure. Because TitleMax's latest refusal to participate in the discovery process is just one in the line of many, and because TitleMax defies even express Court Orders,[1] the Court should award LoanStar its fees and costs in being forced to bring yet another discovery motion. As TitleMax has proven time and time again, anything less is insufficient to compel it to act.

## II.    BACKGROUND OF CASE AND EFFORTS TO MEET AND CONFER

Through the discovery process, LoanStar has successfully established that, just as it alleged (*see* Second Amended Petition ¶¶ 30-57), numerous TitleMax employees engaged in criminal conduct designed to steal LoanStar's customers. Specifically, TitleMax employees

---

[1] *See* LoanStar's Motion to Enforce Court Orders and For Sanctions filed on October 31, 2014, to be heard concurrently herewith.

2

would lurk in LoanStar and other parking lots to record vehicles' license plate and vehicle identification numbers, then use that information to search databases containing motor vehicle records ("DMV Databases") to illegally obtain contact information for the purpose of marketing their services to the owners of the vehicles, including numerous LoanStar customers. TitleMax employees also would search DMV Databases by lienholder name to specifically target the customers of competitors, including LoanStar. TitleMax employees openly engaged in and discussed this conduct, which was in some cases directed by TitleMax management. (Ex. A [Deposition of Randy Rainey at 38-41; Deposition of Michael Ryan at 28-31; Deposition of Patrick Sudduth at 17-22; Deposition of James Griffin at 41-43; Deposition of Richard Todd Hale at 99-100].)

Thus, as part of its continuing discovery efforts, LoanStar served requests for production seeking documents and communications sent, received, or created by four higher-level TitleMax employees (the "Corporate Employees")[2] relating to the DMV Databases and LoanStar customers. In its responses, TitleMax asserts rote, boilerplate objections that are wholly inapplicable to the requests at issue, and further endeavors to rewrite the requests to seek narrower categories of documents than those requested. Moreover, despite counsel's representation that production would be made in the first week of November, TitleMax has not produced any documents to date.[3]

Likewise, TitleMax continues to refuse to produce the hard drives of the computers used by three employees who engaged in the illegal marketing practices at issue in this litigation— Felix DeLeon, Lucia Grajeda, and Todd Hale—even though TitleMax has defaulted on its

---

[2] The Corporate Employees are Tracy Young, Linda McDonald, Otto Biells, and John Robinson.

[3] Rather, the day before LoanStar filed this motion, TitleMax produced a privilege log respecting searches for the email account of only one of the Corporate Employees, Tracy Young.

3

0743

obligations to search the hard drives for relevant information. Indeed, notwithstanding the testimony of multiple TitleMax employees (including Hale himself) that the employees at issue possess relevant information, TitleMax has neither produced any records from these employees' computers nor even bothered to conduct a search of two of the hard drives. The one hard drive that was searched, Hale's, has apparently revealed responsive information. Indeed, TitleMax has now represented twice in open court that a search of Hale's computer by counsel located a spreadsheet containing a list of names that may be responsive to an outstanding discovery request, and that it would produce the same. (Ex. B [September 22, 2014 Hearing Transcript at 81-82; October 10, 2014 Hearing Transcript at 59].) But when LoanStar later requested the promised production, TitleMax backtracked on its representations to the Court and refused to produce the spreadsheet unless LoanStar agreed beforehand, sight unseen, to completely abandon its request for the hard drives of all three employees. LoanStar refused to prejudice itself and accordingly, TitleMax has yet to produce any responsive documents or the hard drives. In the same way, TitleMax has refused to produce the DeLeon and Grajeda hard drives, even though multiple TitleMax employees have testified that DeLeon and Grajeda possessed and distributed lists of LoanStar customers, and LoanStar expressly requested same. Yet, on meet and confer, TitleMax admitted that the DeLeon and Grajeda hard drives have never been searched.

TitleMax should not be permitted to continue to flout the Court and the Rules of Civil Procedure. Rather, it should be compelled to conduct a reasonable inquiry and produce all responsive information, including the hard drives, within ten days of the hearing on this motion.

4

## III.   ARGUMENT AND AUTHORITIES

As TitleMax's conduct throughout this case has made clear, TitleMax is intent on delaying the progress of this litigation through obstruction of LoanStar's discovery efforts. TitleMax effectuates this goal by serving baseless objections, inappropriately withholding responsive documents, and then simply refusing to comply with Court orders requiring production of same. In so doing, TitleMax purposely delays the progress of the litigation and increases costs for both LoanStar and the Court. This gamesmanship runs counter to the entire purpose of the discovery process, which is to ensure a just and fair adjudication of claims on their merits. *Cf.* TEX. R. CIV. P. 1; *In re Dynamic Health, Inc.*, 32 S.W.3d 876, 886 (Tex. App.—Texarkana 2000, pet. denied); *cf. Coleman v. Winn-Coleman, Inc.*, 110 S.W.3d 104, 111 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Discovery is favored, and the rules that govern it are to be liberally construed."). In light of TitleMax's continued improper conduct, the Court should enter an order compelling TitleMax to produce responsive documents within ten days of the hearing on this motion and award monetary sanctions to cover LoanStar's fees and costs in bringing this motion. TEX. R. CIV. P. 215.1(e), 215.2(b)(2), and 215.3.

### A. TitleMax Must Produce the Corporate Employees' Documents And Communications Reflecting TitleMax's Illegal Marketing Practices

Throughout this litigation, TitleMax has asserted inappropriate, rote objections with little or no applicability to the information actually being sought; this time is no different. Here, TitleMax asserts relevance and burden objections to requests seeking documents and communications[4] regarding the very subject matter of the case: (1) marketing to LoanStar's

---

[4] LoanStar specifically requested this information due to deposition testimony indicating that the Corporate Employees used text messages to communicate with one another. (Ex. C [Deposition of Linda McDonald at 76-77].) TitleMax indicated during the meet and confer with LoanStar that it had not asked any of the four Corporate Employees for text messages responsive to the Requests.

5

customers (Ex. D [RFP Nos. 11]); (2) communications with the DMV Databases, (*id.* [RFP Nos. 9, 10]); (3) use by TitleMax employees of the DMV Databases to market to customers of competitors (*id.* [RFP No. 12]), the possession by TitleMax employees of search results from the DMV Databases or other compilations of names and/or addresses including LoanStar customers (*id.* [RFP Nos. 13, 14]), the recording of license plate or VINs during visits to non-TitleMax parking lots (*id.* [RFP 15, 16]), and non-compliance by TitleMax employees with TitleMax's policies related to the solicitation of competitors' customers (*id.* [RFP 17]).

TitleMax's responses are crafted in an improper attempt to unilaterally restrict the scope of its production. Indeed, TitleMax reframed the scope of no less than eight of LoanStar's requests in order to substantially limit—or wholly eliminate—the production of any documents. (*See* Ex. D [Responses to RFP Nos. 10, 12, 13, 14, 15, 16, 17, 18].)

TitleMax's responses to LoanStar's Request Nos. 16 and 18 are emblematic of this tactic:

**REQUEST NO. 16:** Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to relating to any of employees of TMX Finance, TMX Finance TX, and/or TitleMax TX recording, copying, or acquiring vehicle identification numbers (or VIN) or license plate numbers of vehicles located in Non-TitleMax Parking Lots.

**RESPONSE:** Defendants object to this Request . . . . Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents relating to license plate numbers or vehicle identification numbers recorded, copied, or acquired during visits to Plaintiffs' parking lots in Texas.

**REQUEST NO. 18:** Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by the Corporate Employees that refer or relate to any noncompliance of employees of TMX Finance, TMX Finance TX, and/or TitleMax TX with TitleMax' policies, rules, and/or codes of conduct related to the solicitation of Customers of Competitors in the state of Texas.

**RESPONSE:** Defendants object to this Request . . . . Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-

6

0746

<u>privileged policies, rules, and/or codes of conduct</u> related to the solicitation of Customers of Competitors in the state of Texas.

TitleMax's attempted reframing is designed to prevent LoanStar from obtaining critical evidence necessary to its case. For example, TitleMax employees have testified that they improperly searched and identified LoanStar customers by recording license plate numbers not only from LoanStar parking lots, but also apartment parking lots and other shopping centers. (*See* Ex. E [Deposition of Randy Rainey 39-42 (searching license plates obtained from cars parked in general parking lots); Deposition of James Griffin 115-117 (license plates recorded in other parking lots)].) Accordingly, TitleMax's unilateral limitation of its response to Request No. 16 improperly prevents LoanStar from obtaining the full scope of the information to which it is entitled. Similarly, TitleMax's refusal to produce documents reflecting the use of DMV Databases other than DataTrax or PublicData ignores testimony from its own employees that other databases may have been used. (*See, e.g.,* Ex. E [Deposition of Randy Rainey 39-42 (using an unidentified databases for marketing purposes); Deposition of James Griffin 95-96 (unidentified database other than PublicData used to conduct searches); Deposition of Thomas Kirk 124-125 (unspecified database used to create lists of customers for mailers)].) Attempts in this regard to prevent LoanStar from obtaining evidence regarding its claims and TitleMax's purported defenses violate the spirit and purpose of the discovery process. *Chapa v. Garcia*, 848 S.W.2d 667, 668 (Tex. 1992) ("Discovery is designed 'to allow the litigants to obtain the fullest knowledge of the facts and issues prior to trial.'"); *Gutierrez v. Dallas Indep. Sch. Dist.*, 729 S.W.2d 691, 693 (Tex. 1987) ("The rules of discovery were changed to prevent trials by ambush and to ensure that fairness would prevail."). Accordingly, this Court should compel TitleMax to respond to the requests <u>as written</u>.

7

Further, despite the fact that TitleMax's written responses promise some production, to date no production has been made. During meet and confer, TitleMax promised production during the week of November 3, but TitleMax has yet to produce even a single document. Accordingly, the Court should compel TitleMax to produce responsive documents within ten days of the hearing.

**B. TitleMax Must Produce the Hale, DeLeon, and Grajeda Hard Drives**

As described above, due to the significant discrepancies in TitleMax's responses to requests seeking lists of LoanStar customers in TitleMax's possession, LoanStar requested the hard drives of certain employees known to have maintained such lists. LoanStar first informally requested these hard drives, but TitleMax unequivocally refused to produce the same. (Ex. F [June 18, 2014 E-Mail from Sarah Powers to Geoff Gannaway; June 25, 2014 E-Mail from Geoff Gannaway to Sarah Powers].) LoanStar later served formal requests for production of the hard drives, but notwithstanding TitleMax's clear failure to conduct an adequate search under its own volition, TitleMax once again unequivocally refused to produce. Because the information sought is directly relevant to LoanStar's claims and cannot be recovered by alternate means, the Court should compel TitleMax to produce the hard drives. *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 317 (Tex. 2009) (compelling production of hard drives in similar circumstances).

All of the elements the Supreme Court set forth in *Weekley* to support the production of hard drives are present here. First, TitleMax has unquestionably defaulted on its obligation to search for and provide the requested information. *Id.* As set forth above, Hale testified that he maintained a spreadsheet on his computer of customers to whom he had sent marketing materials after obtaining their contact information from PublicData ("Hale Spreadsheet"). (*See* Ex. G [Deposition of Richard Todd Hale at 102-106] (testifying he saved the spreadsheet on a

8

0748

computer at "store office number 20")). LoanStar requested production of the Hale Spreadsheet, but TitleMax claimed that no such document could be found. (Ex. H [TitleMax's Response to the Third Request for Production, No. 6].) Only after LoanStar moved to compel production of the hard drive from Hale's computer did TitleMax even attempt a search, then conveniently representing that the spreadsheet may have been located and would be produced. Yet, TitleMax has not produced the spreadsheet to date, and still refuses to provide the hard drives for expert analysis. In the same way, only upon meet and confer did TitleMax finally admit that it had never searched the Grajeda and DeLeon hard drives, even though those employees pled the Fifth when asked about their searches (see Ex. I [Depositions of Felix DeLeon at 12-16; Lucia Grajeda at 16-18; Ismael Hernandez at 11-21]) and former and current TitleMax employees have consistently testified that Grajeda and DeLeon conducted searches and disseminated search results to other employees. (See e.g., Ex. J [Deposition of Thomas Kirk at 110-111; Deposition of Michael Ryan at 45-48; Deposition of Patrick Sudduth 43-44].) Accordingly, TitleMax has not engaged in the reasonable search required by Texas law and production of the hard drives is appropriate.

Second, LoanStar seeks production of the hard drives not to itself, but to a qualified expert selected by both parties, with LoanStar to bear the expense of the expert.[5] It is not only feasible but likely that a mutually-selected computer expert will be able to recover the requested information—LoanStar does not seek complex computerized data but merely seeks lists of its own customers, likely to be saved as Excel spreadsheets, Word documents, or text files. An expert analysis of the Grajeda and DeLeon hard drives would locate search results and customer

---

[5] LoanStar proposes that each party offer three expert candidates and meet and confer regarding selection, with selection to be completed by no later than December 1, 2014.

9

lists saved on the computers, as well as any attempts to delete the information from the computers.[6] The expert's search would be limited to identifying and retrieving the lists and spreadsheet LoanStar has previously expressly requested TitleMax produce.

Finally, there is no question that there is a "direct relationship between the electronic storage device and the claim itself." *In re Weekley Homes, L.P.*, 295 S.W.3d at 319. Here, LoanStar's entire case is founded on TitleMax's improper and illegal use of computerized online databases to identify and market to LoanStar customers. Thus, the parties previously contemplated the production of this information as early as June 2013, when the parties entered into a stipulated injunction under which TitleMax agreed to image all computer hard drives believed to have been involved in the illegal marketing. The agreement contemplated that the images and the information contained thereon would ultimately be produced.

Because LoanStar requested production of the hard drives due to TitleMax's failure to properly search for responsive documents from Hale, Grajeda, and DeLeon and intends to submit the hard drives directly to an expert who will search for, locate, and extract the information sought, TitleMax is facing no burden in production and has no basis for its continued objection to this discovery. Thus, the Court should compel TitleMax to produce the requested hard drives within ten days of the hearing on this motion, and award LoanStar its costs and fees in accordance with the Rules.

## IV.  PRAYER

Due to TitleMax's continued, unjustified refusal to abide by its discovery obligations and produce documents responsive to LoanStar's requests for production, this litigation has been

---

[6] The deletion or destruction of information at the employee level is a particular concern in this case because, as TitleMax has alleged in its prior pleadings, TitleMax's employees fear criminal prosecution for their actions.

10

needlessly prolonged and this Court's resources unnecessarily wasted. Accordingly, this Court should enter an order compelling TitleMax to produce responsive documents within ten days of the hearing and award LoanStar its costs and fees in bringing this motion.

Respectfully submitted,

SUTHERLAND ASBILL & BRENNAN LLP

By: /s/ Daniel Johnson
Kent C. Sullivan (SBN 19487300)
Daniel Johnson (SBN 24046165)
Robert A. Lemus (SBN 24052225)
1001 Fannin, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: Robert.lemus@sutherland.com

And

WARGO & FRENCH LLP
Joseph D. Wargo (GA No. 738764)
(Admitted *Pro Hac Vice*)
Abigail J. Stecker (CA No. 284534)
(Admitted *Pro Hac Vice*)
999 Peachtree Street, N. E., 26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com
E-Mail: aromero@wargofrench.com

Sarah F. Powers (CA. No. 238184)
(Admitted *Pro Hac Vice*)
Christina L. Goebelsmann (CA No. 273379)
(Admitted *Pro Hac Vice*)
1888 Century Park E, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6300
Facsimile: (310) 853-6333
E-Mail: spowers@wargofrench.com
E-Mail: cgoebelsmann@wargofrench.com

11

0751

*Attorneys for Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP*

12

## CERTIFICATE OF CONFERENCE

Counsel have conferred and otherwise communicated extensively for weeks about the issues raised in this motion and were unable to reach agreement.

DATED: November 12, 2014

/s/ *Daniel Johnson*
Daniel Johnson

13

0753

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the within and foregoing **PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANTS TMX FINANCE LLC, TMX FINANCE OF TEXAS, INC. AND TITLEMAX OF TEXAS, INC. TO REQUESTS FOR PRODUCTION OF DOCUMENTS** has been forwarded to all counsel of record in accordance with TEX. R. CIV. P. 21 and 21a on this 12th day of November 2014.

BECK REDDEN LLP
Geoff Gannaway
Bryon Rice
1221 McKinney St., Suite 4500
Houston, Texas 77010.

FELLOWS LaBRIOLA LLP
Stephen LaBriola
Christina Baugh
Peachtree Center
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731

*Attorneys for TitleMax*
*TMX Finance of Texas, Inc. and*
*TitleMax of Texas, Inc.*

/s/ Daniel Johnson
Daniel Johnson

14

0754

# Exhibit A

0755

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES, ) IN THE DISTRICT COURT
LLC, d/b/a LOANSTAR TITLE )
LOANS and INTEGRITY TEXAS )
FUNDING, LP, )
 )
   Plaintiffs, )
versus )
 ) HARRIS COUNTY, TEXAS
TMX FINANCE HOLDINGS, INC.; TMX )
FINANCE, LLC; TMX FINANCE OF )
TEXAS, INC.; TITLEMAX OF TEXAS, )
INC.; FELIX DeLEON; and )
ISHMAEL HERNANDEZ, )
 )
   Defendants. ) 152nd JUDICIAL DIST.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

RANDY LEE RAINEY

JULY 8, 2014

VOLUME 1 OF 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF RANDY LEE RAINEY, produced as a witness duly sworn by me at the instance of the Defendants, was taken in the above styled and numbered cause on JULY 8, 2014, from 9:03 AM to 10:44 AM, before Beth Howard, CSR in and for the State of Texas, reported by Machine Shorthand, at the offices of Abby Office Preston Center, located at 5956 Sherry Lane, Suite 1000, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure, Notice, Subpoena, and the provisions stated on the record or attached hereto.

Veritext Florida Reporting Co.
800-726-7007           305-376-8800

0756

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    CHRISTINA GOEBELSMANN, ESQ.

    Wargo French

    1888 Century Park East, Suite 1520

    Los Angeles, California  90067

    (310) 853-6807 - FAX: (310) 853-6333

    cgoebelsmann@wargofrench.com


FOR THE DEFENDANTS TMX FINANCE HOLDINGS, INC.; TMX
FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX
OF TEXAS,INC.:

    BRYON RICE, ESQ.

    Beck Redden

    1221 McKinney Street, Suite 4500

    Houston, Texas  77010

    (713) 951-6256 - FAX: (713) 951-3720

    brice@beckredden.com

    VICTORIA H. NEWMAN, ESQ. (Telephonically)

    TMX Finance

    15 Bull Street, Suite 200

    Savannah, Georgia  31401

    (912) 503-2824

    Victoria.newman@titlemax.com

VIDEOGRAPHER:

    Mr. John Hines

    Mr. Arthur Estes

A.    Yes.

Q.    Okay.  And did you ever hear of a technique of writing down license plate numbers in parking lots?

A.    Yes.

Q.    And who did you hear that from?

A.    Tom Griffin.

Q.    And when did you hear that?

A.    Within a week or so after being hired.

Q.    So did Tom tell you about the writing down of license plate numbers as part of your training?

MR. RICE:  Objection, form.

A.    He stated that this was something he was doing, and I actually went with him several times to do it at a couple of different locations.  So I actually -- he actually showed me how to do that.

Q.    (BY MS. GOEBELSMANN) And where did you go on those several times that you accompanied him?

A.    There was -- We went probably two times -- maybe three, but I think at least two times to a competitor that's on Forest Lane and Central Expressway, and that's the -- that's Texas Title, like red and yellow.  It's really close to where I live.  I live on the other side of the freeway.

And another place, I believe it's on Buckingham and Belt Line, same company.

And another place on Central Expressway somewhere between -- it's on the west side of Central Expressway, somewhere between, like, Spring Valley and Alpha, somewhere in -- somewhere around there, within a mile or half mile. And it was, like, a little odd -- very odd little mom-and-pop kind of place. It was, like, in a weird little office at the end of, like, a motel. I don't know the name of that place.

Q. Was that an auto title loan company?

A. I don't know everything -- They did auto loans, the title loans, but I -- they may have had other loan services as well. I'm not sure.

Q. Were there any other places that you accompanied Tom where you would be writing down license plate numbers?

A. If there is, I don't recall. Just those three that I recall.

Q. Okay. And those three times you accompanied him, during what month and year did that occur?

A. It would have been within the couple weeks after I was -- within a week to two weeks after I was hired; and I would say somewhere between the second and fourth, fifth week --

Q. Okay. You --

A. -- when I was there.

Q.    Would that be November 2011?

A.    Yeah.

Q.    Okay.

A.    November -- it may be into early December, but probably not beyond that.

Q.    Okay. And what exactly did Tom do when he brought you to these parking lots?

A.    So the first time that we went to -- he went to the one -- and I think -- I know it was at least twice. Maybe I went there more. Maybe three or four times. I'm not sure. But the one on -- the location on Buckingham, I believe it's Buckingham and Belt Line Road, in east Richardson, we would park -- There was some kind of grocery store or something. Like, it was on the corner of the -- of the intersection.

So we would park, like, adjacent in the parking lot beside it. And I couldn't really see the license plates, because apparently he had a lot better vision than I did. But sometimes he would call them off and I would write them down.

And then he would take his smartphone and just go into, like, a website and log in, and he would find out general information. He told me that that was a website that -- that he paid for. It was information like -- sometimes there were a phone number, address.

It definitely told if the car that he was looking at in the parking lot just in front of us had a lien against it, you know.

I never really questioned the practice, because he said that, you know, he wasn't going on their property, and that this was, you know, public data that he could buy, so....

Q.   Do you know what the name was of the website that he used?

A.   I do not.  And I remember he was saying it was maybe 30, 40 bucks a month, something like that; and he got a num -- a certain number of searches for that, and that could have been like -- I don't remember, 20, 40 a -- you know, a month.  I don't remember the exact numbers.  But it was definitely a dollar amount that he paid for -- I guess you could go up or down on that level and get more searches, and then he -- but he had a set number of searches that he could do monthly.

Q.   So was it your understanding that Tom had paid for this website service and was able to use it for a certain number of searches each month?

A.   Yes.

Q.   Okay.  Did you ever see the smartphone screen when he was performing these searches?

A.   Um-hmm.  Yeah.  He showed me I know at least

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL | * IN THE DISTRICT COURT |
| SERVICES, LLC d/b/a | * |
| LONESTAR TITLE LOANS and | * |
| INTEGRITY TEXAS FUNDING, | * |
| LP, | * |
| | * |
| Plaintiffs | * |
| | * |
| VS. | * 152ND JUDICIAL DISTRICT |
| | * |
| TMX FINANCE HOLDINGS, | * |
| INC.; TMX FINANCE, LLC; | * |
| TMX FINANCE OF TEXAS, | * |
| INC.; TITLEMAX OF TEXAS, | * |
| INC.; FELIX DELEON; and | * |
| ISHMAEL HERNANDEZ, | * |
| | * |
| Defendants | * HARRIS COUNTY, TEXAS |

*****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL RYAN

JUNE 25, 2013

*****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL RYAN,
produced as a witness at the instance of the PLAINTIFFS,
and duly sworn, was taken in the above-styled and
numbered cause on the 25th of JUNE, 2013, from 11:41 a.m.
to 1:51 p.m., before MELISSA PARKHILL, CSR, in and for
the State of Texas, reported by computer-assisted machine
shorthand, at the law offices of Sutherland Asbill &
Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis
County, Texas, pursuant to Texas Rules of Civil Procedure

and the provisions stated on the record.

APPEARANCES

FOR THE PLAINTIFFS:

Jessica C. Casey, Attorney at Law
WARGO FRENCH
999 Peachtree Street, NE, 26th Floor
Atlanta, Georgia 30309
(404) 853-1500
jcasey@wargofrench.com

FOR THE DEFENDANTS, TMX FINANCE OF TEXAS and TITLEMAX of TEXAS:

Stephen T. LaBriola, Esq.
FELLOWS LABRIOLA
Suite 2300, South Tower
225 Peachtree Street, NE
Atlanta, Georgia 30303
(404) 589-9200
slabriola@fellab.com

-AND-

Geoff Gannaway, Esq.
BECK REDDEN, LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
(713) 951-6263
ggannaway@beckredden.com

Q. Did you tell them that?

A. Yeah.

Q. Did you tell anybody else about this idea between September of 2012 and November of 2012 when you learned about the name DataTrax?

A. Yeah, in November I -- I -- I brought it the attention to the -- to the direct marketing that we were doing -- the direct mailers that we were doing to my -- my supervisor, which was Jim Batterson.

Q. We'll come back to that conversation in just a minute.

So once you had the conversation with Lucia and Ishmael in September, what did you do at that point, anything after that related to this information or these letters?

A. No. I -- I told them -- I told them that it sounded like a great idea. Let's try it.

Q. Did you share that information with any of your other Austin stores?

A. Yes.

Q. How often after that meeting did you share this information?

A. Exactly I'm thinking a couple of weeks.

Q. Do you recall what stores you shared this idea with?

A.    Specifically Austin 8, which is on Guadalupe Street -- I know the address of that one, 37001 [sic] Guadalupe -- Austin 10, which is on Lamar, and our TitleBucks store, which is also on Lamar.

Q.    Did the TitleMax stores have numbers?  I'm sorry.

A.    Yes.

Q.    I'm sorry.  Title Bucks you said?

A.    Title Bucks, yes, Title Bucks of Austin 2.

Q.    And where is the Title Bucks 2 store located?

A.    On Lamar Street, too, as well, North Lamar.

Q.    Who works or who worked in the Austin 8 store on Guadalupe at the time that you shared this information?

A.    I believe the G.M. at the time was Jarrod Dozier.

Q.    Do you recall who the S.M. was?

A.    I had several S.M.s in that store.  So exactly which one, I don't -- I don't know.

Q.    And just so I'm clear in a typical TitleMax store, there's a G.M. and an S.M.  Are there any other titled employees?

A.    Some stores depending on their volumes will have C.S.R.s, customer service representatives.

Q.    Do you recall whether there were any --

A.   No.

Q.   -- C.S.R.s in Austin 8?

A.   No.

Q.   At the time that you shared this information with Austin 10 on Lamar, do you recall who the G.M. was?

A.   Yeah.  His name is Gabriel -- I'm sorry.  I can't remember his last name.

Q.   That's fine.

A.   You understand I've been out of the market for several months now.

Q.   And just to the best of your ability, I'm just asking for what you know.

A.   Right.

Q.   Do you recall who the S.M. was in Austin 10 at the time you shared this information?

A.   Yeah, Amelia Figueroa.

Q.   And do you recall any other employees in Austin 10 --

A.   No.

Q.   -- at that time?

A.   Nuh-uh.

Q.   For TitleBucks 2 on Lamar, do you recall -- do they have a G.M. at TitleBucks?

A.   Uh-huh.

Q.   Who was the G.M. at that store at that time?

A.   Her name was Diana Brown.

Q.   And do you recall if that store had an S.M. or C.C.R. [sic] --

A.   Yes, they had an S.M. --

Q.   -- C.S.R.  I'm sorry.

A.   -- S.M., store manager.  I don't recall.  That -- that store had several S.M.s in it as well.  So I don't remember exactly which one was there at that time.

Q.   How did you come to share this information with each of these stores following your visit with Ishmael and Lucia?

A.   Well, I asked Lucia to pull -- pull some data by zip code.  And I would -- She would give me that information as far as the customer information, and I would disseminate my zip codes to those stores that were in that -- where the customers lived at.

Q.   Do you recall the first time that you asked Lucia to attain this information from the web site?

A.   Exactly when, no.  I'm thinking October sometime.

Q.   So walk me through that a little bit.  Did somebody ask you for this information or did you just ask Lucia for it on your own or how did it come to be?

A.   I asked Lucia on her own so these stores could participate in a direct marketing program that she was

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs | *<br>* |
| VS. | * 152ND JUDICIAL DISTRICT<br>* |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DELEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>* |
| Defendants | * HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICK SUDDUTH

JUNE 25, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK SUDDUTH, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 25th of JUNE, 2013, from 2:38 p.m. to 4:54 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Sutherland Asbill & Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis County, Texas, pursuant to Texas Rules of Civil Procedure

and the provisions stated on the record.


                        A P P E A R A N C E S


FOR THE PLAINTIFFS:

        Jessica C. Casey, Attorney at Law
        WARGO FRENCH
        999 Peachtree Street, NE, 26th Floor
        Atlanta, Georgia 30309
        (404) 853-1500
        jcasey@wargofrench.com



FOR THE DEFENDANTS, TMX FINANCE OF TEXAS and TITLEMAX of
TEXAS:

        Stephen T. LaBriola, Esq.
        FELLOWS LABRIOLA
        Suite 2300, South Tower
        225 Peachtree Street, NE
        Atlanta, Georgia 30303
        (404) 589-9200
        slabriola@fellab.com

                -AND-

        Geoff Gannaway, Esq.
        BECK REDDEN, LLP
        1221 McKinney Street, Suite 4500
        Houston, Texas 77010
        (713) 951-6263
        ggannaway@beckredden.com

with them is business to business marketing. Like, if we have an auto repair shop, something like that, where, say, a customer needs $2,000 for a transmission and they don't have that money and the transmission place doesn't offer financing. So we would hope to develop a partnership with that business so that if they had a customer like that, they might would send them to us. We could see if we could loan that amount of money on their car so that they can have their car now, and then they can pay us.

Q. Have you ever heard of the web site DataTrax?

A. I have.

Q. When did you first learn or hear that term?

A. I would say probably I think late December or early January.

Q. Tell me generally what DataTrax is.

A. The way I understand it, it's just a program that can essentially sort the lienholder information.

Q. Had you ever heard of the program before late December just not referred to as DataTrax?

A. Possibly. I think that's the only -- Well, I think DataTrax is the only name that I heard it referred to by.

Q. And so late December was the first time that you ever heard of this type of database being used?

A.   Yeah, as far as I know.

Q.   Tell me in what context you learned about DataTrax.

A.   Well, Jim gave me a call, whichever it was, late December or early January. And it was -- you know, he was basically like, well, I figured out why the north side district was -- has been beating you guys for the last few months. And he kind of told me about the, you know, program that Mike had found out about -- Mike Ryan. And I mean, that was essentially it. He kind of told me there's a way to find, you know, potential customers through lienholders or, you know, it was just a brief summary I guess of what it was.

Q.   Did he tell you how anyone at TitleMax had been using that information?

A.   No. I mean, he kind of just told me, you know, just it's a way to sort lienholder information.

Q.   Did he suggest what you should do with that information?

A.   Well, I mean, it was kind of like, you know, it's -- apparently, they're having some success with it. So, you know, essentially, you know, get with Mike and find out if it's something that might work for y'all.

Q.   What did he tell you was successful -- because you mentioned that he told you they were running

searches?

A. Uh-huh.

Q. But then beyond that, did he tell you anything else?

A. He just told me it was -- basically to find out if, you know, we could send a letter or whatever to a potential customer that we would hope to buy out from whatever institution they were currently with.

Q. Was this a telephone call that you had with Jim?

A. Yes.

Q. Did Jim tell you who had been performing these searches?

A. No.

Q. You mentioned that Mike Ryan's name came up in that conversation?

A. Yes.

Q. What did Jim tell you about Mike?

A. He just said, you know, to get -- if I wanted to get in touch with Mike and, you know, get some more of the details. But as far as what Jim told me, it was just, you know, mainly we can sort by any lienholder, you know, essentially from any sort of third-party lender, I guess, like, any -- any financial institution basically. So...

Q. Did Jim mention anyone else's name during that conversation?

A. No.

Q. After you had that conversation with Jim, what, if anything, did you do?

A. Well, I mean, obviously given that, you know, we're competitive in nature, I was tired of getting beat. So I reached out to Mike, and I said, what's -- what's the deal with this. And he kind of just said try and find out any of the third-party lenders for any financial institutions in -- you know, in my part of the city. And if I'd get that for him, he could sort it by zip code and split it up, you know what I mean.

Q. Did you do that, did you go out and find that information and provide it to Mike?

A. I had -- I'd talked to some of the general managers because I don't -- quite honestly, I don't really have -- I don't really have time to do that. But I asked them -- I guess to me what was I thought was the simplest way to do it was if we had already had any dealings -- like, if we had already maybe bought out a customer from a company or whatever, you know, if we knew some of those third-party lenders based on our interactions with a customer, something like that. That was pretty much it.

Q. How long after your conversation with Jim Batterson did you get in touch with Mike Ryan?

A. Probably pretty soon. Maybe a day or two, something like that.

Q. And then you mentioned that after your conversation with Mike, you spoke to some of your general managers?

A. Uh-huh.

Q. Do you recall which general managers you spoke with?

A. No, I really don't.

Q. Do you recall whether you reached out to all of the general managers in your district?

A. No, I don't think I reached out to all of them.

Q. Why did you reach out to the ones that did you?

A. I couldn't tell you specifically. I don't know. That's a -- That's a good question.

Q. Had Jim suggested to you any specific stores that could benefit from these searches?

A. I would say it was -- we were, you know, thinking lower performing stores was probably the focus of that.

Q. Did Jim identify any of those stores specifically?

A. No.

Q. In your conversation with Mike, did Mike identify any of those stores specifically?

A. No.

Q. Do you recall any of the general managers that you spoke with about the searches immediately following your conservation with Mike?

A. I would say probably -- I think I know I talked to Rad Casillas.

Q. What store is Rad responsible for?

A. That was Austin 3.

Q. Do you recall speaking with other -- any other general managers regarding the searches?

A. I think I spoke with Jim Griffin.

Q. What store is Jim responsible for?

A. He was responsible for Austin 13. He's no longer with the company.

Q. Do you recall approximately how long ago Jim left TitleMax?

A. Maybe February or March, I think.

Q. Do you recall who took over as general manager in Austin 13 after Jim's departure?

A. Yes. Mario Arriaga. He was there for 11 days.

Q. Following Mr. Arriaga's brief stint at Austin 13, who is the general manager?

A. Rudy Perez. He's still the G.M. there.

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, | * IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE | * |
| LOANS and INTEGRITY TEXAS | * |
| FUNDING, LP | * |
| | * |
| VS. | * HARRIS COUNTY, TEXAS |
| | * |
| TMX FINANCE HOLDINGS, INC.; | * |
| TMX FINANCE, LLC; TMX FINANCE | * |
| OF TEXAS, INC.; TITLEMAX OF | * |
| TEXAS, INC.; FELIX DELEON; | * |
| AND ISHMAEL HERNANDEZ | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES ARTHUR GRIFFIN

MAY 23, 2014

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JAMES ARTHUR GRIFFIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of May, 2014, from 9:08 a.m. to 2:09 p.m., before Marsha Evans, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at 600 Congress Avenue, 20th Floor, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFFS:

MS. CHRISTINA GOEBELSMANN
MS. SARAH F. POWERS
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California   90067
310-853-6807/310-853-6859 (fax)
cgoebelsmann@wargofrench.com
spowers@wargofrench.com

FOR THE DEFENDANTS:

MR. GEOFF GANNAWAY
BECK REDDEN
1221 McKinney Street, Suite 4500
Houston, Texas   77010
713-951-6263/713-951-3720 (fax)
ggannaway@beckredden.com
--and--
MS. VICTORIA NEWMAN (Via Telephone)
TMX FINANCE
15 Bull Street, Suite 200
Savannah, Georgia   31401
912-503-2824/912-629-1538 (fax)
victoria.newman@titlemax.biz

ALSO PRESENT:
Mr. Manuel Martin, Videographer

knowledge?

A. She did.

Q. And which store was she general manager?

A. The store in the Oak Hill area, kind of West Austin.

Q. Did you keep in touch with Sarah or Mayumi after you started in Austin 13?

A. We did. We would talk occasionally. I'm still friends with Mayumi on Facebook, so -- we don't discuss TitleMax stuff. We just see each other on Facebook occasionally.

Q. When you were still working with TitleMax, would you discuss marketing practices?

A. Of course. Absolutely.

Q. How often did you discuss your marketing practices?

A. Anytime I had a conversation with another GM, marketing inevitably came up.

Q. Did you discuss with other GMs the use of DMV records?

A. Absolutely.

Q. How many times did you have conversations regarding the use of DMV records?

A. I would say every time we talked about marketing we talked about PublicData. And then there

was another list that came from our district manager. I don't know what website he got that from, but it was just a -- it was a list that was broken up by zip code that gave a list of names of people who had liens on their vehicles.

Q.   Who was the district manager that provided you that list?

A.   Patrick Sudduth.

Q.   How often did you speak with other GMs?

A.   Daily.

Q.   If you had to estimate how many conversations you had with other GMs during the entire time you were with TitleMax, how many conversations would that be?

A.   Hundreds.   500 times.

Q.   The GMs that you spoke with, where were they working?

A.   Primarily they were part of the south -- South Austin market.   Paul and I, as I mentioned earlier, were good friends.   He worked in the North Austin market, so I used to call him.   Another lady by the name of Lucia who again was on the north side.

Q.   What were the names of the GMs that you spoke with?

A.   Lucia, Paul Walton, Lewis McCall when he was there, of course Sarah and Mayumi, Felix, Alberto, the

guy who had called me -- and I cannot believe I can't remember his name. The guy who called me the day that I left the company. Another one on South Lamar. I mean, for the most part we were pretty -- we were a pretty close-knit group and we would all talk.

Q. Did you speak with any GMs in any other districts?

A. Not after training, no.

Q. Did you speak with any other employees that were not GMs regarding marketing practices?

A. Assistant managers, yes.

Q. Who would you speak with?

A. Georgina.

Q. She was in your store, correct?

A. She was for a short period of time. She used to work for Gilberto at another store, and that's when I used to talk to her, and then, of course, when she worked for me.

Q. Any other assistant managers?

A. The one that worked for the guy that I can't remember, and I don't remember his name either.

Q. Was that on the South Lamar store?

A. The South Congress store, the second South Congress store.

Q. Do you remember where Lucia worked?

CAUSE NO. 2013-33584

WELLSHIRE FINANCIAL            * IN THE DISTRICT COURT
SERVICES, LLC, d/b/a           *
LONESTAR TITLE LOANS and       *
INTEGRITY TEXAS FUNDING,       *
LP,                            *
                               *
        Plaintiffs             *
                               *
VS.                            * HARRIS COUNTY, TEXAS
                               *
TMX FINANCE HOLDINGS,          *
INC.; TMX FINANCE, LLC;        *
TMX FINANCE OF TEXAS,          *
INC.; TITLEMAX OF TEXAS,       *
INC.; FELIX DeLEON; and        *
ISHMAEL HERNANDEZ,             *
                               *
        Defendants             * 152ND JUDICIAL DISTRICT

*************************************************************

            ORAL AND VIDEOTAPED DEPOSITION OF

                 RICHARD TODD HALE

                   MAY 15, 2014

*************************************************************

        ORAL AND VIDEOTAPED DEPOSITION OF RICHARD TODD HALE,

produced as a witness at the instance of the PLAINTIFFS,

and duly sworn, was taken in the above-styled and

numbered cause on the 15th of MAY, 2014 from 9:06 a.m. to

2:50 p.m., before MELISSA PARKHILL, CSR, in and for the

State of Texas, reported by computer-assisted machine

shorthand, at the law offices of Sutherland Asbill &

Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis

County, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

      Sarah F. Powers, Attorney at Law
         -and-
      Christina Goebelsmann, Attorney at Law
      WARGO FRENCH
      1888 Century Park East, Suite 1520
      Los Angeles, California 90067
      (305) 913-8587
      spowers@wargofrench.com

FOR THE DEFENDANTS:

      Geoff Gannaway, Esq.
      BECK REDDEN, LLP
      1221 McKinney, Suite 4500
      Houston, Texas 77030
      (713) 951-6263
      ggannaway@beckredden.com

ALSO PRESENT:

      Cody Hall, Videographer

A. I believe that was his last name, yes, ma'am.

Q. Okay. Ernest Pago?

A. Yes, ma'am.

Q. And Rad Casillas?

A. Yes, ma'am.

Q. Okay. And what did they tell you about the concept of searching databases?

MR. GANNAWAY: Object to form.

A. Just that, you know, they were having success with it. You know, they were -- they were all doing it. They also were -- you know, either learned to do it from somebody that was there before them or were instructed to do it by Patrick. And that it was being very successful for them.

Q. And in your case how did you get the initial idea to do that?

A. It came from my supervisor, Patrick Sudduth.

Q. And did Patrick Sudduth tell you where he got the idea to do that?

A. No, ma'am.

Q. Did Patrick Sudduth tell you that he was using that idea before?

A. Yes, ma'am.

Q. Okay. And what did he tell you about that?

A. About him using it before?

Q. Correct.

A. That it had been successful in his -- in his previous region that he was at and that, you know, everybody that was using it here was seeing a lot more success with it here in the Austin area.

Q. What was Patrick Sudduth's previous region?

A. I don't -- I don't know. I don't remember.

Q. Okay. Did Patrick Sudduth ever work outside of Texas, to your knowledge?

A. Yes, ma'am. My understanding is he came into Texas from somewhere else. But I don't remember -- I don't know where he came from.

Q. Okay. So wherever he came from before, was it your understanding that he was using the tactic of searching D.M.V. records in order to market to customers of competitors in that previous area?

MR. GANNAWAY: Object to form.

A. Yes, ma'am, that's my understanding.

Q. Okay. And you got that understanding from conversations with Mr. Sudduth?

A. Yes, ma'am.

Q. Okay. Now, who set your store's performance goals?

A. It was relayed to me from Patrick Sudduth. But my understanding from talking to him, that it was -- the

# Exhibit B

0786

MOTION TO COMPEL
*SEPTEMBER 22, 2014*

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES, LLC d/b/a ) IN THE DISTRICT COURT
LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE )                                    )
LOANS, and d/b/a LOANMAX; MEADOWWOOD     )
FINANCIAL SERVICES, LLC, d/b/a LOANSTAR  )
LOANS, AND d/b/a MONEYMAX TITLE LOANS; and )
INTEGRITY TEXAS FUNDING, LP              )
                                         )
vs.                                      ) HARRIS   COUNTY,   TEXAS
                                         )
TMX FINANCE HOLDINGS, INC.; TMX FINANCE, )                                    )
LLC; TMX FINANCE OF TEXAS, INC;          )
and TITLEMAX OF TEXAS, INC.              ) 152ND JUDICIAL DISTRICT

---

## MOTION TO COMPEL PRODUCTION

---

On the 22nd day of July, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

MOTION TO COMPEL
*SEPTEMBER 22, 2014*

**APPEARANCES**

MR. JOHN DANIEL JOHNSON
SBOT NO. 24046165
SUTHERLAND ASBILL & BRENNAN, LLP
1001 Fannin
Suite 3700
Houston, Texas 77002
Telephone:  713-470-6100
Fax:  713-654-1301
E-mail:  Daniel.johnson@sutherland.com
Counsel for PLAINTIFFS


MS. SARAH F. POWERS
SBOT NO. CA. 238184
WARGO FRENCH LLP
1888 Century Park F
Suite 1520
Los Angeles, California 90067
Telephone:  310-853-6300
Fax:  310-853-6333
E-mail:  Spoers@wargofrench.com
Counsel for PLAINTIFFS

MR. GEOFF GANNAWAY
SBOT NO. 24036617
MR. BRYON RICE
SBOT NO. 24065970
BECK REDDEN
1221 McKinney
Suite 4500
Houston, Texas 77010
Telephone:  713-951-6263
Fax:  713-951-3720
E-mail:  Ggannaway@beckredden.com
Counsel for DEFENDANTS

illegal activity. Todd Hale expressly testified under oath that he had a spreadsheet of LoanStar customers and other customers that he maintained on his computer and that when he left it was there. It should be there, and they told us that they can't find it.

So, that is why we asked that.

MR. GANNAWAY: The only evidence they have of any document that we were not able to find from any of those hard drives was Todd Hale's spreadsheet.

I will tell your Honor last week I actually went back again to make sure that we had done our level best to try to find the Todd Hale spreadsheet he said in his testimony. I think that he enlisted 20 people on the spreadsheet. It should be have been on his computer in Office No. -- Store No. 20 in Austin. I drove over to Store No 20 in Austin. I went through, again, to make sure that we had done our level best.

I did find a spreadsheet that has a list of names and addresses, and I have got it here if your Honor would like to see it. It is not -- entitled Todd Hale Database. He has a little folder that he left behind. It is not in his -- I don't know if this is out to Mr. Hale to ask him -- he is a former employee that doesn't like me very much. And I asked him is this the spreadsheet you are referring to. He said that I went to the Harris County website and I read that the Plaintiffs say that you are using a rogue employee defense. If that applies to me, then I am not going to answer your question. So, please describe your rogue employee defense in detail,

to which I demurred and did not respond.

But -- so, any rate, I have a spreadsheet that has a list of names and addresses. I have no other way of knowing that this a good list of names and addresses. But if it is what they want, I got it.

THE COURT: Todd Hale is that the name?

MR. GANNAWAY: Yes.

THE COURT: Have you had any communications with Todd Hale?

MS. POWERS: Not since his deposition.

THE COURT: So, you don't know if this is the spreadsheet? You haven't asked is this his spreadsheet?

MS. POWERS: That's correct. I have not seen it.

THE COURT: Wonder how you confirm that that was his spreadsheet that he prepared? Did that come off of his computer?

MR. GANNAWAY: It came off --

THE COURT: Well, did that come off a computer that he had access to?

MR. GANNAWAY: Yeah. That is true.

THE COURT: Make your Request.

MS. POWERS: If they'd produced it at the time that we requested, we could have asked it Mr. Hale about it during his deposition.

THE COURT: I understand.

MR. GANNAWAY: And I'm telling your Honor that I went back and did this again to see if there was anything fitting the category. There is not a search term that I could have run. Doesn't say

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR LOANS, AND d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP | ) IN THE DISTRICT COURT ) ) ) ) ) |
| vs. | ) HARRIS COUNTY, TEXAS ) |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC; and TITLEMAX OF TEXAS, INC. | ) ) ) ) 152ND JUDICIAL DISTRICT |

_____

**OBJECTIONS TO CORPORATE REPRESENTATIVE DEPOSITIONS**

_____

On the 10TH day of July, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

OBJECTIONS TO CORPORATE REPRESENTATIVE DEPOSITIONS
*OCTOBER 10, 2014*

**APPEARANCES**

MR. JOHN DANIEL JOHNSON
SBOT NO. 24046165
SUTHERLAND ASBILL & BRENNAN, LLP
1001 Fannin
Suite 3700
Houston, Texas 77002
Telephone: 713-470-6100
Fax: 713-654-1301
E-mail: Daniel.johnson@sutherland.com
Counsel for PLAINTIFFS

MS. CHRISTINA GOEBELSMANN
SBOT NO. CA. 273379
WARGO FRENCH LLP
1888 Century Park F
Suite 1520
Los Angeles, California 90067
Telephone: 310-853-6300
Fax: 310-853-6333
E-mail: Cgoebelsmann@wargofrench.com; jozmer@wargofrench.com
Counsel for PLAINTIFFS

MR. GEOFF GANNAWAY
SBOT NO. 24036617
BECK REDDEN
1221 McKinney
Suite 4500
Houston, Texas 77010
Telephone: 713-951-6263
Fax: 713-951-3720
E-mail: Ggannaway@beckredden.com
Counsel for DEFENDANTS

MR. STEPHEN T. LABRIOLA
SBOT NO.
FELLOWS LABRIOLA
Suite 2300. South Tower
225 Peachtree Street, NE
Atlanta, Georgia 30303
Telephone: 404-586-9200
Fax: 404-529-4028
E-mail: Slabriola@fellab.com
Counsel for DEFENDANTS

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

OBJECTIONS TO CORPORATE REPRESENTATIVE DEPOSITIONS
*OCTOBER 10, 2014*

MS. GOEBELSMANN: I'm not sure.

MR. GANNAWAY: And let me give a little more context to this, your Honor. This was the subject of an earlier issue we discussed before your Honor.

There -- Todd Hale is one of our former employees. He said when I left Store No. 20 in Austin, I left a spreadsheet that I had listed some marketing folks on and some folks that I wanted to market to on it. I believe some of those were obtained from PublicData.

So, I went and looked at Store 20. I actually drove to Austin and looked at their computers. And I found a spreadsheet that looks like a list of addresses. It doesn't -- it wasn't Todd Hale's addresses.

If it will put the issue to rest, I will produce that to them even if I don't know it's the right document. If you will recall I said I contacted Todd Hale is this your document. He said go -- I'd rather not tell you.

THE COURT: Blow it somewhere else?

MS. GOEBELSMANN: And that is part of our concern, as well, is that there may be more out there because these employees got so concerned.

MR. GANNAWAY: There is no indication it was destroyed.

THE COURT: Objection to 5 is sustained.

MS. GOEBELSMANN: And, for the record, they have served the same topic on our corporate representative as well but have indicated that they were only going to be going forward if the Court granted

# Exhibit C

0794

Page 1

ATTORNEYS' EYES ONLY

NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES, IN THE DISTRICT COURT
LLC., d/b/a LOANSTAR TITLE
LOANS and INTEGRITY TEXAS
FUNDING, LP,

    Plaintiffs,

VS. OF HARRIS COUNTY, TEXAS

TMX FINANCE HOLDINGS, INC.;
TMX FINANCE, LLC.; TMX
FINANCE OF TEXAS, INC.;
TITLEMAX OF TEXAS, INC.;
FELIX DeLEON; and ISHMAEL
HERNANDEZ,

    Defendants.

_____/

ATTORNEYS' EYES ONLY

VIDEOTAPE DEPOSITION OF LINDA McDONALD

TAKEN:    Pursuant to Notice by
             Counsel for the Plaintiffs

PLACE:    Hunter MacLean
             200 E. Saint Julian Street
             Savannah, GA 31401

DATE:    Thursday, May 1, 2014

TIME:    Began: 8:57 a.m.
             Ended: 12:34 p.m.

BEFORE:    TRACIE L. THOMPSON, RPR, CRR, CLR
             Notary Public
             State of Florida at Large

ATTORNEYS' EYES ONLY

APPEARANCES

For the Plaintiffs:          SARAH F. POWERS, ESQ.
                             CHRISTINA GOEBELSMANN, ESQ.
                             Wargo French
                             1888 Century Park East
                             Suite 1520
                             Los Angeles, CA   90067
                             305-913-8587
                             spowers@wargofrench.com
                             cgoebelsmann@wargofrench.com


For the Defendants:          STEPHEN T. LaBRIOLA, ESQ.
                             Fellows LaBriola, LLP
                             225 Peachtree Street, NE
                             Suite 2300, South Tower
                             Atlanta, GA   30303
                             404-586-9200
                             slabriola@fellab.com

                             VICTORIA H. NEWMAN, ESQ.
                             TMX Finance
                             15 Bull Street
                             Suite 200
                             Savannah, GA   31401
                             912-503-2824
                             victoria.newman@titlemax.com

Also Present:                Diana Gundelfinger,
                             Videographer


                   *  *  *  *  *  *

MR. LaBRIOLA: I'm aware of no subpoena. You sent a notice.

MS. POWERS: Pardon me?

MR. LaBRIOLA: Shorten the time frame and we'll comply with Texas civil procedure.

MS. POWERS: Are you planning on producing documents or providing further written response at the end of the 30 day period?

MR. LaBRIOLA: Yes, as noted in the pleading file yesterday.

BY MS. POWERS:

Q Before -- pardon me. Strike that.

What prompted you to send the November 2011 e-mail you just described?

A Our president texted me and said that LoanStar claimed that we were going to their parking lot, that an employee was going to a parking lot.

Q In November of 2011?

A In November of 2011, and since we had prior discussions that we're not to subscribe to that practice, he asked me to follow up again and make sure that everybody was clear that we should not be following that practice. So I did. I followed up with my regional managers to make sure that they knew and that they spoke to each district manager and that

each district manager spoke to each store that we don't subscribe to that practice.

Q   And who was the president that texted you?

A   John Robinson.

Q   Do you recall what the text said?

A   It said that LoanStar is claiming we have an employee going to a competitor's parking lot.  We need you to check into it and make sure it's not occurring.

Q   Why do you feel that that practice is a poor business practice?

A   Again, I think it's not ethical.  It's not the right way to do business.  It's not an effective way to do business.  I just think it's an improper business approach.

Q   Now, I believe you just testified that prior to November 11 you had heard of the practice of employees going to competitors' parking lots; is that correct?

MR. LaBRIOLA:  Objection as to form.

THE WITNESS:  No, I hadn't heard of it.  I had -- we have always been coached as employees of TitleMax that we should not do that.  We should not go to competitors', any competitors' parking lot and solicit their business because

# Exhibit D

0799

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, | § | IN THE DISTRICT COURT |
| d/b/a LOANSTAR TITLE LOANS, d/b/a | § | |
| MONEYMAX TITLE LOANS, and d/b/a | § | |
| LOANMAX; MEADOWWOOD FINANCIAL | § | |
| SERVICES, LLC, d/b/a LOANSTAR TITLE | § | |
| LOANS, and d/b/a MONEYMAX TITLE | § | |
| LOANS; and INTEGRITY TEXAS | § | |
| FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; and | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| | § | |
| Defendants. | § | 152ND JUDICIAL DISTRICT |

## DEFENDANTS TMX FINANCE OF TEXAS, INC. AND TITLEMAX OF TEXAS, INC.'S RESPONSES TO PLAINTIFFS' SEVENTH REQUEST FOR PRODUCTION AND DEFENDANT TMX FINANCE LLC'S RESPONSES TO PLAINTIFFS' SECOND REQUEST FOR PRODUCTION

TO: Plaintiffs by and through their attorneys of record, Kent C. Sullivan, Daniel Johnson, and Robert A. Lemus, Sutherland Asbill & Brennan, LLP, 1001 Fannin, Suite 3700, Houston, Texas 77002; and Joseph D. Wargo, Wargo French, LLP, 999 Peachtree Street, N.E. 26th Floor, Atlanta, Georgia 30309.

Defendants TMX Finance of Texas, Inc. and TitleMax of Texas, Inc. hereby serve their Responses to Plaintiffs' Seventh Request for Production. Defendant TMX Finance LLC hereby serves its Responses to Plaintiffs' Second Request for Production.

1730.00001/550071.v1                                    1

0800

Respectfully submitted,

BECK REDDEN LLP


By: /s/ Geoff Gannaway
    David J. Beck
    State Bar No. 00000070
    Geoff A. Gannaway
    State Bar No. 24036617
    Bryon A. Rice
    State Bar No. 24065970
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel: 713-951-3700
Fax: 713-951-3720
Email: dbeck@beckredden.com
        ggannaway@beckredden.com
        brice@beckredden.com

    Stephen T. LaBriola
    Christina M. Baugh
FELLOWS LABRIOLA LLP
Suite 2300, South Tower, Peachtree Center
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
Tel. 404 586-9200
Fax: 404 529-4028
Email: slabriola@fellab.com
        cbaugh@fellab.com

ATTORNEYS FOR DEFENDANTS AND COUNTER-
PLAINTIFFS TMX FINANCE OF TEXAS, INC.,
TITLEMAX OF TEXAS, INC. AND TMX FINANCE
LLC ("DEFENDANTS")

0801

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 27th day of October, 2014, by email:

**SUTHERLAND ASBILL & BRENNAN LLP**
Kent C. Sullivan, Esq.
Daniel Johnson, Esq.
Robert A. Lemus, Esq.
Facsimile: (713) 654-1301
Email: kent.sullivan@sutherland.com
Email: daniel.johnson@sutherland.com
Email: robert.lemus@sutherland.com
Email: carla.kelley@sutherland.com

**WARGO & FRENCH LLP**
Joseph D. Wargo, Esq.
Abigail Joy Stecker, Esq.
Sarah Powers, Esq.
Christina Goebelsmann, Esq.
Email: jwargo@wargofrench.com
Email: astecker@wargofrench.com
Email: spowers@wargofrench.com
Email: cgoebelsmann@wargofrench.com
Email: ecastaneda@wargofrench.com

_/s/ Geoff Gannaway_

**0802**

## General Objections

1. Defendants object to the Instructions to the extent that they seek to place a burden upon Defendants greater than that provided by the Texas Rules of Civil Procedure.

2. Defendants reserve the right to supplement and/or amend its responses to these Requests for Production in accordance with the Texas Rules of Civil Procedure.

3. Defendants object to the definition of "Documents" as overbroad and unduly burdensome. For example, Defendants object to requests for electronic or magnetic data that include "back-up copies" and "dormant or remnant files" because such data is not reasonably available to the responding party in its ordinary course of business. See **TEX. R. CIV. P.** 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.*

4

0803

## RESPONSES TO SEVENTH REQUEST FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All Documents that refer or relate to Your claim for attorneys' fees, including any fee agreements between You and Your counsel (including but not limited to Beck Redden LLP and Fellows Labriola LLP) related to this litigation, time records kept by Your counsel, and invoices for legal services provided to You.

**RESPONSE:** Defendants will produce responsive documents relevant to Defendants' counterclaim, with privileged information redacted.

### REQUEST FOR PRODUCTION NO. 2:

All Documents or Communications received or sent between You or Your counsel, on the one hand, and any third party (whether pursuant to subpoena or otherwise), on the other hand, relating to searches of the DMV Databases. This includes, but is not limited to, communications between You or Your counsel and the Texas Department of Motor Vehicles, the State of Texas, The Source for Public Data, LP d/b/a PublicData.com, DataTrax Services LLC, and Zebec Data Systems, Inc.

**RESPONSE:** Consistent with the Rules, Defendants will produce documents received as a result of subpoenas they served on third parties. To the extent Plaintiffs contend further information should be produced, Defendants object to this Request as overbroad and unduly burdensome, and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

### REQUEST FOR PRODUCTION NO. 3:

All Documents or Communications received or sent between You or Your counsel, on the one hand, and any third party, on the other hand, in connection with or related to any subpoena served on the third party in this lawsuit.

**RESPONSE:** Consistent with the Rules, Defendants will produce documents received as a result of subpoenas they served on third parties. To the extent Plaintiffs contend further information should be produced, Defendants object to this Request as overbroad and unduly burdensome, and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

0804

## REQUEST FOR PRODUCTION NO. 4:

Any and all Documents or Communications received or sent between You or Your counsel and any expert designated by You in this case.

**RESPONSE:** Defendants object that this Request is barred by Texas Rule of Civil Procedure 195.1.

## REQUEST FOR PRODUCTION NO. 5:

The Hard Drives of each and every computer in Your possession, custody, or control to which Todd Hale had access while employed by You.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. The Texas Supreme Court has recognized that "[p]roviding access to information by ordering examination of a party's electronic storage device is particularly intrusive and should be generally discouraged, just as permitting open access to a party's file cabinets for general perusal would be." *In re Weekley Homes*, 295 S.W.3d 309, 317 (Tex. 2009) (orig. proceeding).

> As a threshold matter, the requesting party must show that the responding party has somehow defaulted in its obligation to search its records and produce the requested data. The requesting party should also show that the responding party's production "has been inadequate and that a search of the opponent's [electronic storage device] could recover deleted relevant materials." Courts have been reluctant to rely on mere skepticism or bare allegations that the responding party has failed to comply with its discovery duties. Even if the requesting party makes this threshold showing, courts should not permit the requesting party itself to access the opponent's storage device; rather, only a qualified expert should be afforded such access, and only when there is some indication that retrieval of the data sought is feasible. Due to the broad array of electronic information storage methodologies, the requesting party must become knowledgeable about the characteristics of the storage devices sought to be searched in order to demonstrate the feasibility of electronic retrieval in a particular case. And consistent with standard prohibitions against "fishing expeditions," a

0805

court may not give the expert carte blanche authorization to sort through the responding party's electronic storage device. Instead, courts are advised to impose reasonable limits on production. Finally, federal courts have been more likely to order direct access to a responding party's electronic storage devices when there is some direct relationship between the electronic storage device and the claim itself.

*Id.* at 317–19 (internal citations omitted). None of the necessary showings have been made: Defendants have not defaulted on their obligation to search records, and there has been no evidence that a search might recover deleted materials, that retrieval of the data sought might be feasible, "the particular characteristics of the electronic storage devices involved, the familiarity of [Plaintiffs'] experts with those characteristics, or a reasonable likelihood that the proposed search methodology would yield the information sought." *Id.* at 311. Moreover, if the Court orders Defendants to produce hard drives, Defendants request an "order that the requesting party pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information." TEX. R. CIV. P. 196.4.

## REQUEST FOR PRODUCTION NO. 6:

The Hard Drives of each and every computer in Your possession, custody, or control to which Lucia Grajeda had access while employed by You.

**RESPONSE:** Defendants incorporate by reference the response to Request No. 5.

## REQUEST FOR PRODUCTION NO. 7:

The Hard Drives of each and every computer in Your possession, custody, or control to which Felix DeLeon had access while employed by You.

**RESPONSE:** Defendants incorporate by reference the response to Request No. 5.

## REQUEST FOR PRODUCTION NO. 8:

Documents sufficient to identify the company or companies that provided mobile phone services for any mobile phone numbers used by any of the Corporate Employees for each month between August 2011 and June 2013.

**RESPONSE:** Defendants object to this Request as overbroad and unduly

0806

burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST FOR PRODUCTION NO. 9:

Any and all Documents and Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees to/from representatives or employees of DataTrax, PublicData and/or any other DMV Databases.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents received, created, or sent by any of the Corporate Employees to/from representatives or employees of DataTrax, PublicData and/or any other DMV Databases in Texas.

## REQUEST FOR PRODUCTION NO. 10:

Any and all Documents and Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to any of the DataTrax, PublicData and/or any other DMV Databases.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce

0807

responsive, non-privileged documents relating to use of DataTrax or PublicData to identify Plaintiffs' customers in Texas.

## REQUEST FOR PRODUCTION NO. 11:

Any and all Documents and Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to Marketing to Customers of LoanStar and/or Integrity.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents that refer or relate to Marketing to Customers of LoanStar and/or Integrity in Texas.

## REQUEST FOR PRODUCTION NO. 12:

Any and all Documents and Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to employees of TMX Finance, TMX Finance TX, and/or TitleMax TX using the DMV Databases to Market to Customers of Competitors within the State of Texas.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce

0808

responsive, non-privileged documents relating to use of DataTrax or PublicData to identify Plaintiffs' customers in Texas.

## REQUEST FOR PRODUCTION NO. 13:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to the possession of search results from the DMV Databases by employees of TMX Finance, TMX Finance TX, and/or TitleMax.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents relating to possession of search results from DataTrax or PublicData conducted to identify Plaintiffs' customers in Texas.

## REQUEST FOR PRODUCTION NO. 14:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to the possession of a list or other compilation of names and/or addresses including customers of Integrity or LoanStar in Texas by employees of TMX Finance, TMX Finance TX, and/or TitleMax TX.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist.

0809

Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents relating to possession of a list from DataTrax or PublicData conducted to identify Plaintiffs' customers in Texas.

## REQUEST FOR PRODUCTION NO. 15:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to license plate numbers recorded, copied, or acquired during visits by employees of TMX Finance, TMX Finance TX, and/or TitleMax TX to any Non-TitleMax Parking Lots.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents relating to license plate numbers recorded, copied, or acquired during visits to Plaintiffs' parking lots in Texas.

## REQUEST FOR PRODUCTION NO. 16:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to relating to any of the employees of TMX Finance, TMX Finance TX, and/or TitleMax TX recording, copying, or acquiring vehicle identification numbers (or VIN) or license plate numbers of vehicles located in Non-TitleMax Parking Lots.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—

0810

retrieve the data or information requested or produce it in the form requested. *Id.* Lastly, Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged documents relating to license plate numbers or vehicle identification numbers recorded, copied, or acquired during visits to Plaintiffs' parking lots in Texas.

## REQUEST FOR PRODUCTION NO. 17:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to TitleMax's policies, rules, and/or codes of conduct related to the solicitation of Customers of Competitors in the state of Texas by employees of TMX Finance, TMX Finance TX, and/or TitleMax TX.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Defendants also object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Lastly, Defendants object to the extent this Request calls for documents subject to attorney-client or work product privileges. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged policies, rules, and/or codes of conduct related to the solicitation of Customers of Competitors in the state of Texas.

## REQUEST FOR PRODUCTION NO. 18:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to any noncompliance of employees of TMX Finance, TMX Finance TX, and/or TitleMax TX with TitleMax's policies, rules, and/or codes of conduct related to the solicitation of Customers of Competitors in the state of Texas.

0811

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Defendants object to the extent responsive documents have already been produced or Plaintiffs have been informed that no responsive documents exist. Lastly, Defendants object to the extent this Request calls for documents subject to attorney-client or work product privileges. Subject to, and without waiving, the foregoing objections, Defendants will produce responsive, non-privileged policies, rules, and/or codes of conduct related to the solicitation of Customers of Competitors in the state of Texas.

## REQUEST FOR PRODUCTION NO. 19:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by any of the Corporate Employees that refer or relate to the allegations in the complaint, amended complaints, or answers thereto.

**RESPONSE:** Defendants object to this Request as overbroad and unduly burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Defendants also object to this Request as vague and ambiguous and to the extent responsive documents have already been produced or Plaintiffs have been told responsive documents do not exist.

## REQUEST FOR PRODUCTION NO. 20:

Any and all Documents or Communications, including but not limited to Text Messages, received, created, or sent by the Corporate Employees that refer or relate to the allegations in the Petition and/or Answer.

**RESPONSE:** Defendants object to this Request as overbroad and unduly

0812

burdensome and as seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request for "Text Messages" because such data is not reasonably available to the responding party in its ordinary course of business. *See* TEX. R. CIV. P. 196.4. Consequently, Defendants cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested. *Id.* Defendants also object to this Request as vague and ambiguous and to the extent responsive documents have already been produced or Plaintiffs have been told responsive documents do not exist.

0813

# Exhibit E

0814

NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | ) IN THE DISTRICT COURT ) ) ) |
| Plaintiffs, | ) |
| versus | ) |
| | ) HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | ) ) ) ) ) |
| Defendants. | ) 152nd JUDICIAL DIST. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

RANDY LEE RAINEY

JULY 8, 2014

VOLUME 1 OF 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF RANDY LEE RAINEY, produced as a witness duly sworn by me at the instance of the Defendants, was taken in the above styled and numbered cause on JULY 8, 2014, from 9:03 AM to 10:44 AM, before Beth Howard, CSR in and for the State of Texas, reported by Machine Shorthand, at the offices of Abby Office Preston Center, located at 5956 Sherry Lane, Suite 1000, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure, Notice, Subpoena, and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    CHRISTINA GOEBELSMANN, ESQ.

    Wargo French

    1888 Century Park East, Suite 1520

    Los Angeles, California  90067

    (310) 853-6807 - FAX: (310) 853-6333

    cgoebelsmann@wargofrench.com

FOR THE DEFENDANTS TMX FINANCE HOLDINGS, INC.; TMX
FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; and TITLEMAX
OF TEXAS,INC.:

    BRYON RICE, ESQ.

    Beck Redden

    1221 McKinney Street, Suite 4500

    Houston, Texas  77010

    (713) 951-6256 - FAX: (713) 951-3720

    brice@beckredden.com

    VICTORIA H. NEWMAN, ESQ. (Telephonically)

    TMX Finance

    15 Bull Street, Suite 200

    Savannah, Georgia  31401

    (912) 503-2824

    Victoria.newman@titlemax.com

VIDEOGRAPHER:

    Mr. John Hines

    Mr. Arthur Estes

And another place on Central Expressway somewhere between -- it's on the west side of Central Expressway, somewhere between, like, Spring Valley and Alpha, somewhere in -- somewhere around there, within a mile or half mile. And it was, like, a little odd -- very odd little mom-and-pop kind of place. It was, like, in a weird little office at the end of, like, a motel. I don't know the name of that place.

Q. Was that an auto title loan company?

A. I don't know everything -- They did auto loans, the title loans, but I -- they may have had other loan services as well. I'm not sure.

Q. Were there any other places that you accompanied Tom where you would be writing down license plate numbers?

A. If there is, I don't recall. Just those three that I recall.

Q. Okay. And those three times you accompanied him, during what month and year did that occur?

A. It would have been within the couple weeks after I was -- within a week to two weeks after I was hired; and I would say somewhere between the second and fourth, fifth week --

Q. Okay. You --

A. -- when I was there.

Q. Would that be November 2011?

A. Yeah.

Q. Okay.

A. November -- it may be into early December, but probably not beyond that.

Q. Okay. And what exactly did Tom do when he brought you to these parking lots?

A. So the first time that we went to -- he went to the one -- and I think -- I know it was at least twice. Maybe I went there more. Maybe three or four times. I'm not sure. But the one on -- the location on Buckingham, I believe it's Buckingham and Belt Line Road, in east Richardson, we would park -- There was some kind of grocery store or something. Like, it was on the corner of the -- of the intersection.

So we would park, like, adjacent in the parking lot beside it. And I couldn't really see the license plates, because apparently he had a lot better vision than I did. But sometimes he would call them off and I would write them down.

And then he would take his smartphone and just go into, like, a website and log in, and he would find out general information. He told me that that was a website that -- that he paid for. It was information like -- sometimes there were a phone number, address.

It definitely told if the car that he was looking at in the parking lot just in front of us had a lien against .it, you know.

I never really questioned the practice, because he said that, you know, he wasn't going on their property, and that this was, you know, public data that he could buy, so....

Q. Do you know what the name was of the website that he used?

A. I do not. And I remember he was saying it was maybe 30, 40 bucks a month, something like that; and he got a num -- a certain number of searches for that, and that could have been like -- I don't remember, 20, 40 a -- you know, a month. I don't remember the exact numbers. But it was definitely a dollar amount that he paid for -- I guess you could go up or down on that level and get more searches, and then he -- but he had a set number of searches that he could do monthly.

Q. So was it your understanding that Tom had paid for this website service and was able to use it for a certain number of searches each month?

A. Yes.

Q. Okay. Did you ever see the smartphone screen when he was performing these searches?

A. Um-hmm. Yeah. He showed me I know at least

once where he would kind of scroll down and -- It's on his iPhone. He would just scroll down and I would see various information about -- that was associated with that license plate.

Q. Okay. And do you remember what that screen that you were viewing looked like?

A. Just your basic kind of gridded-out screen that you would see, with, you know, like a -- like a name and, like, information about it, like the -- like name and -- the person's name and address and stuff like that.

Q. What color was the screen?

A. I don't remember it being any bright colors. It was -- I don't -- I don't really remember.

Q. Okay. And do you remember how many search results would come up when he would search a license plate number?

A. Well, just the one result, because it would be whatever data that that search engine or company or whatever he was using had.

Q. Okay. Did he -- did Tom ever tell you whether or not he could search using information other than license plate numbers?

A. No. I don't remember anything like that, other than just that method I told you.

# Exhibit F

0821

| | |
|---|---|
| **From:** | Geoff Gannaway <ggannaway@beckredden.com> |
| **Sent:** | Wednesday, June 25, 2014 7:46 PM |
| **To:** | Powers, Sarah; Bryon Rice; 'Johnson, Daniel'; Wargo, Joseph D.; Goebelsmann, Christina; Stecker, Abigail |
| **Cc:** | 'Steve LaBriola'; 'Christina Baugh'; 'kconklin@fellab.com' |
| **Subject:** | RE: Wellshire et al. v. TMX Holdings et al. |

Sarah: We do not agree to provide the hard drive images. If you have requests for specific documents, we will respond to them through the normal course of discovery.

**From:** Powers, Sarah [mailto:spowers@wargofrench.com]
**Sent:** Wednesday, June 18, 2014 7:40 PM
**To:** Geoff Gannaway; Bryon Rice; 'Johnson, Daniel'; Wargo, Joseph D.; Goebelsmann, Christina; Stecker, Abigail
**Cc:** 'Steve LaBriola'; 'Christina Baugh'; 'kconklin@fellab.com'
**Subject:** Wellshire et al. v. TMX Holdings et al.

Geoff-

I am writing to request Defendants' production to Plaintiffs of certain hard drives of computers used to conduct the conduct described in Plaintiffs' Petition. As you know, based on the deposition testimony of both Mike Ryan and Todd Hale himself, Mr. Hale maintained a spreadsheet on his computer of customers to whom he had sent marketing materials, after obtaining their contact information from PublicData. We have requested the spreadsheet through a request for production, and Defendants' response was that the spreadsheet could not be located. Accordingly, we would like to submit the hard drive to our forensic computer expert for his analysis. Similarly, because both Felix DeLeon and Lucia Grajeda exercised their Fifth Amendment right to refuse to testify regarding their involvement in the illegal conduct, we intend to submit to our forensic expert the computers they used during the relevant time period of their employment with TitleMax. As each of these computers' hard drives has been imaged per the June 28, 2013 Rule 11 Agreement, please also produce the images of these hard drives for comparison.
Please call me if you would like to discuss.

Sincerely,

**Sarah F. Powers**
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California 90067
Telephone: (310) 853-6453 (direct)
Facsimile: (310) 853-6333
E-Mail: spowers@wargofrench.com
Website: www.wargofrench.com

WARGO
FRENCH
Atlanta I Los Angeles I Miami

The information in this message is intended for the addressee only and may contain privileged and confidential information. If you are not the intended recipient, please immediately stop reading this message, delete it from your system and notify the sender at spowers@wargofrench.com that it has been deleted. Any unauthorized reading, distribution, dissemination, copying, or other use of the information in this message is strictly prohibited.

1

0822

0823

# Exhibit G

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>* |
| Plaintiffs | *<br>* |
| VS. | * HARRIS COUNTY, TEXAS<br>* |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>* |
| Defendants | * 152ND JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD TODD HALE

MAY 15, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD TODD HALE, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 15th of MAY, 2014 from 9:06 a.m. to 2:50 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Sutherland Asbill & Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis

0825

County, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S


FOR THE PLAINTIFFS:

          Sarah F. Powers, Attorney at Law
                -and-
          Christina Goebelsmann, Attorney at Law
          WARGO FRENCH
          1888 Century Park East, Suite 1520
          Los Angeles, California 90067
          (305) 913-8587
          spowers@wargofrench.com



FOR THE DEFENDANTS:

          Geoff Gannaway, Esq.
          BECK REDDEN, LLP
          1221 McKinney, Suite 4500
          Houston, Texas 77030
          (713) 951-6263
          ggannaway@beckredden.com



ALSO PRESENT:

          Cody Hall, Videographer

Now, I believe this is one of the documents that was produced to you by Mr. Gannaway. Could you look at the document and confirm?

A. Yes, ma'am. This is one of the ones that I received from -- from him.

Q. Okay. Let's turn to the second page of this document. It's Bates labeled 1338 at the bottom. Do you see that?

A. Yes, ma'am.

Q. And there's an e-mail which appears to be from you to Patrick Sudduth at the bottom of that page.

A. Yes, ma'am.

Q. Okay. Is this an e-mail from you to Patrick Sudduth?

A. Yes, ma'am.

Q. Okay. And it is dated September 15th, 2012; is that correct?

A. That is correct.

Q. Okay. Would you read this e-mail out loud into the record?

A. It says, "I created a database using the data that we got from PublicData.com using the license plates from parked cars at our competition, Texas Title next door."

"I have about 20 names and addresses in

that database and all have liens on their titles according to public data."

"I then created this form letter and used mail merge to merge in the names and address information from the EXCEL database to personalize the letter."

"I'm mailing them out today."

"Todd."

Q. Okay. What do you remember, if anything, about this e-mail?

MR. GANNAWAY: Object to form.

A. I remember that, as I'd already testified on earlier, I had been instructed to use the public database and get the information to mail out. When I -- and if I look on the date on this e-mail, that lines up with the date on the first audit where Patrick says you're not meeting your goals; you're going to have to do more marketing. And so I started doing that. It was time-consuming the original way that he had instructed me to do it because you would have -- get names and information and I think at that time everybody else was just taking down names and information and then writing out an individ -- individualized letter to each individual -- individual on there. Okay.

So all I was trying to convey with this e-mail was I've made it a little bit easier by I created

a Microsoft EXCEL spreadsheet where I had on there the address and the city, state and zip code. And then used -- saved that as a mini database with all of that information and then used that in conjunction with Microsoft Word's merge program to then merge in the names and information just to make it simpler. So then you only had to type out one letter, and it automatically enumerates it with the correct names in here instead of having to do it -- each individual letter. And I was just telling him of that part of the idea.

So just to clarify, that was my idea. The idea of where to get that information is -- came from Patrick Sudduth.

Q. Now, that EXCEL spreadsheet that you just testified about, did -- did you leave that with TitleMax when you left?

A. Yes, ma'am. That was on the computer that I was using at the office.

Q. Okay. Was there any policy to purge that sort of information while you were there?

MR. GANNAWAY: Object to form.

A. No, ma'am.

Q. Did you have a copy of that EXCEL spreadsheet?

A. No, ma'am. I didn't keep it.

Q. Okay. Was it saved in any sort of online

database?

A. I didn't save it on any online database, no, ma'am.

Q. So you just saved it in a compute -- in one single computer; is that correct?

A. Yes, ma'am.

Q. Okay. Did you ever e-mail it to anyone?

A. Yeah. I mean, I think this -- that was part of this e-mail trail. Let me see. Or maybe there wasn't an attachment. Maybe he just said -- Okay. No. Then I guess I didn't attach it.

With regards -- Going back to this e-mail, Patrick responds and he says, "Good idea. Do you mind sharing that with everybody."

So then I did as he instructed, and I shared the -- I forwarded that e-mail then to everybody to give everybody else the idea of using Microsoft Word's merge program with the Public Data. But I guess I did not actually include the attachment of what I created on there.

Q. Well, and I'm just -- And I'm asking about the spreadsheet because we have requested it, and we're told that it couldn't be found. So I'm wondering if you have any concept as to where we might be able to find that spreadsheet?

A. Again, and I've been asked that same question now three times. I was asked that question when the first lady lawyer called me a year ago. I was asked that question again when Mr. Gannaway talked to me the other day. And now, I'm asked that question now. And it's the same response, which is it -- I had created it. I saved it on the computer that I was using at store office number 20. And I mean, I had no reason to take it with me. So I just -- I didn't. And so as far as I know when I left, it was still there on the computer that I was using at number 20.

Q. To your recollection, did you ever attach it to any e-mail or e-mail it to anybody so that it might be saved in a server somewhere?

A. I mean, honestly, I had thought that I -- I attached it with this e-mail trail. But obviously, I was wrong. So I mean, I don't -- I don't -- I guess I didn't.

Q. Okay. And at the time you left, did this spreadsheet include all of the names of the prospective customers that you had gotten from PublicData.com?

MR. GANNAWAY: Object to form.

A. Yes, ma'am, it did. But I need to clarify that it wasn't only -- that wasn't the only place there's information. We also got information from, for instance,

# Exhibit H

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, | § | IN THE DISTRICT COURT |
| LLC, d/b/a LOANSTAR TITLE LOANS | § | |
| and INTEGRITY TEXAS FUNDING, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | OF HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; | § | |
| TMX FINANCE, LLC; | § | |
| TMX FINANCE OF TEXAS, INC.; | § | |
| TITLEMAX OF TEXAS, INC.; | § | |
| FELIX DeLEON; | § | |
| and ISHMAEL HERNANDEZ, | § | |
| | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

## DEFENDANTS TMX FINANCE OF TEXAS, INC. AND TITLEMAX OF TEXAS, INC.'S RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION

TO: Plaintiff Wellshire Financial Services, LLC d/b/a LoanStar Title Loans and Integrity Texas Funding, LP by and through their attorneys of record, Kent C. Sullivan, Daniel Johnson, and Robert A. Lemus, Sutherland Asbill & Brennan, LLP, 1001 Fannin, Suite 3700, Houston, Texas 77002; and Joseph D. Wargo, Wargo French, LLP, 999 Peachtree Street, N.E. 26th Floor, Atlanta, Georgia 30309.

Defendants TMX Finance of Texas, Inc. and TitleMax of Texas, Inc. ("Defendants")

hereby serve their Responses to Plaintiffs' Third Requests for Production.

0834

Respectfully submitted,

BECK REDDEN, LLP

By: _____
David J. Beck
State Bar No. 00000070
Geoff A. Gannaway
State Bar No. 24036617
Bryon A. Rice
State Bar No. 24065970
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel: 713-951-3700
Fax: 713-951-3720
Email: dbeck@beckredden.com
        ggannaway@beckredden.com
        brice@beckredden.com

ATTORNEYS FOR DEFENDANTS
TMX FINANCE OF TEXAS, INC. AND
TITLEMAX OF TEXAS, INC.

0835

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on counsel of record in accordance with Rules 21 and 21a of the Texas Rules of Civil Procedure on this 4th day of April, 2014, by email and facsimile:

**SUTHERLAND ASBILL & BRENNAN, LLP**
Kent C. Sullivan
Daniel Johnson
Robert A. Lemus
Facsimile: (713) 654-1301
E-mail: kent.sullivan@sutherland.com
E-mail: daniel.johnson@sutherland.com
E-mail: robert.lemus@sutherland.com

**WARGO & FRENCH, LLP**
Joseph D. Wargo
Kenneth W. Stroud
Jessica C. Casey
Facsimile: (404) 853-1501
E-Mail: jwargo@wargofrench.com

By: _____
Geoff A. Gannaway

0836

## General Objections

1.  Defendants object to the Instructions to the extent that they seek to place a burden upon Defendants greater than that provided by the Texas Rules of Civil Procedure.

2.  Defendants reserve the right to supplement and/or amend its responses to these Requests for Production in accordance with the Texas Rules of Civil Procedure.

0837

## RESPONSES TO REQUEST FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All contracts or agreements by and between any Defendant, on the one hand, and DataTrax, on the other hand, dated from September 1, 2011 to the present.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object to the extent this request seeks information regarding contracts that might have been entered by persons or entities other than Defendants. Subject to those objections, none.

### REQUEST FOR PRODUCTION NO. 2:

All contracts or agreements by and between any Defendant, on the one hand, and, The Source for PublicData LP (also known as PublicData), on the other hand, dated from September 1, 2011 to the present.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object to the extent this request seeks information regarding contracts that might have been entered by persons or entities other than Defendants. Subject to those objections, none.

### REQUEST FOR PRODUCTION NO. 3:

All emails by, received by, or otherwise in the inbox or deleted items folder for Todd Hale from September 1, 2011 to the present that refer or relate to visiting parking lots of any broker or provider of car title loans.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

### REQUEST FOR PRODUCTION NO. 4:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Todd Hale from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any existing car title loans or loans held by entities other than TitleMax.

0838

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 5:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Todd Hale from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DatraTrax, or the Texas Department of Motor Vehicles ("DMV").

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 6:

The spreadsheet or database used by Todd Hale and identified in the deposition of Patrick Sudduth in which Hale kept track of license plate numbers and other information on potential buyout or refinance customers.

**RESPONSE:** Defendants have not yet been able to locate the document, but will produce it if it is located.

## REQUEST FOR PRODUCTION NO. 7:

All emails sent by, received by, or otherwise in the inbox or deleted items or deleted items folder for Ernest Page from September 1, 2011 to the present that refer or relate to visiting parking lots of any broker or provider of car title loans.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

0839

## REQUEST FOR PRODUCTION NO. 8:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Ernest Page from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any existing car title loans held by entities other than TitleMax.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 9:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Ernest Page from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 10:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Ishmael Hernandez from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any competitor's existing car title loan or loans.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

0840

## REQUEST FOR PRODUCTION NO. 11:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Ishmael Hernandez from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

RESPONSE: Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.


## REQUEST FOR PRODUCTION NO. 12:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Felix DeLeon from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any competitor's existing car title loan or loans.

RESPONSE: Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.


## REQUEST FOR PRODUCTION NO. 13:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Felix DeLeon from September 1, 2011 to the present that refer or relate to The Source for PublicData LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

RESPONSE: Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

0841

## REQUEST FOR PRODUCTION NO. 14:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Michael Ryan from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any existing car title loan or loans held by entities other than TitleMax.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 15:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Michael Ryan from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 16:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Rad Casillas from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any existing car title loan or loans held by entities other than TitleMax.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

0842

## REQUEST FOR PRODUCTION NO. 17:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for Rad Casillas from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 18:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for James Batterson from September 1, 2011 through the present that refer or relate to a "buyout" or refinance of any existing car title loan or loans held by entities other than TitleMax.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

## REQUEST FOR PRODUCTION NO. 19:

All emails sent by, received by, or otherwise in the inbox or deleted items folder for James Batterson from September 1, 2011 to the present that refer or relate to The Source for PublicData, LP (also known as PublicData), DataTrax, or the Texas Department of Motor Vehicles ("DMV").

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit. Defendants further object pursuant to TRCP 196.4 because they cannot through reasonable efforts retrieve the data or information requested. Subject to those objections, Defendants will run keyword searches to locate responsive documents related to Plaintiffs.

0843

## REQUEST FOR PRODUCTION NO. 20:

All documents referring or relating to divisional meetings held by You from September 1, 2011 to the present, including but not limited to meeting minutes and itineraries. This request is limited to those divisional meetings involving the stores identified in Your response to Interrogatory No. 1 of Plaintiffs' Second Set of Interrogatories, served concurrently herewith.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant evidence. The request is not limited to matters relevant to this lawsuit, or to the timeframe relevant to this lawsuit.

0844

# Exhibit I

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LOANSTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP,         Plaintiffs, | ) IN THE DISTRICT COURT ) ) ) ) ) ) |
| vs. | ) OF HARRIS COUNTY, TEXAS ) |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC; FELIX DELEON; and ISMAEL HERNANDEZ,         Defendants. | ) ) ) ) ) ) ) 152ND JUDICIAL DISTRICT |

ORAL VIDEOTAPED DEPOSITION

FELIX DELEON

June 24, 2013

ORAL VIDEOTAPED DEPOSITION OF FELIX DELEON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on June 24, 2013, from 2:53 p.m. to 3:21 p.m., before Teresa Saucier, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Sutherland Asbill & Brennan, 1001 Fannin, Suite 3700, Houston, Harris County, Texas, pursuant to Notice and the Texas Rules of Civil Procedure.

Carlisle Reporting   713-864-4443

APPEARANCES


FOR THE PLAINTIFFS:

    MR. JOSEPH WARGO (VIA TELEPHONE)
    WARGO FRENCH, LLP
    999 Peachtree Street, N.E., 26th Floor
    Atlanta, Georgia   30309


FOR DEFENDANTS TMX FINANCE OF TEXAS, INCORPORATED AND

TITLEMAX OF TEXAS, INCORPORATED:

    MR. GEOFF GANNAWAY
    BECK REDDEN
    1221 McKinney Street, Suite 4500
    Houston, Texas   77010
    Telephone: 713 951-6263
    E-mail: ggannaway@beckredden.com
    and
    MR. STEPHEN T. LABRIOLA
    FELLOWS LABRIOLA
    225 Peachtree Street, NE
    Suite 2300, South Tower
    Atlanta, Georgia   30303
    Telephone: 404 586-9200
    E-mail: slabriola@fellab.com


FOR DEFENDANT ISMAEL HERNANDEZ:

    MR. REECE RONDON
    HALL MAINS LUGRIN, PC
    2800 Post Oak Boulevard, 64th Floor
    Houston, Texas   77057
    Telephone: 713 871-9000
    E-mail: rrondon@hallmaineslugrin.com


FOR DEFENDANT FELIX DELEON:

    MS. CHRISTINA A. BRYAN
    SMYSER KAPLAN & VESELKA, LLP
    700 Louisiana, Suite 2300
    Houston, Texas   77002
    Telephone: 713 221-2345

APPEARANCES (Cont.)


ALSO PRESENT:

    Mr. Nicholas D'Angelo (Videographer)

0848

Page 12

A.    I invoke my Fifth.

Q.    You were aware, were you not, that you could not search the Datatrax database for purposes of discovering customers of your competitors so that you could then solicit those competitors?

MR. GANNAWAY:  Object to form.

MS. BRYAN:  Form.

A.    I invoke my Fifth.

Q.    Do you understand that in order to search the Datatrax database, you were required to certify that you were using the data for a permissible purpose, correct?

MR. GANNAWAY:  Object to form.

A.    I invoke my Fifth.

Q.    Did you provide such a certification?

MS. BRYAN:  Form.

A.    I invoke my Fifth.

Q.    What certification did you provide to Datatrax?

MS. BRYAN:  Objection, form.

A.    I invoke my Fifth.

Q.    You did certify to Datatrax, did you not, sir, that you would not use information that you obtained from Datatrax to solicit customers?

A.    I invoke my Fifth.

Q.    Isn't it true, sir, that you have searched the Datatrax databases for information related to Loanstar or Integrity customers?

MS. BRYAN:  Form.

A.    I invoke my Fifth.

Q.    When did you perform such a search for the first time?

MS. BRYAN:  Objection, form.

MR. GANNAWAY:  Form.

A.    I invoke my Fifth.

Q.    How many customer -- how many customers did you identify throughout all of the searches that you've done of the Datatrax database related to Loanstar or Integrity?

MR. GANNAWAY:  Objection, form.

MS. BRYAN:  Objection, form.

A.    I invoke the Fifth.

Q.    Approximately how many customers did you identify per search of the Datatrax system?

MR. GANNAWAY:  Object to form.

MS. BRYAN:  Objection, form.

A.    I invoke the Fifth.

Q.    Is it true -- it is true, is it not, sir, that you performed such searches of the Datatrax system within the scope of your employment with

Page 14

TitleMax?

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. What searches did you perform on the Datatrax system -- I'm sorry, on the Datatrax database that was, in any way, related to Loanstar or Integrity customers?

MS. BRYAN: Objection, form.

A. I invoke the Fifth.

Q. Did you do a search for the Austin, Texas area related to Integrity or Loanstar customers on the Datatrax database?

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. Did you do a search for Integrity or Loanstar customers in the Dallas area on the Datatrax database?

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. Did you do a search on the Datatrax database for Loanstar or Integrity customers in the Houston, Texas area?

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. Did you target specific area codes or zip

codes in any search of the Datatrax database system?

MR. GANNAWAY: Object to form.

MS. BRYAN: Form.

A.    I invoke the Fifth.

Q.    Did any of your bosses or superiors instruct you to perform any search of the Datatrax database?

A.    I invoke the Fifth.

Q.    Who instructed such a search?

MS. BRYAN: Objection, form.

MR. GANNAWAY: Object to form.

A.    I invoke the Fifth.

Q.    Sir, did you obtain any reports containing the names of Loanstar or Integrity customers as a result of a search of the Datatrax database?

MR. GANNAWAY: Object to form.

MS. BRYAN: Objection, form.

A.    I invoke the Fifth.

Q.    Sir, it's true that you solicited customers on behalf of TitleMax using information that you obtained from the Datatrax system?

MS. BRYAN: Form.

MR. GANNAWAY: Object to form.

A.    I invoke the Fifth.

Q.    Sir, it's true that you solicited customers

in order to make more money, those customers being Loanstar or Integrity customers, that you identified from the Datatrax database?

MR. GANNAWAY: Object to form.

MS. BRYAN: Form.

A. I invoke the Fifth.

Q. Sir, it's true that you solicited over a hundred customers using the Datatrax database that you identified -- let -- let me rephrase that, please.

Sir, it's true that you solicited using the Datatrax data -- database over a hundred customers who, in fact, were Integrity and Loanstar customers?

MS. BRYAN: Form.

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. Sir, you sent letters and flyers to customers you identified through the -- the Datatrax database. Isn't that true?

MS. BRYAN: Objection, form.

MR. GANNAWAY: Object to form.

A. I invoke the Fifth.

Q. And those customers were customers who were Integrity or Loanstar customers, were they not?

NO. 2013-33584

| | | |
|---|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, D/B/A LOANSTAR TITLE LOANS AND INTEGRITY TEXAS FUNDING, LP, | ) ) ) ) ) | IN THE DISTRICT COURT |
| Plaintiffs, | ) ) | |
| VS. | ) ) | HARRIS COUNTY, TEXAS |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DELEON; AND ISHMAEL HERNANDEZ, | ) ) ) ) ) ) | |
| Defendants. | ) | 152ND JUDICIAL DISTRICT |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

LUCIA GRAJEDA

June 27, 2013

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF LUCIA GRAJEDA, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 27th of June, 2013, from 10:19 a.m. to 12:53 p.m., before Heidi Morrison, CSR, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weisbart Springer Hayes, LLP, 212 Lavaca Street, Suite 200, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

        Mr. Kenneth W. Stroud
        WARGO FRENCH
        999 Peachtree Street, NE
        26th Floor
        Atlanta, Georgia  30309
        Telephone: (404) 853-1500
        Fax:  (404) 853-1569
        E-mail: kstroud@wargofrench.com

FOR THE DEFENDANT LUCIA GRAJEDA:

        Mr. Tim Cleveland
        WEISBART SPRINGER HAYES, LLP
        212 Lavaca Street, Suite 200
        Austin, Texas  78701
        Telephone: (512) 652-5780
        Fax:  (512) 682-2074
        E-mail: tcleveland@wshllp.com

FOR THE DEFENDANTS TMX FINANCE OF TEXAS, INC., AND
TITLEMAX OF TEXAS, INC.:

        Mr. Bryon A. Rice
        BECK REDDEN
        1221 McKinney St., Suite 4500
        Houston, Texas  77010
        Telephone: (713) 951-6256
        Fax:  (713) 951-3720
        E-mail: brice@beckredden.com

ALSO PRESENT:

        Cody Hall, Videographer
        Sarah Sibley

MR. CLEVELAND: Is that agreeable?

MR. STROUD: That's agreeable, yes.

Q (By Mr. Stroud) As a general manager, did you work with Michael Ryan?

MR. RICE: Object to form.

A I plead the Fifth.

Q Do you know who Michael Ryan is?

A Yes.

Q What is Michael Ryan's position at TitleMax?

A I plead the Fifth.

Q Was he your supervisor?

A I plead the Fifth.

Q What stores did Michael Ryan oversee?

A I plead the Fifth.

Q Did he oversee your store?

A I plead the Fifth.

Q Are you familiar with a company called DataTracks?

A I plead the Fifth.

Q Did you ever obtain an account with DataTracks?

A I plead the Fifth.

Q Have you ever accessed a database maintained by DataTracks?

A I plead the Fifth.

Q   Have you ever accessed a database maintained by DataTracks on a computer that is owned or maintained by TitleMax?

A   I plead the Fifth.

Q   Have you ever accessed a database maintained by DataTracks for a computer -- on a personal computer?

A   I plead the Fifth.

Q   Have you ever maintained -- have you ever performed a search on a database maintained by DataTracks on any other computers?

A   I plead the Fifth.

Q   Have you ever performed any searches from the Texas Department of Motor Vehicle records?

A   I plead the Fifth.

Q   Okay.  Have you ever searched any database maintaining DMV records for the purposes of -- of locating customers of competitors?

A   I plead the Fifth.

Q   Have you ever searched any database, including, but not limited to, DataTracks, PublicData.com, or the Texas Department of Motor Vehicle records for the purpose of locating or identifying the names of customers of the plaintiffs in this case, Wellshire Financial, doing business as LoanStar Title Loans or Integrity Texas Funding?

MR. CLEVELAND: Objection --

A    I plead the Fifth.

MR. CLEVELAND: Objection; form.

Q    (By Mr. Stroud) Are you familiar with who LoanStar Title Loans is?

MR. CLEVELAND: Hang on a second.

I instruct you not to answer on Fifth Amendment grounds.

A    I plead the Fifth.

Q    (By Mr. Stroud) Are you familiar with who Integrity Texas Funding is?

A    I plead the Fifth.

Q    Have you ever accessed a database containing DMV records and then used the search results that were obtained to mail solicitations to the people identified on the search?

A    I plead the Fifth.

Q    Have you ever searched DataTracks for the names of customers of LoanStar Title Loans or Integrity Texas Funding?

A    I plead the Fifth.

Q    Have you ever searched DataTracks by a lienholder, specifically limited to Integrity Texas Funding?

A    I plead the Fifth.

CAUSE NO. 2013-33584

WELLSHIRE FINANCIAL          )  IN THE DISTRICT COURT
SERVICES, LLC, d/b/a         )
LOANSTAR TITLE LOANS         )
and INTEGRITY TEXAS          )
FUNDING, LP,                 )
          Plaintiffs,        )
                             )
vs.                          )  OF HARRIS COUNTY, TEXAS
                             )
TMX FINANCE HOLDINGS,        )
INC.; TMX FINANCE, LLC;      )
TMX FINANCE OF TEXAS,        )
INC.; TITLEMAX OF TEXAS,     )
INC; FELIX DELEON; and       )
ISMAEL HERNANDEZ,            )
          Defendants.        )  152ND JUDICIAL DISTRICT

ORAL VIDEOTAPED DEPOSITION

ISMAEL HERNANDEZ

June 24, 2013


     ORAL VIDEOTAPED DEPOSITION OF ISMAEL HERNANDEZ, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on June 24, 2013, from 1:52 p.m. to 2:40 p.m., before Teresa Saucier, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Sutherland Asbill & Brennan, 1001 Fannin, Suite 3700, Houston, Harris County, Texas, pursuant to Notice and the Texas Rules of Civil Procedure.

0859

APPEARANCES

FOR THE PLAINTIFFS:

MR. JOSEPH WARGO (VIA TELEPHONE)
WARGO FRENCH, LLP
999 Peachtree Street, N.E., 26th Floor
Atlanta, Georgia  30309


FOR DEFENDANTS TMX FINANCE OF TEXAS, INCORPORATED AND

TITLEMAX OF TEXAS, INCORPORATED:

MR. GEOFF GANNAWAY
BECK REDDEN
1221 McKinney Street, Suite 4500
Houston, Texas  77010
Telephone: 713 951-6263
E-mail: ggannaway@beckredden.com
and
MR. STEPHEN T. LABRIOLA
FELLOWS LABRIOLA
225 Peachtree Street, NE
Suite 2300, South Tower
Atlanta, Georgia  30303
Telephone: 404 586-9200
E-mail: slabriola@fellab.com


FOR DEFENDANT ISMAEL HERNANDEZ:

MR. REECE RONDON
HALL MAINS LUGRIN, PC
2800 Post Oak Boulevard, 64th Floor
Houston, Texas  77057
Telephone: 713 871-9000
E-mail: rrondon@hallmaineslugrin.com


FOR DEFENDANT FELIX DELEON:

MS. CHRISTINA A. BRYAN
SMYSER KAPLAN & VESELKA, LLP
700 Louisiana, Suite 2300
Houston, Texas  77002
Telephone: 713 221-2345

APPEARANCES (Cont.)


ALSO PRESENT:

    Mr. Nicholas D'Angelo (Videographer)
    Mr. Felix DeLeon

MR. RONDON: Yes, I am.

MR. WARGO: And, Chris, I'm sorry. You are as well?

MS. BRYAN: I have no objection to that. Yes. I'm comfortable with that.

MR. GANNAWAY: And -- and, I guess, Mr. Wargo, I'd ask are you comfortable with that as sufficiently invoking his Fifth Amendment rights?

MR. WARGO: I -- I am. If everyone's in agreement, I am. Thank you.

Q. Mr. Hernandez, could you tell me whether you provided any documents to any attorneys other than your counsel, Reece, in this case?

MR. RONDON: Give me one second real quick, Joe.

MR. WARGO: Yes.

MR. RONDON: Joe, we can talk about that later, if you like. And I -- I can -- I'll give you frank and open answers to that. But, Mr. Hernandez, I'm going to ask you to plead the Fifth?

A. I plead the Fifth.

Q. Sir, has anyone at any time -- at any time asked you to shred or dispose of any information that you believe is somehow related to the litigation?

A. I plead the Fifth.

Q. Do you have any information or documentation in your possession that you believe is relevant to this litigation?

A. I plead the Fifth.

Q. Sir, at any time, did you enter into a contract with Datatrax on your behalf or on behalf of TitleMax?

A. I plead the Fifth.

Q. Sir, if you entered into a contract, when did you do so?

MR. RONDON: I'm going to object to form.

A. I plead the Fifth.

Q. Sir, have you ever falsely identified yourself to Datatrax?

A. I plead the Fifth.

Q. Have you ever falsely identified yourself to TitleMax?

A. I plead the Fifth.

Q. Did you ever obtain any information from Datatrax?

A. I plead the Fifth.

Q. Did you ever obtain any information from Datatrax that was subsequently used by anyone at

TitleMax?

MR. RONDON: Objection, form.

MS. BRYAN: Objection, form.

A.    I plead the Fifth.

Q.    Did you ever obtain any information from Datatrax that, to your knowledge, was subsequently used by other people at TitleMax?

MR. GANNAWAY: Object to form.

A.    I plead the Fifth.

Q.    Sir, did you ever provide any certification to Datatrax that information you were obtaining from Datatrax would be used for a proper purpose?

A.    I plead the Fifth.

Q.    Could you tell me what proper purpose you stated to Datatrax in pulling the information?

MR. RONDON: Object to form.

A.    I plead the Fifth.

Q.    Are you aware of the fact that you cannot obtain information from Datatrax without certifying that the information is being obtained for a proper purpose?

MR. GANNAWAY: Object to form.

MR. RONDON: Object to form.

A.    I plead the Fifth.

Q.    Did you ever certify to Datatrax that you

were pulling information from its database for any purpose at all?

A. I plead the Fifth.

Q. Sir, are you aware of the fact that obtaining information from Datatrax for -- for purposes of soliciting customers was an improper purpose?

MS. BRYAN: Objection, form.

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. When you obtained information from Datatrax, did you use that information as an employee of TitleMax?

MR. RONDON: Objection, form.

MS. BRYAN: Objection, form.

A. I plead the Fifth.

Q. Did you use any Datatrax information to solicit customers that were Integrity customers?

MR. RONDON: Objection, form.

A. I plead the Fifth.

Q. Did you ever search the Datatrax databases for information that was related in any way to either Loanstar or Integrity?

A. I plead the Fifth.

Q. When did you perform your first search

seeking information related to Loanstar or Integrity?

MS. BRYAN: Objection, form.

MR. RONDON: Objection, form.

A. I plead the Fifth.

Q. When did you perform your first search using Datatrax databases for information related to Loanstar or Integrity?

MR. GANNAWAY: Objection, form.

MS. BRYAN: Objection, form.

MR. RONDON: Objection, form.

A. I plead the Fifth.

Q. How many customers did you identify -- I'm sorry. Let me start that over again.

How many Integrity or Loanstar customers did you identify through Datatrax searches?

MR. GANNAWAY: Objection, form.

MS. BRYAN: Objection, form.

MR. RONDON: Objection, form.

A. I plead the Fifth.

Q. How often did you perform a search of the Datatrax database for Loanstar or Integrity customers?

MR. RONDON: Objection, form.

A. I plead the Fifth.

MR. WARGO: What is the form

objection?

MR. RONDON: Can you repeat the question, please?

MR. WARGO: Would you read back the question?

MR. RONDON: Yeah. I'm asking her to.

(The record was read as requested.)

MR. RONDON: It assumes facts not in evidence.

Q. On average, how many different customers information did you obtain in any search that you performed?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Did you ever run searches where the results coming back were greater than 100?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Did you perform all of these searches within the scope of your employment at TitleMax?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Did you perform these searches at the direction of anyone else at TitleMax?

MR. GANNAWAY: Object to form.

A.     I plead the Fifth.

Q.     Sir, did you ever perform any search of a Datatrax database specifically seeking customer information of vehicles encumbered by liens made by Integrity?

A.     I plead the Fifth.

Q.     Sir, have you ever searched the Datatrax database by license plate number?

          MR. GANNAWAY:  Object to form.

A.     I plead the Fifth.

Q.     For any searches you performed on Datatrax's database for either Loanstar or Integrity customers, what geographic areas did you search for?

          MR. RONDON:  Object to form.

          MS. BRYAN:  Form.

A.     I plead the Fifth.

Q.     Did you ever seek information concerning Integrity customers in the Austin, Texas area?

A.     I plead the Fifth.

Q.     Did you ever seek information concerning Integrity customers for the Dallas, Texas area?

          MR. GANNAWAY:  Object to form.

A.     I plead the Fifth.

Q.     Did you ever seek information from Datatrax's database for Integrity customers in the

Houston, Texas area?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

MR. WARGO: Was there an objection to form?

MR. GANNAWAY: There was.

MR. WARGO: What is the objection?

MR. GANNAWAY: It's vague and ambiguous.

MR. WARGO: As to what term or phrase?

MR. GANNAWAY: As to whether he ran searches in the Houston area. It's a vague and ambiguous term and -- and is equally susceptible to permissible purpose searches.

Q. Sir, did any of your superiors or bosses instruct you to perform searches of any kind on the Datatrax database?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Who instructed you to perform such searches?

MS. BRYAN: Objection, form.

A. I plead the Fifth.

Q. Did you obtain reports containing the names of Loanstar or Integrity customers that resulted from

a search of the Datatrax database?

    MS. BRYAN: Objection, form.

    MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Sir, what did you do with the names of Loanstar or Integrity customers that you received from Datatrax searches?

    MR. RONDON: Object to form.

    MS. BRYAN: Objection.

A. I plead the Fifth.

Q. Sir, isn't it true that you solicited Loanstar or Integrity customers using information you obtained from Datatrax database searches?

    MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Isn't it true, sir, that you solicited over a hundred such Loanstar or Integrity customers?

    MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Isn't it true that you solicited over a hundred such Integrity or Loanstar customers using information you received from a Datatrax database search?

    MR. GANNAWAY: Object to form.

A. Plead the Fifth.

Q. Isn't it true, sir, that you sent letters and flyers offering to buy out existing loans held by Integrity using Datatrax database information?

MR. RONDON: Objection, form.

A. I plead the Fifth.

Q. Isn't it true, sir, that you sent over a hundred buyout letters to Loanstar and Integrity customers using Datatrax database information?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Isn't it true that you are aware of Loanstar or Integrity customers who stopped doing business with Loanstar or Integrity and started doing business with TitleMax as a result of your finding their names on Datatrax and sending buyout letters or other solicitations to those customers?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Isn't it true that the dollar amount of loans for customers that TitleMax -- I'm sorry, that you switched over from Loanstar or Integrity to TitleMax was in excess of $10,000?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. Isn't it true that the dollar amount of

loans for customers that you switched over from Loanstar or Integrity to TitleMax exceeded $50,000?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. And for purposes of those last two questions, I'm referring to customers that you switched over using information obtained from searches of the Datafax -- Datatrax database.

MR. RONDON: I'm sorry, Joe. Was that a question?

MR. WARGO: Yes.

Q. Do you understand my question?

MR. GANNAWAY: Object to form.

MR. RONDON: Would you -- would you rephrase, please?

Q. Okay. Mr. Hernandez, isn't it true that the dollar amount of loans for customers that you switched over from Loanstar or Integrity to TitleMax using information obtained from Datatrax was in excess of $50,000?

MR. GANNAWAY: Object to form.

A. I plead the Fifth.

Q. The same question. Was it in excess of $100,000?

MR. GANNAWAY: Same objection.

0872

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC, d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT * * * * |
| Plaintiffs | * * |
| VS. | * HARRIS COUNTY, TEXAS * |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DeLEON; and ISHMAEL HERNANDEZ, | * * * * * * |
| Defendants | * 152ND JUDICIAL DISTRICT |

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS B. KIRK

JUNE 5, 2014

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF THOMAS B. KIRK, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 5th of JUNE, 2014 from 9:10 a.m. to 12:29 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Beck Redden, 515 Congress Avenue, Suite 1750, Austin, Travis County,



Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Sarah F. Powers, Attorney at Law
-and-
Christina Goebelsmann, Attorney at Law
WARGO FRENCH
1888 Century Park East, Suite 1520
Los Angeles, California 90067
(305) 913-8587
spowers@wargofrench.com
cgoebelsmann@wargofrench.com


FOR THE DEFENDANTS:

Bryon Rice, Esq.
(Not Present)
-and-
Geoff Gannaway, Esq.
BECK REDDEN, LLP
1221 McKinney, Suite 4500
Houston, Texas 77030
(713) 951-6263
ggannaway@beckredden.com


ALSO PRESENT:

Jeremy Garrett, Videographer
Victoria Newman, Attorney at Law
(Present Electronically)

Q. Did she tell you what to do with this information?

A. Yes.

Q. What did Lucia tell you to do with this information?

A. To mail the flyers to the customers.

Q. And when you say, "mail the flyers," which flyers are you referring to?

A. The ones we went over a few minutes ago, the buyout flyers.

Q. So that would have been the flyers that appeared in Exhibit Number 4?

A. Yes.

Q. Did Lucia tell you why these customers should be sent those flyers that were identified in Exhibit 4?

A. We wanted to possibly buyout their current loans.

Q. And after you received this list or similar lists from Lucia, would you, in fact, send those buyout flyers to the customers that were listed on the list?

A. Yes.

Q. How many times did Lucia provide you lists that looked like the list in Exhibit 5?

MR. GANNAWAY: Object to form.

A. Three or four times.

Q. Was that three or four times during your entire time in Austin 2?

A. Yes.

Q. And how long were each of those lists that you received from Lucia, to your recollection?

A. Approximately 30 to 40 pages.

Q. Do you recall how many different customers names appeared on the lists that Lucia provided to you?

A. No.

Q. To your recollection, did those lists include information regarding the current lienholder that held a lien on the vehicle owned by that customer?

A. Yes.

Q. Did that include lienholder information related to a company called Integrity Texas Funding?

MR. GANNAWAY: Object to form.

A. I believe so.

Q. And so referring to Exhibit 5, could you please show us generally where you would locate the contact information for a customer using the example of the individual that appears in the top one-third of this document under the name Alexander YBarra?

A. It gives the name and the address in the very top lines -- top two lines.

Q. So what -- In order to mail a flyer to, for

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs | * |
| | * |
| VS. | * 152ND JUDICIAL DISTRICT |
| | * |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DELEON; and ISHMAEL HERNANDEZ, | *<br>*<br>*<br>*<br>*<br>* |
| | * |
| Defendants | * HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL RYAN

JUNE 25, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL RYAN, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 25th of JUNE, 2013, from 11:41 a.m. to 1:51 p.m., before MELISSA PARKHILL, CSR, in and for the State of Texas, reported by computer-assisted machine shorthand, at the law offices of Sutherland Asbill & Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis County, Texas, pursuant to Texas Rules of Civil Procedure

and the provisions stated on the record.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

      Jessica C. Casey, Attorney at Law
      WARGO FRENCH
      999 Peachtree Street, NE, 26th Floor
      Atlanta, Georgia 30309
      (404) 853-1500
      jcasey@wargofrench.com

FOR THE DEFENDANTS, TMX FINANCE OF TEXAS and TITLEMAX of TEXAS:

      Stephen T. LaBriola, Esq.
      FELLOWS LABRIOLA
      Suite 2300, South Tower
      225 Peachtree Street, NE
      Atlanta, Georgia 30303
      (404) 589-9200
      slabriola@fellab.com

         -AND-

      Geoff Gannaway, Esq.
      BECK REDDEN, LLP
      1221 McKinney Street, Suite 4500
      Houston, Texas 77010
      (713) 951-6263
      ggannaway@beckredden.com

APPEARANCES CONTINUED

FOR THE DEFENDANT, MR. DELEON:

       Christina A. Bryan, Attorney at Law
       SMYSER KAPLAN & VESELKA, LLP
       700 Louisiana, Suite 2300
       Houston, Texas 77002
       (713) 221-2345
       cbryan@skv.com


FOR THE DEFENDANT, MR. HERNANDEZ:

       Reece Rondon, Esq.
       HALL MAINES LUNGRIN, P.C.
       Williams Tower, 64th Floor
       2800 Post Oak Boulevard
       Houston, Texas 77056
       (713) 871-9000
       rrondon@hallmaineslugrin.com


FOR THE WITNESS:

       Edward J. Hennessy, Esq.
       THE HENNESSY LAW FIRM
       2900 Weslayan, Suite 550
       Houston, Texas 77027
       (713) 224-5066
       ejh@hgbatty.com


ALSO PRESENT:

       Cody Hall, Videographer

A.   Not that I recall, no.

Q.   Do you recall whether -- Strike that.

Tell me how the process worked with requesting these searches from Lucia.  Did other people, to your knowledge, go directly to her or did most of the requests filter through you to get this information?

A.   I don't know the answer to that question.

Q.   How many of the Austin -- Well, how many stores are there in Austin?

A.   I believe there's 21 or 22 now.

Q.   Of the 21 or 22 stores in the Austin market, how many of them do you recall making requests for this information on their behalf?

A.   Maybe ten.

Q.   And at one point in time you were in charge of half of the Austin market; is that right?

A.   Uh-huh.

Q.   How many stores were in your district when you were the north district manager?

A.   Nine.

Q.   Did all nine of those stores request information from DataTrax through you?

A.   None of them actually requested anything from me.

Q.   Did you request information from DataTrax on

behalf of all nine of those stores?

A. I requested information from Lucia.

Q. For all nine of those stores?

A. Not all of them, no.

Q. How many of those nine stores?

A. Probably five.

Q. Why didn't you request information on behalf of the other four stores?

A. No particular reason. I don't know why. Some of them were -- were -- were using the -- the mailers to do their marketing. Some of them weren't using it. Some of them were getting their information directly from Lucia. Some of them were not.

Q. How do you know that some of these stores were getting information directly from Lucia?

A. Just by conversation.

Q. How many conversations do you think you had of that nature?

A. A couple.

Q. Do you recall what stores were getting their information directly from Lucia?

A. Just the ones that I named. And then the only additional ones would probably be Austin 12 and Austin 4. I gave you three -- three stores, and the only other two that were added on that list were Austin 2 and Austin 4.

0883

Q. Who was the G.M. at Austin 12 at the time?

A. Jay Wilkerson [Wilkinson].

Q. Did Mr. Wilkerson tell you that he was getting this information directly from Lucia?

A. No; no. I -- I -- Those were the additional stores that I started requesting information for.

Q. Oh, I'm sorry.

Who was the G.M. for Austin 4?

A. Jose Jarmula.

Q. What stores do you believe were getting information directly from Lucia?

A. Probably Austin 20.

MR. HENNESSY: And understand, don't be guessing.

A. Yeah.

MR. HENNESSY: If you know, answer.

A. I don't know; I don't know.

MR. HENNESSY: If you don't answer -- don't know, don't guess.

A. I don't know.

Q. Did anyone ever tell you that stores were getting their information directly from Lucia?

A. No.

Q. Why do you think that this was the case?

A. That they weren't telling me?

Q. No. Why do you think that stores were getting their information directly from Lucia?

A. Well, they were either getting -- either getting it from me -- the information from me or from Lucia because everyone -- they all talked to Lucia. Everyone talked to Lucia. But I don't know. To be honest with you, I do not know.

Q. Did you ever obtain these customers lists from anyone, other than Lucia?

A. Not -- No.

Q. And you always picked these lists up at Lucia's store?

A. (Nods.)

Q. Did Lucia, to your knowledge, ever -- Strike that.

Did Lucia ever e-mail you any of these lists?

A. Nuh-uh.

Q. Did you ever e-mail any of these lists to anyone else?

A. Nuh-uh; no.

Q. And I apologize if you already answered this. Did any of the stores in your district make a request to you for these customer lists?

A. No. As far as a formal request, no.

Q. Or an informal request?

CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC d/b/a LONESTAR TITLE LOANS and INTEGRITY TEXAS FUNDING, LP, | * IN THE DISTRICT COURT |
| Plaintiffs | |
| VS. | * 152ND JUDICIAL DISTRICT |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC.; TITLEMAX OF TEXAS, INC.; FELIX DELEON; and ISHMAEL HERNANDEZ, | |
| Defendants | * HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICK SUDDUTH

JUNE 25, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK SUDDUTH,

produced as a witness at the instance of the PLAINTIFFS,

and duly sworn, was taken in the above-styled and

numbered cause on the 25th of JUNE, 2013, from 2:38 p.m.

to 4:54 p.m., before MELISSA PARKHILL, CSR, in and for

the State of Texas, reported by computer-assisted machine

shorthand, at the law offices of Sutherland Asbill &

Brennan, 600 Congress Avenue, Suite 2000, Austin, Travis

County, Texas, pursuant to Texas Rules of Civil Procedure

and the provisions stated on the record.

                    A P P E A R A N C E S

FOR THE PLAINTIFFS:

          Jessica C. Casey, Attorney at Law
          WARGO FRENCH
          999 Peachtree Street, NE, 26th Floor
          Atlanta, Georgia 30309
          (404) 853-1500
          jcasey@wargofrench.com


FOR THE DEFENDANTS, TMX FINANCE OF TEXAS and TITLEMAX of
TEXAS:

          Stephen T. LaBriola, Esq.
          FELLOWS LABRIOLA
          Suite 2300, South Tower
          225 Peachtree Street, NE
          Atlanta, Georgia 30303
          (404) 589-9200
          slabriola@fellab.com

               -AND-

          Geoff Gannaway, Esq.
          BECK REDDEN, LLP
          1221 McKinney Street, Suite 4500
          Houston, Texas 77010
          (713) 951-6263
          ggannaway@beckredden.com

APPEARANCES CONTINUED

FOR THE DEFENDANT, MR. DELEON:

        Christina A. Bryan, Attorney at Law
        SMYSER KAPLAN & VESELKA, LLP
        700 Louisiana, Suite 2300
        Houston, Texas 77002
        (713) 221-2345
        cbryan@skv.com


FOR THE DEFENDANT, MR. HERNANDEZ:

        Reece Rondon, Esq.
        HALL MAINES LUNGRIN, P.C.
        Williams Tower, 64th Floor
        2800 Post Oak Boulevard
        Houston, Texas 77056
        (713) 871-9000
        rrondon@hallmaineslugrin.com


FOR THE WITNESS:

        Richard D. Milvenan, Esq.
        MCGINNIS, LOCHRIDGE & KILGORE, L.L.P.
        600 Congress Avenue, Suite 2100
        Austin, Texas 78701
        (512) 495-6005
        rmilvenan@mcginnislaw.com


ALSO PRESENT:

        Cody Hall, Videographer

purposes?

MR. MILVENAN: Objection, form.

Q. Do you understand that there are certain purposes for which someone can access the information in the DataTrax database?

A. I'm not 100 percent sure what --

MR. MILVENAN: Objection, form.

A. Like I said, I don't know a whole lot about the program or anything like that.

Q. That's fine.

A. Yeah.

Q. We're just here to find out --

A. Yeah.

Q. -- what you know today.

A. Right.

Q. Did Mr. DeLeon ever tell you that he had to certify a purpose for accessing information from DataTrax?

A. No.

Q. Other than Jim, did any of your superiors ever instruct you to request these DataTrax searches?

A. No.

Q. To your knowledge, how many of the TitleMax stores in your district received information that was obtained from DataTrax?

A. That would be -- I don't know 100 percent for sure. I would say -- I know there was probably a couple who I don't believe ever got -- who ever used any of those. If I were to guess honestly, it would be a little speculative, but I think maybe six or seven possibly.

Q. Do you personally know that anyone at those stores was -- had obtained this information from DataTrax?

A. My understanding was that any of the information came from reports that Felix had pulled.

Q. You mentioned Austin 3 and Austin 13 were two stores --

A. Right.

Q. -- that you personally obtained information for.

What other stores in your district do you believe had information that was obtained from DataTrax?

MR. MILVENAN: Objection, form.

A. You mean, the specific store numbers?

Q. Right.

A. I'll say I'm fairly confident that Austin 18 did not. And, you know, the others I think it would be an assumption if I were to say that all of the rest did. Oh, I would also feel pretty comfortable saying that Austin 15 probably never received any.

# Tab U

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2013-33584

| | |
|---|---|
| WELLSHIRE FINANCIAL SERVICES, LLC d/b/a LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE LOANS, and d/b/a LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC, d/b/a LOANSTAR LOANS, AND d/b/a MONEYMAX TITLE LOANS; and INTEGRITY TEXAS FUNDING, LP | ) IN THE DISTRICT COURT ) ) ) ) ) ) |
| vs. | ) HARRIS COUNTY, TEXAS ) |
| TMX FINANCE HOLDINGS, INC.; TMX FINANCE, LLC; TMX FINANCE OF TEXAS, INC; and TITLEMAX OF TEXAS, INC. | ) ) ) 152ND JUDICIAL DISTRICT |

---

**ORAL HEARING ON PARTIES' MOTIONS**

---

On the 21ST day of November, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

**APPEARANCES**

MR. JOHN DANIEL JOHNSON
SBOT NO. 24046165
SUTHERLAND ASBILL & BRENNAN, LLP
1001 Fannin
Suite 3700
Houston, Texas 77002
Telephone:  713-470-6100
Fax:  713-654-1301
E-mail:  Daniel.johnson@sutherland.com
Counsel for PLAINTIFFS


MR. JOSEPH D. WARGO
GA 738764
MS. ABIGAIL STECKER ROMERO
CA 284534
WARGO FRENCH
999 Peachtree Street NE
26th Floor
Atlanta, Georgia 30309
Telephone:  404-853-1500
Fax:  404-853-1506
E-mail:  Jwargo@wargofrench.com
Counsel for PLAINTIFFS


MS. CHRISTINA GOEBELSMANN
SBOT NO. CA. 273379
WARGO FRENCH LLP
1888 Century Park F
Suite 1520
Los Angeles, California 90067
Telephone:  310-853-6300
Fax:  310-853-6333
E-mail:  Cgoebelsmann@wargofrench.com; jozmer@wargofrench.com
Counsel for PLAINTIFFS

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

**A P P E A R A N C E S**

MR. GEOFF GANNAWAY
SBOT NO. 24036617
BECK REDDEN
1221 McKinney
Suite 4500
Houston, Texas 77010
Telephone:  713-951-6263
Fax:  713-951-3720
E-mail:  Ggannaway@beckredden.com
Counsel for DEFENDANTS


MARY-OLGA LOVETT
SBOT NO. 00789289
GREENBERG TRAURIG, LLP
1000 Louisiana
Suite 1700
Houston, Texas 77002
Telephone:  713-374-3541
Fax:  713-754-7541
E-mail:  mol@gtlaw.com
Counsel for DEFENDANTS

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

(Judge enters)

THE COURT: All right. *Wellshire Fiance Services v. TMX Finance.*

I was just going to say for the benefit of my court reporter I want the Plaintiffs to identify who's speaking first and then we will get to the Defendants.

Start with Mr. Johnson.

MR. JOHNSON: Daniel Johnson.

MS. GOEBELSMANN: Christina Goebelsmann on behalf of the Plaintiffs.

MS. ROMERO: Abigail Romero on behalf of Plaintiffs.

MR. WARGO: You Honor, Joe Wargo also appearing for the Plaintiff.

THE COURT: Say again?

MR. WARGO: Joe Wargo.

THE COURT: Mr. Gannaway, you start.

MR. GANNAWAY: Your Honor, Geoff Gannaway on behalf of the Defendants.

MS. LOVETT: Mary-Olga Lovett here for the Defendants along with Chris Johnson our Co-Counsel.

And I am to extend the apologies of my colleague Mr. Garcia who got dragged away with the Mayor but he does appear as well.

THE COURT: Oh, you just had to drop that.

MS. LOVETT: He told me to. I had a fiduciary duty to, your.

5

THE COURT: Shameless, shameless promotion -- self-promotion --

MS. LOVETT: From Mr. Garcia --

THE COURT: -- from Mr. Garcia.

MS. LOVETT: Not from me, your Honor.

THE COURT: Okay. I understand.

All right. Ms. Lovett, you're new to this game, aren't you?

MS. LOVETT: I am, your Honor.

THE COURT: Okay. We have 11 filed Motions, correct?

MR. JOHNSON: I think that's right, your Honor.

THE COURT: Since these Motions have been filed have any been resolved by agreement?

MR. GANNAWAY: I don't think so.

MR. JOHNSON: Some issues in some of the Motions have been narrowed, but none of them have been resolved completely.

THE COURT: Okay. I have -- Defendant has filed Motions to Compel. The Plaintiff has filed a Motion to Compel -- two Motions to Compel.

Defendants have filed two Motions for Protection. The Defendants filed a Motion to Designate a Responsible Third Party.

The Plaintiffs have filed Letters Rogatory and Motions -- I guess Motions to Compel relating to that -- those Letters Rogatory.

MR. JOHNSON: Not necessarily. But I think except for that last part of the sentence, I think that's right. And I certainly would accept the Court's direction in however you might want to

proceed.

I might suggest of the 11, the three Motions for Letters Rogatory and then Defendants' Motion for Protection as to the DMV database really I think bundle into one issue or one argument.

And, so, I think if the Court will entertain those first, we might be able to dispose of four at one time.

MR. GANNAWAY: Actually I think, your Honor, some of the quickest matters that are raised in our Motion to Compel, which is a very straight-forward, quick matter and it, also, happens to be the first -- first of the Motions that was set for a hearing in front of your Honor.

MR. JOHNSON: We are looking to get more bang for the buck.

THE COURT: I'll tell you what we're going to do:

We're just going to go in order as it is in the Docket Sheet here and that way we can flip back and forth between parties.

First thing I have is a Motion to -- Defendants' Motion to Compel the Plaintiffs to Respond to Written Discovery.

MS. LOVETT: Correct, your Honor.

I believe the Court had ordered prior to my entree to the case -- and I don't want to retread old ground, but the Court had expressed concern about the full someness of the damage model. And we obviously had sought Discovery on that issue. And the Court had ordered the Plaintiffs to disclose the mean by which the damage model would be calculated since it was represented I believe at the initial TRO that there would be -- that they knew they lost customers, there

were lost customers. Essentially what they have called a "per-customer calculation model" is what they gave us in response to your Order.

THE COURT: Okay. Now, does this request that you're making morph into somehow the list that Judge People is preparing -- the Overlap List that Judge People is supposed to be preparing as the Master in Chancery?

MS. LOVETT: Your Honor, the Plaintiffs might contend that it does. We think it's a simpler issue. We know and I know from my review of the case and getting up to speed that your Honor has I think provided the parties with an opportunity to conduct Discovery over the last 17 months including with what would be assistance of the Special Master.

What we don't have is evidence thus far of even one customer lost which would be and which was represented to the Court at the TRO as the basis for the damage model.

So, what Plaintiffs are now calling a per-customer calculation model, according to their Order by your Honor, is Plaintiffs' lost profit damages will be based upon an analysis of the revenue that Plaintiff lost as a direct and proximate result of our conduct and the associated incremental costs -- I can go on. But the point of fact, your Honor, the list has yet to yield either the overlap fashion or its initial fashion one customer lost as a result of this alleged tortious conduct.

THE COURT: All right. But in this Motion -- unless I have

the wrong Motion to Compel, and I don't think I do -- you're asking for Plaintiffs' profit information, Plaintiffs' per-customer calculation, Plaintiffs' attorneys' fees evidence, contracts that have been breached and/or tortiously interfered with and a couple of other things that are more general than these more specific items.

MS. LOVETT: Understood, your Honor. All of which we would have been satisfied or at least we wouldn't feel the need to file this Motion to Compel had the Plaintiffs complied with the Court's Order to provide the basis for their damage calculation, which would necessarily include all of those elements.

THE COURT: Has a basis for your damage calculation been provided to the Defendant in general terms?

MR. JOHNSON: Your Honor, it was interesting that Ms. Lovett stopped reading where she did because we went on and had she continued to read our explanation indicated what we did is we broke down different parts indicating that it would be calculated from lost CSO fees, lost interest, lost loaner-related fees and charges, lost refinances and repeat customer business.

On the repeat customer business we previously produced information supporting our allegations about the number of times people refinanced.

So, the -- if your Honor recalls from the hearing that we had, it's the Overlap List that was very much the jumping-off point I will say and you will hear much about this I am sure as we go on. We are very frustrated because we still do not have that.

THE COURT: Okay. But you have an initial Overlap List.

MR. JOHNSON: We do.

THE COURT: And have you conducted any Discovery to find one person that has not resigned or renewed their loan with your company --

MR. JOHNSON: No.

THE COURT: -- because of our even marginally because of any agent of the Defendant?

MR. JOHNSON: Your Honor, I think the Overlap List -- the initial Overlap List revealed over 10,000 of those people.

THE COURT: No. The Overlap List reveals common customers, doesn't it?

MR. JOHNSON: That's right. And common customers where you can see on a date where the loan ended with us and then began with them. And, so --

THE COURT: But don't you still have to show -- to prove to them that the loan that ended with you and began with them was somehow related to their actions?

MR. JOHNSON: There is no question but -- that when we come to trial in this case we're going to have to put on that evidence and they are entitled to ask for that evidence. But what I think we started with was Ms. Lovett is saying that the Court ordered us to provide a narrative of how we're going to calculate our fees. And what I've just read to you was a broken-down narrative of the pieces as to how we're going to come up with per-customer loss model.

Now, I didn't read anything in their Motion that is to do -- if what she's describing, well, hey, we need evidence of causation, there is not a word in this Motion about causation. And that's just not before the Court.

What she -- the point that she started with was that your Honor ordered us to describe in narrative in general terms because we're waiting on the Overlap List give them the description of what our per-customer damage model would be and we told them.

We said it's going to comprise interest. It's going to comprise CSO fees. It's going to comprise refinance fees. We told them that. They didn't complain about that for -- I don't know -- two or three weeks. Maybe even longer. A month. And then, finally, we see it in the Motion. But there is nothing in that -- their Motion about the issue of causation. That's just not in there.

THE COURT: Okay. So, what specifically are you asking for that they have not produced as of yet?

MS. LOVETT: Your Honor, what I'm specifically asking for is evidence of one -- what -- I didn't stop reading to be disingenuous. I stopped reading because of anything that they say there is irrelevant if we don't have a customer upon which to base these losses.

So, in other words, we have to get or mind around, as your Honor knows, what's out there in the universe of damages. How much is it going to be. We are entitled to know that. We're entitled to calculate.

Thus far from the original list and now the Overlap List the Court has correctly stated we don't know one individual. So, we don't even know that there's something out there to whom all of these factors could be applied.

These are the factors. That's fine. That's like saying it is going to be X times Y, but we have to know that it's based on the loss of at least one customer. We don't have that.

MR. JOHNSON: I don't disagree with that. That's just not what they have asked for in their Motion. What they asked for in their Motion was I guess a further description --

THE COURT: Okay.

MR. JOHNSON: -- of the components.

THE COURT: All right. When will this per-customer -- this evidence of a customer leaving one and going to another be available?

MR. JOHNSON: Well, your Honor, I think that the Court has ruled -- and obviously I don't want to jump ahead of the Motion for Continuance because that is part of this, but there is a date certain by which the Court has said, okay, Plaintiffs, you have to disclose your damage model.

THE COURT: Hold that thought just one second because I know where you're going.

Is it related to the Overlap List?

MR. JOHNSON: Yes.

THE COURT: So, your evidence of per-customer damages is related to the Overlap List?

MR. JOHNSON: And expert work in relation to that, your Honor.

THE COURT: Okay. What else in this Motion besides the per-customer? You want profit information?

MS. LOVETT: We do, your Honor.

THE COURT: Okay. I don't -- I can't recall as I'm sitting here whether I ordered them to produce specific profit information as I have the Defendants.

MS. LOVETT: You did.

THE COURT: Have I?

MS. LOVETT: You did, your Honor.

THE COURT: Okay.

MS. LOVETT: Exhibit B to our Motion -- I am sorry. I'm skipping. I'm contemplating the two. I don't think you have ordered specific financial profit-and-loss information.

MR. GANNAWAY: Your Honor, if I may, may I approach?

THE COURT: Not sure. Go ahead, Mr. Gannaway.

MR. GANNAWAY: I don't bite. I've got a summary I think of the issues that will --

THE COURT: Well, I'm looking at your Motion. Isn't this contained in the Motion?

MR. GANNAWAY: This summarizes so that you can see all the RFP's that are at issue, your Honor. And if you turn here to the second page of what I've handed your Honor, these are all the Requests for Production that we are moving to compel in this Motion.

The ones that are at issue relating to profits and losses and loan volume go from 4 through 11, your Honor. Those are the ones that are issue with respect to this.

Now, I need to point out, your Honor, in the landscape of this case, and as you know, my client has been ordered to produce a great many things. As you said -- as you said your strike zone is broad when we are talking about Discovery. This is right down the middle. They have a lost profits claim against the Defendants in this case. They're claiming lost profits.

They've got sworn affidavits in this case that they specifically saw lost volume in stores in Texas, and they have refused to give us their profits and losses and region where they claim to be affected.

Those are the same -- you have entered an Order about producing that kind of information. You ordered me to produce that kind of information because they had a discouragement theory.

THE COURT: Okay. You can hold that thought for just a second.

MR. JOHNSON: He is right in the sense that we have said before there has been a decline in revenue, and we have produced -- and I have Bates numbers where we have produced information like that that they have requested.

What they're asking for here -- and just going by the numbers here 1-A the profit-and-loss information -- and, your Honor, what they're asking for is monthly financial reports showing profit

and loss for the State of Texas in Dallas and Austin markets. Our whole point is, as I mentioned earlier, the jumping off point for this our lost profit is not going to be a general number. It's not going to be, hey, how did you do state wide.

It's going to be based upon, as your Honor indicated, this customer, this customer, this customer. And once we have that, candidly, our expert will be able to take that and will be able to provide all of that information for them.

The problem is when you ordered the supplementation of the Overlap List in July, now we're almost in December, and because of their foot dragging we don't have that information.

THE COURT: Okay. But you're going to produce information just like they're compelled to produce information to you. If you're going after their profits, you've got to show them you lost profits. And I am going to go right down the middle on that. And you are going to provide profit-and-loss reports for your operations here in Texas that are consistent with showing in a general sense what you contend your profits -- your losses to be in profits.

We're not just going by customer, customer and that is going to be your evidence. You're going to have to provide them the same type of profit-and-loss information that you are demanding they provide to you.

MR. JOHNSON: Your Honor, our only point would be that's what we intend to do. We want to show that information, and we want to produce it. Otherwise, we're not going to be able to award us

damages. But what we want to do is provide information that is relevant that is based upon the the actual customers that we are going to be telling the jury were stolen.

THE COURT: We're going beyond that. Just like you're asking them to provide profit-and-loss statements for a specific time period for Texas and this region, you're going to have to avoid those same types of information -- that same type of information.

It's not fair for you to demand it of them and you not produce it yourself.

MR. JOHNSON: Your Honor, I would respectfully disagree with that only in the sense that this entire lawsuit we are here because of their conduct.

THE COURT: I understand that. Believe me I know that, Mr. Johnson.

MR. JOHNSON: Your Honor, and our lost profits claim based on the model we just read to you all of those components, the CSO fees, the refinancing, the interest rates, that's what our lost profits information is going to be. And that's information we do want to provide them. We just want to provide it once we get the Overlap List and we know who the customers are.

THE COURT: Item No. 1 on the Request for Production is Loan Contracts.

MR. JOHNSON: I think we are -- are we in -- is that 1-C? No. I am sorry.

THE COURT: No. I'm looking at the cheat sheet Mr. Gannaway

handed me just a moment ago that cut through some -- did you provide them with a copy of that?

MR. JOHNSON:  I got it now.

MR. GANNAWAY:  I did, sir.

THE COURT:  I'm on page 2.

MR. JOHNSON:  The loan contracts I think this is an issue. Candidly, when we got this, we were a little bit confused because we have provided them with the loan contracts at issue.

Now, if their request is -- and if their request is, look, if you're going to claim that we stole 20,000 customers, then you need to go to 20,000 files and pull up 20,0000 contracts and give them to them.  That's not how we read the Request.  But they do have the contracts and they've had them for some time.

MR. GANNAWAY:  That is false, your Honor.

THE COURT:  Now, wait.  Now, Mr. Gannaway, when you say that, I'm going to look at you and say is Mr. Johnson lying to the Court.

MR. GANNAWAY:  I think I need to clarify what Mr. Johnson said.

They gave me a few exemplar contracts.  The kind of contracts that these people sign.  I want the pen and ink that the people they are going to claim we interfered with and what they signed so that we can evaluate it.

They've got a tortious interference with contract claim. And they're suggesting we can't see the actual contracts that are the

basis --

THE COURT: Right. And I can't wait to see how you provide this information to them. Are you going to be -- because you have said at least on one occasion -- and I may be paraphrasing this incorrectly -- that you may not be able to identify each person whose contract was interfered with.

MR. JOHNSON: Your Honor, I will say this without revealing our work product or strategy in the case that we believe that our damage model may be presented to the jury in a way that complies with the evidence in a way that we don't have to show customer by customer causation. That's the point that we're making.

I will say this:

Mr. Gannaway -- and I think what he just said is confirming what we think is an absurdity at this point in the case is he literally -- and we will be guessing because what he wants us to do I assume is go through files of 15-, 20,000 people and pull up what is going to be the same accounts that he already has in his possession. He's --

THE COURT: I'm sure --

MR. JOHNSON: -- already has those contracts.

THE COURT: No. No. Wait a minute --

MR. JOHNSON: What he has is he's got the same contracts.

THE COURT: No. He's got the template for the contract, but he doesn't have the contract from Geoff Gannaway who you claim was interfered with. The rhetorical Geoff Gannaway, not really you.

MR. GANNAWAY: Thank goodness.

THE COURT: Yeah. I just picked the name.

But if you're claiming that the contract that you have with Customer X you haven't produced that contract. You've produced the template for that transaction.

MR. JOHNSON: And the information that goes into it would be derived from the Overlap List. In other words, the form is going to have dates. It's going to have somebody's name on it. It's going to have the information from the loan. All of that information we are going to be able to derive once we get a finalized Overlap List.

And, your Honor, I am certainly not suggesting that once we get the Overlap List we identify, okay, here, now, we have our set of people for whom we're going to go to trial and present evidence on.

We may be able to scrape up these 10- to 15,000 contracts but at this point without the Overlap List there is no way we can do that.

MS. GOEBELSMANN: Additionally, your Honor, during our last hearing on October 10th it would be to produce loan contracts for all the loans at issue. And Mr. Gannaway represented that all that they were seeking were the narrative of those contracts, as we already provided the terms of those loans in response to prior Interrogatories based upon a prior Overlap List. And we are committed to otherwise aiming our response to that Interrogatory based upon our anticipated amended and correct Overlap List.

So, to the extent that they're seeking the terms of those

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

particular loans, they will be getting those.  Now, whether those loan terms appear in individual blanks, that will be extremely difficult for our client to get together.

THE COURT:  Okay.  Mr. Gannaway, I know what you want.  You want each contract of each customer that's been -- that they allege was interfered with.

MR. GANNAWAY:  The first step to that they need to allege was interfered.

THE COURT:  Right.  And we can't do that -- we can't do that until the Overlap List is done.

MR. GANNAWAY:  Your Honor, they have had a list of 8500 people on it for 11 months.  And we don't have a lick of evidence that any one of those fits within the cause -- within the chain of causation that is required for them to make their case.  Not one.

As Ms. Lovett pointed at the beginning, they have 8500 they've been living with for 11 months.  Why don't we have a single contract signed by one of those people if they are going to claim that it fits their allegation model and it's going to result in them being awarded damages in this court?

MS. GOEBELSMANN:  The Overlap List still needs to be amended --

THE COURT:  Wait a minute.  You've had 8500 names.  He's right there.  You've had that Overlap List of -- the first Overlap List for almost a year now?

MS. GOEBELSMANN:  But it's not reliable.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

THE COURT: Why not?

MR. JOHNSON: I don't think that --

THE COURT: Why is it not reliable?

MR. JOHNSON: I don't think that we've had it --

THE COURT: For whatever period of time you've had it, you've had it and you've had --

MS. GOEBELSMANN: Right.

THE COURT: -- an Overlap List that contains 8500 names, correct?

MS. GOEBELSMANN: Correct. Except that it misses all the information that would have been -- that is supposed to have been provided by both of the parties for the years proceeding. So at this point --

THE COURT: Like what information?

MS. GOEBELSMANN: The July 11 expanded Overlap List was supposed to include an entire year of information that had originally been missing. And that would include information as to who were customers of TitleMax and who were customers of LoanStar.

Once those -- when -- once those lists were produced, the Special Master was supposed to provide a new Overlap List. Without that additional information we don't know really whether the 8500 people are the correct 8500 or if it's even 8500. It may very well be double that now.

MR. WARGO: If I can be heard, your Honor? Joe Wargo.

We have a list that's incomplete as to the 8500, your Honor.

Your Honor ordered that they provide information that goes back further.

One of the key issues here is who was whose customers. Who was whose customers first. Okay. When someone flips from one to the other or one to the other, that's evidence here as to whether their misconduct caused our damage.

We can't run anything with the 8500, your Honor. Because when we get that list that goes back even earlier, we're going to get new information potentially we expect that reason would tell us from earlier in time of where -- whether those customers were our customers first, their customers first.

It is an entire do over of the entire list. And they know that, your Honor. Maybe new counsel doesn't, respectfully. But they know that 8500 serves us no purpose because, if we give you a number today, it may be an entirely and will be for a certainty some of those people would have been other customers of other parties prior -- at least one of them. Maybe a certain percentage but we know for sure that that list will be faulty.

So, the 8500, your Honor, is of no value.

THE COURT: Okay. Ms. Lovett?

MS. LOVETT: Your Honor, new counsel does know one thing that Mr. Wargo -- whom I've just had that pleasure of meeting -- did stand up in front of Judge Bennett at the June 2013 TRO hearing and said this:

We have seen a lost customer base. We know we have lost

business.

That was the representation he made to the Court. He was able to make that recitation based on the fact supposedly that at least one customer was filched by misconduct. Our question is and it is the Court's question:

Why in the 8500 customers that they have whether they can at least make the allegation that there's been a jumping of ship that's attributable to this conduct?

THE COURT: Does the list of 8500 contain the identity of whether the customer was initially a LoanStar customer or a TitleMax customer?

MS. LOVETT: Your Honor, I think the answer to that would have to be were they anybody's customer. Who it is -- the list of 8500 is a snapshot in time that they based their TRO in good faith on. They had to have some basis from that list.

THE COURT: Okay. But that list is the identity of individuals who were customers of both the Plaintiffs and the Defendants.

MS. LOVETT: I understand, your Honor.

THE COURT: Does it show who they contracted with first?

MS. LOVETT: That is a -- go ahead.

THE COURT: If Bob Schaffer's name appeared on the Overlap List -- I'm not going to pick on you anymore.

If Bob Schaffer's name appears on the Overlap List, does it say:

Bob Schaffer contracted with LoanStar first or TitleMax first?

MR. JOHNSON: It does not, your Honor. And that is the entire reason --

THE COURT: I got it, Mr. Johnson.

MR. JOHNSON: That's the reason why we had to expand.

THE COURT: That's why I'm asking this question. Identify whose customer they were first. It is hard to identify whether Bob Schaffer was filched -- I think you used that?

MS. LOVETT: That is mine, Judge.

THE COURT: That is your term.

Filched by one entity or the other. When will we know whose customer was first?

MR. GANNAWAY: Your Honor --

MR. WARGO: When we have an Overlap List pursuant to the terms of your Honor's Order. And, remember, we tried to go as far back in time. Your Honor cut it off. And that is going to be a snapshot in time that --

THE COURT: Okay. Mr. Wargo, hold on a minute. I don't mean to be disrespectful by interrupting because these guys here all know what interruptions do to the Court, but I'm going to short circuit this to a certain extent so that we are not here till 6:00 o'clock because you have probably have a plane to catch.

MR. WARGO: Yes, your Honor.

THE COURT: All right. So, we need a list which identifies

this information.  We don't have that list now, do we?

MR. WARGO:  No, your Honor.

MR. GANNAWAY:  Your Honor, what we have list -- the list is not going forward in time.  June 2013 --

THE COURT:  I know.

MR. GANNAWAY:  -- we had a cut off before.  It is still is.  So, they're going to know regardless of whether additional new loans end up on the new Overlap List, we know who's the last person in that time period to have a loan.

And under their theory, if the last person was a TitleMax loan, I guess that's what they're going to seek damages on.  That is not going to change when they get a new list.

THE COURT:  But that person whose last loan was TitleMax their first loan could have been TitleMax and their running a wild-goose chase after that person.

MR. GANNAWAY:  Your Honor --

THE COURT:  So, my question is:

Is Judge Peoples preparing the Overlap List so that we know who the first lender was for that individual?

MR. GANNAWAY:  The answer is "yes" Judge Peoples has the information from the two parties at this point.

THE COURT:  So, he's going to be preparing his Overlap List to identify Schaffer comma Robert first loan TitleMax, second loan LoanStar and so forth and so on?

MR. WARGO:  Almost, your Honor.  And that will be done by

the expert. But certainly data will be presented by the Special Master where then the expert can run that information.

THE COURT: Okay.

MR. WARGO: Yes, your Honor.

THE COURT: All right.

MR. GANNAWAY: Your Honor, they have taken the position in previous hearings before your Honor that even if a customer went back and forth if they ended up landing with TitleMax and they can prove all the other things they need to prove like this person was the subject of illegal search or even if months and months or even a year passes between the two loans, they're saying that's last touch.

TitleMax got a loan and they did those things, it is in our damages model. If they are going to stipulate here that if TitleMax had a loan before their loan that they are not going to include that in their damages model, maybe what they're suggesting is right. But I have a feeling they will not stipulate to that.

They would still include that customer in their damages model. And they should let us know that that information as part of their calculation and they should certainly let us see the contracts that they are going to allege fall into that category.

MR. JOHNSON: If I can clarify that a little bit? I think there may be some confusion.

What we said in the past is your Honor was asking some questions at the previous hearing about, well, aren't you just looking for loans that ends here and start here. And we said "yes"

we're looking for those. But just because a loan ended here with us and then started with them six months later, that doesn't mean it couldn't have been the result of an illegal search.

So, that may very well be within our damage model. But that doesn't change the fact that the Court made which is that we do not have that list to show within the time we have from where the loan starts.

THE COURT: I think they have know where the loan started. Where the loan ends -- where the loan -- see, y'all have got me where I can't even talk.

Where the loan ends doesn't matter if we don't know where it started. And we have to know where it started and it ends. Needs to have started with LoanStar, correct.

MS. GOEBELSMANN: Yes.

THE COURT: You agree? I'm looking to LoanStar to tell me "yay" or "nay."

MR. JOHNSON: I believe that is correct.

MR. WARGO: Yes, your Honor.

THE COURT: Okay. Okay.

MS. LOVETT: Judge, just to clarify so that -- as we stand here today, your Honor, then the position is that all of a sudden now it is impossible to determine whether or not there has been a customer lost because we don't know the result of the Overlap List.

THE COURT: I think that's exactly what we are hearing.

MS. LOVETT: So as of today's date, there is no evidence in

the record that there has been a customer taken.

MR. WARGO: That is incorrect, your Honor. If I may? We are talking about our damages model and what we're going to present as damages.

That's an entirely different matter as to whether there's already been deposition testimony where people have raised their right hand and said:

I used to work at TitleMax. And those people came in with my buy-out sheets that I got using PublicData.com and they came in and I flipped them from LoanStar to TitleMax.

That evidence is in the record.

THE COURT: But the evidence of who they flipped --

MR. WARGO: Their names is not known.

THE COURT: No. No. Wait a minute, Mr. Wargo.

MR. WARGO: I apologize.

THE COURT: You want a clean record?

MR. WARGO: Yes, your Honor.

THE COURT: Okay.

The evidence of who was flipped from LoanStar to TitleMax is not in this record. The evidence is that someone has testified that that I got the information and I flipped them from LoanStar to TitleMax.

MR. WARGO: Numerous people have testified to that. Yes, your Honor. And that they did not keep the names of those people. That is correct.

THE COURT: I can't wait to see how it's presented at trial.

MR. GANNAWAY: Your Honor, there is another thing that Mr. Johnson said but I want to make sure --

MR. JOHNSON: Okay.

MR. GANNAWAY: -- they are taking -- they're not going to take the position at trial that, if a loan originated with TitleMax and then later on went through LoanStar then TitleMax again, they are not going to take the position they can recover damages if it originated with TitleMax?

I think that's what I heard him say, but I want to clarify because that's a matter for how Discovery proceeds.

THE COURT: I think I heard them say something akin to that.

MR. WARGO: We have to show your Honor that their misconduct caused us damage. We agree to that.

THE COURT: What if it's a TitleMax customer that went to LoanStar and then subsequently went back to TitleMax?

MR. WARGO: Based on the misconduct? We would have to prove it.

THE COURT: How are you going to prove it?

MR. WARGO: Your Honor, we would have to prove that.

THE COURT: Okay. Okay.

MS. LOVETT: Your Honor --

THE COURT: Can I tell you something?

MR. GANNAWAY: Yes, your Honor.

THE COURT: When we get to trial, you're going to have to

prove that.

MR. WARGO:  Yes, your Honor.

THE COURT:  I mean, you're going to have to prove that customer --

MR. WARGO:  Yes, your Honor.

THE COURT:  -- was highjacked in some scenario.

MR. WARGO:  Yes, your Honor.  We understand that.  We are on the same page.

THE COURT:  Okay.

MS. LOVETT:  Your Honor, if I might because the concern arrises now in the context of this Discovery.  And I am making a supposition having heard what Mr. Johnson said, which is how we would present.

We know that Rule 1006 references voluminous summary, that experts can do those.  However, we also know that we are entitled to every single document that under pen that summary and that includes proof that each of these individuals was at LoanStar at one point and then at TitleMax.

So, we would not yield on an objection at the time of trial but here is our 1006 Summary and you're just going to have to take our word for it.

THE COURT:  I don't disagree with you completely.

MR. JOHNSON:  Well, that may be the case but I will say that in terms of taking evidence, okay, from the Overlap List that is not a Rule -- that's not what we are talking about a summary that we

prepared.

We've asked for a Special Master to take evidence that you don't want to give us and to take evidence that we don't want to give you and to put it in a form where we think it will be admissible in trial.

MR. GANNAWAY: Your Honor --

MR. JOHNSON: But I will say that's beyond the scope. Now, if you want to give us your Customer List, then we will be glad to compare them ourselves and then we won't have all that underlying stuff.

But the whole point of having the Special Master was to avoid having to exchange each other's Customer Lists and then come up with an Overlap List that would be admissible.

MS. LOVETT: Your Honor, I won't point at counsel if he won't point at me nor will I call him "hey." I will call him "Mr. Johnson."

But my simple point is this and what your Honor's question cut to it:

How are you going to present this as evidence?

The only way to present this type of evidence of which I am aware of after 20 years, which I know isn't much, I know your Honor is Federal -- is Texas Rule of Evidence 1006, that is the summary of voluminous documents.

THE COURT: Okay. Okay.

MS. LOVETT: That's where I am with that.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

THE COURT: Okay. I got it, and that's not really related to what we're doing here today. That's a future thing and I appreciate what you're looking for and I can tell you I generally agree with what you're saying and I look -- wait with baited breath on how the Plaintiffs are going to present their evidence.

And, so, we're going to move on. The next item is attorneys' fee evidence.

MR. JOHNSON: I think this one should be resolved. We have amended our Discovery Responses in writing to state that we would produce the attorneys' fees invoices now.

We have made the same request of them. They have not produced theirs. As the Court is aware, that requires a lot of redaction. And, so, I think that if we work with them and just come up with a mutual time that both parties can exchange redacted documents, we can do that.

THE COURT: Now, the attorneys' fee information is always interesting when we approach it at trial because then inevitably one party or the other seeking fees neglects to bring themselves up to date.

Can we reach some kind of an agreement on the production of attorneys' fee information and the timing of it?

MS. LOVETT: Yes, your Honor.

THE COURT: So that we don't have to keep asking this question.

MR. JOHNSON: I think so.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

THE COURT: Both sides are compelled to provide attorneys' fee information, correct?

MS. LOVETT: Yes, your Honor.

MR. GANNAWAY: We agree to it, your Honor.

THE COURT: So, let's do this:

How many different times do y'all want the attorneys' fee evidence produced?

MR. GANNAWAY: I think we should start out produce what the parties have incurred to date. And then we can agree to a time reasonably to update again, of course, at trial.

THE COURT: At trial. Okay. You agree to that?

MR. JOHNSON: That is fine with us.

THE COURT: Okay. So, we are going to produce attorneys' fee documentation as of today. And then we're going to produce attorneys' fee information as of the date of mediation.

Go ahead.

MR. JOHNSON: Yes, sir.

THE COURT: I mean, are you in agreement with that?

MR. JOHNSON: I was just going to clarify all the invoices issued through the end of October 31st, which would be to date I think.

THE COURT: That's fine. This time frame --

MR. JOHNSON: Got you.

THE COURT: -- is what we're talking about here. Can you produce it to October 31st? I doubt seriously if either one of

33

Defense counsel are going to make an issue out of that.

MR. JOHNSON: Understood.

THE COURT: The date of mediation. Is that reasonable for the next time?

MR. GANNAWAY: That's fair.

MS. LOVETT: That would be good, your Honor.

THE COURT: Then mediation is probably going to be fairly close to the trial setting. Within 90 days of the trial setting.

MS. LOVETT: Yes, sir. It must be completed by February 18th I believe.

THE COURT: Well, today but we have a Motion for Continuance on the floor as well.

MS. LOVETT: Understood, your Honor.

THE COURT: Have y'all talked to Dave Matthiesen.

MR. GANNAWAY: No, your Honor.

MR. JOHNSON: I don't think we have spoken with him about that yet, your Honor.

MR. GANNAWAY: We had produced some alternatives. The Plaintiffs weren't agreeable. So --

MR. JOHNSON: I think we are fine with Matthiesen.

THE COURT: You don't want Dave Matthiesen?

MR. GANNAWAY: Dave Matthiesen, your Honor, is a very good mediator. We had proposed after conferring with our client.

THE COURT: Okay. Unless there is an agreement, we are going to stay with Mr. Matthiesen.

MS. LOVETT: We will find somebody, your Honor.

THE COURT: You want to weigh in on something?

MR. WARGO: No, your Honor. I just thought everybody was standing, so I might as well.

MR. GANNAWAY: Your Honor --

THE COURT: Hold on a second. Let's finish this attorneys' fees thing.

So, October 31st -- up to October 31st or today, whichever you chose. Date of mediation is the next one and then the trial.

MS. LOVETT: Yes, sir.

THE COURT: Is that enough?

MS. LOVETT: I would suggest produce a week prior to trial and then maintain through trial.

THE COURT: And then whatever happens for that week on is presented at trial.

MS. LOVETT: Yes.

THE COURT: And we know it will be substantial if we go to trial.

MS. LOVETT: Yes, sir.

THE COURT: Okay. So, now, mediation seven days before trial and then trial.

MS. LOVETT: Yes, sir.

THE COURT: Okay. Whoever is preparing the Order I hope you got it right.

Why don't you prepare the Order, Mr. Gannaway.

MR. GANNAWAY:  Got it, your Honor.

THE COURT:  Okay.  Contracts at Issue really goes to the Overlap List.  And, so, we're going to hold off on compelling unless -- well, no, you've got the --

MR. GANNAWAY:  Exemplars.

THE COURT:  -- exemplars.  So, you know what the contract looks like?  You're just waiting for the individuals?

MR. GANNAWAY:  There is different kinds of contract but I don't know which one.  Just so I understand your Honor, once they do have the Overlap List and then they will eventually have to provide the pen-and-ink contracts; is that your ruling?

THE COURT:  We're going to face that issue once they produce the pen -- once they produce the Overlap List.

And, by the way, is Judge Peoples still speaking to me?

MR. GANNAWAY:  Honestly, he doesn't bear the brunt of the work.  The technical advisor he has hired.

THE COURT:  Okay.  Because when I see him at the Judicial Conference I may not go up to him.

MS. LOVETT:  It's coming up, Judge.

THE COURT:  Once the Overlap List is prepared and the damage model is prepared from that Overlap List, then we're going to talk about production of specific contracts.

I think until that -- until we get to that point, I don't think it's fruitful to discuss production of specific contracts.

MR. GANNAWAY:  Your Honor, returning to last point just to

make sure I got your ruling because there has been disputes after your hearing before:

Their objections to our Requests 4, 6, 7, 8, 9, 11 relating to contracts are all overruled?

MR. JOHNSON: What were those, again?

THE COURT: 4, 6, 7 and 8?

MR. GANNAWAY: 8, 9 and 11, your Honor.

THE COURT: Okay. The rest of that page?

MR. GANNAWAY: Yes.

MR. JOHNSON: Your Honor, we'd likewise would like that to wait until such time we are able to provide our damages model so that you can make the determination if we cannot agree with Mr. Gannaway as to relevancy of that.

MR. GANNAWAY: Your Honor, that's completely unacceptable. This needs to be provided to our expert witness as well.

THE COURT: Hold on. Hold on. Let me read this specifically.

Are these six Requests similar to the Requests for the same information that the Plaintiffs sent to the Defendants?

MR. GANNAWAY: They are nearly identical to what you have compelled us to produce. That's why I limited them to the Dallas and Austin markets because that's what you ordered us to do.

So, I essentially mirror imaged your Request on that is what at issue here.

THE COURT: Mr. Wargo?

MR. WARGO:  Thank you, your Honor.

And our point is similar to what you were picking up on the last Order as far as waiting right now based on, as Mr. Johnson said, work product, which we're not in position to reveal right now.

That information is irrelevant to our damages claim.  And merely because it may be relevant to what we're seeking from them, doesn't make it relevant to what we're seeking as damages from this case.

So, we asked your Honor that their dilatory conduct in not providing information to the Special Master so that we have an accurate Overlap List, which has prevented us from providing our damage model to them which right now I represent to you will not be based in any way on that information, we ask that that not be produced.

THE COURT:  But isn't this information not only reasonably calculated to lead to the discovery of admissible evidence but it's relevant information.  And I don't know what's on it, but if it shows that your profits and losses in Texas for September 11th through June 13th went up every month, isn't that evidence that you haven't been harmed?

MR. WARGO:  No, it's not, your Honor.

THE COURT:  Okay.  Why?

MR. WARGO:  Why that's the case is our case is not based on how well we did in Texas.  Our case is based on their theft of our customers.

THE COURT: Okay. I appreciate that, but I'm going to order you to produce this information and I overrule your objections to Requests 4, 6, 7, 8, 9 and 11.

I am going to play this down the middle, and they're going to get the same type of information from LoanStar and your other -- there are two or three other companies involved, right, besides just LoanStar? We're speaking LoanStar parenthetically?

MR. WARGO: Understood, your Honor.

THE COURT: Okay. And then the last two are 17 and 18?

MR. GANNAWAY: Yes, your Honor.

THE COURT: Documents containing notations --

MR. GANNAWAY: And I can --

THE COURT: -- communications or trafficking of alleged buy outs of Plaintiffs' loans by Defendants.

MR. GANNAWAY: And this Request sprung from deposition of two of Plaintiffs' employees. And I asked them is there a way in your computer system that you keep track of when there has been a buy out of a TitleMax loan by LoanStar by other -- of TitleMax -- or the reverse -- when either of the parties buy out each other's loans.

Two of those employees testified, yes, I notate that frequently -- usually and put it in the notes field in our computer system.

What I'm asking for here, your Honor, is that they provide notations that suggest there has been a buy out one way or the other because that is stuff that is on the Overlap List. It shows

evidence of whether, in fact, there was a buy out going one way or the other, which goes directly to the damages.

THE COURT: What specifically are you asking for? The actual notes, or that someone noted that a LoanStar loan was bought out by TitleMax or a TitleMax loan was bought out by LoanStar?

MR. GANNAWAY: Whatever notation they have, your Honor. And in whatever form they have it in. In its native format is what we would like to see.

MR. JOHNSON: Your Honor, I think key phrase as reflected on the Overlap List and that's the point here is that the Overlap List is going to have this information on it.

What he's asking us to do I presume is for the -- and keep in mind, your Honor, on the first Overlap List there was 8500 identifiable people that were on both. But if you just take ours and you take theirs, we're talking about on the first one, tens of thousands of names.

Presumably what Mr. Gannaway is asking is that we go through tens of thousands of files and look for some notation about a buy out even though this case isn't about us buying out their loans and there has been no evidence of any wrong doing on our part.

The case is about their buying out our loans. And we think that that is overly burdensome. We think it's harassing. There's no reason for the because that same information is going to be on the Overlap List once it's completed.

And I will say as to the testimony -- I think the testimony

has indicated that's not a usual practice. That while those people did it some, that they're not aware of that being a usual practice in our company.

THE COURT: Can you note on the Overlap List the identity of -- no. Let me restate that.

Who were the people that testified to that?

MR. GANNAWAY: Alex Steven Haegen and Nancy Lopez.

THE COURT: Can you note on the Overlap Lists where these two individuals participated in a transaction and then go look at those transactions to determine whether either one of them made a note on that particular file?

MR. JOHNSON: I don't believe, your Honor, that there is a way to identify the person who was responsible for the transaction. I think the Overlap List will reveal the store, will reveal a lot of information. And I think that candidly will reveal when there is a buy out because we have end dates and new dates for loans.

But what he's asking us to do in a case where really the complaint is -- there is no counter-claim. The complaint is they're buying out our loans based on their wrongful, illegal conduct. And what he wants us from us, hey, we want you to go through tens of thousands of files and look to see whether y'all bought out a loan from us and we just don't think that gets us anywhere in this case.

MR. WARGO: And, your Honor, if I can --

THE COURT: Hold on just a second, Mr. Wargo.

You're asking them to produce documents that your employees

made notes on?

MR. GANNAWAY: That their employees made notes on. That they had made -- and it is not documents. It's in their electronic files they have a database that I assume can be run very quickly. If there is a reference to "TMX" or "TitleMax," both their employees said they would put in a notation.

And why it is relevant, your Honor, you don't assume that -- you should not assume that every loan on the Overlap List was a buy out. And sometimes there are -- there is a long time span between them.

In some issues it might be a close time span but it might still not be a buy out. That person might have found funds from whatever source, paid off their LoanStar loan and a few weeks later decides they have a wild hair and go to TitleMax and get a loan from them.

That's not a buy out. That's finishing one loan and starting another. And the Overlap List doesn't tell us that. And we know now that they've got relevant information that shows whether there were buy outs going both ways. Under any view of the evidence, that's going to be relevant, your Honor. And they haven't submitted an affidavit to you saying that's tough to run that search in the data. It's relevant and it's not overly burdensome.

THE COURT: Okay. Before I make a ruling one way or another, you need to give me an idea of what it would take and what the extent to which that would be a burden on LoanStar to look into

these files and find out if notations were made about buy outs, who bought out who.

I'm going -- before I make a ruling on this, I want to know what the burden is.

MR. JOHNSON:  Understood, your Honor.  We will submit an affidavit to that effect.

THE COURT:  Okay.

MR. GANNAWAY:  Your Honor, I think that there's only a couple of issues left with respect to this Motion.

One is they have a boilerplate objection to trade secret.  I think in their Response said they're really not withholding anything based on that.  But I want to make clear that they need to amend their Responses to say that.  If they're going to say that, they will withhold trade secrets or produce pursuant to our Protective Order, that's fine.  But I need to know they're not withholding anything by the substance of that.

MR. JOHNSON:  We will amend our Responses to make clear we are not withholding anything on the basis of trade secret, Judge.

THE COURT:  Thank you.

MR. GANNAWAY:  The last issue has to do with language of the Order.  And as your Honor knows, we went back and forth many times regarding the last Order that your Honor issued.  And I'd asked you to reconsider it and your Honor let it stand.

Some of the items in there we're asking for reciprocal treatment, which you had ordered us to provide and to do.  And the

limitations you placed on it we would like the same Order to that.

THE COURT: I haven't a clue what you're talking about.

MR. GANNAWAY: And I'm going to be specific, your Honor. One is you told us not just to produce profit-and-loss information but to produce revenue -- certain revenue and expense information. We'd just ask that they do the same thing so that we can analyze the profit-and-loss numbers.

The other is that you said if we didn't produce information pursuant to the Requests for profit-and-loss information, that we could not use it at trial to impeach their expert. And I would like -- your Honor, honestly I think that's an inappropriate ruling. But if it is going to stand, then it needs to go both ways. And if they don't produce --

THE COURT: What is inappropriate about it?

MR. GANNAWAY: Because it wasn't relief they sought in the Motion that was before your Honor when your Honor ruled.

THE COURT: But that is almost reciting what the Rule says that if evidence is requested and not produced, it doesn't come in at trial. And that's the whole intent of my ruling.

I am frustrated with having evidence come up at trial that was not produced in Discovery. And, now, I have to conduct an independent review of whether or not one party or the other is going to be prejudiced by that.

MR. GANNAWAY: I'm not here to challenge your ruling that you made already, your Honor.

THE COURT: Well, except that you said that you didn't think it was appropriate.

MR. GANNAWAY: I apologize.

THE COURT: Mr. Gannaway, that tells me that you think the Court has made of some kind of error in its ruling.

MR. GANNAWAY: Your Honor, I apologize for suggesting that. My point, now, is, given that position of your Honor, I would like reciprocal treatment.

MR. JOHNSON: Well, that wasn't in that Motion that they filed.

THE COURT: It is not in your Motion. But I will make it really, really clear that:

If Discovery is requested and not produced in this case -- because of the volume of information that we're talking about, if it's requested and it's not produced, it's not coming in at trial.

This Court is not going to conduct a review to determine whether it's prejudicial or not. If you ask for it and you don't produce it, it's not coming into trial.

Okay. So I'm sure if we have to trial this case, one of you are going to remind me of this and you probably won't have to. It's very frustrating. You know, I speak at seminars about what to do the last 60 days out before trial and one of them is to clean up your Discovery to make sure that everything is produced so that we don't have those issues.

I don't think I have to put this in any Order we have

relating to what we're doing today. I just wanted everyone to understand, if the other side doesn't have it, it's not coming in.

Okay. Can we move on to the next Motion?

MR. GANNAWAY: Yes, your Honor. That is all.

THE COURT: The next thing I have is a Motion for Protective Order regarding the Apex Deposition of Tracy Young --

MR. GANNAWAY: Yes, your Honor.

THE COURT: -- who I understand is the CEO of TMX Finance.

MS. LOVETT: Your Honor, the LLC which is the parent --

THE COURT: Parent.

MS. LOVETT: -- entity that owns the holding company. That owns the affiliates.

THE COURT: Okay. What specific evidence do you believe that Tracy Young has that's relevant to this lawsuit and cannot be obtained from other -- some other resources?

MS. LOVETT: That is a question for them, your Honor.

THE COURT: You're right. Thank you very much.

MR. WARGO: I like the question, but she didn't have an answer for that.

MS. LOVETT: I do.

THE COURT: Can I tell you something?

She has an answer for you.

MR. WARGO: Well, your Honor, we may disagree because the starting point here when you're talking about Apex Doctrine is whether it applies. And that's what we filed in our Response, your

Honor.

Mr. Gannaway has represented to this Court that the LLC -- and that is TMX Finance, LLC -- has one employee. And that is -- your Honor remembers this.

THE COURT: I've read all these Motions.

MR. WARGO: Okay. So, your Honor, from our point of view -- and I think the law is crystal on this -- there is no Apex Doctrine. He is the guy and their Defendant in this case.

Your Honor has already ordered that his documents be produced. That his Email be reviewed. We're going to explore this when we get further in Discovery, but everything that came out of that Production was privileged. We will explore that in Discovery. That's their current position.

But, your Honor, for the same reason that you ordered that his Emails are relevant based on Mr. Gannaway's representation that Tracy Young -- forget about him being a CEO. Okay, he is. He's also the CEO of the Texas entities at issue. He is.

Your Honor, he's the only guy. He's the only employee. So, we are entitled respectfully, your Honor, to take evidence from the single employee of a Defendant in this case.

That's our -- that's why the whole Apex Doctrine, your Honor, doesn't even apply. It's a nonstarter.

THE COURT: Okay. Well, let's say for the sake of discussion that it does apply.

MR. WARGO: Okay. Your Honor, what we have here is -- and we

put this in our paper. Going back to December 6th, 2012 we have alleged from their General Counsel TMX Finance, LLC, saying as follows -- and this is in the record:

First TMX denies the allegations in your letter.

This is a letter from our general counsel to TMX Finance saying we've heard that you guys are doing some illegal stuff in Texas -- your Honor, that is the basis of this lawsuit -- and we would like you to stop.

And they wrote back through their Deputy General Counsel:

TMX denies the allegations in your letter. Specifically TMX employees are neither monitoring Select Texas stores, marketing parking lots for the purpose of obtaining license plate numbers from Select customers nor are they obtaining names and contact numbers of Select customers through improper searching of lien information in Texas state maintained motor vehicle records.

Now, your Honor, we know, though, that is just false. And that was from their Deputy General Counsel of TMX Financial.

They further state:

Second, TMX does not consider the above allegations to be a proper business purpose and has reminded all Texas managers of its position of its of this practice.

The only person who could have done that, your Honor, is Mr. Young. Tracy Young. He was the only employee of TMX Finance. May I --

THE COURT: Who was that letter from?

MR. WARGO:  This is from Vin Thomas, their Deputy General Counsel dated December 6, 2012.

THE COURT:  Deputy General Counsel of what?

MR. WARGO:  The rate clause -- there's reference at the bottom.  Their rate clause in their letter with their letterhead says:

Cease and desist letter dated November 15th, 2012 from Select Management Resources, LLC -- that's us, your Honor -- to TMX Finance, LLC.  Parens, quote, TMX, close quote, close parens.  They are responding on behalf of TMX Finance.  Tracy Young.  He's the only employee there.

And this representation -- the only one who could have authorized this individual -- this attorney to the make this representation is Tracy Young.

This representation, your Honor, purports to make a representation about what's happening in Texas concerning the facts and circumstances of this very litigation.

THE COURT:  Why does it have to be ordered by Tracy Young?

MR. WARGO:  He's the only guy.  He's the only employee. This is of record.  There's no dispute here.  He's the only employee. He's the only manager, and he's the only member of the LLC.

THE COURT:  Okay.  Ms. Lovett?

MS. LOVETT:  Thank you, your Honor.

First of all, what counsel says is "Re:  The cease and desist letter" that they directed to -- they chose Texas TMX Finance,

LLC, this says "TitleMax" on the letterhead and it's signed by -- if Mr. Thomas is the Deputy General Counsel and Mr. Young is the only guy, then obviously we're talking about a different entity if he is the only employee.

But here is the question that your Honor asked me and I will answer:

They've done nothing.

Your Honor had a hearing on October 10th where the parties I think quite vehemently debated the issue on what would be the proper topic for a corporate representative deposition. I know your Honor recalls that. Chapter and verse, your Honor.

THE COURT: And this record is going to look quite interesting, I know.

MS. LOVETT: Your Honor, we've seen more interesting.

But at that hearing, which is on October 10th, the parties were arguing and the Court found that the proper categories because there was not an agreement over those categories for what -- and I am calling it a 30(b(6) witness, a corporate representative witness under Texas Law.

Those categories were determined. The depo was set for November 13th, and we've got a ball game. Somebody is going to testify on all of those issues, which this Court ordered were proper.

Then something very interesting happens:

On October 23rd the Corporate Rep Notice is pulled. They say we don't have new information to depose a corporate

representative. The next day they notice Mr. Young because apparently they have enough information to depose him.

Now, that, your Honor, smacks harassment because Mr. Young is Apex. He is the crystal definition of an Apex. The reason he is the only employee of that one entity is because it sits atop all the other entities.

He is -- as you just heard -- the CEO of the Texas entity, which makes him an Apex Deponent. They have to carry the burden. What have they done? That cancelled the deposition that we came in here and wasted your Honor's time with apparently and fought over and the next day they turn around and noticed him.

As they have told you, the only Emails produced that were relevant every single person who's testified has said I've never talked to this person about that. I've never talked to Mr. Young. Not unusual because he's the CEO. But when his own Emails were produced -- and we provided a Privilege Log. That Privilege log contains only privileged communications.

I won't go into the details of those, your Honor, but simply put the representation was that there is nothing that he knows that is relevant. Your Honor had a hearing about what was relevant. And why that corporate rep deposition was cancelled and the next day he was noticed when they don't have enough information to depose the individual that would be able to meet all categories they came in and argued about 13 days before but suddenly they can depose Mr. Young who has nothing and from whom they have seen nothing, is the paradox.

He's the Apex. That's a heavy burden. They haven't met it.

THE COURT: Mr. Wargo --

MR. WARGO: Yes, your Honor?

THE COURT: -- TMX Finance is the company that's at the top of this pyramid, correct?

MR. WARGO: So to speak, yes, your Honor.

THE COURT: Well --

MR. WARGO: Here's why I answered it that way:

What we made a matter of record in this court, if you look at their 10K, their filings, they themselves -- themselves treat all of these entities as one.

In fact, one person who reported to him, Linda McDonald, when we took her deposition, she didn't even know who her employer was. And, in fact, when she was stated who her employer was, she made -- she was -- a nonentity. Doesn't even exist.

So, your Honor, we can say it that way; but it's not how it works in reality. I understand that there's a company here and there are Texas companies, but they are all one company.

THE COURT: If they're all one company --

MR. WARGO: Yes.

THE COURT: -- doesn't that mitigate against your assertion that because TMX Finance only has one employee then I should be able to take TMX Finance's employee's deposition since we are alleging that TMX Finance is a bad guy here?

MR. WARGO: Your Honor, I think you just said what my

argument is. And, so, I misheard you. TMX --

THE COURT: No. If they are only-- if they're just one entity --

MR. WARGO: Yes.

THE COURT: -- acting as one entity and he's the CEO, is there anybody above him in this structure?

MR. WARGO: No, your Honor. There is no one above him in this structure, but that has nothing to do with whether he has relevant information. And with regard to a Defendant in this case, is -- and they haven't disputed this, your Honor, I want to make two things very clear:

She argued and I get to distraction talking about no corporate representative deposition. That is nothing to what we are arguing about here. What we're arguing about here is whether Tracy Young has relevant information.

Your Honor asked us to assume the Apex Doctrine applies. It doesn't, but we were going with that. She didn't even try to say that it applies. And I know your Honor asked us to assume that --

THE COURT: Wait. Wait. Wait. Ms. Lovett did say the Apex --

MR. WARGO: Yes, your Honor. She didn't argue that, in fact, it applied based on your -- you asked us to assume that it does. When you look at the facts of the Apex Doctrine and you look at the law, there is no dispute. There are three or four cases. The Apex Doctrine requires a whole bunch of people reporting to someone

who is really too busy taking care of business.

Your Honor, we have the flattest of flat organizations here. TMX Finance is a Defendant in this case. That's undisputed. TMX Finance has one employee:

Tracy Young. That's undisputed.

TMX has one member. That's undisputed. TMX Finance has one -- what's the last one -- manager. That's undisputed.

It's all Tracy Young. And what I am pointing to you is their own letterhead coming from TMX Finance says we are looking at overseeing everything in Texas and we are making a representation to you, SMR, LoanStar, that we got the ball. We're not doing anything wrong.

That shows knowledge. That shows personal information. And that all tracks back to literally -- and they haven't disputed this -- one person they can call on the CEO and he is -- and he happens to be the CEO of other entities. But that doesn't negate the legal significance of this document, your Honor.

I'm entitled to argue to a jury that TMX Finance, their only guy, is a bad dude because he has knowledge going back to 2012 purported to do something about it and didn't. I'm going to argue that in front of a jury. How can I make that argument if I don't depose him and find out what he's going to say? He's the only guy.

So, your Honor, I would like to make one other point, if I could take a sip. They submitted an affidavit from him in this case, and it's interesting what it says and what it doesn't say. And

that's found on their Motion for Protection and on page 2 -- it's a very short affidavit.  At the top.

THE COURT:  What exhibit?

MR. WARGO:  I believe it's the only one, your Honor.

THE COURT:  No.  I see A through K.

MR. WARGO:  It's B.  I apologize.

THE COURT:  Thank you.

MR. WARGO:  It's the only one in mind because you don't need to look at the others --

THE COURT:  You're right.  Okay.

MR. WARGO:  -- in my opinion.

Your Honor, on the second page of B -- now, remember Mr. Gannaway made representations to your Honor, which I have not been contradicted here at all in oral argument nor in affidavit, and that is what I told you that this is the flattest of flat organizations.

Okay.  So, what this would have been the affidavit to say, oh, wait, there are other people whom have information in TMX Finance.  Its own legitimate, separately legal entity that will be a Defendant in this case that I'm going to have to argue to a jury needs to be tagged.

And what is my evidence?  It's this letter to start with. This letter is TMX Finance and TMX Finance making a representation that nothing is wrong.  I'm entitled to depose the guy -- the only guy.  That's your record here your Honor, the only guy made this

statement.

And I'm entitled to depose him. It's that simple respectfully.

THE COURT: But that statement is not made by a TMX Finance person.

MR. WARGO: It's made by a lawyer on behalf of TMX Finance. That's what it says. That's just what it says. "Agent," your Honor. And it's on behalf of TMX. We've sent the letter to TMX Finance, and TMX Finance wrote back.

There's only one person, your Honor. And I get to tell the a jury that is the guy. And getting to my affidavit -- their affidavit, your Honor, I do not have -- here's -- here's the sum total of, hey, I don't know anything. I do not have any first-hand personal knowledge of relevant facts concerning the subject matter, blah, blah, blah. Gosh darn it, your Honor, I am pretty sure Tracy wasn't stuffing envelopes, wasn't in the back room getting on the computer stealing our customers.

That's not the theory of our case. But people who worked in his organization did, and we've deposed them and what this is the wiggliest of wiggle words:

I do not have firsthand personal knowledge.

Your Honor, respectfully, he doesn't need to for him to have relevant evidence. It's what the company's knowledge is that I get to argue to a jury they knew at the time they said they didn't know. They knew this is a lie. He had relevant firsthand -- maybe not

firsthand. We're all lawyers. We know what firsthand is. But Tracy Young I'm going to argue to a jury knew what was going on, orchestrated what was going on and it goes to the very top of this one entity and there's only one guy. He's in charge.

THE COURT: What evidence do you have that he orchestrated what was going on?

MR. WARGO: Your Honor, we have evidence that Tracy Young is the guy responsible for everything that happens in this company. That -- this is a small industry, your Honor. This letter was sent to TMX Finance because that's Tracy Young. Tracy is someone who has his hands in the business.

Okay. This is my client, LoanStar. They know who my guy is. Okay. This is a small industry. Tracy Young knows what's going on in his business. That's what we know.

THE COURT: How do you know that?

MR. WARGO: Your Honor --

THE COURT: Because it's a small industry?

MR. WARGO: That's part of it. How do we also know is I have a letter from them.

THE COURT: Besides the letter, Mr. Wargo --

MR. WARGO: Yes, your Honor?

THE COURT: Besides the letter, Mr. Wargo, what evidence do you have? And that goes to my very first question:

What evidence do you have that Mr. Young has relevant information in this lawsuit?

MR. WARGO: Their 10K, your Honor. Their 10K says that this guy, Tracy Young, every one serves at his pleasure, at his discretion. That he is the person who is in charge of all of the Texas -- of the Texas entities.

He has his hands in everything. Your Honor, their was recently a message that went back and forth between Tracy Young and the person who's in charge of our company where Tracy Young said I got it. I'm taking care of this. I'm going to make sure it doesn't happen.

He's making those representations within the last month. That's the same representation that Vin Thomas is making that Tracy Young is going to put a stop to this.

So, your Honor, it doesn't even matter what I'm telling you on this point, respectfully. As a matter of law -- we are lawyers here. As a matter of law, there is only one guy. So, I can be entirely wrong about what I just said. I have one person in this one company to depose. And you're not going to let me? I respectfully think that's not fair, your Honor.

You're talking about what's fair? This isn't Ford Motor Company. They have less than a thousand employees. This guy can make some time to sit down and answer some questions about the veracity and what he knew about these kind of statements.

So, when you're telling me I have to go somewhere else, there is no where else to go. And they've never disputed that to this moment. I have no where else to go to get evidence about this

company, your Honor.

THE COURT: Okay.

MR. WARGO: Thank you.

THE COURT: Ms. Lovett?

MS. LOVETT: Would your Honor like to see a copy of the letter up close?

THE COURT: No. I got it.

MS. LOVETT: I understand. You know, it's sent from TitleMax. It's signed by the Deputy General Counsel of that entity. It doesn't mention an organization. It says employees have been reminded. It doesn't say anything about Mr. Young.

And, I'm sorry, I am asserting that Apex Deposition applies. We asserted that it applies in our Pleading that we filed with the Court. The Apex Deposition under *Crawley Industrial* absolutely applies.

He is the guy over those one thousand employees. I don't file 10K's for a living. I've never seen one that says he's the guy. But if that's what the 10K says, your Honor, and if they came into this Court and arguing that a corporate representative had personal knowledge and important knowledge that he needed to be behind and your Honor ordered -- entered an Order on that and they pull it down and the next day it's all going to be Tracy Young, then it doesn't matter what Tracy Young said which might be a privilege settlement -- may or not be a communication.

So, the burden that they bear -- counsel's bear assertion of

ignore the Exhibits C through L, which, your Honor, are the deposition excerpts in which individuals repeatedly deny having any discussion about that with Mr. Young. The letters they are showing you is written by a company lawyer, which means that even if he did discuss this with Mr. Young there is a privilege.

So before we get to knocking down the door to the CEO's office -- even a thousand employees is a lot to me. Before we get to the CEO's office, there has to be some showing that he has relevant knowledge. And he may know that there is a lawsuit. That's relevant. Does that mean that you get to go and depose Bill Gates because he knows there's a patent infringement lawsuit?

Every single court that's looked at has said that's not prudent and it may turn out not to be such a good idea. But in this instance it's their burden and all they're bringing the Court is this letter which doesn't say it's on behalf of, by the way, the LLC.

It says we're responding to your letter directed to TMX. It's on TitleMax letterhead.

THE COURT: Directed to TMX Finance?

MS. LOVETT: Well, yes. They show to whom to direct it. TMX -- the one guy at TMX Finance, didn't respond to this.

THE COURT: But it is a letter in response TMX Finance, not TitleMax Texas or any of the other entities that are in this lawsuit.

MS. LOVETT: Fair enough, your Honor. But, again, if they want to take this letter and stick it front of the nose of every single person that testified and say were you warned, were you told

about this, were you -- did you discuss this and they had wished to actually if they came before this Court in good faith saying we need information from a corporate representative.  The reason that's not a diversion or distraction is because the law requires that they show you that they have sought other means of obtaining the relevant information.

They told you that there was other relevant information.  They filed a Motion.  They forced us into a hearing on it.  You ordered it.  They pull down the deposition, and then they noticed Mr. Young.  There's no showing except for this one letter from a lawyer.  The communications surrounding which would probably be privileged.

THE COURT:  Okay.  I am not ruling right now on this, but I will give you a ruling next week.

MR. WARGO:  Thank you, your Honor.

MS. LOVETT:  Thank you, Judge.

THE COURT:  The next thing I have is a Motion for Continuance.  I don't want to do that just yet.

MS. LOVETT:  Can I correct a misstatement?  I want to correct this on the record.  It's not a thousand employees.  It's 6,000.  I am good at correcting.

THE COURT:  Okay.  Defendant's Motion to Designate a Responsible Third Party.

MR. GANNAWAY:  Yes, your Honor.  May I approach?

THE COURT:  You may.

MR. GANNAWAY: This -- to give to visual aid, direct the Court to page 15.

In a nut shell, your Honor, we have designated the PublicData and DataTrax entities, the companies that run those web sites, as people who are responsible third parties in this case.

As your Honor knows, Chapter 33 says what we have to do is designate any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought whether by negligent acts or omission by other conduct or activity that violates applicable legal standards.

And all we have to do at this phase, your Honor, is meet the bear Pleading Standards required by Texas Rules of Civil Procedure.

We've done that. We have listed a number of statutes and other applicable legal standards that we believe that these folks have run afoul on just on the basis of the testimony that we've heard from folks who ran searches and what they believe they were committing to when they saw the interfaces, for instance, on PublicData.com.

Now, they argue that we need to show that these folks would actually be found negligent. They talk about contributory negligence and all this sort, superceding negligence that would wipe out these acts.

Your Honor, they're talking about ultimate liability. And it may be under the old Chapter 33 regime that would have worked. The Rule used to say you can designate one who could have been but

was not sued by the claimant and the person is or may be liable to the claimant. That's not the case anymore.

In 2003 it was changed to say:

If someone committed -- contributed to the harm in any way by conduct or activity that violates applicable legal standard.

And if you turn to page 17, I've cited the *Unitech* case out of the 1st District. That says:

An RTP can include people who aren't even subject to the Court's jurisdiction who might be immune from liability of the claim, your Honor.

We don't need to show that these folks are ultimately going to be liable or that they ultimately have breached a legal standard. They don't even need to be liable.

THE COURT: Don't you have to prove that they did something wrong?

MR. GANNAWAY: I need to show they breached an applicable legal standard. That's what the Rule says.

THE COURT: Okay. They did something wrong.

MR. GANNAWAY: Yes, your Honor.

THE COURT: What did DataTrax --

MR. WARGO: DataTrax.

THE COURT: What did DataTrax and PublicData do wrong?

MR. GANNAWAY: If your Honor will turn to page 20, I've given an of the applicable legal standard that hasn't been met here. And this is from *Diverse Policy Driver*. I am not sure -- you know,

it's the centerpiece of their allegations. That says in Part C of USC 2721 in Chapter 18:

An authorized recipient of personal information may resell or may disclose the information only for use per Subsection B.

That's the laundry list of permissible uses of what you can use these searches for.

And then I cited your Honor to 2nd Circuit case that evaluated that language. When a reseller like DataTrax, like PublicData, was excused of not having the right safeguards on their website -- and that led to someone getting personal information that resulted in an altercation where someone was physically hurt. So, the database provider was sued. And the 2nd Circuit said:

In light of the Texas legislative history, we hold that resellers are subject to a duty of reasonable care but before DTPP protected personal information.

And if you turn to the next page, page 21, you will see that allegations that the 2nd Circuit there thought were relevant were the same kind of allegations that we're making here:

We conclude that a reasonable jury can find they failed to exercise reasonable care when it disclosed the personal information.

One of the issue -- and I going to go over with your Honor, if you will turn to the next page. I've shown this to you before in giving you some background about how those databases. Page 22, says -- and there has been lot of testimony on this from lots of TitleMax former employers and employees. When they were running

searches, they all agreed with this and it says, quote, for any use in the normal course of business. And I will tell you it sounds like that's -- whatever anyone does at work might not apply to running a search.

If they're trying to locate -- even if you assume that everything they are saying as true, if they were trying to locate one of their folks so they can send out a mailer to them and trying to get them to convert and drum up some business, that's what those folks thought would fit into the normal course of business. Take that and ran the search and there was no suggesting that there was anything that they were doing was wrong.

There has been lots of testimony on that.

THE COURT: Except if you click on that link -- not filling in the space, if you click on the link, it describes what that means, doesn't it?

MR. GANNAWAY: That is true, your Honor. I'm sure they are going to argue that to the jury but that's factual. We just have a Pleading Standard here right now. And I did ask some of those folks did you click on this, did you know if clicked on it you could see a more full explanation. And the testimony to that was "no."

And then if you turn back to page 21, look at what the 2nd Circuit said about this sort of thing. There was a purpose there called "insurance other" that at least arguably is not a permitted purpose. And there is some statutory language that suggests that certain insurers can look up information related to insurance. But

"insurance other" Court said that might not cut it but we don't need to decide that today, your Honor. That is a factual issue.

We made the Pleading that they have breached a legal standard that is certainly applicable to resellers like DataTrax and PublicData. And we don't need to show exactly what those interfaces do that but we've done that, your Honor. We've shown you where the confusion has been. We've already had testimony that there was confusion about and those folks thought there was nothing wrong with running these searches.

So, at this stage where we just have to make a bear bones pleading required by Texas Rules of Civil Procedure with, we have certainly shown where an applicable legal standard that arguably has been breached.

THE COURT: Yes, ma'am?

MS. ROMERO: Your Honor, Abigail Romero.

This is just another one of TitleMax's attempts to shift --

THE COURT: Okay. You know something? Hold on a second. Let's stop with the jury arguments. I don't mean to pick on you. I really wanted to pick on him. I really wanted to pick on him because the Pleading is loaded with it. It does absolutely nothing for me.

So, let's not hurl invectives. Just tell me why you think you're right.

MS. ROMERO: PublicData and DataTrax did not cause our harm. The statute requires that the responsible third party have to cause or contribute to the harm. Our harm was 100 percent caused by

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

TitleMax, caused by their employees. And they misrepresented their purpose to PublicData and DataTrax. They're conclusively presumed to know the law.

So, even though we can get to all this other negligence and they violated an applicable legal standard if you want, but at the end of the day they didn't cause our harm.

TitleMax could have had their employees sitting at a computer running searches on our customers all day, that's not what damaged us. What damaged us is they have of our customers. It was the marketing. It was the theft.

In fact, once of their employees who did, in fact, sit down and run searches all day DataTrax sent that employee a letter saying you have overloaded our severers. We think you're not doing this for an inappropriate purpose; but, that aside, running searches, that doesn't harm us.

There is no way that they have satisfied the applicable pleading standards because there is no -- just no harm on the face of their papers. And we can get into the rest of if you want. We have a Statute of Limitations argument that also bars in large majority of their claims but there is no causation on the face of theirs.

MR. GANNAWAY: Your Honor, I appreciate the stipulation that running searches does not cause harm. It still doesn't mean that we can't designate RTP. She is jumping to a jury argument, as your Honor noted.

And even when she didn't start using the invective against

my client, she's still arguing that the facts don't support the RTP designation. We have pled facts. We have shown evidence already, your Honor, that support the RTP designation. We have gone far beyond the mere bare bones pleading standard required by the Rules.

And the only analysis --

THE COURT: Wait. Hold on a minute. Hold on a minute. You said you don't have to prove that they caused harm?

MR. GANNAWAY: Well, I don't have to prove it at this stage. Eventually we would have to show those contributed to the Plaintiffs' harm.

THE COURT: Is there anywhere in these -- what do you call them data information?

MR. GANNAWAY: Databases.

THE COURT: Databases have been brought in a lawsuit in the manner in which you're alleging that it should be?

MR. GANNAWAY: Well, I think one example out of the 2nd Circuit, yes, they have been sued in other areas for how they treated the resell of data and whether they were careful enough and followed the statutory requirement.

MS. ROMERO: Your Honor, if I may?

THE COURT: Just a moment? You are talking about *Gordon v. Softech International*?

MR. GANNAWAY: That's correct, your Honor.

THE COURT: And what is -- what's the fact situation in that case?

MR. GANNAWAY: Try to recite as best as I can recall it, your Honor.

I believe that someone got in an altercation on the streets. Got in an argument and one of the individuals involved in the altercation went home --

THE COURT: Okay. Go ahead.

MR. GANNAWAY: Went home and ran a search to try to find -- they had I guess the license plate of the other person who they got in a fight with. They looked up that information and tracked him down and I guess beat him up. Something to that affect is what I recall.

The person who got beat up then sued the person who beat him up and the database provider for having made available the information and not taking enough steps to protect someone being able to access.

I think that's parallel to what we have here. Particularly here all we have to do is meet the pleading standards. We just have to show that they contributed to the harm. Folks have testified if I had known this was illegal, if there was something on that PublicData screen that said you can't run this unless and gave the full statutory language and explained what's wrong with it, then I would not have run the searches.

So, it directly impacts the damages that they're claiming. It might have been zero damages if there had been something in here that would have let people that want to abide by the law know that it

might not be permissible to run the searches.

THE COURT: Yes, ma'am?

MS. ROMERO: This case that that Geoff's talking about right now not at all the same as this one.

In this case the Plaintiff was the person whose information was searched. They're the ones that were harmed. PublicData and DataTrax did not harm us at all.

They gave away Gordon's information in this case. That is not this case. Not at all.

MR. WARGO: Your Honor -- if may interject, your Honor?

THE COURT: You may.

MR. WARGO: Your Honor makes decisions like this all the time. Pleading standards where someone has improperly alleged causation, as your Honor has pointed out. Your Honor, here this is a bridge too far. That case is entirely inapplicable to our case. There is direct linkage between the search and the harm.

Here, we have a bunch of people for purposes of this argument who we think we've already proven this those your Honor we will prove it to a jury where they are in a room taking our information and soliciting our customers and stealing.

These folks are in the middle of all of this and the only -- and they are the ones, as Ms. Romero pointed out, they are the ones who have caused our harm.

Your Honor makes these decisions all the time on Pleading Standards. I'm sorry, this is a bridge too far. You haven't caused

the harm here. This is a like saying there a vendor. These people, your Honor -- DataTrax -- these are vendors. So, is a copy service. So, is a currier service that couriers these documents in between their various offices in order to distribute these materials.

THE COURT: But if they hadn't had access to the database, I'm sure Mr. Gannaway would point out, they would have never found out that that customer was a TitleMax customer.

MR. WARGO: And your Honor can recognize as a judge that the State of Texas has said this is a legal enterprise and making that information available is legal.

And if I can bring this home? Geoff just gave away exactly why he loses this argument. He said -- and I wrote it down as best I could -- that he's talked to -- he's taken people's depositions where they said if I had known that was illegal, I wouldn't have done it.

That is the core of our response to them. As a matter of law, your Honor, you cannot state a cause of action based on his argument. If I'd just known this was illegal, I wouldn't have done it. As a matter of law, that is not a cause of action. That cannot be a claim, and that's what they're basing this claim on.

THE COURT: As a matter of law according to who? You throw that phrase around a lot, Mr. Wargo.

According to who as a matter of --

MR. WARGO: Ignorance of the law is no excuse to saying, please, I shouldn't do this. That's all I am referring to when I say that, your Honor.

He's making his argument, gee whiz, if I had only known this conduct was illegal I wouldn't have clicked on here.  Your Honor, the -- our Justice System would cease to exist if we don't have the rule that says you, everyone, is presumed to know the law and you cannot claim ignorance of the law.

THE COURT:  So, you're saying that someone signs on PublicData or DataTrax they're supposed to have knowledge of a complicated federal statute which precludes them from using that database for a certain specific purpose?

MR. WARGO:  I don't have to say that here, your Honor.  All I'm saying in response his Motion, he cannot base his Motion on what at the bottom is something that is not a legal principal.  That is, I should -- if I had only known the law, that's what he has to go do in order to meet many Pleading Standard, your Honor.

If he came in on an entirely unrelated case and said in a Pleading if I had only known this was illegal I wouldn't have done it, you'd throw that out of court.

You can't say someone -- you can't maintain a cause of action because, oh, gosh, if I would only known about the law.  That's his claim right here.  You'd throw that out of court and that's what he's basing this on, your Honor.  And that's why it doesn't even meet the minimal standard.

In addition to, he has not made any showing and we have already come forward with evidence in this case that they're not the cause.  That these people, PublicData.com, they're not the cause.

They're the cause of the damage -- of the harm as the statute points out.

Thank you, your Honor.

MS. LOVETT: Your Honor --

THE COURT: Yes, ma'am?

MS. LOVETT: What Mr. Wargo said that you would -- you would evaluate on pleading standards all the time. Of course, you and I know is incorrect because don't have a 12(b(6) here in Texas. That's the difficulty many of us have struggled with.

While I'm a proud Los Angeles Lakers fan at the annoyance of all my friends in Houston, the bottom line is in Texas there is no Pleading Standards that Mr. Wargo is describing.

The standards under Rule 33 as now amended is caused or contributed to. And that's what would give you, for example, a Dram Shop case. The drunk driver is the person that killed the person. That doesn't mean you can't name as a responsible third party the bar.

Cause or contributed to. The standard is brought. There is no -- we are not here on a Motion to Dismiss posture because there isn't one in this case. We are here on the simple posture of whether or not you can identify a responsible third party. And the pleading standards for that simply is that they caused or contributed.

Here's the contribution because it's the searches and, now, we have the stipulation on the record that these searches didn't harm -- didn't harm LoanStar.

We will deal with that, I'll assure you. But if the searches hadn't been done, then the question becomes is there a causal connection. Is there some nexus there that destroys our responsibility and creates or adds them into the picture. And that is exactly what our Third-Party Responsibility Statute is designed to do.

So, the pleading standards there is not what someone would have to do in a federal case on 12(b)(6). The standard is simply what Mr. Gannaway articulated:

Could they? Have we pled facts? We may not be able to prove them. They may not be able to prove theirs. But have we pled facts that these third parties contributed? Your Honor, that's undisputed those searches were done. That's where the information came from.

THE COURT: Anything else?

MR. GANNAWAY: Your Honor, I would just point out knowledge of the law means that we can't plead this, if you look at the *Garcia v. El Paso Limited Partnership* case, it says:

Criminal actions that are a foreseeable result of a prior tort do not excuse the previous tortfeasor liability.

That's dead on kills Mr. Wargo's argument.

THE COURT: Okay. I'm going to grant the Motion. That doesn't mean that it's going on the Charge. It only means that today we will consider it if there's evidence to support it.

MR. WARGO: Thank you, your Honor.

MR. GANNAWAY: Understood, your Honor.

THE COURT: Plaintiffs' Motion to Enforce Orders and for Sanctions.

Mr. Johnson -- let's go off the record for a second. I don't want this on the record.

(Brief discussion off the record)

THE COURT: With that said, Plaintiffs' Motion to Enforce Orders and for Sanctions.

I guess the Plaintiffs' argument here is there are two Orders here I've signed. One of which specifically relates to the Overlap List that the Defendants are not complying with and they should be punished for it.

Have I characterized your argument, Mr. Wargo?

MR. WARGO: Your Honor, the last word I wouldn't use "punish" given what you just indicated on off the record. But, your Honor, I will tell you I've maybe in my career filed about five of these.

THE COURT: Okay.

MR. WARGO: So, I want you to know this isn't something that we routinely do and, you know, Mr. Johnson and it's not something that he's going to routinely do.

But we have a few Motions here -- are happy to start with the Overlap List -- that simply have not been complied with over a period of time.

And I know Mr. Johnson has -- he's been on the front line

with Mr. Gannaway.  They have had, you know, those discussions.  And, so, he will weigh in as he deems fit.  But, your Honor, we have demonstrated I believe -- perhaps using too many adjectives and I will take responsibility for that, your Honor.

We will make sure to curb our conduct going forward, your Honor.  Your Honor, we have documented -- putting aside those words that gave you pause -- systemic refusal to engage in the Discovery process that truly slows this case down dramatically.  And we put in our papers no overstatement has brought it to a stand still.

Your Honor, this is the only -- the Overlap List of the Motion is where I would like to go back a little bit in time.  The other ones I will not do this, your Honor, but I think it's instructive and I will do this as briefly as possible.

Your Honor, the Overlap List was created out of a Consent Rule 11.  And that goes back to the very infancy of this case.  And that goes back, your Honor, to around September -- July/September of 2013.

Now, your Honor, you may not remember this and I doubt that you do but we sure do:

A couple of weeks after we got their data, our client looked at this -- this being a small industry -- and saying, gosh darn it, that's too small of a list.  There's no way that that's accurate except --

THE COURT:  Hold on just a second.  It's now 4:00 o'clock.

MR. WARGO:  Your Honor --

76

THE COURT: So, let's short circuit this just a little bit.

MR. WARGO: Yes, sir.

THE COURT: I signed an Order requiring that the Overlap List be updated.

MR. WARGO: Yes, sir.

THE COURT: Requiring that certain information be provided within a certain period of time. It's your allegations, am I correct, the information has not been provided to Judge Peoples so that he can prepare the Second Amended Overlap List?

MR. WARGO: My understanding is on November the 6th or 7 that data was finally produced by Mr. Gannaway.

THE COURT: Okay.

MR. WARGO: Yes, your Honor.

THE COURT: Okay. So, Judge Peoples is now working on this second Overlap List.

MR. WARGO: Yes, your Honor.

THE COURT: And your complaint is that the Court ordered him to do that a while back?

MR. WARGO: Yes, your Honor.

THE COURT: And he's been quite tardy at doing that?

MR. WARGO: Yes, your Honor. And a bit more than that.

THE COURT: A bit more than that?

MR. WARGO: Yes, your Honor. A bit more than quite tardy.

THE COURT: Okay. Mr. Gannaway?

MR. GANNAWAY: Yes, your Honor?

THE COURT: They're complaining about three specific Orders not being complied with.

MR. GANNAWAY: Yes, your Honor.

THE COURT: Have you complied with each of these three Orders?

MR. GANNAWAY: Every single one of the issues raised in the Motion to Enforce has now been completed, your Honor.

THE COURT: Okay. When were they completed?

MR. GANNAWAY: Some of them were completed last week with respect to the Amended Discovery Responses. The Special Master List was completed on August the 11th when your Honor ordered us to provide. You gave us 28 days from the day you gave the Order. We submitted those.

In October the Plaintiffs said we believe there is some records that are missing. We saw them on the first Overlap List. We don't see them on the second.

We investigated internally, and we found that the problem was -- I will try to get into as few details as possible but to explain to you the problem:

One of the fields that we have to provide to the Special Master is the secondary Social Security number. There's always a primary Social Security number associated with an account. That's the borrower. Sometimes there's a co-signer or a co-borrower.

We discovered that in many instances the secondary Social Security number was missing in the list that we provided pursuant to

your Honor's Order on August the 11th. And we worked to fix that as quickly as we can.

We're talking about a list that generated 485,000 entries not reflected, your Honor, to cull from the Defendant's databases and we have been hampered, as I've explained in the Motion by the fact that every time we have been ordered to produce a new database that we had to produce a new list for the database instruction by the Special Master.

We have had a new IT person that has to do it because there has been a lot of turnover at TitleMax. So, it's a new person that has to cull the database properly. So, we have corrected that issue. Your Honor gave us 28 days to do the first instance from the time that we identified the issue or they identified the issue. We completed our investigation and provided them a new list. It was 24 days. We are doing our level best to comply.

We understand that that was a mistake. We told them it was a mistake, and we provided the list as quickly as we could and we told them we would pay for the Special Master process, for the corrected process.

We've done all we can, your Honor. There is no bad faith here whatsoever.

THE COURT: Has the Defendant provided you with Responses to Discovery that are contained in these Orders that you're complaining about?

MR. WARGO: No, your Honor.

THE COURT:   Which one?

MR. WARGO:   In part.

THE COURT:   Which ones have they not complied with?

MR. WARGO:   Your Honor, the marketing portion.

THE COURT:   Which Order are you referring to?

MR. WARGO:   Your Honor, I'm referring to your Order dated August 19th.   They have entirely failed to comply with one aspect of this in that with elucidation and I will show they have also failed to comply with the other.   In particular talking about Paragraph 5.

THE COURT:   Tell me the date again.

MR. WARGO:   Your Honor, August 19th of this year.   It's about the July 18th hearing.   Paragraph 5, your Honor.

THE COURT:   I got it.

MR. WARGO:   Thank you, your Honor.   May I?

THE COURT:   You may.

MR. WARGO:   Your Honor, your Honor specifically ordered -- and I'm going to the center of that Paragraph 5 well.   I will just go:

Defendant shall identify the employees of TitleMax Finance of Texas, Inc., and TitleMax of Texas, Inc., by full name, address and job title who were involved in the approval of buy-out letters and fliers used to solicit customers of Plaintiffs.

That's Bucket No. 1.

Bucket No. 2:

And the marketing strategy of using databases to identify

customers of competitors.

Well, your Honor, on Bucket No. 2 they have never identified any one at all at any time who on using your Honor's Order provided or were instrumental in providing information regarding the marketing strategy of using databases to identify customers or competitors. Never ever ever. Even after they supplemented to address the first portion of that, your Honor. And I would like to address that because that's supplementation is false.

So, I will break them down. Whatever is easier for your Honor. But your Honor asked me to respond specifically. They've never given us any person who was involved in the marketing strategy.

THE COURT: I got that.

MR. WARGO: Yes, your Honor.

THE COURT: What else?

MR. WARGO: And that on the first part they were instructed and ordered to provide persons -- your Honor, I won't read it again -- who were involved in fliers in the creation of them and the approval -- where is that -- approval of buy-out letter to solicit the customer.

THE COURT: So, you're saying they haven't complied with Paragraph 5 at all?

MR. WARGO: Well, your Honor, with regard to Paragraph 5, they name people who were low-level people in Texas and they -- and they did that based on deposition testimony.

Your Honor, they named no one within -- who was in the

marketing department in corporate in Savanna who was responsible for this, your Honor.

If I may --

THE COURT: What if no one from the corporate office in Savanna was responsible these two items?

MR. WARGO: From the deposition, your Honor, of an Austin District Manager taken in this case named Michael Bryant, I quote:

"The fliers that were created in your district were typically created at the store level?

"Yes. But we also used a standard flier -- a company "standard flyer.

"And that's something that's created by the marketing "department?

"Yeah.

"In the corporate office.

"Uh-huh.

"Was that standard flier to your knowledge -"

This is the key:

"Was that standard flier to your knowledge ever sent to any "of the individuals listed on these customer lists from DataTrax?

"Answer: I'm sure they were. It was a corporate flier."

Beyond that, your Honor -- may I approach?

THE COURT: You may.

MR. WARGO: I've given you three documents. I am handing copies to Mr. Gannaway. One of them I had from my reference was

entitled "Georgia." I put a yellow sticky named "Georgia." That's this one, Geoff. One "Virginia" and the other "Georgia." That is this one here.

THE COURT: Mr. Gannaway?

MR. GANNAWAY: Your Honor, you are not going to see any difference between these copies of fliers. The first one is evidence of this case. It's the Texas case. And the evidence in this case, your Honor, is that the first one named "Texas" was one of the fliers that was used to go after our clients through the DataTrax/PublicData.com method. That is the first one I gave you, your Honor.

The second one we got in Virginia last month from TitleMax. The third one we got in Georgia from TitleMax last month.

Your Honor, these are -- certainly the first and second are exactly the same. The third, if you will look at the dollar bill and verbiage on there, it's virtually identical. The serial number is the same 50-dollar bill.

Your Honor, we have direct evidence from a former district manager that these fliers were approved by corporate. I just read you that testimony.

THE COURT: Okay. Mr. Gannaway?

MR. GANNAWAY: Your Honor, this is death of a thousand cuts. We have been through this before. When you signed that Order, we asked your Honor to reconsider it. While it was being reconsidered, we had a hearing on September 22nd when this precise issue was

discussed again with your Honor. And this is what Daniel Johnson says with respect to what they were looking for because I said I need them to narrow the universe of what they he said.

So, what he said:

So, what we agreed to on the record, while we are specifically looking for these targeted -- these fliers and the fliers that were sent out to directed specifically towards buyers of competitors loan, that is all we are looking for. So, you know, company-wide marketing strategies we are not interested in that.

And I explained here to your Honor that I was going to go through deposition testimony and try to identify those specific types of non-company wide things that they are complaining. Specific things that were generated at store level against our company policy to send out mailers and fliers.

You directed me to review the depositions to see if the exhibits dealt with that and if there was testimony that showed that. I did that, your Honor. You also asked me have I inquired -- have you, Mr. Gannaway, inquired to the areas of managers -- regional manager of the Dallas area.

I said: I have not, your Honor.

You said: Okay. Do so.

I said: Will do.

You said: And then carry on with what you're doing right now identifying these items.

I reviewed all those depositions, your Honor. I have

updated my Responses accordingly, and we've inquired with the Dallas Regional Manager exactly as you said.

We have updated our Discovery. And this stuff about company-wide strategy stuff that Mr. Johnson told you he wasn't interested in, is beyond anything that could possibly be relevant to this case.

Why does it matter who approved a 50-dollar bill? That's why Mr. Johnson agreed that we didn't have to look if the -- with respect to responding to this Interrogatory.

MR. WARGO: Your Honor, you before Mr. Johnson respond s, I would like to add one more thing. It certainly matters who approved the bill because their Georgia entity we have to show to a jury is culpable here, too. I have a jury argument to make that people in Georgia were involved in this as well.

Your Honor, the problem with Mr. Gannaway's argument that I would like to say before Mr. Johnson jumps in is that he is arguing something that happened at a hearing.

Unfortunately -- or fortunately for us there's an Order from the Court that I just read to you that you have on your screen. Your Honor, he moved to modify this. Your Honor denied. So, here is his Response and I would like to quote:

In the face of your Honor's Order, here is his Response:

Based upon a review of the deposition transcripts and communications by Dallas Regional Managers, pursuant to this Court's direction, Defendants respond that the following people apparently

played a role in designing, preparing and/or approving letters and fliers offering to buy out competitors' loan.

And then he lists people who have been deposed. Your Honor, we fought this. It is death by a thousand cuts. That's why we are asking for our fees because we're here a third time. We moved to compel. We've had a couple of hearings on this. It resulted in an Order.

And the information that we are seeking is critical to our case. It goes to the letters that were stuffed in the envelopes that came to us to say -- from our customers saying what's going on here. There are the very letters that they brought customers to TitleMax.

There couldn't be anything more relevant to this case and whether Georgia -- I'm sorry -- Savanna approved those letters shows the corporate knowledge that we are going to need to show in this case.

And Mr. Gannaway's response is quite telling, your Honor. He doesn't abide by your Honor's Orders. He's calling it direction, and I am quoting from him. And he's also saying that these people apparently played a role.

Your Honor, we're entitled to know who created this and whether this was part of the company and whether it was part of a company's sponsored event.

MR. JOHNSON: All I want to the say is I don't think that is an accurate characterization of what was discussed.

THE COURT: He's reading the transcript.

MR. JOHNSON: I understand that; but the broader discussion, your Honor. And I have read it. I read right before we came down to the courthouse. What we were talking about is I don't care what the corporate strategy is for marketing in Georgia. I don't care what it is in Virginia. I don't care about that stuff. But as to the buy-out letters that were sent to our customers in Texas, we want to know who created those. And what you have in front of your Honor is evidence that somebody -- somebody in Texas didn't create that and send it to Virginia.

This is some decision was that was made by the corporate office, and that is exactly what we are looking for because those were sent to people in Texas. It's in the middle of our case, your Honor.

THE COURT: Mr. Gannaway --

MR. GANNAWAY: Yes, your Honor?

THE COURT: -- how difficult would it be to identify the person in Savanna or wherever it was who created this marketing?

MR. GANNAWAY: May I consult with my client, your Honor?

THE COURT: You may.

MR. GANNAWAY: We could tell them who created this flier.

THE COURT: Why don't you?

MR. GANNAWAY: We will, your Honor.

THE COURT: Because all you're doing -- yeah, it's death by a thousand cuts. But you're bringing us such a lit bitty -- a little bitty problem to the Court and it's causing all of this commotion

here.

It's a simple thing to do it. Just do it. Identify the person that created this marketing strategy. Period. Just do it.

MR. GANNAWAY: Will do, your Honor.

MR. WARGO: Thank you, your Honor.

THE COURT: What else do you not have?

MR. WARGO: What I don't have is the second part of your Order, Paragraph 5, your Honor. They've never given us anything at all, zero, with regard to the marketing strategy of using databases.

THE COURT: Okay. Is there a marketing strategy of at TMX involving the use of databases?

MR. GANNAWAY: Absolutely not.

THE COURT: Why don't you admit -- why don't you acknowledge that, and just say there is no such marketing strategy?

MR. GANNAWAY: I've said that it was not approved by corporate. That's in the Interrogatory Response that we served even before the later version that we amended.

MR. WARGO: Your Honor, they have not answered this question. And if they want --

THE COURT: If there is no one who has approved or participated in the marketing strategy, what else do you want them to say?

MS. GOEBELSMANN: Your Honor --

THE COURT: No. I am asking Mr. Wargo.

MR. WARGO: I want to lock them down and he is not telling

you the answer.  They did not answer this question, your Honor.

THE COURT:  Within 14 days of the hearing Defendant shall identify employees by name, address, job title who were involved in the approval of buy-out letters and fliers used to solicit customers of the Plaintiffs' and the marketing strategy of using databases to identify customers of competitors.

If they say there are no individuals involved in the marketing strategy of using databases to identify customers, which is what I hear Mr. Gannaway is saying and I'm presuming that he said that in response to Discovery --

MR. WARGO:  He did not.

THE COURT:  Well, if he didn't, then you need to.

MR. GANNAWAY:  I will read it to, your Honor, if you would like.

THE COURT:  Where did you answer that question, though?

MR. GANNAWAY:  Supplemental Answer to Interrogatory No. 4.

THE COURT:  And when was that sent out?

MR. GANNAWAY:  I don't have the date, but it was months ago.

THE COURT:  What does it say?

MR. GANNAWAY:  It says:

As limited by agreement with counsel -- because we had a meet-and-confer session -- Defendant states that no one had authority or was responsible for the designing, preparing and/or approving marketing approaches certain employees that were targeted customer known to have a third-party title loans.  The marketing materials

used were not approved by the marketing department.  And, therefore, were against policy.

MR. WARGO:  That is correct, your Honor.

He has not responded to this.  If that were accurate, your Honor, what were talking about at the hearing?

THE COURT:  I don't know because that happened months ago.

MR. WARGO:  Yes, your Honor.

THE COURT:  And I've had a couple of thousand hearings since that date.

MR. WARGO:  Understood, your Honor.  And we are happy to take this representation where he can supplement -- we are happy to put in the supplement answering.  That is all.  We just want to lock them down.

MS. GOEBELSMANN:  Your Honor, just by way of context since it was a July 18th hearing where this was discussed occur before I think that response that Mr. Gannaway is referring to was on behalf TMX Finance, LLC, only and we did move to compel a further response to that Request they had responded to it.  However, we did move to compel with respect to the Texas entities that are --

THE COURT:  Okay.  Okay.  Fine.  Provide them with a Supplemental Response and answering it specifically in response to this Order.

MR. GANNAWAY:  Yes, your Honor.

THE COURT:  Is there anything else that has not been produced pursuant to an Order of this Court?

MR. WARGO: Your Honor, the answer to that is -- as far as we can tell right now the answer is they have supplemented as of this past week and we think that they have complied.

And I do want to keep my Motion for Sanctions, though, as something for your Honor to consider. Because we're only going to be back here again if your Honor doesn't take some action, as your Honor just said and you got exercised about it and I don't blame you, we are here on the little tiniest of things.

And if we aren't going get some corporation in response to the little, tiniest things we are going to be filing more Motions to Compel and then Motion to Enforce. That's why respectfully, your Honor, and I know it's late and I know it's Friday but our Motion is substantial with regard to their numerous failures to respond, failure to -- and Mr. Gannaway -- Mr. Johnson asked him can you give me a date about when you're going to comply. And he said that's a reasonable request and he never does.

Your Honor, respectfully, if you don't take some action about their failure to respond to these things in the ordinary coarse, we are going to be back here again because we are dealing with things that are basic. These are things counsel always agrees to your Honor. Always.

THE COURT: Well, that is not necessarily correct, Mr. Wargo. I can assure that these items in this Order were not agreed to by counsel for TMX.

MR. WARGO: Your Honor, Privilege Log, responding to --

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

THE COURT: If it was agreed to I wouldn't have ordered it.

MR. WARGO: No. I'm saying it's something counsel typically agrees to and everything is a fight. Everything is a Motion. It's because we are not getting anything coming back requiring us to file Motions and take your Honor's time.

THE COURT: I'm not awarding sanctions at this time. But if we come back in here again on tardiness in responding to things, then I will take it under advisement -- consideration. But I'm not going to at this point in time.

He did respond last week. I know it was -- probably your argument is, well, it was done pursuant to or in response to these Motions. I appreciate that. We're just going to let it go at this point and deal with it.

But if it happens again, Mr. Gannaway, I can appreciate their concern because you're responding to things and I don't know the whole story and I will acknowledge that, which is one of the reasons why I'm not asserting anything. But getting information from TMX seems to be a bit burdensome. And you didn't respond to some of these things until last week, which could be interpreted as being a response because of Motion for Sanctions was pending.

MR. GANNAWAY: Your Honor, I told them that I would get all of -- they said they needed this information before the corporate representative deposition. I told them I would have it in advance. There was no date set with respect to anything that's in front of your Honor other than that Special Master list.

But I understand your Honor's frustration.

THE COURT:  I'm frustrated because I have a handful of cases that require Friday afternoon.  11 Motions all in one?  This is not the normal way cases run in Houston.  Probably not in --

MR. WARGO:  Georgia.

THE COURT:  Georgia.

MR. WARGO:  Atlanta.

THE COURT:  That's what I thought it was.  I didn't know if it was Atlanta or LA.

Okay.  Come on, people, let's bring some rationality to this -- is that a word -- and move things along because y'all are one of two or three cases that require this kind of attention.  And I appreciate the fact that neither one of you really want to go to the extent that I'm ordering you to produce certain Discovery.

That said -- that's all I am going to say.

MR. WARGO:  Thank you, your Honor.

MR. GANNAWAY:  May I interject something at this point as far as scheduling?

THE COURT:  Sure.  If you don't mind me continuing to look for the proper Order to sign in this.  Go ahead.

MR. GANNAWAY:  I know that it's getting late in the day.  It's 4:20.

One of the issues that I think is more pressing from our perspective and needing a ruling we had set it for submission last week and the Plaintiffs requested that it be moved to this hearing

was a few Motions at issue regarding Third-Party Discovery.

Some of them have already been received with subpoenas.

THE COURT: You're talking about the Letters Rogatory?

MR. GANNAWAY: Yes, your Honor. The Letters Rogatory and there's also our Motion for Protection from Subpoenas already served and because apparently those folks might be thinking, your Honor, they are already under subpoena and starting to generate material that we would suggest are irrelevant and beyond the scope of Discovery that we address that issue if the -- we can.

MR. JOHNSON: I think this was the four-for-one, your Honor. We can hopefully knock out four --

THE COURT: I'm trying to figure out what -- you're talking about the Letter Rogatory to Online Guru, Acanum Investigations, Burbridge Detective Agency --

MR. JOHNSON: Yes, your Honor. There were three Motions for Letters Rogatory and then we issued subpoenas and then they filed a Motion for Protection as to those and are all the same issues.

THE COURT: I'm trying to find the Motion.

MR. GANNAWAY: It was filed on Halloween, your Honor.

THE COURT: Is that an editorial comment on the Motion itself?

MR. GANNAWAY: Not at all.

MR. JOHNSON: May I approach, your Honor?

THE COURT: Just one second.

MR. JOHNSON: Sure.

THE COURT: All right. The Subpoena Duces Tecum that you sent out you sent it to who?

MR. JOHNSON: We sent it to various parties, your Honor. The Motion for Protection addresses several subpoenas in general and this is true as to the subpoenas and the Letters Rogatory they were directed toward third-party databases that will provide the same type of information as PublicData.com and DataTrax.

We have multiple witnesses in this case and we've cited the testimony in our papers where witnesses for TitleMax has said, look, we know this was a web site that we went to. Can't identify which one.

And, so, what we have done, your Honor, is we've done the spade work, which we have to do as Plaintiffs, to go and find evidence. So, there is not 50,000 of these companies out there. There is a handful of them. And we have asked those entities some very narrow questions which are:

Do you have searches that were done that fall into the category of searches we looking for this this case.

Mr. Gannaway and I -- and I and Geoff and do get along very well despite the disputes that we have. And I pleaded with him. I said, Geoff, this doesn't cost your client anything. If we hit a dry hole with something, it doesn't impact anybody. It doesn't cost your client money. It's not a burden. Anything like that. But we should be entitled to find out since there are people that said "yes" we use some web sites and we can't remember which ones. There was one

witness that said I've not heard of PublicData or DataTrax.

So, unless that other limited universe of database providers we wanted to know whether or not these searches were done. We have gotten a response from one of them already. And low and behold in the response we find in Integrity searches that were done. This is exactly why we did the searches, your Honor.

THE COURT: Mr. Gannaway --

MR. GANNAWAY: Your Honor --

THE COURT: -- what standing do you have to even raise an objection to these things? This is not -- Mr. Johnson is right. This doesn't cost you a thing and that it's not your company that is being asked to produce documents. What standing do you have to complain here?

MR. GANNAWAY: Your Honor, under the Texas Rules, as you know, anyone affected by Discovery Requests.

THE COURT: How are you affected by this?

MR. GANNAWAY: We are affected by this because we -- for the databases that have been shown to have some link to the Plaintiffs' claim, those are PublicData and DataTrax, they have produced documents. There is a 30,000-page stack from PublicData almost all of which, if not all of which, was reasonable legal searches. But we have to go through and look at those 30,000 pages to see whether the Plaintiffs might claim about it.

As your Honor knows, there is nothing wrong with running these searches. In fact, the Temporary Injunction that we entered on

and agreed basis back last summer said Plaintiffs stipulate Defendant may continue to use these databases for legal purposes.

Their position here is literally, your Honor, because they have shown that PublicData and DataTrax were used, they can subpoena any database owner in the country and it's not a handful, your Honor. A lot of people buy this information from DMV's including from Texas and beyond.

THE COURT: But it's a handful that they are seeking it from. It's three by Letters Rogatory, and I don't know about the third-party Deposition by Written Questions. How many of those?

MR. JOHNSON: There were five subpoenas, your Honor. And one of which we already have responses.

THE COURT: So, there's eight total.

MR. GANNAWAY: Your Honor, there is no logic to this from those folks to this case. What they said in their Letters Rogatory Motion, your Honor, was:

Through Discovery in this matter -- here's an example -- Online Guru, Incorporated has been identified as a person who has relevant facts during the relevant time period of Defendants' tortious conduct against Plaintiffs and may possess relevant documents.

They told your Honor that that person has been identified in this Discovery as a business with relevant facts. I did a double-take when I saw that Motion filed, your Honor, because I hadn't heard of Online Guru.

I searched every bit of Discovery we have in the case. I took every transcript that has been taken in that case. That name and the database name associated with it and it has never come up.

Your Honor, if this kind of activity is permitted to go on, if subpoenas can be served to anyone in the world that runs a database whether for legal or illegal purposes that searches were done, there is going to be no end to the satellite litigation that's going to be involved in this case.

There is no way that we can try this case if they continue to generate issues for which there has been no proof that the documents that are produced are going to be relevant to this case and they are going to start trying to ask us to produce information regarding all of those searches that might have been and probably were for perfectly legal reasons, your Honor.

There is also no limit to what they are -- what they are requesting here. They haven't limited it in cases the Request for Production they've served on those people to Texas entities and your Honor might not know but a week or two ago these folks filed suit against TitleMax entities in Georgia the Wargo Firm on behalf I guess affiliated entities of LoanStar.

They appear to be using your proceeding, your Honor, to get Discovery for those other matters because what they've asked of these databases is not limited to Texas issues.

Your Honor, this is a fishing expedition pure and simple just because it doesn't make me produce something, doesn't make it

less of a fishing expedition they are not entitled to do under the Rules of Discovery, your Honor.

THE COURT: But what gives you the right to come in and complain?

MR. GANNAWAY: Because I'm affected by it.

THE COURT: How are you affected by it?

MR. GANNAWAY: Because if they generate a ream of paper that shows 50,000 legal searches that we didn't do skip tracing -- which no one is contesting. It's perfectly legitimate practice to use the databases. We are going to have to deal with that issue.

Remember, this all came up with respect to the filing they made with your Honor when they originally got in that PublicData production that they said, aha, we found some people that ran searches from TitleMax and they turned up Integrity lien holders.

And, so, we came to your Honor and showed you, your Honor, that is just a false non-secular assumption. And we showed you the very first search that they attached to what they pled in front of your Honor to say that we did something illegal and wrong in breach of the Temporary Injunction.

I showed you that was a TitleMax customer. There was nothing wrong with running those searches.

So, their Discovery is overbroad and it affects us because of the allegations that they've made wrongfully that that necessarily means that it was a wrongful search.

MR. JOHNSON: If that's the standard for affecting you, then

the whole notion under Texas Law that it has to affect you means that anyone -- any party can object to a Third-Party Subpoena. That's not the Rule.

The Rule is that it has to affect you and what Mr. Gannaway is saying we don't think you're going to find anything. I have stuff. We have found stuff. We found license plate searches that came up with Integrity liens. This is exactly what he doesn't want us to get.

THE COURT: Wait. Wait. What's the problem with the license search that came up with Integrity liens?

MR. JOHNSON: Well --

THE COURT: With those license searches?

MR. JOHNSON: Well, your Honor, the point is that with this that these are our customers. There are searches being done based on the request that they ask.

There's an Email account here is from an individual named Blaze DeLeon. They have identified an individual supplementing their Response in the last two weeks Blane DeLeon who is an individual that they identified that has access to data accounts.

Okay. We think that we're entitled to learn whether Blase DeLeon is doing license plate searches on Integrity customers. Is he, in fact, engaging in conduct we are complaining about here.

These are third parties. Doesn't cost them anything at all. They are not affected by this. And under the standard he's articulating, any party would be able to object to subpoenas in Texas

and that is not the Rule.

MR. GANNAWAY: Under the standard he's articulating, I can't object to any Discovery directed to third parties, your Honor. That is simply not the Rule.

How it affects me and my client is just laid out by what Mr. Johnson said if Mr. DeLeon -- is that his name?

MR. JOHNSON: Blase DeLeon.

MR. GANNAWAY: Mr. DeLeon ran searches perfectly legal for skip tracing and we have to then prove that through some theory that the Defendants have that that must mean that it was illegal, then it affects us, your Honor. It affects my client. It affects the work that we have to do and what they have to pay their attorney, frankly.

THE COURT: Okay. Motion for Protective Order is denied. I am signing the Letters Rogatory at this point. I don't know that I have an Order denying the Motion for Protective Order.

I have an Order granting it.

MR. JOHNSON: Let me see if we have one, your Honor.

MR. GANNAWAY: Your Honor, with -- understanding the Court's ruling, we will intend to subpoena those third parties ourselves.

THE COURT: That's fine.

MR. GANNAWAY: To the see if LoanStar ran searches.

THE COURT: Pardon me?

MR. GANNAWAY: To see if LoanStar ran searches.

THE COURT: I doubt seriously if LoanStar will object. It would be an interesting hearing, if they did.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

I don't see where I have an Order denying? Did y'all file one?

MR. WARGO: Your Honor, we can provide one on Monday.

THE COURT: No. All right. You don't have to. It will take me five minutes to do it -- less than five minutes to do it.

MR. WARGO: Thank you, your Honor.

THE COURT: Okay. Let's see what's left here.

MR. WARGO: You waited for Los Angeles.

MS. GOEBELSMANN: You saved the best for last, Judge.

THE COURT: Is that the Continuance?

MS. GOEBELSMANN: No. Actually that will be last. This one is two Motions to Compel I believe. Unless you want to take up the Continuance first?

THE COURT: Hold on just a second. Okay. We've done that. We've done the first one. We've done the second one. Motion for Continuance I am holding off on. Responsible Third Party is done. Enforce the Settlement, that is done.

Plaintiffs' Motion to Compel Discovery Responses, Documents and Communications Higher Level TitleMax; is that the one we're talking about?

MS. GOEBELSMANN: That's one of the two Motions to Compel. If it saves time, your Honor, the other Motion to Compel which regards those individual who we believe ran searches in violation of the TI at the same time or prior to.

THE COURT: I don't see that Motion. What date was it filed

on?

MS. GOEBELSMANN: The Motion to Compel the Responses to the to the people who we believe were violating the Temporary Injunction filed on November 5th I believe.

It regards the Sixth Request for Production on documents.

THE COURT: Okay. That one I haven't looked at.

MS. GOEBELSMANN: If Your Honor would like, it's fairly straight forward and actually regards a number of statements that opposing counsel made during the last argument.

THE COURT: Okay. Yeah. Let's --

MS. GOEBELSMANN: Would you like me to provide you a copy for your reference?

THE COURT: No. I have it here. I'm looking at it right here. I thought I looked at everything but apparently not. Okay. Go ahead.

MS. GOEBELSMANN: Well, this one would probably seem very similar to their Motion to Compel. The two Motions to Compel that are before your Honor are very simple and very straight forward. All of regards is TitleMax refused to provide us evidence that goes to our core claims as well as our concerns regarding searches that were conducted by several employees in Texas after the entry of the Temporary Injunction in this case.

I'm starting with that second issue since it came up in the prior argument. Back on July 17th TitleMax submitted four declarations to your Honor claiming that certain searches that were

run by TitleMax employees after the entry of the Temporary Injunction in June 2013 were for collection purposes.

When we saw those --

THE COURT: Were for what?

MR. WARGO: Collection purposes.

THE COURT: Thank you.

MS. GOEBELSMANN: When we saw those documents or those declarations, we were concerned because they were contradicted by the PublicData production that Mr. Gannaway referenced earlier and that was 25,000 pages of documents. With respect to these four employees, 90 percent of those documents did not reference or relate to any TitleMax liens.

So, we were concerned that they were claiming in these declarations that they were only conducting these searches for the purpose of collections' activities with respect to only TitleMax customers.

It just didn't jive. Our other concern was that excuse had been used previously in this litigation. At the beginning of the case there was an individual named Ishmael Hernandez named as a Defendant. He had run an operation that he claimed to DataTrax was using DataTrax's services for collections purposes. It turned out that lot of those searches that he ran were really relating to customers and when we went to depose him on the issue he pled the Fifth.

So, we were very, very concerned about what's going on. And

we served the Sixth Request for Production of Documents on TitleMax in order to obtain documents that supported the allegations that were made in those declarations as well as to investigate the activities of these four employees to see if they, too, were involved in the same illegal market practices that had formed the basis of this case.

We also had served the Seventh Request for the Production of Documents to the Texas entities and the Second Request for Production of Documents to the TMX Finance, LLC, to get additional information regarding the higher-level employees knowledge of understanding of these marketing practices.

To date we have gotten very little back from TitleMax. They have not given us the information that we needed in order to adequately investigate whether or not the four people that we identified in Texas who were conducting those searches after the TIO were, in fact, violating your Orders.

And we have no information really with respect to those corporate employees. Potentially some information that have been produced previously for one employee with respect to deposition she said last year or the earlier this year, but for the most part we haven't gotten much of anything.

So, all we really want are those documents so that we can continue to prove up our case.

Now, there are several other issues that are also requested in these two Motions. One of which seeks identification of additional employees for that expanded time period that's not issued

in the Overlap List as well as bonus information regarding those individuals so we can identify who was really involved in this conduct as well as that -- again, revisit the issue that the Court -- that your Honor may recall from a prior hearing as to the production of hard drives for several individuals for whom we still haven't received sufficient documents.

So, we are just looking for the basic documents and going to a claims in this case.

THE COURT:  Mr. Gannaway?

MR. GANNAWAY:  Your Honor, with respect to -- I will call them the -- Penny Dobney was one of the folks that we submitted a declaration to your Honor in response to their allegation there have been a breach of the TI hearings and the TI Agreement.  They said there was clearly a legal -- clearly breached the TI.

We obtained a declaration from Penny Dobney and others.  Ms. Dobney said I only run these searches for locating information related to TitleMax customers.  I have never looked for the Plaintiffs' customers with these -- with any of the searches on these databases.  That was to cut off.  An irrelevant rabbit trail.

Their assumption that a search came up that showed Integrity, therefore, it must be a breach.  And, if you recall, that I brought to your Honor the exact customer records that relates to the very first Penny Dobney ran a show, look, your Honor when she ran this search this person has been our customer for a month.  They might previously had an Integrity lien.  And, therefore, it turned up

as an Integrity lienholder when she ran the search for skip tracing.

Well, we showed your Honor this is a rabbit trail. Running a search and finding "Integrity" doesn't mean something went wrong.

Now, they say, Okay, Mr. Gannaway says it's a rabbit trail. Make him prove it's a rabbit trail. For the 8,000 pages of documents related to the Penny Dobney search that she has already said under oath were just for TitleMax's business and never to locate Plaintiffs' customers.

They want us to go through there and every time an Integrity reference occurred to disprove that it could possibly have been related to a search for one of their customers, your Honor.

We have produced a lot of documents related to Ms. Dobney. We've agreed to produce them, and we told them there's the search terms we have run. And those include things like "PublicData" and "DataTrax." That will be the kind of search terms you would expect if these people were running these searches, foregoing around for information around PublicData and DataTrax.

We've agreed to produce that information. We've produced most, if not all, of it already. They want more. Your Honor, they want us to go through and not just produce the information in those folks' Email accounts, that says anything about PublicData or DataTrax, they want us to do more and actually comb through the PublicData records, compare them to our records and show and bring up the evidence showing that every search was related to a TitleMax customer.

Your Honor, that's too much to ask and it's going down a rabbit trail that is specifically defined by what folks have sworn in declarations to the Court.

THE COURT: Do you have any evidence to that Penny Dobney has done improper searches?

MS. GOEBELSMANN: Yes.

THE COURT: What is it?

MS. GOEBELSMANN: The searches that result in non-TitleMax lienholders --

THE COURT: What is it --

MS. GOEBELSMANN: -- over 90 percent of the documents --

THE COURT: Whether is it?

MS. GOEBELSMANN: I can certainly present some of them to you, your Honor. As well I have the binder that opposing counsel has presented at the July 18th hearing and actually his representations regarding what that search was and what they revealed really are not consistent with his representations to the Court today.

First, I will provide you the information, if I may, regarding the search results that resulted from Penny Dobney's account.

THE COURT: It's your assertion that Penny Dobney did searches only on TitleMax TMX customers?

MR. GANNAWAY: Your Honor, declaration --

THE COURT: Okay.

MS. GOEBELSMANN: So, your Honor, the documents that you

have before you and opposing counsel has in his hands what has been submitted to the Court previously and in a opposition to the Motion that they filed back in July, which generated the basis from trying to produce these affidavits to the Court. It's a summary of all the searches that were completed by TitleMax employees after the entry of the Temporary Injunction in this case.

There were the four employees. Penny Dobney was the most frequent person to use these searches. The searches that were conducted regarding ZIP Codes, regard license plate, that regarded VIN numbers, I believe that is in your hands. You should have the results that list Integrity as a lien holder.

To the extent that opposing counsel thinks that it will be onerous for him to provide responses to this information, I note that -- he already has it all in his possession. If he didn't from the prior filing, he certainly has it now.

We are very concerned because our customer -- our client kept coming up. Their customers kept coming up. And --

THE COURT: Well, you just said 90 percent of what Penny Dobney researched came up with your customers, not TMX.

MS. GOEBELSMANN: Not quite, your Honor. 90 percent was not TitleMax. That doesn't necessarily also --

THE COURT: Okay. So, I heard Mr. Gannaway saying the research is done by Ms. Dobney are on TitleMax customers. And I hear you saying your review of the Dobney research indicates that only 10 percent were TitleMax customers?

MS. GOEBELSMANN: Yes, your Honor.

THE COURT: Mr. Gannaway?

MR. GANNAWAY: Your Honor, there is a lag time. To give you the example that I gave your Honor before, there was a gentleman who a search was ran on August 23rd by Penny Dobney. The evidence that you heard is he is our customer. He had taken out a loan from us on July 23. Penny Dobney ran the search on August 23 on payment collection to see when that loan was due.

The record that came up say that it's an Integrity lien, which suggested at some point this gentleman did have an Integrity lien. I don't know how often PublicData or DataTrax update their databases but at some point he had an Integrity lien. But it demonstrably shows that this was a TitleMax customer.

What happened even though it doesn't say "TitleMax" in the line, that doesn't prove anything. If you look through the 8,000 thousand pages -- Penny Dobney documents -- a lot of them are liens from the person who sold them the car. Capital one. The Ford Motor Company. Something like that. Sometimes there are lenders. But there is a very small percentage -- extremely small that will say "Integrity."

And we've shown how that is, why it occurred and we've got an affidavit from the lady saying that she never looked for the Plaintiffs' loans. And that's borne out by the fact there are so few instances of Integrity lien holders in her 8,000 pages.

MS. GOEBELSMANN: Going towards the public records that the

prior search that were conducted related to a TitleMax lien, I have the documents that he provided at the last hearing. Unfortunately. I didn't have the opportunity to copy them. But I can certainly show your Honor or opposing counsel if we can both approach the Bench and look at it but basically the search that was run was not a license plate search. It was not a VIN search. It was a Zip Code search.

It resulted in an entry for a car on which TitleMax actually didn't have a loan. The contract that they provided to try and say that this individual actually had a loan with TitleMax regards a 1998 Dodge Ram with a VIN number that starts 1B7HC. The result, though, that we got from PublicData that Penny Dobney did when she ran it was for a 2000 White Dodge VIN No. 1B3 something, something. They were a different vehicle.

That was our loan. That was our customer that they were looking up. So, to the extent that they're pointing to this --

THE COURT: Wait. Wait. Wait. Wait. That is your customer that came up. How do I know they were looking for your customer?

MS. GOEBELSMANN: Because the search result that they provide here was something that was clicked on by that individual in order to view it.

And for us to really resolve this discrepancy we need to be able to depose Ms. Dobney to discover what was going on. And before we conduct her deposition, we need the rest of the documents that we requested our Request for Production.

Notably, Mr. Gannaway represented that some documents were presented for her. They were but they didn't include documents after a certain time period that they self-collected. They only produced documents from 2011 to 2013.

We are needing documents that go beyond 2013 because that's when she was running these searches that we believe violate the TIO. We aren't just investigating her involvement in this illegal marketing practice, we're investigating whether or not she violated your Court's orders.

And we are very concerned about that. They are moving papers. They are trying -- 14 instances. 14 instances if they are a violation of the Court Order are very, very concerning to us.

So, all that we want to do is get the documents to which we are entitled so that we could affectively depose her. If it turns out that we deposed her and they are able to prove up this defense they are now trying to raise, then that will happen; but we can't do that without this information.

In addition, with respect to these Requests for Production, there are three other individuals who came up as having conducted those searches after the entry of the TIO. For those individuals they didn't even run full searches. Not only did they restrict the time frame for those searches, but they limited those search results to some of their search words to some that aren't even going to be -- produce information responsive to a number of these Requests. They only searched the words "PublicData", "Integrity" and "LoanStar."

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

They didn't search "buyout" or "DataTrax" or "direct mail" or any of the other terms that they used for Penny Dobney.  So, I don't know for what purpose they think that they can limit their production for those three individuals when they've already demonstrated that they can actually conduct those searches and give us all the information that is responsive.

They are just trying to prevent us from getting information we need so that we can continue with this Discovery that's necessary to prove up our claims and make sure that this conduct is not occurring anymore.

THE COURT:  Mr. Gannaway?

MR. GANNAWAY:  Your Honor, this is indicative of how they approach every point of Discovery.

THE COURT:  Let me ask you a question.

MR. GANNAWAY:  Yes, your Honor?

THE COURT:  The research that you said Penny Dobney performed you said it was on TitleMax customers?

MR. GANNAWAY:  May I approach and show your Honor?

THE COURT:  You said that it was on TitleMax customer -- yes. you can.  Just a minute.  And she's saying that the search -- that she is searching by ZIP Code?

MR. GANNAWAY:  I don't think that's true, your Honor.  That is why I handed you this.  If you look at this, this is the search at issue.  This is the first search they attached to their Motion saying that we've done all these illegal things that I know they violated

the Injunction.

If you look at the top, that middle data in the date is when this search was run. August 23rd, 2013. If you look in the first box, you see there is the long line that has referrals and then it has DL number filled in the middle there. Do you see that "DL state Texas," if you're following me, your Honor?

THE COURT: Not yet.

MR. GANNAWAY: It's right here.

THE COURT: Okay. I got it.

MR. GANNAWAY: So, I mean, we haven't deposed PublicData yet. We will. It's my understanding, just based on looking at this, that that means that this search was run on August 23 was by driver's license number. And you will see it popped up a number of people for some reason. Every one from Anne Waters to Steven Gordon Moran.

If you turn to page 2, you see that apparently Ms. Dobney clicked on Steven Gordon Moran. That was the one she was looking for.

And if you turn to the next page, it says "lien holder information Integrity Texas Funding." So, that's what was produced by PublicData. That led them to say illegal. Violating the Injunction.

What I showed your Honor was the next page, which is the loan agreement we filed with Steve Moran. We signed it, as you can see, in the upper right. The date of agreement July 24th, 2013. His loan came due on a month later. That happens to be the exact date

that Ms. Dobney ran a search, your Honor.

This evidence shows she was looking for a TitleMax customer and she found him.

MS. GOEBELSMANN: Your Honor, I believe he misunderstands how the results are being displayed. If you look on the page that is the first page of the handout that he provided, under the heading PublicData.com there is what probably are -- I don't know -- links or something. Then Texas is indicated. Department of Motor Vehicles and then results for one database search by ZIP Code.

So, really it seems like this is not a driver's license. And if it were, it would be really concerning that there is this many people with that number. It seems like this was a ZIP Code search.

MR. GANNAWAY: There can't possibly be four people in that ZIP Code, your Honor.

THE COURT: I'm sorry? What?

MR. GANNAWAY: If this was a search of that ZIP Code, 75241, there is only -- there's Anne Waters, Karen Moran -- appears to be Mr. Moran's wife -- Heather Chance and Ida Waters. That's it. There is five people that live in that entire ZIP Code --

MS. GOEBELSMANN: It's a very specific ZIP Code search it seems like.

THE COURT: Both of y'all need to stop interrupting the other one.

MR. GANNAWAY: Your Honor, the point is --

THE COURT: This was a ZIP code search?

MS. GOEBELSMANN: Yes.

THE COURT: Well, show me what evidence --

MR. GANNAWAY: Your Honor, may I be heard?

THE COURT: What specifically was she researching on this occasion? Social Security number?

MR. GANNAWAY: I believe it was for address information; but I don't know that for a fact, your Honor.

THE COURT: Doesn't the search show up in that top box?

MR. GANNAWAY: You mean what I was pointing to earlier?

THE COURT: Yes. Yes.

MR. GANNAWAY: I believe so, but we haven't deposed PublicData. So, I don't know for a fact.

THE COURT: Have you deposed Penny Dobney?

MS. GOEBELSMANN: We haven't been able to because we haven't gotten all the documents that are responsive to these Requests. We'd hate to depose her and then have to reopen the deposition once they finally do produce everything that they should be producing.

THE COURT: I don't know what this search was for. You say it's for ZIP Codes, and you say it's driver's license number. I can't tell what this is.

MS. GOEBELSMANN: Neither can we. However --

THE COURT: And that doesn't give you the right to go and get thousands of pages of more documents. You're throwing this out here at me saying this is obviously a ZIP Code search, and I don't see how it is.

I don't even know what the search is for. It just happened to turn up four or five people in this particular ZIP Code. I don't know what the search terms are. If it was ZIP Code I would expect it to turn up more than this. If it was driver's license numbers, I would be amazed that these -- this number of folks have the same driver's license number.

I don't know what this is a search for.

MR. GANNAWAY: Your Honor --

THE COURT: And neither one of you can tell me.

MR. GANNAWAY: Your Honor, I can tell you this:

First of all, Ms. Lovett just pointed out to me, there's 27,066 people in that ZIP Code in Dallas. More importantly, your Honor, say she was looking by ZIP Code to identify her existing customer, the only thing we know is on the day that this customer's loan payment was coming due she ran a search and she clicked on his name specifically.

There is no suggestion here whether she looked him up by looking at ZIP Code that he entered on his application, whether she looked him up by driver's license number. She clicked on him and it was the date that his payment was due. And there is no suggestion that it wasn't our customer and that's why we were running the search.

That is why, your Honor, going down this road is just it's so far beyond what has already been defined as might be relevant to this case.

The Overlap List, as you know, ends on June 2013 for a reason. That's what the parties agreed to. That's what your Honor has enforced in the subsequent Special Master process. And, now, they want to go with no limits whatsoever knowing that we have an Injunction over our heads. That we have sent out correspondence to folks telling them that they cannot run or they will be terminated if they do this kind of a search for anything other than that purpose.

It's a rabbit trail, your Honor.

THE COURT: Is it your assertion that because Penny Dobney ran a search and it turned up an Integrity client that you're entitled to look at everything Penny Dobney searched?

MS. GOEBELSMANN: We already have search results from PublicData. What we are asking for in this Request for Production are more much tailor that what you just stated.

For instance, we are looking for documents or communications that support or refute the statements that she made in the affidavit that she provided to the Court.

We're looking for evidence for those results that involved Integrity liens to show that what they are claiming that these were, in fact, TitleMax customers. From what they've provided so far, what we've seen is that there is a different car out there that has our loan on it. And they just happened to have a loan on a totally separate vehicle.

For all we know what she is doing is trying to search other vehicles owned by this individual to try to take that business. That

would be an impermissible, illegal marketing practice to take our client's in violation of this Court's Temporary Injunction.

THE COURT: You're fishing here.

MS. GOEBELSMANN: Your Honor, you have to be able --

THE COURT: Y'all are fishing here. What's the specific Request?

MS. GOEBELSMANN: I printed three different Requests for you one by one or I have a handout that I can also asses.

The first Requests specifically regarding the affidavits --

THE COURT: What exhibit number?

MS. GOEBELSMANN: -- are in the exhibits attached to the Motion regarding the Responses as --

THE COURT: Do you know what exhibit number that is?

MS. GOEBELSMANN: I wrote them down. That's actually the handout.

THE COURT: Okay.

MS. GOEBELSMANN: The answers are all otherwise Exhibit D to our Motion. I'll try to make it easier because there was a number of documents that were submitted. So, this is the first set of Request for Production that we are concerned about. They submitted affidavits to your Honor stating certain things that are in contradiction to what the evidence suggests that needs to be explained in that are suspect because we have had the same excuse raised before.

So, we are requesting documents that support or refute the

statements that are being made.  If these statements are accurate, then they shouldn't have any concern with producing this information.

THE COURT:  Except they have to go through the work to get the information.  That's time consuming.  It's costly and it's -- and that contributes to why they don't want to have to produce this information.

This is a bottomless pit y'all are running here.  Y'all are pursuing a bottomless pit of information.  I'm agreeing with Mr. Gannaway to that extent.  You are absolutely trying to discover every document that can be -- that is out there relating to certain individuals with TMX, and I have to decide whether or not that's reasonable and that results in the Discovery of admissible evidence or could reasonably -- see, you've got me tongue twisted at this time of day -- could be reasonably calculated to discovery of admissible evidence.

You guys are running -- you are running down every rabbit trail that there could be in this instance.

MR. WARGO:  Your Honor --

THE COURT:  And I am trying to figure whether it's going to be the least bit productive.  I want you to show me, tell me -- and you may have and I'm just missing it -- what your evidence -- if your evidence is this and it turned up the Integrity people, Integrity loans, tell me why this research done by Ms. Dobney was not research done on TMX customers.

MS. GOEBELSMANN:  It was not done on TMX customers because

it shows Integrity lien holders.

THE COURT: That doesn't mean it wasn't done on TMX customers, does it?

MS. GOEBELSMANN: Well, we don't know anything about any of who TitleMax's customers are. We requested the information that would answer that question in our Request for Production so that we could verify the statements that are being made.

We are really interested in making sure that we are able to investigate through these Discovery Requests this defense that they raised that this is for collections purposes.

We also are entitled to investigate the basis for these affidavits that have been submitted. So, that is why we served those Requests requesting that information.

MR. WARGO: Your Honor, may I make a suggestion? What about if we go down one of these with Penny Dobney? We will stop there if Mr. Gannaway's correct. If he's not, Mr. Gannaway might agree with us that we can continue.

THE COURT: What do you mean you go down one of these?

MR. WARGO: We take the deposition of Penny Dobney. We get the documents that we've requested regarding Penny Dobney to see if Mr. Gannaway's correct.

If he's correct, it is over. We won't try to seek information, documentation or further depositions from these people. If the Penny Dobney deposition and the documents that we have asked for concerning Penny Dobney do support what we believe is the case,

that this TIO of the Court has been violated, then we would like to go ahead. And I am sure Mr. Gannaway way would agree that we would be entitled to that information from the others.

We have asked for three or four and we are happy to go with one.

THE COURT: I think it's four.

MR. WARGO: Four, your Honor. Penny Dobney looks like she's the most egregious violater. So, if we can get that documentation, sit her down for deposition, and, if this is incorrect, then we've had one deposition and we've have had to incur the time and trouble of getting documents together for one individual.

MR. GANNAWAY: Your Honor, that doesn't change the fact that it's a bottomless pit. It takes time to do these kind of searches to determine if these are, in fact, our employees.

They have asked you to in their Request for Production to have us believe every TitleMax customer, every person in those searches is a TitleMax customer. Remember, we're talking about 8,000 pages in Ms. Dobney's PublicData search results.

They have an affidavit from her. They can put her on the stand for deposition, your Honor.

THE COURT: Hold on a second. Have you produced 8,000 pages of Discovery on Ms. Dobney?

MR. GANNAWAY: PublicData.

THE COURT: PublicData produced 8,000 pages?

MS. GOEBELSMANN: It's all searchable. All they have to do

is Control F and Integrity and they will get all the results.

THE COURT: Can't you do that, too.

MS. GOEBELSMANN: We can do it as well.

MR. GANNAWAY: We had Ms. Dobney --

THE COURT: Wait a minute. You've got 8,000 pages from PublicData?

MS. GOEBELSMANN: Yes.

THE COURT: And you can yourself do the searches to determine if it was Integrity or not?

MS. GOEBELSMANN: Yes.

THE COURT: Why don't you?

MS. GOEBELSMANN: We have and we've presented some of those to your Honor that we believe are TI --

THE COURT: Okay.

MR. GANNAWAY: Your Honor, moreover, they can search their own records to see when those Integrity -- when those Integrity loans were bought out. They are the only ones that have that information and, they can then cross-examine Ms. Dobney. She is -- we offered her up for deposition already. They are the ones with the keys to the information, your Honor, as to whether there was an Integrity -- an existing Integrity loan on the date that those searches were run.

MS. GOEBELSMANN: Yeah. But we're asking for the proof that supports these claims in the affidavits that these were existing TitleMax employees because --

THE COURT: How does she know -- for instance, look on this

package that they just provided today.  The first PublicData page the search box says August 23rd, 2013.

MR. GANNAWAY:  Yes, your Honor.

THE COURT:  You with me?

MR. GANNAWAY:  I'm with you.

THE COURT:  And the PublicData notes Dallas, Texas person.

MR. GANNAWAY:  Yes, your Honor.

THE COURT:  Okay.  On the next page it shows lien holder Integrity Texas Funding.

How does she know from this information that this search was seeking out a TMX employee -- a TMX customer?

MR. GANNAWAY:  Couple of answers, your Honor.

First of all, this search, according to what PublicData said in their Production, and it's certainly what Ms. Dobney provided in an affidavit that said she never ran a search for Integrity for other Plaintiffs.

The second --

THE COURT:  Okay.  Let me respond to that.  This is an indication that that might not be correct, isn't it?

MR. GANNAWAY:  No, your Honor.

THE COURT:  If it comes up with "Integrity"?

MR. GANNAWAY:  As I -- this is exactly -- this is actually the situation where for the gentleman whose records I handed you.  This is his search.  And that shows that coming up "Integrity" has nothing to do with whether he is a current TitleMax customer or not.

This is Mr. Moran. We might have to seal this record because I have said his name a few times. But that is exactly where this is a rabbit trail, your Honor. We've shouldn't have to go --

THE COURT: I don't see exactly why it's a rabbit trail. Maybe I'm not smart enough to figure it out, but I don't see it. When a search is conducted and the information that is derived from the search says "Integrity Texas Funding," how do I know that what this person is looking for is TMX customers?

MR. GANNAWAY: She's sworn to in affidavit. She is ready to be deposed on it, your Honor.

The other issue, if they want to look and see, well, when Ms. Dobney did this search was this one of your customers, they can look at August 23rd, 2013. Go into LoanStar's records. Was Mr. Moran an Integrity customer as of August 23rd, 2013. They can go do that.

We all know, your Honor, that there is no suggestion -- if the indication here is right that the drivers license number and that we can -- I think we need to depose PublicData to get to the bottom of exactly what they mean search by driver's license number.

There is no way that Ms. Dobney intuitively or guessed what someone driver's license might be so that she can figure out if it was an Integrity person.

THE COURT: Is it your contention that because "Integrity" came up they were obviously searching for Integrity?

MS. GOEBELSMANN: And that they have conducted searches

that, yes, result in our --

THE COURT: That's not what I asked you. I asked you:

Is it your contention that because this came up that they were searching for Integrity?

MS. GOEBELSMANN: I don't know what they were searching for. Integrity specifically or other competitors as well.

THE COURT: Doesn't that matter? Doesn't that matter --

MS. GOEBELSMANN: It does.

THE COURT: -- what they were searching for?

MS. GOEBELSMANN: It does matter if she was searching for marketing purposes and she found one of our customers, then we need to have the documents that they claim exists that would refute what we're seeing in this evidence.

THE COURT: Okay. Before we're going to go down that trail, we're going to find out what the searches terms were.

If the search terms were by driver's license number and that driver's license number leads you to a TMX customer, then this is not an improper search, is it?

MS. GOEBELSMANN: I don't know.

THE COURT: What's your gut feeling?

MS. GOEBELSMANN: If they were driver's license? I don't know what information they may have obtained that may be using to search for our customers. I'm not willing to make a statement to that point because it -- that very well may be driven out of context later on.

THE COURT: How would they have obtained your customer's driver's license number?

MS. GOEBELSMANN: Again, this is possible litigation.

THE COURT: Okay.

MS. GOEBELSMANN: There are many things to try to locate our customers.

THE COURT: Before we go down this trail, either find out what the search terms were because I think that's important. If the search terms are benign search terms or are they actually searching for a TMX customer, then I don't necessarily think you're entitled to get all of this information.

MS. GOEBELSMANN: Essentially the information that we are asking for and regarding our suggestion to help make this -- reach a resolution regarding this issue, we have a limited number of items that we believe are TIO violation.

We can always do as Mr. Wargo suggested and just have them provide us information regarding to searches and then we can go ahead and depose Ms. Dobney and try to investigate the --

THE COURT: Limited to these searches right here.

MS. GOEBELSMANN: Limited to the ones that we believe are in violation of the TIO. And not just with respect to her affidavit -- it is not with respect to outstanding Requests that we have touched on this afternoon.

THE COURT: So, there is 14 searches here?

MS. GOEBELSMANN: Right. There are 14 searches --

THE COURT: You limit it to these 14 -- information on these 14 searches.

MS. GOEBELSMANN: Yes. In response to those Requests 12, 25, 37, 11, 24, 36 and 49.

THE COURT: Let's test this, Mr. Gannaway. And limit your Response to these particular Requests -- to the 14 items that are on this package of information that was provided to you.

MR. GANNAWAY: A couple of points, your Honor:

May we go through the exercise of deposing PublicData first to see if there was any improper search terms?

As your Honor pointed out, this exercise is looking at things that are likely, according to the basis of the documents, to be searches for specific people by people who knew something like the driver's license number. I would suggest that a -- the way to approach this is depose PublicData and find out the information to that.

THE COURT: It would seem to me that it would be easier to just provide the information on these 14 searches and conduct the deposition of Ms. Dobney based on that, and I would really prefer you do it that way.

MR. GANNAWAY: Your Honor, I would point out that not all of those searches are run by Penny Dobney. If you look in the second column --

THE COURT: Then limit it to the searches that are performed by Penny Dobney and I think that's --

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MS. GOEBELSMANN:  Says "P. Dobney 01."

MR. GANNAWAY:  Your Honor, let me point something else out --

THE COURT:  Mr. Gannaway, come on.  It's 5:00 o'clock -- it's after 5:00 o'clock, and we are not done yet.  You want to be here till 6:00 or 6:30?

I've made my ruling.  I want you to produce the information relating to these ten searches by P. Dobney 01.  Take her deposition.  And if the deposition tends to support your claims, then we will take another look at going at more extensive Discovery on things relating to these Requests.

MS. GOEBELSMANN:  Your Honor, just a minor point of clarification:

Since they had previously restricted their Production to the time frame of Overlap List in these searches that regard after the TIO was entered, can we ensure that any Production includes the time period after the entry of the TIO?

THE COURT:  Yes.

MR. GANNAWAY:  With respect to those search?

THE COURT:  With respect to just these ten searches.

MR. GANNAWAY:  Understood, your Honor.

THE COURT:  Is that clear?

MR. GANNAWAY:  It is, your Honor.  Understood.

MS. GOEBELSMANN:  So, to keep moving forward, the other Requests that were at issue here that regard the marketing to

customers by these employees as well as recording it and copying of license plate numbers as well as searches DMV database, those were also restricted by time unilateral TitleMax to 2011 to 2013.

And we just want to ensure that, when they make their Production, that they include the search terms that were used also use for Penny Dobney for these other individuals. These are separate Requests and as well as increase the time frame for those particular requests.

MR. GANNAWAY: As I understand from what your Honor just pulled, I will run these searches Penny Dobney, which includes searches in 2014. And that is going to be the basis for determining whether it's proper to extend Discovery of the time period relating to these searches.

I think that makes sense because there is still not any evidence before this Court that there were actually searches done to try to locate Plaintiffs' customers.

In fact, the evidence is just the opposite. I know they think these people all perjured themselves, but they gave declarations to this Court that said they didn't run searches to locate the Plaintiffs' customers.

MS. GOEBELSMANN: And part of the reason we don't have the full response to any of the individual beyond Penny Dobney.

THE COURT: What specific Request?

MS. GOEBELSMANN: I have them right here.

THE COURT: Okay. I have them right her in front of me.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MS. GOEBELSMANN:  Okay.  So, it's going to be -- it will seem like a lot, your Honor.

So, it's Request 14,  16 --

THE COURT:  One at a time.

MS. GOEBELSMANN:  Some of these are similar to one another.

THE COURT:  Just one at a time.

MS. GOEBELSMANN:  So --

THE COURT:  Any and all documents or communications evidencing any contracts; is that what you're talking about?

MS. GOEBELSMANN:  Yes.  That refers really to these individuals conducting marketing to customers of competitors, recording or copying license plate numbers.

THE COURT:  Hold on a minute.  Maybe I'm looking at the wrong Request No. 14.

MS. GOEBELSMANN:  I'm sorry.  I may be combining them all.

THE COURT:  Don't.  One at a time so that I can understand what you're dealing with.

MS. GOEBELSMANN:  Sure.

THE COURT:  Is No. 14 any and all documents or communications evidencing any contracts between Schaefer and DataTrax, PublicData and any other DMV database dated from any time during his employment with TitleMax?

MS. GOEBELSMANN:  I'm not sure which Request you're on, your Honor.

THE COURT:  Well, it looks I was -- I clicked on Exhibit D.

MS. GOEBELSMANN: The first one that I was looking at that relates that -- that relates to James Schaeffer is Request No. 16 and that is any and all --

THE COURT: Which exhibit are you referring to?

MS. GOEBELSMANN: That should also be in Exhibit D.

THE COURT: Well, I'm reading No. 14, and it says "James Schaefer."

MS. GOEBELSMANN: Okay. I'm not sure that we're moving with respect to No. 14. The one that I marked that we're moving on that we are concerned about is No. 16.

THE COURT: 16: Any and all documents and communications including but not limited to those located in marketing binders for each TitleMax store in which James Schaefer has worked while employed by TitleMax that refer or relates to James Schaefer marketing to customers of competitors.

MR. GANNAWAY: Your Honor, that's part of their business. They try to market to customers' competitors. That is substantially overbroad.

MS. GOEBELSMANN: We believe that it's overbroad and we are happy that it can be restricted to the circumstances that are at issue by using the searches terms for Penny Dobney for any of those employees. We would like them to employ the same search terms they used for her for these individuals to see if there are any responsive documents.

MR. GANNAWAY: To let your Honor know what the basis for

them seeking all this, if you look at this list, James Schaefer, look at the subject of these Requests one search that turned up "Integrity" --

THE COURT: Hold on. Before we start doing extensive searching to determine whether or not everybody has committed a violation of federal law or any other improper act, let's see what Penny Dobney's Discovery turns up.

And then, if it turns up anything, then we will expand this to the others.

MS. GOEBELSMANN: Our only concern, your Honor, is that if Penny Dobney -- we understand that --

MR. WARGO: Christina --

MS. GOEBELSMANN: Okay.

THE COURT: Thank you.

MS. GOEBELSMANN: Moving forward with this same Motion to Compel, the other Requests that we had it issue are 56, 57 and 58. I have a handout for your Honor.

THE COURT: It'll take me a while to get there, but I'm going to tennis finger here but I'll get there.

All documents sufficient to identify each district manager for each district identified in Response to 54 from August 2011 to June 2013.

Hold on a minute. Identity of each district manager -- how many districts were identified in 54?

MS. GOEBELSMANN: Your Honor, we haven't received any

response to that.

MR. GANNAWAY: 54 asks for every district in Texas. So, in other words, they want a list of every district manager throughout the State of Texas for almost a two-year time period with no indication why that would be relevant.

MS. GOEBELSMANN: It is relevant because there are -- there is a pending Order from this Court that certain production by your client is going to be relating to the kind of that occurrence in certain districts and regions.

So, we need to know where -- what those districts and regions were. We would also like to know what the district or region is so that we will be able to do appropriate Discovery to determine which in this illegal market practice.

THE COURT: But you haven't limited it to any district or region.

MS. GOEBELSMANN: Oh, because we don't know what those districts and regions are.

THE COURT: I thought we were --

MS. GOEBELSMANN: They haven't provided it to us.

THE COURT: Well, 54 is:

All documents to identify the geographic state, name and number of each of TitleMax's districts.

So, you're asking for district managers in every district in Texas?

MS. GOEBELSMANN: We've requested similar information

previously in this litigation. It only went over the time period from 2012 to 2013.

Since the expansion of the Over Lap List, we are missing employment history or the number of employees or who they were for the rest of the state with respect to that time period.

We're trying to -- since we've been burdened with trying to do Third-Party Discovery in order to identify who was employed -- won't talk. Won't identify the people who were involved. They won't give us the contract. They won't tell us what databases they were using. Everyone keeps clamming up.

We need to know who else was out there so that we can conduct Discovery that was necessary, and it's been effective in this case.

We have had the opportunity to depose a number of former employees who have, in fact, told us that they were engaged in this type of conduct. With Randy Rainey over in Dallas. Mike Martinez over in Dallas. These people were found based upon similar types of Discovery what they are.

When they don't give us this information, they are preventing us from actually being able to prove up the rest of our case and we know that it's affective because it has worked so far.

MR. GANNAWAY: Your Honor, there is nothing linking this Request to any allegation by the Plaintiff. They literally want a list of every district manager.

And then if you parlay that to what she is about to tell

you, they want to know what every single one of our employees -- 950 employees in Texas what bonuses they were paid.

Under the theory that, if they got a bonus, they must have done something through good performance that resulted from an illegal search. That's literally the theory that they have here, your Honor.

There is not any relevance to that. And there is not any reason that they need to know every district manager regardless of where he's located -- he or she is located -- and regardless of whether there is an ounce of evidence from anyone or any document that they implicated with any of the Plaintiffs' allegations.

MR. WARGO: Your Honor, the way that has worked as we have found in this case is that people from district to district talk to one another.

Mr. Gannaway will admit that. People hand information from one office to another. Hey, do a search like this. Do an illegal search like this and it spreads from office to office.

Those are the facts of this case that we have found in Discovery. But what we're trying to find out here is the name of people -- many of these people are going to be former employees. The names of these people to find out, hey, did this get handed to your district? Did you hear about this? Who did you report to? Did your superior know about this?

That is -- as Mr. Johnson had said previously, that's the spade work. We're going to go ahead and call these people -- many of them are former employees -- and find out did you hear about this.

Did you know about this. Did higher ups know about this. That's our hard work. But without identifying who those people were, we're stuck.

And the evidence in this case -- Mr. Gannaway will not be able to deny this -- is from office to office they traded buy-out letters. Word-of-mouth was like, oh, DataTrax, did you use that. PublicData.com. That's how it spread from office to office. And that's all we're trying to find out.

The burden on them is negligent. It's infinitesimal. We just want the names of these people. We will do the work in contacting them and find out what they knew.

THE COURT: How many districts are there?

MR. GANNAWAY: My client just left.

THE COURT: I just noticed that, yeah. You have an idea -- ballpark?

MR. GANNAWAY: I think -- I want to say -- for instance, in Austin there's five to ten districts. Something in that order to give you a sense. But I don't know the answer, your Honor.

MR. WARGO: And, your Honor, respectfully, we're talking about people who could lead to the Discovery of admissible information.

Thank you, your Honor.

MR. GANNAWAY: Your Honor, I think what he --

THE COURT: Just wait. I can't listen and read.

MR. GANNAWAY: Understood, your Honor. I am sorry.

THE COURT: So, you are not asking me to compel them to respond to No. 54, but you are asking me to get them to respond to 56? It seems to like 54 would be important to responding to 56.

MS. GOEBELSMANN: Yes. And we can certainly have them respond to 54 as well.

THE COURT: Okay. I'm going to ask you to respond to 54 and 56.

MR. WARGO: Thank you, your Honor.

THE COURT: If their legwork to date has turned up otherwise wouldn't have turned up except for you identifying names of employees for them to go interview, I think -- I think this is discoverable.

So, 54 and 56 the objections are overruled.

MR. WARGO: Thank you, your Honor.

MS. GOEBELSMANN: Does the same apply to 57?

THE COURT: You didn't ask me to apply 57?

MS. GOEBELSMANN: Your Honor, 57 is very similar corporate response to 55 and that is just in regards regional managers. Our understanding is that there is less regional managers than district managers.

THE COURT: Okay. Then I agree. 55 and 57 as well.

MR. GANNAWAY: Okay.

THE COURT: What else?

MS. GOEBELSMANN: The last Request in this particular Motion to Compel is Request for Production 58. Provide bonus information. We are interested in obtaining this information because it will allow

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

us to demonstrate to the jury when we essentially get there that there was an incentive for these people to engage in a particular type of conduct.

That people were either being -- were awarded for their efforts that they engaged. Or if they weren't being rewarded for their efforts, that maybe they were unable to meet performance goals they have been so desperate to do so punish to this particular methodology for located customers.

THE COURT: At this time I am going the deny 58. I tink that is overruled. I am not sure that that is calculated to lead to the discovery of admissible evidence.

We may address that issue at some other time in the future, but at this point in time I'm denying it.

MS. GOEBELSMANN: I think that brings us to the other Motion to Compel, and this is a Motion to Compel where we have not gotten documents on --

THE COURT: Give me the date it was filed.

MS. GOEBELSMANN: It was filed I believe on November 12.

THE COURT: Specific items?

MS. GOEBELSMANN: The specific items Request for Production 9 through 17.

THE COURT: Are those items contained in your Motion, or do I need to go look at actual Motion?

MS. GOEBELSMANN: I believe that --

THE COURT: The actual Request for Production.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MS. GOEBELSMANN: It's probably easier for you to look at the actual Request for Production due to the length of those particular Requests. I have a hand out for you.

THE COURT: Exhibit what?

MS. GOEBELSMANN: Let's see.

THE COURT: Exhibit B?

MS. GOEBELSMANN: It is Exhibit B. I had to do a double take. The letter to our other Motion.

THE COURT: Okay. What number?

MS. GOEBELSMANN: These are Requests 9 through 18. We can start at the top with No. 9.

THE COURT: So, you want text messages from employees to DataTrax, PublicData or DMV?

MS. GOEBELSMANN: We're looking for all documents and communications that involve correspondence between four particular individuals who were employed by TitleMax that regard a number of things including text messages. And this particular Request is, as you stated, the use of DataTrax, PublicData, DMV databases.

MR. GANNAWAY: As you see, your Honor, we did agree to produce much of what they were requesting --

MS. GOEBELSMANN: The problem is though --

THE COURT: Don't interrupt. Come on.

MR. GANNAWAY: I am sorry.

THE COURT: It's going to go much quicker if you don't.

MR. GANNAWAY: So, we --

THE COURT: Wait a minute. Hold on a minute. Let me read. Where is it?

Necessarily what you're agreeing to produce if there were any communications from the four employees that are at issue? Two are from people associated with DataTrax, PublicData, DMV databases.

MR. GANNAWAY: We tried to locate that by looking for the search DataTrax, PublicData, DMV in the database -- I'm sorry -- in those folk's Email accounts and nothing came up.

Nothing came up, your Honor.

MS. GOEBELSMANN: Didn't make it clear nothing came up. They said we object to the extent that these things have already been produced, that there are no documents --

THE COURT: Okay. You need to amend your response.

MR. GANNAWAY: Say "none." I will do it. And I told Mr. Johnson that there were none, but yes.

THE COURT: You still have to do it.

MR. GANNAWAY: Okay.

THE COURT: Okay.

MR. GANNAWAY: Well, I don't think it's quite accurate that there were none and there were just a couple of items on the Privilege Log that was provided.

THE COURT: File a Supplemental Response to this Request. What's next?

MS. GOEBELSMANN: The remaining Requests are ones that are very familiar to your Honor, I'm sure, in regard to marketing to

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

LoanStar's customers and their use of DMV databases.  Really looking for communications involving --

THE COURT:  Tell me the numbers.

MS. GOEBELSMANN:  So, you can go to -- you can go to No. 11.

THE COURT:  Okay.  Give me the numbers.  Just go down the list.

MS. GOEBELSMANN:  11.

THE COURT:  Yes.

MS. GOEBELSMANN:  12, 13, 14, 15, 16 and 17.

THE COURT:  Any and all documents including text messages by any corporate employee that refer or relate to marketing to customers of LoanStar or Integrity.

MR. GANNAWAY:  As you see, I object to the text messages but did say we will produce responsive non-further documents that refer or related to marketing customer of Integrity, which I think meets the Request.

And I will -- I can amend to say --

THE COURT:  But the question is what they -- what -- here is my issue with Discovery in general.  Y'all may have heard it or not:

Saying we will produce doesn't help me because I don't know if you have anything or not.  We will supplement doesn't help me because I don't know if you have anything or not.

So, you have to tell me whether you have something to produce and you also have to tell them whether you have or don't have something to produce.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MR. GANNAWAY: Understood and I can amend to do that. I can tell them the search terms we used. With respect to all of their Requests that she is going through the answer has been "none" based on the word search for these four folks.

MS. GOEBELSMANN: What were the key words searched that you used because? We haven't received that information of all these individuals.

MR. GANNAWAY: I will amend and provide to you and explain it's none.

MS. GOEBELSMANN: To the extent that there's any difference, we would request that you use the same search terms that you used and were listed in the Penny Dobney production:

Buy out, DataTrax, direct mails, DMV and Integrity, LoanStar, PublicData, license plate, marketing plans, goals.

They are all listed in the --

MR. GANNAWAY: The terms you've just said go far beyond some of the Requests for Production. We've had search terms that are likely uncover things related to these Requests for Production, but I will explain to you what those terms have been.

MS. GOEBELSMANN: Your Honor, we really believe they should be using the same search terms that were used for previously prepared similar Requests because it's resulted in the production of responsive information.

And since they've complied before, we know that you are capable of doing it.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MR. GANNAWAY: Your Honor, that doesn't mean that -- for instance, she used the word "license plate" -- to just give an example --

THE COURT: She is going to send you their universe of requested search terms. You go through those search terms and look for terms that specifically relate to marketing to customers of LoanStar.

That is on No. 11. No. 12 -- these are all marketing?

MR. GANNAWAY: I will explain to your Honor what I have done:

In general there is a lot of search terms we used but the core ones that we have used are:

LoanStar, Integrity, DataTrax and PublicData.

The ones that are likely to relate to these databases.

We also searched the term "DMV" even though that turns up a lot of documents that are unlikely to be responsive. But the core ones -- PublicData, Integrity, DataTrax, LoanStar -- we have definitely done that with respect to all of the four of those folks and their Emails.

MS. GOEBELSMANN: Marketing within a certain number of terms would be a search term that would be very important in responsive to a number of these Requests.

THE COURT: Say that that again.

MS. GOEBELSMANN: Marketing where you can do a certain number of terms with competitors that would be responsive, but we

don't want to limit it at this point what we believe the list is. I can certainly give some examples as to what should be searched.

MR. GANNAWAY: But -- and therein lies the problem, your Honor. When you say "marketing" -- anything that has "marketing" and "competitors," that could be a million documents that have nothing to do with this lawsuit that we would have to review that if we wanted to search something like that.

THE COURT: Have you done searches using search terms -- well, the answer's going to be "no"?

You want to use 4 or 5 search terms, and you want to use 12 or 13 search terms. And my question what I'm curious whether the 4 or 5 would turn up what you have obtained versus using the 12 or 13.

MS. GOEBELSMANN: Not necessarily.

THE COURT: And we don't know the answer to that unless you do it.

Send your list of search terms. Consider expanding your list beyond the 4 or 5 and see what kind of -- maybe you can get some kind of an agreement.

This electronic Discovery is exploding in this country and I'm not trying to make an editorial comment or something but it's going nuts as everybody knows.

Send him your terms. Expand it beyond the 4 that you're talking about. May not include every one of them but make a good-faith effort to.

MR. GANNAWAY: And to be fair, your Honor, with every

production we have said these are the search terms we've used. So, I don't want to hide behind anything.

THE COURT: Okay. That covers -- and that would cover most of these, wouldn't it?

MS. GOEBELSMANN: Yes. Our only concern is that we might end up before your Honor, again --

THE COURT: You will end up before me again.

MR. WARGO: May I make this more of a concrete -- can we split the difference and let us pick the terms? We have a certain amount. They have a certain amount.

I don't even know what their numbers are. I think they're at 10. We are at 4. We will split the difference. We will pick the search terms.

MR. GANNAWAY: And, your Honor, if the term is something like "marketing to competitor," I don't think it's fair to us to review 10- or 20,000 documents that might pop up as a result of something that general.

MS. GOEBELSMANN: It would be the search terms that were similarly used for Penny Dobney. That certainly didn't result in tens upon millions of documents. You have already indicated that other search terms and didn't have as much.

So, I don't think -- really think, based upon your representations, that we will be in that situation.

THE COURT: I will tell you -- I will tell you what let's do:

Use their search terms.  See how much documents come up. Talk between each other and see if you can work it out.  You're going to be back here.

Mr. Wargo, as much as you think you're not, you're going to be back here.

MR. WARGO:  I am sorry.  I am trying to avoid that.  What if we limit it to the Penny Dobney search terms?  Then split --

THE COURT:  Do the search.  Use search their search terms and see what comes up.

MR. GANNAWAY:  I will.

THE COURT:  If it's a manageable number.  If it's a not a manageable number then --

MR. GANNAWAY:  We will work with them.

THE COURT:  -- talk to each other and try to work on it.

MR. WARGO:  Thank you, your Honor.

THE COURT:  Does that take care of those?

MS. GOEBELSMANN:  That takes care of those Requests and I believe that the --

THE COURT:  Hard drives.

MS. GOEBELSMANN:  I believe that Mr. Wargo can speak as to a particular aspect of these Requests regarding text messages.

MR. WARGO:  Well, did you make that representation that there were no text messages responsive to this?

MR. GANNAWAY:  No.  Our position was that we do not own the mobile devices that those employees use.  They are their own private

device, and they are not in our custody and control.

We did not ask them for their text messages. There is one exception:

At the deposition of Linda McDonald -- who's one of those four people -- she specifically referenced a text message that would have been relevant and responsive. They didn't ask her at that deposition but we did ask her during a break do you have that text message that you referenced anymore and she said "no."

She is no longer with the company. But that's the only -- that's the only evidence that there was a relevant text message anywhere any time.

MR. WARGO: Well, your Honor, we understand that -- again, it being a small community, we understand that there is a significant amount of text messaging that's going on within that company.

And if they're making a representation that they're not their phones, we will then send out subpoenas asking for Verizon or et cetera for that information.

Thank you. We will do the spade work. Thank you, your Honor.

THE COURT: Is that it?

MS. GOEBELSMANN: Almost.

THE COURT: Hard drives?

MS. GOEBELSMANN: Yes. The hard drives are the last issue. These are Requests for Production 5, 6 and 7.

MR. GANNAWAY: I can short circuit this, your Honor. I can

tell what we've done since the meet-and-confer session we had about this.

At the meet-and-confer session -- you remember the issue of the spreadsheet that I'm not sure --

THE COURT: Not at 5:35 on a Friday afternoon I don't.

MR. GANNAWAY: I can show you what it is, but that's -- the one piece of testimony that we have that someone saved a document that might have had PublicData or DataTrax stuff on it on the computer Todd Hale who testified to that.

THE COURT: Okay.

MR. GANNAWAY: We searched the hard drive data at the store that he was at for the terms that would likely turn up PublicData and DataTrax stuff. PublicData, DataTrax and Integrity. We didn't find anything in that hard drive data.

They filed -- after his deposition, they had a specific Request for Production directed to me that said find me that spreadsheet. I went and looked. We had already done the search term issues, but we looked at every single Excel spreadsheet in that hard drive data and I found one that might be it.

THE COURT: I do recall that.

MR. GANNAWAY: And Hale wouldn't tell me. He told me to pound sand when I called him last.

THE COURT: Right.

MR. GANNAWAY: So, there is no more to search on that hard drive. I have looked for search terms and I have found a document

that I told them if you will drop the issue of Mr. Hale's store hard drive data I will give it to you.

I'm not making any representation that it's it, but I will give it to you. They've declined.

Now, the other two hard drives they're seeking are from stores that at which Lucia Grajeda --

THE COURT: Right.

MR. GANNAWAY: -- and Mr. DeLeon worked. And those two folks pled the 5th.

Now, there's been no testimony that they saved stuff on those hard drives but -- and at the meet-and-confer that we had on this I told them I have not searched those hard drives because there has been no testimony that there's been anything on them unlike the Mr. Hale hard drive.

And I said if you have specific search terms that you want me to look for, specific documents that you think might be on those hard drives, tell me but I haven't done any searches.

Yes, they filed that Motion to Compel. I went ahead and did searches myself to deal with this issue before we came before your Honor. And I searched PublicData, DataTrax an Integrity. We found two documents that were responsive. One of which was already produced in this case as a paper document. And one of which demonstrably on its face I am thinking even they will contend, though, that we were searching PublicData to figure out information about an existing TitleMax customer. That's it.

I've run the searches that would be likely to recover anything that is relevant and that is responsive to their Discovery Requests on those hard drives. And, therefore, they don't get anywhere close to the standard that needs to be met by *In Re Weekly Homes* to get our hard drives.

We've done the search. We've produced the information found. It's done.

MS. GOEBELSMANN: Several corrections to what Mr. Gannaway said.

First off with regard to the production that he claims to have made from the Felix DeLeon's data from his hard drive, we got one page that was a result -- it's page 21 of 41 -- from a PublicData or DataTrax search that listed an Integrity lien holder.

We don't know where the rest of document is and it had not previously produced in Discovery even though it was responsive to one of the first Requests for Production ever served in this case and should have been provided in response to that Request.

Second, we still don't have the spreadsheet that I believe is responsive to the Request for Production regarding Mr. Hale. Although he tried to, you know, make us basically buy a pig in a poke, say I am not going to tell you what this but drop your entire argument based upon this document, we weren't willing to do that because we don't know what it is he has.

THE COURT: No. You shouldn't have done that.

Mr. Gannaway, that was interesting request on your part. Do

you have -- is there a spreadsheet?

MR. GANNAWAY: Yeah. I can show it to.

THE COURT: Why don't you give it to them? Have you given it to the Plaintiffs?

MR. GANNAWAY: No.

THE COURT: Why not?

MR. GANNAWAY: Because they said they were still reserving the right to pursue the hard drive issue. There is no more hard drive issue to pursue. I would like to give it to them and put this issue to bed.

THE COURT: Why can't you give it to them without limitations? It may put this thing to bed.

MR. GANNAWAY: At your Honor's direction, I will do that.

THE COURT: What's on that that causes you not to want to produce it?

MR. GANNAWAY: Nothing. It's a list of names and addresses. The point is I don't know that this -- what they have asked for in this Discovery Request. I am making a guess it could be. It's a list of names and addresses. I can show it to your Honor --

THE COURT: It won't have any meaning to me.

MR. GANNAWAY: Well, I just -- I just want to let your Honor know if this clearly was Mr. Hale's document I would have produced it, but I don't have any reason to believe that. I will give it to opposing counsel now.

MR. WARGO: Well, I can't let that one go, your Honor,

because if there is any reasonable belief by an officer of this Court that this is a relevant document, the gamesmanship involved in waving the document in front of your Honor saying this may be it but I'm not going to give to unless you reduce your rights, your Honor, that's inappropriate.

THE COURT: You've got it.

MR. WARGO: Thank you.

THE COURT: Right?

MR. WARGO: Now we do, your Honor.

THE COURT: You have it now.

MR. WARGO: And we had to move to Compel to get to this point.

THE COURT: You shouldn't have had to do that. You should have --

MR. WARGO: We sought our fees, your Honor.

THE COURT: You should have gone ahead and given it to them. Have you provided them with the documentation of the searches that you have done on the other -- on all three of these computers?

MR. GANNAWAY: As part of our response to their Motion and then I produced the documents.

THE COURT: Have you provided the documentation which indicates what the searches were that you performed?

MR. GANNAWAY: I say in the Motion that we looked for DataTrax, Integrity and LoanStar.

THE COURT: And is there demonstration of those searches?

Does -- I've never performed a hard drive search. But when you perform a search of a hard drive using specific terms, does it produce a document which shows what the nature of the hard drive search was including what the search terms were and whether the search was productive?

MR. GANNAWAY: No. I will tell you it's sort of like we use a tool called "Relativity." We load all our contents of the hard drive in Relativity. It's sort of like Google. I will search the word "DataTrax." And any document on that hard drive that contains the word "DataTrax" will come up in a list of search results. And I will have to click all of them to see if they are responsive to the Request.

MR. WARGO: Your Honor, it depends how you do it. And I do not doubt that Mr. Gannaway just told you what he did and what happened when he did it. But this is a very easy thing to do that people do all the time who are in IT.

I'm sure his IT guy at his law firm could go on there, run a search and then you would have a print out -- a screen shot that says I ran this and it came back zero. Absolutely, your Honor.

MR. GANNAWAY: Your Honor, there is no requirement to do that.

THE COURT: No, there isn't. But there is -- you're asking them to believe you.

MR. GANNAWAY: Whenever we respond to Discovery, we're asking the other side to believe us. There is nothing extraordinary

about this one.

THE COURT: And -- well, I'm not so sure about that, Mr. Gannaway. With the number of times they have been in here and as much as I know you and Mr. Johnson are working well together, I don't feel the love amongst you guys completely.

Have your IT guy -- which I know your firm has or I presume they do -- produce the report of the review. Do the search. Show -- do the screen shot that we're talking.

MR. GANNAWAY: A screen shot of how many results came up?

MR. WARGO: The search terms and the results.

THE COURT: The search terms and the results.

MR. GANNAWAY: Okay.

MR. WARGO: Thank you, your Honor.

THE COURT: Because what you're telling me is nothing came up.

MR. GANNAWAY: No. Two things came up.

THE COURT: Right.

MR. GANNAWAY: Let me be clear:

The word "Integrity" produced things. Like Integrity is one of the mantras of the company. One of the company's core beliefs that their employees should operate under.

So, yes, "Integrity" came up with results that were not responsive to their Request. Like "applications" and "Integrity" are part of TitleMax's deal. Your performance review. Do you believe you've met this standard.

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

So, yes, there were things that came up. The only two that related to database searches were the two that I produced to them, your Honor.

THE COURT: Do the search again. Show search terms. Provide the report and provide it to the Plaintiffs.

MR. GANNAWAY: And to be clear:

The report there were 40 documents that matched the word "Integrity". If that's what they want --

THE COURT: Does it indicate what those documents are?

MR. GANNAWAY: No.

THE COURT: Do the search. Produce the report. Y'all look at it. And if you need to talk about it -- but go ahead and do it and produce the documents. Not the documents that --

MR. GANNAWAY: Show them the screen shots of how many came up?

THE COURT: Show them the screen shot and show them what you produced.

MR. GANNAWAY: Okay.

THE COURT: Okay.

MR. WARGO: Thank you, your Honor.

THE COURT: Thank you very much?

MS. GOEBELSMANN: That's all for the Motion to Compel, your Honor.

THE COURT: Thank you very much. Motion for Continuance. Did somebody oppose?

MS. LOVETT:   That would be it.

THE COURT:   Why are you opposing it?

MS. LOVETT:   Because the longer this goes on, the more difficult it's for my client to continue to do business.   There are corollary lawsuits, as your Honor now knows, in Georgia this week, in South Carolina all boot strapping from your Honor's litigation whether you're aware of that or not.

And there is -- assuming that we adhere to the Court's Orders, and we will to stay away from the rabbit trails and cut to the chase, there is no reason this case can't be tried four and a half months from now, your Honor.

There's not --

THE COURT:   Well, I'm not so sure I agree with that because you have this new Overlap List that still hasn't been produced and we don't -- and Judge Peoples and his folks are still working on that, correct?

MR. JOHNSON:   Yes, sir.

THE COURT:   Do you have any kind of indication that when that Overlap List is going to be produced?

MR. WARGO:   Do you know, counsel?

MS. LOVETT:   I will answer the Judge's question.

Your Honor, the answer is:

I have no idea when it's going to be produced.   But what I do know is that, according to representations counsel's made here today, when it is produced -- because Judge People's is working with

a technical advisor. When it's produced we will have a discrete list of names and we will have -- presumably and we will then have, according to them if what they told you is correct about their damages calculation as they were directed to provide under the Order of this Court, then they will just plug those names, enter that information and we will have a damage model.

So, my only my plea to the Court is that, if we drag this out too far -- and perhaps the Court could make an inquiry of Judge Peoples as to what a reasonable estimate would be. Because every single day the reputational risk that goes with this and the multiplication of litigation that goes with this is harming my client.

We're ready to go.

THE COURT: Well, we can't do anything about multiplication of litigation in Court.

MS. LOVETT: I know that, Judge.

THE COURT: This Court has no any control over that and will not have any control over how many times your client has to respond to any lawsuits filed against them. So, that's not a factor.

The Overlap -- our trial setting in part was determined based on the production of the Overlap List giving the experts enough time to review it and produce reports that are substantive and helpful in getting this case to mediation, among other things.

We're done for the year for all practical purposes in doing productive Discovery.

How much work gets done from Thanksgiving to Christmas on litigation?

MR. JOHNSON: Very little, your Honor.

MS. LOVETT: Unfortunately at my firm a little too much.

THE COURT: A little too much?

MS. LOVETT: I've got January trials.

THE COURT: Okay. So, I am inclined to grant the Motion for Continuance. Problem that I have is at June trial date. And I will tell you why I have a problem with a June trial date and that is because our policy on Vacation Letters would allow you, anyone here, here to designate -- well, I shouldn't say that. Only lead counsel to designate a week in June as a vacation week and that gives you your own little Continuance.

You may not do that it that way in Atlanta or Los Angeles but we have that policy here that allows people to have a life during the summer and you can designate four weeks.

MR. WARGO: It gets hot here.

THE COURT: Designate four weeks in the summertime in which time you cannot be compelled to be put to trial.

If I grant you a June trial date, which is what you're asking for, who ever the lead counsel is could very easily give themselves a Continuance.

And I really want to avoid that because I think we are at a time where we have to fish or cut bait, so to speak.

MR. WARGO: Your Honor, does your rule -- and I'm sorry for

the ignorance of this -- is it July or summer?

THE COURT: Summer months. June, July and August.

MR. WARGO: Your Honor, we're the Plaintiffs and we want to try this case and we want to try it soon. I'm not going -- I take a vacation, but I'm not going to take vacation to mess up Your Honor's calendar.

Okay. So, you have that representation from me.

THE COURT: Let me just ask it this way:

Who's lead counsel? Is it --

MS. LOVETT: Yes, sir.

THE COURT: If I grant you a trial date in June -- what is the date -- June what --

MR. GANNAWAY: Your Honor, I think we may have submitted an Order that permitted your coordinator to enter the appropriate date.

THE COURT: Okay. I will grant the continuance. I will reset the case for June. I will put it in the first Docket in June, which is June 1st. Okay. I heard a grunt and a groan. What's the problem with June 1st?

MS. LOVETT: I know I am in trial May 15th in Marshall, Texas for two weeks.

THE COURT: Would you rather be there, or would you rather be here?

MS. LOVETT: Well, habeas corpus, your Honor, I'd rather be with Judge Gilstrap.

THE COURT: June 15th is the next --

ORAL HEARING ON PARTIES' MOTIONS
*NOVEMBER 21, 2014*

MR. JOHNSON: That is agreeable.

THE COURT: Is that okay? I will set it for June 15th so long as have and assurance by those here -- those lead counsel because that's really the only attorneys that have vacation --

MR. WARGO: So, I can't switch it for him if --

THE COURT: Whoever the lead counsel will not designate that period as their vacation period.

MR. WARGO: Yes, your Honor.

THE COURT: You agree to that.

MR. WARGO: Yes, your Honor.

THE COURT: Mr. Johnson?

MR. JOHNSON: Yes, your Honor.

THE COURT: Mr. Gannaway?

MR. GANNAWAY: I'm not sure who is going to be lead counsel on our side, but we will talk about it with the client.

THE COURT: Well, I'm going to get to her in just a second. Do you agree to that?

MR. GANNAWAY: I won't do a June 15th vacation.

THE COURT: Thank you. Ms. Lovett?

MS. LOVETT: I will not.

THE COURT: Thank you very much.

Are these the four that matter as far as lead counsel is concerned?

MS. LOVETT: And, your Honor, the truth is without Mr. Hancock and Garcia to tell you, I can't represent to you that I

outrank them.  Although, I can arm wrestle with them.

MR. GANNAWAY:  And I'm certainly not contending for David Beck.

THE COURT:  Oh, I forgot that David Beck is on the Pleadings here.  Is he the attorney in charge?

MR. GANNAWAY:  He's the first listed on the first filing that we had.  I suppose if that is the standard.  I don't think that we designated someone -- specifically an attorney in charge in our initial Pleading I think.

MR. WARGO:  Your Honor, we're happy to work with them if they need an extra week or two.  Okay.  So, maybe we can get back to you on that?

THE COURT:  I will tell you that on my Docket Sheet lists Johnson and Gannaway as the attorneys.

MR. WARGO:  Well, you have that representation from our said.

THE COURT:  And you apparently signed the Pleading. Otherwise, it would be David Beck.

Okay.  Anything else?

MR. JOHNSON:  Your Honor, we appreciate your time.  And I'm impressed with your stamina.

THE COURT:  Well, I was losing it there.

MS. LOVETT:  I'm not the least bit surprised.

THE COURT:  And I had represented to my Bailiff this would only take a couple hours.  I guess I was wrong.  For which, I

apologize.

Everybody come get your documents.

(Hearing ended)

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

STATE OF TEXAS

COUNTY OF HARRIS

I, Cynthia Martinez Montalvo, Official Court Reporter in and for the 152nd District Court of Harris, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by BECK REDDEN.

/s/ Cynthia Martinez Montalvo

Cynthia Martinez Montalvo, CSR
Texas CSR 6863
Official Court Reporter
152nd District Court
Harris County, Texas
201 Caroline, 11th Foor
Houston, Texas 77002
Telephone: 713-368-6037
Expiration: 12/31/2014

**/**

/s [1]  163/17

**0**

00789289 [1]  3/10
01 [2]  128/1 128/8

**1**

1-A [1]  13/24
1-C [1]  15/23
10 [4]  18/14 108/24 145/12 145/16
10,000 [1]  9/10
100 [1]  65/25
1000 [1]  3/11
1001 [1]  2/4
1006 [3]  29/14 29/20 30/22
10K [4]  51/10 57/1 57/1 58/18
10K's [1]  58/17
10th [3]  18/18 49/8 49/15
11 [15]  5/9 6/2 13/2 19/12 19/16 20/15 36/3 36/7 38/3 75/15 92/3 127/4 141/4 141/7 143/8
11th [4]  37/18 77/11 78/1 163/21
12 [8]  72/8 73/8 127/3 138/18 141/9 143/8 144/10 144/12
12/31/2014 [1]  163/22
1221 [1]  3/4
13 [4]  50/24 141/9 144/11 144/12
1301 [1]  2/6
13th [2]  37/19 49/21
14 [15]  88/2 111/11 111/11 126/24 126/25 127/1 127/2 127/6 127/18 130/3 130/14 130/19 131/6 131/9 141/9
15 [3]  17/16 61/2 141/9
15,000 [1]  18/14
1500 [1]  2/14
1506 [1]  2/14
1520 [1]  2/20
152ND [3]  1/10 163/5 163/20
15th [5]  48/7 159/19 159/25 160/2 160/18
16 [5]  130/3 131/2 131/10 131/11 141/9
17 [5]  7/12 38/9 62/6 138/21 141/9
1700 [1]  3/11
17th [1]  102/24
18 [3]  38/9 63/2 139/10
1888 [1]  2/20
18th [4]  33/10 79/12 89/15 107/15
1998 [1]  110/9
19th [2]  79/7 79/11
1B3 [1]  110/12
1B7HC [1]  110/10
1st [3]  62/7 159/17 159/18

**2**

20 [2]  30/21 62/23
20,000 [4]  16/10 16/11 17/16 145/16
20,0000 [1]  16/11
2000 [1]  110/12
2003 [1]  62/3
201 [1]  163/21
2011 [3]  111/4 129/3 132/21
2012 [5]  47/1 48/2 48/7 53/19 134/2
2013 [15]  21/23 24/4 75/17 103/2 111/4 111/5 113/3 113/24 117/1 123/2 124/13 124/14 129/3 132/22 134/2
2013-33584 [1]  1/3
2014 [3]  1/17 129/11 163/22
21 [3]  63/16 64/21 150/12
21ST [1]  1/17
22 [1]  63/23
22nd [1]  82/25
23 [3]  109/7 109/7 113/12

23rd [6]  49/24 109/5 113/3 123/2 124/13 124/14
24 [2]  78/14 127/4
24036617 [1]  3/3
24046165 [1]  2/3
24th [1]  113/24
25 [1]  127/4
25,000 [1]  103/10
26th [1]  2/13
27,066 [1]  116/12
2721 [1]  63/2
273379 [1]  2/19
28 [2]  77/12 78/12
284534 [1]  2/11
2nd [5]  63/7 63/12 63/17 64/21 67/16

**3**

30 [1]  49/18
30,000 [1]  95/22
30,000-page [1]  95/20
30309 [1]  2/13
310-853-6300 [1]  2/21
310-853-6333 [1]  2/22
31st [4]  32/20 32/25 34/8 34/8
33 [3]  61/6 61/24 72/13
33584 [1]  1/3
3541 [1]  3/12
36 [1]  127/4
37 [1]  127/4
3700 [1]  2/5
3720 [1]  3/6

**4**

40 [1]  155/7
404-853-1500 [1]  2/14
404-853-1506 [1]  2/14
41 [1]  150/12
4500 [1]  3/5
485,000 [1]  78/3
49 [1]  127/4
4:00 [1]  75/24
4:20 [1]  92/22

**5**

50,000 [2]  94/14 98/8
50-dollar [2]  82/17 84/7
54 [9]  132/21 132/24 133/2 133/20 137/2 137/3 137/5 137/6 137/12
55 [2]  137/17 137/20
56 [5]  132/16 137/3 137/3 137/7 137/12
57 [5]  132/16 137/14 137/15 137/16 137/20
58 [3]  132/16 137/24 138/9
5:00 [2]  128/4 128/5
5:35 [1]  148/5
5th [2]  102/4 149/9

**6**

6,000 [1]  60/21
60 [1]  44/22
6037 [1]  163/22
6100 [1]  2/6
6263 [1]  3/6
6300 [1]  2/21
6333 [1]  2/22
6863 [1]  163/19
6:00 [2]  23/22 128/6
6:30 [1]  128/6
6th [2]  47/1 76/10

**7**

713-368-6037 [1]  163/22
713-374-3541 [1]  3/12
713-470-6100 [1]  2/6

713-654-1301 [1]  2/6
713-754-7541 [1]  3/13
713-951-3720 [1]  3/6
713-951-6263 [1]  3/6
738764 [1]  2/10
75241 [1]  114/16
7541 [1]  3/13
77002 [3]  2/5 3/12 163/21
77010 [1]  3/5

**8**

8,000 [7]  106/5 109/15 109/24 121/17 121/21 121/24 122/5
8500 [15]  19/11 19/15 19/22 20/8 20/21 20/22 20/22 20/25 21/7 21/14 21/19 22/6 22/9 22/14 39/13

**9**

90 [5]  33/8 103/11 107/11 108/18 108/20
90067 [1]  2/21
950 [1]  135/1
999 [1]  2/12

**A**

a tool [1]  153/7
abide [2]  68/25 85/17
ABIGAIL [3]  2/11 4/11 65/15
able [23]  6/6 14/7 14/7 14/25 17/5 18/10 18/14 22/3 36/11 50/23 51/22 68/14 73/10 73/11 99/25 110/23 111/15 115/14 118/4 120/8 133/12 134/20 136/5
about [94]  6/21 8/20 8/24 10/3 10/11 10/14 13/7 13/14 25/24 27/3 29/25 32/24 33/16 35/22 39/15 39/18 39/19 39/21 42/1 43/2 43/14 44/14 44/21 45/24 46/16 48/16 49/3 50/14 50/20 50/24 52/12 52/14 52/14 53/20 57/16 57/19 57/21 57/22 57/25 58/11 59/3 60/1 61/20 61/23 63/23 64/22 65/8 67/21 69/3 71/19 74/16 77/1 78/3 78/24 79/9 79/12 84/3 86/3 86/5 89/5 90/7 90/15 90/18 93/3 93/13 95/23 96/9 99/22 101/20 103/25 106/21 111/10 118/20 120/4 120/14 121/17 130/9 131/10 134/25 135/21 135/22 135/25 136/1 136/1 136/20 144/23 148/1 149/25 154/1 154/2 155/12 157/3 157/14 160/15
above [6]  1/18 47/19 52/6 52/7 163/6 163/9
above-styled [1]  163/9
above-titled [1]  1/18
absolutely [5]  58/14 65/20 87/12 119/9 153/19
absurdity [1]  17/14
Acanum [1]  93/13
accept [1]  5/25
access [3]  68/15 70/5 99/19
according [7]  7/18 70/20 70/22 123/13 127/12 156/24 157/3
accordingly [1]  84/1
account [3]  77/22 99/16 107/20
accounts [4]  17/17 99/19 106/21 140/8
accurate [6]  37/11 75/22 85/24 89/4 119/1 140/19
acknowledge [2]  87/13 91/16
act [1]  132/6
acting [1]  52/5
action [5]  70/16 70/18 71/19 90/6 90/17
actions [2]  9/18 73/19
activities [2]  103/15 104/3
activity [3]  61/9 62/5 97/4
acts [2]  61/9 61/22
actual [6]  15/2 16/25 39/4 138/23 138/25 139/2
actually [15]  6/7 60/2 61/20 101/11 102/8 106/22 107/15 110/7 110/9 112/5 118/14

1054

**A**

actually... [4]  123/22 126/9 129/15 134/20
add [1]  84/11
addition [2]  71/23 111/18
additional [4]  20/21 24/7 104/8 104/25
Additionally [1]  18/17
address [7]  79/20 80/6 80/7 88/3 93/9 115/6 138/12
addresses [3]  94/4 151/16 151/19
adds [1]  73/4
adequately [1]  104/13
adhere [1]  156/8
adjectives [1]  75/3
admissible [7]  30/4 30/13 37/16 119/12 119/14 136/20 138/11
admit [2]  87/13 135/14
advance [1]  91/23
advisement [1]  91/8
advisor [2]  35/16 157/1
affect [3]  68/10 99/1 99/4
affected [7]  13/13 95/15 95/16 95/17 98/5 98/6 99/24
affecting [1]  98/25
affective [1]  134/21
affectively [1]  111/14
affects [5]  98/22 100/5 100/11 100/11 100/11
affidavit [14]  41/21 42/6 53/24 54/2 54/14 54/17 55/11 55/12 109/22 117/16 121/19 123/15 124/9 126/21
affidavits [6]  13/10 108/4 118/9 118/21 120/12 122/23
affiliated [1]  97/20
affiliates [1]  45/12
afoul [1]  61/15
after [18]  14/14 24/15 30/21 33/23 36/1 75/20 80/6 82/9 102/21 103/1 104/14 108/5 111/2 111/20 128/5 128/15 128/17 148/15
afternoon [3]  92/3 126/23 148/5
again [19]  4/14 28/7 32/10 36/5 59/23 79/10 80/17 83/1 90/6 90/19 91/7 91/14 105/3 126/3 143/23 145/6 145/7 147/12 155/4
against [8]  13/8 51/21 66/25 83/13 89/2 96/20 97/19 157/19
Agency [1]  93/14
agent [2]  9/8 55/7
ago [4]  16/1 88/18 89/6 97/18
agree [14]  26/15 28/14 31/4 32/4 32/9 32/11 36/12 120/16 121/2 137/20 139/19 156/13 160/9 160/17
agreeable [2]  33/19 160/1
agreed [9]  64/1 83/5 84/8 90/24 91/1 96/1 106/13 106/18 117/2
agreeing [2]  119/8 140/3
agreement [10]  5/12 31/20 32/18 33/24 49/17 88/21 105/13 113/23 113/24 144/18
agrees [2]  90/20 91/3
aha [1]  98/13
ahead [13]  11/16 12/17 22/21 32/16 68/6 92/20 102/15 121/2 126/17 135/24 149/18 152/16 155/12
aid [1]  61/1
aiming [1]  18/23
akin [1]  28/12
Alex [1]  40/7
all [124]  4/2 5/7 7/25 8/6 8/10 11/3 11/13 12/22 12/24 14/8 15/16 18/9 18/18 18/19 20/10 23/20 23/25 25/5 25/9 26/21 30/9 32/19 36/4 45/4 46/5 47/20 48/24 49/22 50/5 50/23 51/10 51/18 51/19 53/8 53/14 54/14 56/1 57/3 58/22 59/14 61/11 61/21 64/1 66/4 66/8 66/12 68/17 69/4 69/7 69/9 69/12

69/21 69/24 70/24 71/10 72/7 72/11 78/20 80/3 80/21 83/8 83/25 85/23 86/23 86/25 87/9 89/12 91/21 92/3 92/15 93/17 93/22 94/1 95/20 95/21 97/13 98/11 99/23 101/4 102/18 104/21 106/19 108/4 108/14 111/13 112/6 112/25 115/15 116/11 117/24 118/17 121/25 121/25 122/1 123/13 124/16 126/11 127/21 129/18 130/8 130/15 130/19 131/3 131/11 132/1 132/20 133/21 136/8 139/14 141/10 142/2 142/6 142/15 143/8 143/18 152/18 153/7 153/11 153/16 155/22 156/6 157/24 163/7 163/9
allegation [4]  19/18 22/7 105/12 134/23
allegations [11]  8/20 47/4 47/10 47/19 63/1 63/17 63/18 76/7 98/23 104/2 135/10
allege [3]  19/5 19/7 25/20
alleged [5]  7/24 38/13 47/2 61/7 69/13
alleging [2]  51/23 67/15
allow [2]  137/25 158/10
allows [1]  158/15
almost [7]  14/10 19/24 24/25 43/17 95/20 133/4 147/21
along [3]  4/19 92/11 94/19
already [26]  17/17 17/20 18/20 27/6 43/25 46/9 65/7 67/2 69/18 71/24 93/2 93/5 93/7 95/4 96/12 106/6 106/19 108/14 112/4 116/24 117/12 122/19 140/11 145/20 148/17 149/21
also [23]  4/12 6/9 29/15 46/16 56/18 66/19 79/8 81/10 83/17 85/18 93/5 97/15 104/6 104/23 108/21 118/8 120/11 129/3 129/5 131/5 133/11 141/24 143/15
altercation [3]  63/11 68/3 68/5
alternatives [1]  33/18
Although [2]  150/20 161/1
always [5]  31/16 77/21 90/20 90/21 126/16
am [40]  4/21 5/8 8/24 12/13 14/15 15/24 18/11 29/11 30/20 30/25 38/4 43/20 49/17 53/8 55/15 58/12 60/13 60/21 62/25 70/24 76/7 81/24 85/18 87/24 92/15 100/14 101/16 119/19 121/2 136/25 138/9 138/10 139/23 146/6 146/6 149/23 150/21 151/18 158/7 159/19
amazed [1]  116/5
amend [6]  42/12 42/17 140/13 141/17 142/1 142/8
amended [7]  18/24 19/21 31/9 72/13 76/9 77/10 87/17
among [1]  157/23
amongst [1]  154/5
amount [3]  145/10 145/10 147/14
analysis [2]  7/19 67/5
analyze [1]  43/6
and put [1]  151/9
and/or [3]  8/4 85/1 88/23
Angeles [4]  2/21 72/10 101/8 158/14
Anne [2]  113/14 114/17
annoyance [1]  72/10
another [9]  11/14 28/2 41/17 41/24 65/16 128/10 130/5 135/13 135/15
answer [19]  22/12 24/20 45/19 45/22 49/6 57/21 81/21 88/1 88/15 88/16 90/1 90/2 120/6 136/18 142/3 144/14 156/21 156/22
answer's [1]  144/9
answered [2]  51/8 87/18
answering [2]  89/12 89/21
answers [2]  118/17 123/12
anticipated [1]  18/24
any [69]  5/11 9/3 9/7 19/13 37/13 39/20 41/19 44/25 55/13 59/2 59/22 61/7 61/8 62/4 64/1 71/23 80/3 80/3 80/11 81/19 82/5 96/5 99/2 99/25 100/3 103/11 105/18 107/4 112/2 119/2 120/4 127/10 128/16 129/14 129/22 130/8 130/9 130/19 130/20 130/21 130/21

131/3 131/11 131/21 131/23 132/6 132/25 133/14 134/23 135/6 135/6 135/9 135/10 140/4 141/10 141/11 142/10 147/11 149/3 149/17 151/20 151/23 152/1 153/9 156/18 157/17 157/18 157/19 163/12
anybody [2]  52/6 94/22
anybody's [1]  22/13
anymore [4]  22/23 62/2 112/10 147/8
anyone [6]  64/3 95/15 97/5 99/2 135/9 158/10
anything [37]  10/1 10/19 21/7 42/11 42/15 42/18 53/11 55/13 58/11 64/11 73/15 84/5 85/12 87/8 87/8 89/24 91/4 91/17 91/24 94/21 94/23 99/5 99/23 104/20 106/21 109/15 117/7 120/4 132/8 141/11 141/22 144/4 145/2 148/14 149/13 150/2 157/14 161/19
anywhere [4]  40/22 67/11 147/11 150/4
Apex [14]  45/6 45/24 46/7 46/21 50/4 50/4 50/8 51/1 52/16 52/20 52/23 52/25 58/12 58/14
apologies [1]  4/21
apologize [5]  27/15 44/3 44/6 54/6 162/1
apparently [8]  50/2 50/10 84/25 85/19 93/6 102/14 113/15 161/17
appear [3]  4/22 19/2 97/21
APPEARANCES [1]  2/1
appeared [1]  22/22
appearing [1]  4/12
appears [2]  22/24 114/17
applicable [9]  61/10 61/14 62/5 62/16 62/24 65/4 65/12 66/5 66/16
application [1]  116/18
applications [1]  154/23
applied [2]  11/4 52/22
applies [6]  45/25 52/16 52/18 58/12 58/13 58/15
apply [5]  46/22 46/24 64/3 137/14 137/15
appreciate [7]  31/3 38/1 66/21 91/12 91/14 92/13 161/20
approach [9]  12/16 31/17 60/24 81/22 93/23 110/4 112/13 112/18 127/15
approaches [1]  88/24
appropriate [3]  44/2 133/12 159/14
approval [4]  79/21 80/18 80/18 88/4
approved [7]  82/19 84/7 84/11 85/13 87/15 87/20 89/1
approving [2]  85/1 88/23
are [269]
area [1]  83/19
areas [2]  67/17 83/18
aren't [6]  5/7 25/24 62/8 90/9 111/7 111/23
arguably [2]  64/23 65/12
argue [8]  52/21 53/18 53/20 54/20 55/24 56/2 61/19 64/17
argued [2]  50/24 52/12
arguing [6]  49/16 52/14 52/14 58/19 67/1 84/16
argument [20]  6/4 52/1 53/21 54/14 66/19 66/23 68/4 69/18 70/12 70/17 71/1 73/21 74/9 74/13 84/13 84/15 91/11 102/9 102/24 150/22
arguments [1]  65/18
arm [1]  161/1
around [6]  10/22 50/11 70/21 75/16 106/16 106/17
arrises [1]  29/11
articulated [1]  73/9
articulating [2]  99/25 100/2
as [158]  4/22 6/3 6/14 7/6 7/16 7/20 7/23 8/24 9/25 10/16 10/22 12/6 12/7 13/5 13/6 13/6 14/2 14/5 18/20 19/15 20/17 20/25 21/5 23/16 25/18 26/20 26/25 27/4 27/5 30/19 31/12 32/14 32/15 33/12 34/4 36/13 36/15

## A

as... [121] 37/3 37/3 37/3 37/7 39/9 39/25 42/21 47/2 50/7 50/12 51/11 52/5 57/14 57/15 61/5 61/6 64/6 66/23 68/1 68/1 69/4 69/14 69/22 70/8 70/12 70/15 70/18 70/20 70/22 72/1 72/13 72/16 75/2 75/13 75/13 77/18 77/18 78/1 78/2 78/5 78/17 78/17 84/2 84/14 86/5 88/21 90/1 90/1 90/2 90/4 90/6 91/19 92/17 92/18 93/17 94/5 94/7 94/13 95/14 95/24 96/18 96/23 102/20 102/20 103/19 104/3 104/3 105/1 105/1 105/3 105/3 105/4 106/1 107/14 108/11 111/19 113/23 116/24 117/1 118/12 122/3 122/20 123/22 124/14 125/6 126/16 127/11 129/1 129/1 129/2 129/2 129/7 129/7 129/9 135/11 135/23 137/5 137/20 139/17 139/19 141/13 144/2 144/21 145/16 145/21 146/4 146/4 146/20 149/22 152/19 154/3 154/4 156/5 157/4 157/9 158/12 160/3 160/7 160/22 160/22 161/14
ASBILL [1] 2/4
aside [2] 66/14 75/6
ask [15] 9/21 37/13 43/6 44/17 64/18 97/12 99/15 107/1 112/14 137/6 137/15 147/2 147/6 147/7 159/8
asked [23] 11/9 11/9 30/2 37/9 38/16 42/22 49/5 52/16 52/18 52/22 80/10 82/24 83/17 90/14 94/15 95/12 97/22 120/24 121/4 121/15 125/2 125/2 151/17
asking [28] 8/1 10/15 10/17 13/23 13/25 15/5 23/7 25/23 31/23 38/23 39/3 39/12 39/17 40/17 40/25 42/24 85/5 87/24 117/13 122/22 126/13 133/23 137/1 137/2 147/16 153/22 153/25 158/21
asks [1] 133/2
aspect [2] 79/7 146/21
asserted [1] 58/13
asserting [2] 58/12 91/17
assertion [4] 51/21 58/25 107/21 117/9
asses [1] 118/8
assistance [1] 7/12
associated [4] 7/21 77/22 97/3 140/5
assume [8] 17/16 41/4 41/7 41/8 52/16 52/18 52/22 64/5
assuming [1] 156/8
assumption [2] 98/16 105/20
assurance [1] 160/3
assure [2] 73/1 90/23
Atlanta [4] 2/13 92/7 92/9 158/14
atop [1] 50/5
attached [3] 98/17 112/24 118/11
attempts [1] 65/16
attention [1] 92/12
attorney [4] 48/13 100/12 161/5 161/8
attorneys [2] 160/4 161/14
attorneys' [10] 8/3 31/7 31/10 31/16 31/21 32/1 32/6 32/13 32/15 34/6
attributable [1] 22/8
August [13] 77/11 78/1 79/7 79/11 109/5 109/7 113/3 113/12 123/2 124/13 124/14 132/21 159/2
August 19th [2] 79/7 79/11
August 2011 [1] 132/21
August 23 [2] 109/7 113/12
August 23rd [5] 109/5 113/3 123/2 124/13 124/14
Austin [4] 14/1 36/22 81/6 136/17
authority [1] 88/22
authorized [2] 48/13 63/3
available [3] 11/14 68/13 70/10
avoid [4] 15/6 30/12 146/6 158/23
award [1] 14/25
awarded [2] 19/19 138/4

awarding [1] 91/6
aware [4] 30/21 31/12 40/2 156/7
away [4] 4/22 69/8 70/11 156/9

## B

back [31] 6/15 21/1 21/8 23/17 25/7 28/16 42/21 47/1 47/9 53/14 53/19 55/9 55/16 57/6 64/21 75/11 75/15 75/16 76/18 90/6 90/19 91/4 91/7 96/1 102/24 104/11 108/3 146/3 146/5 153/19 161/11
background [1] 63/23
bad [3] 51/24 53/19 78/20
Bailiff [1] 161/24
bait [1] 158/24
baited [1] 31/4
ball [2] 49/21 53/11
ballpark [1] 136/15
bang [1] 6/12
bar [1] 72/17
bare [1] 67/4
bars [1] 66/19
base [3] 10/20 21/25 71/11
based [29] 7/19 11/6 14/5 15/2 15/15 18/22 18/24 22/3 22/14 28/17 37/3 37/13 37/23 37/24 40/19 42/12 46/15 52/22 70/16 80/24 84/23 99/14 113/11 127/19 134/17 142/3 145/22 150/22 157/21
basic [2] 90/20 105/7
basically [2] 110/5 150/20
basing [2] 70/19 71/21
basis [15] 7/16 8/9 8/11 17/1 22/15 42/18 47/7 61/15 96/1 104/5 108/3 120/11 127/12 129/11 131/25
Bates [1] 13/21
be [204]
bear [5] 35/15 58/25 58/25 61/12 65/10
beat [3] 68/10 68/12 68/12
because [112] 8/14 8/25 9/7 9/7 10/6 10/19 11/17 11/20 13/16 14/10 15/11 16/7 17/3 17/15 21/7 21/14 23/20 23/23 26/1 26/23 28/11 29/10 31/17 35/17 36/1 36/22 37/6 38/25 39/23 40/16 43/15 44/14 45/23 49/16 50/1 50/3 50/5 50/15 51/22 53/19 54/8 56/10 56/17 59/11 60/4 65/19 66/17 71/19 72/8 72/19 72/23 78/9 80/8 83/2 84/12 85/5 86/11 86/23 88/21 89/6 90/5 90/19 91/4 91/15 91/20 92/2 92/11 93/6 95/17 96/3 96/24 97/22 97/25 98/5 98/7 98/22 103/8 108/16 110/19 111/5 115/14 117/9 118/18 118/23 119/25 122/24 124/2 124/23 125/3 125/24 126/8 129/14 133/6 133/16 134/21 137/25 141/20 141/22 142/6 142/22 149/12 150/23 151/7 152/1 154/14 156/3 156/13 156/25 157/9 158/10 158/23 160/4
BECK [5] 3/4 161/3 161/4 161/18 163/15
beckredden.com [1] 3/7
becomes [1] 73/2
bed [2] 151/10 151/12
been [81] 5/11 5/12 5/14 5/15 8/4 8/7 8/11 13/5 13/20 19/5 19/16 20/11 20/11 20/17 21/16 22/7 24/14 26/3 26/22 27/1 27/6 36/1 37/20 38/17 38/24 39/20 54/14 54/17 58/10 61/25 62/24 63/24 64/12 65/7 65/13 67/14 67/17 68/24 68/24 73/2 74/23 74/25 76/8 76/20 77/7 78/5 78/6 78/10 82/23 85/3 89/24 93/2 95/18 96/18 96/22 97/2 97/10 97/13 103/18 104/17 105/13 105/24 106/10 108/1 115/14 116/24 120/12 121/1 134/6 134/12 138/7 140/11 142/3 142/19 147/6 149/10 149/13 149/13 150/17 154/3 156/14
before [39] 1/18 10/4 13/20 24/6 25/7 25/14 34/20 36/2 41/23 42/3 43/16 44/22 50/24 59/6 59/7 60/2 63/14 63/22 82/23

84/10 84/16 86/2 87/17 89/15 91/22 102/18 108/1 109/4 110/23 118/24 125/14 126/7 129/15 132/4 142/24 145/6 145/7 149/19 149/19
began [2] 9/14 9/17
beginning [2] 19/15 103/18
behalf [9] 4/9 4/11 4/17 48/10 55/6 55/8 59/15 89/16 97/19
behind [2] 58/20 145/2
behold [1] 95/4
being [17] 19/19 40/2 46/16 68/14 75/21 77/2 82/24 91/19 95/12 99/14 114/5 119/1 120/7 134/20 138/4 138/5 147/13
belief [1] 152/1
beliefs [1] 154/20
believe [40] 6/19 6/24 15/13 17/8 26/17 33/10 40/12 45/13 54/4 61/14 61/16 68/3 75/3 77/14 101/12 101/23 102/3 102/4 108/10 111/6 114/4 115/6 115/11 120/25 121/16 122/13 126/15 126/20 131/19 138/18 138/24 142/20 144/1 146/18 146/20 150/18 151/23 153/23 153/25 154/24
Bench [1] 110/4
benefit [1] 4/4
benign [1] 126/9
Bennett [1] 21/23
besides [4] 12/3 38/6 56/20 56/22
best [4] 68/1 70/12 78/15 101/9
between [10] 6/15 25/11 41/9 57/6 69/16 70/3 82/6 130/20 139/15 146/2
beyond [13] 15/4 30/7 67/4 81/22 84/5 93/8 96/7 111/5 116/24 129/22 142/16 144/17 144/22
bill [5] 59/10 82/15 82/17 84/7 84/12
binder [1] 107/14
binders [1] 131/12
bit [11] 16/7 25/21 75/11 76/1 76/21 76/22 76/23 91/18 97/1 119/20 161/23
bite [1] 12/18
bitty [2] 86/24 86/25
blah [3] 55/15 55/15 55/15
blame [1] 90/7
Blane [1] 99/18
blanks [1] 19/2
Blase [2] 99/20 100/7
Blaze [1] 99/17
Bob [4] 22/22 22/24 23/1 23/8
boilerplate [1] 42/10
bones [2] 65/10 67/4
bonus [3] 105/1 135/3 137/24
bonuses [1] 135/2
boot [1] 156/6
borne [1] 109/23
borrower [2] 77/23 77/23
both [10] 20/12 22/17 31/14 32/1 39/14 41/5 41/19 43/12 110/4 114/22
bottom [4] 48/5 71/12 72/11 124/18
bottomless [3] 119/7 119/8 121/13
bought [5] 39/4 39/5 40/21 42/2 122/17
box [3] 113/4 115/8 123/2
breach [3] 98/18 105/13 105/21
breached [6] 8/4 62/12 62/16 65/3 65/13 105/14
break [2] 80/9 147/7
breath [1] 31/4
BRENNAN [1] 2/4
bridge [2] 69/15 69/25
Brief [1] 74/6
briefly [1] 75/13
bring [4] 31/18 70/11 92/10 106/23
bringing [2] 59/14 86/24
brings [1] 138/14
broad [1] 13/7

1056

## B

broader [1] 86/1
broke [1] 8/15
broken [1] 9/24
broken-down [1] 9/24
brought [5] 67/14 72/18 75/9 85/11 105/22
brunt [1] 35/15
Bryant [1] 81/7
buck [1] 6/12
Bucket [3] 79/23 79/24 80/2
bunch [2] 52/25 69/17
bundle [1] 6/4
Burbridge [1] 93/14
burden [8] 41/25 42/4 50/8 51/1 58/25 59/14 94/23 136/9
burdened [1] 134/6
burdensome [3] 39/22 41/22 91/18
business [15] 8/18 8/19 22/1 47/20 53/1 56/11 56/14 64/2 64/8 64/9 96/23 106/7 117/25 131/16 156/4
busy [1] 53/1
buy [22] 27/9 38/13 38/17 38/19 38/24 39/1 39/18 40/16 41/8 41/12 41/16 41/19 42/1 79/21 80/18 85/2 86/6 88/4 96/6 136/5 142/13 150/20
buy-out [6] 27/9 79/21 80/18 86/6 88/4 136/5
buyers [1] 83/7
buying [3] 39/19 39/21 40/19
buyout [1] 112/1
by it [1] 98/5

## C

CA [2] 2/11 2/19
calculate [2] 9/23 10/25
calculated [5] 6/24 8/16 37/16 119/14 138/10
calculation [7] 7/2 7/18 8/3 8/9 8/11 25/19 157/4
calendar [1] 159/6
California [1] 2/21
call [6] 30/15 30/15 53/15 67/11 105/10 135/24
called [4] 7/1 64/23 148/22 153/7
calling [3] 7/17 49/18 85/17
came [36] 1/17 27/8 27/9 46/11 50/9 50/23 58/18 60/2 71/15 73/14 85/10 86/2 98/11 98/15 99/7 99/10 102/23 105/20 108/19 109/9 110/17 111/19 113/25 124/24 125/3 140/8 140/9 140/10 149/19 153/19 154/9 154/14 154/16 154/22 155/1 155/14
can [117] 6/15 7/21 9/14 12/22 13/17 16/23 18/15 20/24 22/6 25/2 25/8 25/21 28/8 28/23 29/15 31/3 31/14 31/15 31/20 32/9 32/24 36/12 38/12 40/4 40/8 40/23 41/4 43/6 45/3 45/21 50/24 51/16 53/15 53/21 57/15 57/20 60/19 61/25 62/8 63/5 63/19 64/7 64/25 66/4 66/18 68/1 70/8 70/11 72/21 76/9 78/2 78/20 89/11 90/2 90/14 90/23 91/14 93/9 93/11 96/4 97/5 97/9 99/2 101/3 104/21 105/2 107/13 110/3 110/4 112/3 112/5 112/8 112/20 113/23 115/21 116/9 116/10 118/8 119/10 120/17 121/8 121/19 122/3 122/8 122/15 122/18 124/12 124/14 124/18 124/21 126/16 126/17 128/16 130/16 131/20 134/11 137/4 139/10 141/4 141/4 141/17 142/1 142/1 143/24 144/2 144/17 145/8 146/2 146/20 147/25 147/25 148/6 151/2 151/19 158/16 161/1 161/11
can't [28] 12/6 16/25 17/2 19/9 19/9 21/7 26/10 28/1 66/23 68/20 71/18 71/18 72/16 73/17 94/10 94/25 100/2 111/16 114/13

115/20 122/2 136/24 151/11 151/25 156/10 157/14 160/5 160/25
cancelled [2] 50/9 50/21
candidly [3] 14/7 16/7 40/15
cannot [8] 36/12 45/14 70/16 70/18 71/5 71/11 117/6 158/19
capable [1] 142/25
Capital [1] 109/17
car [3] 109/17 110/7 117/21
care [9] 53/1 57/8 63/14 63/20 86/3 86/4 86/5 146/16 146/17
career [1] 74/16
careful [1] 67/18
Carolina [1] 156/6
Caroline [1] 163/21
carry [2] 50/8 83/23
case [82] 6/20 7/10 9/20 13/5 13/9 13/10 17/8 17/14 19/14 29/23 37/8 37/23 37/23 37/24 39/19 39/21 40/17 40/22 44/13 44/19 46/8 46/20 52/9 53/3 53/24 54/20 55/18 61/5 62/2 62/6 63/7 67/25 69/3 69/5 69/8 69/9 69/15 69/15 71/15 71/24 72/15 72/20 73/8 73/18 75/8 75/15 81/7 82/7 82/7 82/7 84/6 85/9 85/12 85/15 86/12 94/8 94/18 96/15 97/1 97/2 97/8 97/9 97/11 102/22 103/19 104/5 104/22 105/8 108/6 116/25 120/25 134/13 134/21 135/12 135/17 136/4 149/22 150/16 156/10 157/23 159/4 159/16
cases [5] 52/24 92/2 92/4 92/12 97/16
catch [1] 23/23
categories [4] 49/16 49/17 49/20 50/23
category [2] 25/20 94/18
causal [1] 73/3
causation [7] 10/2 10/3 10/14 17/11 19/14 66/20 69/14
cause [15] 1/3 1/18 19/13 65/23 65/24 66/6 66/22 70/16 70/18 71/18 71/25 71/25 72/1 72/18 163/9
caused [10] 21/6 28/14 61/7 65/25 66/1 67/7 69/23 69/25 72/13 72/22
causes [1] 151/14
causing [2] 61/8 86/25
cease [3] 48/7 48/24 71/3
center [1] 79/17
centerpiece [1] 63/1
Century [1] 2/20
CEO [8] 45/8 46/16 46/17 50/7 50/15 52/5 53/15 53/16
CEO's [2] 59/6 59/8
certain [20] 11/17 21/17 23/22 43/5 64/25 71/9 76/6 76/7 88/24 92/14 102/25 111/3 118/21 119/10 133/7 133/9 143/20 143/24 145/9 145/10
certainly [16] 5/24 18/11 25/1 25/19 65/4 65/12 82/14 84/11 107/13 108/15 110/3 123/14 137/4 144/2 145/19 161/2
certainty [1] 21/15
certify [3] 163/5 163/11 163/14
cetera [1] 147/17
Cgoebelsmann [1] 2/22
chain [1] 19/13
challenge [1] 43/24
chambers [1] 163/10
Chance [1] 114/18
Chancery [1] 7/7
change [3] 24/12 26/5 121/12
changed [1] 62/3
Chapter [4] 49/11 61/6 61/24 63/2
characterization [1] 85/24
characterized [1] 74/13
charge [6] 56/4 57/3 57/7 73/23 161/5 161/8
charges [1] 8/17
chase [2] 24/15 156/10

cheat [1] 15/25
chose [2] 34/9 48/25
Chris [1] 4/20
CHRISTINA [3] 2/18 4/9 132/12
Christmas [1] 158/1
circuit [8] 23/22 63/7 63/12 63/17 64/22 67/17 76/1 147/25
circumstances [2] 48/17 131/20
cited [3] 62/6 63/7 94/8
Civil [2] 61/12 65/11
claim [18] 13/8 13/13 15/15 16/10 16/22 16/24 17/24 19/17 37/5 40/18 62/9 70/19 70/19 71/5 71/20 95/19 95/23 125/12
claimant [2] 62/1 62/2
claimed [1] 103/20
claiming [6] 13/9 18/3 68/23 102/25 103/13 117/19
claims [7] 66/20 102/20 105/8 112/9 122/23 128/9 150/10
clamming [1] 134/10
clarification [1] 128/13
clarify [5] 16/18 25/21 26/20 28/10 32/19
clause [2] 48/4 48/5
clean [2] 27/16 44/22
clear [8] 42/12 42/17 44/12 52/11 128/22 140/10 154/18 155/6
clearly [3] 105/14 105/14 151/22
click [4] 64/13 64/14 64/19 153/11
clicked [7] 64/19 71/2 110/20 113/16 116/15 116/19 130/25
client [19] 13/5 19/3 33/23 56/12 67/1 75/20 86/18 94/21 94/23 100/5 100/11 108/16 117/10 133/8 136/13 156/4 157/12 157/18 160/15
client's [1] 118/2
clients [1] 82/9
close [6] 33/8 41/11 48/9 48/9 58/6 150/4
clue [1] 43/2
co [3] 4/20 77/23 77/23
co-borrower [1] 77/23
Co-Counsel [1] 4/20
co-signer [1] 77/23
coarse [1] 90/19
code [15] 110/6 112/21 114/9 114/12 114/14 114/16 114/19 114/20 114/25 115/24 116/2 116/3 116/12 116/13 116/18
Codes [2] 108/9 115/19
colleague [1] 4/21
collected [1] 111/3
collection [3] 103/2 103/5 109/8
collections [2] 103/21 120/10
collections' [1] 103/15
column [1] 127/23
comb [1] 106/22
combining [1] 130/15
come [16] 9/19 9/25 30/12 31/13 43/18 43/20 71/24 91/7 92/10 97/3 98/3 128/4 139/22 146/1 153/10 162/2
comes [2] 123/21 146/9
coming [10] 35/19 44/15 44/18 45/2 53/9 91/4 108/17 108/17 116/15 123/24
comma [1] 24/23
comment [2] 93/20 144/20
committed [3] 18/23 62/4 132/5
committing [1] 61/17
common [2] 9/11 9/13
commotion [1] 86/25
communication [1] 58/24
communications [12] 38/13 50/17 60/11 84/24 101/19 117/15 130/8 130/20 131/11 139/15 140/4 141/2
community [1] 147/13
companies [4] 38/6 51/18 61/4 94/14

1057

## C

company [24] 9/5 40/3 45/11 51/4 51/17 51/18 51/19 56/8 57/7 57/17 57/20 58/1 59/4 81/10 83/9 83/12 83/13 84/4 85/21 95/11 109/18 147/9 147/14 154/20
company's [3] 55/23 85/22 154/20
company-wide [2] 83/9 84/4
compare [2] 30/9 106/23
compel [28] 5/17 5/17 5/18 5/22 6/8 6/17 8/1 8/8 12/25 85/6 89/17 89/19 90/11 101/12 101/18 101/21 101/22 102/2 102/17 102/17 132/16 137/1 137/24 138/15 138/15 149/18 152/11 155/22
compelled [4] 14/13 32/1 36/21 158/19
compelling [1] 35/3
competitor [1] 145/15
competitors [10] 80/1 80/5 83/8 88/6 125/6 130/11 131/15 131/17 143/25 144/5
competitors' [1] 85/2
complain [3] 10/11 95/13 98/4
complaining [4] 77/1 78/23 83/12 99/22
complaint [3] 40/18 40/18 76/17
completed [8] 33/9 39/24 77/7 77/8 77/9 77/11 78/14 108/5
completely [4] 5/15 29/22 36/14 154/5
complicated [1] 71/8
complied [8] 8/8 74/23 77/2 77/4 79/3 80/20 90/3 142/24
complies [1] 17/9
comply [4] 78/15 79/7 79/9 90/15
complying [1] 74/11
components [2] 11/12 15/16
comprise [3] 10/9 10/10 10/10
computer [5] 38/17 38/21 55/17 66/8 148/9
computerized [1] 1/21
computers [1] 152/18
concern [7] 6/21 29/10 91/15 103/17 119/2 132/10 145/5
concerned [8] 103/8 103/13 103/25 108/16 111/10 118/20 131/10 160/23
concerning [5] 48/16 55/14 111/12 114/11 120/25
concerns [1] 102/20
conclude [1] 63/19
conclusively [1] 66/2
concrete [1] 145/8
conduct [23] 7/11 7/21 7/24 15/12 22/8 37/9 40/19 43/21 44/16 61/9 62/5 71/2 75/5 96/20 99/22 105/3 110/24 112/5 112/9 127/18 134/12 134/16 138/3
conducted [7] 9/3 102/21 108/9 110/1 111/19 124/6 124/25
conducting [3] 103/14 104/14 130/11
confer [4] 88/22 148/1 148/3 149/11
Conference [1] 35/18
conferring [1] 33/23
confirming [1] 17/13
confused [1] 16/7
confusion [3] 25/22 65/7 65/8
connection [1] 73/3
Consent [1] 75/14
consider [4] 47/19 73/24 90/5 144/16
consideration [1] 91/8
consistent [2] 14/17 107/17
consult [1] 86/18
consuming [1] 119/4
contact [1] 47/13
contacting [1] 136/11
contain [1] 22/9
contained [3] 12/21 78/23 138/22
containing [1] 38/11
contains [4] 20/8 50/17 153/9 163/6

contemplating [1] 12/14
contend [3] 7/8 14/18 149/23
contending [1] 161/2
contention [2] 124/23 125/3
contents [1] 153/7
contesting [1] 98/9
context [3] 29/11 89/14 125/24
continuance [11] 11/17 33/11 60/18 101/10 101/13 101/16 155/24 158/8 158/13 158/22 159/15
continue [6] 96/2 97/9 104/22 112/8 120/17 156/4
continued [1] 8/15
continuing [1] 92/19
contract [12] 16/24 17/6 17/23 17/24 18/3 18/4 19/5 19/17 35/6 35/8 110/8 134/9
contracted [2] 22/20 23/1
contracts [22] 8/3 15/22 16/6 16/8 16/11 16/13 16/20 16/21 16/25 17/20 17/22 18/14 18/18 18/20 25/19 35/2 35/11 35/22 35/24 36/4 130/9 130/20
contradicted [2] 54/14 103/8
contradiction [1] 118/22
contribute [1] 65/25
contributed [8] 61/7 62/4 67/9 68/18 72/14 72/18 72/22 73/12
contributes [1] 119/5
contribution [1] 72/23
contributory [1] 61/20
control [4] 122/1 147/1 157/17 157/18
convert [1] 64/8
coordinator [1] 159/14
copies [2] 81/25 82/6
copy [5] 16/2 58/5 70/2 102/11 110/3
copying [2] 129/1 130/12
core [5] 70/15 102/20 143/12 143/16 154/20
corollary [1] 156/5
corporate [21] 49/10 49/18 49/24 49/25 50/21 52/13 58/19 60/3 81/1 81/4 81/15 81/21 82/19 85/14 86/4 86/10 87/16 91/22 104/17 137/16 141/11
corporation [1] 90/9
corpus [1] 159/23
correct [24] 5/9 6/18 18/24 20/9 20/10 20/22 26/13 26/17 27/25 32/2 51/5 60/19 60/20 67/23 76/8 89/3 90/22 120/16 120/21 120/22 123/19 156/16 157/3 163/6
corrected [2] 78/14 78/19
correcting [1] 60/21
corrections [1] 150/8
correctly [2] 11/2 163/12
correspondence [2] 117/5 139/15
cost [5] 94/21 94/22 95/11 99/23 163/14
costly [1] 119/4
costs [1] 7/21
could [27] 11/4 24/14 43/10 47/22 48/12 53/24 61/25 64/19 66/7 70/13 73/10 78/17 84/5 86/20 91/19 106/10 111/14 119/13 119/14 119/17 120/7 136/20 144/5 151/18 153/17 157/8 158/21
couldn't [2] 26/3 85/12
counsel [38] 2/7 2/15 2/23 3/7 3/14 4/20 21/13 21/21 30/14 33/1 47/2 47/5 47/9 47/17 48/2 48/3 48/24 49/2 58/9 88/21 90/20 90/24 91/2 102/9 107/14 108/1 108/12 110/4 151/24 156/20 158/11 158/21 159/9 160/3 160/6 160/14 160/22 163/8
counsel's [2] 58/25 156/24
counter [1] 40/18
counter-claim [1] 40/18
country [2] 96/5 144/19
COUNTY [4] 1/8 1/20 163/2 163/20
couple [9] 8/4 42/9 75/20 85/6 89/8 123/12

127/8 140/20 161/25
couriers [1] 70/3
course [4] 32/10 64/2 64/9 72/7
court [60] 1/3 1/5 4/4 6/5 6/19 6/20 6/22 7/15 9/22 10/4 11/2 11/15 11/18 16/17 19/19 22/2 23/21 26/5 31/12 44/5 44/16 46/2 49/16 49/22 51/9 58/14 58/19 59/12 59/14 60/2 61/2 65/1 71/17 71/20 76/17 84/19 86/25 89/25 105/3 107/3 107/17 108/2 108/4 111/12 117/17 121/1 129/15 129/19 133/7 152/1 157/5 157/7 157/8 157/15 157/17 163/4 163/5 163/10 163/19 163/20
Court's [9] 5/25 8/8 22/5 62/9 84/24 100/18 111/9 118/2 156/8
courthouse [1] 86/3
cover [1] 145/3
covers [1] 145/3
Crawley [1] 58/14
create [1] 86/8
created [9] 75/14 81/8 81/9 81/12 85/20 86/7 86/17 86/20 87/3
creates [1] 73/4
creation [1] 80/17
Criminal [1] 73/19
critical [1] 85/8
cross [1] 122/18
cross-examine [1] 122/18
crystal [2] 46/7 50/4
CSO [3] 8/17 10/10 15/16
CSR [2] 163/18 163/19
cull [2] 78/4 78/11
culpable [1] 84/13
curb [1] 75/5
curious [1] 144/11
current [2] 46/13 123/25
currier [1] 70/3
custody [1] 147/1
customer [68] 7/2 7/14 7/17 7/23 8/2 8/18 8/19 9/25 10/8 10/20 11/7 11/13 11/14 11/24 12/4 14/6 14/6 14/6 14/19 14/19 17/10 17/10 18/4 19/5 21/25 22/4 22/10 22/10 22/11 22/13 23/8 23/13 25/7 25/17 26/23 27/1 28/15 29/4 30/8 30/12 70/7 70/7 80/19 81/20 88/24 98/20 105/22 105/24 106/25 108/16 109/6 109/13 110/14 110/17 110/18 112/19 114/2 116/14 116/21 121/16 121/17 123/11 123/25 124/14 125/17 126/10 141/15 149/25
customer's [2] 116/14 126/1
customers [66] 6/25 7/1 9/11 9/13 15/2 15/20 16/10 20/18 20/18 21/3 21/4 21/10 21/11 21/11 21/16 22/6 22/17 37/25 47/13 47/14 55/17 66/8 66/9 69/20 79/22 80/1 80/5 85/10 85/11 86/6 88/4 88/6 88/8 99/14 99/21 103/16 103/23 105/17 105/18 106/8 106/11 107/22 108/17 108/19 108/23 108/25 112/17 117/20 119/24 119/25 120/3 120/5 124/8 124/12 125/11 125/23 126/6 129/1 129/16 129/20 130/11 131/15 138/8 141/1 141/11 143/6
customers' [1] 131/17
cut [8] 16/1 23/17 24/6 30/18 65/1 105/19 156/9 158/24
cuts [3] 82/22 85/4 86/24
Cynthia [3] 163/4 163/17 163/18

## D

d/b/a [5] 1/5 1/5 1/6 1/6 1/7
Dallas [9] 14/1 36/21 83/19 84/1 84/24 116/12 123/6 134/16 134/17
damage [15] 6/21 6/23 7/16 8/9 8/11 10/8 11/19 17/9 21/6 26/4 28/14 35/20 37/12 72/1 157/6

**D**

damaged [2] 66/9 66/9
damages [20] 7/19 10/23 11/24 15/1 19/19 24/11 25/13 25/15 25/17 27/3 27/4 28/8 36/11 37/5 37/7 39/2 61/8 68/23 68/24 157/4
DANIEL [3] 2/3 4/8 83/1
Daniel.johnson [1] 2/7
darn [2] 55/15 75/21
data [13] 25/1 41/22 67/12 67/18 75/20 76/11 99/19 113/2 148/11 148/14 148/19 149/2 150/11
database [18] 6/4 41/4 63/12 68/13 70/5 71/9 78/6 78/7 78/11 95/2 96/5 97/3 97/6 114/9 129/2 130/21 140/7 155/2
databases [22] 63/23 67/13 67/14 78/4 79/25 80/5 87/9 87/11 88/5 88/8 94/6 95/18 96/2 97/23 98/10 105/19 109/12 134/9 139/18 140/5 141/1 143/14
DataTrax [41] 61/4 62/20 62/21 62/22 63/8 65/4 65/23 66/2 66/12 69/7 70/2 71/7 81/20 82/10 94/7 95/1 95/19 96/4 103/20 106/15 106/17 106/22 109/11 112/1 130/21 136/6 139/13 139/18 140/5 140/7 142/13 143/13 143/17 148/8 148/13 148/13 149/20 150/13 152/24 153/9 153/10
DataTrax's [1] 103/21
DataTrax/PublicData.com [1] 82/10
date [29] 9/14 11/17 26/25 31/19 32/9 32/15 32/20 33/3 34/9 79/10 88/18 89/9 90/15 91/24 101/25 104/11 113/2 113/24 113/25 116/20 122/21 137/9 138/17 158/8 158/9 158/20 159/11 159/12 159/14
dated [4] 48/2 48/7 79/6 130/21
dates [3] 18/8 40/16 40/16
Dave [3] 33/14 33/21 33/22
David [3] 161/2 161/4 161/18
day [13] 1/17 50/1 50/11 50/21 58/22 66/6 66/8 66/12 77/12 92/21 116/14 119/14 157/10
days [8] 33/8 34/20 44/22 50/24 77/12 78/12 78/15 88/2
dead [1] 73/21
deal [5] 73/1 91/13 98/10 149/19 154/24
dealing [2] 90/19 130/17
dealt [1] 83/16
death [3] 82/22 85/4 86/23
debated [1] 49/9
December [3] 14/10 47/1 48/2
decide [2] 65/2 119/11
decides [1] 41/14
decision [1] 86/10
decisions [2] 69/12 69/24
declaration [3] 105/12 105/15 107/23
declarations [6] 102/25 103/8 103/14 104/3 107/3 129/19
decline [1] 13/20
declined [1] 149/4
deems [1] 75/2
Defendant [14] 5/16 8/12 9/8 46/8 46/20 52/9 53/3 54/20 78/22 79/19 88/2 88/22 96/1 103/20
Defendant's [2] 60/22 78/4
DEFENDANTS [15] 3/7 3/14 4/6 4/18 4/19 5/19 5/20 12/8 13/8 22/18 36/19 38/14 74/11 84/25 100/10
Defendants' [3] 6/3 6/16 96/19
defense [3] 33/1 111/15 120/9
defined [2] 107/2 116/24
definitely [1] 143/18
definition [1] 50/4
DeLeon [7] 99/17 99/18 99/21 100/6 100/7 100/8 149/8
DeLeon's [1] 150/11

demand [1] 15/8
demanding [1] 14/21
demonstrably [2] 109/13 149/23
demonstrate [1] 138/1
demonstrated [2] 75/3 112/5
demonstration [1] 152/25
denied [2] 84/20 100/13
denies [2] 47/4 47/10
deny [3] 59/2 136/5 138/9
denying [3] 100/15 101/1 138/13
department [4] 81/1 81/13 89/1 114/8
depends [1] 153/13
depo [1] 49/20
Deponent [1] 50/8
depose [17] 49/25 50/2 50/22 50/24 53/22 54/24 55/2 57/17 59/10 103/23 110/23 111/14 115/16 124/18 126/18 127/15 134/14
deposed [7] 55/19 85/3 111/15 113/10 115/11 115/13 124/10
deposing [1] 127/9
deposition [34] 27/6 38/15 45/6 49/10 50/9 50/21 51/13 51/23 52/13 58/12 58/14 59/2 60/9 80/24 81/6 83/16 84/23 91/23 96/13 104/18 110/24 115/16 120/19 120/24 121/9 121/10 121/20 122/19 127/19 128/8 128/9 147/4 147/7 148/15
depositions [4] 70/13 83/15 83/25 120/23
Deputy [6] 47/9 47/17 48/1 48/3 49/2 58/9
derive [1] 18/10
derived [2] 18/7 124/6
describe [1] 10/6
describes [1] 64/14
describing [2] 10/2 72/12
description [2] 10/7 11/10
designate [10] 5/20 60/22 61/7 61/25 66/23 158/11 158/12 158/16 158/18 160/6
designated [2] 61/3 161/8
designation [2] 67/2 67/3
designed [1] 73/5
designing [2] 85/1 88/23
desist [2] 48/7 48/25
desperate [1] 138/7
despite [1] 94/20
destroys [1] 73/3
details [2] 50/18 77/18
Detective [1] 93/14
determination [1] 36/12
determine [7] 26/22 40/10 44/16 121/14 122/9 132/5 133/12
determined [2] 49/20 157/20
determining [1] 129/11
device [1] 147/1
devices [1] 146/25
did [62] 8/14 8/15 12/9 12/11 14/4 16/1 16/4 21/22 25/12 27/24 37/24 40/2 52/19 55/19 59/4 60/1 62/14 62/18 62/20 62/22 64/18 64/19 64/19 65/23 66/11 69/7 80/24 83/17 88/1 88/11 88/15 89/17 89/18 91/10 95/6 96/23 98/18 100/25 101/1 103/11 107/21 109/10 110/11 111/21 124/12 135/20 135/21 135/21 135/21 135/25 136/1 136/1 136/6 139/19 141/14 146/22 147/2 147/7 149/18 153/14 153/15 155/25
didn't [36] 10/1 10/11 10/18 43/8 44/1 45/18 51/13 52/17 52/21 53/20 55/24 59/20 66/6 66/25 72/24 72/25 84/8 86/8 88/12 91/18 92/8 98/8 103/17 108/14 110/3 110/8 111/2 111/21 112/1 129/19 137/15 140/10 145/19 145/21 147/6 148/13
difference [4] 82/6 142/10 145/9 145/12
different [8] 8/16 27/5 32/6 35/8 49/3 110/13 117/21 118/7
difficult [3] 19/3 86/16 156/4

difficulty [1] 72/9
dilatory [1] 37/9
direct [7] 7/20 59/19 61/1 69/16 82/18 112/1 142/13
directed [9] 48/25 59/16 59/18 83/7 83/15 94/6 100/3 148/16 157/4
direction [4] 5/25 84/25 85/17 151/13
directly [2] 39/2 68/23
disagree [4] 11/8 15/10 29/22 45/23
disclose [3] 6/23 11/18 63/4
disclosed [1] 63/20
discouragement [1] 13/16
discover [2] 110/23 119/9
discoverable [1] 137/11
discovered [1] 77/24
discovery [54] 6/17 6/22 7/11 9/3 13/7 28/11 29/11 31/9 37/16 43/21 44/13 44/23 46/11 46/12 75/7 77/10 78/23 84/3 88/10 92/14 93/1 93/9 95/15 96/17 96/23 97/1 97/22 98/2 98/22 100/3 101/18 112/8 112/13 119/12 119/14 120/9 121/22 128/10 129/12 132/7 133/12 134/7 134/12 134/18 135/18 136/20 138/11 141/19 144/19 150/2 150/15 151/18 153/24 157/25
Discovery Responses [1] 31/9
discrepancy [1] 110/22
discrete [1] 157/1
discretion [1] 57/3
discuss [3] 35/24 59/5 60/1
discussed [3] 83/1 85/24 89/15
discussion [4] 46/24 59/3 74/6 86/1
discussions [1] 75/1
disingenuous [1] 10/18
Dismiss [1] 72/19
displayed [1] 114/5
dispose [1] 6/6
disprove [1] 106/10
dispute [2] 48/20 52/24
disputed [3] 52/10 53/14 57/24
disputes [2] 36/1 94/20
disrespectful [1] 23/20
distraction [2] 52/12 60/4
distribute [1] 70/4
district [23] 1/5 1/10 62/7 81/7 81/8 82/18 132/20 132/21 132/23 133/2 133/3 133/11 133/14 133/23 133/23 134/2 135/7 135/12 135/12 135/13 137/18 163/5 163/20
districts [7] 132/24 133/9 133/10 133/17 133/22 136/12 136/17
Diverse [1] 62/25
diversion [1] 60/4
DL [2] 113/5 113/5
DMV [10] 6/3 129/2 130/21 139/13 139/18 140/5 140/7 141/1 142/13 143/15
DMV's [1] 96/6
do [150] 6/13 8/1 8/25 9/2 10/1 12/5 14/4 14/24 15/1 15/18 16/12 17/15 18/15 19/9 19/9 21/12 23/21 24/1 26/5 29/15 31/15 32/5 32/6 35/9 36/22 39/12 40/17 42/20 42/25 43/6 44/21 45/13 45/20 52/8 53/20 55/12 55/13 55/21 56/5 56/15 56/18 56/22 56/24 60/18 61/6 61/11 62/22 65/6 67/11 68/17 70/24 71/13 73/6 73/8 73/20 74/20 74/21 75/12 75/13 75/19 75/19 76/18 78/9 78/12 83/21 83/22 87/2 87/2 87/3 87/4 87/6 87/21 90/4 94/13 94/17 94/19 95/9 95/12 98/1 98/8 100/12 101/5 101/5 106/22 107/4 110/17 111/13 111/16 113/5 115/17 117/7 118/13 120/18 120/25 121/13 121/25 122/2 122/3 122/8 123/25 124/7 124/15 126/16 127/20 133/12 134/7 135/15 135/15 135/16 138/7 138/22 139/7 140/14 140/16 142/1 143/24 144/6 144/15 145/25 146/8 146/24 147/7 147/18

## D

do... [27] 148/20 150/22 150/25 151/13 152/9 152/13 153/13 153/13 153/15 153/16 153/20 154/7 154/7 154/8 154/24 155/4 155/11 155/12 156/4 156/18 156/20 156/24 157/14 158/14 160/17 160/18 163/5

do it [1] 101/5

Dobney [51] 105/11 105/15 105/16 105/23 106/6 106/12 107/4 107/21 108/7 108/19 108/23 108/24 109/5 109/7 109/16 110/11 110/23 112/2 112/16 113/15 114/1 115/13 117/9 117/11 119/23 120/15 120/19 120/20 120/24 120/25 121/7 121/22 122/4 122/18 123/14 124/12 124/20 126/18 127/19 127/22 127/25 128/1 128/8 129/6 129/10 129/22 131/21 132/11 142/12 145/19 146/7

Dobney's [3] 107/19 121/18 132/7

Docket [3] 6/14 159/16 161/13

Doctrine [6] 45/24 46/7 46/21 52/16 52/23 52/25

document [14] 29/16 53/17 119/10 135/9 148/7 148/25 149/22 150/14 150/22 151/22 152/2 152/3 153/3 153/9

documentation [5] 32/14 120/23 121/8 152/17 152/21

documented [1] 75/6

documents [70] 30/23 31/15 38/11 40/25 41/3 46/9 70/3 81/24 95/12 95/20 96/21 97/11 101/18 102/5 103/7 103/10 103/11 104/1 104/2 104/7 104/8 104/21 105/6 105/7 106/5 106/12 107/11 107/25 109/16 110/2 110/24 111/1 111/2 111/4 111/5 111/13 115/15 115/23 117/15 118/11 118/25 120/20 120/24 121/11 125/12 127/12 130/8 130/19 131/11 131/24 132/20 133/21 138/16 139/14 140/12 141/9 141/14 143/16 144/5 145/16 145/20 146/1 149/16 149/21 152/20 155/7 155/9 155/13 155/13 162/2

Dodge [2] 110/10 110/12

does [30] 4/22 7/4 7/9 21/21 22/9 22/20 22/24 23/3 46/24 47/19 48/18 52/23 59/10 64/3 65/20 66/22 84/7 88/19 90/16 120/3 122/25 123/10 125/8 125/10 137/14 146/16 153/1 153/2 155/9 158/25

doesn't [53] 9/12 17/24 21/13 26/2 26/5 26/11 35/15 37/4 41/17 43/18 45/2 46/22 51/15 51/21 52/17 53/16 53/25 55/22 57/8 57/13 58/10 58/11 58/22 59/15 64/15 66/15 66/22 71/22 72/16 73/23 85/17 90/6 94/21 94/22 94/22 95/11 97/25 97/25 99/7 99/23 106/3 108/21 109/14 109/15 115/8 115/22 120/2 121/12 125/7 125/7 141/20 141/21 143/1

doing [16] 31/2 39/20 45/1 47/6 53/11 64/11 66/13 76/20 78/15 83/23 86/23 99/21 117/24 132/4 142/25 157/24

dollar [3] 82/15 82/17 84/7

don't [132] 5/13 6/20 7/14 8/1 9/16 10/11 10/20 11/2 11/3 11/7 11/8 11/16 12/6 12/14 12/18 14/11 17/10 19/12 19/16 20/2 20/4 20/21 23/19 24/1 26/11 26/23 29/22 30/3 30/3 31/23 33/16 33/21 34/25 35/9 35/23 37/17 40/12 40/22 41/7 43/13 44/17 44/23 44/25 49/25 50/22 53/21 54/8 55/13 58/16 60/18 62/11 62/13 62/14 65/1 65/5 65/18 67/1 67/7 67/8 71/3 71/10 72/8 74/5 77/16 85/23 86/3 86/4 86/5 86/21 87/7 87/13 87/13 88/18 89/6 90/7 90/17 91/15 92/19 96/9 99/5 100/14 101/1 101/4 101/25 109/11 112/3 112/22 114/7 115/7 115/12 115/18 115/24 116/1 116/2 116/7 119/5 120/4 122/11 124/4 124/5 125/5 125/19 125/21 126/10 129/21 130/16 133/16 134/19 136/18 139/22 139/24

140/19 141/20 141/22 141/24 144/1 144/14 145/2 145/11 145/15 145/22 148/5 150/3 150/14 150/18 150/23 151/3 151/17 151/23 154/4 156/15 161/7

done [48] 19/10 24/25 47/22 49/7 50/9 61/13 65/6 70/14 70/17 71/16 73/2 73/13 78/20 91/11 94/12 94/12 94/17 95/3 95/5 97/7 99/14 101/14 101/15 101/15 101/16 101/17 107/5 108/23 112/25 119/23 119/24 119/25 120/2 128/5 129/15 135/4 143/10 143/18 144/8 148/1 148/17 149/17 150/6 150/7 150/24 152/18 157/24 158/1

door [1] 59/6

double [3] 20/23 96/24 139/7

double-take [1] 96/24

doubt [4] 32/25 75/18 100/24 153/14

down [27] 8/16 9/24 13/7 14/15 38/4 57/21 58/21 59/6 60/9 66/11 68/10 70/12 75/8 80/9 86/2 87/25 89/13 107/1 116/23 118/14 119/16 120/15 120/18 121/9 125/14 126/7 141/5

drag [1] 157/7

dragged [1] 4/22

dragging [1] 14/11

Dram [1] 72/14

dramatically [1] 75/8

drive [14] 148/11 148/14 148/19 148/25 149/2 149/14 150/11 151/8 151/9 153/1 153/2 153/3 153/8 153/9

driven [1] 125/24

driver [2] 62/25 72/15

driver's [13] 113/12 114/10 115/19 116/4 116/6 116/19 124/19 124/21 125/16 125/17 125/21 126/2 127/14

drivers [1] 124/17

drives [10] 105/5 146/19 147/22 147/23 149/5 149/11 149/12 149/17 150/3 150/5

drop [3] 4/23 149/1 150/21

drum [1] 64/8

drunk [1] 72/15

dry [1] 94/21

DTPP [1] 63/14

Duces [1] 94/1

dude [1] 53/19

due [5] 109/8 113/25 116/15 116/20 139/2

during [6] 18/17 96/19 102/9 130/22 147/7 158/15

duty [2] 4/24 63/14

## E

E-mail [5] 2/7 2/15 2/22 3/7 3/13

each [14] 17/5 19/5 19/5 29/17 30/12 38/19 77/4 131/13 132/20 132/21 132/23 133/22 146/2 146/14

earlier [6] 14/2 21/8 21/10 103/9 104/19 115/9

easier [4] 80/9 118/18 127/17 139/1

easily [1] 158/21

easy [1] 153/15

editorial [2] 93/20 144/20

effect [1] 42/6

effective [1] 134/12

effort [1] 144/24

efforts [2] 138/5 138/6

egregious [1] 121/8

eight [1] 96/13

either [6] 7/22 32/25 38/19 40/10 126/7 138/4

El [1] 73/18

electronic [2] 41/3 144/19

elements [1] 8/10

else [13] 12/3 57/23 57/24 57/25 73/15 80/14 87/6 87/21 89/24 128/2 134/11 137/22

161/19

elucidation [1] 79/8

Email [4] 46/10 99/16 106/21 140/8

Emails [4] 46/15 50/12 50/15 143/19

employ [1] 131/22

employed [3] 131/13 134/7 139/16

employee [15] 46/3 46/18 46/20 47/23 48/11 48/19 48/20 49/4 50/5 51/22 53/4 66/12 104/18 123/11 141/11

employee's [1] 51/23

employees [42] 38/16 38/20 40/25 41/2 41/5 47/11 57/20 58/10 58/16 59/7 60/20 63/25 66/1 66/7 66/11 79/19 88/3 88/24 102/21 103/1 103/10 104/4 104/9 104/17 104/25 108/5 108/7 121/14 122/24 129/1 131/22 134/4 134/15 135/1 135/2 135/19 135/25 137/10 139/12 140/4 146/25 154/21

employer [2] 51/13 51/14

employers [1] 63/25

employment [2] 130/22 134/4

end [7] 24/8 32/20 40/16 66/6 97/7 145/6 145/7

ended [5] 9/14 9/17 25/8 26/1 162/3

ends [5] 25/25 26/9 26/11 26/12 117/1

Enforce [5] 74/2 74/7 77/7 90/11 101/17

enforced [1] 117/3

engage [2] 75/7 138/2

engaged [2] 134/15 138/5

engaging [1] 99/22

enough [8] 34/11 50/2 50/22 59/23 67/18 68/14 124/5 157/21

ensure [2] 128/16 129/4

enter [2] 157/5 159/14

entered [5] 13/14 58/21 95/25 116/18 128/16

enterprise [1] 70/9

enters [1] 4/1

entertain [1] 6/5

entire [7] 15/11 20/16 21/12 21/12 23/4 114/19 150/21

entirely [6] 21/15 27/5 57/16 69/15 71/15 79/7

entities [13] 46/17 50/6 51/11 53/16 57/4 59/22 61/4 89/19 94/15 97/17 97/19 97/20 104/7

entitled [18] 9/21 10/24 10/24 29/15 46/19 53/18 54/24 55/2 82/1 85/20 94/24 98/1 99/20 111/14 117/11 120/11 121/3 126/10

entity [11] 23/12 45/11 49/3 50/5 50/7 52/3 52/5 54/19 56/4 58/9 84/12

entree [1] 6/19

entries [1] 78/3

entry [6] 102/21 103/1 108/5 110/7 111/20 128/17

envelopes [2] 55/16 85/9

error [1] 44/5

essentially [4] 7/1 36/23 126/12 138/1

estimate [1] 157/9

et [1] 147/17

evaluate [2] 16/23 72/7

evaluated [1] 63/8

even [35] 7/14 9/7 10/12 11/3 20/22 21/8 25/7 25/10 25/10 26/10 39/19 46/22 51/13 51/15 52/17 57/13 59/4 59/7 62/8 62/13 64/5 66/4 66/25 71/22 80/6 87/16 95/9 109/14 111/21 111/23 116/1 143/15 145/11 149/23 150/15

event [1] 85/22

eventually [2] 35/10 67/9

ever [5] 80/6 80/6 81/19 150/16 158/21

every [29] 29/16 37/19 41/8 50/13 57/2 59/12 59/24 77/6 78/6 97/1 97/2 106/9 106/24 112/13 113/14 119/10 119/16 121/16

**E**

every... [11] 121/16 133/2 133/3 133/23 134/24 135/1 135/7 144/23 144/25 148/18 157/9

everybody [4] 34/3 132/5 144/21 162/2

everyone [3] 45/1 71/4 134/10

everything [11] 44/23 46/11 53/10 56/8 57/5 64/6 91/3 91/3 102/14 115/17 117/11

evidence [71] 7/14 8/3 9/20 9/21 10/2 10/18 11/14 11/24 14/20 17/24 18/13 19/12 21/5 26/25 27/11 27/12 27/19 27/20 29/24 30/2 30/3 30/19 30/20 30/22 31/5 31/7 32/7 37/16 37/19 39/1 39/20 41/19 43/18 43/20 45/13 46/19 54/22 55/23 56/5 56/7 56/22 56/24 57/25 67/2 71/24 73/24 82/6 82/7 82/18 86/8 94/14 102/19 106/24 107/4 109/5 114/2 115/2 117/18 118/22 119/12 119/15 119/21 119/22 125/13 129/15 129/17 135/9 136/4 138/11 147/10 163/7

evidencing [2] 130/9 130/20

exact [2] 105/22 113/25

exactly [13] 26/24 65/5 70/11 73/5 82/15 84/2 86/11 95/6 99/7 123/22 124/2 124/4 124/19

examine [1] 122/18

example [5] 67/16 72/14 96/17 109/4 143/3

examples [1] 144/2

Excel [1] 148/18

except [8] 5/23 20/10 44/1 60/10 64/13 75/23 119/3 137/10

exception [1] 147/3

excerpts [1] 59/2

exchange [2] 30/12 31/14

excuse [4] 70/23 73/20 103/17 118/23

excused [1] 63/9

exemplar [1] 16/20

exemplars [2] 35/5 35/6

exercise [3] 63/20 127/9 127/11

exercised [1] 90/7

exhibit [11] 12/13 54/3 118/10 118/13 118/17 130/25 131/4 131/5 139/4 139/6 139/7

exhibits [4] 59/1 83/16 118/11 163/12

exist [2] 51/15 71/3

existing [4] 116/13 122/21 122/23 149/25

exists [1] 125/12

expand [3] 23/6 132/8 144/22

expanded [2] 20/15 104/25

expanding [1] 144/16

expansion [1] 134/3

expect [3] 21/9 106/15 116/3

expedition [2] 97/24 98/1

expense [1] 43/5

expert [6] 12/1 14/7 25/1 25/2 36/15 43/10

experts [2] 29/15 157/21

Expiration [1] 163/22

explain [4] 77/19 142/8 142/19 143/9

explained [4] 68/21 78/5 83/10 118/23

explanation [2] 8/15 64/20

exploding [1] 144/19

explore [2] 46/10 46/12

expressed [1] 6/21

extend [2] 4/21 129/12

extensive [2] 128/10 132/4

extent [9] 18/25 23/22 41/25 92/14 108/12 110/15 119/9 140/11 142/10

extra [1] 161/11

extraordinary [1] 153/25

extremely [2] 19/2 109/19

**F**

face [5] 35/12 66/17 66/20 84/22 149/23

fact [23] 7/22 22/3 26/5 39/1 51/12 51/14 52/22 66/11 66/11 67/24 78/5 92/13 95/25 99/22 104/15 109/23 115/7 115/12 117/20 121/12 121/14 129/17 134/15

factor [1] 157/19

factors [2] 11/4 11/5

facts [10] 48/16 52/23 55/14 67/1 67/2 73/10 73/12 96/19 96/23 135/17

factual [2] 64/17 65/2

failed [3] 63/19 79/7 79/8

failure [2] 90/14 90/18

failures [1] 90/13

fair [7] 15/8 33/5 57/18 57/19 59/23 144/25 145/15

fairly [2] 33/7 102/7

faith [4] 22/14 60/2 78/20 144/24

fall [2] 25/20 94/17

false [4] 16/14 47/16 80/8 98/16

familiar [1] 140/25

fan [1] 72/10

Fannin [1] 2/4

far [15] 7/14 11/1 23/16 37/3 67/3 69/15 69/25 90/1 92/16 116/24 117/20 134/21 142/16 157/8 160/22

fashion [2] 7/23 7/23

faulty [1] 21/18

Fax [5] 2/6 2/14 2/22 3/6 3/13

February [1] 33/9

federal [4] 30/22 71/8 73/8 132/6

fee [7] 31/7 31/16 31/21 32/2 32/6 32/14 32/15

feel [2] 8/7 154/5

feeling [2] 25/16 125/20

fees [12] 8/3 8/17 8/17 9/23 10/10 10/10 15/17 31/10 31/18 34/7 85/5 152/15

Felix [1] 150/11

few [7] 16/20 41/13 74/22 77/18 93/1 109/23 124/2

Fiance [1] 4/2

fiduciary [1] 4/24

field [1] 38/21

fields [1] 77/20

Fifth [1] 103/24

fight [2] 68/9 91/3

figure [5] 93/12 119/19 124/5 124/21 149/24

filched [3] 22/4 23/9 23/12

file [6] 8/7 40/11 58/17 91/4 101/1 140/22

filed [25] 5/9 5/11 5/16 5/17 5/19 5/20 5/21 44/10 45/25 58/13 60/8 74/16 93/16 93/19 96/24 97/18 101/25 102/4 108/3 113/23 138/17 138/18 148/15 149/18 157/19

files [6] 16/11 17/16 39/18 40/21 41/4 42/1

filing [4] 90/10 98/11 108/15 161/6

filings [1] 51/10

filled [1] 113/5

filling [1] 64/13

finalized [1] 18/10

finally [3] 10/12 76/11 115/17

FINANCE [34] 1/9 1/9 1/10 4/3 45/8 46/3 47/2 47/5 47/23 48/9 48/10 48/25 51/4 51/22 51/24 53/3 53/4 53/6 53/9 53/18 54/19 54/23 54/23 55/4 55/6 55/8 55/9 56/10 59/18 59/20 59/21 79/19 89/17 104/8

Finance's [1] 51/23

financial [5] 1/5 1/6 12/15 13/25 47/17

find [21] 9/3 34/1 42/1 53/22 63/19 68/7 93/18 94/13 94/24 95/5 99/5 125/15 126/7 127/15 135/18 135/20 135/25 136/8 136/11 148/13 148/16

finding [1] 106/3

fine [7] 11/5 32/12 32/22 33/20 42/15 89/20 100/20

finger [1] 132/19

finish [1] 34/6

finishing [1] 41/16

firm [4] 97/19 153/17 154/6 158/4

first [52] 4/5 6/5 6/10 6/10 6/16 19/7 19/23 21/4 21/11 21/11 22/20 23/1 23/2 23/8 23/13 24/14 24/19 24/23 39/13 39/15 47/4 48/24 55/13 56/23 77/15 78/12 80/6 80/15 82/6 82/8 82/10 82/14 98/17 101/13 101/15 105/23 107/18 112/24 113/3 114/6 116/11 118/9 118/19 123/1 123/13 127/9 131/1 150/10 150/16 159/16 161/6 161/6

first-hand [1] 55/13

firsthand [4] 55/21 55/25 56/1 56/1

fish [1] 158/24

fishing [4] 97/24 98/1 118/3 118/5

fit [2] 64/9 75/2

fits [2] 19/13 19/18

five [7] 74/16 96/11 101/5 101/5 114/19 116/2 136/17

fix [1] 78/1

flat [2] 53/2 54/15

flattest [2] 53/2 54/15

flier [5] 81/10 81/17 81/19 81/21 86/20

fliers [11] 79/22 80/17 81/8 82/6 82/8 82/19 83/6 83/7 83/14 85/2 88/4

flip [1] 6/15

flipped [4] 27/10 27/12 27/19 27/21

flips [1] 21/4

floor [2] 2/13 33/12

flyer [1] 81/11

folk's [1] 140/8

folks [21] 61/14 61/16 61/19 62/11 64/7 64/9 64/18 65/8 68/18 69/21 93/6 96/15 97/18 105/11 107/2 116/5 117/6 142/4 143/18 149/9 156/15

folks' [1] 106/21

followed [1] 67/18

following [3] 1/17 84/25 113/6

follows [1] 47/3

Foor [1] 163/21

foot [1] 14/11

forced [1] 60/8

Ford [2] 57/19 109/17

foregoing [2] 106/16 163/6

foreseeable [1] 73/19

forget [1] 46/16

forgot [1] 161/4

form [3] 18/7 30/4 39/7

format [1] 39/7

formed [1] 104/5

former [5] 63/25 82/18 134/14 135/19 135/25

forth [5] 6/15 24/24 25/8 42/21 57/6

fortunately [1] 84/18

forward [8] 6/9 24/4 71/24 75/5 102/8 102/18 128/24 132/15

fought [2] 50/10 85/4

found [18] 41/12 49/16 54/1 61/20 70/6 77/17 98/13 99/6 99/6 114/3 125/11 134/17 135/12 135/17 148/19 148/25 149/20 150/7

four [23] 6/6 52/24 93/10 93/11 102/24 103/10 104/4 104/13 108/7 114/13 116/2 121/4 121/6 121/7 139/15 140/4 142/4 143/18 147/5 156/10 158/16 158/18 160/22

four-for-one [1] 93/10

frame [4] 32/22 111/22 128/15 129/7

frankly [1] 100/12

FRENCH [2] 2/12 2/19

frequent [1] 108/8

frequently [1] 38/21

Friday [3] 90/12 92/3 148/5

friends [1] 72/11

front [10] 6/10 21/23 53/21 59/24 74/25 86/7 91/24 98/17 129/25 152/3

## F

**fruitful [1]** 35/24
**frustrated [3]** 8/25 43/20 92/2
**frustrating [1]** 44/21
**frustration [1]** 92/1
**full [6]** 6/21 64/20 68/20 79/20 111/21 129/22
**FUNDING [4]** 1/7 113/19 123/9 124/7
**funds [1]** 41/12
**further [9]** 11/10 21/2 46/11 47/18 89/17 120/23 141/14 163/11 163/14
**future [2]** 31/2 138/12

## G

**GA [1]** 2/10
**game [2]** 5/7 49/21
**gamesmanship [1]** 152/2
**GANNAWAY [54]** 3/3 4/16 4/17 12/17 15/25 16/15 17/13 17/24 17/25 18/19 19/4 34/25 36/12 39/17 44/4 46/2 54/13 70/6 73/9 75/1 76/11 76/24 81/25 82/4 82/21 83/18 86/14 88/9 89/16 90/14 91/14 94/19 95/7 99/4 103/9 105/9 106/4 108/22 109/2 111/1 112/11 119/20 116/3 121/2 127/5 128/4 135/14 136/4 150/8 150/25 153/14 154/3 160/13 161/14
**Gannaway's [5]** 46/15 84/15 85/16 120/16 120/21
**Garcia [5]** 4/21 5/3 5/4 73/17 160/25
**Gates [1]** 59/10
**gave [12]** 7/2 16/20 68/20 69/8 70/11 75/7 77/12 77/12 78/12 82/10 109/4 129/18
**gee [1]** 71/1
**general [17]** 8/5 8/12 10/6 14/3 14/17 47/2 47/5 47/9 47/17 48/1 48/3 49/2 58/9 94/4 141/19 143/11 145/17
**generally [1]** 31/3
**generate [3]** 93/7 97/10 98/7
**generated [3]** 78/3 83/13 108/3
**gentleman [3]** 109/4 109/10 123/23
**GEOFF [8]** 3/3 4/17 17/24 17/25 70/11 82/2 94/19 94/21
**Geoff's [1]** 69/3
**geographic [1]** 133/21
**Georgia [13]** 2/13 82/1 82/1 82/2 82/13 84/12 84/14 85/13 86/4 92/5 92/6 97/19 156/5
**get [52]** 4/6 6/12 10/22 15/19 18/10 18/12 19/3 21/8 21/8 24/12 28/25 35/23 38/5 41/14 46/11 52/12 55/10 55/23 57/25 59/6 59/7 59/10 64/8 66/4 66/18 77/18 90/9 91/21 94/19 97/21 99/8 104/8 111/13 115/23 119/3 120/19 121/8 122/1 124/18 126/11 132/18 132/19 135/20 137/2 138/1 144/17 150/3 150/5 152/11 160/16 161/11 162/2
**gets [3]** 40/22 158/1 158/17
**getting [11]** 7/10 19/1 55/11 55/16 63/10 91/4 91/17 92/21 112/7 121/11 157/23
**Ggannaway [1]** 3/7
**Gilstrap [1]** 159/24
**give [30]** 10/7 13/12 16/11 21/14 30/3 30/3 30/8 41/24 60/14 61/1 72/14 90/14 109/3 112/5 115/22 134/9 134/19 136/18 138/17 141/5 143/2 144/2 149/2 149/4 151/3 151/9 151/11 151/23 152/4 158/21
**given [9]** 44/7 62/24 74/15 80/11 81/24 87/8 104/12 151/3 152/16
**gives [2]** 98/3 158/12
**giving [2]** 63/23 157/21
**glad [1]** 30/8
**go [69]** 6/14 7/21 8/24 12/17 13/2 14/15 16/11 17/16 18/13 22/21 23/16 32/16 34/17 35/18 39/17 40/9 40/20 41/14 43/12 50/18 57/23 57/24 57/25 59/10 63/21 68/6 71/13 74/4 75/11 79/18 82/9 83/10 91/12 92/13 92/20 94/13 95/22 97/4 102/15 106/9 106/20 111/5 115/22 117/4 119/3 120/15 120/18 121/2 121/4 124/3 124/13 124/14 125/14 126/7 126/17 127/9 135/24 137/11 138/23 139/24 141/4 141/4 141/5 142/16 143/5 151/25 153/17 155/12 157/13
**goals [2]** 138/6 142/14
**GOEBELSMANN [2]** 2/18 4/9
**goes [14]** 18/6 21/1 21/8 35/2 39/2 56/3 56/23 75/15 75/16 85/9 102/19 156/3 157/10 157/11
**going [166]**
**gone [2]** 67/3 152/16
**good [8]** 22/14 33/6 33/22 59/13 60/2 60/21 135/4 144/24
**good-faith [1]** 144/24
**goodness [1]** 18/1
**Google [1]** 153/8
**goose [1]** 24/15
**Gordon [3]** 67/21 113/14 113/16
**Gordon's [1]** 69/8
**gosh [3]** 55/15 71/19 75/21
**got [45]** 4/22 12/18 13/10 14/14 16/3 16/7 16/24 17/22 17/23 23/5 25/12 26/9 27/9 27/21 31/1 32/23 34/24 35/1 35/4 36/1 41/18 49/21 53/11 57/8 58/7 68/3 68/4 68/8 68/12 75/20 79/13 80/12 82/12 82/13 90/7 98/12 109/21 110/11 113/9 119/13 122/5 135/3 150/11 152/6 158/6
**gotten [5]** 95/4 104/11 104/20 115/15 138/15
**Grajeda [1]** 149/6
**grant [5]** 73/22 158/7 158/20 159/11 159/15
**granting [1]** 100/16
**great [1]** 13/6
**GREENBERG [1]** 3/10
**groan [1]** 159/17
**ground [1]** 6/20
**grunt [1]** 159/17
**gtlaw.com [1]** 3/13
**guess [9]** 5/22 11/10 24/11 68/8 68/10 74/9 97/19 151/18 161/25
**guessed [1]** 124/20
**guessing [1]** 17/15
**Guru [3]** 93/13 96/18 96/25
**gut [1]** 125/20
**guy [22]** 46/8 46/18 48/19 49/3 51/24 53/19 53/22 54/24 54/25 54/25 55/11 56/4 56/8 56/12 57/2 57/15 57/20 58/16 58/17 59/20 153/17 154/6
**guys [4]** 23/20 47/6 119/16 154/5

## H

**habeas [1]** 159/23
**had [82]** 4/23 4/24 6/19 6/20 6/22 6/22 8/8 8/14 8/23 13/16 16/13 19/11 19/22 19/23 20/4 20/5 20/6 20/6 20/16 21/22 22/15 23/6 24/6 25/14 33/18 33/23 41/3 42/25 49/8 50/20 55/25 58/19 60/1 65/7 66/7 68/8 68/19 68/24 70/5 70/14 71/1 71/13 71/16 75/1 78/7 78/9 81/25 82/25 85/6 88/21 88/22 89/8 89/18 92/24 103/17 103/20 104/5 104/6 105/25 109/6 109/12 110/9 118/23 121/10 121/10 122/4 128/14 132/16 134/14 135/23 139/7 142/17 148/1 148/8 148/15 148/17 149/11 150/14 152/11 152/13 161/7 161/24
**hadn't [3]** 70/5 73/2 96/25
**Haegen [1]** 40/7
**hair [1]** 41/14
**Hale [4]** 148/9 148/21 149/14 150/19
**Hale's [2]** 149/1 151/22
**half [1]** 156/11
**Halloween [1]** 93/19
**hampered [1]** 78/5
**Hancock [1]** 160/25
**hand [4]** 27/7 55/13 135/14 139/3
**handed [5]** 12/24 16/1 112/23 123/23 135/20
**handful [4]** 92/2 94/15 96/5 96/8
**handing [1]** 81/24
**handout [4]** 114/6 118/8 118/15 132/17
**hands [4]** 56/11 57/5 108/1 108/10
**happen [2]** 57/9 111/16
**happened [6]** 84/17 89/6 109/14 116/1 117/22 153/15
**happening [1]** 48/16
**happens [7]** 6/9 34/14 49/23 53/16 56/8 91/14 113/25
**happy [6]** 74/22 89/10 89/11 121/4 131/20 161/10
**harassing [1]** 39/22
**harassment [1]** 50/3
**hard [26]** 23/8 105/5 136/2 146/19 147/22 147/23 148/11 148/14 148/18 148/24 149/1 149/5 149/11 149/12 149/14 149/17 150/3 150/5 150/11 151/8 151/8 153/1 153/2 153/3 153/7 153/9
**harm [19]** 61/8 62/4 65/23 65/25 65/25 66/6 66/15 66/17 66/22 67/7 67/10 68/18 69/7 69/16 69/23 70/1 72/1 72/25 72/25
**harmed [2]** 37/20 69/6
**harming [1]** 157/11
**HARRIS [5]** 1/8 1/19 163/2 163/5 163/20
**has [106]** 5/16 5/17 7/10 7/22 8/11 9/4 11/2 11/15 11/18 13/5 13/20 17/17 17/20 17/22 24/20 26/22 27/1 27/20 35/16 36/1 37/11 38/17 38/24 39/20 40/1 42/20 44/5 45/14 45/22 46/2 46/3 46/9 47/20 50/13 50/25 51/22 52/8 52/8 52/15 53/4 53/6 53/6 53/19 56/10 56/24 57/5 59/8 59/8 59/12 63/24 64/12 65/7 65/12 69/13 69/14 70/9 71/13 71/23 74/25 75/9 76/8 77/7 78/9 78/10 78/11 78/22 87/20 89/4 89/24 94/9 96/18 96/18 96/22 97/2 97/3 97/10 99/1 99/4 99/19 105/24 106/6 107/5 107/14 108/1 108/1 108/14 108/15 113/4 113/5 116/24 117/3 117/21 121/1 123/24 131/13 132/5 134/21 135/11 137/9 142/3 144/4 149/13 150/23 154/6 157/17 157/18
**hasn't [2]** 62/24 156/14
**hate [1]** 115/16
**have [415]**
**haven't [22]** 18/4 37/19 41/20 43/2 51/1 52/10 53/14 69/25 80/20 97/16 102/6 104/20 105/5 113/10 115/11 115/14 115/14 132/25 133/14 133/19 142/6 149/17
**having [8]** 29/12 30/11 30/12 43/20 59/2 63/9 68/13 111/19
**he [93]** 4/22 4/24 13/19 17/13 17/14 17/15 17/17 17/22 17/24 22/2 22/20 30/14 35/15 35/16 40/20 46/8 46/16 46/17 47/23 49/3 50/4 50/4 50/7 50/19 50/21 52/8 53/15 53/15 53/19 55/22 55/25 56/5 57/3 57/5 57/22 58/16 58/20 59/4 59/8 59/9 59/11 70/12 70/12 71/11 71/13 71/15 71/23 75/2 75/2 76/9 83/3 83/4 84/4 84/16 84/20 85/3 85/17 87/25 88/9 88/11 88/12 89/4 89/11 90/15 90/16 91/10 99/7 99/22 103/20 103/20 103/22 103/23 108/14 108/14 108/15 109/6 109/6 109/12 110/2 114/4 114/6 116/18 123/25 135/8 136/23 148/12 148/21 150/10 150/20 150/23 153/14 153/15 161/5
**he's [40]** 17/18 17/22 17/23 19/22 24/22 39/12 40/17 46/16 46/18 46/18 48/10 48/19

1062

**H**

he's... [28] 48/19 48/20 48/21 48/21 50/15 51/1 52/5 53/22 53/22 56/4 57/10 58/17 70/13 70/13 71/1 71/21 74/21 74/25 76/20 85/17 85/18 85/25 99/24 100/2 120/16 120/22 135/8 161/6
heading [1] 114/6
heads [1] 117/5
hear [5] 8/24 88/9 108/23 135/21 135/25
heard [14] 20/24 28/10 28/12 29/12 47/6 50/7 61/15 95/1 96/25 108/22 109/6 115/3 141/19 159/17
hearing [24] 1/14 6/10 8/22 18/18 21/23 25/24 26/24 36/2 49/8 49/15 50/20 60/8 79/12 82/25 84/17 88/2 89/5 89/15 92/25 100/25 105/4 107/15 110/2 162/3
hearings [4] 25/7 85/6 89/8 105/13
Heather [1] 114/18
heavy [1] 51/1
held [2] 1/18 1/19
help [3] 126/13 141/20 141/21
helpful [1] 157/23
her [22] 51/13 51/13 51/14 109/24 110/24 111/2 111/7 111/14 111/15 115/16 116/13 121/9 121/19 121/19 122/19 126/21 128/8 129/25 131/23 147/6 147/7 160/16
here [105] 4/19 6/15 12/7 12/23 13/23 13/24 14/16 15/11 18/12 21/3 21/5 23/20 23/22 25/13 25/25 25/25 26/1 26/21 29/20 31/2 32/24 36/24 38/23 39/10 43/24 45/24 46/25 48/20 49/5 50/10 51/17 51/24 52/14 52/14 53/2 54/14 54/25 57/15 62/24 63/18 64/18 68/16 68/17 68/24 69/14 69/17 70/1 71/2 71/10 71/20 72/8 72/19 72/20 74/9 74/10 74/22 78/21 82/3 83/10 84/13 84/20 84/22 85/5 85/10 87/1 90/6 90/8 90/19 91/7 95/13 96/3 97/16 99/16 99/22 101/7 102/13 102/14 110/20 113/8 115/24 116/17 118/3 118/5 119/7 124/17 126/19 126/24 128/6 128/25 129/24 132/19 135/5 135/18 141/18 146/3 146/5 154/3 156/24 158/10 158/11 158/15 158/17 159/22 160/3 161/5
here's [5] 51/8 55/12 55/12 72/23 96/17
hereby [1] 163/5
Hernandez [1] 103/19
hey [7] 10/2 14/4 30/15 40/20 55/13 135/15 135/20
hide [1] 145/2
higher [3] 101/19 104/9 136/1
higher-level [1] 104/9
highjacked [1] 29/6
him [36] 28/10 30/15 30/15 33/16 35/17 35/18 46/16 50/2 50/8 50/11 51/12 52/6 52/7 53/22 53/24 55/2 55/22 65/19 65/19 68/9 68/10 68/12 76/17 85/18 90/14 94/20 103/23 106/5 108/13 114/3 116/17 116/19 116/19 144/22 148/22 160/5
hired [1] 35/16
his [36] 17/17 24/22 46/9 46/10 46/15 50/15 55/19 56/11 56/14 57/2 57/2 57/5 70/16 71/1 71/11 71/11 71/20 84/20 84/22 100/6 107/15 107/17 108/1 108/14 113/24 116/15 116/18 116/20 123/24 124/2 130/22 148/15 150/11 153/17 153/17 156/15
history [2] 63/13 134/4
hit [1] 94/21
hold [19] 11/20 13/17 23/19 34/6 35/3 36/16 36/16 40/24 63/13 65/17 67/6 67/6 75/24 101/14 121/21 130/13 132/4 132/23 140/1
holder [4] 108/11 113/18 123/8 150/13
holders [3] 98/14 109/24 120/1
holding [2] 45/11 101/16

HOLDINGS [1] 1/9
hole [1] 94/22
home [3] 68/5 68/7 70/11
Homes [1] 150/5
honestly [2] 35/15 43/11
Honor [476]
Honor's [12] 23/16 30/17 50/10 78/1 80/3 84/22 85/17 91/5 92/1 151/13 156/6 159/5
Honorable [1] 1/19
hope [1] 34/23
hopefully [1] 93/11
hot [1] 158/17
hours [1] 161/25
Houston [7] 1/19 2/5 3/5 3/12 72/11 92/4 163/21
how [44] 9/23 9/25 10/23 14/4 16/12 17/2 28/1 28/11 28/19 29/12 30/19 31/5 32/6 37/24 51/16 53/21 56/15 56/18 63/23 67/17 86/16 95/16 96/10 98/6 100/5 109/11 109/21 110/17 112/12 114/5 115/25 122/25 123/10 124/7 126/1 132/23 136/7 136/12 146/1 153/13 154/9 155/14 157/18 158/1
however [4] 5/25 29/15 89/18 115/21
huh [1] 81/16
hurl [1] 65/21
hurt [1] 63/11

**I**

I'd [3] 42/22 70/17 159/23
I'll [4] 6/13 73/1 118/18 132/19
I'm [83] 10/17 12/6 12/13 12/14 12/20 15/25 16/5 16/16 17/19 22/23 23/7 23/21 26/15 38/1 38/23 42/3 43/3 43/24 44/19 53/18 53/20 54/20 54/24 55/2 56/2 57/8 57/8 57/13 58/12 64/16 69/25 70/6 71/11 72/10 73/22 79/6 79/17 81/21 85/13 88/9 91/2 91/6 91/8 91/17 92/2 92/14 93/12 93/18 98/5 102/13 102/23 114/15 119/8 119/21 123/5 124/5 125/23 130/13 130/15 130/23 131/6 131/8 132/18 137/6 138/13 140/7 140/25 144/11 144/20 148/4 149/3 152/3 153/17 154/2 156/13 158/25 159/4 159/5 160/14 160/16 161/2 161/20 161/23
I've [22] 9/24 12/18 12/24 21/22 46/5 50/13 50/14 58/17 62/6 62/23 63/22 74/10 74/16 78/5 81/24 87/15 89/8 95/1 128/7 150/1 153/1 158/6
Ida [1] 114/18
idea [4] 41/24 59/13 136/14 156/23
identical [2] 36/20 82/16
identifiable [1] 39/14
identification [1] 104/24
identified [10] 78/13 78/13 80/2 96/18 96/22 99/17 99/19 104/14 132/21 132/24
identifies [1] 23/25
identify [24] 4/5 17/5 18/12 23/7 23/8 24/23 40/13 72/21 79/19 79/25 80/5 83/11 86/16 87/2 88/3 88/6 88/8 94/10 105/2 116/12 132/20 133/21 134/7 134/8
identifying [3] 83/24 136/2 137/10
identity [4] 22/9 22/16 40/4 132/23
if evidence [1] 43/18
ignorance [3] 70/23 71/5 159/1
ignore [1] 59/1
illegal [20] 25/10 26/3 40/19 47/6 68/19 70/14 70/17 71/2 71/16 97/6 98/18 100/10 104/5 111/7 112/25 113/20 118/1 133/13 135/4 135/15
imaged [1] 36/23
immune [1] 62/9
impact [1] 94/22
impacts [1] 68/23
impeach [1] 43/10

impermissible [1] 118/1
implicated [1] 135/10
important [4] 58/20 126/8 137/3 143/21
importantly [1] 116/12
impossible [1] 26/22
impressed [1] 161/21
improper [5] 47/14 107/5 125/18 127/10 132/6
improperly [1] 69/13
inapplicable [1] 69/15
inappropriate [4] 43/11 43/14 66/14 152/5
INC [5] 1/9 1/10 1/10 79/20 79/20
incentive [1] 138/2
inclined [1] 158/7
include [10] 8/10 20/16 20/17 25/14 25/17 62/8 106/14 111/2 129/5 144/23
included [1] 163/8
includes [3] 29/16 128/16 129/10
including [6] 7/12 96/6 131/12 139/17 141/10 153/4
incomplete [1] 20/25
Incorporated [1] 96/18
incorrect [3] 27/2 72/8 121/9
incorrectly [1] 17/5
increase [1] 129/7
incremental [1] 7/21
incur [1] 121/10
incurred [1] 32/9
independent [1] 43/22
indicate [1] 155/9
indicated [6] 8/15 14/5 40/1 74/15 114/8 145/20
indicates [2] 108/24 152/22
indicating [1] 8/16
indication [4] 123/19 124/17 133/5 156/18
indicative [1] 112/12
individual [15] 11/2 19/2 24/19 48/13 50/23 99/16 99/17 99/18 101/23 103/19 110/9 110/20 117/25 121/11 129/22
individuals [19] 22/17 29/17 35/7 40/9 59/2 68/4 81/20 88/7 105/2 105/5 111/19 111/20 112/4 119/11 129/6 130/11 131/23 139/16 142/7
Industrial [1] 58/14
industry [4] 56/9 56/13 56/17 75/21
inevitably [1] 31/17
infancy [1] 75/15
infinitesimal [1] 136/9
information [142] 8/2 8/20 12/4 12/7 12/15 13/15 13/16 13/21 13/24 14/8 14/11 14/12 14/13 14/21 14/24 15/1 15/7 15/7 15/18 15/18 17/3 18/6 18/9 18/9 20/11 20/14 20/16 20/17 20/21 21/1 21/9 24/1 24/21 25/2 25/18 27/21 31/16 31/21 32/2 32/15 36/19 37/5 37/10 37/13 37/15 37/17 38/2 38/5 39/11 39/23 40/15 41/18 43/4 43/5 43/8 43/9 44/14 47/14 49/25 50/2 50/22 52/9 52/15 53/13 54/18 56/25 60/3 60/6 60/7 63/3 63/4 63/10 63/15 63/20 64/25 67/12 68/8 68/14 69/5 69/8 69/20 70/10 73/13 76/6 76/8 80/4 85/8 91/17 91/22 94/7 96/6 97/12 104/8 104/12 104/16 104/17 105/1 105/16 106/17 106/18 106/20 107/18 108/13 111/17 111/24 112/6 112/7 113/19 115/6 119/2 119/4 119/6 119/8 120/5 120/13 120/23 121/3 122/17 122/20 123/10 124/6 125/22 126/11 126/12 126/17 127/1 127/7 127/15 127/18 128/7 133/25 134/19 135/14 136/21 137/24 137/25 142/6 142/23 147/17 149/24 150/6 157/6
infringement [1] 59/11
initial [5] 6/24 7/23 9/1 9/10 161/9
initially [1] 22/10
Injunction [10] 95/25 98/19 102/3 102/22

**I**

Injunction... [6] 103/1 108/6 113/1 113/21 117/5 118/2
ink [2] 16/21 35/11
inquired [3] 83/17 83/18 84/1
inquiry [1] 157/8
instance [8] 59/14 61/17 78/12 117/15 119/17 122/25 136/16 143/2
instances [4] 77/24 109/24 111/11 111/11
instructed [1] 80/15
instruction [1] 78/7
instructive [1] 75/13
instrumental [1] 80/4
insurance [3] 64/23 64/25 65/1
insurers [1] 64/25
INTEGRITY [56] 1/7 95/5 98/14 99/7 99/10 99/21 105/21 105/25 106/1 106/3 106/9 108/11 109/9 109/10 109/12 109/20 109/24 111/25 113/19 117/10 117/19 119/22 119/22 120/1 122/1 122/9 122/16 122/16 122/20 122/21 123/9 123/15 123/21 123/24 124/7 124/14 124/22 124/23 124/24 125/4 125/6 132/3 141/12 141/15 142/13 143/13 143/17 148/13 149/20 150/13 152/24 154/19 154/19 154/22 154/23 155/8
intend [2] 14/24 100/19
intent [1] 43/19
interest [3] 8/17 10/9 15/17
interested [4] 83/9 84/5 120/8 137/25
interesting [8] 8/13 31/17 49/13 49/14 49/23 53/25 100/25 150/25
interfaces [2] 61/17 65/5
interfered [6] 8/4 16/22 17/6 17/25 19/6 19/8
interference [1] 16/24
interject [2] 69/10 92/17
internally [1] 77/17
International [1] 67/22
interpreted [1] 91/19
Interrogatories [1] 18/22
Interrogatory [4] 18/23 84/9 87/16 88/16
interrupt [1] 139/22
interrupting [2] 23/20 114/22
interruptions [1] 23/21
interview [1] 137/11
intuitively [1] 124/20
invective [1] 66/25
invectives [1] 65/21
investigate [5] 104/3 104/13 120/9 120/11 126/18
investigated [1] 77/17
investigating [2] 111/7 111/8
investigation [1] 78/14
Investigations [1] 93/13
invoices [2] 31/10 32/19
involve [1] 139/22
involved [14] 38/6 68/4 79/21 80/11 80/17 84/14 88/3 88/7 97/8 104/4 105/2 117/18 134/8 152/2
involvement [1] 111/7
involving [2] 87/11 141/2
irrelevant [4] 10/20 37/5 93/8 105/19
is [585]
is correct [1] 26/17
Ishmael [1] 103/19
isn't [10] 12/20 30/21 37/15 37/19 39/19 57/19 72/20 74/19 123/19 153/22
issue [45] 6/4 6/22 7/9 10/14 12/23 13/1 13/3 16/6 16/8 18/19 33/1 35/2 35/12 36/24 42/20 46/17 49/9 63/21 65/2 78/11 78/13 78/13 82/25 93/1 93/9 98/10 102/23 103/23 105/3 112/24 124/11 126/14 128/25 131/21

132/16 138/12 140/4 141/19 147/23 148/3 149/1 149/19 151/8 151/9 151/10
issued [4] 32/20 42/22 93/16 104/25
issues [14] 5/14 12/19 21/3 41/11 42/9 44/24 49/22 77/6 92/23 93/17 97/10 97/23 104/23 148/18
it [410]
It'll [1] 132/18
it's [132] 7/9 8/23 10/9 10/9 10/10 11/6 14/3 14/5 15/8 18/8 18/8 19/18 19/25 20/22 28/1 28/15 35/19 35/24 37/16 37/21 39/22 39/24 41/3 41/22 41/22 44/15 44/15 44/17 44/18 44/20 45/2 46/22 49/1 51/16 53/8 53/25 54/1 54/4 54/6 54/8 54/22 55/2 55/6 55/8 55/23 56/17 58/8 58/9 58/22 59/14 59/15 59/17 60/20 60/20 63/1 72/23 73/23 74/20 75/12 75/24 76/7 78/10 79/11 82/7 82/16 86/12 86/23 86/25 87/2 90/12 90/12 91/2 91/3 92/21 92/22 94/23 95/11 96/5 96/8 96/9 98/9 102/7 106/4 106/5 107/1 107/21 108/4 109/9 113/8 113/11 114/20 115/19 115/19 116/23 117/8 119/4 119/4 119/19 121/6 121/13 121/25 123/14 124/4 128/4 128/5 129/12 130/1 130/2 131/4 134/12 134/21 136/9 139/1 139/24 140/19 142/9 142/22 144/20 145/15 146/11 146/11 149/3 150/7 150/12 151/16 151/18 153/6 153/8 156/4 156/23 157/1
it's the [1] 8/23
item [2] 15/21 31/6
items [11] 8/5 42/24 81/5 83/24 90/23 126/14 127/6 138/19 138/20 138/22 140/20
its [7] 7/23 39/7 44/5 47/20 47/21 54/19 149/23
itself [1] 93/21

**J**

James [5] 131/2 131/6 131/13 131/14 132/1
January [1] 158/6
jive [1] 103/17
job [2] 79/21 88/3
Joe [3] 4/12 4/15 20/24
JOHN [1] 2/3
JOHNSON [28] 2/3 4/7 4/8 4/20 15/14 16/16 16/18 23/5 28/3 29/12 30/16 37/3 74/4 74/20 74/25 83/1 84/4 84/8 84/10 84/16 90/14 95/10 100/6 135/23 140/15 154/4 160/11 161/14
JOSEPH [1] 2/10
jozmer [1] 2/22
judge [22] 1/19 4/1 7/5 7/6 21/23 23/10 24/18 24/20 26/20 35/14 35/19 42/18 60/16 70/8 76/8 76/14 101/9 156/15 156/25 157/8 157/16 159/24
Judge's [1] 156/21
JUDICIAL [2] 1/10 35/17
July [12] 14/10 20/15 75/16 79/12 89/15 102/24 107/15 108/3 109/7 113/24 159/1 159/2
July 17th [1] 102/24
July 18th [3] 79/12 89/15 107/15
July 23 [1] 109/7
July 24th [1] 113/24
July/September [1] 75/16
jump [1] 11/16
jumping [4] 8/23 14/2 22/7 66/23
jumping-off [1] 8/23
jumps [1] 84/16
June [20] 21/23 24/4 37/19 103/2 117/1 132/22 158/8 158/9 158/12 158/20 159/2 159/11 159/12 159/16 159/16 159/17 159/18 159/25 160/2 160/18
June 13th [1] 37/19

June 15th [2] 159/25 160/18
June 2013 [3] 103/2 117/1 132/22
jurisdiction [1] 62/9
jury [16] 15/3 17/9 53/18 53/21 54/20 55/11 55/24 56/2 63/19 64/17 65/18 66/23 69/19 84/12 84/13 138/1
just [112] 4/4 4/23 6/14 9/24 10/3 10/14 11/8 11/20 13/17 13/23 14/13 14/19 15/4 15/16 15/19 16/1 17/13 18/2 21/22 25/24 26/1 26/20 29/20 31/13 32/19 34/3 35/7 35/9 35/25 38/6 39/14 40/22 40/24 43/4 43/6 45/1 47/16 50/7 51/25 52/2 55/7 57/16 60/18 61/15 64/17 65/10 65/16 65/21 66/17 67/21 68/17 70/11 70/17 73/16 74/15 75/24 76/1 79/17 82/19 84/19 87/2 87/3 87/14 89/12 89/14 90/7 91/12 93/24 97/25 98/16 100/5 101/14 103/17 105/7 106/7 106/20 108/18 111/7 112/7 112/20 113/11 116/1 116/11 116/23 117/14 117/22 119/21 123/1 126/16 126/21 127/18 128/12 128/20 129/4 129/9 129/17 130/6 136/10 136/13 136/14 136/24 137/17 140/20 141/5 142/16 143/2 151/21 151/21 153/14 157/5 159/8 160/16
Justice [1] 71/3
Jwargo [1] 2/15

**K**

Karen [1] 114/17
keep [6] 27/24 31/23 38/17 39/12 90/4 128/24
keeps [1] 134/10
kept [2] 108/17 108/17
key [4] 21/3 39/9 81/18 142/5
keys [1] 122/19
killed [1] 72/15
kills [1] 73/21
kind [16] 13/15 13/16 16/20 31/20 44/5 57/22 63/18 92/12 97/4 106/15 117/7 121/13 133/8 144/17 144/18 156/18
kinds [1] 35/8
knew [7] 6/25 55/24 55/25 56/2 57/22 127/13 136/11
knock [1] 93/11
knocking [1] 59/6
know [134] 7/9 7/9 10/11 10/24 11/2 11/3 11/6 11/20 13/5 15/13 15/20 19/4 20/21 21/12 21/14 21/18 21/21 21/25 23/12 23/21 24/5 24/7 24/8 24/18 25/18 26/8 26/11 26/12 26/23 29/14 29/15 30/21 30/21 34/17 35/6 35/9 37/17 41/18 42/3 42/15 44/21 47/16 49/10 49/13 51/13 52/18 55/13 55/24 56/1 56/12 56/14 56/15 56/18 58/8 59/9 62/25 64/19 65/17 66/3 68/25 71/4 72/8 74/19 74/20 74/25 75/1 83/8 85/20 86/7 89/6 90/12 90/12 91/10 91/15 92/8 92/21 94/10 95/3 95/15 96/9 97/18 100/14 109/11 110/17 112/3 112/25 114/7 115/7 115/12 115/18 116/1 116/3 116/7 116/14 117/1 117/24 118/13 120/4 122/25 123/10 124/7 124/16 125/5 125/19 125/22 129/17 131/25 133/10 133/11 133/16 134/11 134/21 135/1 135/7 135/22 136/1 136/1 136/18 141/20 141/22 142/24 144/14 145/11 150/14 150/20 150/23 151/17 151/22 154/4 154/6 156/20 156/24 157/16 159/19
knowing [1] 117/4
knowledge [14] 53/13 53/19 55/14 55/21 55/23 58/20 58/20 59/9 71/7 73/16 81/17 81/19 85/14 104/9
known [9] 27/13 68/19 70/14 70/17 71/1 71/13 71/16 71/19 88/25
knows [9] 10/23 42/21 50/19 56/13 59/11 61/6 95/24 144/21 156/5

1064

**L**

lady [1] 109/22

lag [1] 109/3

laid [1] 100/5

Lakers [1] 72/10

landing [1] 25/8

landscape [1] 13/4

language [4] 42/20 63/8 64/24 68/21

Lap [1] 134/3

large [1] 66/19

last [32] 5/24 7/12 18/17 24/8 24/10 24/13 25/11 35/25 37/3 38/9 42/20 42/22 44/22 53/7 57/10 74/14 77/9 82/12 82/13 91/10 91/19 92/24 96/1 99/18 101/9 101/11 102/9 104/19 110/2 137/23 147/23 148/22

late [2] 90/12 92/21

later [6] 26/2 28/7 41/13 87/17 113/25 125/25

laundry [1] 63/5

law [20] 46/7 49/19 52/24 57/14 57/15 60/4 66/3 68/25 70/16 70/18 70/20 70/23 71/4 71/5 71/13 71/19 73/17 99/1 132/6 153/17

lawsuit [9] 15/11 45/14 47/7 56/25 59/9 59/11 59/22 67/14 144/6

lawsuits [2] 156/5 157/19

lawyer [3] 55/6 59/4 60/11

lawyers [2] 56/1 57/14

lead [10] 37/16 136/20 138/10 158/11 158/21 159/9 160/3 160/6 160/14 160/22

leads [1] 125/17

learn [1] 99/20

least [9] 8/7 11/7 17/4 21/17 22/4 22/7 64/23 119/20 161/23

leaving [1] 11/14

led [2] 63/10 113/20

left [3] 42/9 101/7 136/13

legal [21] 53/17 54/19 61/10 61/14 62/5 62/12 62/17 62/24 65/3 65/12 66/5 70/9 70/10 71/12 95/21 96/2 97/6 97/14 98/8 100/8 105/14

legislative [1] 63/13

legitimate [2] 54/19 98/9

legwork [1] 137/9

lender [1] 24/19

lenders [1] 109/18

length [1] 139/2

less [4] 57/20 98/1 101/5 137/18

let [19] 25/18 25/19 36/16 40/5 42/23 57/17 68/25 91/12 100/17 112/14 123/18 128/2 131/25 140/1 145/9 151/21 151/25 154/18 159/8

let's [14] 32/5 34/6 46/23 65/18 65/21 74/4 76/1 92/10 101/7 102/10 127/5 132/6 139/5 145/24

letter [24] 47/4 47/5 47/10 47/25 48/5 48/7 48/25 54/22 54/23 55/8 56/9 56/19 56/20 56/22 58/6 59/15 59/16 59/21 59/24 60/10 66/12 80/18 93/13 139/8

letterhead [4] 48/5 49/1 53/9 59/17

letters [20] 5/21 5/22 6/2 59/3 79/21 85/1 85/9 85/11 85/13 86/6 88/4 93/3 93/4 93/16 94/5 96/9 96/15 100/14 136/6 158/10

level [6] 78/15 80/23 81/9 83/13 101/19 104/9

liability [3] 61/23 62/9 73/20

liable [3] 62/1 62/12 62/13

license [26] 47/12 68/8 99/6 99/10 99/12 99/21 108/9 110/5 113/13 114/10 115/19 116/4 116/6 116/19 124/17 124/19 124/21 125/16 125/17 125/21 126/2 127/14 129/2 130/12 142/14 143/2

lick [1] 19/12

lie [1] 55/25

lien [13] 47/14 98/14 105/25 108/11 109/9 109/11 109/12 109/24 110/1 113/18 120/1 123/8 150/13

lienholder [1] 106/1

lienholders [1] 107/9

liens [5] 99/7 99/10 103/12 109/16 117/19

lies [1] 144/3

life [1] 158/15

light [1] 63/13

like [53] 11/5 13/21 14/13 15/4 20/14 25/9 35/7 36/10 39/8 43/1 43/11 44/7 45/18 47/8 53/23 58/5 63/8 63/8 64/2 65/4 69/12 70/1 75/11 80/7 84/11 84/16 84/21 88/14 94/23 102/7 102/11 106/14 109/18 114/10 114/12 114/21 121/1 121/7 127/13 130/2 131/22 133/11 135/15 135/16 136/6 137/3 144/7 145/15 151/9 153/6 153/8 154/19 154/23

likely [5] 127/12 142/18 143/14 148/12 150/1

likewise [1] 36/10

limit [7] 97/15 112/3 127/1 127/5 127/24 144/1 146/7

limitations [3] 43/1 66/19 151/12

limited [12] 36/21 73/18 88/21 95/2 97/16 97/23 111/22 126/14 126/19 126/20 131/12 133/14

limits [1] 117/4

Linda [2] 51/12 147/4

line [4] 72/11 74/25 109/15 113/4

link [3] 64/13 64/14 95/18

linkage [1] 69/16

linking [1] 134/22

links [1] 114/7

list [104] 7/5 7/6 7/22 8/23 9/1 9/9 9/10 9/11 10/7 11/1 11/11 11/22 11/25 14/10 15/20 18/7 18/10 18/12 18/15 18/22 18/24 19/10 19/11 19/20 19/23 19/24 20/8 20/15 20/20 20/25 21/8 21/12 21/18 22/9 22/13 22/15 22/16 22/23 22/24 23/15 23/25 24/1 24/3 24/3 24/8 24/12 24/18 24/22 26/6 26/23 29/24 30/8 30/13 35/3 35/10 35/13 35/20 35/21 37/11 38/25 39/10 39/10 39/13 39/24 40/4 40/14 41/8 41/17 63/5 74/11 74/23 75/10 75/14 75/22 76/4 76/9 76/15 77/10 77/15 77/25 78/3 78/7 78/14 78/17 91/25 105/1 108/11 117/1 128/15 132/1 133/3 134/3 134/24 141/6 144/1 144/16 144/17 151/16 151/19 153/10 156/14 156/19 157/1 157/21

listed [6] 61/13 81/20 142/12 142/15 150/13 161/6

listen [1] 136/24

lists [6] 20/19 30/12 40/8 81/20 85/3 161/13

lit [1] 86/24

literally [5] 17/15 53/14 96/3 134/23 135/5

litigation [9] 48/17 97/7 103/18 126/3 134/1 156/6 157/11 157/15 158/2

little [12] 16/7 25/21 75/11 76/1 86/24 90/8 90/10 104/11 158/3 158/4 158/5 158/13

live [1] 114/19

living [2] 19/16 58/17

LLC [14] 1/5 1/6 1/10 45/9 46/2 46/3 47/2 48/8 48/9 48/21 49/1 59/15 89/17 104/8

LLP [3] 2/4 2/19 3/10

load [1] 153/7

loaded [1] 65/20

loan [47] 9/4 9/14 9/17 13/2 15/21 16/6 16/8 18/9 18/18 19/2 24/9 24/11 24/13 24/14 24/23 24/23 25/12 25/14 25/14 26/1 26/6 26/8 26/9 26/9 26/11 28/6 38/18 39/4 39/5 40/21 41/8 41/13 41/14 41/18 83/8 85/2 109/6 109/8 110/8 110/9 110/14 113/23 113/25 116/15 117/22 117/22 122/21

loaner [1] 8/17

loaner-related [1] 8/17

LOANMAX [1] 1/6

loans [20] 1/5 1/6 1/7 1/7 18/19 18/21 19/1 24/7 25/11 25/25 38/14 38/19 39/19 39/21 40/16 40/19 88/25 109/23 119/23 122/16

LOANSTAR [36] 1/5 1/6 20/18 22/10 23/1 24/24 26/13 26/15 27/10 27/19 27/21 28/7 28/16 29/17 38/5 38/7 38/7 38/18 39/4 39/5 41/13 41/25 53/11 56/12 72/25 97/20 100/21 100/23 100/24 111/25 141/12 142/14 143/7 143/13 143/17 152/24

LoanStar's [2] 124/13 141/1

locate [7] 64/5 64/6 106/7 126/5 129/16 129/20 140/6

located [4] 131/12 135/8 135/8 138/8

locating [1] 105/16

lock [2] 87/25 89/12

log [4] 50/16 50/16 90/25 140/21

logic [1] 96/14

long [3] 41/9 113/4 160/3

longer [3] 10/12 147/9 156/3

look [40] 16/9 16/16 31/4 39/18 40/9 40/21 41/25 49/12 51/9 52/23 52/23 54/9 64/21 64/25 73/17 82/15 84/8 92/19 94/9 95/22 105/23 109/15 110/5 112/23 113/2 113/3 114/5 117/11 122/25 124/11 124/13 127/22 128/10 132/1 132/1 138/23 139/1 143/5 149/16 155/11

looked [13] 59/12 68/9 75/20 102/6 102/14 105/17 109/22 116/17 116/19 148/17 148/18 148/25 152/23

looking [31] 6/12 12/20 15/25 25/25 26/1 26/15 31/3 53/9 83/2 83/6 83/8 86/11 94/18 102/13 105/7 110/15 110/17 113/11 113/16 114/2 116/13 116/18 117/15 117/18 124/8 127/11 130/13 131/1 139/14 140/6 141/1

looks [3] 35/7 121/7 130/25

Lopez [1] 40/7

Los [4] 2/21 72/10 101/8 158/14

loses [1] 70/12

losing [1] 161/22

loss [11] 9/25 11/7 12/15 13/24 14/1 14/16 14/21 15/5 43/4 43/7 43/9

losses [5] 10/21 13/1 13/12 14/18 37/18

lost [20] 6/25 7/1 7/15 7/19 7/20 7/23 8/16 8/17 8/17 8/17 13/8 13/9 13/11 14/3 14/14 15/15 15/17 21/25 21/25 26/23

lot [13] 31/12 40/14 59/7 63/24 70/21 78/10 96/6 103/22 106/12 109/16 130/2 143/11 143/16

lots [3] 47/12 63/24 64/12

Louisiana [1] 3/11

love [1] 154/5

LOVETT [12] 3/9 4/19 5/7 8/13 9/22 19/15 21/20 48/22 52/19 58/4 116/11 160/19

low [2] 80/23 95/4

low-level [1] 80/23

LP [1] 1/7

Lucia [1] 149/6

lying [1] 16/16

**M**

ma'am [3] 65/14 69/2 72/5

machine [1] 1/21

made [30] 22/2 26/5 31/11 40/10 41/1 41/2 41/3 42/1 43/25 44/5 51/9 51/15 54/13 54/25 55/4 55/6 65/3 68/13 71/23 86/10 98/12 98/23 102/9 104/3 117/16 119/1 120/7 128/7 150/11 156/24

mail [6] 2/7 2/15 2/22 3/7 3/13 112/1

mailer [1] 64/7

mailers [1] 83/14

mails [1] 142/13

# M

maintain [2] 34/13 71/18
maintained [1] 47/15
majority [1] 66/19
make [40] 19/14 22/3 22/7 28/3 33/1 36/1 36/12 37/7 41/23 42/3 42/12 42/17 44/11 44/23 48/13 48/15 52/10 53/21 53/23 57/8 57/21 65/10 75/5 84/13 97/25 97/25 106/5 112/9 118/18 120/14 125/23 126/13 129/4 140/10 144/20 144/23 145/8 146/22 150/20 157/8
makes [4] 50/8 69/12 69/24 129/14
making [14] 7/4 17/11 29/11 53/10 54/23 57/10 57/11 63/18 70/9 71/1 120/8 147/15 149/3 151/18
manageable [2] 146/11 146/12
Management [1] 48/8
manager [11] 48/21 53/7 81/7 82/19 83/19 84/2 132/20 132/23 133/3 134/24 135/7
managers [7] 47/20 83/18 84/24 133/23 137/17 137/18 137/19
manner [1] 67/15
mantras [1] 154/20
many [17] 13/6 32/6 42/21 71/14 72/9 75/3 77/24 96/10 114/11 126/5 132/24 135/19 135/24 136/12 154/9 155/14 157/18
marginally [1] 9/7
marked [1] 131/9
market [3] 104/5 131/17 133/13
marketing [40] 47/11 66/10 79/4 79/25 80/4 80/11 81/1 81/12 83/9 86/4 86/17 87/3 87/9 87/10 87/14 87/21 88/5 88/8 88/24 88/25 89/1 104/10 111/8 118/1 125/11 128/25 130/11 131/12 131/14 140/25 141/11 141/15 142/14 143/6 143/8 143/20 143/24 144/4 144/4 145/15
markets [2] 14/1 36/22
Marshall [1] 159/19
Martinez [4] 134/16 163/4 163/17 163/18
MARY [2] 3/9 4/19
MARY-OLGA [2] 3/9 4/19
Master [13] 7/7 7/13 20/20 25/2 30/2 30/11 37/10 77/10 77/21 78/8 78/18 91/25 117/3
matched [1] 155/7
material [1] 93/7
materials [2] 70/4 88/25
matter [20] 6/9 26/11 27/5 28/11 51/9 55/14 57/13 57/14 57/15 58/23 70/15 70/18 70/20 70/22 84/7 96/17 125/7 125/7 125/10 160/22
matters [3] 6/8 84/11 97/22
Matthiesen [5] 33/14 33/20 33/21 33/22 33/25
may [62] 12/16 12/16 17/4 17/5 17/9 18/14 20/22 21/15 25/22 26/4 27/2 29/23 35/18 37/6 45/23 47/24 58/24 59/9 59/13 60/24 60/25 61/24 62/1 63/3 63/4 67/20 69/10 69/11 73/10 73/11 75/18 79/14 79/15 81/3 81/22 81/23 86/18 86/19 92/17 93/23 96/2 96/20 105/4 107/18 112/18 115/3 119/21 120/14 125/22 125/22 125/24 127/9 130/15 138/12 141/19 144/23 145/8 151/12 152/3 158/14 159/13 159/19
maybe [11] 10/12 21/13 21/17 25/15 55/25 74/16 124/5 130/13 138/6 144/17 161/11
Mayor [1] 4/22
McDonald [2] 51/12 147/4
McKinney [1] 3/4
me [72] 4/24 5/5 13/15 15/13 16/1 16/20 26/9 26/15 30/15 35/14 36/16 40/5 41/24 44/4 44/20 49/5 57/17 57/23 59/7 65/20 65/21 79/10 80/10 83/15 83/17 90/15 92/19

97/25 100/5 100/17 100/22 101/5 102/11 112/14 113/6 115/2 115/24 116/9 116/11 119/13 119/20 119/20 119/23 123/4 123/18 127/17 128/2 129/25 132/18 137/1 137/2 137/15 138/17 140/1 141/3 141/5 141/20 141/21 141/23 145/7 148/16 148/16 148/21 148/21 149/16 149/17 151/20 154/14 154/18 159/7 159/8 163/10
MEADOWWOOD [1] 1/6
mean [18] 6/23 23/20 26/2 29/3 32/18 59/10 65/18 66/22 72/16 73/23 100/10 106/3 113/10 115/9 120/2 120/18 124/19 143/1
meaning [1] 151/20
means [8] 59/4 60/5 64/14 73/17 73/23 98/24 99/1 113/12
mediation [6] 32/15 33/3 33/7 34/9 34/20 157/23
mediator [1] 33/23
meet [10] 50/23 61/11 68/17 71/14 71/22 88/22 138/6 148/1 148/3 149/11
meet-and-confer [4] 88/22 148/1 148/3 149/11
meeting [1] 21/22
meets [1] 141/16
member [2] 48/21 53/6
mention [1] 58/10
mentioned [1] 14/2
mere [1] 67/4
merely [1] 37/6
mess [1] 159/5
message [4] 57/6 147/5 147/8 147/10
messages [7] 139/12 139/17 141/10 141/13 146/21 146/23 147/2
messaging [1] 147/14
met [4] 51/1 62/24 150/4 154/25
method [1] 82/10
methodology [1] 138/8
Michael [1] 81/7
middle [7] 13/8 14/15 38/4 69/21 86/12 113/2 113/5
might [30] 5/25 6/2 6/6 7/8 29/10 34/4 41/11 41/11 41/12 58/23 62/9 64/3 65/1 68/24 69/1 93/6 95/23 97/13 97/18 105/25 116/24 120/16 123/19 124/1 124/21 145/5 145/16 148/8 148/19 149/16
Mike [1] 134/16
million [1] 144/5
millions [1] 145/20
mind [4] 10/22 39/13 54/8 92/19
mine [1] 23/10
minimal [1] 71/22
minor [1] 128/12
minute [12] 17/21 19/22 23/19 27/14 67/6 67/6 112/20 122/5 130/13 132/23 140/1 140/1
minutes [2] 101/5 101/5
mirror [1] 36/23
misconduct [4] 21/6 22/4 28/13 28/17
misheard [1] 52/1
misrepresented [1] 66/1
misses [1] 20/10
missing [5] 20/17 77/15 77/25 119/21 134/3
misstatement [1] 60/19
mistake [2] 78/16 78/17
misunderstands [1] 114/4
mitigate [1] 51/21
mobile [1] 146/25
model [20] 6/21 6/23 7/2 7/16 7/18 9/25 10/8 11/19 15/16 17/9 19/18 25/13 25/15 25/18 26/4 27/3 35/21 36/11 37/12 157/6
modify [1] 84/20
mol [1] 3/13
moment [3] 16/1 57/25 67/21
Monday [1] 101/3

money [1] 94/23
MONEYMAX [2] 1/5 1/7
monitoring [1] 47/11
Montalvo [3] 163/4 163/17 163/18
month [7] 10/12 37/19 57/10 82/12 82/13 105/24 113/25
monthly [1] 13/25
months [10] 7/12 19/12 19/16 25/10 25/10 26/2 88/18 89/6 156/11 159/2
Moran [6] 113/14 113/16 113/23 114/17 124/1 124/14
Moran's [1] 114/18
more [23] 6/12 8/5 8/5 49/14 64/20 76/21 76/22 76/23 84/11 85/12 90/10 92/23 106/19 106/22 115/23 116/4 116/12 117/14 128/10 145/8 148/24 151/8 156/3
moreover [1] 122/15
morph [1] 7/5
most [5] 104/19 106/19 108/7 121/8 145/3
Motion [78] 5/17 5/20 6/3 6/8 6/16 6/16 7/25 8/1 8/8 10/1 10/3 10/13 10/14 11/9 11/10 11/16 12/3 12/13 12/20 12/21 12/25 33/11 42/9 43/16 44/9 44/11 45/3 45/5 54/1 60/8 60/17 60/22 71/11 71/11 72/19 73/22 74/2 74/7 75/11 77/7 78/5 90/4 90/11 90/12 91/3 91/20 93/5 93/17 93/18 93/20 94/4 96/16 96/24 100/13 100/15 101/15 101/18 101/22 101/25 102/2 102/17 108/2 112/24 118/12 118/18 132/15 137/23 138/14 138/15 138/22 138/23 139/8 149/18 152/19 152/23 155/22 155/24 158/7
MOTIONS [23] 1/14 5/9 5/11 5/14 5/16 5/17 5/19 5/21 5/22 6/2 6/10 46/5 74/22 90/10 91/5 91/12 92/3 93/1 93/15 101/12 101/21 102/17 104/24
motor [4] 47/15 57/19 109/17 114/8
mouth [1] 136/6
move [6] 31/6 45/3 89/17 89/18 92/11 152/11
moved [3] 84/20 85/5 92/25
moving [6] 12/25 111/10 128/24 131/8 131/9 132/15
MR [51] 2/3 2/10 3/3 4/7 4/16 4/21 5/3 5/4 12/17 15/13 15/25 16/15 16/16 16/18 17/13 18/19 19/4 21/22 23/5 23/19 27/14 28/2 29/12 30/15 33/25 36/25 44/4 49/2 50/24 56/22 58/11 59/5 70/21 74/13 76/24 82/21 86/14 87/24 95/7 95/10 100/8 105/9 109/2 112/11 119/8 120/21 126/16 136/4 150/19 154/2 160/13
Mr. [74] 34/25 36/12 37/3 39/17 40/24 46/2 46/15 47/23 49/2 50/1 50/3 50/14 51/2 54/13 56/20 56/24 59/3 60/10 70/6 72/6 72/12 73/9 73/21 74/4 74/20 74/25 75/1 76/11 81/25 82/4 83/18 84/4 84/8 84/10 84/15 84/16 85/16 88/9 89/16 90/14 90/14 90/23 91/14 94/19 99/4 100/6 100/6 103/9 106/4 108/22 111/1 114/18 120/16 120/16 121/2 124/1 124/14 127/5 128/4 135/14 135/23 140/15 146/4 146/20 149/1 149/8 149/14 150/8 150/25 151/22 153/14 154/4 160/11 160/25
Mr. DeLeon [2] 100/6 149/8
Mr. Gannaway [30] 34/25 36/12 39/17 46/2 54/13 70/6 73/9 75/1 76/11 81/25 82/4 83/18 88/9 89/16 90/14 91/14 94/19 99/4 103/9 106/4 108/22 111/1 120/16 121/2 127/5 128/4 135/14 150/8 150/25 153/14
Mr. Gannaway's [4] 46/15 84/15 85/16 120/16
Mr. Hale [1] 149/14
Mr. Hale's [2] 149/1 151/22
Mr. Hancock [1] 160/25

## M

**Mr. Johnson [14]** 37/3 74/4 74/20 74/25 84/4 84/8 84/10 84/16 90/14 100/6 135/23 140/15 154/4 160/11

**Mr. Moran [2]** 124/1 124/14

**Mr. Moran's [1]** 114/18

**Mr. Wargo [8]** 40/24 51/2 56/20 72/6 72/12 90/23 146/4 146/20

**Mr. Wargo's [1]** 73/21

**Mr. Young [8]** 47/23 49/2 50/1 50/3 50/14 56/24 59/3 60/10

**MS [29]** 2/11 2/18 5/7 8/13 9/22 19/15 21/20 48/22 52/19 58/4 69/22 105/15 106/12 108/23 110/23 113/15 114/1 116/11 119/23 121/18 121/22 122/4 122/18 123/14 124/12 124/20 126/18 127/19 160/19

**much [20]** 8/23 8/24 10/23 30/21 45/17 104/20 107/1 117/14 139/20 139/24 145/21 146/1 146/4 154/4 155/21 155/24 158/1 158/4 158/5 160/21

**multiple [1]** 94/8

**multiplication [2]** 157/11 157/14

**must [4]** 33/9 100/10 105/21 135/3

**mutual [1]** 31/14

**my [39]** 4/4 4/21 6/19 7/9 13/5 24/17 27/9 30/17 43/19 44/7 51/25 54/11 54/22 55/11 56/12 56/12 56/23 67/1 72/11 74/16 76/10 81/25 84/1 86/18 90/4 100/5 100/11 113/11 128/7 136/13 141/19 144/11 156/4 157/7 157/7 157/11 158/4 161/13 161/24

**myself [1]** 149/19

## N

**name [15]** 18/2 18/8 22/22 22/24 72/16 79/20 80/23 88/3 97/2 97/3 100/6 116/16 124/2 133/21 135/18

**named [7]** 80/25 81/7 82/1 82/8 99/16 103/19 103/19

**names [13]** 19/22 20/8 27/13 27/24 39/16 47/13 135/20 136/10 137/10 151/16 151/19 157/2 157/5

**Nancy [1]** 40/7

**narrative [4]** 9/23 9/24 10/6 18/20

**narrow [2]** 83/3 94/16

**narrowed [1]** 5/15

**native [1]** 39/7

**nature [1]** 153/3

**nay [1]** 26/16

**NE [1]** 2/12

**nearly [1]** 36/20

**necessarily [8]** 5/23 8/10 90/22 98/23 108/21 126/10 140/3 144/13

**necessary [2]** 112/8 134/12

**need [36]** 8/7 10/2 13/4 16/11 16/18 19/7 23/25 25/9 41/24 42/12 42/15 54/8 55/22 60/2 61/19 62/11 62/13 62/16 65/1 65/5 83/2 85/14 88/12 110/22 110/24 112/8 114/22 124/18 125/11 133/10 134/11 135/7 138/23 140/13 155/12 161/11

**needed [3]** 58/20 91/22 104/12

**needing [2]** 92/24 111/5

**needs [7]** 19/20 26/12 36/15 43/12 54/21 118/22 150/4

**negate [1]** 53/16

**neglects [1]** 31/18

**negligence [3]** 61/20 61/21 66/4

**negligent [3]** 61/9 61/20 136/9

**neither [4]** 47/11 92/13 115/21 116/9

**never [16]** 50/13 50/14 57/24 58/17 70/6 80/2 80/6 80/11 87/8 90/16 97/3 105/17 106/7 109/22 133/15 153/1

**new [16]** 5/7 20/20 21/9 21/13 21/21 24/7 24/8 24/12 40/16 49/25 78/6 78/7 78/9 78/10 78/14 156/14

**next [18]** 31/6 33/4 34/9 45/3 45/5 50/1 50/11 50/21 58/22 60/14 60/17 63/16 63/22 113/18 113/22 123/8 140/23 159/25

**next time [1]** 33/4

**nexus [1]** 73/3

**no [116]** 1/3 2/3 2/19 3/3 3/10 9/6 9/11 9/19 15/21 15/24 15/25 17/21 17/21 17/23 18/15 21/14 21/19 24/2 26/25 27/14 27/14 33/15 34/3 35/4 37/21 39/20 39/22 40/5 40/18 46/7 48/20 52/2 52/7 52/7 52/12 52/24 54/5 57/24 57/25 58/7 60/10 64/10 64/20 66/16 66/17 66/17 66/20 70/23 72/11 72/19 75/9 75/22 78/20 78/25 79/23 79/24 80/2 80/25 81/4 87/14 87/20 87/24 88/7 88/16 88/22 91/2 91/24 96/14 97/7 97/9 97/10 97/15 98/9 101/4 101/11 102/13 104/16 110/12 116/17 116/20 117/4 123/20 124/16 124/20 130/14 130/19 131/2 131/6 131/9 131/10 133/4 137/2 139/11 140/12 141/4 143/8 143/8 144/9 146/23 146/24 147/8 147/9 148/24 149/10 149/13 150/24 151/5 151/8 153/6 153/20 153/22 154/16 155/10 156/10 156/23 157/17

**non [4]** 83/12 98/16 107/8 141/14

**non-company [1]** 83/12

**non-further [1]** 141/14

**non-secular [1]** 98/16

**non-TitleMax [1]** 107/8

**none [6]** 5/15 140/14 140/15 140/20 142/3 142/9

**nonentity [1]** 51/15

**nonstarter [1]** 46/22

**normal [3]** 64/2 64/9 92/4

**nose [1]** 59/24

**not [255]**

**Notably [1]** 111/1

**notate [1]** 38/20

**notation [3]** 39/6 39/18 41/6

**notations [3]** 38/11 38/24 42/1

**note [4]** 40/4 40/8 40/11 108/13

**noted [2]** 39/4 66/24

**notes [5]** 38/21 39/4 41/1 41/2 123/6

**nothing [21]** 10/13 49/7 50/19 50/25 50/25 52/8 52/13 54/24 65/8 65/20 95/24 98/21 123/25 134/22 140/8 140/9 140/10 144/5 151/16 153/25 154/14

**notice [2]** 49/24 50/1

**noticed [4]** 50/11 50/22 60/9 136/14

**notion [1]** 99/1

**November [6]** 1/17 48/7 49/21 76/10 102/4 138/18

**November 12 [1]** 138/18

**November 13th [1]** 49/21

**November 15th [1]** 48/7

**November 5th [1]** 102/4

**now [54]** 7/4 7/17 10/1 11/1 13/4 14/10 16/3 16/9 16/15 16/15 18/12 19/1 19/24 20/23 24/1 26/21 29/11 30/7 31/10 31/16 34/20 37/3 37/4 37/12 41/18 43/21 44/7 47/16 50/3 54/12 60/13 61/19 64/18 69/4 72/13 72/23 75/18 75/24 76/14 77/7 83/24 90/2 104/23 106/4 108/15 111/16 117/3 149/5 149/10 151/24 152/9 152/10 156/5 156/11

**number [41]** 8/20 14/3 21/14 61/13 77/21 77/22 77/25 82/16 102/8 110/10 111/24 113/5 113/13 113/13 114/12 115/5 115/19 116/5 116/6 116/19 118/10 118/13 118/18 124/17 124/19 125/16 125/17 126/2 126/14 127/14 133/22 134/4 134/14 139/9 139/16 143/20 143/22 143/25 146/11 146/12 154/3

**numbered [2]** 1/18 163/9

**numbers [12]** 13/21 13/24 43/7 47/12 47/13 108/10 116/4 129/2 130/12 141/3 141/5 145/11

**numbers where [1]** 13/21

**numerous [2]** 27/23 90/13

**nut [1]** 61/3

**nuts [1]** 144/21

## O

**o'clock [4]** 23/23 75/24 128/4 128/5

**oath [1]** 106/7

**object [6]** 99/2 99/25 100/3 100/24 140/11 141/13

**objection [3]** 29/19 42/10 95/10

**objections [3]** 36/3 38/2 137/12

**obtain [1]** 104/2

**obtained [5]** 45/15 105/15 125/22 126/1 144/12

**obtaining [4]** 47/12 47/13 60/5 137/25

**obviously [5]** 6/22 11/16 49/3 115/24 124/24

**occasion [2]** 17/4 115/5

**occur [1]** 89/15

**occurred [3]** 106/10 109/21 163/10

**occurrence [1]** 133/8

**occurring [1]** 112/10

**October [9]** 18/18 32/20 32/25 34/8 34/8 49/8 49/15 49/24 77/14

**October 10th [1]** 49/15

**October 23rd [1]** 49/24

**off [12]** 8/23 14/2 23/17 24/6 35/3 41/13 74/4 74/6 74/15 101/16 105/19 150/10

**offered [2]** 122/18 163/12

**offering [1]** 85/2

**office [12]** 59/7 59/8 81/4 81/15 86/11 135/15 135/16 135/16 136/5 136/5 136/7 136/7

**officer [1]** 152/1

**offices [1]** 70/4

**Official [2]** 163/4 163/19

**often [1]** 109/11

**oh [6]** 4/23 54/18 71/19 133/16 136/6 161/4

**okay [115]** 5/6 5/9 5/16 7/4 9/1 10/15 11/11 11/18 12/3 12/6 12/12 13/17 14/12 18/12 19/4 21/4 21/20 22/16 23/19 25/3 26/19 26/19 27/18 28/4 28/21 28/21 29/9 29/24 30/24 30/24 31/1 32/11 32/13 33/24 34/20 34/23 35/2 35/17 36/8 37/22 38/1 38/9 41/23 42/7 44/19 45/3 45/13 46/6 46/16 46/23 46/25 48/22 54/10 54/17 56/12 56/13 58/2 60/13 60/22 62/18 65/17 68/6 73/22 74/18 76/12 76/14 76/24 77/8 82/21 83/21 87/10 89/20 89/20 92/10 99/20 100/13 101/7 101/14 102/6 102/10 102/14 106/4 107/24 108/22 113/9 118/16 122/14 123/8 123/18 125/14 126/4 129/25 130/1 131/8 132/13 137/6 137/20 137/21 139/9 140/13 140/17 140/18 141/5 145/3 148/10 154/12 155/18 155/19 158/7 159/7 159/15 159/17 160/2 161/11 161/19

**old [2]** 6/20 61/24

**OLGA [2]** 3/9 4/19

**omission [1]** 61/9

**once [13]** 14/6 15/19 18/10 18/11 20/19 20/19 35/9 35/12 35/13 35/20 39/24 66/11 115/16

**one [162]** 6/4 6/4 6/6 7/14 7/23 9/3 10/18 11/2 11/7 11/14 11/20 17/4 19/13 19/14 19/17 21/3 21/4 21/5 21/17 21/21 22/4 23/12 29/17 31/8 31/17 32/25 34/9 35/9 38/24 39/1 39/15 40/10 41/16 41/23 42/10 43/4 43/22 44/19 44/22 46/3 48/12 50/5 51/11 51/12 51/18 51/19 51/22 52/2 52/5 52/7 53/4 53/6 53/7 53/7 53/15 53/23 54/4 54/8 55/10 56/4 56/4 57/2 57/15 57/16 57/16 58/16 58/17 59/20 60/10 61/25 63/21 64/6 65/16 67/16 68/4

# O

one... [87] 69/4 72/20 74/10 77/6 77/20 79/1 79/7 80/3 80/25 81/4 81/25 82/2 82/2 82/3 82/6 82/8 82/8 82/10 82/12 82/13 84/11 87/20 88/22 91/16 92/3 92/11 92/13 92/23 93/10 93/24 94/11 94/25 95/4 96/12 98/9 100/17 101/2 101/3 101/11 101/15 101/15 101/19 101/21 102/6 102/16 104/18 104/24 105/11 106/11 109/17 113/14 113/16 114/9 114/23 116/9 118/8 118/8 120/15 120/18 121/5 121/10 121/11 124/12 125/11 130/4 130/5 130/6 130/16 131/1 131/9 132/2 135/1 135/13 135/15 144/23 147/2 147/4 148/7 148/19 149/21 149/22 150/12 150/15 151/25 154/1 154/19 154/20

onerous [1] 108/13

ones [15] 13/1 13/2 69/6 69/22 69/22 75/12 79/3 94/25 122/17 122/19 126/20 140/24 143/12 143/14 143/17

Online [3] 93/13 96/18 96/25

only [64] 14/23 15/11 30/20 37/15 42/8 46/18 46/18 47/22 47/23 48/10 48/12 48/19 48/19 48/20 48/21 48/21 49/4 49/4 50/5 50/12 50/17 51/22 52/2 53/18 53/22 54/4 54/8 54/24 54/25 55/10 56/4 57/15 63/4 67/5 69/21 71/1 71/13 71/16 71/19 73/23 75/10 89/17 90/5 103/14 103/15 105/16 107/22 108/24 111/3 111/21 111/25 114/17 116/14 122/17 132/10 134/1 145/5 147/9 147/10 155/1 157/7 158/11 160/4 161/25

open [1] 163/10

operate [1] 154/21

operation [1] 103/20

operations [1] 14/16

opinion [1] 54/11

opportunity [3] 7/11 110/3 134/14

oppose [1] 155/25

opposing [7] 102/9 107/14 108/1 108/12 110/4 151/24 156/2

opposite [1] 129/17

opposition [1] 108/2

oral [2] 1/14 54/14

orchestrated [2] 56/3 56/5

order [48] 6/14 7/3 7/18 8/9 13/14 23/16 34/23 34/25 37/3 38/1 42/14 42/21 42/22 43/1 44/25 45/6 58/21 70/4 71/14 76/3 77/12 78/1 79/5 79/6 80/3 82/23 84/18 84/22 85/7 87/8 89/22 89/25 90/23 92/20 100/13 100/15 100/15 100/16 101/1 104/2 104/12 110/21 111/12 133/7 134/7 136/17 157/4 159/14

ordered [24] 6/19 6/23 9/22 10/6 12/7 12/14 13/5 13/15 14/9 21/1 36/22 42/25 46/9 46/14 48/18 49/22 58/21 60/9 76/17 77/11 78/6 79/16 80/16 91/1

ordering [1] 92/14

orders [10] 74/2 74/8 74/10 77/1 77/5 78/23 85/17 104/15 111/9 156/9

ordinary [1] 90/18

organization [2] 55/19 58/10

organizations [2] 53/2 54/16

original [1] 11/1

originally [2] 20/16 98/12

originated [2] 28/6 28/9

other [68] 8/5 10/22 18/7 21/5 21/5 21/16 21/16 23/12 25/9 31/18 38/5 38/6 38/18 38/24 39/2 43/8 43/22 45/2 45/15 45/15 50/6 53/16 53/23 54/18 59/22 60/5 60/7 61/9 61/14 64/23 65/1 66/4 67/17 68/8 75/12 79/9 82/2 91/25 95/2 97/22 101/22 103/17 104/23 111/19 112/2 114/23 117/7 117/24 123/15 124/11 125/6 128/24 129/6 130/21

132/6 132/16 133/3 138/12 138/14 139/8 145/21 146/2 146/14 149/5 152/18 153/25 157/23 163/7

other's [2] 30/12 38/19

others [4] 54/9 105/15 121/3 132/9

otherwise [5] 14/25 18/23 118/17 137/9 161/18

ounce [1] 135/9

our [132] 4/20 6/8 7/20 8/15 8/20 9/7 9/23 10/8 12/13 14/1 14/3 14/7 14/23 15/15 15/17 17/8 17/8 18/12 18/17 18/23 18/24 19/3 21/6 21/10 22/4 25/12 26/4 27/3 29/20 29/21 31/9 33/23 36/3 36/11 36/15 37/2 37/5 37/11 37/23 37/24 37/24 38/21 39/20 39/21 40/3 40/19 42/14 42/17 45/25 46/6 46/21 47/1 47/5 55/17 55/18 57/7 58/13 65/23 65/25 66/6 66/8 66/9 66/13 69/15 69/19 69/20 69/23 70/15 71/3 73/3 73/5 75/5 75/9 75/20 78/14 78/15 82/9 83/13 84/3 85/5 85/8 85/10 86/6 86/12 90/12 92/23 93/5 94/9 99/14 102/20 102/20 103/17 104/22 105/24 106/23 108/16 108/16 109/6 110/14 110/14 110/25 112/9 116/21 117/5 117/21 118/1 118/18 120/6 121/14 125/1 125/11 125/23 126/5 126/13 132/10 134/20 135/1 136/1 137/17 139/8 145/5 146/24 147/1 150/5 152/15 152/19 153/7 157/20 158/10 160/15 161/8 161/15

ours [1] 39/14

ourselves [2] 30/9 100/19

out [88] 10/23 11/3 13/4 27/9 32/8 33/1 38/18 38/19 38/24 39/1 39/5 39/5 39/18 39/19 39/21 40/16 40/19 40/21 41/9 41/12 41/16 42/1 42/2 44/22 46/11 53/22 59/13 61/21 62/6 64/7 67/16 69/14 69/22 70/6 70/7 71/17 71/20 72/2 73/16 74/9 79/21 80/18 83/7 83/14 85/2 86/6 88/4 88/17 93/11 93/12 94/2 94/14 94/24 100/5 103/21 109/6 109/23 111/15 115/23 116/11 117/5 117/21 119/10 122/17 123/11 124/5 124/21 125/15 125/24 126/7 127/11 127/15 127/21 128/3 134/11 135/18 135/20 135/25 136/5 136/8 136/11 139/3 142/13 146/2 147/16 149/24 153/18 157/8

outrank [1] 161/1

outs [3] 38/14 41/19 42/1

outstanding [1] 126/22

over [17] 7/12 9/10 21/12 49/17 50/10 58/16 63/21 74/23 107/11 117/5 120/22 134/1 134/3 134/16 134/17 157/17 157/18

overbroad [3] 98/22 131/18 131/19

overlap [66] 7/6 7/23 8/23 9/1 9/9 9/10 9/11 10/7 11/1 11/22 11/25 14/10 15/20 18/7 18/10 18/12 18/15 18/22 18/24 19/10 19/20 19/23 19/23 20/8 20/15 20/20 22/22 22/24 23/15 24/8 24/18 24/22 26/23 29/24 30/13 35/3 35/10 35/13 35/20 35/21 37/11 38/25 39/10 39/10 39/13 39/24 40/4 40/8 40/14 41/8 41/17 74/11 74/23 75/10 75/14 76/3 76/9 76/15 77/15 105/1 117/1 128/15 156/14 156/19 157/20 157/21

overloaded [1] 66/13

overly [2] 39/22 41/22

overrule [1] 38/2

overruled [3] 36/4 137/12 138/10

overseeing [1] 53/10

overstatement [1] 75/9

own [7] 50/15 53/9 54/19 122/16 146/24 146/25 158/13

owned [1] 117/25

owner [1] 96/5

owns [2] 45/11 45/12

# P

package [2] 123/1 127/7

page [24] 12/24 16/5 29/8 36/8 54/1 54/12 61/2 62/6 62/23 63/16 63/16 63/22 63/23 64/21 95/20 113/15 113/18 113/22 114/5 114/6 123/1 123/8 150/12 150/12

pages [10] 95/22 103/10 106/5 109/16 109/24 115/23 121/18 121/21 121/24 122/5

paid [4] 41/13 135/2 163/15 163/15

paid/will [1] 163/15

paper [3] 47/1 98/7 149/22

papers [4] 66/18 75/9 94/9 111/11

paradox [1] 50/25

Paragraph [6] 79/9 79/12 79/17 80/21 80/22 87/8

parallel [1] 68/16

paraphrasing [1] 17/4

Pardon [1] 100/22

parens [2] 48/9 48/9

parent [2] 45/9 45/10

parenthetically [1] 38/7

Park [1] 2/20

parking [1] 47/12

parlay [1] 134/25

part [18] 5/24 11/17 25/18 39/20 56/18 63/1 79/2 80/15 85/21 85/21 87/7 104/19 129/21 131/16 150/25 152/19 154/24 157/20

participated [2] 40/9 87/21

particular [13] 19/1 40/11 79/9 116/2 127/6 129/7 137/23 138/2 138/7 139/3 139/15 139/17 146/21

Particularly [1] 68/16

parties [19] 6/15 7/11 20/12 21/16 24/21 31/14 32/9 38/19 49/8 49/15 61/5 73/12 94/3 99/23 100/3 100/19 117/2 163/8 163/13

PARTIES' [1] 1/14

Partnership [1] 73/18

parts [1] 8/16

party [17] 5/20 31/18 43/22 60/23 65/24 72/16 72/21 73/5 88/25 93/1 94/6 96/10 99/2 99/2 99/25 101/16 134/7

Paso [1] 73/18

passes [1] 25/11

past [2] 25/23 90/3

patent [1] 59/11

pause [1] 75/7

pay [2] 78/18 100/12

payment [3] 109/7 116/15 116/20

Peachtree [1] 2/12

pen [4] 16/21 29/16 35/11 35/13

pen-and-ink [1] 35/11

pending [2] 91/20 133/7

Penny [35] 105/11 105/15 105/23 106/6 107/4 107/19 107/21 108/7 108/18 109/5 109/7 109/16 110/11 112/2 112/16 115/13 117/9 117/11 120/15 120/19 120/20 120/24 120/25 121/7 127/22 127/25 129/6 129/10 129/22 131/21 132/7 132/11 142/12 145/19 146/7

people [71] 7/5 7/6 8/21 9/10 16/21 16/22 17/16 18/13 19/12 19/17 20/22 21/16 27/6 27/8 27/23 27/24 39/14 40/1 40/6 52/25 54/18 55/18 61/5 62/8 68/25 69/17 70/1 71/25 80/23 80/23 84/13 84/25 85/3 85/18 86/12 92/10 94/24 96/6 97/17 98/13 102/3 104/13 106/16 113/13 114/12 114/13 114/19 116/2 116/12 119/22 120/23 127/13 127/13 129/18 134/8 134/17 135/12 135/14 135/19 135/19 135/20 135/24 136/2 136/10 136/20 138/2 138/4 140/5 147/5 153/16 158/15

people's [2] 70/13 156/25

Peoples [7] 24/18 24/20 35/14 76/8 76/14 156/15 157/9

**P**

per [9] 7/2 7/17 8/2 9/25 10/8 11/13 11/24 12/4 63/4

per-customer [8] 7/2 7/17 8/2 9/25 10/8 11/13 11/24 12/4

percent [6] 65/25 103/11 107/11 108/18 108/20 108/25

percentage [2] 21/17 109/19

perfectly [3] 97/14 98/9 100/8

perform [1] 153/2

performance [3] 135/4 138/6 154/24

performed [4] 112/17 127/24 152/22 153/1

perhaps [2] 75/3 157/8

period [16] 15/6 20/5 24/9 74/24 76/7 87/3 96/19 104/25 111/3 128/17 129/12 133/4 134/1 134/5 160/7 160/7

perjured [1] 129/18

permissible [2] 63/5 69/1

permitted [3] 64/23 97/4 159/14

person [42] 9/4 17/5 24/8 24/10 24/13 24/15 25/9 40/13 41/12 47/2 50/13 50/14 51/12 53/15 55/5 55/10 57/3 57/7 57/16 59/25 61/7 62/1 68/8 68/12 68/12 69/5 72/15 72/15 78/9 78/10 80/11 86/17 87/3 96/18 96/22 105/24 108/8 109/17 121/16 123/6 124/8 124/22

personal [8] 53/13 55/14 55/21 58/19 63/3 63/10 63/15 63/20

persons [1] 80/16

perspective [1] 92/24

phase [1] 61/11

phones [1] 147/16

phrase [2] 39/9 70/21

physically [1] 63/11

pick [6] 22/23 65/18 65/19 65/19 145/9 145/12

picked [1] 18/2

picking [1] 37/2

picture [1] 73/4

piece [1] 148/7

pieces [1] 9/24

pig [1] 150/20

pit [3] 119/7 119/8 121/13

placed [1] 43/1

Plaintiff [5] 4/13 5/17 7/20 69/5 134/23

PLAINTIFFS [28] 2/7 2/15 2/23 4/5 4/10 4/11 5/21 6/17 6/23 7/8 7/17 8/8 11/18 22/17 31/5 33/19 36/19 77/14 79/22 92/25 94/13 95/23 96/1 96/20 123/16 151/4 155/5 159/3

Plaintiffs' [19] 7/19 8/2 8/2 8/3 38/14 38/16 67/9 74/2 74/7 74/9 88/5 95/18 101/18 105/18 106/8 109/23 129/16 129/20 135/10

plane [1] 23/23

plans [1] 142/14

plate [10] 47/12 68/8 99/6 99/21 108/9 110/6 129/2 130/12 142/14 143/2

play [1] 38/4

played [2] 85/1 85/19

plea [1] 157/7

plead [1] 73/17

pleaded [1] 94/20

pleading [19] 58/13 61/12 64/18 65/3 65/11 65/20 66/17 67/4 68/17 69/13 69/24 71/14 71/16 72/7 72/12 72/21 73/7 161/9 161/17

Pleadings [1] 161/4

please [1] 70/24

pleasure [2] 21/22 57/2

pled [6] 67/2 73/10 73/11 98/17 103/23 149/9

plug [1] 157/5

point [45] 7/22 8/23 10/5 13/4 14/2 14/2 14/23 17/11 17/14 18/15 20/13 24/21 29/17 30/11 30/14 30/15 30/17 35/23 35/25 37/2 39/10 44/7 45/24 46/6 53/23 57/14 70/6 73/16 91/9 91/13 92/17 99/13 100/14 109/10 109/12 112/13 114/24 125/24 127/21 128/2 128/12 138/13 144/1 151/17 152/12

pointed [5] 19/15 69/14 69/22 116/11 127/11

pointing [3] 53/8 110/15 115/9

points [2] 72/1 127/8

poke [1] 150/21

policy [5] 62/25 83/13 89/2 158/10 158/15

pop [1] 145/16

popped [1] 113/13

portion [2] 79/4 80/7

portions [1] 163/7

position [10] 25/6 26/21 28/6 28/8 37/4 44/7 46/13 47/21 96/3 146/24

possess [1] 96/20

possession [2] 17/17 108/14

possible [3] 75/13 77/18 126/3

possibly [3] 84/5 106/10 114/13

posture [2] 72/19 72/20

potentially [2] 21/9 104/17

pound [1] 148/22

practical [1] 157/24

practice [7] 40/1 40/2 47/21 98/9 111/8 118/1 133/13

practices [2] 104/5 104/10

precise [1] 82/25

precludes [1] 71/8

prefer [1] 127/19

prejudiced [1] 43/23

prejudicial [1] 44/17

preparation [1] 163/14

prepare [2] 34/25 76/9

prepared [4] 30/1 35/20 35/21 142/21

preparing [7] 7/5 7/6 24/18 24/22 34/23 85/1 88/23

present [7] 18/13 27/3 29/13 30/19 30/20 31/5 107/13

presented [7] 17/9 25/1 28/1 34/15 107/15 111/2 122/12

Presiding [1] 1/19

pressing [1] 92/23

presumably [2] 39/17 157/2

presumably and [1] 157/2

presume [2] 39/12 154/6

presumed [2] 66/2 71/4

presuming [1] 88/9

pretty [1] 55/15

prevent [1] 112/7

prevented [1] 37/11

preventing [1] 134/20

previous [3] 25/7 25/24 73/20

previously [10] 8/19 103/18 104/18 105/25 108/2 128/14 134/1 135/23 142/21 150/15

primary [1] 77/22

principal [1] 71/12

print [1] 153/18

printed [1] 118/7

prior [11] 6/19 18/21 18/22 21/17 34/12 73/19 101/24 102/24 105/4 108/15 110/1

private [1] 146/25

privilege [6] 50/16 50/16 58/23 59/5 90/25 140/21

privileged [3] 46/12 50/17 60/12

probably [10] 23/23 33/7 44/20 60/11 91/10 92/4 97/13 102/16 114/7 139/1

problem [11] 14/9 77/17 77/19 84/15 86/25 99/9 139/21 144/3 158/8 158/9 159/18

Procedure [2] 61/12 65/11

proceed [1] 6/1

proceeding [2] 20/12 97/21

proceedings [4] 1/17 1/21 163/7 163/11

proceeds [1] 28/11

process [4] 75/8 78/18 78/19 117/3

produce [51] 12/7 13/5 13/15 14/12 14/13 14/25 15/9 18/18 31/10 32/8 32/13 32/14 32/25 34/12 35/12 35/13 36/21 38/2 40/25 42/14 43/4 43/5 43/8 43/13 44/18 78/6 78/7 92/14 95/12 97/12 97/25 106/13 106/18 106/20 108/4 111/24 115/17 119/5 128/7 139/20 140/3 141/14 141/20 141/24 141/25 151/15 153/3 154/7 155/11 155/13 157/22

produced [44] 8/19 10/16 13/20 13/21 18/4 18/4 20/19 31/12 32/7 33/18 37/14 43/18 43/21 44/13 44/15 44/23 46/10 50/12 50/16 76/11 89/25 95/19 97/11 104/18 106/12 106/18 111/3 113/19 121/21 121/24 140/12 149/22 150/6 150/15 151/22 152/20 154/19 155/2 155/17 156/14 156/19 156/23 156/25 157/1

producing [3] 13/15 115/17 119/2

product [2] 17/8 37/4

production [41] 12/25 15/21 31/20 35/22 35/24 46/12 97/17 98/13 102/5 103/9 104/1 104/6 104/7 105/4 110/25 111/18 112/4 117/13 118/20 120/6 121/15 123/14 128/14 128/16 129/5 133/7 137/24 138/20 138/25 139/2 142/12 142/17 142/18 142/22 145/1 147/24 148/16 150/10 150/16 150/19 157/21

productive [3] 119/20 153/5 157/25

profit [14] 7/19 8/2 12/4 12/7 12/15 13/24 13/25 14/3 14/16 14/21 15/5 43/4 43/7 43/9

profit-and-loss [8] 12/15 13/24 14/16 14/21 15/5 43/4 43/7 43/9

profits [11] 13/1 13/8 13/9 13/12 14/14 14/14 14/18 14/18 15/15 15/18 37/18

promotion [2] 5/1 5/2

proof [3] 29/17 97/10 122/22

proper [6] 47/20 49/9 49/16 49/22 92/20 129/12

properly [1] 78/11

proposed [1] 33/23

protect [1] 68/14

protected [1] 63/15

Protection [6] 5/19 6/3 54/1 93/5 93/17 94/4

Protective [4] 42/14 45/6 100/13 100/15

proud [1] 72/10

prove [21] 9/16 25/8 25/9 28/17 28/19 28/20 29/1 29/3 62/14 67/7 67/8 69/19 73/11 73/11 100/9 104/22 106/5 109/15 111/15 112/9 134/20

proven [1] 69/18

provide [37] 8/9 9/23 14/8 14/16 14/20 14/22 15/1 15/5 15/19 15/19 16/1 17/2 20/20 21/1 32/1 35/10 36/11 38/23 42/25 77/12 77/20 80/16 89/20 94/6 101/3 102/11 102/19 107/18 108/13 110/20 126/17 127/18 137/24 142/8 155/5 155/5 157/4

provided [27] 7/11 8/12 16/8 18/21 20/12 36/15 50/16 76/6 76/8 77/25 78/14 78/17 78/22 80/3 110/2 110/8 114/6 117/17 117/20 123/1 123/14 127/7 133/19 140/21 150/17 152/17 152/21

provider [2] 63/12 68/13

providers [1] 95/2

providing [3] 37/10 37/11 80/4

proximate [1] 7/20

prudent [1] 59/13

public [1] 109/25

PublicData [50] 61/4 62/22 63/9 65/5 65/23 66/2 68/19 69/6 71/7 95/1 95/19 95/20 96/4 98/12 103/9 106/14 106/17 106/21 106/23 109/11 110/11 111/25 113/10 113/20 115/12 117/13 121/18 121/23 121/24 122/6

1069

## P

**PublicData... [20]** 123/1 123/6 123/13 124/18 127/9 127/15 130/21 139/13 139/18 140/5 140/7 142/14 143/13 143/17 148/8 148/12 148/13 149/20 149/24 150/12
**PublicData.com [7]** 27/9 61/18 71/25 82/10 94/7 114/7 136/7
**pull [4]** 16/11 17/16 58/21 60/9
**pulled [2]** 49/24 129/10
**punish [2]** 74/15 138/7
**punished [1]** 74/12
**pure [1]** 97/24
**purported [1]** 53/20
**purports [1]** 48/15
**purpose [11]** 21/14 47/12 47/20 64/22 64/24 66/2 66/14 71/9 103/15 112/3 117/7
**purposes [9]** 69/17 96/2 97/6 103/2 103/5 103/21 120/10 125/11 157/24
**pursuant [7]** 23/15 42/14 43/9 77/25 84/24 89/25 91/11
**pursue [2]** 151/8 151/9
**pursuing [1]** 119/8
**put [16]** 9/20 30/4 38/21 41/6 44/25 47/1 50/19 57/12 75/8 82/1 89/12 121/19 151/9 151/12 158/19 159/16
**putting [1]** 75/6
**pyramid [1]** 51/5

## Q

**question [20]** 9/19 22/4 22/5 23/7 24/17 30/17 31/24 45/16 45/18 49/5 56/23 73/2 87/19 88/1 88/15 112/14 120/6 141/18 144/11 156/21
**questions [4]** 25/24 57/21 94/16 96/10
**quick [1]** 6/9
**quicker [1]** 139/24
**quickest [1]** 6/8
**quickly [3]** 41/4 78/2 78/17
**quite [7]** 49/9 49/12 76/20 76/23 85/16 108/20 140/19
**quote [5]** 48/9 48/9 64/1 81/7 84/21
**quoting [1]** 85/18

## R

**rabbit [10]** 105/19 106/2 106/4 106/5 107/2 117/8 119/16 124/3 124/4 156/9
**Rainey [1]** 134/16
**raise [2]** 95/9 111/16
**raised [5]** 6/8 27/6 77/6 118/24 120/10
**Ram [1]** 110/10
**ran [20]** 61/16 64/10 68/7 98/13 100/8 100/21 100/23 101/23 103/22 105/23 105/23 106/1 109/5 109/7 110/11 114/1 116/15 117/10 123/15 153/19
**Randy [1]** 134/16
**rate [2]** 48/4 48/5
**rates [1]** 15/17
**rather [3]** 159/21 159/21 159/23
**rationality [1]** 92/10
**Re [2]** 48/24 150/4
**reach [2]** 31/20 126/13
**read [15]** 8/15 9/24 10/1 15/16 16/12 36/16 46/5 80/16 82/19 84/19 86/2 86/2 88/13 136/24 140/1
**reading [5]** 8/14 10/18 10/19 85/25 131/6
**ready [2]** 124/9 157/13
**reality [1]** 51/17
**really [29]** 6/4 17/25 20/21 31/1 35/2 40/17 42/11 44/12 44/12 53/1 65/19 65/19 92/13 103/22 104/16 104/21 105/2 107/16 110/22 114/10 114/11 120/8 127/19 130/10 141/1 142/20 145/22 158/23 160/4

**ream [1]** 98/7
**reason [13]** 21/9 23/4 23/6 39/23 46/14 50/4 60/3 113/14 117/2 129/21 135/7 151/23 156/10
**reasonable [9]** 33/3 63/14 63/19 63/20 90/16 95/21 119/12 152/1 157/9
**reasonably [4]** 32/10 37/15 119/13 119/14
**reasons [2]** 91/17 97/14
**recall [6]** 12/6 68/1 68/11 105/4 105/21 148/20
**recalls [2]** 8/22 49/11
**received [4]** 93/2 105/6 132/25 142/6
**recently [1]** 57/6
**recipient [1]** 63/3
**reciprocal [2]** 42/24 44/8
**recitation [1]** 22/3
**recite [1]** 68/1
**reciting [1]** 43/17
**recognize [1]** 70/8
**reconsider [2]** 42/23 82/24
**reconsidered [1]** 82/24
**record [22]** 1/2 27/1 27/11 27/16 27/20 47/3 48/20 49/12 51/9 54/25 60/20 72/24 74/4 74/5 74/6 74/15 83/5 109/9 124/1 163/9 163/11 163/15
**recording [2]** 129/1 130/12
**records [9]** 47/15 77/15 105/22 106/23 106/23 109/25 122/16 123/23 124/13
**recover [2]** 28/8 150/1
**recovery [1]** 61/8
**redacted [1]** 31/14
**redaction [1]** 31/13
**REDDEN [2]** 3/4 163/16
**reduce [1]** 152/4
**refer [3]** 131/14 141/11 141/15
**reference [6]** 41/5 48/4 81/25 102/12 103/11 106/10
**referenced [3]** 103/9 147/5 147/8
**references [1]** 29/14
**referrals [1]** 113/4
**referring [5]** 70/24 79/5 79/6 89/16 131/4
**refers [1]** 130/10
**refinance [1]** 10/10
**refinanced [1]** 8/21
**refinances [1]** 8/18
**refinancing [1]** 15/17
**reflected [2]** 39/9 78/4
**reflects [1]** 163/12
**refusal [1]** 75/7
**refused [2]** 13/12 102/19
**refute [3]** 117/16 118/25 125/12
**regard [10]** 52/9 80/22 87/9 90/13 108/9 128/15 128/25 139/16 140/25 150/10
**regarded [1]** 108/9
**regarding [19]** 42/22 45/6 80/4 93/1 97/13 102/20 104/9 105/1 107/16 107/19 108/9 118/9 118/12 120/20 126/13 126/14 126/17 146/21 150/19
**regardless [3]** 24/7 135/7 135/8
**regards [6]** 101/23 102/5 102/8 102/19 110/9 137/17
**regime [1]** 61/24
**region [4]** 13/12 15/6 133/11 133/15
**regional [5]** 83/18 84/2 84/24 137/17 137/18
**regions [3]** 133/9 133/11 133/17
**relate [4]** 103/11 141/11 143/6 143/14
**related [15]** 8/17 9/18 11/22 11/25 31/1 64/25 105/17 106/6 106/11 106/12 106/24 110/1 141/15 142/18 155/2
**relates [5]** 74/10 105/22 131/2 131/2 131/1
**relating [10]** 5/22 13/1 36/3 45/1 103/22 119/10 128/8 128/10 129/12 133/8

**relation [1]** 12/1
**Relativity [2]** 153/7 153/8
**relevance [1]** 135/6
**relevancy [1]** 36/13
**relevant [38]** 15/2 37/6 37/7 37/17 41/7 41/18 41/20 41/22 45/14 46/15 50/13 50/20 50/20 52/9 52/15 55/14 55/23 55/25 56/24 59/8 59/10 60/5 60/7 63/17 84/5 85/12 96/19 96/19 96/20 96/23 97/11 116/24 133/5 133/6 147/6 147/10 150/2 152/2
**reliable [2]** 19/25 20/3
**relief [1]** 43/15
**remaining [1]** 140/24
**remember [7]** 23/16 54/12 75/18 94/25 98/11 121/17 148/3
**remembers [1]** 46/4
**remind [1]** 44/20
**reminded [2]** 47/20 58/11
**renewed [1]** 9/4
**reopen [1]** 115/16
**rep [2]** 49/24 50/21
**repeat [2]** 8/18 8/19
**repeatedly [1]** 59/2
**report [5]** 135/21 154/7 155/5 155/7 155/11
**reported [3]** 1/21 51/12 163/10
**reporter [3]** 4/4 163/4 163/19
**REPORTER'S [4]** 1/2 163/9 163/11 163/15
**reporting [1]** 52/25
**reports [3]** 13/25 14/16 157/22
**represent [2]** 37/12 160/25
**representation [16]** 22/2 46/15 48/12 48/14 48/15 48/16 50/19 53/10 54/23 57/11 89/11 146/22 147/15 149/3 159/7 161/15
**representations [6]** 54/13 57/10 107/15 107/17 145/23 156/24
**representative [7]** 49/10 49/18 50/1 52/13 58/19 60/3 91/23
**represented [6]** 6/24 7/15 18/19 46/2 111/1 161/24
**reputational [1]** 157/10
**request [44]** 7/4 15/21 16/9 16/9 16/12 31/11 36/23 38/15 89/18 90/16 97/16 99/15 102/5 104/1 104/6 104/7 110/25 117/13 118/6 118/19 120/6 121/15 129/23 130/3 130/14 130/23 131/2 134/23 137/23 137/24 138/20 138/25 139/2 139/17 140/22 141/16 142/11 148/16 150/17 150/19 150/25 151/18 153/12 154/23
**requested [12]** 13/22 43/18 44/13 44/15 92/25 104/23 110/25 120/5 120/20 133/25 143/5 163/7
**requesting [4]** 97/16 118/25 120/13 139/20
**requests [36]** 12/25 36/3 36/18 36/18 38/3 43/9 95/15 111/18 111/24 115/15 118/7 118/9 120/9 120/13 126/22 127/3 127/6 128/11 128/25 129/7 129/8 132/2 132/16 139/3 139/10 140/24 142/3 142/17 142/18 142/22 143/22 146/17 146/21 147/24 150/3 150/16
**require [2]** 92/3 92/12
**required [4]** 19/14 61/12 65/11 67/4
**requirement [2]** 67/19 153/20
**requires [4]** 31/12 52/25 60/4 65/24
**requiring [3]** 76/3 76/6 91/4
**research [5]** 108/23 108/24 112/16 119/23 119/23
**researched [1]** 108/19
**researching [1]** 115/4
**resell [2]** 63/3 67/18
**reseller [1]** 63/8
**resellers [2]** 63/14 65/4
**reserving [1]** 151/7
**reset [1]** 159/16
**resigned [1]** 9/4

# R

resolution [1] 126/14
resolve [1] 110/22
resolved [3] 5/12 5/15 31/8
resources [2] 45/15 48/8
respect [22] 13/3 42/9 77/10 83/2 84/9 89/19 91/24 98/11 103/10 103/15 104/16 104/18 105/10 111/18 126/21 126/22 128/19 128/20 131/9 134/5 142/2 143/18
respectfully [10] 15/10 21/13 46/19 55/3 55/22 57/14 57/17 90/17 90/17 136/19
respective [1] 163/13
respond [16] 6/17 59/20 80/10 84/10 84/25 90/13 90/18 91/10 91/18 123/18 137/2 137/2 137/5 137/6 153/24 157/18
responded [2] 89/4 89/18
responding [7] 48/10 59/16 84/9 90/25 91/7 91/15 137/3
response [34] 7/2 18/21 18/23 42/11 45/25 59/21 70/15 71/11 84/21 84/22 85/16 87/16 88/10 89/16 89/17 89/21 89/21 90/9 91/11 91/20 95/4 95/5 99/18 105/12 127/3 127/6 129/22 132/21 133/1 137/17 140/13 140/22 150/17 152/19
responses [11] 31/9 42/13 42/17 77/10 78/22 84/1 96/12 101/18 102/2 108/13 118/12
responsibility [3] 73/4 73/5 75/4
responsible [12] 5/20 40/13 56/8 60/23 61/5 65/24 72/16 72/21 81/1 81/5 88/23 101/16
responsive [17] 111/24 112/6 115/15 131/23 141/14 142/23 143/16 143/21 143/25 146/23 147/6 149/21 150/2 150/15 150/19 153/11 154/23
rest [6] 36/8 66/18 110/24 134/5 134/20 150/14
restate [1] 40/5
restrict [1] 111/21
restricted [3] 128/14 129/3 131/20
result [13] 7/20 7/23 19/18 26/3 26/23 73/19 107/8 110/10 110/19 125/1 145/16 145/19 150/12
resulted [6] 63/11 85/6 107/19 110/7 135/4 142/22
results [15] 107/19 108/11 111/22 114/5 114/9 117/12 117/18 119/12 121/18 122/1 153/10 154/9 154/10 154/11 154/22
retread [1] 6/20
returning [1] 35/25
reveal [4] 37/4 40/14 40/14 40/15
revealed [2] 9/10 107/16
revealing [1] 17/7
reveals [1] 9/11
revenue [4] 7/20 13/20 43/5 43/5
reverse [1] 38/19
review [11] 7/10 43/22 44/16 83/15 84/23 108/24 144/6 145/16 154/7 154/24 157/22
reviewed [2] 46/10 83/25
revisit [1] 105/3
rewarded [1] 138/5
RFP's [1] 12/23
rhetorical [1] 17/25
right [52] 4/2 5/7 5/10 5/24 7/25 9/13 11/13 13/7 13/19 14/15 17/2 19/9 19/23 20/7 23/25 25/5 25/15 27/7 34/24 37/3 37/4 37/12 38/6 45/17 54/10 60/13 63/9 64/18 65/22 69/3 71/20 83/23 86/2 90/2 94/1 95/10 98/3 101/4 102/13 113/8 113/24 115/22 124/17 126/19 126/25 129/24 129/25 148/23 149/7 151/8 152/8 154/17
rights [1] 152/4
risk [1] 157/10

road [1] 116/23
ROBERT [2] 1/19 24/23
Rogatory [11] 5/21 5/22 6/3 93/3 93/4 93/13 93/16 94/5 96/9 96/15 100/14
role [2] 85/1 85/19
ROMERO [4] 2/11 4/11 65/15 69/22
room [2] 55/16 69/19
routinely [2] 74/20 74/21
RTP [4] 62/8 66/23 67/1 67/3
rule [14] 29/14 29/25 30/22 43/17 61/25 62/17 71/4 72/13 75/15 99/3 99/4 100/1 100/4 158/25
ruled [2] 11/16 43/16
Rules [5] 61/12 65/11 67/4 95/14 98/2
ruling [13] 35/11 36/1 41/23 42/3 43/11 43/19 43/24 44/5 60/13 60/14 92/24 100/19 128/7
run [26] 21/7 25/2 41/4 41/21 61/4 61/15 66/12 68/20 68/22 69/1 92/4 103/1 103/20 105/16 106/14 110/5 111/21 113/3 113/12 117/6 122/21 127/22 129/10 129/19 150/1 153/17
running [16] 24/14 63/25 64/3 65/9 66/8 66/14 66/22 95/24 98/21 106/2 106/16 111/6 116/21 119/7 119/16 119/16
runs [1] 97/5

# S

safeguards [1] 63/9
said [82] 10/9 11/18 13/6 13/6 13/19 16/19 17/4 17/13 21/24 25/23 25/25 27/7 28/3 29/12 37/3 41/6 42/11 43/8 44/1 50/13 51/25 55/24 57/7 57/16 58/23 59/12 63/12 64/22 65/1 67/7 68/20 70/9 70/12 70/14 71/15 72/6 74/7 77/14 83/2 83/3 83/4 83/20 83/21 83/22 83/23 84/2 87/15 88/9 90/7 90/15 91/22 92/15 94/9 94/21 94/24 95/1 96/1 96/15 98/13 100/6 104/19 105/13 105/13 106/6 108/18 112/16 112/17 112/19 123/13 123/15 124/2 129/19 135/23 140/11 142/16 145/1 147/8 148/16 149/15 150/9 151/7 161/16
sake [1] 46/23
same [30] 13/14 14/20 15/7 15/7 17/17 17/22 29/8 31/11 36/18 38/5 39/23 43/1 43/6 46/14 57/11 63/18 69/4 82/15 82/17 93/17 94/6 101/24 104/5 116/5 118/23 131/22 132/15 137/14 142/11 142/21
sanctions [5] 74/3 74/8 90/4 91/6 91/20
sand [1] 148/22
satellite [1] 97/7
satisfied [2] 8/7 66/16
Savanna [4] 81/1 81/5 85/13 86/17
saved [3] 101/9 148/7 149/10
saves [1] 101/22
saw [6] 13/11 61/17 77/15 96/24 103/3 103/7
say [59] 4/4 4/14 8/24 10/19 16/15 16/16 17/7 17/12 22/25 28/10 28/12 29/23 30/7 39/25 42/13 42/13 46/23 49/25 51/16 52/17 52/19 53/22 53/25 54/17 58/11 59/15 59/25 61/25 62/3 70/24 71/10 71/18 84/16 85/10 85/23 87/14 87/22 88/7 88/19 92/15 98/18 106/4 109/9 109/14 109/19 110/8 113/20 115/18 115/19 116/13 136/16 140/14 141/14 141/17 143/23 144/4 150/21 152/23 158/11
saying [29] 9/22 11/5 25/11 31/4 41/21 47/2 47/6 60/2 64/6 66/12 70/1 70/23 71/6 71/11 75/21 80/20 85/10 85/18 88/9 91/2 99/5 108/22 108/24 109/22 112/20 112/24 115/24 141/20 152/3
says [31] 43/17 48/6 48/24 49/1 53/9 53/25 55/7 55/7 57/1 58/10 58/17 58/18 59/16 61/6 62/7 62/17 63/1 63/24 64/1 71/4 73/18 83/2 88/20 106/4 106/21 113/18 123/2 124/7 128/1 131/6 153/18

SBOT [4] 2/3 2/19 3/3 3/10
scenario [1] 29/6
Schaefer [5] 130/20 131/7 131/13 131/14 132/1
Schaeffer [1] 131/2
SCHAFFER [4] 1/19 23/1 23/9 24/23
Schaffer's [2] 22/22 22/24
scheduling [1] 92/18
scope [2] 30/7 93/8
scrape [1] 18/14
screen [7] 68/20 84/19 153/18 154/8 154/9 155/14 155/16
seal [1] 124/1
search [124] 25/10 26/3 41/21 64/4 64/10 68/7 69/16 98/17 98/24 99/10 105/20 105/24 106/1 106/3 106/6 106/11 106/13 106/15 106/24 107/16 107/19 109/5 109/7 110/1 110/5 110/6 110/6 110/6 110/19 111/22 111/23 112/1 112/20 112/23 112/24 113/3 113/12 114/1 114/9 114/12 114/16 114/20 114/25 115/8 115/18 115/24 116/1 116/3 116/7 116/15 116/22 117/7 117/10 117/12 117/24 121/18 122/15 123/2 123/10 123/13 123/15 123/24 124/6 124/7 124/12 124/19 125/16 125/18 125/23 126/8 126/9 126/9 127/10 128/19 129/5 131/22 132/2 135/5 135/15 135/16 140/7 142/2 142/4 142/11 142/17 142/21 143/5 143/5 143/11 143/21 144/7 144/8 144/10 144/11 144/16 145/1 145/13 145/18 145/21 146/1 146/7 146/8 146/8 146/8 148/17 148/24 148/25 149/15 150/6 150/13 153/1 153/2 153/4 153/4 153/5 153/8 153/10 153/18 154/7 154/10 154/11 155/4 155/4 155/11
searchable [1] 121/25
searched [10] 69/6 97/1 111/25 117/11 142/5 143/15 144/2 148/11 149/12 149/20
searches [86] 61/16 63/6 64/1 65/9 66/8 66/12 66/14 66/22 68/22 69/1 72/23 72/24 73/2 73/13 94/17 94/18 95/3 95/5 95/6 95/21 95/25 97/6 97/13 98/8 98/14 98/21 99/6 99/12 99/14 99/21 100/8 100/21 100/23 101/23 102/20 102/25 103/14 103/22 104/14 105/16 105/18 106/16 107/5 107/8 107/22 108/5 108/8 108/8 111/6 111/20 111/21 111/22 112/5 121/13 121/17 122/8 122/21 124/25 125/15 126/17 126/19 126/24 126/25 127/2 127/13 127/18 127/22 127/24 128/8 128/15 128/20 129/2 129/9 129/11 129/13 129/15 129/19 131/21 144/8 149/17 149/19 150/1 152/17 152/22 152/25 155/2
searching [10] 47/14 112/21 124/24 125/4 125/5 125/9 125/10 126/9 132/5 149/24
second [27] 11/20 12/24 13/18 24/23 34/6 40/24 47/19 54/12 65/17 74/4 75/24 76/9 76/15 77/16 82/12 82/14 87/7 93/24 101/14 101/15 102/23 104/7 121/21 123/17 127/22 150/18 160/16
secondary [2] 77/21 77/24
secret [2] 42/10 42/18
secrets [1] 42/14
secular [1] 98/16
Security [4] 77/21 77/22 77/25 115/5
see [50] 9/14 10/13 12/22 16/25 17/2 25/19 26/9 28/1 35/17 39/8 40/21 54/5 58/5 63/16 64/19 77/16 82/5 83/15 95/22 100/17 100/21 100/23 101/1 101/7 101/25 104/4 109/8 113/4 113/5 113/13 113/15 113/24 115/25 119/13 120/20 122/16 124/4 124/5 124/11 127/10 131/23 132/6 139/5 139/19 141/13 144/17 146/1 146/2 146/9 153/11
seeing [1] 125/13
seek [2] 24/11 120/22
seeking [10] 18/20 18/25 31/18 37/6 37/7

**S**

seeking... [5] 85/8 96/8 123/11 132/1 149/5
seeks [1] 104/24
seem [3] 102/16 127/17 130/2
seems [5] 91/18 114/10 114/12 114/21 137/3
seen [5] 21/25 49/14 50/25 58/17 117/21
Select [4] 47/11 47/13 47/14 48/8
self [2] 5/2 111/3
self-collected [1] 111/3
self-promotion [1] 5/2
seminars [1] 44/21
send [7] 64/7 83/14 86/9 143/4 144/16 144/22 147/16
sense [5] 13/19 14/17 15/11 129/14 136/18
sent [14] 36/19 55/8 56/9 58/8 66/12 81/19 83/7 86/6 86/12 88/17 94/2 94/2 94/3 117/5
sentence [1] 5/24
separate [2] 117/23 129/6
separately [1] 54/19
September [4] 37/18 75/16 75/16 82/25
serial [1] 82/16
seriously [2] 32/25 100/24
served [8] 87/16 93/5 97/5 97/17 104/1 104/6 120/12 150/16
serves [2] 21/14 57/2
service [2] 70/2 70/3
services [4] 1/5 1/6 4/2 103/21
session [3] 88/22 148/1 148/3
set [7] 6/10 18/12 49/20 91/24 92/24 118/19 160/2
setting [3] 33/8 33/8 157/20
settlement [2] 58/23 101/17
seven [1] 34/20
Seventh [1] 104/6
several [5] 94/4 102/21 104/23 105/5 150/8
severers [1] 66/13
shall [2] 79/19 88/2
shameless [2] 5/1 5/1
she [53] 8/14 8/14 10/5 10/5 45/18 45/22 51/13 51/14 51/14 51/15 52/12 52/17 52/21 66/23 66/25 104/18 105/23 106/1 106/6 109/22 110/11 111/6 111/8 112/21 113/16 114/2 114/3 115/4 116/13 116/15 116/15 116/17 116/18 116/19 117/16 117/17 117/24 122/18 122/25 123/10 123/15 124/9 124/21 125/10 125/11 134/25 135/8 142/3 143/2 143/4 147/5 147/8 147/9
she's [5] 10/2 67/1 112/20 121/7 124/9
sheet [3] 6/14 15/25 161/13
sheets [1] 27/9
shell [1] 61/3
shift [1] 65/16
ship [1] 22/7
Shop [1] 72/15
short [4] 23/21 54/2 76/1 147/25
shot [4] 153/18 154/8 154/9 155/16
shots [1] 155/14
should [19] 25/18 25/19 31/8 32/8 41/8 51/22 67/15 71/13 74/12 94/23 108/10 115/17 131/5 142/20 144/2 150/17 152/13 152/16 154/21
shouldn't [6] 70/24 119/2 124/3 150/24 152/13 158/11
show [34] 9/16 14/14 14/24 17/10 22/20 26/6 28/13 59/19 60/4 61/19 62/11 62/16 65/5 67/9 68/18 79/8 84/12 85/14 105/23 106/23 110/3 112/18 115/2 115/8 117/19 119/20 148/6 151/2 151/19 154/7 155/4 155/14 155/16 155/16
showed [7] 83/16 98/15 98/16 98/20 105/20 106/2 113/22
showing [7] 13/25 14/17 59/3 59/8 60/10

71/23 106/24
shown [7] 63/22 65/6 65/12 67/2 95/18 96/4 109/21
shows [13] 37/17 38/25 41/18 53/13 53/13 85/13 98/8 109/13 114/2 120/1 123/8 123/24 153/3
side [3] 45/2 153/25 160/15
sides [1] 32/1
sign [2] 16/21 92/20
signed [9] 16/23 19/17 49/1 58/9 74/10 76/3 82/23 113/23 161/17
signer [1] 77/23
significance [1] 53/17
significant [1] 147/13
signing [1] 100/14
signs [1] 71/6
similar [8] 36/18 37/2 102/17 130/5 133/25 134/17 137/16 142/22
similarly [1] 145/19
simple [6] 30/17 55/2 72/20 87/2 97/24 102/18
simpler [1] 7/9
simply [5] 50/18 72/22 73/8 74/23 100/4
since [12] 5/11 6/24 51/23 89/8 89/14 94/24 102/23 128/14 134/3 134/6 142/24 148/1
single [10] 19/16 29/16 46/20 50/13 59/12 59/25 77/6 135/1 148/18 157/10
sip [1] 53/24
sir [10] 16/4 32/17 33/9 34/10 34/19 34/22 76/2 76/5 156/17 159/10
sit [3] 57/21 66/11 121/9
site [1] 94/10
sites [2] 61/5 94/25
sits [1] 50/5
sitting [2] 12/6 66/7
situation [3] 67/24 123/23 145/23
six [2] 26/2 36/18
Sixth [2] 102/5 104/1
skip [3] 98/8 100/9 106/1
skipping [1] 12/14
slows [1] 75/8
smacks [1] 50/3
small [8] 56/9 56/13 56/17 75/21 75/22 109/19 109/19 147/13
smart [1] 124/5
SMR [1] 53/11
snapshot [2] 22/14 23/18
so [150] 5/13 6/5 7/17 8/22 9/15 10/15 10/22 11/2 11/24 12/22 16/23 18/25 20/12 21/19 23/22 23/25 24/7 24/17 24/18 24/22 24/24 24/24 26/4 26/20 26/25 29/19 31/6 31/13 31/23 31/25 32/5 32/13 33/19 34/4 34/8 34/20 35/3 35/6 35/9 36/11 36/23 37/9 37/10 43/6 44/19 44/23 46/6 46/18 51/6 51/16 52/1 53/23 54/17 57/13 57/15 57/23 58/25 59/6 63/11 64/7 65/10 65/21 66/4 68/23 70/2 70/3 71/6 73/7 74/19 75/2 76/1 76/8 76/14 78/10 78/11 80/9 80/20 83/4 83/5 83/8 83/21 84/20 94/12 94/14 95/2 96/13 98/15 98/22 103/13 103/25 104/21 104/21 105/2 105/7 107/25 108/22 109/23 110/15 111/13 111/14 112/2 112/8 113/10 113/19 114/10 115/11 115/12 116/24 117/20 118/19 118/25 120/6 120/12 121/8 124/21 126/24 128/24 130/1 130/3 130/7 130/16 133/2 133/10 133/12 133/23 134/11 134/21 137/1 137/12 138/7 138/7 139/12 139/25 141/4 141/23 145/1 145/22 148/24 154/2 154/22 155/1 156/13 157/7 157/19 158/7 158/24 159/7 160/2 160/5 161/11
So at [1] 20/12
Social [4] 77/21 77/22 77/24 115/5
Softech [1] 67/22

sold [1] 109/17
solicit [3] 79/22 80/18 88/4
soliciting [1] 69/20
some [55] 5/14 5/14 6/7 16/1 16/13 21/15 22/15 25/22 25/23 29/6 31/20 33/18 39/18 40/2 41/11 42/24 44/5 45/15 47/6 57/21 57/21 59/8 63/23 64/8 64/18 64/24 73/3 77/9 77/14 86/10 90/6 90/9 90/17 91/18 92/10 93/2 94/15 94/25 95/18 98/13 100/9 104/17 107/13 109/10 109/12 111/1 111/23 111/23 113/14 122/12 130/5 138/12 142/16 144/2 144/17
somebody [5] 34/1 49/21 86/8 86/8 155/25
somebody's [1] 18/8
somehow [2] 7/5 9/18
someness [1] 6/21
someone [17] 21/4 27/20 39/4 52/25 56/10 62/4 63/10 63/11 68/3 68/14 69/13 71/6 71/18 73/7 124/21 148/7 161/8
something [40] 11/3 28/12 28/23 34/2 45/21 49/23 53/20 62/14 62/18 65/17 68/10 68/19 68/24 71/12 74/19 74/20 81/12 84/17 90/5 91/2 92/17 94/22 97/25 98/18 106/3 109/18 110/12 110/12 110/20 114/8 127/13 128/2 135/4 136/17 141/23 141/25 144/7 144/20 145/14 145/17
sometimes [3] 41/9 77/23 109/18
somewhere [1] 57/23
soon [1] 159/4
sorry [12] 12/13 15/24 58/12 69/25 85/13 114/15 130/15 136/25 139/23 140/7 146/6 158/25
sort [4] 61/21 64/22 153/6 153/8
sought [5] 6/22 43/15 60/5 61/8 152/15
sounds [1] 64/2
source [1] 41/13
South [1] 156/6
space [1] 64/14
spade [3] 94/13 135/24 147/18
span [2] 41/9 41/11
speak [4] 44/21 51/6 146/20 158/24
speaking [3] 4/5 35/14 38/7
Special [12] 7/13 20/20 25/1 30/2 30/11 37/10 77/10 77/20 78/8 78/18 91/25 117/3
specific [22] 8/5 12/7 12/15 15/5 35/22 35/24 43/3 45/13 71/9 77/1 83/11 83/12 114/20 118/5 127/13 129/23 138/19 138/20 148/15 149/15 149/16 153/2
specifically [20] 10/15 10/17 13/11 36/17 39/3 47/10 74/10 79/16 80/10 83/6 83/7 89/21 107/2 115/4 116/16 118/9 125/6 143/6 147/5 161/8
speed [1] 7/10
split [3] 145/9 145/12 146/7
spoken [1] 33/16
sponsored [1] 85/22
spread [1] 136/7
spreads [1] 135/16
spreadsheet [5] 148/4 148/17 148/18 150/18 151/1
sprung [1] 38/15
stack [1] 95/20
stage [2] 65/10 67/8
stamina [1] 161/21
stand [6] 21/23 26/20 42/23 43/12 75/9 121/20
standard [23] 62/5 62/12 62/17 62/24 64/18 65/4 65/12 66/5 67/4 71/14 71/22 72/18 73/8 81/10 81/11 81/17 81/19 98/25 99/24 100/2 150/4 154/25 161/7
standards [12] 61/10 61/12 61/14 66/17 68/17 69/13 69/25 72/7 72/12 72/13 72/22 73/7

## S

standing [3] 34/4 95/9 95/12
start [10] 4/7 4/16 25/25 32/8 54/22 66/25 74/22 97/12 132/4 139/11
started [7] 9/22 10/5 26/2 26/8 26/12 26/12 26/13
starting [4] 41/17 45/24 93/7 102/23
starts [2] 26/7 110/10
state [13] 14/1 14/4 31/17 47/15 47/18 70/9 70/16 113/5 133/4 133/21 134/5 163/1 163/5
stated [4] 11/2 51/14 117/14 139/18
statement [3] 55/1 55/4 125/23
statements [7] 15/5 57/22 102/8 117/16 119/1 119/1 120/7
states [1] 88/22
stating [1] 118/21
statute [5] 65/24 66/19 71/8 72/1 73/5
statutes [1] 61/13
statutory [3] 64/24 67/19 68/21
stay [2] 33/25 156/9
stealing [2] 55/17 69/20
STECKER [1] 2/11
stenotype [1] 1/21
step [1] 19/7
steps [1] 68/14
Steve [1] 113/23
Steven [3] 40/7 113/14 113/16
stick [1] 59/24
sticky [1] 82/1
still [17] 8/25 9/16 19/20 24/6 25/17 35/14 41/12 66/22 67/1 75/9 105/5 129/14 140/16 150/18 151/7 156/14 156/15
stipulate [3] 25/13 25/16 96/1
stipulation [2] 66/21 72/24
stole [1] 16/10
stolen [1] 15/3
stop [6] 10/18 47/8 57/12 65/18 114/22 120/15
stopped [2] 8/14 10/19
store [6] 40/14 81/9 83/13 131/13 148/11 149/1
stores [3] 13/11 47/11 149/6
story [1] 91/16
straight [3] 6/9 102/8 102/18
straight-forward [1] 6/9
strapping [1] 156/6
strategies [1] 83/9
strategy [13] 17/8 79/25 80/5 80/11 84/4 86/4 87/3 87/9 87/10 87/14 87/21 88/5 88/8
Street [1] 2/12
streets [1] 68/3
strike [1] 13/6
structure [2] 52/6 52/8
struggled [1] 72/9
stuck [1] 136/3
stuff [11] 30/10 38/25 47/6 84/3 84/4 86/5 99/6 99/6 148/8 148/13 149/10
stuffed [1] 85/9
stuffing [1] 55/16
styled [1] 163/9
subject [5] 25/10 55/14 62/8 63/14 132/2
submission [1] 92/24
submit [1] 42/5
submitted [10] 41/20 53/24 77/13 102/24 105/11 108/2 118/19 118/20 120/12 159/13
subpoena [5] 93/7 94/1 96/4 99/2 100/19
subpoenas [9] 93/2 93/5 93/16 94/4 94/5 96/11 97/5 99/25 147/16
Subsection [1] 63/4
subsequent [1] 117/3
subsequently [1] 28/16
substance [1] 42/16

substantial [2] 34/17 90/13
substantially [1] 131/17
substantive [1] 157/22
such [4] 36/11 59/13 86/24 87/14
sudden [1] 26/21
suddenly [1] 50/24
sued [4] 62/1 63/12 67/17 68/12
sufficient [2] 105/6 132/20
suggest [5] 6/2 34/12 38/24 93/8 127/14
suggested [2] 109/10 126/16
suggesting [5] 16/25 18/11 25/15 44/6 64/10
suggestion [5] 116/17 116/20 120/14 124/16 126/13
suggests [2] 64/24 118/22
suit [1] 97/18
Suite [4] 2/5 2/20 3/5 3/11
sum [1] 55/12
summarizes [1] 12/22
summary [7] 12/18 29/14 29/16 29/20 29/25 30/22 108/4
summer [4] 96/1 158/16 159/1 159/2
summertime [1] 158/18
superceding [1] 61/21
superior [1] 135/22
supplement [3] 89/11 89/12 141/21
Supplemental [3] 88/16 89/21 140/22
supplementation [2] 14/9 80/8
supplemented [2] 80/6 90/2
supplementing [1] 99/17
support [7] 67/1 67/3 73/24 117/16 118/25 120/25 128/9
supported [1] 104/2
supporting [1] 8/20
supports [1] 122/23
suppose [1] 161/7
supposed [5] 7/6 20/11 20/16 20/20 71/7
supposedly [1] 22/3
supposition [1] 29/12
sure [31] 8/24 12/17 17/19 21/18 28/3 36/1 44/19 44/23 55/15 57/8 62/25 64/16 70/6 75/5 75/19 81/21 92/19 93/25 112/9 120/8 121/2 130/18 130/23 131/8 138/10 140/25 148/4 153/17 154/2 156/13 160/14
surprised [1] 161/23
surrounding [1] 60/11
suspect [1] 118/23
SUTHERLAND [1] 2/4
sutherland.com [1] 2/7
switch [1] 160/5
sworn [3] 13/10 107/2 124/9
system [3] 38/17 38/22 71/3
systemic [1] 75/7

## T

tagged [1] 54/21
tailor [1] 117/14
take [34] 14/7 28/6 28/8 29/20 30/2 30/3 39/14 39/15 41/24 46/19 51/23 53/24 59/24 64/9 75/4 89/11 90/6 90/17 91/5 91/8 96/24 101/5 101/12 117/25 118/1 120/19 128/8 128/9 132/18 139/8 146/16 159/4 159/5 161/25
taken [6] 25/6 27/1 70/13 81/7 97/2 109/6
takes [2] 121/13 146/17
taking [6] 28/5 29/24 53/1 57/8 68/14 69/19
talk [9] 26/10 35/21 61/20 134/8 135/12 146/2 146/14 155/12 160/15
talked [4] 33/14 50/14 50/14 70/13
talking [26] 13/7 27/3 29/25 32/24 39/15 43/2 44/14 45/24 49/3 52/12 57/19 61/23 67/21 69/3 78/3 79/9 86/3 89/5 93/3 93/12 101/20 121/17 130/9 136/19 144/23 154/8

tardiness [1] 91/7
tardy [2] 76/20 76/23
targeted [2] 83/6 88/24
technical [2] 35/16 157/1
Tecum [1] 94/1
Telephone [6] 2/6 2/14 2/21 3/6 3/12 163/22
tell [35] 6/13 21/9 26/15 28/23 31/3 41/17 45/21 55/10 64/2 65/21 74/16 79/10 86/20 90/2 115/20 116/9 116/10 119/20 119/23 134/9 134/25 141/3 141/23 141/24 142/2 145/24 145/24 148/1 148/21 149/17 150/21 153/6 158/9 160/25 161/13
telling [7] 15/3 57/13 57/23 85/16 87/25 117/6 154/14
tells [1] 44/4
template [2] 17/23 18/5
Temporary [7] 95/25 98/19 102/3 102/22 103/1 108/6 118/2
ten [3] 128/8 128/20 136/17
tends [1] 128/9
tennis [1] 132/19
tens [4] 39/15 39/18 40/20 145/20
term [5] 23/11 143/15 143/21 145/14 148/17
terminated [1] 117/6
terms [53] 8/12 10/6 18/21 18/25 19/2 23/16 29/24 106/14 106/15 112/2 116/3 125/15 125/16 126/8 126/9 126/9 127/10 129/5 131/21 131/22 142/2 142/11 142/16 142/17 142/19 142/21 143/5 143/5 143/6 143/11 143/20 143/25 144/8 144/10 144/11 144/16 144/22 145/1 145/9 145/13 145/18 145/21 146/1 146/7 146/8 148/12 148/25 149/15 153/2 153/4 154/10 154/11 155/4
test [1] 127/5
testified [8] 27/20 27/23 38/20 40/6 50/13 59/25 68/18 148/9
testify [1] 49/22
testimony [16] 27/6 39/25 39/25 61/15 63/24 64/12 64/20 65/7 80/24 82/20 83/11 83/16 94/9 148/7 149/10 149/13
TEXAS [69] 1/7 1/8 1/10 1/10 1/20 2/5 3/5 3/12 13/11 14/1 14/17 15/6 30/22 37/18 37/24 46/17 47/7 47/11 47/15 47/20 48/16 48/25 49/19 50/7 51/18 53/10 57/4 57/4 59/22 61/12 63/13 65/11 70/9 72/8 72/11 79/20 79/20 80/23 82/7 82/8 86/6 86/8 86/12 89/19 95/14 96/6 97/17 97/23 99/1 99/25 102/21 104/7 104/14 113/6 113/19 114/8 123/6 123/9 124/7 133/2 133/4 133/24 135/2 159/20 163/1 163/5 163/19 163/20 163/21
text [11] 139/12 139/17 141/10 141/13 146/21 146/23 147/2 147/5 147/7 147/10 147/14
than [10] 8/5 57/20 76/21 76/22 76/23 91/25 101/5 116/4 117/7 137/18
Thank [30] 18/1 37/1 42/19 45/17 48/23 54/7 58/3 60/15 60/16 72/3 73/25 79/14 87/5 92/16 101/6 103/6 132/14 136/22 137/8 137/13 146/15 147/18 147/18 152/7 154/13 155/20 155/21 155/24 160/19 160/21
Thanksgiving [1] 158/1
that [1247]
that reasonable [1] 33/3
that's [146] 5/10 5/24 9/13 10/3 10/14 11/5 11/5 11/8 14/23 15/17 15/18 16/12 17/11 19/5 20/25 21/5 22/7 23/6 23/7 24/11 25/11 26/24 27/5 28/10 28/11 29/25 30/7 30/25 31/1 31/2 32/22 33/5 36/14 36/21 36/22 37/23 39/10 40/1 41/16 41/16 41/20 41/21 42/15 43/11 43/19 45/14 45/25 46/13 46/21 46/21 48/8 51/1 51/4 53/3 53/5 53/6 53/7 54/1 54/25 55/7 55/7 55/18 56/10 56/14 56/18 57/11 57/18 58/18 59/9 59/12 59/12 60/3 62/2

1073

**T**

**that's... [73]** 62/17 63/5 64/3 64/8 64/17 66/8 67/23 68/16 70/19 70/24 71/13 71/20 71/21 71/21 72/8 72/14 73/12 73/13 73/21 75/22 75/22 77/22 79/23 80/8 81/12 81/12 82/1 84/7 85/4 87/16 90/11 90/15 91/24 92/8 92/15 97/7 98/25 99/2 100/20 101/21 104/25 107/1 109/23 111/5 112/8 112/22 113/19 114/18 116/21 117/2 117/2 118/14 119/4 119/11 125/2 126/8 127/25 131/16 135/5 135/23 136/1 136/7 136/8 147/9 147/10 147/14 148/6 149/25 152/4 155/8 155/22 157/19 160/4

**the core [1]** 70/15

**theft [2]** 37/24 66/10

**their [116]** 7/18 8/9 9/4 9/18 10/1 10/13 11/9 11/10 13/12 14/11 14/14 15/12 16/9 16/9 19/14 19/18 21/5 21/11 22/14 24/10 24/14 24/14 25/14 25/15 25/17 25/19 27/6 27/13 28/13 31/5 36/3 37/9 37/24 39/19 39/21 40/19 41/2 41/3 41/5 41/13 42/11 42/13 43/10 46/8 46/13 47/2 47/9 47/17 48/1 48/5 48/5 48/5 51/10 51/10 53/9 53/18 54/1 55/11 57/1 57/1 57/5 59/14 63/1 63/9 64/7 66/1 66/1 66/7 66/11 66/18 66/22 70/4 75/20 84/12 90/13 90/18 91/15 96/3 96/15 98/22 99/17 100/12 102/17 105/12 105/20 106/11 108/17 109/11 111/23 112/3 112/24 121/15 122/15 123/14 128/14 129/4 131/16 137/9 138/4 138/6 141/1 142/2 143/4 143/19 145/11 146/1 146/8 146/25 147/2 147/16 150/2 152/19 154/21 154/23 157/3 160/7

**theirs [4]** 31/12 39/15 66/20 73/11

**them [118]** 5/15 9/15 9/17 9/17 10/7 10/8 10/11 12/7 14/8 14/14 14/20 15/5 15/8 15/19 16/2 16/8 16/12 16/12 16/13 17/3 19/14 19/18 21/17 26/2 27/10 27/21 28/12 30/9 31/1 31/13 36/21 37/6 37/12 38/16 40/10 40/25 41/10 41/15 44/22 45/16 55/19 56/19 64/7 64/8 67/12 70/15 71/8 73/4 73/11 77/9 77/15 77/16 78/14 78/16 78/18 80/9 80/17 81/25 83/3 86/20 87/21 87/25 89/13 89/20 91/21 91/23 93/2 94/15 95/4 99/23 105/11 106/13 106/13 106/23 107/13 109/16 109/17 110/3 113/20 117/6 118/14 126/16 129/24 129/25 130/15 131/22 132/1 135/25 136/9 136/11 137/1 137/2 137/4 137/11 141/24 142/2 144/23 146/13 147/2 149/1 149/12 149/13 151/3 151/9 151/11 152/16 152/17 153/11 153/23 155/2 155/14 155/16 155/16 157/3 157/19 161/1 161/1 161/10

**them data [1]** 67/12

**them down [1]** 89/13

**themselves [5]** 31/18 51/10 51/10 129/18 158/22

**then [74]** 4/5 6/3 9/14 10/12 16/10 25/2 26/2 26/21 28/7 28/7 28/16 29/18 30/8 30/9 30/12 31/17 32/9 32/14 33/7 34/9 34/13 34/14 34/21 35/10 35/21 38/9 40/9 43/12 49/3 49/23 51/22 58/22 60/9 63/7 64/21 68/12 68/21 73/2 83/23 85/3 88/12 90/11 91/7 93/16 93/16 98/25 100/9 100/10 111/16 113/4 114/8 114/9 115/16 119/2 121/1 121/9 122/18 125/11 125/17 126/10 126/17 127/24 128/9 132/8 132/8 134/25 137/20 146/7 146/12 147/16 152/20 153/18 157/2 157/5

**theory [6]** 13/16 24/10 55/18 100/9 135/3 135/5

**there [185]**

**there's [28]** 11/3 22/7 27/5 39/22 42/8 48/4 48/20 51/17 55/10 56/4 59/11 60/10 73/24 75/22 77/21 77/23 84/18 93/5 96/13 99/16 106/13 114/17 116/11 136/17 142/10

149/10 149/13 156/12

**therefore [4]** 89/1 105/21 105/25 150/3

**therein [1]** 144/3

**therein lies [1]** 144/3

**these [127]** 5/11 8/5 10/20 11/3 11/5 12/24 16/21 18/14 23/20 29/17 36/18 40/8 42/1 46/5 51/11 57/22 61/14 61/19 61/21 62/11 63/6 65/9 67/11 69/21 69/24 70/1 70/2 70/3 70/4 71/25 72/24 73/12 74/17 77/4 78/23 81/5 81/20 82/6 82/14 82/19 83/6 83/6 83/24 85/18 90/18 90/20 90/23 91/11 91/19 94/14 95/3 95/10 95/25 96/2 97/18 97/22 99/14 99/23 103/10 103/13 103/14 104/4 104/10 104/24 105/16 105/18 105/18 106/16 106/16 108/4 108/8 111/6 111/18 111/24 112/25 115/15 116/5 117/19 119/1 120/9 120/11 120/15 120/18 120/23 121/13 121/14 122/23 122/23 126/19 127/1 127/1 127/6 127/18 128/8 128/11 128/15 128/20 129/1 129/6 129/6 129/10 129/13 129/18 130/5 130/10 131/23 132/2 134/17 135/19 135/20 135/24 136/10 138/2 139/10 140/11 142/4 142/6 142/18 143/8 143/14 143/22 145/1 145/4 146/21 147/24 152/18 160/22

**they [361]**

**they're [36]** 13/9 13/23 13/25 14/13 16/25 18/25 24/7 24/11 25/11 25/15 28/5 38/4 40/2 40/18 42/11 42/13 42/15 51/19 52/2 59/14 61/23 64/5 66/2 68/23 69/6 70/19 71/7 71/24 71/25 72/1 77/1 110/15 145/11 147/15 147/15 149/5

**they've [16]** 13/10 16/13 16/24 19/16 41/18 49/7 57/24 80/10 87/8 97/17 97/22 98/23 112/4 117/20 142/24 149/4

**thing [15]** 6/16 21/21 28/2 31/2 34/7 43/6 45/5 60/17 64/22 84/11 87/2 95/11 116/14 151/12 153/15

**things [30]** 8/5 13/6 25/9 25/12 52/11 83/12 83/13 90/8 90/10 90/18 90/20 90/20 91/7 91/15 91/19 92/11 95/10 106/14 112/25 118/21 126/5 127/12 128/10 139/17 140/11 142/18 154/16 154/19 155/1 157/23

**think [95]** 5/10 5/13 5/23 5/24 6/4 6/5 6/7 7/9 7/11 8/1 9/9 9/21 11/15 12/14 12/18 15/23 16/6 16/18 17/13 17/14 20/2 20/4 22/12 23/9 25/21 26/8 26/24 28/10 28/12 30/4 31/8 31/13 31/25 32/8 32/21 33/16 33/20 35/23 35/24 39/9 39/21 39/22 39/23 40/14 40/15 40/22 42/8 42/11 43/11 44/1 44/4 44/25 46/7 49/9 51/25 57/18 65/21 66/13 67/16 68/16 69/18 75/12 85/23 89/16 90/3 92/23 93/10 99/5 99/20 112/3 112/22 121/6 124/18 126/8 126/10 127/25 129/14 129/18 136/16 136/23 137/11 137/11 138/14 140/19 141/15 145/11 145/15 145/22 145/22 146/4 149/16 158/23 159/13 161/7 161/9

**think what [1]** 136/23

**thinking [2]** 93/6 149/23

**thinks [1]** 108/12

**third [21]** 5/20 60/23 61/5 65/24 72/16 72/21 73/5 73/12 82/13 82/15 85/5 88/25 93/1 94/6 96/10 99/2 99/23 100/3 100/19 101/16 134/7

**third-party [7]** 73/5 88/25 93/1 94/6 96/10 99/2 134/7

**this [441]**

**Thomas [3]** 48/1 49/2 57/11

**those [123]** 5/22 6/5 8/10 9/10 13/2 13/14 15/7 15/16 17/20 18/20 18/21 18/25 19/1 19/1 19/13 19/17 20/19 20/19 21/10 21/16 25/12 26/1 27/8 27/24 29/15 36/5 38/20 40/1 40/10 44/24 49/17 49/20 49/22 50/18 57/10 58/16 61/4 63/23 64/8 64/18 65/5 65/8 67/9

69/18 73/13 75/1 75/6 77/13 83/11 83/25 85/13 86/7 86/11 93/6 93/17 94/15 95/19 95/22 96/10 96/15 97/13 97/17 97/22 98/21 99/12 100/19 101/23 103/3 103/7 103/7 103/11 103/22 104/3 104/14 104/16 104/21 105/1 106/14 106/20 111/20 111/20 111/22 111/22 112/4 112/5 117/18 120/12 121/16 122/12 122/16 122/16 122/21 127/3 127/22 128/19 129/2 129/7 131/12 131/21 133/10 133/16 135/17 136/2 138/22 139/2 140/8 142/19 143/5 143/18 146/16 146/17 146/25 147/4 149/8 149/11 149/12 149/16 150/3 152/25 155/9 157/5 160/3 160/3

**though [11]** 39/19 47/16 66/4 88/15 90/4 109/14 110/10 139/21 143/15 149/24 150/15

**thought [9]** 11/20 13/17 34/3 63/17 64/9 65/8 92/8 102/14 133/18

**thousand [9]** 57/20 58/16 59/7 60/20 82/22 85/4 86/24 89/8 109/16

**thousands [4]** 39/16 39/18 40/21 115/23

**three [15]** 6/2 10/12 38/6 52/24 77/1 77/4 81/24 92/12 93/15 96/9 111/19 112/4 118/7 121/4 152/18

**through [31]** 13/2 16/1 17/16 28/7 32/20 34/12 37/18 39/17 40/20 47/9 47/14 54/5 59/1 82/9 82/23 83/11 95/22 96/17 100/9 106/9 106/20 106/22 109/15 119/3 120/9 127/9 135/4 138/21 139/10 142/3 143/5

**throughout [1]** 133/3

**throw [3]** 70/20 71/17 71/20

**throwing [1]** 115/23

**thus [2]** 7/14 11/1

**TI [5]** 101/24 105/13 105/13 105/14 122/13

**till [2]** 23/22 128/6

**time [68]** 6/6 15/5 16/13 20/5 21/10 22/14 23/17 23/18 24/4 24/9 26/6 29/19 31/14 32/9 32/22 33/4 36/11 41/9 41/11 50/10 55/24 57/21 69/13 69/24 72/7 74/24 75/11 76/7 78/6 78/12 80/3 85/5 91/5 91/6 91/9 96/19 101/22 101/24 104/25 106/9 109/3 111/3 111/22 119/4 119/13 121/10 121/13 128/15 128/16 129/3 129/7 129/12 130/4 130/6 130/16 130/21 133/4 134/1 134/5 138/9 138/12 138/13 147/11 153/16 157/22 158/19 158/24 161/20

**times [7]** 8/20 11/6 32/6 42/21 124/2 154/3 157/18

**timing [1]** 31/21

**tiniest [2]** 90/8 90/10

**tink [1]** 138/9

**TIO [8]** 104/14 111/6 111/20 121/1 126/15 126/21 128/16 128/17

**title [6]** 1/5 1/5 1/7 79/21 88/3 88/25

**titled [1]** 1/18

**TITLEMAX [80]** 1/10 20/18 22/10 23/1 24/10 24/13 24/14 24/23 25/8 25/12 25/13 27/8 27/10 27/19 27/22 28/6 28/7 28/9 28/15 28/16 29/18 38/18 38/18 39/5 39/5 41/5 41/14 49/1 58/9 59/17 59/22 63/25 66/1 66/7 70/7 78/10 79/19 79/20 82/12 82/13 85/11 94/9 97/19 98/14 98/20 101/19 102/19 102/24 103/1 103/12 103/15 104/1 104/11 105/17 106/24 107/8 107/22 108/5 108/21 108/23 108/25 109/13 109/14 110/1 110/7 110/9 112/17 112/19 114/2 117/20 121/16 121/17 122/24 123/25 129/3 130/22 131/13 131/14 139/16 149/25

**TitleMax's [5]** 65/16 106/7 120/5 133/22 154/24

**TMX [60]** 1/9 1/9 1/10 4/2 41/5 45/8 46/3 47/2 47/4 47/5 47/10 47/10 47/17 47/19 47/23 48/8 48/9 48/10 48/25 51/4 51/22 51/23 51/24 52/1 53/3 53/3 53/6 53/6 53/9

**1074**

**T**

TMX... [31] 53/18 54/18 54/23 54/23 55/4 55/6 55/8 55/8 55/9 56/10 59/16 59/18 59/20 59/20 59/21 87/10 89/17 90/24 91/18 104/8 107/22 108/19 119/11 119/24 119/25 120/2 123/11 123/11 124/8 125/17 126/10
to give [1] 61/1
to her [1] 160/16
today [12] 21/15 26/21 31/2 32/14 33/11 34/8 45/1 65/2 73/23 107/17 123/1 156/25
today's [1] 26/25
Todd [1] 148/9
together [3] 19/3 121/11 154/4
told [22] 4/24 10/8 10/10 43/4 50/12 54/15 59/25 60/7 78/16 78/18 84/4 91/21 91/23 96/22 106/13 134/15 140/14 148/21 149/1 149/12 153/14 157/3
tongue [1] 119/13
too [12] 53/1 69/15 69/25 75/3 75/22 84/13 104/4 107/1 122/2 157/8 158/4 158/5
took [2] 51/13 97/2
tool [1] 153/7
top [6] 51/4 54/2 56/3 113/2 115/8 139/11
topic [1] 49/10
tort [1] 73/20
tortfeasor [1] 73/20
tortious [3] 7/24 16/24 96/20
tortiously [1] 8/4
total [3] 55/13 96/13 163/14
totally [1] 117/22
touch [1] 25/11
touched [1] 126/22
tough [1] 41/21
toward [1] 94/6
towards [2] 83/7 109/25
tracing [3] 98/8 100/9 106/1
track [1] 38/17
tracked [1] 68/9
tracks [1] 53/14
Tracy [22] 45/6 45/14 46/16 47/23 48/10 48/14 48/18 52/14 53/5 53/8 55/15 56/1 56/7 56/10 56/10 56/13 57/2 57/6 57/7 57/11 58/22 58/23
trade [3] 42/10 42/14 42/18
traded [1] 136/5
trafficking [1] 38/13
trail [11] 105/19 106/2 106/4 106/5 107/2 117/8 119/17 124/3 124/4 125/14 126/7
trails [1] 156/9
transaction [3] 18/5 40/9 40/13
transactions [1] 40/10
transcript [2] 85/25 97/2
transcription [1] 163/6
transcripts [1] 84/23
TRAURIG [1] 3/10
treat [1] 51/10
treated [1] 67/17
treatment [2] 42/25 44/8
trial [34] 1/3 9/20 18/13 28/1 28/6 28/25 29/19 30/5 31/17 32/10 32/11 33/8 33/8 34/9 34/12 34/13 34/15 34/18 34/21 34/21 43/10 43/19 43/20 44/15 44/18 44/19 44/22 157/20 158/8 158/9 158/19 158/20 159/11 159/19
trials [1] 158/6
tried [4] 23/16 140/6 150/20 156/10
TRO [4] 6/25 7/15 21/23 22/14
trouble [1] 121/10
true [5] 64/6 64/16 94/5 112/22 163/6
truly [2] 75/8 163/12
truth [1] 160/24
try [17] 52/17 68/1 68/7 77/18 83/11 97/9 110/8 117/25 118/18 120/22 126/5 126/18

129/16 131/17 146/14 159/4 159/4
trying [19] 64/5 64/6 64/7 93/12 93/18 97/12 108/3 111/11 111/16 112/7 117/24 119/9 119/19 134/6 134/6 135/18 136/8 144/20 146/6
turn [14] 12/23 50/11 59/13 62/6 62/23 63/16 63/22 64/21 113/15 113/18 116/2 116/4 144/12 148/12
turned [8] 98/14 103/21 105/25 117/10 119/22 132/2 137/9 137/10
turnover [1] 78/10
turns [4] 111/14 132/7 132/8 143/15
twisted [1] 119/13
two [31] 5/17 5/19 10/12 12/14 24/21 25/11 38/6 38/9 38/16 38/20 40/9 52/10 74/9 81/5 92/12 97/18 99/18 101/12 101/21 102/17 104/24 133/4 140/4 149/5 149/8 149/21 154/16 155/1 155/2 159/20 161/11
two-year [1] 133/4
type [7] 14/21 15/7 30/20 38/5 94/6 134/16 138/3
types [3] 15/7 83/11 134/17
typically [2] 81/9 91/2

**U**

Uh [1] 81/16
Uh-huh [1] 81/16
ultimate [1] 61/23
ultimately [2] 62/11 62/12
unable [1] 138/6
unacceptable [1] 36/14
uncover [1] 142/18
under [19] 24/10 29/16 41/19 49/19 58/14 61/24 72/13 91/8 93/7 95/14 98/1 99/1 99/24 100/2 106/6 114/6 135/3 154/21 157/4
underlying [1] 30/9
understand [17] 5/6 15/13 22/19 29/7 35/9 45/2 45/8 51/17 58/8 78/16 86/1 92/1 129/9 130/16 132/11 147/12 147/13
understanding [5] 76/10 100/18 104/9 113/11 137/18
Understood [11] 8/6 33/2 33/13 38/8 42/5 74/1 89/10 128/21 128/23 136/25 142/1
undisputed [5] 53/3 53/5 53/6 53/7 73/13
Unfortunately [3] 84/18 110/2 158/4
unilateral [1] 129/3
Unitech [1] 62/6
universe [4] 10/23 83/3 95/2 143/4
unless [8] 7/25 33/24 35/4 68/20 95/2 101/12 144/14 152/4
unlike [1] 149/13
unlikely [1] 143/16
unrelated [1] 71/15
until [5] 19/10 35/23 35/23 36/11 91/19
unusual [1] 50/15
up [84] 7/10 9/25 16/11 17/16 18/14 21/23 24/8 25/8 30/12 31/14 31/18 34/8 35/18 35/19 37/2 37/19 43/20 44/22 58/6 64/8 64/25 68/9 68/10 68/12 68/13 97/3 98/11 98/14 99/7 99/10 101/12 102/23 104/22 105/20 105/25 106/23 108/17 108/17 108/19 109/9 110/15 110/17 111/15 111/19 112/9 113/13 115/8 116/2 116/4 116/17 116/19 117/10 119/22 122/19 123/21 123/24 124/24 125/3 132/2 132/7 132/8 134/10 134/20 137/9 137/10 140/8 140/9 140/10 143/15 144/12 145/6 145/7 145/16 146/1 146/9 148/12 153/10 154/9 154/15 154/16 154/22 155/1 155/15 159/5
update [2] 32/10 109/11
updated [3] 76/4 84/1 84/3
upon [11] 7/19 10/20 14/5 15/2 18/22 18/24 84/23 134/17 145/20 145/22 150/22

upper [1] 113/24
ups [1] 136/1
us [77] 7/2 9/14 9/22 10/6 13/12 14/25 17/15 21/9 21/14 25/18 25/19 26/1 28/14 30/3 30/8 32/12 36/21 36/22 37/11 39/12 39/19 40/17 40/20 40/20 40/22 40/22 41/17 42/25 43/4 48/8 52/16 52/18 52/22 60/8 66/9 66/9 66/15 69/7 72/9 77/11 77/12 78/12 80/11 84/18 85/10 86/24 87/8 91/4 97/12 98/22 99/8 100/11 102/19 104/12 106/9 106/20 106/22 109/6 110/22 111/12 112/6 112/7 120/17 121/16 126/17 133/19 134/9 134/9 134/15 134/19 134/20 138/1 138/14 145/9 145/15 150/20 153/25
USC [1] 63/2
use [21] 43/10 63/4 63/6 64/1 74/14 87/11 94/24 96/2 98/9 108/8 129/6 136/6 139/18 141/1 142/11 144/10 144/10 146/1 146/8 146/25 153/6
used [22] 23/9 27/8 61/25 79/22 81/10 82/9 88/4 89/1 96/4 103/18 112/2 129/5 131/23 142/2 142/6 142/11 142/21 143/2 143/11 143/12 145/1 145/19
uses [1] 63/5
using [19] 27/9 66/25 71/8 75/3 79/25 80/3 80/5 87/9 88/5 88/8 97/21 103/21 125/22 131/21 134/10 142/21 144/8 144/12 153/2
usual [2] 40/1 40/2
usually [1] 38/21

**V**

vacation [7] 158/10 158/12 159/5 159/5 160/4 160/7 160/18
value [1] 21/19
various [2] 70/4 94/3
vehemently [1] 49/9
vehicle [3] 47/15 110/13 117/23
vehicles [2] 114/8 117/25
vendor [1] 70/1
vendors [1] 70/2
veracity [1] 57/22
verbiage [1] 82/16
verify [1] 120/7
Verizon [1] 147/16
verse [1] 49/11
version [1] 87/17
versus [1] 144/12
very [43] 6/9 8/23 8/25 20/22 26/4 33/22 41/4 44/21 45/17 48/17 49/23 52/11 54/2 56/3 56/23 75/15 85/11 94/16 94/19 98/17 102/16 102/18 102/18 103/25 103/25 104/11 105/23 108/16 109/19 111/10 111/12 111/12 114/20 125/24 137/16 140/25 143/21 153/15 155/21 155/24 158/3 158/21 160/21
view [3] 41/19 46/6 110/21
Vin [6] 48/1 57/11 108/10 110/6 110/10 110/12
violate [1] 111/6
violated [4] 66/5 111/8 112/25 121/1
violater [1] 121/8
violates [2] 61/10 62/5
violating [3] 102/3 104/15 113/20
violation [6] 101/23 111/12 118/2 126/15 126/21 132/6
Virginia [4] 82/2 82/12 86/5 86/9
virtually [1] 82/16
visual [1] 61/1
volume [5] 1/2 13/2 13/11 44/14 163/8
VOLUMES [1] 1/2
voluminous [2] 29/14 30/23

**W**

wait [22] 16/15 17/2 17/21 19/22 27/14 28/1

# W

**wait... [16]** 31/4 36/11 52/19 52/19 52/19 54/18 67/6 99/9 99/9 110/16 110/16 110/16 110/16 122/5 136/24 140/1

**waited [1]** 101/8

**waiting [3]** 10/7 35/7 37/3

**want [74]** 4/5 5/25 6/20 11/16 12/4 14/24 14/24 15/1 15/19 15/19 16/21 19/4 19/5 27/16 28/3 28/10 30/3 30/3 30/8 32/6 33/21 34/2 40/20 42/3 42/12 52/10 59/24 60/18 60/19 66/5 66/18 68/25 74/5 74/19 85/23 86/6 87/19 87/21 87/25 89/12 90/4 92/13 99/7 101/12 104/21 106/9 106/19 106/20 106/22 111/13 117/4 119/5 119/20 124/11 128/5 128/7 129/4 133/3 134/23 135/1 136/10 136/16 139/12 144/1 144/10 144/10 145/2 149/15 151/14 151/21 155/8 158/23 159/3 159/4

**wanted [5]** 45/1 65/19 65/19 95/3 144/6

**wants [2]** 17/15 40/20

**WARGO [24]** 2/10 2/12 2/19 4/12 4/15 20/24 21/22 23/19 27/14 36/25 40/24 51/2 56/20 56/22 70/21 72/6 72/12 74/13 87/24 90/23 97/19 126/16 146/4 146/20

**Wargo's [1]** 73/21

**wargofrench.com [3]** 2/15 2/22 2/22

**warned [1]** 59/25

**was [230]**

**wasn't [7]** 43/15 44/9 55/16 55/16 84/4 116/21 120/2

**wasted [1]** 50/10

**Waters [3]** 113/14 114/17 114/18

**waving [1]** 152/2

**way [29]** 6/15 17/9 17/10 18/15 30/20 35/14 37/13 38/16 38/24 39/1 40/13 41/23 51/8 51/16 59/15 61/8 62/4 66/16 75/22 89/14 92/4 97/9 121/2 124/20 127/14 127/20 135/11 158/14 159/8

**ways [2]** 41/19 43/12

**we [590]**

**we'd [3]** 36/10 43/6 115/15

**we're [67]** 6/13 6/14 9/20 9/23 9/25 10/7 10/24 14/10 14/19 14/25 15/4 17/11 18/13 21/8 26/1 27/3 31/2 31/6 32/14 32/24 35/3 35/12 35/21 37/4 37/6 37/7 38/7 39/15 42/24 44/14 45/1 46/10 49/3 52/14 53/11 56/1 59/16 63/18 78/3 85/5 85/20 90/5 91/12 99/20 101/19 111/8 117/18 121/17 122/22 125/13 125/14 125/15 131/8 131/9 134/6 135/18 135/24 136/2 136/8 136/19 139/14 153/24 154/8 157/13 157/24 159/3 161/10

**we've [40]** 20/4 30/2 47/6 49/14 49/21 55/8 55/19 61/13 61/15 65/6 65/6 65/7 69/18 78/20 84/1 85/6 94/8 94/12 101/14 101/15 101/15 106/13 106/18 106/18 109/21 109/21 112/25 117/21 120/20 121/9 121/10 122/12 124/3 133/25 134/6 142/17 145/1 148/1 150/6 150/6

**web [3]** 61/4 94/10 94/25

**website [1]** 63/10

**week [13]** 34/12 34/14 60/14 77/9 90/3 91/10 91/19 92/25 97/18 156/5 158/12 158/12 161/11

**Weekly [1]** 150/4

**weeks [7]** 10/12 41/13 75/20 99/18 158/16 158/18 159/20

**weigh [2]** 34/2 75/2

**well [69]** 4/22 10/2 11/15 12/20 20/22 25/24 26/4 29/23 33/11 33/12 34/4 35/4 36/15 37/24 44/1 44/9 45/23 46/23 51/7 59/19 67/8 67/16 79/17 80/2 80/22 84/14 88/12 90/22 91/11 94/20 99/11 99/13 102/16 102/20 104/3 105/1 105/3 106/2 107/14

---

108/18 115/2 120/4 122/3 124/11 125/6 125/24 129/1 129/2 129/7 130/25 131/6 133/20 137/5 137/20 140/19 144/9 146/22 147/12 151/21 151/25 154/2 154/4 156/13 157/14 158/11 159/23 160/16 161/15 161/22

**WELLSHIRE [2]** 1/5 4/2

**went [16]** 8/14 25/7 28/7 28/15 28/16 37/19 42/21 57/6 68/5 68/7 94/10 103/23 106/3 134/1 148/17 149/18

**were [153]** 7/1 15/3 16/7 18/20 18/20 20/17 20/18 20/19 21/10 22/13 22/17 23/8 36/5 37/2 39/14 40/6 41/19 42/1 49/16 49/20 49/22 50/12 50/15 52/17 59/25 59/25 60/1 61/16 63/17 63/17 63/25 64/6 64/11 67/18 69/6 73/13 77/8 77/9 79/21 80/4 80/15 80/17 80/23 81/8 81/8 81/21 82/19 83/2 83/7 83/13 84/14 85/9 86/3 86/6 86/12 88/3 88/24 89/1 89/2 89/4 89/5 90/23 93/15 94/5 94/17 95/3 95/5 96/4 96/11 97/6 97/14 102/3 102/20 102/25 103/2 103/4 103/8 103/8 103/13 103/13 103/14 103/22 103/25 104/2 104/4 104/14 104/15 106/7 106/16 108/5 108/7 108/8 108/25 110/1 110/12 110/14 110/17 111/1 111/2 114/11 116/21 117/19 118/19 122/17 122/21 122/23 124/24 125/4 125/5 125/9 125/15 125/16 125/21 126/8 128/25 129/2 129/5 129/15 132/24 133/11 133/18 134/4 134/8 134/9 134/15 134/17 135/2 136/2 138/4 138/4 138/6 139/16 139/20 140/3 140/15 140/20 140/20 142/5 142/12 142/21 145/18 146/23 149/21 149/24 151/7 152/22 153/4 154/22 155/1 155/2 155/7 157/4 163/10

**weren't [3]** 33/19 138/5 150/22

**what [282]**

**what's [17]** 10/23 37/17 48/16 53/7 56/13 57/19 67/24 68/21 85/10 99/9 101/7 103/25 118/5 125/20 140/23 151/14 159/17

**whatever [7]** 20/5 34/14 39/6 39/7 41/13 64/3 80/9

**whatsoever [2]** 78/21 117/4

**when [66]** 9/19 11/13 13/7 14/9 16/7 16/15 20/19 21/4 21/8 23/12 23/15 24/12 28/25 31/17 35/17 38/17 38/19 40/15 43/16 45/24 46/11 50/15 50/22 51/13 51/14 52/23 57/23 61/17 63/8 63/20 63/25 66/25 70/24 77/8 77/11 82/23 82/25 88/17 90/15 96/24 98/12 103/3 103/7 103/23 105/23 106/1 109/8 110/11 111/6 112/4 113/2 122/16 122/16 124/6 124/11 129/4 134/19 138/1 144/4 148/22 153/1 153/15 156/18 156/23 156/25 157/1

**Whenever [1]** 153/24

**where [49]** 8/14 9/13 9/14 11/21 13/12 13/21 21/10 25/2 26/6 26/8 26/9 26/9 26/9 26/11 26/11 26/12 27/6 30/4 30/25 40/8 40/17 49/8 57/7 57/24 57/25 63/11 65/6 65/10 65/12 69/13 69/19 70/13 73/13 75/11 80/18 88/15 89/11 89/15 94/9 101/1 123/23 124/2 133/10 135/8 138/15 140/2 143/24 150/14 158/24

**wherever [1]** 86/17

**whether [47]** 12/7 19/1 20/21 21/5 21/10 22/6 22/10 23/8 24/7 26/22 27/5 39/1 40/10 40/21 41/18 43/22 44/17 45/25 52/8 52/14 61/9 67/18 72/20 85/13 85/21 85/21 95/3 95/22 97/6 99/20 104/13 107/12 111/8 116/17 116/18 119/11 119/19 122/20 123/25 129/12 132/5 135/9 141/23 141/24 144/11 153/4 156/7

**which [75]** 6/8 6/23 7/15 7/15 8/6 8/9 10/20 11/18 23/25 26/5 29/12 30/20 30/21 32/20 35/9 37/4 37/11 37/12 39/2 41/25 42/25 45/9 49/15 49/22 50/8 54/13 58/23 59/1 59/2 59/4 59/15 60/11 61/8 67/15 71/8 74/10 79/1 79/3 79/5 88/8 91/16 91/19 94/10

---

94/13 94/16 94/25 95/21 95/21 96/12 97/10 98/8 101/22 104/24 108/3 109/10 110/7 111/13 113/22 129/10 130/23 131/4 131/13 133/13 141/15 149/6 149/21 149/22 152/21 153/3 154/6 158/18 158/20 159/17 161/25 163/9

**whichever [1]** 34/8

**while [7]** 40/1 72/10 76/18 82/24 83/5 131/13 132/18

**White [1]** 110/12

**whiz [1]** 71/1

**who [85]** 4/22 15/20 17/24 20/17 20/18 21/3 21/3 22/13 22/17 22/20 24/19 27/12 27/19 40/6 40/13 42/1 42/2 45/8 47/22 47/25 48/12 50/25 51/12 51/13 51/14 53/1 55/18 56/10 56/12 57/3 61/5 61/7 61/16 61/25 62/8 62/9 66/11 68/8 68/12 68/12 69/18 69/23 70/20 70/22 79/21 80/3 80/11 80/17 80/23 80/25 81/1 84/7 84/11 85/3 85/20 86/7 86/17 86/20 87/20 88/3 94/2 96/18 99/18 101/23 102/3 104/14 105/2 109/4 109/17 111/19 120/5 127/13 134/4 134/7 134/8 134/11 134/15 135/21 136/2 136/20 139/16 148/9 153/16 158/21 160/14

**who's [6]** 4/5 24/8 50/13 57/7 147/4 159/9

**Whoever [2]** 34/23 160/6

**whole [7]** 14/2 30/11 43/19 46/21 52/25 91/16 99/1

**whom [7]** 11/3 18/13 21/22 50/25 54/18 59/19 105/5

**whose [8]** 17/5 21/3 21/4 23/8 23/12 24/13 69/5 123/23

**why [42]** 19/16 20/1 20/3 22/6 23/6 23/7 34/25 36/21 37/22 37/23 41/7 46/21 48/18 50/21 51/8 65/21 70/12 71/21 84/7 84/8 85/4 86/21 87/13 87/13 90/11 91/17 95/6 109/21 112/23 116/21 116/23 119/5 119/23 120/12 122/11 124/4 133/5 151/3 151/6 151/11 156/2 158/9

**wide [4]** 14/4 83/9 83/12 84/4

**wife [1]** 114/18

**wiggle [1]** 55/20

**wiggliest [1]** 55/20

**wild [2]** 24/15 41/14

**wild-goose [1]** 24/15

**will [137]** 4/6 6/5 7/19 8/24 8/24 11/13 12/19 14/7 14/7 17/7 17/12 17/15 19/1 19/2 21/15 21/18 23/12 24/25 25/1 25/16 29/23 30/4 30/7 30/8 30/15 30/15 34/1 34/17 35/10 37/12 39/25 40/14 40/14 40/15 42/5 42/13 42/17 44/11 46/12 49/5 54/19 60/14 62/23 63/16 63/22 64/2 69/19 73/1 73/24 74/16 75/2 75/4 75/5 75/12 75/13 77/18 79/8 79/17 80/9 82/15 83/22 86/22 87/4 88/13 91/8 91/16 94/6 100/19 100/24 101/4 101/11 105/10 106/15 107/18 108/12 109/19 111/16 113/11 113/13 117/6 120/15 122/1 128/9 129/10 130/1 132/8 133/12 135/14 136/4 136/10 137/25 140/14 141/14 141/17 141/20 141/21 142/8 142/19 143/9 145/7 145/12 145/12 145/23 145/24 145/24 146/10 146/13 147/16 147/18 149/1 149/2 149/3 149/23 151/13 151/23 153/6 153/8 153/10 153/11 156/9 156/21 157/1 157/2 157/2 157/5 157/6 157/17 158/8 159/15 159/15 159/16 160/2 160/6 160/15 160/20 161/13 163/15

**willing [2]** 125/23 150/22

**wipe [1]** 61/21

**wished [1]** 60/1

**withhold [1]** 42/14

**withholding [3]** 42/11 42/15 42/18

**within [11]** 19/13 19/13 26/4 26/6 33/8 57/10 76/7 80/25 88/2 143/20 147/14

**1076**

## W

**without [7]** 17/7 18/15 20/20 111/17 136/2 151/11 160/24
**witness [4]** 36/15 49/18 49/18 95/1
**witnesses [2]** 94/8 94/9
**won't [13]** 30/9 30/14 30/15 44/20 50/18 80/16 120/22 134/8 134/8 134/8 134/9 151/20 160/18
**word [11]** 10/3 29/21 74/14 92/11 136/6 142/4 143/2 153/9 153/10 154/19 155/7
**Word-of-mouth [1]** 136/6
**words [8]** 10/22 18/7 55/20 75/6 111/23 111/25 133/3 142/5
**work [19]** 12/1 17/8 27/8 31/13 35/16 37/4 64/3 94/13 100/11 119/3 135/24 136/2 136/10 146/2 146/13 146/14 147/18 158/1 161/10
**worked [7]** 55/18 61/24 78/1 131/13 134/21 135/11 149/8
**working [4]** 76/14 154/4 156/15 156/25
**works [1]** 51/17
**world [1]** 97/5
**would [116]** 5/25 6/24 6/25 7/12 7/15 8/6 8/9 8/16 10/8 14/23 15/10 18/6 18/18 20/11 20/17 21/9 21/16 22/12 25/17 28/17 28/20 29/12 29/19 30/13 31/9 32/20 33/6 34/12 36/10 39/8 41/6 41/24 41/25 43/1 43/10 44/7 47/8 49/9 50/23 53/23 54/17 58/5 60/11 61/19 61/21 61/24 64/9 67/9 68/21 68/25 70/6 70/6 71/3 71/19 72/6 72/6 72/14 73/7 73/16 75/11 78/18 80/7 84/11 84/16 84/21 86/16 88/13 91/21 91/23 93/8 99/25 100/25 102/7 102/11 102/16 106/15 114/11 116/3 116/5 118/1 120/6 121/1 121/2 121/2 125/12 126/1 127/14 127/17 127/17 127/19 127/21 131/22 133/5 133/11 137/3 142/11 143/21 143/21 143/25 144/6 144/12 145/3 145/18 147/5 148/12 150/1 151/9 151/22 153/18 156/1 157/9 158/10 159/21 159/21 161/18 161/24
**wouldn't [10]** 8/7 70/14 70/17 71/2 71/16 74/14 91/1 137/10 145/4 148/21
**wrestle [1]** 161/1
**writing [2]** 31/9 163/7
**written [3]** 6/17 59/4 96/10
**wrong [17]** 8/1 39/20 53/12 54/24 57/16 62/15 62/18 62/22 64/11 65/8 68/21 95/24 98/18 98/21 106/3 130/14 161/25
**wrongful [2]** 40/19 98/24
**wrongfully [1]** 98/23
**wrote [4]** 47/9 55/9 70/12 118/14

## Y

**y'all [12]** 26/9 32/6 33/14 40/21 92/11 101/1 114/22 118/5 119/7 119/7 141/19 155/11
**yay [1]** 26/16
**yeah [7]** 18/2 81/14 86/23 102/10 122/22 136/14 151/2
**year [8]** 19/24 20/16 25/10 79/11 104/19 104/19 133/4 157/24
**years [2]** 20/12 30/21
**yellow [1]** 82/1
**yes [84]** 11/23 23/24 24/20 25/4 25/25 26/14 26/18 27/17 27/23 28/24 29/2 29/5 29/7 31/22 32/3 32/17 33/9 34/10 34/16 34/19 34/22 36/9 38/10 38/20 45/4 45/7 51/3 51/6 51/20 52/4 52/21 56/21 59/19 60/24 62/19 65/14 67/17 69/2 72/5 76/2 76/5 76/13 76/16 76/19 76/21 76/23 76/25 77/3 80/13 81/10 86/15 89/7 89/23 93/4 93/15 94/24 107/6 109/1 112/15 112/20 115/1 115/10 115/10 122/7 122/10 123/3 123/7 125/1 127/3 128/18 130/10 137/4 140/15 141/8 145/5 147/23 149/18 154/22 155/1 156/17 159/10

160/8 160/10 160/12
**yet [7]** 7/22 10/16 33/17 60/18 113/7 113/11 128/5
**yield [2]** 7/22 29/19
**you [478]**
**you a [1]** 112/14
**you'd [2]** 71/17 71/20
**you're [57]** 5/7 7/4 8/1 11/21 14/12 14/13 14/20 15/4 15/6 16/10 18/3 28/25 29/3 29/20 31/3 31/4 35/7 40/25 43/2 45/17 45/24 54/10 57/17 57/19 57/23 65/22 66/13 67/15 71/6 78/23 80/20 83/23 86/23 86/24 90/15 91/15 93/3 93/12 99/5 113/6 115/23 117/10 118/3 126/10 130/9 130/17 130/23 133/23 140/3 144/22 146/2 146/4 146/4 153/22 154/14 156/7 158/20
**you've [13]** 14/14 18/4 19/22 19/23 20/5 20/6 20/6 35/4 119/13 122/5 142/16 152/6 154/25
**you've had [1]** 20/6
**Young [31]** 45/6 45/14 46/16 47/23 47/23 48/10 48/14 48/18 49/2 50/1 50/3 50/14 50/24 52/15 53/5 53/8 56/2 56/7 56/10 56/13 56/24 57/2 57/6 57/7 57/12 58/11 58/22 58/23 59/3 59/5 60/10
**your [574]**
**yourself [2]** 15/9 122/8

## Z

**zero [3]** 68/24 87/9 153/19
**ZIP [17]** 108/9 110/6 112/21 114/9 114/12 114/14 114/16 114/19 114/20 114/25 115/19 115/24 116/2 116/3 116/12 116/13 116/18
**zone [1]** 13/6

# Tab V

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2013-33584

WELLSHIRE FINANCIAL SERVICES, LLC d/b/a ) IN THE DISTRICT COURT
LOANSTAR TITLE LOANS, d/b/a MONEYMAX TITLE )           )
LOANS, and d/b/a LOANMAX; MEADOWWOOD  )
FINANCIAL SERVICES, LLC, d/b/a LOANSTAR )
LOANS, AND d/b/a MONEYMAX TITLE LOANS; and )
INTEGRITY TEXAS FUNDING, LP     )
             )
vs.           ) HARRIS COUNTY, TEXAS
             )
TMX FINANCE HOLDINGS, INC.; TMX FINANCE, )           )
LLC; TMX FINANCE OF TEXAS, INC;  )
and TITLEMAX OF TEXAS, INC.   ) 152ND JUDICIAL DISTRICT

---

**MOTION FOR PROTECTION**

---

On the 18th day of July, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

CYNTHIA MARTINEZ MONTALVO, CSR
152ND DISTRICT COURT
713-368-6037
cynthiam@justex.net

**APPEARANCES**

MR. JOHN DANIEL JOHNSON
SBOT NO. 24046165
SUTHERLAND ASBILL & BRENNAN, LLP
1001 Fannin
Suite 3700
Houston, Texas 77002
Telephone:  713-470-6100
Fax:  713-654-1301
E-mail:  Daniel.johnson@sutherland.com
Counsel for PLAINTIFFS

MS. CHRISTINA GOEBELSMANN
SBOT NO. CA. 273379
WARGO FRENCH LLP
1888 Century Park F
Suite 1520
Los Angeles, California 90067
Telephone:  310-853-6300
Fax:  310-853-6333
E-mail:  Cgoebelsmann@wargofrench.com; jozmer@wargofrench.com
Counsel for PLAINTIFFS

MR. JOSEPH W. OZMER, II
SBOT NO. GA. 001542
WARGO FRENCH LLP
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone:  404-853-1500
Fax:  404-853-1561
E-mail:  Jozmer@wargofrench.com
Counsel for PLAINTIFFS

MR. GEOFF GANNAWAY
SBOT NO. 24036617
MR. BRYON RICE
SBOT NO. 24065970
BECK REDDEN
1221 McKinney
Suite 4500
Houston, Texas 77010
Telephone:  713-951-6263
Fax:  713-951-3720
E-mail:  Ggannaway@beckredden.com; brice@beckredden.com
Counsel for DEFENDANTS

produce that person and say it --

THE COURT: Okay. All right. Let's see. I don't think they need to produce the person or persons who approved that type of marketing because I don't know what it gets you.

As far as what you just referred to, if your position is going to be that these were the acts of rogue employees, then they should be entitled to conduct Discovery to find out whether or not others above these rogue employees were involved in that.

And if that's marketing materials such as approving letters and so forth, then you need to identify them. But if you come in and say these were rogue employees and you haven't provided them information that they could use to prove otherwise, then that is going to be a problem at trial. And I think they are asking for that information in this Request.

It's broad, I agree. And if you can narrow it and focus it a little bit more, that will be better. But asking for the person that approved all the marketing directed at former -- directed at people who have loans at other places, that he just showed me would qualify and I just don't see why you need to know the identity of the person who put that out there -- who approved that.

But I do see why you would want to know identity of the person who said -- who recommended or suggested or prepared the materials which would be specifically geared towards you customer.

Does that make sense?

MS. GOEBELSMANN: Exactly. And what the intent was is what

STATE OF TEXAS

COUNTY OF HARRIS


        I, Cynthia Martinez Montalvo, Official Court Reporter in and for the 152ND District Court of Harris, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

        I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid by Beck Redden.

                        /s/ Cynthia Martinez Montalvo

                        Cynthia Martinez Montalvo, CSR
                        Texas CSR 6863
                        Official Court Reporter
                        152ND District Court
                        Harris County, Texas
                        201 Caroline, 11th Floor
                        Houston, Texas 77002
                        Telephone:  713-368-6037
                        Expiration:  12/31/2014

# Tab 1

KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Bush,   Tex.App.-Dallas,   June 12, 2009

11 S.W.3d 173

Supreme Court of Texas.

In re ALCATEL USA, INC. f/k/a DSC
Communications Incorporated, Relator.

No. 98–1243.   |   Jan. 6,
2000.   |   Argued Dec. 1,
1999.   |   Decided Jan. 6, 2000.

Competitor brought action against corporation for theft of trade secrets. The 193rd District Court, Dallas County, allowed competitor to take apex depositions of corporation's high-level executives. Corporation sought mandamus relief. The Dallas Court of Appeals conditionally granted mandamus relief. Competitor filed petition for writ of mandamus. The Supreme Court, Abbott, J., held that competitor was not entitled to take apex depositions of executives.

Petition denied.

West Headnotes (9)

[1]    **Mandamus**
⮑ Remedy at Law

**Mandamus**
⮑ Nature of acts to be commanded

Mandamus relief is available only to correct a clear abuse of discretion when there is no other adequate remedy at law.

3 Cases that cite this headnote

[2]    **Mandamus**
⮑ Discretion of lower court

When a party alleges that the court of appeals abused its discretion by granting mandamus relief, Supreme Court focuses on whether the trial court's ruling was an abuse of discretion.

5 Cases that cite this headnote

[3]    **Pretrial Procedure**
⮑ Corporate officers, agents, and employees

If the party seeking the apex deposition of a high-level corporate official has arguably shown that the official has any unique or superior personal knowledge of discoverable information, the trial court should deny the motion for protection and the party seeking discovery should be entitled to take the apex depositions.

21 Cases that cite this headnote

[4]    **Pretrial Procedure**
⮑ Corporate officers, agents, and employees

Party seeking the apex deposition of a high-level corporate official is required to pursue less intrusive means of discovering the information only when that party cannot make the requisite showing concerning unique or superior knowledge.

14 Cases that cite this headnote

[5]    **Pretrial Procedure**
⮑ Corporate officers, agents, and employees

Competitor failed to show that corporate defendant's chairman and chief executive officer (CEO) had unique or superior personal knowledge of discoverable information, so as to entitle competitor to obtain apex deposition of CEO in competitor's action for theft of trade secrets; at most, competitor demonstrated that CEO would have discoverable information, but not that CEO's knowledge was unique or superior.

4 Cases that cite this headnote

[6]    **Pretrial Procedure**

Corporate officers, agents, and employees

Testimony that a corporate executive possesses knowledge of company policies does not, by itself, satisfy the requirement for obtaining an apex deposition of that executive based on executive's unique or superior personal knowledge.

2 Cases that cite this headnote

**[7]    Pretrial Procedure**
Corporate officers, agents, and employees

Competitor failed to show that corporate defendant's former chairman had unique or superior personal knowledge of discoverable information, so as to entitle competitor to obtain apex deposition of CEO in competitor's action for theft of trade secrets; at most, competitor's evidence established that former chairman received information related to underlying facts of case, but others had the same information.

1 Cases that cite this headnote

**[8]    Pretrial Procedure**
Corporate officers, agents, and employees

To obtain apex deposition of high-level corporate official based on official's unique or superior personal knowledge, there must be some showing beyond mere relevance, such as evidence that a high-level executive is the only person with personal knowledge of the information sought or that the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources.

13 Cases that cite this headnote

**[9]    Pretrial Procedure**
Corporate officers, agents, and employees

Business disputes provide no greater license than any other kind of suit to explore by apex deposition whether a high-level corporate executive knows anything relevant to the case.

Cases that cite this headnote

**Attorneys and Law Firms**

*174 Timothy S. Durst, Dallas, Bob E. Shannon, Austin, Joseph D. Cheavens, Houston, Joseph R. Knight, Joe R. Greenhill, Austin, Samara L. Kline, Dallas, Scott Partridge, Houston, Michael P. Lynn, Eric W. Pinker, John Jesse Kendrick, Robert E. Goodfriend, Dallas, for relator.

R. Laurance Macon, San Antonio, Jack Hightower, Austin, David J. Healey, Houston, Nina Cortell, Dallas, Lynne Liberato, Houston, Mike A. Hatchell, Tyler, Stephan B. Rodgers, Karen Kroesche Gulde, Melanie Goins Cowart, San Antonio, Ana E. Kadala, Stephen L. Lundwall, Houston, Sharon N. Freytag, Debra Janece McComas, Dallas, for respondent.

**Opinion**

Justice ABBOTT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN and Justice GONZALES join.

The issue in this mandamus proceeding is whether the trial court abused its discretion by allowing DSC Communications [1] to take the apex depositions of two high-level Samsung executives. The court of appeals conditionally granted mandamus relief, concluding that DSC failed to prove that the executives had "unique or superior knowledge that is unavailable through less intrusive means." —— S.W.3d ——, 1998 WL 851123. We hold that DSC failed to present any evidence that arguably shows that the executives have unique or superior personal knowledge of discoverable information. Thus, the court of appeals did not err in conditionally granting the writ of mandamus because the trial court abused its discretion by overruling Samsung's [2] motion to quash the depositions. We therefore deny Alcatel's request for mandamus relief.

## I

DSC filed this suit alleging that Samsung engaged in a plan to steal a new DSC telecommunication technology known as "intelligent network" and "next generation switching" systems. DSC asserts that Samsung identified and lured a team of *175 engineers away from DSC and then specifically assigned them to develop the same type of product they had developed at DSC. DSC claims that Samsung's actions were the direct result of a plan engineered at the highest level of Samsung's executive structure, and that highest-level Samsung executives were involved in the plan's execution at all stages.

DSC noticed the depositions of two high-level Samsung executives, Jin–Ku Kang and Kun–Hee Lee. Kang served as Chairman of defendant Samsung Electronics Co., Ltd. (SEC) during the earliest events giving rise to this case and is currently Chairman Emeritus of that corporation. Lee is currently Chairman and CEO of SEC and formerly served as the Chairman of the Samsung Chaebol[3] during the earliest events at issue in this case. DSC and Samsung agree, and therefore we assume, that the Kang and Lee depositions qualify as apex depositions.

Samsung moved to quash both depositions. At the first evidentiary hearing on the issue, the special discovery master assigned to the case deferred ruling until after the deposition of Mr. K.H. Kim, the former President and CEO of SEC at all times relevant to this matter.[4] After Kim's deposition, DSC renewed its request for the Kang and Lee depositions and moved to compel both. After holding another evidentiary hearing, the special discovery master denied Samsung's motion to quash and ordered that both depositions proceed. Samsung appealed the special discovery master's order to the trial court. The trial court reviewed the transcripts of these hearings and conducted a third hearing. The trial judge denied Samsung's appeal and affirmed the special discovery master's order. Samsung moved for reconsideration. After a fourth hearing on Samsung's motion to reconsider, the trial judge denied the motion.

Samsung filed a petition for writ of mandamus with the court of appeals. Basing its decision on *Crown*

*Central Petroleum Corp. v. Garcia,* 904 S.W.2d 125 (Tex.1995), the court of appeals held that DSC had failed to prove that it was entitled to take the apex depositions and conditionally granted mandamus relief. DSC filed a petition for writ of mandamus in this Court, arguing that the court of appeals abused its discretion by granting the writ because the trial court did not abuse its discretion.

## II

[1] [2] Mandamus relief is available only to correct a "clear abuse of discretion" when there is no other adequate remedy at law. *See Walker v. Packer,* 827 S.W.2d 833, 839–44 (Tex.1992). When a party alleges that the court of appeals abused its discretion by granting mandamus relief, this Court focuses on whether the trial court's ruling was an abuse of discretion. *See In re Meador,* 968 S.W.2d 346, 350 (Tex.1998) (citing *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985)). We agree with the court of appeals that the trial court's ruling was an abuse of discretion and therefore we deny DSC's request for mandamus relief.

## III

This Court first adopted the apex deposition guidelines in *Crown Central Petroleum Corp. v. Garcia,* 904 S.W.2d 125 (Tex.1995). We held that the apex deposition guidelines apply "[w]hen a party seeks to depose a corporate president or other high level corporate official." *Id.* at 128. A party initiates the *Crown Central* guideline proceedings by moving for protection and filing the corporate official's affidavit denying any knowledge of relevant facts. The trial court evaluates the motion first by deciding if the party seeking the deposition has "arguably shown that the official *176 has any unique or superior personal knowledge of discoverable information." *Id.* "If the party seeking the deposition cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should" not allow the deposition to go forward without a showing, after a good faith effort to obtain the discovery through less intrusive means, "(1) that there is a reasonable indication that the official's deposition is calculated

to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate." *Id.*

[3] [4] While we agree with the court of appeals' conclusion that mandamus relief was appropriate, we disagree with that court's phrasing of the *Crown Central* guidelines. The court of appeals stated: "A party requesting an apex deposition must show that the corporate official to be deposed has an [sic] unique or superior personal knowledge that is unavailable through less intrusive means." —— S.W.3d ——, 1998 WL 851123. That phrasing of the guidelines improperly collapses the two discrete inquiries into a single test. Under *Crown Central*, if the party seeking the deposition has "arguably shown that the official has any unique or superior personal knowledge of discoverable information," the trial court should deny the motion for protection and the party seeking discovery should be entitled to take the apex depositions. *Crown Cent.*, 904 S.W.2d at 128. The party seeking the apex deposition is required to pursue less intrusive means of discovering the information only when that party cannot make the requisite showing concerning unique or superior knowledge. *See id.* We recognize that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders: First, a hearing on whether to grant a protective order and, if one is granted, then a second hearing, after less intrusive methods of discovery have been explored, to determine whether the protective order should be dissolved. We believe that such a mechanical application of the *Crown Central* guidelines is unnecessary when, as here, the parties have already undertaken extensive discovery and the court has sufficient information to consider both prongs of the guidelines.

In this case, when Samsung moved for the protective orders the parties had already engaged in significant discovery, including more than 300 hours of depositions. At this stage of discovery, nothing in *Crown Central* precluded the trial court from considering whether DSC had attempted to gain the information by less intrusive means and otherwise satisfied the second *Crown Central* test. The parties argued both *Crown Central* tests in the trial court, and both the discovery master and trial judge denied the requested protective orders without

specifying the reasons. Accordingly, mandamus is not appropriate if the trial court's order can be sustained under either *Crown Central* test. We consider first whether DSC arguably showed that Lee or Kang have unique or superior personal knowledge of discoverable information.

## *LEE*

[5] The most comprehensive discussion of Kun–Hee Lee's knowledge as it relates to this lawsuit is found in a document submitted by DSC titled: "Kun–Hee Lee's Significance and Connection to This Lawsuit." In that document, DSC urges several reasons why Lee's deposition is necessary. First, under the heading "Kun–Hee Lee Sets Samsung's Course," DSC claims that (1) Lee is the leader of the Samsung Chaebol, (2) Lee sets the overall vision for the Samsung companies, and (3) Samsung's goal is to be one of the world's top five telecommunications companies by 2005. Second, under the heading "Kun–Hee Lee's Ties To The Lead Defendant, Samsung Electronics Co., Ltd.," DSC states that Lee (1) was the chief executive officer and president of SEC, (2) was a long-standing director of SEC, and (3) is *177 the largest single owner of Samsung and its subsidiaries.

Evidence tending to support these allegations does not satisfy the first *Crown Central* test; it merely demonstrates that Lee is a long-time company leader who sets the company vision with lofty goals. Virtually every company's CEO has similar characteristics. Allowing apex depositions merely because a high-level corporate official possesses apex-level knowledge would eviscerate the very guidelines established in *Crown Central*. Such evidence is too general to arguably show the official's knowledge is unique or superior.

[6] In *AMR Corp. v. Enlow*, 926 S.W.2d 640 (Tex.App.—Fort Worth 1996, no writ), the Second Court of Appeals addressed a somewhat similar argument. In *AMR Corp.*, an American Airlines passenger became intoxicated on his flight and later had a traffic accident with the plaintiff. The plaintiff sued AMR Corp. and American Airlines under the Dramshop Act. The plaintiff sought the apex deposition of Robert Crandall, AMR's president,

CEO, and chairman of the board, and American Airlines, Inc.'s CEO and chairman of the board, arguing that he "wish[ed] to depose Robert Crandall in order to determine where the authority lies within the organization for making those [alcohol service and flight attendant training] policy decisions so that Plaintiffs can understand how and why those policy decisions were made and what precisely the policies in place were." *Id.* at 643. The court of appeals held that "[t]his testimony amounts to nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has the ultimate responsibility for all corporate decisions and falls far short of the [*Crown Central* ] standard." *Id.* at 644. We agree with the *AMR Corp.* court of appeals. Testimony that a corporate executive possesses knowledge of company policies does not, by itself, satisfy the first *Crown Central* test because it does not show that the executive has unique or superior knowledge of discoverable information. *See In re El Paso Healthcare Sys.*, 969 S.W.2d 68, 74 (Tex.App.—El Paso 1998, no writ) ("A generalized claim that a corporate president has ultimate responsibility for all corporate decisions or has knowledge of corporate policy is insufficient to establish that the corporate president has unique or superior personal knowledge of discoverable information."); *see also AMR Corp.,* 926 S.W.2d at 644.

Under the heading "The Samsung Project At Issue In This Case Smacks Of Chairman–Level Importance," DSC claims that (1) the "[t]echnology at issue in this case involved huge investments and expected revenue," (2) "SEC's commitment to technology in this case is significant to execution" of its plan to be in the top five companies in its industry, (3) "[t]he significance of the project is illustrated by the claims made in this case,"[5] and (4) "Kun–Hee Lee has been involved with Samsung's telecommunications business." Proof of the importance of the project to Samsung, combined with the allegation that the issue in this case "smacks of chairman-level importance," at most tends to show that the chairman-level official whose deposition is sought may possess discoverable information. It does not, however, arguably show that the official's knowledge is unique or superior. Consequently, the first prong of the *Crown Central* guidelines has not been satisfied with regard to Lee.

## KANG

[7] J.K. Kang served as Chairman of defendant SEC during the earliest events that gave rise to this case and is currently *178 Chairman Emeritus of that corporation. DSC contends that Kang's unique or superior personal knowledge is arguably shown by the deposition testimony of Dr. Joo Hyung Lee, an SEC manager who personally oversaw the establishment of Samsung's Dallas laboratory. Contrary to DSC's contention, Joo Hyung Lee's deposition conveys that Kang may have been made aware of information contained in reports prepared by others, but still does not show why Kang's knowledge may be unique or superior.

In his deposition, Joo Hyung Lee testified that he prepared a status report of the next-generation switching system and presented it to, among others, Song, the Samsung executive in charge of telecommunications, and Kang. Joo Hyung Lee characterized the report as an overview that did not last very long—it was "kind of a simple thing." He further testified that, other than that single presentation, he had no other communication with Kang concerning the next-generation switching system. Further probing by DSC during Joo Hyung Lee's deposition indicated that none of the project's details were conveyed to Kang by Joo Hyung Lee; instead, it was Joo Hyung Lee and Song who were involved in the details:

Q. And I believe section 1.3 [of the document entitled "The Current Status of the Next–Generation Switch System"] provides the time line for the next-generation system as you [Joo Hyung Lee] contemplated it at that time?

A. Yes, that's right.

Q. And if you turn to the next page, I believe this page addresses the—what is called a progress report, and Section 2.1 addresses employment status; is that right?

A. Yes, that's correct.

Q. And the—the box is indicating the number of people that you had interviewed as well as the

response to your advertisements, things like that; is that correct?

A. That's correct.

Q. And at that time, you were indicating to Chairman Kang that you had 15 total people that you were engaged in employment contract negotiations with?

A. Well, I'm thinking, you know, again, that this and the subsequent stuff, you know, I don't think we necessarily made a report on that to the chairman.

Q. Are you saying that the items in part two, you're uncertain whether they were presented to the chairman?

A. I'm thinking that we probably did not specifically make a report on this to him. I mean, this is, you know, all too detailed a level for it to be, you know, reported to the chairman.

....

Q. Did you discuss this with Mr. Song?

A. Yeah, because that's a matter of the progress, just in a simple fashion.

Q. With respect to item three of the document, which I believe concerns the status report on the facilities or the buildings that you were considering, did you discuss that with Chairman Kang?

A. I don't recall that I did.

Q. Did you discuss it with Mr. Song?

A. Yes. We just kind of briefly told him about how there was something like this.

Q. And would you turn to the fourth matter in the document on the last page.

A. Yes.

Q. Which I believe is addressing proposed matters; is that correct?

A. Well, proposed, well, basically I, you know, kind of presented my opinions during this time of the —the report.

*179 Q. And that was my question. Were these matters presented to Chairman Kang during the presentation?

A. No. I don't think there—that would have been necessary vis-a-vis the chairman.

Q. Would these have been discussed with Mr. Song?

A. Yes.

Additionally, DSC claims that an index of computer files produced by Samsung contains numerous listings of computer files identified as reports to J.K. Kang on Samsung's next generation switching system. One of these reports that Kang apparently received a copy of was titled "Action Plans for the Development of the Next Generation Telecommunication System."

[8] This evidence arguably shows that Kang may have discoverable information. But the first *Crown Central* guideline requires more; it requires that the person to be deposed arguably have "*unique* or *superior* personal knowledge of discoverable information." This requirement is not satisfied by merely showing that a high-level executive has some knowledge of discoverable information. If "some knowledge" were enough, the apex deposition guidelines would be meaningless; they would be virtually indistinguishable from the scope of general discovery. Although *Crown Central* did not elaborate on what character of knowledge makes it unique or superior, there must be some showing beyond mere relevance, such as evidence that a high-level executive is the only person with personal knowledge of the information sought or that the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources.

At most, DSC's evidence establishes that Kang received information related to the underlying facts of this case. A recipient's knowledge of the contents of a report is not unique or generally superior to the author's, of course. The record shows that Joo–Hyung Lee's and Song's knowledge of the reports to Kang is comparable, if not superior, to the knowledge possessed by Kang. Although both Joo–Hyung Lee and Song were deposed by DSC, the record does not show that Kang possessed information not possessed

by Lee and Song and does not show that Kang had relevant knowledge that was greater in quantity or quality than Lee or Song. Combined with other factors, receipt of such a report could arguably support that Kang had unique or superior knowledge. But evidence that an apex official received information requires something more to establish that the apex has unique or superior knowledge of discoverable information.

## IV

DSC seeks to distinguish business-related cases like this from tort-related cases like *Crown Central* and *AMR Corp.* DSC contends that the trial court, in allowing the depositions to proceed, considered that "this litigation involves two giant international multinational corporations suing each other over trade secrets and corporate direction, policy and defamation." DSC argues that, "[i]n contrast to cases like ... *Crown Central,* this is the very kind of lawsuit in which high-level executives would be *expected* to participate." (Emphasis in original). The special discovery master apparently agreed with this reasoning by stating:

> [T]his is not the same situation as in *Crown Central* or the *Wal–Mart* case, the original apex deposition case. Mr. Lee appears to be the one person at the very top of the chain at Samsung, and *it may very well be that he does not know anything that's relevant to this case,* and that can be determined very quickly. But I think that *DSC ought to have an opportunity to test that.*

(Emphasis added).

[9] Even if a lawsuit concerns a business dispute rather than a tort claim, and regardless of whether high-level executives would be *expected* to participate in a decision relevant to the dispute, the *Crown* *180 Central* prerequisites must still be met. Business disputes provide no greater license than any other kind of suit to explore by apex deposition whether a high-level executive knows anything relevant to the case. It

may well be true that many tort claims arise without the knowledge or involvement of a high-level officer. Conversely, it may also be true that many business disputes directly involve the decisions or actions of a high-level officer. Regardless of the truth, *vel non,* of these suppositions, the fact remains that the *Crown Central* guidelines must be applied.

## V

Because DSC failed to arguably show that either Kang or Lee possesses unique or superior knowledge of discoverable information, the trial court's order cannot be supported under the first *Crown Central* test. Nevertheless, DSC argues that it has pursued less intrusive means and therefore is entitled to the depositions under *Crown Central* 's second guideline:

> If the party seeking the deposition cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should grant the motion for protective order and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods.... After making a good faith effort to obtain the discovery through less intrusive methods, the party seeking the deposition may attempt to show (1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate. If the party seeking the deposition makes this showing, the trial court should modify or vacate the protective order as appropriate.... If the party seeking the deposition fails

to make this showing, the trial court should leave the protective order in place.

*Crown Cent.*, 904 S.W.2d at 128.

From the record before us, DSC has not shown that it attempted to obtain the information it sought from Kang through less intrusive methods. DSC based its contention that Kang has unique or superior knowledge largely on his presence at a written and oral presentation concerning the next generation switching system. But, DSC was allowed to depose Joo–Hyung Lee, who presented the report to Kang and Song. Also, DSC deposed Song, the Samsung executive in charge of telecommunications, who also attended the presentation. Yet, DSC has failed to identify any relevant information that it seeks from Kang that it attempted and failed to obtain from either Joo–Hyung Lee or Song.

In addition, DSC failed to establish that it attempted to obtain the information that it sought from Lee through less intrusive methods. DSC argued that Lee has unique and superior knowledge regarding Samsung's policies. But the special master allowed DSC to depose Kim, the president and CEO of SEC during the relevant time. Yet, DSC failed to ask Kim any questions about Samsung's "vision" for telecommunications or any of the other issues DSC now contends justify an apex deposition of Lee. DSC also did not issue interrogatories, requests for admissions, or any other forms of discovery to Samsung regarding its corporate policies. The record simply does not show that the information sought from Lee was sought by less intrusive means or that the information sought was unobtainable from other sources.

Absent a showing that an executive arguably has unique or superior personal knowledge, a court has no discretion to allow an apex deposition unless the party seeking the deposition establishes that it has attempted to obtain the information through less intrusive methods. The special master provided DSC with the opportunity *181 to depose other Samsung executives who at least arguably possessed the information DSC seeks. Yet, DSC either failed to take advantage of that opportunity or failed to preserve its attempts in the record. Thus, the trial court abused its discretion in overruling Samsung's motion to quash the depositions of Kang and Lee.

\* \* \* \* \*

We agree with the court of appeals' conclusion that the trial court abused its discretion when it refused to quash the depositions of Kang and Lee because it failed to properly apply the guidelines set forth in *Crown Central v. Garcia.* Accordingly, we deny the mandamus relief requested by DSC.

Justice ENOCH filed a dissenting opinion, in which Justice BAKER and Justice O'NEILL join.

Justice HANKINSON did not participate in the decision.

Justice ENOCH, joined by Justice BAKER and Justice O'NEILL.

This Court has held that the proper place to amend or promulgate a rule is through rulemaking, not judicial fiat.[1] Yet today, from mere guidelines intended to aid a trial court's decision to allow or prevent apex depositions in the context of discovery harassment, the Court effectively forges an apex deposition rule—one, significantly, not found in our recently promulgated discovery rules. This new rule erects an improperly high barrier, imposing a special protection for corporate officials.

The apex guidelines arose from an evaluation of the existing Rules of Civil Procedure, which have long articulated a deponent's right to protection "from undue burden, unnecessary expense, harassment, [or] annoyance...."[2] The progenitor of Texas cases analyzing the propriety of apex depositions is *Wal–Mart Stores, Inc. v. Street.*[3] In that case, this Court examined a business invitee's assertion in a slip-and-fall case that he should be allowed to depose the chair of Wal–Mart's Board of Directors, Sam Walton. We held that the trial judge abused his discretion by ordering the deposition to be taken at a location other than Walton's residence or place of business.[4] Our decision in *Street* recognized the potential for harassment that high-level corporate officials face

when a corporation is routinely subjected to litigation, and when the official's connection to the case is as tenuous as Walton's connection to a slip-and-fall case in one of hundreds of Wal–Mart stores.

Despite the Court's concerns signaled in *Street,* litigants continued to seek the depositions of highest ranking executives of large corporations in what appeared to be nothing more than an effort to harass or pressure settlement by needlessly increasing the costs of litigation.[5] Deciding that it was appropriate to alert courts to such undue discovery burden and harassment, we established parameters to guide a trial court's discretion.[6] While I strongly support the protection from harassment that our apex deposition guidelines provide, I do not countenance a *de facto* rule, unavailable to any other potential deponent, that extends a privilege to corporate officials to avoid depositions by virtue of their position.

Consistent with this Court's holding in *Crown Central,*[7] I would hold that when *182 there is evidence that *arguably shows* that a high-level corporate official has any unique or superior personal knowledge of discoverable information, a trial court does not abuse its discretion by allowing an apex deposition. But when the evidence suggests only that a high-level official's deposition is being sought because the official has ultimate decisionmaking authority, "this amounts to nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has ultimate responsibility for all corporate decisions,"[8] and falls far short of supporting a trial court's discretion to allow the deposition. Consequently, I disagree with the court of appeals' conclusion in this case protecting Kang from being deposed, but agree that Lee cannot be deposed. I would therefore conditionally grant mandamus in part against the court of appeals, and allow the Kang deposition to proceed.

To determine whether the court of appeals improperly granted mandamus relief, this Court focuses on whether the trial court's ruling was an abuse of discretion.[9] A trial court is vested with broad discretion in the area of discovery.[10] Indeed, the reviewing court may not substitute its judgment for the trial court's.[11] *Crown Central*'s guidelines inform

a trial court's discretion to allow or prevent an apex deposition. Pertinent to this case, the trial court's discretion was to be guided by whether DSC *arguably* showed that Kang or Lee had *any* unique *or* superior personal knowledge of discoverable information, and, generally, whether the depositions were sought to harass.[12] The Court's decision today raises a barrier to many otherwise legitimate apex depositions by divesting the trial court of its discretion, and by substituting this Court's judgment for the trial court's.

## LEE

In *AMR Corp. v. Enlow,*[13] the plaintiffs argued that they could depose AMR CEO Robert Crandall in their dramshop negligence case because Crandall had ultimate authority on all of AMR's policies. The court of appeals prevented the deposition, concluding that ultimate policy authority is insufficient evidence and that parties must articulate facts implicating the apex official's personal knowledge.[14] The allegations and mandamus evidence in this case point to Lee in the same way the *AMR* plaintiffs pointed to Crandall. DSC's record evidence reflects such nebulous items as the fact that Lee sets the overall vision for Samsung, is a principal Samsung shareholder, and believes Samsung should actively pursue status as a top-five global telecommunications company. Allegations that a CEO should be deposed because that is where the buck stops are not evidence arguably showing unique or superior personal knowledge of discoverable information. As such, I believe the Court correctly adopts the *AMR* standard with regard to Lee. But while I agree with the Court's result on Lee, my decision would hinge only on the *AMR* rationale. The Fort Worth Court of Appeals described and answered the problem succinctly. I would not go beyond that rationale in analyzing whether the trial court abused its discretion by allowing Lee's deposition.

## *183 KANG

The mandamus record reflects that the special discovery master, Judge Andrews, sat through more than thirty hearings on more than sixty discovery motions. The record also reflects that Judge Andrews

understood that this was not a case in which the facts driving the litigation are extremely remote from the CEO and trickle up the corporate structure. Here, corporate policy and directives may have pushed the events driving this litigation down the corporate hierarchy. Inevitably, the policies driving corporate action and personal knowledge of actions taken in pursuit of such policies intersect. One federal court has held that at this intersection, "when the motives behind corporate action are at issue, an opposing party usually has to depose those officers and employees who in fact approved and administered the particular action."[15] While it is not this Court's role to say whether Kang arguably was at the intersection of Samsung's corporate policy and the events driving this litigation, given the evidence before it, the trial court did not abuse its discretion by doing so.

Only after an exhaustive review of the evidence DSC presented did the trial court conclude that Kang arguably had unique or superior personal knowledge of discoverable information. DSC offered evidence that Kang was directly involved in Samsung's next generation switching system project and had been specifically informed of Samsung's efforts to obtain DSC technology. There was also evidence that Kang received a written and oral presentation in 1996 about the status of Samsung's next generation switching system project in the United States, and that numerous reports were provided to Kang on the same project around the time of the events giving rise to this suit. One of the reports apparently contained an organizational chart for Samsung's telecommunication project that contained the names of DSC employees —who were still with DSC at the time. When asked why he made the presentation to Kang, a lower-level Samsung official responded "because [Kang] had a lot of interest in the information telecommunications side of the business." While this evidence shows Kang's personal knowledge of relevant information, the question *Crown Central* requires the trial court to consider before allowing the deposition is whether DSC arguably showed that the knowledge was unique or superior.

Substituting its judgment for the trial court's, the Court concludes that Kang could not be deposed because DSC did not arguably show that Kang's knowledge of discoverable information was unique or superior.

As evidence that Kang did not reach this level of knowledge, the Court offers Dr. J.H. Lee's deposition testimony that: (1) the report was a simple thing that did not last long; (2) outside of the report, Dr. Lee had no other communication on the next-generation network switch system with Kang; and (3) Dr. Lee conveyed no project details to Kang.[16] In support of its conclusion, the Court announces the new apex deposition rule that a party must make a showing beyond *mere* relevance with evidence "such as ... that " (1) a high-level executive is the only person with personal knowledge of the information sought or (2) the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources."[17] Relying on this new rule, the Court surmises that Kang cannot be deposed because, at best, Dr. Lee's deposition "conveys that Kang may have been made aware of information contained in reports prepared by others, but still does not show why Kang's knowledge may be unique or superior."[18] This new rule and its rationale are problematic.

*184 The Court's conclusion is problematic because it would require a litigant seeking to depose a CEO regarding a board-level decision, about which all present at the board meeting have the same information, to depose a lower-level board member and not the CEO. Why should a litigant be forced to depose the least qualified witness when it could depose the most qualified if they have the same information? While the CEO and a lower-level official may have the same information, they have different levels of knowledge. As one federal court has concluded, an apex official's knowledge may be deemed unique and the deposition allowed, even if other corporate officials possess similar knowledge.[19]

Moreover, the Court's opinion treats "knowledge" as though it were only the bare facts communicated to Kang and nothing more. But knowledge is more than mere information. The Court ignores the role that Kang's, or any apex official's, position within the corporation plays on the information received. When the policies driving corporate action and personal knowledge of actions taken in pursuit of such policies intersect, a new level of knowledge arises. When the motives behind corporate action are at issue, *arguably* the knowledge created at that intersection

is unique to the corporate officer. And certainly that level of knowledge is "greater in quality" than the level possessed by the individual who communicated only the bare facts.

This does not mean that an apex official who merely receives information will automatically be deposed. Trial courts must continue to employ the Rules of Civil Procedure to protect all potential deponents from "undue burden, unnecessary expense, harassment, [or] annoyance...."[20] Moreover, as the Fort Worth Court of Appeals correctly recognized, for corporate officials, bald allegations of final policymaking authority will not constitute sufficient evidence to justify an apex deposition. Likewise, mere allegations that the apex official both forms policy and has personal knowledge of facts relevant to the litigation do not arguably show unique or superior knowledge. Rather, there should be some evidence that the confluence of the official's policy-forming role and personal knowledge of activities related to such policies arguably creates unique or superior knowledge of discoverable information.

The Court's reliance on the amount of Kang's knowledge that Dr. Lee's deposition testimony "conveys" is also troublesome. Benefitted by numerous hearings and direct contact with the litigants and the evidence, the special master and the trial judge had no need to rely on the mere implications of the evidence. Indeed, trial courts have the best vantage point from which to determine whether an apex official's receipt or use of information communicated by lower-level officials arguably shows unique or superior knowledge.

To make this determination, trial courts should consider the context of the allegations the discovering party raises, the type of information sought from the official, any evidence of the official's role in the specific act or transaction underlying the suit, and the official's role within the corporation relative to the corporation's size. In addition, if the party merely seeks factual information an apex official receives, the trial court may limit such discovery if the information "is obtainable from some other source that is more convenient, less burdensome, or less expensive."[21] But if the discovering party presents some evidence showing that the receipt of information

and the official's corporate role arguably combine to form unique or superior knowledge, the trial court does not abuse its discretion to allow the deposition. For this Court to decide that the trial court *185 abused its discretion here, invades the trial court's discretion in the type of judgment call where it is uniquely implicated.

As *Crown Central* counsels, trial courts should carefully balance litigants' need for information against the potential for abuse apex depositions pose. And while the discovering party may not initially be entitled to the deposition if they fail to make the requisite showing, the matter is not foreclosed. *Crown Central* counsels that after a party has failed to offer some evidence that arguably shows the official's unique or superior knowledge, the party may still pursue a good faith effort to discover the information through less-intrusive methods, and then attempt to take the apex deposition.[22]

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law."[23] Given the evidence before it, and the special master's intimate familiarity with the case, I cannot say that the trial judge's decision to permit Kang's deposition was arbitrary and unreasonable. DSC presented evidence that supports the trial court's decision because it arguably shows that Kang had unique or superior discoverable knowledge. And with respect to resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court.[24] Finally, Judge Andrews was not unmindful of the possibility that the depositions were sought to harass. He therefore specifically limited the depositions to matters raised in the parties' claims and counterclaims. Thus, the trial court did not abuse its discretion when it refused to quash the deposition of Kang. Consequently, I would conditionally grant mandamus in part against the court of appeals, allowing Kang's deposition to proceed, but preventing Lee's.

**Parallel Citations**

43 Tex. Sup. Ct. J. 278

Footnotes

1 In September 1998, DSC Communications Corporation merged with and changed its name to Alcatel USA, Inc. We refer to Relator throughout this opinion as DSC, as it was referenced in the trial court and the court of appeals.

2 The real parties in interest are James L. Bunch, Michael Bray, David Fox, Kevin Gallagher, Bhushan Gupta, Nancy Korman, James Olivier, Leo Putchinski, Martin Wu, Samsung Electronics Corp., Samsung Electronics Co., Ltd., and Samsung Telecommunications America, Inc. They are collectively referred to as "Samsung."

3 A chaebol is a Korean conglomerate in which subordinates are extremely deferential to their hierarchical superiors.

4 Mr. Kim currently serves as the CEO and Chairman of Samsung Americas.

5 DSC states that (1) "SEC claims $300 million in damages caused simply by a *delay* in this project," (2) "DSC's damages are $1.3 billion, including present value of $922 million for Samsung's ill-gotten profits," and (3) "DSC's claims for punitive damages arise, in part, from Samsung's corporate culture and strategic directives, which have been set by the highest level of Samsung management, including Kun–Hee Lee."

1 *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992); *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 915 (Tex.1992).

2 TEX.R. CIV. P. 192.6(b).

3 754 S.W.2d 153 (Tex.1988).

4 *See id.* at 155.

5 *See Monsanto Co. v. May*, 889 S.W.2d 274 (Tex.1994) (opinion on denial of leave to file petition for writ of mandamus).

6 *See Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex.1995).

7 *See id.*

8 *AMR Corp. v. Enlow*, 926 S.W.2d 640, 644 (Tex.App.—Fort Worth 1996, orig. proceeding).

9 *See In re Meador*, 968 S.W.2d 346, 350 (Tex.1998).

10 *See Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985).

11 *See Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990).

12 *See Crown Central*, 904 S.W.2d at 128 (emphasis added).

13 926 S.W.2d 640 (Tex.App.—Fort Worth 1996, orig. proceeding).

14 *See id.* at 644.

15 *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 142 (D.Mass.1987).

16 11 S.W.3d at 178.

17 *Id.* at 179.

18 *Id.* at 178.

19 *See Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y.1997).

20 TEX.R. CIV. P. 192.6(b)

21 TEX.R. CIV. P. 192.4(a).

22 *See Crown Central*, 904 S.W.2d at 128.

23 *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).

24 *See Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41–42 (Tex.1989).

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds    Fischer v. Hooper,    N.H.,
June 16, 1999

96 S.Ct. 1551
Supreme Court of the United States

Joseph BAXTER et al., Petitioners,
v.
Nicholas A. PALMIGIANO.
Jerry J. ENOMOTO et al., Petitioners,
v.
John Wesley CLUTCHETTE et al.

Nos. 74-1187 and 74-1194.    |    Argued
Dec. 15, 1975.    |    Decided April 20, 1976.

Actions were brought by state prison inmates alleging that procedures used in prison disciplinary proceedings violated their constitutional rights. In one action, the District Court, 328 F.Supp. 767, granted substantial relief, and the Court of Appeals, 497 F.2d 809, 510 F.2d 613, affirmed. In the other, the district court denied relief and the Court of Appeals, 487 F.2d 1280, reversed. On remand by the Supreme Court, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155, the Court of Appeals, 510 F.2d 534, affirmed prior decision but modified opinion, and the Supreme Court granted certiorari in both actions. The Supreme Court, Mr. Justice White, held that prison inmates do not have right to either retained or appointed counsel in disciplinary hearings; that permitting adverse inference to be drawn from inmate's silence at his disciplinary proceeding is not, on its face, invalid practice; that mandating confrontation and cross-examination of witnesses at prison disciplinary proceedings effectively preempts area that has been left to sound discretion of prison officials; and that where there was no evidence that prison inmates in one action were subject to "lesser penalty" of loss of privileges, but rather it appeared that all were charged with "serious misconduct," requiring procedures such as notice and opportunity to respond even when inmate is faced with temporary suspension of privileges was premature.

Judgments of Courts of Appeals reversed.

Mr. Justice Brennan filed opinion concurring in part and dissenting in part in which Mr. Justice Marshall joined.

West Headnotes (14)

[1]    Federal Civil Procedure
⚖ In general; certification in general
Without certification of action as class action and identification of class, action is not properly a class action. Fed.Rules Civ.Proc. rule 23(c)(1, 3), 28 U.S.C.A.

31 Cases that cite this headnote

[2]    Constitutional Law
⚖ Prisons

Constitutional Law
⚖ Prisons

Although one of named plaintiffs in action by state prison inmates alleging that procedures used in disciplinary proceedings at prison violated their rights to due process and equal protection had been paroled and other had died, where parties stipulated to intervention of another inmate as named party plaintiff and further stipulated that such inmate had been brought before disciplinary committee for infraction that could have also lead to state criminal proceedings, that he asked for and was denied attorney, and that he was assigned to "segregation" for unspecified number of days for infraction, such inmate had standing to raise issues involved in action before Supreme Court. U.S.C.A.Const. Amend. 14.

45 Cases that cite this headnote

[3]    Federal Courts
⚖ Constitutional rights, civil rights, and discrimination in general
Where state adult correction authority regulations, although concededly state

law, did not even mention right to counsel when charges brought were also crimes under state law and did not suggest whether inmate's silence might be used against him in proceeding itself, complaint by prison inmate claiming that disciplinary hearing violated his due process rights did not mention or challenge any rule or regulation of authority but asked that disciplinary decision be declared invalid and its enforcement enjoined, statute requiring convening of three judge court did not appear to be applicable and thus Supreme Court was not deprived of jurisdiction on ground that case involved issues that should have been heard by three-judge court subject to review on direct appeal. 28 U.S.C.A. § 2281.

86 Cases that cite this headnote

[4] **Prisons**
 ⌐ Counsel or other assistance

Prison inmates do not have right to either retained or appointed counsel in disciplinary hearings.

200 Cases that cite this headnote

[5] **Prisons**
 ⌐ Counsel or other assistance

State authorities were not in error in failing to advise prison inmate that he was entitled to counsel at disciplinary hearing and that state would furnish counsel if he did not have one of his own since inmates do not have right to either retained or appointed counsel in disciplinary hearings.

143 Cases that cite this headnote

[6] **Prisons**
 ⌐ Statements, confessions, and admissions; self-incrimination

Prison disciplinary hearings are not criminal proceedings, but if inmates are compelled in such proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered whatever immunity is required to supplant privilege and may not be required to waive such immunity. U.S.C.A.Const. Amend. 5.

54 Cases that cite this headnote

[7] **Prisons**
 ⌐ Statements, confessions, and admissions; self-incrimination

Where no criminal proceedings were pending against state inmate, state did not insist or ask that inmate waive his Fifth Amendment privilege against self-incrimination but notified him that he was privileged to remain silent if he chose, although his silence could be used against him, and his silence in and of itself was insufficient to support adverse decision by disciplinary board, permitting adverse inference to be drawn from his silence was not invalid practice. U.S.C.A.Const. Amends. 5, 14.

1084 Cases that cite this headnote

[8] **Prisons**
 ⌐ Discipline and misconduct

Disciplinary proceedings in state prisons involve correctional process and important state interests other than conviction for crime.

9 Cases that cite this headnote

[9] **Constitutional Law**
 ⌐ Silence

Aside from privilege against compelled self-incrimination, in proper circumstances silence in face of accusation is relevant fact not barred from evidence by the due process clause. U.S.C.A.Const. Amends. 5, 14.

108 Cases that cite this headnote

[10] **Prisons**

⟜ Statements, confessions, and admissions; self-incrimination

Permitting adverse inference to be drawn from prison inmate's silence at disciplinary proceeding is not, on its face, invalid practice.

264 Cases that cite this headnote

[11] **Prisons**

⟜ Cross-examination and confrontation

Mandating confrontation and cross-examination of witnesses at prison disciplinary proceedings, except where prison officials could justify their denial of such privileges on grounds that would satisfy court of law, effectively preempted area that had been left to sound discretion of prison officials.

53 Cases that cite this headnote

[12] **Prisons**

⟜ Cross-examination and confrontation

**Prisons**

⟜ Determination and disposition; statement of reasons

Since there is no general right to confront and cross-examine adverse witnesses at prison disciplinary proceedings, and since due to particular environment of prison setting it may be that certain facts relevant to disciplinary determination may not come to light until after formal hearing, such facts need not be excluded from consideration; however, allowing consideration of such facts in no way diminishes requirement that there be written statement by fact finder as to evidence relied upon and reason for disciplinary action.

231 Cases that cite this headnote

[13] **Civil Rights**

⟜ Criminal law enforcement; prisons

Record in action by state prison inmates alleging that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection contained no evidence of abuse of discretion by state prison officials in connection with confrontation and cross-examination of witnesses at disciplinary proceedings. U.S.C.A.Const. Amend. 14.

97 Cases that cite this headnote

[14] **Prisons**

⟜ Determination and disposition

Where there was no evidence that named state prison inmates, who alleged that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection, were subject to "lesser penalty" of loss of privileges but rather were charged with "serious misconduct," Court of Appeals acted prematurely to extent it required procedures such as notice and opportunity to respond even when inmate is faced with temporary suspension of privileges. U.S.C.A.Const. Amend. 14.

64 Cases that cite this headnote

**\*\*1553** *Syllabus* [*]

\*308 Respondent state prison inmates in No. 74-1194 filed an action for declaratory and injunctive relief alleging that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection of the laws under the Fourteenth Amendment. The District Court granted relief, and the Court of Appeals affirmed, holding that minimum notice and a right to respond are due an inmate faced even with a temporary suspension of privileges, that an inmate at a disciplinary hearing who is denied the privilege of confronting and cross-examining

witnesses must receive written reasons or the denial will be deemed prima facie evidence of abuse of discretion, and that an inmate facing prison discipline for a violation that might also be punishable in state criminal proceedings has a right to counsel (not just counsel-substitute) at the prison hearing. Respondent state prison inmate in No. 74-1187, upon being charged with inciting a prison disturbance, was summoned before prison authorities and informed that he might be prosecuted for a violation of state law, that he should consult an attorney (although the attorney would not be permitted to be present during the disciplinary hearing), and that he had a right to remain silent during the hearing but that if he did so his silence would be held against him. On the basis of the hearing, at which respondent remained silent, he was placed in "punitive segregation" for 30 days. He then filed an action for damages and injunctive relief, claiming that the disciplinary hearing violated the Due Process Clause of the Fourteenth Amendment. The District Court denied relief, but the Court of Appeals reversed, holding that an inmate at a prison disciplinary proceeding must be advised of his right to remain silent, that he must not be questioned further once he exercises that right, that such silence may not be used against him at that time or in future proceedings, and that where criminal charges *309 are a realistic possibility prison authorities should consider whether defense counsel, if requested, should be permitted at the proceeding. *Held:* The procedures required by the respective Courts of Appeals are either inconsistent with the "reasonable accommodation" reached in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, between institutional needs and objectives and the constitutional provisions of general application, or are premature on the basis of the case records. Pp. 1556-1561.

(a) Prison inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." Wolff, supra, at 570, 94 S.Ct. at 2981, 41 L.Ed.2d at 959. P. 1556.

(b) Permitting an adverse inference to be drawn from an inmate's silence at his **1554 disciplinary proceedings is not, on its face, an invalid practice, and there is no basis in the record for invalidating it as applied to respondent in No. 74-1187. Pp. 1556-1559.

(c) Mandating that inmates should have the privilege of confrontation and cross-examination of witnesses at prison disciplinary proceedings, except where prison officials can justify their denial of such privilege on grounds that would satisfy a court of law, effectively pre-empts the area that Wolff, supra, left to the sound discretion of prison officials, and there is no evidence of abuse of such discretion by the prison officials in No. 74-1194. Pp. 1559-1560.

(d) Where there was no evidence that any of the respondents in No. 74-1194 were subject to the "lesser penalty" of loss of privileges, but rather it appeared that all were charged with "serious misconduct," the Court of Appeals acted prematurely to the extent it required procedures such as notice and an opportunity to respond even when an inmate is faced with a temporary suspension of privileges. Pp. 1560-1561.

No. 74-1187, 510 F.2d 534; No. 74-1194, 510 F.2d 613, reversed.

## Attorneys and Law Firms

Ronald A. Dwight, Providence, R. I., for petitioners.

*310 Stephen J. Fortunato, Jr., Pawtucket, R. I., for respondent.

## Opinion

Mr. Justice WHITE delivered the opinion of the Court.

These cases present questions as to procedures required at prison disciplinary hearings and as to the reach of our recent decision in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

I

### A. No. 74-1194

[1] [2] Respondents are inmates of the California penal institution at San Quentin. They filed an action under 42 U.S.C. s 1983 seeking declaratory and injunctive relief and alleging that the procedures used in disciplinary proceedings at San Quentin violated their rights to due process and equal protection of the laws under the Fourteenth Amendment of the Constitution. [1] After an evidentiary *311 hearing,

the District Court granted substantial relief. Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971). The Court of Appeals for the Ninth Circuit, with one judge dissenting, affirmed, 497 F.2d 809 (1974), holding that an inmate facing a disciplinary proceeding at San Quentin was entitled to notice of the **1555 charges against him, to be heard and to present witnesses, to confront and cross-examine witnesses, to face a neutral and detached hearing body, and to receive a decision based solely on evidence presented at the hearing. The court also held that an inmate must be provided with counsel or a counsel-substitute when the consequences *312 of the disciplinary action are "serious," such as prolonged periods of "isolation." Id., at 821. The panel of the Court of Appeals, after granting rehearing to reconsider its conclusions in light of our intervening decision in Wolff, supra, reaffirmed its initial judgment again with one judge dissenting but modified its prior opinion in several respects. 510 F.2d 613 (1975). The Court of Appeals held that minimum notice and a right to respond are due an inmate faced even with a temporary suspension of privileges, that an inmate at a disciplinary helping who is denied the privilege of confronting and cross-examining witnesses must receive written reasons for such denial or the denial "will be deemed prima facie evidence of abuse of discretion," Id., at 616, and reaffirming its initial view that an inmate facing prison discipline for a violation that might also be punishable in state criminal proceedings has a right to counsel (not just counsel-substitute) at the prison hearing. We granted certiorari and set the case for oral argument with No. 74-1187. 421 U.S. 1010. 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

**B. No. 74-1187**

Respondent Palmigiano is an inmate of the Rhode Island Adult Correction Institution serving a life sentence for murder. He was charged by correctional officers with "inciting a disturbance and disrupt(ion) of (prison) operations, which might have resulted in a riot." App. 197 (No. 74-1187). He was summoned before the prison Disciplinary Board and informed that he might be prosecuted for a violation of state law, that he should consult his attorney (although his attorney was not permitted by the Board to be present during the hearing), that he had a right to remain silent during the hearing but that if he remained silent his silence would be held against him. Respondent availed himself

of the counsel-substitute provided for by prison rules and remained *313 silent during the hearing. The Disciplinary Board's decision was that respondent be placed in "punitive segregation" for 30 days and that his classification status be downgraded thereafter.

[3] Respondent filed an action under 42 U.S.C. s 1983 for damages and injunctive relief, claiming that the disciplinary hearing violated the Due Process Clause of the Fourteenth Amendment of the Constitution. [2] The District *314 Court held an evidentiary **1556 hearing and denied relief. The Court of Appeals for the First Circuit, with one judge dissenting, reversed, holding that respondent "was denied due process in the disciplinary hearing only insofar as he was not provided with use immunity for statements he might have made within the disciplinary hearing, and because he was denied access to retained counsel within the hearing." 487 F.2d 1280, 1292 (1973). We granted certiorari, vacated the judgment of the Court of Appeals, and remanded to that court for further consideration in light of Wolff v. McDonnell, supra, decided in the interim, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974). On remand, the Court of Appeals affirmed its prior decision but modified its opinion. 510 F.2d 534 (1974). The Court of Appeals held that an inmate at a prison disciplinary proceeding must be advised of his right to remain silent, that he must not be questioned further once he exercises that right, and that such silence may not be used against him at that time or in future proceedings. With respect to counsel, the Court of Appeals held:

"(I)n cases where criminal charges are a realistic possibility, prison authorities should consider whether defense counsel, if requested, should not be let into the disciplinary proceeding, not because Wolff requires it in that proceeding, but because Miranda (v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) requires it in light of future criminal prosecution." Id., at 537.

We granted certiorari and heard the case with No. 74-1194. 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

**II**

In Wolff v. McDonnell, supra, drawing comparisons to Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), we said:

"The insertion of counsel into the (prison) disciplinary process would inevitably give the proceedings *315 a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." 418 U.S.. at 570, 94 S.Ct., at 2981, 41 L.Ed.2d, at 959.

Relying on Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602. 16 L.Ed.2d 694 (1966), and Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), both Courts of Appeals in these cases held that prison inmates are entitled to representation at prison disciplinary hearings where the charges involve conduct punishable as a crime under state law, not because of the services that counsel might render in connection with the disciplinary proceedings themselves, but because statements inmates might make at the hearings would perhaps be used in later state-court prosecutions for the same conduct.

Neither Miranda, supra, nor Mathis, supra, has any substantial bearing on the question whether counsel must be provided at "(p)rison disciplinary hearings (which) are not part of a criminal prosecution." Wolff v. McDonnell. supra, 418 U.S., at 556. 94 S.Ct.. at 2979. 41 L.Ed.2d, at 956. The Court has never held, and we decline to do so now, that the requirements of those cases must be met to render pretrial statements admissible in other than criminal cases.

|4| |5| We see no reason to alter our conclusion so recently made in Wolff that inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." 418 U.S., at 570, 94 S.Ct., at 2981, 41 L.Ed.2d, at 959. Plainly, therefore, state authorities were not in error in failing to advise Palmigiano to the contrary, I. e., **1557 that he was entitled to counsel at the hearing and that the State would furnish counsel if he did not have one of his own.

## *316 III

Palmigiano was advised that he was not required to testify at his disciplinary hearing and that he could remain silent but that his silence could be used against him. The Court of Appeals for the First Circuit held that the self-incrimination privilege of the Fifth Amendment, made applicable to the States by reason of the Fourteenth Amendment, forbids drawing adverse inferences against an inmate from his failure to testify. The State challenges this determination, and we sustain the challenge.

|6| As the Court has often held, the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973). Prison disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered "whatever immunity is required to supplant the privilege" and may not be required to "waive such immunity." Id., at 85, 94 S.Ct.. at 326, 38 L.Ed.2d, at 286; Garrity v. New Jersey. 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); Sanitation Men v. Sanitation Comm'r, 392 U.S. 280. 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In this line of cases from Garrity to Lefkowitz, the States, pursuant to statute, sought to interrogate individuals about their job performance or about their contractual relations with the State; insisted upon waiver of the Fifth Amendment privilege not to respond or to object to later use of the incriminating statements in criminal prosecutions; and, upon refusal to waive, automatically *317 terminated employment or eligibility to contract with the State. Holding that the State could not constitutionally seek to compel testimony that had not been immunized by threats of serious economic reprisal, we invalidated the challenged statutes.

The Court has also plainly ruled that it is constitutional error under the Fifth Amendment to instruct a jury in a criminal case that it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This holding paralleled the existing statutory policy of the United States, id., at 612, 85 S.Ct., at 1232, 14 L.Ed.2d, at 108, and the governing statutory or constitutional rule in the overwhelming majority of the States. 8 J. Wigmore, Evidence 425-439 (McNaughton rev. 1961).

[7] The Rhode Island prison rules do not transgress the foregoing principles. No criminal proceedings are or were pending against Palmigiano. The State has not, contrary to Griffin, sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding. Neither has Rhode Island insisted or asked that Palmigiano waive his Fifth Amendment privilege. He was notified that he was privileged to remain silent if he chose. He was also advised that his silence could be used against him, but a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing, as respondent Palmigiano did here, is not in consequence of his silence automatically found guilty of the infraction with which he has been charged. Under Rhode Island law, disciplinary decisions "must be based on substantial evidence manifested in the record of the disciplinary proceeding." Morris v. Travisono, 310 F.Supp. 857, 873 (R.I.1970). It is thus undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board. In *318 this respect, this case is very different from the circumstances before the Court in **1558 the Garrity-Lefkowitz decisions, where refusal to submit to interrogation and to waive e Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege. The advice given inmates by the decisionmakers is merely a realistic reflection of the evidentiary significance of the choice to remain silent.

Had the State desired Palmigiano's testimony over his Fifth Amendment objection, we can but assume that it would have extended whatever use immunity is required by the Federal Constitution. Had this occurred and had Palmigiano nevertheless refused to answer, it surely would not have violated the Fifth Amendment to draw whatever inference from his silence that the circumstances warranted. Insofar as the privilege is concerned, the situation is little different where the State advises the inmate of his right to silence but also plainly notifies him that his silence will be weighed in the balance.

[8] Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a party to a Civil cause." 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961). In criminal cases, where the stakes are *319 higher and the State's sole interest is to convict, Griffin prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt. Disciplinary proceedings in state prisons, however, involve the correctional process and important state interests other than conviction for crime. We decline to extend the Griffin rule to this context.

[9] It is important to note here that the position adopted by the Court of Appeals is rooted in the Fifth Amendment and the policies which it serves. It has little to do with a fair trial and derogates rather than improves the chances for accurate decisions. Thus, aside from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause. Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-154, 44 S.Ct. 54, 56, 68 L.Ed. 221, 223 (1923); Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed.2d 1054 (1926); Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908). See also United States v. Hale, 422 U.S. 171, 176-177,

95 S.Ct. 2133, 2136, 45 L.Ed.2d 99, 104 (1975); Gastelum-Quinones v. Kennedy, 374 U.S. 469, 479, 83 S.Ct. 1819, 1824, 10 L.Ed.2d 1013, 1020 (1963); Grunewald v. United States, 353 U.S. 391, 418-424, 77 S.Ct. 963, 981-984, 1 L.Ed.2d 931, 950-954 (1957). Indeed, as Mr. Justice Brandeis declared, speaking for a unanimous court in the Tod case, supra, which involved a deportation: "Silence is often evidence of the most persuasive character." 263 U.S., at 153-154, 44 S.Ct., at 56, 68 L.Ed., at 224. And just last Term in Hale, supra, the Court recognized that "(f)ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question." 422 U.S., at 176, 95 S.Ct., at 2136, 45 L.Ed.2d, at 104.[3]

*320 **1559 [10] The short of it is that permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice; and there is no basis in the record for invalidating it as here applied to Palmigiano.[4]

## IV

In Wolff v. McDonnell, we held that "the inmate facing disciplinary proceedings should be allowed to call *321 witnesses and present documentary evidence in his defense when permitting him to do will not be unduly hazardous to institutional safety or correctional goals." 418 U.S., at 566, 94 S.Ct., at 2979, 41 L.Ed.2d, at 956. We noted that "(o)rdinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." Ibid. The right to call witnesses, like other due process rights delineated in Wolff, is thus circumscribed by the necessary "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." Id., at 556, 94 S.Ct., at 2975, 41 L.Ed.2d, at 950. Within the reasonable limitations necessary in the prison disciplinary context, we suggested, but did not require, that the disciplinary committee "state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." Id., at 566, 94 S.Ct., at 2980, 41 L.Ed.2d, at 956.

We were careful to distinguish between this limited right to call witnesses and other due process rights at disciplinary hearings. We noted expressly that, in comparison to the right to call witnesses, "(c)onfrontation and cross-examination present greater hazards to institutional interests." Id., at 567, 94 S.Ct., at 2980, 41 L.Ed.2d, at 957. We said: "If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability." Ibid.

We therefore concluded that "(t)he better course at this time, in a period where prison practices are diverse and *322 somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons." Id. at 569, 94 S.Ct., at 2981, 41 L.Ed.2d, at 958.

**1560 Although acknowledging the strictures of Wolff with respect to confrontation and cross-examination, the Court of Appeals for the Ninth Circuit, on rehearing in No. 74-1194, went on to require prison authorities to provide reasons in writing to inmates denied the privilege to cross-examine or confront witnesses against them in disciplinary proceedings; absent explanation, failure to set forth reasons related to the prevention of one or more of the four concerns expressly mentioned in Wolff would be deemed prima facie abuse of discretion.

[11] [12] [13] This conclusion is inconsistent with Wolff. We characterized as "useful," but did not require, written reasons for denying inmates the limited right to call witnesses in their defense. We made no such suggestion with respect to confrontation and cross-examination which, as was there pointed out, stand on a different footing because of their inherent danger and the availability of adequate bases of decision without them. See 418 U.S., at 567-568, 94 S.Ct., at 2980-2981, 41 L.Ed.2d, at 957-958. Mandating confrontation and cross-examination, except where prison officials can justify

their denial on one or more grounds that appeal to judges, effectively preempts the area that Wolff left to the sound discretion of prison officials.[5] We add that on the record before us *323 there is no evidence of the abuse of discretion by the state prison officials.

## V

[14] Finally, the Court of Appeals for the Ninth Circuit in No. 74-1194 held that minimum due process such as notice, opportunity for response, and statement of reasons for action by prison officials was necessary where inmates were deprived of privileges. 510 F.2d, at 615. We did not reach the issue in Wolff; indeed, we said: "We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges." 418 U.S., at 572 n. 19. 94 S.Ct., at 2982. 41 L.Ed.2d, at 960. Nor do we find it necessary to reach the issue now in light of the record before us. None of the named plaintiffs in No. 74-1194 was subject solely to loss of privileges; all were brought before prison disciplinary hearings for allegations of the type of "serious misconduct," 418 U.S., at 558, 94 S.Ct., at 2975. 41 L.Ed.2d, at 952. that we held in Wolff to trigger procedures therein outlined. See n. 1, supra. Without such a record, we are unable to consider the degree of "liberty" at stake in loss of privileges and thus whether some sort of procedural safeguards are due when only such "lesser penalties" are at stake. To the extent that the Court of Appeals for the Ninth Circuit required any procedures in such circumstances, the Court of Appeals *324 acted prematurely, and its decision on the issue cannot stand.[6]

**1561 We said in Wolff v. McDonnell: "As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution." 418 U.S., at 572, 94 S.Ct., at 2982. 41 L.Ed.2d. at 960. We do not retreat from that view. However, the procedures required by the Courts of Appeals in Nos. 74-1187 and 74-1194 are either inconsistent with the "reasonable accommodation" reached in Wolff, or premature on the bases of the records before us. The judgments in Nos. 74-1187 and 74-1194 accordingly are Reversed.

Judgments reversed.

Mr. Justice STEVENS took no part in the consideration or decision of these cases.

Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL joins, concurring in part and dissenting in part.

I agree that consideration of the procedural safeguards necessary where an inmate is deprived only of privileges is premature on this record, and thus I join Part V of the Court's opinion, which leaves open whether an inmate may be deprived of privileges in the absence of due process safeguards.

*325 Parts II and IV of the Court's opinion simply reaffirm Wolff v. McDonnell. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). I continue to believe that Wolff approved procedural safeguards short of the minimum requirements of the Due Process Clause, and I dissent from Parts II and IV for the reasons stated by my Brother Marshall, 418 U.S., at 580. 94 S.Ct.. at 2986, 41 L.Ed.2d, at 964.

Part III of the Court's opinion, however, confronts an issue not present in Wolff[1] and in my view reaches an erroneous conclusion. The Court acknowledges that inmates have the right to invoke the privilege against compulsory self-incrimination in prison disciplinary proceedings, Ante, at 1556, but nevertheless holds that "permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice," Ante, at 1558, and was proper in the circumstances of this case. This conclusion cannot be reconciled with the numerous cases holding that the government is barred from penalizing an individual for exercising the privilege; precedents require the holding that if government officials ask questions of an individual *326 to elicit incriminating information, as happened here, the imposition of any substantial sanction on that individual for remaining silent violates the Fifth Amendment. That principle prohibits reliance on any

inference of guilt from the exercise of the privilege in the context of a prison disciplinary hearing.

## I

As we have frequently and consistently recognized: "The constitutional privilege against self-incrimination has two primary interrelated **1562 facets: The Government may not use compulsion to elicit self-incriminating statements, see, E. g., Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195 (35 L.Ed. 1110), and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion. See, E. g., Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513." Murphy v. Waterfront Comm'n, 378 U.S. 52, 57 n. 6, 84 S.Ct. 1594, 1598, 12 L.Ed.2d 678, 683 (1964).

Indeed, only weeks ago we said that "the privilege protects against the use of compelled statements As well as guarantees the right to remain silent absent immunity." Garner v. United States, 424 U.S. 648, at 653, 96 S.Ct. 1178, at 1182, 47 L.Ed.2d 370, at 376 (1976) (emphasis supplied). Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), held that the Fifth Amendment the "essential mainstay" of our "American system of criminal prosecution," Id., at 7, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659 protects "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Id., at 8, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659. See Spevack v. Klein, 385 U.S. 511, 514, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). As The Chief Justice noted last Term: "This Court has always broadly construed (the Fifth Amendment) protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *327 Maness v. Meyers, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574, 585 1975). Further, "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)." Lefkowitz v. Turley. 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d

274, 282 (1973). See Maness v. Meyers, supra, 419 U.S., at 473, 95 S.Ct., at 597, 42 L.Ed.2d, at 592 (White, J., concurring in result).

Thus, the Fifth Amendment not only excludes from use in criminal proceedings any evidence obtained from the defendant in violation of the privilege, but also is operative before criminal proceedings are instituted: it bars the government from using compulsion to obtain incriminating information from any person. Moreover, the protected information "does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution. . . . Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951)." Maness v. Meyers, supra, at 461, 95 S.Ct., at 592, 42 L.Ed.2d, at 585. And it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection. " 'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.' " Grunewald v. United States, 353 U.S. 391, 421, 77 S.Ct. 963, 982, 1 L.Ed.2d 931, 953 (1957), quoting Slochower v. Board of Education, 350 U.S. 551, 557-558, 76 S.Ct. 637, 641, 100 L.Ed. 692, 699 (1956). See E. Griswold, The Fifth Amendment Today 10-22 (1955); Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 24 U.Chi.L.Rev. 472 (1957).

Accordingly, the fact that no criminal proceedings were pending against Palmigiano, Ante, at 1557, does not answer the crucial question posed by this case. The evidentiary *328 use of his statements in a criminal proceeding lurked in the background, but the significant element for this case is that the Fifth Amendment also prohibits the government from compelling an individual to disclose information that might tend to connect him with a crime. Maness v. Meyers, supra, pointed up this distinction in its recognition that availability of motions to suppress compelled testimonial evidence **1563 do not remedy the Fifth Amendment violation. 419 U.S., at 460, 463, 95 S.Ct., at 592, 42 L.Ed.2d, at 584.

## II

It was this aspect of the privilege that we relied on in a line of cases beginning with Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and leading up to Lefkowitz v. Turley, supra. The Court says today that "this case is very different," Ante, at 1557, but in my view the Garrity-Lefkowitz cases are compelling authority that drawing an adverse inference from an inmate's exercise of the privilege to convict him of a disciplinary offense violates the Fifth Amendment.

In Garrity policemen were summoned to testify in the course of an investigation of police corruption. They were told that they could claim the privilege, but would be discharged if they did. Garrity held that imposition of the choice between self-incrimination and job forfeiture denied the constitutionally required "free choice to admit, to deny, or to refuse to answer." Lisenba v. California, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166, 182 (1947). Subsequent criminal convictions were therefore set aside on the ground that the unconstitutionally compelled testimony should not have been admitted in evidence at trial.

In Spevack v. Klein, supra, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, decided the same day as Garrity, an attorney refused to honor a subpoena calling for production of certain financial records; the sole basis for the refusal was the privilege against self-incrimination. He was disbarred for exercising the privilege, and *329 the disbarment was challenged in this Court as infringing the Fifth Amendment. Relying on *Malloy v. Hogan, supra*, 378 U.S., at 8, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659. *Spevack* held that the privilege protects individuals against any penalty for their silence and that its protection bars "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.' " 385 U.S., at 515, 87 S.Ct., at 629, 17 L.Ed.2d, at 577.[2] See Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106, 109 (1965). Spevack expressly stated that "(t)he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion," 385 U.S., at 516, 87 S.Ct., at 628, 17 L.Ed.2d, at 578, and therefore held that by inferring professional misconduct, and penalizing that misconduct, solely on the basis of an invocation of the privilege, the State had violated the Fifth Amendment.

Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), involved a policeman called to testify before a grand jury investigating police corruption. He was warned of his constitutional right to refuse to give any incriminating information, but was also asked to waive immunity, and told that if he refused to do so, a state statute required that he be discharged. He refused to waive immunity and was discharged. Gardner invalidated the state statute on the ground that the Fifth Amendment does not permit the government to use its power to discharge employees to coerce disclosure of incriminating evidence. Id., at 279, 88 S.Ct., at 1916, 20 L.Ed.2d, at 1087. *330 Sanitation Men v. Sanitation Comm'r, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), decided the same day, turned on the same ground.[3]

**1564 Lefkowitz v. Turley, supra, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274, the most recent decision involving noncriminal penalties for exercising the privilege, concerned two architects summoned to testify before a grand jury investigating charges of corruption relating to state contracts. They refused to waive the privilege, and a state statute provided that such a refusal would result in cancellation of existing state contracts and ineligibility for future contracts for five years. The architects brought suit, claiming that the statute violated the privilege against compulsory self-incrimination. The Court held that in the absence of a grant of immunity the government may not compel an individual to give incriminating answers. 414 U.S., at 79, 94 S.Ct., at 323, 38 L.Ed.2d, at 282.[4] A "substantial economic sanction" in the form of loss of contracts was held sufficient to constitute compulsion within the meaning of the Fifth Amendment. Id., at 82, 94 S.Ct., at 324, 38 L.Ed.2d, at 284. The penalty, again imposed in a noncriminal context, was held to infringe the Fifth Amendment.

It follows that settled jurisprudence until today has been that it is constitutionally impermissible for the government to impose noncriminal penalties as a means of compelling individuals to forgo the privilege. The Court therefore begs the question by "declin(ing) to extend the *331 *Griffin* rule" to prison disciplinary proceedings, *ante*, at 1558. Affirmance of the Court of Appeals' holding that reliance on an inmate's silence is barred by the Fifth Amendment is required by *Spevack, Gardner, Sanitation Men,* and *Lefkowitz.*

The Court's attempted distinction of those cases plainly will not wash. To be sure, refusal to waive the privilege resulted in automatic imposition of some sanction in all of those cases. The Court reasons that because disciplinary decisions must be based on substantial record evidence, Morris v. Travisono, 310 F.Supp. 857. 873 (RI 1970),[5] and Palmigiano's silence "at the hearing in the face of evidence that incriminated him . . . was given no more evidentiary value than was warranted by the facts surrounding his case," Ante, at 1557, no automatic imposition of a sanction results, and therefore the use of such silence "does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege," Ibid.

But the premise of the Garrity-Lefkowitz line was not that compulsion resulted from the automatic nature of the sanction, but that a sanction was imposed that made costly the exercise of the privilege. Plainly the penalty imposed on Palmigiano 30 days in punitive segregation and a downgraded classification made costly the exercise of the privilege no less than loss of government *332 contracts or discharge from a state job. Even accepting the Court's assertion that a disciplinary conviction does not automatically follow from an inmate's silence, in sanctioning reliance on silence as probative of guilt of the disciplinary offense charged, the Court allows prison officials **1565 to make costly the exercise of the privilege, something Garrity-Lefkowitz condemned as prohibited by the Fifth Amendment. For it cannot be denied that the disciplinary penalty was imposed to some extent, if not solely,[6] as a sanction for exercising the constitutional privilege. See Griffin v. California, supra, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; United States v. Jackson. 390 U.S. 570, 581-582, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138. 146 (1968). That plainly violates the Fifth Amendment.

It is inconsequential that the State is free to determine the probative weight to be attached to silence. Garrity-Lefkowitz did not consider probative value, and other precedents deny the State power to attach any probative weight whatever to an individual's exercise of the privilege, as I develop more fully in Part IV.

*333 The compulsion upon Palmigiano is as obvious as the compulsion upon the individuals in Garrity-

Lefkowitz. He was told that criminal charges might be brought against him. He was also told that anything he said in the disciplinary hearing could be used against him in a criminal proceeding.[7] Thus, the possibility of self-incrimination was just as real and the threat of a penalty just as coercive. Moreover, the Fifth Amendment does not distinguish among types or degrees of compulsion. It prohibits " 'inducement of any sort.' " Bram v. United States, 168 U.S. 532, 548, 18 S.Ct. 183, 189, 42 L.Ed. 568, 575 (1897). "We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." Malloy v. Hogan, 378 U.S., at 7, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659. Palmigiano was forced to choose between self-incrimination and punitive segregation or some similar penalty. Since the Court does not overrule the Garrity-Lefkowitz group of decisions, those precedents compel the conclusion that this constituted impermissible compulsion.

### III

The Court also draws support from the "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse *334 to testify in response to probative evidence offered against them." Ante, at 1558. That rule may prevail, but it did not have the approval of this Court until today. Some commentators have suggested that permitting an adverse inference in some civil cases violates the Fifth Amendment. Comment, Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination, 24 U.Fla.L.Rev. 541, 546 (1972); Comment, 1968, U.Ill.L.F. 75; Note, Use of **1566 the Privilege Against Self-Incrimination in Civil Litigation, 52 Va.L.Rev. 322 (1966). I would have difficulty holding such an inference impermissible in civil cases involving only private parties. But I would hold that compulsion violating the privilege is present in any proceeding, criminal or civil, where A government official puts questions to an individual with the knowledge that the answers might tend to incriminate him. See Garner v. United States, 424 U.S. at 653, 96 S.Ct. at 1181, 47 L.Ed.2d at 376; Sanitation Men v. Sanitation Comm'r, 392 U.S., at 284, 88 S.Ct., at 1919, 20 L.Ed.2d, at 1092.

Such a distinction is mandated by one of the fundamental purposes of the Fifth Amendment: to preserve our adversary system of criminal justice by preventing The government from circumventing that system by abusing its powers. Garner v. United States, supra, 424 U.S. at 653, 96 S.Ct. at 1182, 47 L.Ed.2d at 376. Only a few weeks ago, we said "That system is undermined when a government deliberately seeks to avoid the burdens of independent investigation by compelling self-incriminating disclosures." Ibid.

"One of the most important functions of the privilege is to protect all persons, whether suspected of crime or not, from abuse by the government of its powers of investigation, arrest, trial and punishment. It was not solicitude for persons accused of crime but the desire to maintain the proper balance between government and the persons governed that *335 gave rise to the adoption of these constitutional provisions." Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 24 U.Chi.L.Rev. 472, 484 (1957) (footnote omitted).

In a civil suit involving only private parties, no party brings to the battle the awesome powers of the government, and therefore to permit an adverse inference to be drawn from exercise of the privilege does not implicate the policy considerations underlying the privilege. But where the government "deliberately seeks" the answers to incriminatory questions, allowing it to benefit from the exercise of the privilege aids, indeed encourages, governmental circumvention of our adversary system. In contrast, an affirmance of the judgment in Palmigiano's case would further obedience of the government to the commands of the Fifth Amendment. Cf. United States v. Karathanos, 531 F.2d 26, 35 (CA2 1976) (Oakes, J., concurring); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349 (1974).

Nothing in this record suggests that the State does not use the disciplinary procedure as a means to gather evidence for criminal prosecutions. On the contrary, Palmigiano was told that he might be prosecuted, which indicates that criminal proceedings are brought in some instances. And if the State does not intend to initiate criminal proceedings, the Fifth Amendment problem can be readily avoided simply by granting

immunity for any testimony given at disciplinary hearings. [8]

#### *336 **1567 IV

I would therefore affirm the judgment of the Court of Appeals in No. 74-1187 insofar as that court held that an inmate's silence may not be used against him in a prison disciplinary proceeding. This would make unnecessary addressing the question whether exercise of the privilege may be treated as probative evidence of guilt. Since the Court, however, indicates that invocation of the privilege is probative in these circumstances, Ante, at 1558-1559, I express my disagreement. For we have repeatedly emphasized that such an inference has no foundation. Indeed, the very cases relied upon by the Court expose its error and support the conclusion that Palmigiano's silence could not be treated as probative.

United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), quoted Ante, at 1558, involved a deportation proceeding in which the deportee failed to deny that he was an alien. But he also failed to claim or attempt to prove that he was a citizen. Alienage was not an element of any crime, and his silence was held probative of his *337 alienage. The inference was plainly permissible since the deportee faced no possibility of incrimination, and there was therefore no implication of the privilege. But Palmigiano's predicament was that answers to the questions put to him by the prison officials could connect him with a crime.

The Court also quotes part of a sentence from United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). We said in Hale that "(i)n most circumstances silence is so ambiguous that it is of little probative force." Id., 419 U.S. at 176, 95 S.Ct. at 2136, 45 L.Ed.2d at 104. We also noted that its probative force increases where a person "would be more likely than not to dispute an untrue accusation." Ibid. We emphasized that "(f)ailure to contest an assertion, however, is considered evidence of acquiescence Only if it would have been natural under the circumstances to object to the assertion in question." Ibid. (emphasis supplied). That was not the case since Hale's silence was in response to notice that he had a right to remain silent, and that any statements he made would be

used against him in court. These excerpts from Hale require the conclusion that Palmigiano's silence also had no probative force. Palmigiano was also advised that he had a right to remain silent, that he might be prosecuted, and that anything he said could be used against him in court.

Finally, Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), is particularly persuasive authority that Palmigiano's silence is not probative. We there considered whether one Halperin's exercise of the privilege was probative of guilt, and we concluded that his silence, in the circumstances, was "wholly consistent with innocence." Id., at 421, 77 S.Ct., at 982, 1 L.Ed.2d, at 952. "Halperin repeatedly insisted . . . that he was innocent and that he pleaded his Fifth Amendment privilege solely on the advice of counsel." Id., at 422, 77 S.Ct., at 983, 1 L.Ed.2d, at 953. Similarly, Palmigiano here maintained that he was innocent and that he claimed the privilege on *338 the advice of counsel. *Grunewald* was a situation where "the Fifth Amendment claim was made before a grand jury where Halperin was a compelled, and not a voluntary, witness; where he was not represented by counsel; where he could summon no witnesses; and where he had no opportunity to cross-examine witnesses testifying against him." Ibid. That was similar to Palmigiano's situation; inmates have only a very limited right to call witnesses, and an even more limited right of cross-examination, Ante, at 1559. Grunewald is thus most persuasive authority that Palmigiano's silence was not probative. See **1568 Flint v. Mullen, 499 F.2d 100, 103 (CA1). cert. denied, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). [9]

To accord silence probative force in these cases overlooks the hornbook teaching "that one of the basic functions of the privilege is to protect Innocent men." Grunewald v. United States, supra, 353 U.S. at 421, 77 S.Ct. at 982, 1 L.Ed.2d at 952 (emphasis in original). If this Court's insensitivity to the Fifth *339 Amendment violation present in this case portends still more erosion of the privilege, state courts and legislatures will remember that they remain free to afford protections of our basic liberties as a matter of state law. See Michigan v. Mosley, 423 U.S. 96, 120-121; 96 S.Ct. 321, 332, 46 L.Ed.2d 313, 334 (1975) (Brennan, J., dissenting). Contrary to this Court's interpretation of the Federal Constitution's privilege against compulsory self-incrimination in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the California Supreme Court recently construed California's constitutional prohibition to forbid use of an accused's inculpatory statement obtained in violation of custodial interrogation safeguards announced in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court said, People v. Disbrow, 16 Cal.3d 101, 113-115, 127 Cal.Rptr. 360, 368, 545 P.2d 272, 280 (1976): "We . . . declare that Harris is not persuasive authority in any state prosecution in California. . . . We pause . . . to reaffirm the independent nature of the California Constitution and our responsibility to separately define and protect the rights of California citizens despite conflicting decisions of the United States Supreme Court interpreting the federal Constitution." [10]

*340 The fact that Palmigiano is a prison inmate cannot, of course, distinguish this case from the cases in the Garrity-Lefkowitz line, since "a prisoner does not shed his basic constitutional rights at the prison gate." Wolff v. McDonnell, 418 U.S., at 581, 94 S.Ct. 2963, at 2987, 41 L.Ed.2d 935, at 965 (Marshall, J., dissenting); see Jackson v. Bishop, 404 F.2d 571, 576 (CA8 1968) (Blackmun, J.). I must therefore view today's decision as another regrettable disregard of Mr. Justice Frankfurter's admonition that our interpretation of the privilege **1569 is not faithful to the Founding Fathers' purpose when it does not reflect the teaching of history:

"This command of the Fifth Amendment . . . registers an important advance in the development of our liberty 'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States." Ullmann v. United States, 350 U.S. 422, 426-427, 76 S.Ct. 497, 500, 100 L.Ed. 511, 518 (1956) (footnotes omitted).

Next 2015 Thomson Reuters. No claim to original U.S. Government Works.

14

**Parallel Citations**

96 S.Ct. 1551, 47 L.Ed.2d 810

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499, 505.

1    Respondents John Wesley Clutchette and George L. Jackson brought suit "on their own behalf, and, pursuant to Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all other inmates of San Quentin State Prison subject to defendants' jurisdiction and affected by the policies, practices or acts of defendants complained of herein." Plaintiffs' Amended Complaint, 1 Record 33 (No. 74-1194). The District Court treated the suit as a class action, Clutchette v. Procunier, 328 F.Supp. 767, 769-770 (N.D.Cal.1971), but did not certify the action as a class action within the contemplation of Fed.Rules Civ.Proc. 23(c)(1) and 23(c)(3). Without such certification and identification of the class, the action is not properly a class action. Indianapolis School Comm'rs v. Jacobs, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). We were advised at oral argument in No. 74-1194 that respondent Clutchette was paroled in 1972, two years after the suit was filed; counsel for respondents conceded that the case is moot as to him. Tr. of Oral Arg. (No. 74-1194), p. 34. We were further advised that respondent Jackson died after the suit was filed. However, the parties stipulated on June 21, 1972, to the intervention of Alejandro R. Ferrel as a named party plaintiff in the suit. 3 Record 285 (No. 74-1194). The parties further stipulated the facts that, like Clutchette and Jackson, Ferrel was an inmate at San Quentin who was brought before a disciplinary committee for an infraction that could have also led to state criminal proceedings, that he asked for and was denied an attorney at the hearing, and that he was assigned to "segregation" for an unspecified number of days for the infraction. Ferrel, we were told at oral argument, is still incarcerated at San Quentin. Tr. of Oral Arg. 34 (No. 74-1194). He thus has standing as a named plaintiff to raise the issues before us in No. 74-1194.

2    The United States as Amicus curiae suggests that No. 74-1187 is not properly before the Court because the case involves the constitutionality of regulations of the Rhode Island Adult Corrections Authority and hence should have been heard by a three-judge court, subject to review here on direct appeal. The applicable regulations of the Authority when this case was brought had been promulgated as the result of a negotiated settlement of litigation in the District Court for the District of Rhode Island. Morris v. Travisono, 310 F.Supp. 857 (1970). It is conceded that they have become state law, and it would appear that they are of statewide effect. The rules on their face, however, although regulating in some detail the procedures required in prison disciplinary hearings, do not expressly grant or deny, or even mention, the right to counsel where charges brought are also a crime under state law. Nor do they suggest, one way or the other, whether an inmate's silence may be used against him in the proceeding itself. Palmigiano's complaint did not mention or challenge any rule or regulation of the Authority; nor did it seek an injunction against the enforcement of any identified rule. What it asked was that the Board's disciplinary decision be declared invalid and its enforcement enjoined. Neither Palmigiano nor the State asked or suggested that a three-judge court be convened. It would not appear that the District Court considered the validity of any of the Authority's rules to be at stake. That court ruled Palmigiano was not entitled to be represented by counsel, not because the applicable rules forbade it but because it considered the controlling rule under the relevant cases was to this effect. The Court of Appeals, although quite aware that constitutional attacks on the Rhode Island prison rules might necessitate a three-judge court, see Souza v. Travisono, 498 F.2d 1120, 1121-1122 (CA1 1974), evidently did not doubt its jurisdiction in this case. On the record before us, the provisions of 28 U.S.C. s 2281 with respect to three-judge courts would not appear to be applicable.

3    The Court based its statement on 3A J. Wigmore, Evidence s 1042 (Chadbourn rev. 1970), which reads as follows:
"Silence, omissions, or negative statements, as inconsistent: (1) Silence, etc., as constituting the impeaching statement. A failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of evidence (s 1071 infra ). There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency.
"There are several common classes of cases:
"(1) Omissions in legal proceedings to assert what would naturally have been asserted under the circumstances.
"(2) Omissions to assert anything, or to speak with such detail or positiveness, when formerly narrating, on the stand or elsewhere, the matter now dealt with.

"(3) Failure to take the stand at all, when it would have been natural to do so.

"In all of these much depends on the individual circumstances, and in all of them the underlying test is, would it have been natural for the person to make the assertion in question?" (Emphasis in original.) (Footnotes omitted.)

4     The record in No. 74-1187 shows that Palmigiano was provided with copies of the Inmate Disciplinary Report and the superior's investigation report, containing the charges and primary evidence against him, on the day before the disciplinary hearing. At the hearing, Captain Baxter read the charge to Palmigiano and summarized the two reports. In the face of the reports, which he had seen, Palmigiano elected to remain silent. The Disciplinary Board's decision was based on these two reports, Palmigiano's decision at the hearing not to speak to them, and supplementary reports made by the officials filing the initial reports. All of the documents were introduced in evidence at the hearing before the District Court in this case. App. 197-202 (No. 74-1187).

5     The Court of Appeals also held, in its initial opinion (unmodified in rehearing with respect to this point), that "the disciplinary committee must be required to make its fact finding determinations based solely upon the evidence presented at the hearing" in order "(f)or the right to confront and cross-examine adverse witnesses to be meaningful." 497 F.2d, at 820. Because we have held that there is no general right to confront and cross-examine adverse witnesses, it follows that the Court of Appeals' holding on this point must fall with its rejected premise. Due to the peculiar environment of the prison setting, it may be that certain facts relevant to the disciplinary determination do not come to light until after the formal hearing. It would be unduly restrictive to require that such facts be excluded from consideration, inasmuch as they may provide valuable information with respect to the incident in question and may assist prison officials in tailoring penalties to enhance correctional goals. In so stating, however, we in no way diminish our holding in Wolff that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." 418 U.S., at 564, 94 S.Ct., at 2979, 41 L.Ed.2d, at 955.

6     Petitioners in No. 74-1194 have not challenged the holdings of the Court of Appeals for the Ninth Circuit with respect to notice, 497 F.2d, at 818, or to the right to be heard by a "neutral and detached" hearing body, Id., at 820. Cf. 418 U.S., at 570-571, 94 S.Ct., at 2981-2982, 41 L.Ed.2d, at 959-960. Because these holdings are no longer in issue, it is unnecessary for us to consider them.

1     I agree that No. 74-1194 is not moot, since the intervening plaintiff (Ferrell) has a personal stake in the outcome of this litigation. But the citation of Indianapolis School Comm'rs v. Jacobs, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), is inapposite. We held that case moot because the named plaintiffs no longer had a personal stake in the outcome, and the action had not been formally certified as a class action. Id., at 129, 95 S.Ct., at 849, 43 L.Ed.2d, at 77. We did not, however, hold that without such formal certification "the action is not properly a class action." Ante, at 1554 n. 1. Jacobs applies only to the determination of mootness, and did not deal with whether, for example, a court of appeals may treat an action as a class action in the absence of formal certification by the district court. Moreover, the propriety of the certification need not be addressed, since there is a plaintiff with a personal interest in the outcome. Youakim v. Miller, 425 U.S. 231, at 236-237 n. 2, 96 S.Ct. 1399, at 1402, 47 L.Ed.2d 701, at 706-707.

2     Although this quotation is from the plurality opinion of four Justices, Mr. Justice Fortas, who concurred in the judgment, "agree(d) that Spevack could not be disbarred for asserting his privilege against self-incrimination," 385 U.S., at 520, 87 S.Ct., at 631, 17 L.Ed.2d, at 581, thus providing a majority for that proposition. He wrote separately because he was of the view that state employees enjoyed a lesser protection. He agreed with the result, however, because Spevack like Palmigiano was not a state employee. Ibid. See Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

3     In Sanitation Men 15 sanitation employees called before the Sanitation Commissioner investigating alleged improprieties were told that a claim of the privilege as a basis for refusing to answer questions concerning their official duties would result in their discharge. Three employees answered and denied the charges, but when later called before grand juries refused to waive immunity and were discharged for doing so. The Court held that to put the employees to a choice between their constitutional rights and their jobs was compulsion that violated the privilege. 392 U.S., at 284, 88 S.Ct., at 1919, 20 L.Ed.2d, at 1092.

4     "(T)he State intended to accomplish what Garrity has specifically prohibited to compel testimony that had not been immunized." 414 U.S. at 82, 94 S.Ct. at 325, 38 L.Ed.2d at 284.

5     Although Morris imposes a substantial-evidence standard for appellate review of findings in disciplinary proceedings, nothing in that case supports the Court's assumption that an inmate's silence alone would not meet this evidentiary standard. Ante, at 1557; cf. Ante, at 1555 n. 2. But if silence alone provides an evidentiary premise sufficient for discipline, the Court's distinction of the Garrity-Lefkowitz cases crumbles. I therefore read the Court's opinion to imply

that the Fifth Amendment bars conviction of a disciplinary violation based solely on an inmate's silence. In No. 74-1187, petitioners concede that an inmate's silence, without more, would not be substantial evidence.

As the Court notes, the only evidence, other than Palmigiano's silence, before the Disciplinary Board consisted of written reports made by the prison officials who filed the initial charges against Palmigiano. On the whole, the record inspires little confidence that his silence was not the sole basis for his disciplinary conviction. At the hearing a prison official read the disciplinary charges to Palmigiano and then asked him: "What happened here, Nick?" Palmigiano's response was again to request the presence of counsel, which had previously been denied. When the renewed request was denied, Palmigiano stated that he would remain silent on the advice of counsel. The official thereafter asked: "Do you intend to answer any questions for the board?" Consistent with his earlier statement, Palmigiano replied that he did not. The Board excused him from the hearing room; he was called back within five minutes and informed that he had been found guilty and sentenced to 30 days' punitive segregation, with a possible downgrade in his classification.

In this respect it is not clear that all of the Morris requirements were observed in Palmigiano's disciplinary hearing. Under the prison's rules, each inmate must be advised that "statements he makes in his defense at a disciplinary hearing are probably not admissible for affirmative use by the prosecution at a trial." Brief for Petitioners in No. 74-1187, pp. 4-5. Palmigiano, however, was told that anything he said could be used against him at a criminal trial. In any event, the uncertain warning required by the prison rules would hardly satisfy constitutional requirements. See n. 8, Infra. In this respect, the Court's holding that the prisoner has no right to counsel exacerbates the difficulty, for surely the advice of counsel is essential in this complex area. See Maness v. Meyers, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

Although my view is that only transactional immunity can remove the self-incrimination problem, Piccirillo v. New York, 400 U.S. 548, 562, 91 S.Ct. 520, 527, 27 L.Ed.2d 596, 605 (1971) (Brennan, J., dissenting), that view is not presently the law. See, E. g., Lefkowitz v. Turley, 414 U.S. 70, 84, 94 S.Ct. 316. 325, 38 L.Ed.2d 274. 285 (1973); Kastigar v. United States, 406 U.S. 441. 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

Although Rhode Island prison officials are not authorized by statute to grant immunity, my Brother White has suggested that a witness who fails to persuade a judge that a prospective answer is incriminatory "is nevertheless protected by a constitutionally imposed use immunity if he answers in response to the (judge's) order and under threat of contempt." Maness v. Meyers. 419 U.S., at 474, 95 S.Ct. at 599. 42 L.Ed.2d. at 592 (concurring in result). See Fowler v. Vincent, 366 F.Supp. 1224, 1228 (S.D.N.Y.1973); Sands v. Wainwright, 357 F.Supp. 1062, 1093 (M.D.Fla.1973). Although an inmate would not be testifying in response to a court order, his answers in response to questions of prison officials are nevertheless compelled within the meaning of the Fifth Amendment. Thus, there would be immunity for any statements given. The inmate must, however, be informed of the existence of the immunity. As my Brother White said, "a witness may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without At that time being assured that neither it nor its fruits may be used against him." Maness v. Meyers, supra. 419 U.S.. at 473, 95 S.Ct.. at 598. 42 L.Ed.2d. at 592. (emphasis in original).

The other cases cited by the Court likewise do not support a holding that Palmigiano's silence should have probative force. No self-incrimination problem was presented in Gastelum-Quinones v. Kennedy, 374 U.S. 469. 83 S.Ct. 1819. 10 L.Ed.2d 1013 (1963). That case involved a deportation proceeding, and the subject of that proceeding remained silent, but not for Fifth Amendment reasons. Moreover, the Court held that "deportation is a drastic sanction" and "must therefore be premised upon evidence . . . more directly probative than a mere inference based upon the alien's silence." Id., at 479, 83 S.Ct. at 1824, 10 L.Ed.2d, at 1020. We held that particular deportation order not based on substantial evidence. Id.. at 480, 83 S.Ct.. at 1825. 10 L.Ed.2d, at 1020. Similarly, the Court did not address any self-incrimination issue relevant to the instant case in Adamson v. California. 332 U.S. 46, 67 S.Ct. 1672. 91 L.Ed. 1903 (1947), and Twining v. New Jersey. 211 U.S. 78, 29 S.Ct. 14. 53 L.Ed. 97 (1908). Those cases were based on the premise, overruled in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment protection against self-incrimination was not applicable to the States. Finally, whether Raffel v. United States. 271 U.S. 494. 46 S.Ct. 566. 70 L.Ed. 1054 (1926), remains law is subject to much doubt. See United States v. Hale. 422 U.S. 171, 175 n. 4, 95 S.Ct. 2133. 2136. 45 L.Ed.2d 99, 104 (1975); United States v. Grunewald, 233 F.2d 556. 575 (CA2 1956), (Frank, J., dissenting), rev'd, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

Other state courts have also rejected Harris as a matter of state constitutional law. Commonwealth v. Triplett, 462 Pa. 244. 341 A.2d 62 (1975); State v. Santiago. 53 Haw. 254, 492 P.2d 657 (1971). In addition, admission of incriminating statements for impeachment purposes can be prohibited by statute notwithstanding the decision in Harris. Butler v. State, 493 S.W.2d 190 (Tex.Cr.App.1973). See United States v. Jordan, 20 U.S.C.M.A. 614, 44 C.M.R. 44 (1971). Finally, it should be noted that there need not be a state constitutional counterpart to the Fifth Amendment or a specific statutory prohibition to reach this result; use of incriminating statements can be prohibited by a state court as a matter

of public policy in that State. See In re Pillo, 11 N.J. 8, 93 A.2d 176 (1952); State v. Miller, 67 N.J. 229, 245 n. 1, 337 A.2d 36, 45 n. 1 (1975) (Clifford, J., concurring in part and dissenting in part).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

29 S.W.3d 159
Court of Appeals of Texas,
Houston (14th Dist.).

Tom L. BOALES, Brenda K. Boales, Mark S. Coalmer, Lynn K. Coalmer, James W. Dunbar, Raynoldo Garcia, Laura P. Garcia, Shaun C. Hills, Carla D. Hills, Linda Lanier, John M. Simmons, Diane M. Simmons, Ronald H. Vitulli, and Connie S. Vitulli, Appellants,

v.

BRIGHTON BUILDERS, INC.,
George Wimpey, Inc., and George
Wimpey Of Texas, Inc., Appellees.

No. 14–99–00535–CV.  |  July 6, 2000.
|  Rehearing Overruled Sept. 21, 2000.

Several homeowners sued developer and builders from whom they purchased homes, alleging fraud, fraud in a real estate transaction, breach of warranty, violation of the Deceptive Trade Practices Act (DTPA), negligence, negligence per se, promissory estoppel, and other causes. The 61st District Court, Harris County, John Donovan, J., after first severing various defendants and plaintiffs, entered summary judgment in favor of developer and a builder. Homeowners appealed. The Court of Appeals, Wittig, J., held that: (1) notice provision of Water Code did not apply to limit recovery by homeowners alleging that developer and builder actively misrepresented facts about low utility district taxes to induce them to purchase their homes; (2) similarity of representations by sales agents of both developer and builder as to why property taxes were so low was insufficient to raise a genuine issue of material fact on issue of conspiracy; (3) genuine issue of material fact existed as to whether builder and developer intended that homeowners rely on representations of sales agents, precluding summary judgment for builder and developer on homeowners' claim for promissory estoppel; and (4) release as to an adjacent easement did not release claims in this case; and (5) homeowners were consumers under the DTPA.

Affirmed in part and reversed and remanded in part.

West Headnotes (29)

[1] **Fraud**
⟜ Nature and form of remedy

Water Code provision, limiting purchaser's remedy for failure to provide required written notice to purchasers that the property could be subject to utility district taxes, did not apply to preclude recovery by homeowners alleging that developer and builder actively misrepresented reason for low property taxes to induce them to purchase their homes. V.T.C.A., Water Code § 50.301 (Repealed).

Cases that cite this headnote

[2] **Appeal and Error**
⟜ Cases Triable in Appellate Court

When a trial court dismisses a case upon special exceptions for failure to state a cause of action, that issue of law is reviewed under a de novo standard; the appellate court must accept as true all material factual allegations and all factual statements reasonably inferred from the allegations set forth in the respondent's pleadings.

6 Cases that cite this headnote

[3] **Statutes**
⟜ Giving effect to statute or language: construction as written

**Statutes**
⟜ Context

**Statutes**
⟜ Superfluousness

Court of Appeals must give full effect to an unambiguous statute according to all of its terms and context.

Cases that cite this headnote

[4] Judgment

Sales of real and personal property

Similarity of representations by sales agents of both developer and builder to home purchasers as to why property taxes were so low amounted to no more than a scintilla of probative evidence, and thus was insufficient to raise a genuine issue of material fact on issue of whether developer and builder conspired to defraud purchaser. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

2 Cases that cite this headnote

[5] Conspiracy

Nature and Elements in General

An actionable civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

3 Cases that cite this headnote

[6] Conspiracy

Nature and Elements in General

The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.

4 Cases that cite this headnote

[7] Conspiracy

Conspiracy to defraud

A common purpose on part of developer and builder to sell homes in subdivision, together with their failure to file of record the purchase agreements containing alleged misrepresentations, was not wrongful, and thus, purchasers could not recover for civil conspiracy to commit fraud.

Cases that cite this headnote

[8] Vendor and Purchaser

Recording and registration

Nothing in state law requires sales and purchase agreements containing provisions relating to plans to issue bonds and impose property taxes to be filed of record.

1 Cases that cite this headnote

[9] Negligence

Violations of statutes and other regulations

Negligence per se tort claims are established when a plaintiff shows that a defendant, without excuse, violates a statute or ordinance setting an applicable standard of care if the statute is designed to prevent an injury to that class of persons to which the injured party belongs.

1 Cases that cite this headnote

[10] Antitrust and Trade Regulation

Tortious conduct and negligence in general

Negligence

Standard established by statute or regulation

The Deceptive Trade Practices Act facially does not establish an applicable standard of care for imposing liability based on negligence per se; the act, rather, is a comprehensive consumer-protection plan establishing its own penalties. V.T.C.A., Bus. & C. § 17.41 et seq.

3 Cases that cite this headnote

[11] Judgment

Sales cases in general

Genuine issue of material fact existed as to whether developer and builder

made certain misrepresentations to home purchaser that they intended purchasers to rely upon and whether purchasers foreseeably relied on the representations, precluding summary judgment for builder and developer on purchasers' claim that, under doctrine of promissory estoppel, builder and developer were liable for purchasers' reliance on their alleged misrepresentation as to why district property taxes were low.

3 Cases that cite this headnote

**[12]  Estoppel**

⇒ Future events; promissory estoppel

Although promissory estoppel is usually a defensive plea, it can be used by a plaintiff as an affirmative ground of relief.

2 Cases that cite this headnote

**[13]  Estoppel**

⇒ Future events; promissory estoppel

The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment.

3 Cases that cite this headnote

**[14]  Appeal and Error**

⇒ Striking out part of pleading

Error in striking from plaintiff homeowners' pleadings their contradefensive allegations regarding ratification, adoption, and estoppel was harmless, considering that the counterdefenses could still be raised in response to an future claim by defendant developer and builder that their sales agents lacked authority to make the representations that were the subject of the lawsuit.

1 Cases that cite this headnote

**[15]  Release**

⇒ Release of specific indebtedness or liability in general

Release executed by homeowners, by its own language, concerned the builder's misrepresentations regarding an adjacent easement, and thus, did not apply to release homeowners' claims that builder's sale representative misrepresented why district property taxes were low.

Cases that cite this headnote

**[16]  Release**

⇒ General rules of construction

Releases must be construed like all other contracts.

2 Cases that cite this headnote

**[17]  Release**

⇒ General rules of construction

If a release is capable of a certain or definite legal meaning or interpretation, then effect must be given to the parties' intentions as expressed within the language of the release.

Cases that cite this headnote

**[18]  Release**

⇒ General rules of construction

A release will be construed in light of the facts and circumstances surrounding its execution.

4 Cases that cite this headnote

**[19]  Release**

⇒ General release

A general, categorical release clause must be construed narrowly.

3 Cases that cite this headnote

**[20]  Release**

⟿ Scope and extent in general

Any claims not clearly within the subject matter of a release are not discharged, even if such claims existed at the time the release was executed; the releasing instrument must mention the claim to be released.

2 Cases that cite this headnote

[21] **Appeal and Error**
⟿ Depositions, affidavits, or discovery

The Court of Appeals reviews a trial court's decision regarding a discovery-related protective order under an abuse of discretion standard.

4 Cases that cite this headnote

[22] **Privileged Communications and Confidentiality**
⟿ Professional Character of Employment or Transaction

The lawyer-client privilege extends to all matters concerning litigation or business transactions, regardless of whether the matters are pertinent to the matter for which the attorney was employed.

1 Cases that cite this headnote

[23] **Privileged Communications and Confidentiality**
⟿ Communications from client to attorney and from attorney to client

Under attorney-client privilege, the statements and advice of the attorney to the client are as protected as the communications of the client to the attorney.

Cases that cite this headnote

[24] **Pretrial Procedure**
⟿ Corporate officers, agents, and employees

Apex doctrine did not apply to preclude deposition of general counsel for builder in action by homeowners, where homeowners did not seek to depose him merely because his corporate position, but rather because they alleged he had first-hand knowledge of certain facts.

2 Cases that cite this headnote

[25] **Pretrial Procedure**
⟿ Protective Orders Before Examination
**Privileged Communications and Confidentiality**
⟿ Subject Matter: Particular Cases

Requested deposition of general counsel for builder in action by homeowners as to the advice he gave to builder's vice president during contract negotiations with developer and to builder's sales representatives during training sessions on buyer disclosure and the Deceptive Trade Practices Act (DTPA) were likely protected by attorney-client privilege, warranting protective order.

1 Cases that cite this headnote

[26] **Antitrust and Trade Regulation**
⟿ Consumers, purchasers, and buyers; consumer transactions

Homeowners alleging that builder's and developer's sale representatives misrepresented why district property taxes were low to induce them to purchase were complaining about an aspect of the real estate and the transaction involved, and thus, were "consumers" within the meaning of Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.45(4).

1 Cases that cite this headnote

[27] **Appeal and Error**
⟿ Extent of Review Dependent on Nature of Decision Appealed from

On appeal, in the interest of judicial economy, Court of Appeals may review grounds for summary judgment asserted at trial and preserved for appeal even if such grounds were rejected by the trial court.

1 Cases that cite this headnote

[28] **Antitrust and Trade Regulation**
    — Purpose and construction in general

The Deceptive Trade Practices Act (DTPA) is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of goods or services. V.T.C.A., Bus. & C. § 17.45(4).

1 Cases that cite this headnote

[29] **Antitrust and Trade Regulation**
    — Real property in general

The Deceptive Trade Practices Act (DTPA) can make actionable, misrepresentations about real estate. V.T.C.A., Bus. & C. § 17.45(4).

Cases that cite this headnote

**Attorneys and Law Firms**

*162 Joseph F. Nistico. Jr., W. Lance Stodghill, Richard Paul Martini, Houston, for appellants.

C. Ed Harrell, Stacey Beth Saunders, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices HUDSON and WITTIG.

**OPINION**

DON WITTIG, Justice.

Tom L. Boales and multiple homeowners in Aberdeen Trails subdivision appeal from a no-evidence summary judgment and dismissal on special exceptions granted

in favor of Brighton Builders, Inc., George Wimpey, Inc., and George Wimpey of Texas, Inc. Because we find that the Water Code does not preclude some of the homeowners' causes of action, we reverse and remand for a trial on the merits of those claims. We also affirm multiple rulings by the trial court on discovery, special exceptions, and partial summary judgment on conspiracy, effectively dismissing many of the homeowners' other contentions.

**I. Background**

Appellants allege that from 1992 to 1994, appellees defrauded them on their new home purchases made in the Aberdeen Trails subdivision. The subdivision was in Municipal Utility District No. 14, which was established to provide water, sewer, drainage, and flood control facilities in the district. Appellants complain that appellees told them that subdivision taxes were low because the utility district bonds already had been retired and that any future tax increases were to be limited to increases to deal with the increased cost of maintenance. Appellants also allege that appellees told them that the utility district encompassed certain nearby commercial properties and that the taxes paid by these properties helped pay off the bonds and would help keep taxes low. In reality, appellants allege in their suit, the district had not yet issued bonds when appellants purchased their homes. After appellants purchased their homes, the district issued bonds and assessed taxes to pay for the bonds, increasing appellants' tax rate by 700% in 1994. Appellants also complain that the commercial properties mentioned by appellees fell outside the district.

Appellants originally consisted of 117 individuals who sued the developer, Wimpey, and the builders from whom they purchased their homes, Brighton and Perry Homes, a joint venture. Subsequently, in an attempt to expedite the resolution, the trial court severed the case, creating an "A" case involving the sale of eight homes in the subdivision. The trial court then granted several special exceptions and motions for summary judgment dismissing all claims made against Perry Homes by Perry Homes homeowners Tom L. Boales, Brenda K. Boales, James W. Dunbar, Shaun C. Hills, Carla D. Hills, and Linda Lanier. The court then

severed the claims of the Perry Homes homeowners in the "A" case into a "B" case so the judgment would be final and appealable. The "B" cause came before this court as *Boales v. Perry Homes, a Joint Venture*, No. 14–98–00975–CV, 2000 WL 674922 (Tex.App.—Houston [14 th Dist.] May 25, 2000, no pet. h.) (not designated for publication). The trial court likewise granted several special exceptions and motions for summary judgment dismissing all of the claims made against Brighton and Wimpey. These causes of action against Brighton and Wimpey were severed into this "C" case so the judgment would be final and appealable.

The causes of action asserted by appellants are fraud, fraud in a real estate transaction, breach of warranty, violation of the Deceptive Trade Practices Act, negligence, negligence per se, promissory estoppel, conspiracy to violate the section 32.47 of the Penal Code, conspiracy to commit real estate fraud, conspiracy to violate the DTPA, fraudulent inducement, and money had and received. Appellants *163 also assert a claim of breach of fiduciary duty against Wimpey and breach of contract against Brighton.

## II. Discussion

### A. Water Code Preemption

[1] In their second point of error, appellants complain the trial court erred in sustaining appellees' special exceptions on grounds that the Water Code preempted appellants' causes. We will deal with this question first because this is the only issue advanced at trial that addresses all of the appellants' claims.

[2] When a trial court dismisses a case upon special exceptions for failure to state a cause of action, we review that issue of law under a *de novo* standard. *See Sanchez v. Huntsville Indep. Sch. Dist.*, 844 S.W.2d 286, 288 (Tex.App.—Houston [1 st Dist.] 1992, no writ). We must accept as true all material factual allegations and all factual statements reasonably inferred from the allegations set forth in the respondent's pleadings. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 240 (Tex.1994).

Section 50.301 of the Water Code requires any person who proposes to sell or convey real property in a utility district to provide written notice to purchasers that the property is in the district and may be subject to district taxes. *See* Act of May 29, 1989, 71 st Leg., R.S., ch. 935, § 1, 1989 Tex. Gen. Laws 3977–78. [1] Section 50.301(n) of the code provides that the remedies detailed in subsections (*l*) and (m) are the exclusive remedies for violations of the section. *See id.* at 3979. Subsection (n) provides, in part, as follows:

Notwithstanding any part or provision of the general or special laws or the common law of the state to the contrary, the relief provided under Subsections (*l*) and (m) shall be the exclusive remedies for a purchaser aggrieved by the seller's failure *to comply with the provisions of this section.*
*Id.* [Emphasis added.]

[3] Under subsection (*l*) if the seller fails to comply with the provision of the section, the purchaser can recover all of the costs relative to the purchase of the property, plus interest and attorney's fees (rescission). Under subsection (m) the purchaser can recover maximum damages of $5,000, plus attorney's fees. *See id.* We must give full effect to an unambiguous statute according to all of its terms and context. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998).

The statute plainly limits the remedies but expressly only for failure to comply with the notice provisions of section 50.301. The substance of the plaintiff-appellants' complaints is not that appellees failed to comply with the notice requirements, but that appellees actively misrepresented facts to induce appellants to purchase homes. Although appellees committed some technical errors in complying with section 50.301, appellants do not complain primarily of appellees' failure to comply with that section. In fact, even had appellees complied with section 50.301, appellants would have a cause of action for misrepresentations falling outside the purview of section 50.301.

The Legislature did not express an intent that section 50.301 immunize property sellers from any liability arising from all fraudulent acts committed during the sale of property within a utility district. We hold

the Water Code does not preclude appellants' extra-statutory causes of action. We sustain appellants' second issue.

## B. Conspiracy

[4] In their first point of error, appellants complain the trial court erred in granting partial summary judgment to appellees *164 on appellants' claims of conspiracy to defraud, to defraud in a real estate transaction, and to violate the DTPA. Appellees moved for summary judgment on the conspiracy claims on grounds that: (1) the failure to file certain sale and purchase agreements (discussed below) is not an unlawful act; (2) no case law suggests that violations of the DTPA, or real estate fraud can be the underlying tort to support a conspiracy claim; (3) plaintiffs cannot show a meeting of the minds to commit unlawful acts; and (4) there is no evidence of an object or common purpose to be accomplished, meeting of the minds on common purpose, or one or more unlawful or overt acts where the parties understood that the other parties shared a common purpose.

If, after adequate time for discovery, no probative evidence exists of one or more essential elements of a claim on which a party would have the burden of proof at trial, a no-evidence summary judgment is proper. See TEX.R. CIV. P. 166a(i); Esco Oil v. Sooner Pipe & Supply Corp., 962 S.W.2d 193, 197 n. 3 (Tex.App.—Houston [1 st Dist.] 1998, pet. denied). We review a no-evidence summary judgment under the same legal sufficiency standard as a directed verdict. See Lampasas v. Spring Ctr., Inc., 988 S.W.2d 428, 432 (Tex.App.—Houston [14 th Dist.] 1999, no pet. h.) We view the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. See Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997). We will sustain a no-evidence point if: (1) there is a complete absence of a vital fact, (2) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered is no more than a mere scintilla, or (4) the evidence offered conclusively establishes the opposite of a vital fact. See Lampasas, 988 S.W.2d at 432. If the proffered evidence is so weak as to create no more than a "mere surmise or suspicion" of a vital fact, less than

a scintilla of evidence exists because such evidence lacks probative force, and in legal effect, is no evidence at all. See Kindred v. Con/Chem., Inc., 650 S.W.2d 61, 63 (Tex.1983).

[5] [6] An actionable civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. See Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex.1983). The elements are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. Id.

[7] As proof of a common object or purpose, appellants cite (1) the defendant-appellees' desire to sell homes in the subdivision, (2) the substantially identical misrepresentations, (3) the failure to file of record certain sales and purchase agreements signed by appellees that stated that utility district bonds had not yet been sold and that provided that the agreements were not to be filed of record. Defendant-appellees' common purpose to sell homes, the signing of sales and purchase agreements, and the failure to file those agreements of record will not support a finding of civil conspiracy. None of the acts is wrongful and the agreement to perform a lawful act cannot serve as the basis for a finding of conspiracy. See Times Herald Printing Co. v. A.H. Belo Corp., 820 S.W.2d 206, 216–17 (Tex.App.—Houston [14 th Dist.] 1991, no writ). Nothing is unlawful about selling homes, signing otherwise proper agreements, and failing to file those agreements of record when not otherwise required to do so by law. The only evidence proffered to show a meeting of minds to commit unlawful activity is the substantially similar representations on the part of sales representatives of Brighton and Wimpey. These sales representations, by non-principals, without more, constitute a mere scintilla of evidence of a meeting of minds of the principals to accomplish an unlawful purpose. Although appellees' sales people did offer similar— *165 not identical—representations regarding why district taxes were low, this evidence of unlawful common purpose, standing alone, is too slight to support a conspiracy claim. The trial court did not err in granting partial summary judgment in favor of appellees on the appellants' civil conspiracy claims. We overrule appellants' first point of error

## C. Failure to File Sale and Purchase Agreements

In their third point of error, appellants complain the trial court erred in granting appellees' special exceptions on appellants' conspiracy claims based on appellees' failure to file of record certain sales and purchase agreements between Brighton and Wimpey. The trial court signed three orders—January 23, 1998; January 30, 1998; and June 29, 1998 —dismissing appellant-plaintiffs' conspiracy claims based on conspiracy to violate section 32.47 of the Penal Code and the DTPA. The court included in its orders certain language stating the court's belief that the failure to file the sale and purchase agreements did not violate the Penal Code or the Water Code. Appellants do not appeal those particular portions of the orders dealing with the Water Code. The court in its order of June 29, which related to Wimpey only, also stated that the failure to file the sale and purchase agreements did not violate the DTPA.

[8] Brighton and Wimpey signed certain sales and purchase agreements containing provisions relating to plans to issue bonds and impose property taxes. The agreements further stated that the contracts were not to be filed of record in the county property records. Nothing in state law requires such agreements to be filed of record. There could be any number of legitimate business reasons why the parties did not wish to file their agreements of record. This failure to file, being a lawful act, does not constitute a violation of the DTPA. As for section 32.47 of the Penal Code, [2] this Penal Code section deals with the switching of price tags or the alteration of a trade mark. It is not intended to require parties to file business agreements of record when state law does not otherwise require such filing.

Appellants argue that the trial court's language stating that the failure to file the agreements is not a violation of the Penal Code or the DTPA are advisory opinions. We construe the court's orders as either summary judgment orders or dismissals on special exceptions related to certain conspiracy-related causes. The failure of appellants to raise a material fact issue regarding meeting of the minds, discussed above, entitled appellees to summary judgment on all conspiracy-related causes of action. We view the specific orders discussed here simply as additional grounds on which the trial court granted summary judgment or special exceptions in favor of appellees regarding conspiracy to violate the Penal Code and the DTPA. We view the complained-of language as the trial court's explanation of why it acted and a delineation of the legal issued being decided. We discuss the issues here in the interest of judicial economy. The trial court did not err in dismissing appellants' conspiracy claims that were based upon appellees' failure to file the sale and purchase agreements. We overrule appellants' third point of error.

## *166 D. Negligence Per Se

In their fourth point of error, appellants complain the trial court erred in dismissing their claims for negligence per se, based on violation of section 32.47 of the Penal Code and the DTPA, and promissory estoppel.

[9] [10] Negligence per se tort claims are established when a plaintiff shows that a defendant, without excuse, violates a statute or ordinance setting an applicable standard of care if the statute is designed to prevent an injury to that class of persons to which the injured party belongs. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex.1987). Because as a matter of law, the acts complained of—the failure to file the sale and purchase agreements—do not constitute a violation of the Penal Code, as alleged, such acts cannot constitute a basis for a negligence per se claim. The DTPA facially does not establish an applicable standard of care for imposing liability based on negligence per se. The act, rather, is a comprehensive consumer-protection plan establishing its own penalties. *See Johnson v. Sawyer*, 47 F.3d 716, 729 (5 [th] Cir.1995) (recognizing that Texas has no law creating common law cause of action for statutory violation for which violation there is express and comprehensive statutory cause of action). Any presumed violation of the DTPA here does not constitute negligence per se sufficient to establish liability. We overrule appellants' fourth point of error.

## E. Promissory Estoppel

[11] In their fifth issue, appellants complain the trial court erred in dismissing their claims based on promissory estoppel. Although the trial court does not specifically state whether it was granting summary judgment or special exceptions as to promissory estoppel, we presume the trial court acted on grounds that plaintiff-appellants failed to state a cause of action.

[12] [13] Although promissory estoppel is usually a defensive plea, it can be used by a plaintiff as an affirmative ground of relief. *See Donaldson v. Lake Vista Community Improvement Ass'n*, 718 S.W.2d 815, 818 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). The misrepresentations alleged by appellants may not be promises in the strict sense, that is, promises that the property taxes will not rise; however, plaintiff-appellants make clear in their pleadings their complaint. Appellants allege that appellees made certain representations that appellees intended appellants to rely upon, that appellants foreseeably relied on the representations, and that appellees are estopped to deny the foreseeability of appellants' reliance. The trial court erred in dismissing appellants' claims based upon promissory estoppel. We sustain appellants' fifth issue.

## F. Ratification, Estoppel, and Adoption

[14] Appellants in their sixth point of error complain that the trial court erred in granting Wimpey's special exceptions concerning ratification and adoption and Brighton's special exceptions concerning ratification and estoppel. At the trial court level, appellees argued that ratification, adoption, and estoppel are not causes of action and should be dismissed. Appellants did not plead the issues as causes of action but rather as contradefensive issues, that is, to counter any possible argument by appellees that the acts of their sales representatives could not be attributed to appellees. Although appellants were not required to plead such issues, *see McDonald v. Clemens*, 464 S.W.2d 450,

455 (Tex.Civ.App.—Tyler 1971, no writ), nothing in the rules prohibits them from pleading such issues. To the extent that the trial court dismissed ratification, estoppel, and adoption as causes of action, it did not err. *167 To the extent that the trial court may have stricken from plaintiff-appellants' pleadings contradefensive allegations regarding the issues, it erred. Such error is harmless, however. *See* TEX.R.APP. P. 44.1. If appellees later assert a defense that the sales representatives lacked authority, appellants would be free at that point to counter the defense with pleadings and evidence of ratification, adoption, or estoppel. We overrule appellants' sixth point issue.

## G. Release

[15] In its seventh point of error, appellants complain that the trial court erred in granting partial summary judgment in favor of appellees as to Ronald and Connie Vitulli on grounds that the Vitullis had released any claims against Brighton.

The Vitullis allege that Leta Fitzgerald, a Brighton sales representative, made certain representations regarding an easement adjacent to their property. The Vitullis on appeal allege that they signed a release concerning only misrepresentations as to the easement. Brighton agues that the release contains language releasing all claims against Brighton.

The release provides, in part, as follows:

> WHEREAS, it has come to Brighton's attention that Leta Fitzgerald may have mistakenly advised the Purchasers [Vitullis] that nothing would be built adjacent to their fence behind the Property since there was a Southwestern Bell Telephone Co. easement behind their lot; and
>
> WHEREAS, improvements can be built on the commercial property between the Southwestern Bell Telephone Company easement and the rear property line of the Property, and
>
> WHEREAS, without admitting liability or culpability, Brighton agrees to settle *this misunderstanding* ...

....

The Purchasers hereby RELEASE, ACQUIT AND DISCHARGE Brighton ... from all matters, causes of action, accounting, suits, controversies, agreements, damages, claims and demands, known or unknown, arising out of pertaining to, or associated with any statement by Leta Fitzgerald regarding the property.

The Purchasers intend "claim" to mean any and all demands, rights, claims, damages, exemplary damages, lawsuits, common law, federal statutory or federal constitutional causes of action, costs, judgment, penalties, executions, and attorneys' fees ... that they have or ever may have against Brighton that have arisen or ever may arise directly or indirectly out of *this claim*. [Emphasis added.]

[16] [17] [18] [19] [20] Releases must be construed like all other contracts. *See Williams v. Glash*. 789 S.W.2d 261 (Tex.1990). If a release is capable of a certain or definite legal meaning or interpretation, then effect must be given to the parties' intentions as expressed within the language of the release. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). A release will be construed in light of the facts and circumstances surrounding its execution. *See Tricentrol Oil Trading, Inc. v. Annesley*. 809 S.W.2d 218. 221 (Tex.1991). A general, categorical release clause must be construed narrowly. *See Sanus/ New York Life Health Plan, Inc. v. Dube–Seybold–Sutherland Management, Inc.*, 837 S.W.2d 191, 197 (Tex.App.—Houston [1st Dist.] 1992. no writ). Any claims not clearly within the subject matter of a release are not discharged, even if such claims existed at the time the release was executed. *Id.* The releasing instrument must "mention" the claim to be released. *See Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931. 938 (Tex.1991).

Here, the release by its own language concerns the misrepresentations made regarding the adjacent easement. Any claims Fitzgerald may have made about tax rates or whether certain commercial properties fell within the district do not *168 clearly fall within the release nor are they mentioned in the release. We must construe the general release language narrowly and do not find that the parties intended to release Brighton from all possible misrepresentation claims. The trial court erred in granting summary judgment to Brighton as to the homeowner Vitullis on the grounds of release. We sustain appellants' seventh issue.

## H. Protective Order

In their eighth point of error, appellants complain the trial court erred in issuing a protective order concerning plaintiffs' attempt to depose John Krugh, general counsel for Perry Homes. After appellants sought to depose Krugh, Perry Homes sought a protective order on grounds that Krugh is an "apex" employee and that any information sought is protected by the lawyer-client privilege. Appellants countered by arguing that Krugh is not an "apex" employee, that even if he is an "apex" employee, he has unique and superior knowledge of discoverable facts, and that the material is not protected by the lawyer-client privilege.

[21] [22] [23] We review a trial court's decision regarding a discovery-related protective order under an abuse of discretion standard. *See Bloyed v. General Motors Corp.*, 881 S.W.2d 422. 437 (Tex.App.—Texarkana 1994), *aff'd*, 916 S.W.2d 949 (Tex.1996). Under the lawyer-client privilege, the client may refuse to disclose and may prevent any other person from disclosing confidential communications made for the purpose of facilitating rendition of legal services to client. *See* TEX.R. EVID. 503(b); *Keene Corp. v. Caldwell*, 840 S.W.2d 715, 719 (Tex.App.Houston [14th Dist.] 1992, no writ). The privilege extends to all matters concerning litigation or business transactions, regardless of whether the matters are pertinent to the matter for which the attorney was employed. *See Williams v. Williams*, 108 S.W.2d 297, 299 (Tex.Civ.App.—Amarillo 1937, no writ). The statements and advice of the attorney to the client are as protected as the communications of the client to the attorney. *See Boring & Tunneling Co. of Am. v. Salazar*, 782 S.W.2d 284. 289 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding).

[24] First, we note that the "apex" doctrine does not apply. Appellants do not seek to depose Krugh merely because of his corporate position. Rather they seek to depose him because they allege he has first-hand knowledge of certain facts, that is, the advice he

gave to a Perry Homes vice president during contract negotiations between Perry Homes and Wimpey and to Perry Homes' sales representatives during training sessions regarding buyer disclosure and the DTPA. *See Simon v. Bridewell*, 950 S.W.2d 439, 442 (Tex.App.—Waco 1997, no writ) ("apex" doctrine applies where corporate officer has been noticed for deposition merely because of officer's corporate position; an officer with first-hand knowledge of relevant facts cannot avoid deposition because of "apex" status).

[25] Under the lawyer-client privilege, the legal advice given to Perry Homes employees and to the Perry Homes vice president during contract negotiations with Wimpey likely are protected by the lawyer-client privilege. Although appellants argue that third-parties were at the training sessions between Krugh and Perry Homes sales representatives and thus the lawyer-client privilege does not apply, the record before us does not show that third parties were present during the sessions. Because the evidence sought by appellants likely is significantly protected by the lawyer-client privilege, the trial court did not abuse its discretion by granting appellees' motion for a protective order. We overrule appellants' issue.

## I. DTPA

[26] In a single crosspoint, appellees complain the trial court erred in denying their motion for summary judgment on grounds that appellants below as a matter *169 of law were not "consumers," as defined by the DTPA.

[27] [28] On appeal, in the interest of judicial economy, we may review grounds for summary judgment asserted at trial and preserved for appeal even if such grounds were rejected by the trial court. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996); *Augusta Court Co–Owners' Ass'n v. Levin, Roth & Kasner, P.C.*, 971 S.W.2d 119, 123 (Tex.App.—Houston [14th Dist.] 1998, writ denied). A DTPA plaintiff must plead and prove

"consumer" status. *See* TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987); *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351–52 (Tex.1987). Additionally, the goods or services purchased must form the basis of the plaintiff's complaint. *See Melody Home*, 741 S.W.2d at 352. The DTPA is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of goods or services. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex.1981). Goods include real property purchased or leased for use. *See* § 17.45(1).

[29] The DTPA can make actionable, misrepresentations about real estate. *See Chastain v. Koonce*, 700 S.W.2d 579, 581 (Tex.1985) (purchasers of lots, who complained of misrepresentations relating to other nearby lots, were "consumers" even though they complained about lots other than the lots purchased); *Sanchez v. Guerrero*, 885 S.W.2d 487, 490 (Tex.App.—El Paso 1994, no writ) (broker's failure to mention that home's previous owner was child molester supports finding of DTPA violation). Here, appellants complain about the tax rates on their homes and allege that appellees made misrepresentations to induce them to buy the homes. The appellants are complaining about an aspect of the real estate and the transaction involved. *See Chastain*, 700 S.W.2d at 581. The trial court did not err in denying summary judgment in favor of appellees on grounds that appellants were not consumers under the DTPA. We overrule appellees' single crosspoint.

## III. Conclusion

We sustain appellants' second, fifth, and seventh issues, and overrule all of appellants' other points. We overrule appellees' single crosspoint. We affirm the trial court's judgment concerning all conspiracy-related and negligence per se claims. We reverse the judgment as to all other causes of action and remand for a trial on the merits or other proceedings in accordance with this opinion.

Footnotes

1 Amending TEX. WATER CODE § 50.301; current version at TEX. WATER CODE ANN. § 49.452 (Vernon 2000).

2 The Penal Code provides, in part, as follows:

(a) A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals, alters, substitutes, or otherwise impairs the verity, legibility, or availability of a writing, other than a governmental record.

(b) For purposes of this section, "writing" includes:

(1) printing or any other method of recording information;

(2) money, coins, tokens, stamps, seals, credit cards, badges, trademarks;

(3) symbols of value, right, privilege, or identification; and

(4) labels, price tags, or markings on goods.

TEX. PEN.CODE ANN. § 32.47 (Vernon 1994).

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 4

2006 WL 2192546
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

In re BP PRODUCTS NORTH
AMERICA INC., Relator.

No. 01-06-00613-CV.  |  Aug. 4, 2006.

Original Proceeding on Petition for Writ of
Mandamus.

**Attorneys and Law Firms**

Katherine D. MacKillop, Otway B. Denny, Stephen
Fernelius, Graig J. Alvarez and James B. Galbraith, for
BP Products North America Inc.

John Eddie Williams, Jim S. Hart, Collyn A. Peddie,
Byron M. Buchanan, James C. Dean, Brent W. Coon,
Robert E. Ammons, Arturo J. Gonzalez and James D.
Nebout, for Plaintiffs' Steering Committee.

Panel consists of Chief Justice RADACK and Justices
ALCALA and HIGLEY.

**MEMORANDUM OPINION**

ELSA ALCALA, Justice.

*1 By petition for writ of mandamus, relator, BP
Products North America Inc., challenges the trial
court's June 21, 2006 order granting the motion of the
Plaintiffs' Steering Committee ("Plaintiffs")[1] to strike
BP's " 'Objection' to and/or Motion for Protection
Regarding the Deposition of John Manzoni," Group
Managing Director and Chief Executive of Refining
and Marketing of BP p.l.c.[2] In its sole issue, BP
contends that the trial court abused its discretion
in striking the affidavit of Manzoni as insufficient
to invoke protection under the "apex doctrine"
established in *Crown Central Petroleum Corp. v.
Garcia*, 904 S.W.2d 125 (Tex.1995).[3]

We conditionally grant the petition for writ of
mandamus.

**Background**[4]

On June 1, 2006, the Plaintiffs notified BP of their
intent to depose Manzoni. On June 6, BP moved
for protection and moved to quash the notice on the
grounds that Manzoni, a resident of London, England,
was not subject to deposition in Texas. Footnoted in
BP's motion was an objection to Manzoni's deposition
on the grounds that Manzoni, an "upper level corporate
official," was not subject to deposition under the
*Crown Central* guidelines. BP stated that it would later
file a brief in support of its objection. On June 14,
the Plaintiffs moved to strike as legally insufficient
BP's motion to quash and BP's " 'Objection' to the
deposition of John Manzoni" because BP had not filed
the requisite affidavit by Manzoni.

On June 16, BP submitted its brief in support of its
apex objection and appended the affidavit of Manzoni,
which stated as follows, in pertinent part:

3. I am Chief Executive of Refining and Marketing
of BP p.l.c. and have held this position since 2002.
I am also a Group Managing Director of BP p.l.c.
and have held this position since 2003. In my
positions, I have global responsibility for refining
and marketing and ultimate responsibility for 17
refineries, a similar number of chemical plants,
25,000 retail stations, pipelines and terminals. I
report directly to Lord Browne, who is Group Chief
Executive of BP p.l.c. and the highest official in BP
p.l.c.

...

5. I am not a director, officer or employee of BP
Products North America Inc., an indirect wholly
owned subsidiary corporation of BP p.l.c.... BP
Products North America Inc. owns and operates the
Texas City Refinery. I do not manage or authorize
the day-to-day operations of BP Products North
America Inc. or of the Texas City Refinery.

6. I do not have unique or superior knowledge of
information, much less unique or superior personal

knowledge, concerning the allegations made in the lawsuits arising out of the March 23, 2005 accident at the BP Products North America's Texas City Refinery. Information concerning the accident and the investigation of the accident was provided to me from employees of both BP p.l.c. and BP Products North America Inc. I did not participate in the investigation of the March 23, 2005 accident. I therefore have no personal knowledge of facts relevant to the accident or the allegations made in the lawsuits filed against BP Products North America Inc.

*2 7. I have no unique personal knowledge of the Texas City facility or its operations, including any safety issues or concerns. Information concerning the Texas City facility or its operations, including any safety issues or concerns was provided to me from employees of both BP p.l.c. and BP Products North America Inc., including Michael Hoffman, Group Vice President for Refining, who reports to me on these issues.

8. Thus, the only knowledge I have concerning the accident, the investigation of the accident and the other allegations made against BP Products North America Inc. is second hand. Certainly, I do not possess relevant knowledge equal to or greater in quality or quantity than executives and employees of BP Products North America Inc. or other executives or employees of BP p.l.c.

9. After the March accident, BP Products North America Inc., in part with the aid of loaned personnel from affiliated companies, immediately began an investigation of the incident. That investigation was performed by a group of highly qualified and knowledgeable individuals, who were directed to use all resources to find the causes of the accident and to report the causes to the public. All of these activities were at the direction of and monitored by persons other than me, although I have kept myself informed about the progress and results of the investigation.

On June 19, BP filed a second motion for protection based on its objection and filed a response to Plaintiffs' motion to strike. On June 20, the Plaintiffs filed a brief in support of their motion to strike, objecting to Manzoni's affidavit on the grounds that he admitted

having knowledge concerning the accident and that he failed to state that he has " 'no knowledge of any facts relevant' to this lawsuit as *Crown Central* and *Alcatel* require." In addition, the Plaintiffs filed a supplemental motion to strike, voicing the same contentions.

On June 21, after a hearing, the trial court granted the motion to strike, ordering that

> BP Products' Motion for Protection for and/or objection to the deposition of John Manzoni on alleged "apex" grounds is stricken/denied/ overruled because, in the exercise of the Court's discretion, it finds that BP has failed to invoke properly that doctrine by failing to file an affidavit complying with *Crown Central* and *Alcatel* and has not, therefore, presented an issue for this Court to decide. In addition, this Court specifically finds that Mr. Manzoni has admitted knowledge of relevant facts of the case precluding reliance on *Apex*.

It is from this order that BP seeks mandamus relief.

## Standard of Review

A party is entitled to mandamus relief if a trial court abuses its discretion or violates a legal duty and the party has no adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex.1992); *In re Taylor*, 113 S.W.3d 385, 389 (Tex.App.-Houston [1st Dist.] 2003, orig. proceeding). A trial court abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Walker*, 827 S.W.2d 839-40; *see Taylor*, 113 S.W.3d at 389. With respect to factual issues, matters are committed to the trial court's discretion, and the reviewing court may not substitute its judgment for that of the trial court. *Walker*, 827 S.W.2d at 839; *Taylor*, 113 S.W.3d at 389. The relator must establish that the trial court reasonably could have reached only one decision. *Walker*, 827 S.W.2d

at 840. With respect to a trial court's determination of legal principles, however, review is less deferential. *Id.; Taylor,* 113 S.W.3d at 389. A trial court has no discretion to incorrectly determine what the law is or to improperly apply the law to the facts. *Walker,* 827 S.W.2d at 840. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in an extraordinary writ. *Id.*

*3 Generally, the scope of discovery is within the trial court's discretion. *In re Colonial Pipeline Co.,* 968 S.W.2d 938, 941 (Tex.1998). However, the trial court abuses its discretion if it issues a discovery order in an arbitrary or unreasonable manner, or without reference to guiding rules and principles. *See id.* If there has been a clear abuse of discretion and there is no adequate remedy by appeal, mandamus will issue to correct the order. *Id.* Mandamus relief is appropriate if the trial court erroneously permits the deposition of an apex official. *In re Alcatel USA, Inc.,* 11 S.W.3d 173, 175-76 (Tex.2000).

## Apex Deposition

In ordering or preventing an apex deposition, a trial court must apply the guidelines set out in *Crown Central Petroleum Corporation v. Garcia,* 904 S.W.2d 125 (Tex.1995). *In re Daisy Mfg. Co.,* 17 S.W.3d 654, 656 (Tex.2000). Under *Crown Central,* a corporation may shield a high-level corporate official from a deposition by filing a motion for a protective order with an affidavit by the official "denying any knowledge of relevant facts." *Crown Central,* 904 S.W.2d at 128.[5] The trial court determines the motion by first considering whether the proponent of the deposition has "arguably shown that the official has any unique or superior personal knowledge of discoverable information." *Id.* If the proponent fails to make such a showing, "the trial court should grant the motion for protective order and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods." *Id.* These methods could include taking the depositions of lower-level employees or directing discovery requests to the corporation itself. *Id.* If, after making a good faith effort to obtain the discovery through less intrusive means, the proponent shows that (1) there

is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence and (2) that less intrusive methods of discovery are insufficient, the trial court should modify or vacate the protective order. *Id.*

Since *Crown Central,* the Texas Supreme Court has clarified that it is improper to collapse the two discrete inquiries in *Crown Central* into a single test. *Alcatel,* 11 S.W.3d at 176. For instance, the *Crown Central* guidelines should not be interpreted to require a party seeking an apex deposition to show that the official to be deposed has unique or personal knowledge that is unavailable through less intrusive means. *Id.*

At issue in the instant case is whether Manzoni's affidavit is sufficient to invoke protection from deposition under *Crown Central.* Pursuant to *Crown Central,* the apex deposition guidelines are invoked by including with a motion for a protective order, an affidavit by the official "denying any knowledge of relevant facts." *Crown Central,* 904 S.W.2d at 128. Here, the trial court found that BP failed to properly invoke the *Crown Central* doctrine because it failed "to file an affidavit complying with *Crown Central* and *Alcatel.*" In addition, the trial court found that Manzoni had admitted knowledge of relevant facts of the case, which precluded reliance on the apex doctrine.

*4 The Plaintiffs contend that, because Manzoni's affidavit failed to specifically deny "any knowledge of relevant facts," it was properly found to be insufficient to invoke the apex doctrine. Specifically, the Plaintiffs contend that Manzoni's affidavit as insufficient because it uses the following qualifying language:

> 6. I do not have *unique or superior knowledge* of information, much less *unique or superior personal knowledge* concerning the allegations made in the lawsuits arising out of the March 23, 2005 accident at the BP Products North America's Texas City Refinery. Information concerning the accident and the investigation of the accident was provided to me from employees of both BP p.l.c. and BP Products North America Inc. I did not participate in the investigation of the March 23, 2005 accident. *I therefore have no personal knowledge of facts relevant to the accident or the allegations* made

in the lawsuits filed against BP Products North America Inc. (Emphasis added).

7. I have no *unique personal knowledge* of the Texas City facility or its operations, including any safety issues or concerns.... (Emphasis added).

In addition, the Plaintiffs contend that Manzoni admits that he has knowledge regarding the matters at issue, as follows:

6.... Information concerning the accident and the investigation of the accident was provided to me from employees of both BP p.l.c. and BP Products North America Inc....

8. Thus, the only knowledge I have *concerning the accident, the investigation of the accident and the other allegations made against BP Products North America Inc.* is second hand.... (Emphasis added).

During the hearing on the motion to strike, the Plaintiffs raised the following as evidence that Manzoni has knowledge of relevant facts: (1) testimony that the Chemical Safety Board reported that one of the causes of the explosion was a lack of corporate oversight and that Manzoni is "the guy in charge of corporate oversight" and (2) testimony that, the day after the explosion, Manzoni flew in from Great Britain and gave a press conference in Texas City, during which he stated that "on behalf of the corporate parent we take responsibility for this, we'll get to the bottom of it and we'll fix it."

In addition, the Plaintiffs presented to the trial court for *in camera* inspection a letter from BP's CEO, Lord John Browne, to BP staff regarding the interim conclusions and recommendations prepared by the team of personnel investigating the explosion ("Fatal Accident Report") stating that "I have asked John Manzoni to lead the next stage of implementation within the Refining and Marketing segment. He will insure that all the changes necessary are made." Further, Plaintiffs contend that BP's website states that "When an explosion at the Texas City Refinery in the U.S. killed 15 people and injured 170 last March, Manzoni handled the situation with care and sensitivity."

*5 The Plaintiffs rely on *In re Columbia Rio Grande Healthcare*, 977 S.W.2d 433, 434 (Tex.App.-Corpus Christi 1998, orig proceeding), as "the only reported case involving a potential deponent who, like Mr. Manzoni here, admits knowledge about the case in question." In *Columbia*, an official's affidavit "did not contain a broad denial of 'any knowledge of relevant facts" and denied only that he had "personal knowledge of many aspects of the lawsuit." *Id.* The court held that the official's affidavit "failed to satisfy the threshold requirement of *Crown Central*, to 'deny any knowledge of relevant facts." ' *Id.* However, *Columbia* has been cited solely in apparent disagreement.[6]

BP contends that the affidavit is sufficient to invoke *Crown Central* because it properly denies knowledge of relevant facts. Specifically, BP contends that, while Manzoni's affidavit does not specifically deny "any knowledge of relevant facts," the language in the affidavit has been interpreted to satisfy *Crown Central*. BP contends that *Crown Central* does not require the use of any "magic words." In addition, BP contends that the Plaintiffs failed in their burden to demonstrate, as required under *Crown Central*, that Manzoni has "unique or superior personal knowledge." Plaintiffs respond that, because the doctrine was not invoked, the burden never shifted to the Plaintiffs to show "unique or superior personal knowledge."

BP argues that, since *Crown Central*, there are only a few cases in which appellate courts have affirmed refusals to quash apex depositions, citing *JHC Ventures L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 777-78 (Tex.App.-San Antonio 2002, no pet.) and *In re Columbia Rio Grande Healthcare*, 977 S.W.2d 433, 434 (Tex.App.-Corpus Christi 1998, orig proceeding).

In *JHC*, the appellate court upheld the trial court's refusal to quash a deposition of an apex affidavit official because the trial court was within its discretion to find that the company was "wrongfully resisting discovery" of the official. *JHC*, 94 S.W.3d at 777-78. Importantly, in *JHC*, the party wishing to depose the apex official presented deposition testimony by a witness who said that the apex official was the "only person" with knowledge of relevant facts. *Id.* The court's decision, therefore, was not premised on the adequacy of the apex official's affidavit, but rather on the evidence introduced that rebutted the

contents of the affidavit. *Id.* at 778. *JHC,* therefore, is distinguishable from the situation before us. As discussed above, *Columbia* has been exclusively met with disagreement.

We think that the better rule is that a mechanical application of *Crown Central* in determining the sufficiency of an affidavit to invoke the apex doctrine is to be rejected. *See In re Texas Genco,* 169 S.W.3d 764, 768 (Tex.App.-Waco 2005, orig. proceeding) (concluding that affidavit in which official attested that he had "no involvement in the operation or management of the [plant]" and had "no specialized or unique knowledge of the operations" and "no personal knowledge ... other than what has been reported to me" was sufficient to invoke protection under *Crown Central* doctrine); *In re Burlington N. and Santa Fe Ry. Co.,* 99 S.W.3d 323, 326 n. 3 (Tex.App.-Fort Worth 2003, orig. proceeding) (concluding that affidavit in which official attested that he had "no specific or superior knowledge with regard to the ... issue in the suit or with regard to any other aspect of the case" was sufficient to invoke protection under *Crown Central* doctrine and explaining that there is no requirement that a party must specifically recite language of *Crown Central* in an affidavit to show that affiant has no knowledge of relevant facts); *In re El Paso Healthcare Sys.,* 969 S.W.2d 68, 73 (Tex.App.-El Paso 1998, orig. proceeding) (concluding that affidavit in which official attested that he had no personal knowledge of the employees' jobs or of the day-to-day administration was sufficient to invoke protection under *Crown Central* doctrine); *AMR Corp. v. Enlow,* 926 S.W.2d 640, 643-44 (Tex.App.-Fort Worth 1996, no pet.) (concluding that affidavit in which official attested that he had no "personal knowledge of the conduct, actions, or events at issue," or "the training" employees received, or "the decisions related to or procedures for changing" policies was sufficient to invoke protection under *Crown Central* doctrine).

**\*6** Based upon an analysis of these cases, the following specific statements in Manzoni's affidavit constitute a sufficient denial of relevant facts to invoke protection under *Crown Central:*

> 5.... I do not manage or authorize the *day-to-day* operations of BP Products North America Inc. or of the Texas City Refinery. (Emphasis added).

*See Texas Genco,* 169 S.W.3d 766; *El Paso Healthcare Sys.,* 969 S.W.2d at 73.

> 6. *I do not have unique or superior knowledge of information, much less unique or superior personal knowledge, concerning the allegations made in the lawsuits* arising out of the March 23, 2005 accident at the BP Products North America's Texas City Refinery. *Information concerning the accident and the investigation of the accident was provided to me from employees* of both BP p.l.c. and BP Products North America Inc. I did not participate in the investigation of the March 23, 2005 accident. *I therefore have no personal knowledge of facts relevant to the accident* or the allegations made in the lawsuits filed against BP Products North America Inc.

> 7. *I have no unique personal knowledge of the Texas City facility or its operations, including any safety issues or concerns. Information concerning the Texas City facility or its operations, including any safety issues or concerns was provided to me from employees of both BP p.l.c. and BP Products North America Inc., including Michael Hoffman, Group Vice President for Refining, who reports to me on these issues.*

> 8. Thus, the only knowledge I have concerning the accident, the investigation of the accident and the other allegations made against BP Products North America Inc. *is second hand.* Certainly, *I do not possess relevant knowledge equal to or greater in quality of quantity than executives and employees* of BP Products North America Inc. or other executives or employees of BP p.l.c.

> 9. After the March accident, ... [t]hat investigation was performed by a group of highly qualified and knowledgeable individuals.... All of these activities were at the direction of and monitored by persons other than me, although I have kept myself informed about the progress and results of the investigation.

*See Crown Central,* 904 S.W.2d at 126; *Texas Genco,* 169 S.W.3d at 768; *Burlington Northern,* 99 S.W.3d at 326 n. 3; *El Paso Healthcare Sys.,* 969 S.W.2d at 73; *Enlow,* 926 S.W.2d at 643-44.

Manzoni denied having any unique or superior personal knowledge of the day-to-day operations of the Texas City refinery, of any safety issues or concerns, or of the allegations at issue in the suit. Having "some knowledge of discoverable information" does not render an affidavit insufficient. *Alcatel*, 11 S.W.3d at 179. We conclude that Manzoni sufficiently denied any knowledge of relevant facts and that BP provided the trial court with a sufficient affidavit under *Crown Central. See id.* at 175; *Burlington.* 99 S.W.3d at 326.

## Conclusion

*7 We hold that the trial court abused its discretion in striking BP's affidavit. We therefore conditionally grant BP's petition for writ of mandamus, direct the trial court to vacate its June 21, 2006 order striking BP's affidavit, and direct the trial court to reinstate BP's motion for protection.[7] We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

Footnotes

1    The trial court appointed a Plaintiffs' Steering Committee to speak on behalf of claimants for purposes of resolving discovery matters prior to trial.

2    The respondent is the Honorable Susan E. Criss of the 212th District Court of Galveston County.

3    An "apex deposition" is the deposition of a corporate officer who is at the top of the corporate hierarchy. *Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125. 126 (Tex.1995). Under the "apex doctrine," a corporate officer may be protected from deposition if the "*Crown Central* guidelines" are met. *Id.*

4    The underlying suit is *In re: Texas City Explosion March 23, 2005 Coordinated Discovery Proceedings*, No. 05-CV0337-A (212th Dist. Ct., Galveston County, Tex.).

5    Pursuant to the Texas Rules of Civil Procedure, "[a] person has knowledge of relevant facts when that person has or may have knowledge of any discoverable matter. The person need not have admissible information or personal knowledge of the facts." TEX.R. CIV. P. 192.3(e).

6    *In re Genco L.P.*, 169 S.W.3d 764, 768 (Tex.App.-Waco 2005, orig. proceeding); *In re Centerpoint Energy. Inc.*, No. 10-05-00244-CV. 2005 WL 1531827, at *3 (Tex.App.-Waco 2005, orig. proceeding) (not designated for publication).

7    The merits of BP's motion for protection are not before this Court; rather, this mandamus proceeding solely concerns whether the affidavit was properly stricken as insufficient to constitute proper support for a motion for protection under *Crown Central.* Having determined that the affidavit is sufficient, we reinstate the motion for protection and the trial court moves forward to hear and determine the motion. We conditionally grant BP's petition without prejudice to requesting relief on the motion for protection.

---

        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 5

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Lynd v. Bass Pro Outdoor World, Inc.,
Tex.App.-Dallas, March 12, 2014

84 S.W.3d 198
Supreme Court of Texas.

Hanan BUTNARU and
Gil Butnaru, Petitioners,

v.

FORD MOTOR COMPANY, Respondent.

No. 00–0513. | Argued Feb. 14,
2001. | Decided June 27, 2002.

Potential buyers of automobile dealership filed action asserting claims against dealership, its shareholder, and another potential buyer for breach of purchase and sale agreements and claims against manufacturer for tortious interference. The 63rd Judicial District Court, Val Verde County, George M. Thurmond, J., granted temporary injunction to prevent manufacturer from exercising right of first refusal to buy dealership. Manufacturer appealed. The Court of Appeals, 18 S.W.3d 762, dismissed appeal in part, dissolved temporary injunction, and remanded case. Potential buyers filed petition for review. The Supreme Court, James A. Baker, J., held that: (1) amended provision of Motor Vehicle Commission Code granting Motor Vehicle Board exclusive, original jurisdiction to regulate aspects of distribution, sale, and leasing of motor vehicles as governed by Code constitutionally applied retroactively; (2) potential buyers' tortious interference and declaratory judgment claims fell outside purview of Board's exclusive jurisdiction, but Board had primary jurisdiction over claims; and (3) trial court did not abuse its discretion in issuing a temporary injunction.

Reversed and remanded.

West Headnotes (21)

[1] **Injunction**
 Preservation of status quo

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits.

141 Cases that cite this headnote

[2] **Injunction**
 Extraordinary or unusual nature of remedy

A temporary injunction is an extraordinary remedy and does not issue as a matter of right.

38 Cases that cite this headnote

[3] **Injunction**
 Issues, proof, and variance

To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

256 Cases that cite this headnote

[4] **Injunction**
 Irreparable injury

**Injunction**
 Adequacy of remedy at law

**Injunction**
 Recovery of damages

An injury is irreparable, for purposes of a temporary injunction, if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

120 Cases that cite this headnote

[5] **Injunction**
 Discretionary Nature of Remedy

Whether to grant or deny a temporary injunction is within the trial court's sound discretion.

89 Cases that cite this headnote

[6] **Appeal and Error**
    ⊱ Injunction

A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion.

50 Cases that cite this headnote

[7] **Appeal and Error**
    ⊱ Abuse of discretion

A reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion.

42 Cases that cite this headnote

[8] **Antitrust and Trade Regulation**
    ⊱ Retroactive operation
    **Statutes**
    ⊱ Administrative agencies and proceedings
    **Statutes**
    ⊱ Trade or business

Amended provision of Motor Vehicle Commission Code granting Motor Vehicle Board exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by Code constitutionally applied retroactively in action brought by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer; amended provision was jurisdictional statute that did not alter parties' rights or obligations or remove any available remedies, and parties did not have vested right in choosing what tribunal would initially resolve all issues and claims governed by Code.

Vernon's Ann.Texas Civ.St. art. 4413(36), § 3.01(a).

4 Cases that cite this headnote

[9] **Antitrust and Trade Regulation**
    ⊱ Exclusive and Concurrent Remedies or Laws
    **Antitrust and Trade Regulation**
    ⊱ Exhaustion

Although amended provision of Motor Vehicle Commission Code granted Motor Vehicle Board exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by Code, tortious interference and declaratory judgment claims asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer were not governed by Code and, thus, fell outside the purview of the Board's exclusive jurisdiction, such that potential buyers did not have to exhaust any administrative remedies before raising claims in trial court. Vernon's Ann.Texas Civ.St. art. 4413(36), § 3.01(a).

5 Cases that cite this headnote

[10] **Torts**
    ⊱ Contracts in general

To establish their tortious interference claim, potential buyers of automobile dealership had to show: (1) a contract for sale of dealership existed between them and dealership, its sole shareholder, and property owners; (2) dealership willfully and intentionally interfered with that contract; (3) the interference proximately caused potential buyers damage; and (4) buyers suffered actual damage or loss.

49 Cases that cite this headnote

[11] **Torts**

↪ Defense, justification or privilege in general

Defendant could defeat liability for tortious interference claim by proving the affirmative defense that its conduct was privileged or justified, so long as that conduct was not illegal or tortious.

13 Cases that cite this headnote

[12] **Antitrust and Trade Regulation**
↪ Judicial remedies prior to or pending administrative proceedings

Motor Vehicle Board had primary jurisdiction over tortious interference and declaratory judgment claims asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer, which claims raised Motor Vehicle Commission Code construction issue that was within Board's special competence and expertise; thus, trial court should abate lawsuit and suspend finally adjudicating tortious interference and declaratory judgment claims until Board had a reasonable opportunity to act on the matter. Vernon's Ann.Texas Civ.St. art. 4413(36), § 5.01B(d).

15 Cases that cite this headnote

[13] **Constitutional Law**
↪ Abrogation, modification, or recognition of remedies

State Constitution's open courts provision prohibits the Legislature from abrogating well-established, common-law claims unless the reason for doing so outweighs a litigant's constitutional right of redress. Vernon's Ann.Texas Const. Art. 1, § 13.

4 Cases that cite this headnote

[14] **Antitrust and Trade Regulation**
↪ Exclusive and Concurrent Remedies or Laws

Motor Vehicle Commission Code did not abrogate any previously existing common-law rights and, thus, trial court had immediate jurisdiction to adjudicate common-law claims for breach of the purchase and sale agreements asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer. Vernon's Ann.Texas Civ.St. art. 4413(36).

Cases that cite this headnote

[15] **Antitrust and Trade Regulation**
↪ Particular cases

Reliance by potential buyers of automobile dealership on general equitable principles did not relieve buyers of their burden to show an inadequate legal remedy, in seeking temporary injunction against manufacturer's exercising its right of first refusal to purchase dealership on the same terms and conditions as proposed buyers.

7 Cases that cite this headnote

[16] **Antitrust and Trade Regulation**
↪ Particular cases

Evidence that potential buyers of automobile dealership would lose not only their right to purchase real property, in addition to the dealership, if manufacturer exercised its right of first refusal was sufficient to establish that potential buyers had a probable right to recovery and that injunctive relief was necessary to preserve the status quo.

31 Cases that cite this headnote

[17] **Injunction**
↪ Contracts

**Injunction**
↪ Breaches in general

Generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable

injury and an inadequate legal remedy when damages for breach of contract are available.

26 Cases that cite this headnote

[18] **Appeal and Error**

⟶ Injunction

Under an abuse of discretion standard for reviewing an injunction, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles.

88 Cases that cite this headnote

[19] **Appeal and Error**

⟶ Substituting reviewing court's judgment

The court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion.

8 Cases that cite this headnote

[20] **Appeal and Error**

⟶ Reasonably supported findings

A trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision.

152 Cases that cite this headnote

[21] **Equity**

⟶ Property and rights therein in general

A trial court may grant equitable relief when a dispute involves real property.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*200 Jonathan Scott Miles, Andrew L. Kerr, Holland & Knight LLP, San Antonio, Byron W. Hodge, Lowry Foster & Hodge, Del Rio, Larry G. Berkman, Jenkens & Gilchrist, San Antonio, for Petitioner.

Paul S. Francis, Jon David Ivey, Baker & Hostetler, Alfred V. Sumpter, Oritz & Sumpter, Del Rio, for Respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

On December 6, 2001, we granted Ford's motion for rehearing. We withdraw our opinion dated July 7, 2001, and substitute the following in its place.

In this case, we determine whether the Texas Motor Vehicle Board has exclusive jurisdiction over a prospective car dealership transferees' claims that raise an issue about how to construe the Texas Motor Vehicle Commission Code.[1] We conclude the Board has exclusive jurisdiction to resolve only those claims and issues the Code governs. Moreover, we conclude that this exclusive jurisdiction does not extend to the prospective transferees' claims here, and thus, they do not have to exhaust administrative remedies before bringing their claims in the trial court. Instead, because of the Board's special expertise in interpreting the Code, the trial court should abate the prospective transferees' tortious interference and declaratory judgment claims so the Board may exercise its primary jurisdiction to *201 determine the Code construction issue raised with those claims. We further conclude that the trial court did not abuse its discretion by entering a temporary injunction. Accordingly, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

Martin Graf is the sole shareholder of Graf Ford, Lincoln, Mercury, Inc., a dealership in Del Rio, Texas. The dealership's agreement with Ford provides that if Graf Ford proposes to transfer the dealership, Ford

shall have a right of first refusal to purchase the dealership on the same terms and conditions that the proposed buyer agreed to, "regardless of whether the proposed buyer is qualified to be a dealer." A Ford representative testified that this provision's purpose, and the purpose of similar provisions in other standard Ford dealership agreements, is "to be able to put into business dealers who [Ford feels] are qualified whenever [Ford has] the opportunity."

In 1999, Hanan and Gil Butnaru contracted with Graf to buy the Graf dealership. They also contracted separately to buy the real property upon which the dealership was located. Graf and J.M. Barton owned the property and executed that contract. Graf told the Butnarus about Ford's right of first refusal. Additionally, both agreements were "expressly conditioned upon approval by Ford of Hanan Butnaru as a[sic] authorized sales and service dealer" and warranted that neither agreement conflicted with any prior agreement to which Graf or Barton were parties.

In September 1999, Graf told Ford that he intended to sell the dealership to the Butnarus. The Butnarus then filed a Prospective Dealer Application with Ford, seeking approval as an authorized dealer. A month later, Ford informed Graf that it intended to exercise its right of first refusal and offered to pay the Butnarus' reasonable expenses incurred in negotiating the purchase and sale agreements. On the same day, Ford assigned its right of first refusal to an existing Ford dealer. Ford and Graf agreed that Ford would indemnify Graf against damages arising from Ford's exercising its right of first refusal and that Graf would cooperate with Ford in defending any action challenging the right.

Anticipating their breaching the purchase and sale agreements, the Butnarus sued Graf, Graf Ford, and Barton for breach of those agreements. The Butnarus also sued Ford for tortiously interfering with the agreements. They alleged Ford tortiously interfered because Ford's right of first refusal violates a Code provision that prohibits a manufacturer from denying or preventing a dealership transfer to a qualified applicant. See TEX.REV.CIV. STAT. art. 4413(36), §§ 5.01B(c), 5.02(b)(8). Thus, the Butnarus sought a declaration that Ford's right of first refusal was unenforceable and a declaration about the parties' rights and obligations under the agreements. Finally, the Butnarus requested a temporary injunction to prevent Ford or its assignees from exercising its right of first refusal during the suit. Ford opposed this request and filed a plea to the jurisdiction. Ford argued that the Board has exclusive jurisdiction to determine whether a manufacturer has violated the Code's provisions. The trial court denied Ford's plea and granted the injunction.

Ford sought interlocutory review of the trial court's temporary injunction. See 18 S.W.3d at 762. The court of appeals first noted that the Legislature did not confer any rights on prospective transferees under *202 the Code to seek relief for the Code violation the Butnarus allege. Then, the court of appeals held that the trial court did not have jurisdiction over the Butnarus' claims, "to the extent their claims are based on violations of the [Code]," because the Code grants the Board exclusive jurisdiction over alleged Code violations. 18 S.W.3d at 767. The court also held that the Code does not violate the Texas Constitution's open courts provision, which prohibits the Legislature from unreasonably abrogating well-established common-law claims. The court explained that the Code merely confers new statutory rights on motor vehicle dealers and leaves "all others in the same position they previously occupied." 18 S.W.3d at 768. Therefore, the court concluded that "the Butnarus can sue Ford ... for tortious interference with contract, breach of contract, and declaratory relief. They simply cannot base those causes of action on [Code] violations...." 18 S.W.3d at 768. The court of appeals then remanded the claims not based on Code violations and, holding that the Butnarus did not establish an inadequate legal remedy, dissolved the trial court's temporary injunction. 18 S.W.3d at 769–70.

The Butnarus petitioned this Court to review the court of appeals' opinion. Typically, jurisdiction over an order granting or denying a temporary injunction is final in the courts of appeals. See TEX. GOV'T CODE § 22.225(b)(4). However, because the court of appeals' decision here conflicts with another court of appeals' decision, this Court has jurisdiction. See TEX. GOV'T CODE § 22.225(c). Specifically, the court of appeals' holding that the Code does not violate the Texas Constitution's open courts provision conflicts

with *David McDavid Nissan, Inc. v. Subaru, Inc.*, 10 S.W.3d 56, 68 (Tex.App.-Dallas 1999), *affirmed in part, reversed in part, and remanded on rehearing*, 84 S.W.3d 212 (Tex.2002). In *David McDavid Nissan*, the court of appeals held that the Code abrogated the plaintiff's common-law claims without reasonably substituting another remedy and thus contravened the open courts provision. 10 S.W.3d at 67–68. We granted the Butnarus' petition, as well as the petition in *David McDavid Nissan*, to resolve this conflict.

At the time the trial courts and courts of appeals here and in *David McDavid Nissan* determined whether the Board had exclusive jurisdiction, section 3.01 of the Code provided:

> (a) The board has the general and original power and jurisdiction to regulate all aspects of the distribution, sale, and leasing of motor vehicles and to do all things, whether specifically designated in this Act or implied herein, or necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction. In addition to the other duties placed on the board by this Act, the board shall enforce and administer the terms of Chapter 503, Transportation Code.
>
> (b) Unless otherwise specifically provided by Texas law not in conflict with the terms of this Act, all aspects of the distribution and sale of motor vehicles shall be governed exclusively by the provisions of this Act.

TEX.REV.CIV. STAT. art. 4413(36), § 3.01 (Vernon Supp.1998), *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313.

In our original opinions in this case and in *David McDavid Nissan*, we concluded that this provision granted the Board primary—not exclusive— jurisdiction over Code issues and claims. Moreover, we concluded that section 3.01(b) does not grant the Board exclusive jurisdiction because, **\*203** by its plain language, that subsection only establishes that the Code governs this area of law and trumps other laws if they conflict with the Code.

However, only weeks before we issued our opinions, the Legislature amended section 3.01(a) to provide:

> (a) The board has the *exclusive, original jurisdiction* to regulate *those aspects* of the distribution, sale, and leasing of motor vehicles *as governed by this Act* and to do all things, whether specifically designated in this Act or implied herein, or necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction.

TEX.REV.CIV. STAT. art. 4413(36), § 3.01(a) (emphasis added). The Legislature made this amendment "effective immediately" after receiving the necessary votes, which occurred on May 18, 2001. *See* Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313, 317. The Legislature's amendment did not change section 3.01(b).

Today, we determine (1) whether section 3.01 's current or former version applies, (2) whether the applicable provision grants the Board exclusive jurisdiction and how this affects the trial court's jurisdiction here, and (3) whether the trial court abused its discretion by issuing a temporary injunction.

## II. APPLICABLE LAW

### A. DAVID MCDAVID NISSAN, INC.

#### 1. Retroactive application of Section 3.01

Today, in *David McDavid Nissan*, we held that section 3.01 's current version constitutionally retroactively applied to the pending claims a licensed motor vehicle dealer had raised against a manufacturer. *David McDavid Nissan*, 84 S.W.3d at 218. We explained that this jurisdictional provision is procedural and remedial and did not affect a vested right. *David McDavid Nissan*, 84 S.W.3d at 219 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273, 114 S.Ct. 1483 (1994); *Baker Hughes, Inc. v. Keco, R & D, Inc.*, 12 S.W.3d 1, 4 (Tex.1999); *City of Tyler v. Likes*, 962 S.W.2d 489,

502 (Tex.1997); *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex.1981); *McCain v. Yost*, 155 Tex. 174, 284 S.W.2d 898, 900 (1955); *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 560 (1916); *Blonstein v. Blonstein*, 831 S.W.2d 468, 472 (Tex.App.-Houston [14th Dist.] 1992, writ denied); *Southwestern Bell Tel. Co. v. City of Kountze*, 543 S.W.2d 871, 874–75 (Tex.Civ.App.-Beaumont 1976, no writ)).

### 2. Exclusive Versus Primary Jurisdiction

Furthermore, in *David McDavid Nissan*, we explained the significant differences between the primary and exclusive jurisdiction doctrines. *David McDavid Nissan*, 84 S.W.3d at 218. We held that, unlike its former version, section 3.01(a) 's current version expressly confers exclusive jurisdiction on the Board to initially determine issues or claims that the Code governs. *David McDavid Nissan*, 84 S.W.3d at 218. We based our decision on the provision's plain language, and the Legislature's intent when it amended the provision to include the express exclusive jurisdiction language. *David McDavid Nissan*, 84 S.W.3d at 218. (citing *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex.2000); *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 447 (Tex.1996); SENATE COMM. ON STATE AFFAIRS, BILL ANALYSIS, Tex. H.B. 1665, 77th Leg., R.S. (2001)).

### *204 3. Open Courts Challenge

In *David McDavid Nissan*, we also concluded that, as applied to the motor vehicle dealer in that case, the Code did not violate the Texas Constitution's open courts provision. *David McDavid Nissan*, 84 S.W.3d at 227; *see also* TEX. CONST. art. 1, § 13. We explained that the Board's exclusive jurisdiction over issues and claims the Code governs—all matters derived from the Code and not the common law—did not abrogate any of the motor vehicle dealer's common-law rights. *David McDavid Nissan*, 84 S.W.3d at 227 (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 448 (Tex.1993)).

### B. TEMPORARY INJUNCTIONS

[1] [2] [3] [4] A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex.1993); *Electronic Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex.Civ.App.-Dallas 1974, no writ). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling*, 863 S.W.2d at 57. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Walling*, 863 S.W.2d at 57; *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex.App.-Dallas 1989, no writ).

[5] [6] [7] Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984). A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Walling*, 863 S.W.2d at 58; *Walker*, 679 S.W.2d at 485. The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. of Appeals*, 700 S.W.2d 916, 918 (Tex.1985); *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex.1978).

### III. ANALYSIS

### A. WHETHER AMENDED SECTION 3.01 RETROACTIVELY APPLIES

[8] In *David McDavid Nissan*, we concluded that section 3.01(a), a jurisdictional provision, is a procedural and remedial statute that applied retroactively because it did not affect a vested right in that case. *See David McDavid Nissan*, 84 S.W.3d at 219 (citing *Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483; *Likes*, 962 S.W.2d at 502; *Abell*, 613 S.W.2d at 260; *Phil H. Pierce Co. v. Watkins*, 114 Tex. 153, 263

S.W. 905, 907 (1924); *Middleton*, 185 S.W. at 560; *Blonstein*, 831 S.W.2d at 472; *City of Kountze*, 543 S.W.2d at 874–75). However, section 3.01(a) still may not constitutionally retroactively apply in this case if it affects a vested right. *See Baker Hughes*, 12 S.W.3d at 4; *Middleton*, 185 S.W. at 560.

The Butnarus do not allege that section 3.01(a) affects any vested right. Instead, they contend that the Legislature did not expressly make the amendment to section 3.01(a) retroactive, and therefore, we should apply the Code Construction Act to conclude section 3.01(a)'s current version does not retroactively apply. *See* TEX. GOV'T CODE §§ 311.022 ("A statute is presumed *205 to be prospective in its operation unless expressly made retrospective."), 311.031 ("[T]he ... amendment ... of a statute does not affect ... the prior operation of the statute or any prior action taken under it.").

But the Butnarus misplace their reliance on the Code Construction Act. That statute applies only to "each code enacted by the 60th or subsequent legislature as part of the state's continuing statutory revision program." TEX. GOV'T CODE § 311.002. When the Legislature recodifies a statute under Texas's continuing statutory revision program, the statute will indicate this. *See, e.g.*, TEX. LOCAL GOV'T CODE § 1.001 ("This code is enacted as a part of the state's continuing statutory revision program...."). And, though we refer to the Motor Vehicle Code as "the Code," nothing in the Code's language or legislative history shows that it is part of our State's "continuing statutory revision program." TEX. GOV'T CODE § 311.002; *Robbins Chevrolet Co. v. Motor Vehicle Bd.*, 989 S.W.2d 865, 867 (Tex.App.-Austin 1999, pet. denied); *see also Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 385 (Tex.1982).

Section 3.01(a) is a jurisdictional statute that, in this case, does not alter the parties' rights or obligations or remove any remedies already available. *See David McDavid Nissan*, 84 S.W.3d at 222; *Likes*, 962 S.W.2d at 502. This provision merely determines the tribunal that must initially resolve all issues and claims the Code governs. *See Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483; *David McDavid Nissan*, 84 S.W.3d at 222; *City of Kountze*, 543 S.W.2d at 874–75. The parties do not have a vested right in choosing what

tribunal will do this. *See Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483; *David McDavid Nissan*, 84 S.W.3d at 222; 1898454; *Middleton*, 185 S.W. at 559; *City of Kountze*, 543 S.W.2d at 874–75. Accordingly, we conclude that amended section 3.01(a) constitutionally applies retroactively in this case.

## B. APPLYING SECTION 3.01'S CURRENT VERSION TO THE BUTNARUS' CLAIMS

[9] Ford contends that section 3.01's current version grants the Board exclusive jurisdiction, and thus, the Board has the sole authority to make the initial determination about the alleged Code violation here. The Butnarus, on the other hand, argue that section 3.01 does not oust the trial court's jurisdiction because the Board does not have authority to award damages for their well-established common-law claims. Therefore, the Butnarus assert that the Board only has *primary* jurisdiction to decide whether Ford's right of first refusal violates the Code.

The Butnarus' pleadings currently reflect four claims, the first two of which are based on Ford's allegedly violating the Code. First, the Butnarus seek a judicial declaration that Ford's right of first refusal violates the Code. Second, the Butnarus allege that Ford tortiously interfered with the purchase and sale agreements by attempting to exercise its allegedly invalid right of first refusal. Third, the Butnarus seek a declaration about the parties' rights and obligations under the purchase and sale agreements. Fourth, the Butnarus claim that Graf and Barton have breached or are about to breach the purchase and sale agreements by permitting Ford to exercise its right of first refusal rather than requiring Ford to determine the Butnarus' eligibility under the Code for the dealership transfer.

The court of appeals, after analyzing section 3.01's former version, concluded that the Board has exclusive jurisdiction; *206 however, it held that the Butnarus do not have standing as prospective car dealership transferees to seek relief from the Board for the Code violation they allege. The court of appeals further determined that the Butnarus' lack of standing to obtain relief from the Board did not give them a right to seek damages for the alleged Code violation in the trial court. 18 S.W.3d at 767–68. Accordingly, the court

of appeals held that the Butnarus could maintain their breach of contract and tortious interference claims; however, the Butnarus could not "base those causes of action on [Code] violations." 18 S.W.3d at 768.

As discussed above, we disagree that section 3.01 's former version granted the Board exclusive jurisdiction. But we conclude that section 3.01(a) 's current version, which applies here, grants the Board exclusive jurisdiction over issues and claims the Code governs. Thus, we must determine if the Butnarus' claims fall within the Board's exclusive jurisdiction.

Because motor vehicle distribution and sales affects our State's economy and citizens' welfare, the Code's primary purpose is "to insure a sound system of distributing and selling motor vehicles through licensing and regulating manufacturers ... and dealers of those vehicles." See TEX.REV.CIV. STAT. art. 4413(36), § 1.02. To accomplish this, the Code strictly regulates conduct by or between franchise dealers and manufacturers. See TEX.REV.CIV. STAT. art. 4413(36), §§ 4.01–.07, 5.01–.05. For example, the Code establishes how a dealer must request a transfer, assignment, or sale of its franchise agreement. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B. Under that process, the Code also determines the circumstances under which a manufacturer may withhold its consent to the dealer's request. See TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c).

Specifically, to transfer a dealership the dealer must file a written application with the manufacturer to transfer the dealership. The application must identify the prospective transferee and any pertinent agreements about the proposed transfer. See TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(a)(1)-(4). The manufacturer must timely advise the dealer in writing if the prospective transferee is qualified or if the transferee is not acceptable. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(b). The Code prohibits a manufacturer from "unreasonably" withholding its consent to a dealer's transfer application if the prospective transferee is "of good moral character" and otherwise meets the manufacturer's predetermined, written standards, if any, about a transferee's business experience and financial qualifications. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c). Further, the Code makes it unlawful for a manufacturer

to "fail to give effect to or attempt to prevent any sale or transfer" of a dealership "except as provided by Section 5.01B." TEX.REV.CIV. STAT. art. 4413(36), § 5.02(b)(8).

Additionally, the Code provides a dealer a remedy if the manufacturer "unreasonably" denies a dealer's application to transfer its franchise ownership. The Code's definition of "dealer" includes licensed dealers but not prospective transferees. See TEX.REV.CIV. STAT. art. 4413(36), § 1.03(7). The dealer may file a protest with the Board. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(d). The issue would be whether the prospective transferee is qualified, and the manufacturer must prove the prospective transferee's inadequacy. TEX.REV.CIV. STAT. art. 4413(36), §§ 5.01B(d)-(e). If the Board determines the prospective transferee is qualified, the Board shall enter an order reflecting this, and the manufacturer must accept the transfer. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(e).

*207 [10] [11] Here, the court of appeals' analysis presumes that the Butnarus' trial court claims simply seek monetary damages based on their allegation that Ford's exercising its right of first refusal and denying the dealership transfer violated section 5.01B. But the Butnarus' trial court claims involve something different. The Butnarus seek relief for Ford's alleged tortious interference, and this claim, in turn, raises a Code construction issue. To establish their tortious interference claim, the Butnarus must show: (1) a contract exists between Graf, Graf Ford, Barton and the Butnarus; (2) Ford willfully and intentionally interfered with that contract; (3) the interference proximately caused the Butnarus damage; and (4) the Butnarus suffered actual damage or loss. See Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 210 (Tex.1996); Holloway v. Skinner, 898 S.W.2d 793, 795–96 (Tex.1995). But Ford may defeat liability by proving the affirmative defense that its conduct was privileged or justified—so long as that conduct was not illegal or tortious. See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc., 29 S.W.3d 74, 80 (Tex.2000); ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 431 (Tex.1997); Texas Beef Cattle, 921 S.W.2d at 210. It is the Butnarus' position that Ford does not have a justification defense, because rights of first refusal contravene

certain Code provisions and, accordingly, are void and unenforceable. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c) (prohibiting a manufacturer from unreasonably denying a dealership transfer); TEX.REV.CIV. STAT. art. 4413(36), § 1.04 (making an agreement to waive the Code's terms void and unenforceable). The Butnarus also request that the trial court enter a declaratory judgment that rights of first refusal violate the Code.

We conclude that the Butnarus' tortious interference and declaratory judgment claims fall outside the purview of the Board's exclusive jurisdiction. In *David McDavid Nissan,* we held that the Board's exclusive jurisdiction under section 3.01(a) required the dealer in that case to exhaust its administrative remedies to obtain a final Board finding to support its Code-based DTPA, bad faith, and oral contract claims. *David McDavid Nissan,* 84 S.W.3d at 226. In concluding that the Board's exclusive jurisdiction applied to the dealer's Code-based DTPA and bad-faith claims, we explained that the Code provides a hybrid claims-resolution process by which a dealer or manufacturer may seek damages for certain Code violations. *David McDavid Nissan,* 84 S.W.3d at 226 (discussing TEX.REV.CIV. STAT. art. 4413(36), §§ 6.06(a), (e)). Based on this process, we held that the dealer had to exhaust its administrative remedies under the Code to obtain supporting Board findings before a trial court could finally adjudicate the dealer's damages request for its Code-based claims. *See David McDavid Nissan,* 84 S.W.3d at 227. Additionally, in requiring the dealer to obtain a Board finding before pursuing its oral contract claims, we relied on a Code provision mandating that a dealer obtain the Board's approval and a license before operating a franchise in a certain area. *See David McDavid Nissan,* 84 S.W.3d at 227 (discussing TEX.REV.CIV. STAT. art. 4413(36), §§ 4.02(c), 4.06(a)-(e)).

Here, however, no Code provision extends the Board's exclusive jurisdiction to resolving the Butnarus' tortious interference and declaratory judgment claims so that they must exhaust any administrative remedies before seeking judicial relief. In fact, the Code's failing to establish any procedure through which the Board may resolve a prospective transferee's claim that a manufacturer unlawfully refused to *208 accept a dealer's transfer request—coupled with the Board's

inability to award monetary damages—demonstrate the contrary. Thus, this case is analogous to *Cash America,* in which we held that the plaintiff did not have to exhaust administrative remedies under the Pawnshop Act because "nothing in the statutory scheme indicate[d] that the Legislature intended to replace a pledgor's common-law remedies with the like-kind replacement remedy" available under the statute. *Cash Am.,* 35 S.W.3d at 18. Similarly, because the Code does not indicate the Legislature's intent to replace the prospective transferees' remedies here, the Butnarus do not have to exhaust any administrative remedies before suing Ford for tortious interference or declaratory relief.

[12] But our inquiry does not end here. Though the Legislature did not confer exclusive jurisdiction on the Board to resolve the Butnarus' claims, we still must decide whether the Board has primary jurisdiction to resolve the Code construction issue that those claims raise. *See, e.g, Cash Am.,* 35 S.W.3d at 18 (recognizing that, though an agency does not have exclusive jurisdiction, the policies underlying the primary jurisdiction doctrine may require the agency to initially decide an issue). In *David McDavid Nissan,* we explained that the primary jurisdiction doctrine requires trial courts to allow an administrative agency to initially decide an issue when: (1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations. *David McDavid Nissan,* 84 S.W.3d at 221 (citing *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Cash Am.,* 35 S.W.3d at 18; *Foree v. Crown Cent. Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968); *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26. 344 S.W.2d 411, 413 (1961); *Kavanaugh v. Underwriters Life Ins. Co.,* 231 S.W.2d 753, 755 (Tex.Civ.App.-Waco 1950, writ ref'd); Travis, Comment, *Primary Jurisdiction: A General Theory and Its Application to the Securities Exchange Act,* 63 CAL. L.REV. 926, 927 (1975)). We noted that, when the primary jurisdiction doctrine requires a trial court to defer to an agency to make an initial determination, the court should abate the lawsuit and suspend finally adjudicating the claim until the agency

has an opportunity to act on the matter. *David McDavid Nissan*, 84 S.W.3d at 221 (citing *Central Power & Light Co. v. Public Util. Comm'n*, 17 S.W.3d 780, 787 (Tex.App.-Austin 2000. pet. denied); *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 771 (Tex.App.-Dallas 1992, no writ)).

We conclude that the primary jurisdiction doctrine applies in this case. The Butnarus' tortious interference and declaratory judgment claims raise a Code construction issue that is within the Board's special competence and expertise. *See Cash Am.*, 35 S.W.3d at 18. As discussed above, the Legislature has specifically authorized the Board to resolve disputes between a manufacturer and dealer when the dealer alleges that the manufacturer violated section 5.01B by unreasonably withholding consent to transfer a dealership. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(d). The Board's expertise in construing section 5.01B in these disputes, and the State's interest in a uniform interpretation of the Code, requires the trial court to abate the lawsuit and suspend finally adjudicating the tortious interference and declaratory judgment claims until the Board has a reasonable opportunity to \*209 act on the matter. *See David McDavid Nissan*, 84 S.W.3d at 228; *Central Power & Light*, 17 S.W.3d at 787; *Roberts Express*, 842 S.W.2d at 771. Accordingly, the trial court should abate the claims pending the Board having an opportunity to exercise its primary jurisdiction to determine, at least in the first instance, whether a right of first refusal violates the Code. In sum, we hold that section 3.01(a) confers exclusive jurisdiction on the Board but only over issues and claims the Code governs. Here, the Code does not govern the Butnarus'—as prospective transferees—tortious interference and declaratory judgment claims. Consequently, the Butnarus do not have to exhaust any administrative remedies before raising these claims in the trial court. However, because these claims raise a Code construction issue, the primary jurisdiction doctrine requires the trial court to abate the claims pending the Board having a reasonable opportunity to determine whether a right of first refusal violates the Code.

## C. OPEN COURTS CHALLENGE

[13] The Butnarus contend that if the Board has exclusive jurisdiction over all Code issues and claims, this violates our Constitution's open courts provision. TEX. CONST. art. 1, § 13. This provision prohibits the Legislature from abrogating well-established, common-law claims unless the reason for doing so outweighs a litigant's constitutional right of redress. *See Texas Ass'n of Bus.*, 852 S.W.2d at 448.

[14] But we have already concluded that the Board's exclusive jurisdiction does not extend to the claims in this case. Accordingly, the Code does not abrogate any previously existing common-law rights here. The trial court has immediate jurisdiction to adjudicate the Butnaru's common-law claims for breach of the purchase and sale agreements. And, after deferring to the Board so it has an opportunity to decide the Code construction issue, the trial court may finally adjudicate the tortious interference and related declaratory judgment claim.

## D. TEMPORARY INJUNCTION

The trial court temporarily enjoined Ford or its assignees from exercising its right of first refusal during the suit. The court of appeals dissolved the temporary injunction, agreeing with Ford's contention that the Butnarus did not establish an inadequate legal remedy. 18 S.W.3d at 769. In so concluding, the court of appeals noted that generally a court will not enforce contracts by injunction because a suit for damages is deemed to be an adequate remedy. 18 S.W.3d at 769. The Butnarus respond twofold. First, they argue that they were not required to show an inadequate legal remedy because an alleged statutory violation relieves a movant of that burden. *See Furr v. Hall*, 553 S.W.2d 666, 672 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.). They assert that courts have a duty to enjoin statutory violations. *See Priest v. Texas Animal Health Comm'n*, 780 S.W.2d 874, 876 (Tex.App.-Dallas 1989, no writ). Second, the Butnarus argue that they have otherwise established the temporary-injunction elements. On the inadequate legal remedy element, they argue that Ford's exercising its right of first refusal would deprive them of the opportunity to purchase two unique assets: real property and the dealership located on the property. *See, e.g., Home Sav. of Am. v. Van Cleave Dev. Co.*, 737 S.W.2d 58,

59 (Tex.App.-San Antonio 1987, no writ) (noting that "each and every piece of real estate is unique" and that "is certainly an element to be considered in deciding whether there [will be] irreparable damages").

### *210 1. Statutory Violation

[15] The Butnarus' misplace their reliance on *Furr*. *See Furr*, 553 S.W.2d at 672. *Furr* does not generally propose that an alleged statutory violation relieves the plaintiff's burden to show an inadequate legal remedy. Rather, the party seeking injunctive relief in *Furr* relied on a specific statute giving the right to an injunction, and the court of appeals concluded that the statutory right relieved the party from proving an inadequate legal remedy. *Furr*, 553 S.W.2d at 672. The court relied on *Republic Insurance Co. v. O'Donnell Motor Co.*, which explains:

> The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law. This limitation, however, has no application where the right to relief is predicated on a statutory ground other than on the general principles of equity.

289 S.W. 1064, 1066 (Tex.Civ.App.-Dallas 1926, no writ).

Here, the Butnarus rely on general equitable principles, not a statutory injunctive-relief right, to enjoin Ford's conduct. Thus, *Furr* does not apply. And the Butnarus had to establish in the trial court, in addition to the other temporary-injunction elements, an inadequate legal remedy.

### 2. Temporary Injunction Elements

[16] In the trial court, the Butnarus alleged that Ford's exercising its right of first refusal would tortiously interfere with the Butnarus' contract to purchase the real property and the contract to purchase the dealership. They further contended that their right to purchase the real property and dealership would be lost if Ford exercised its right of first refusal, and, therefore, injunctive relief was necessary to preserve the status quo.

At the temporary injunction hearing, the Butnarus presented the following evidence: (1) their agreement with Graf and Barton to purchase the real property, (2) their agreement with Graf and Graf Ford to purchase the dealership, (3) Graf Ford's agreement with Ford containing the right of first refusal that allegedly violates the Code, (4) the Code provisions that allegedly prohibit Ford's right of first refusal provision, and (5) the Butnarus' dealership application to Ford detailing their business experience and financial qualifications. Additionally, Hanan Butnaru testified about his agreements with Graf, Graf Ford, and Barton to purchase dealership and the real property in Del Rio. He stated that in planning to establish a dealership, he was only looking within a 100 mile radius of San Antonio, which includes Del Rio. He also explained, and the agreements entered in evidence showed, that the Butnarus agreed to pay $1.2 million for the real property and only $500,000 for the dealership.

Based on the Butnarus' allegations and this evidence, the trial court granted the temporary injunction. The trial court stated in the order that the Butnarus would be irreparably harmed if Ford exercises its right of first refusal "in that the issues and rights sought to be adjudicated will become moot and [the Butnarus] will have lost the opportunity to purchase the Dealership and the Real Property."

The court of appeals, however, dissolved the temporary injunction after concluding that the Butnarus did not establish an inadequate legal remedy:

> The Butnarus are not interested in the real property for its own resources or aesthetics. Their interest in the property results solely from the fact that the dealership is located on it. Thus, their true complaint relates to their inability to purchase the dealership. The uniqueness *211 of the real property is therefore irrelevant

to the adequacy of their legal remedy.

18 S.W.3d at 769. The court of appeals' holding is predicated upon its assumptions that the real property is neither unique nor pertinent to this dispute and that the Butnarus are only interested in purchasing the dealership.

[17] [18] [19] [20] We agree with the court of appeals that, generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available. *Canteen Corp.*, 773 S.W.2d at 401; *Chevron U.S.A., Inc. v. Stoker*, 666 S.W.2d 379, 382 (Tex.App.-Eastland 1984, writ dism'd). But under an abuse of discretion standard, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex.1991); *Davis*, 571 S.W.2d at 861–62. Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992); *Beaumont Bank*, 806 S.W.2d at 226. The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Davis*, 571 S.W.2d at 862.

[21] The evidence shows this is a case involving two contracts: a contract to purchase land and a contract to purchase a business. There is some evidence that the Butnarus desired valuable land located at this specific Del Rio location. Thus, the evidence before the trial court supports its conclusion that this dispute is about the right to purchase real property worth at least $1.2 million and not just the dealership itself. *See Home Sav.*, 737 S.W.2d at 59 (upholding temporary injunction in dispute involving land worth $1.5 million). And a trial court may grant equitable relief when a dispute involves real property. *See Bennett v. Copeland*, 149 Tex. 474, 235 S.W.2d 605, 609 (1951); *E.I. DuPont de Nemours & Co. v. Zale Corp.*, 462 S.W.2d 355, 359–60 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.); *Burnett v. Mitchell*, 158 S.W. 800, 801–02 (Tex.Civ.App.-Fort Worth 1913, writ ref'd). Thus, the trial court's conclusion that the Butnarus do not have an adequate legal remedy was

not arbitrary and unreasonable and was not made without reference to guiding rules and principles. And, because the trial court's determination was not an abuse of discretion, the court of appeals should not have substituted its judgment for that of the trial court. *Beaumont Bank*, 806 S.W.2d at 226.

Ford contends that the court of appeals could have also determined that the Butnarus did not establish a probable right to recovery. We disagree. The trial court could reasonably conclude, based on the Butnarus' allegations and the evidence previously discussed, that the Butnarus had a probable right to recovery. *See Sun Oil*, 424 S.W.2d at 218 (stating that the temporary injunction applicant is not required to establish that it will prevail on final trial and need only plead a cause of action and show a probable right to the relief sought). Because this conclusion was not "so arbitrary as to exceed the bounds of reasonable discretion," *CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ), the trial court did not abuse its discretion in finding a probable right to recovery.

Accordingly, we conclude that there is evidence to support the trial court's decision to issue the temporary injunction. *See Davis*, 571 S.W.2d at 862. Thus, the *212 trial court did not abuse its discretion, and we reverse the court of appeals' order dissolving the temporary injunction.

## IV. CONCLUSION

Section 3.01(a) grants the Board exclusive jurisdiction but only over the issues and claims the Code governs. Because the Code does not govern, or expressly authorize the Board to resolve, the Butnarus' tortious interference and declaratory judgment claims, these prospective transferees need not exhaust any administrative remedies before the trial court has jurisdiction over these claims. However, under the primary jurisdiction doctrine, the trial court should abate these claims to the extent that may be necessary to allow the Board a reasonable opportunity to resolve the Code construction issue they raise. Finally, the trial court did not abuse its discretion in granting the temporary injunction. Thus, we reverse the court of appeals' judgment and remand the cause to the

trial court for further proceedings consistent with this opinion on rehearing.

**Parallel Citations**

45 Tex. Sup. Ct. J. 916

Footnotes

1    Unless otherwise indicated, "the Code" refers to the Texas Motor Vehicle Commission Code, and "the Board" refers to the Motor Vehicle Board. *See* TEX.REV.CIV. STAT. art. 4413(36).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 6

**778 S.W.2d 916**
Court of Appeals of Texas,
Houston (14th Dist.).

CITY OF HOUSTON, Diana Kay Ball,
and Robert John Collins, Relators,
v.
Hon. Ken HARRISON, Judge, 165th
Judicial District Harris County, Respondent.

No. B14-89-00821-CV. | Nov. 2, 1989.

City and city attorneys filed motion for leave to file petition for writ of mandamus requesting court to order county court judge to vacate his orders holding city attorneys in contempt for refusing to answer certain deposition questions. The Court of Appeals held that judge did not abuse his discretion in ordering attorneys to answer certain questions and in holding them in contempt for their failure to do so.

Motion overruled.

West Headnotes (2)

**[1]** **Mandamus**
⟋ Remedy at Law

Mandamus issues only to correct clear abuse of discretion or violation of duty imposed by law when there is no other adequate remedy by law.

Cases that cite this headnote

**[2]** **Contempt**
⟋ Disobedience to Mandate, Order, or Judgment

Where city's bill of review made several specific and serious allegations against worker's compensation benefits claimant, trial court did not abuse its discretion in ordering city attorneys to answer certain deposition questions propounded to discover what reasonable inquiry attorneys had made before bill of review

was filed and in holding attorneys in contempt for their failure to do so, despite attorneys' contentions that answers would divulge privileged attorney-client communications and privileged attorney work product.

Cases that cite this headnote

**Attorneys and Law Firms**

*917 Diana K. Ball, Robert J. Collins, Houston, Russell H. McMains, Corpus Christi, Byron Lee, Houston, for relators.

Paul Spradlin, W. James Kronzer, Houston, for respondent.

Before MURPHY, ROBERTSON and SEARS, JJ.

**OPINION**

PER CURIAM.

On September 1, 1989, relators filed a motion for leave to file petition for writ of mandamus requesting this Court to order respondent to vacate his orders signed August 28, 1989.

The orders of August 28, 1989, held both Diana Kay Ball and Robert John Collins in contempt of court for failing to answer questions propounded to them during a deposition. The order further commands Ball and Collins to answer the objectionable questions. Respondent suspended the sentence pending mandamus review. Diana Kay Ball and Robert John Collins refused to answer the questions on the grounds their answers would divulge privileged attorney-client communications of the City and privileged attorney work product. Collins additionally invoked the party communications privilege.

Jay Howard Hill sought worker's compensation benefits from the City and damages for the City's alleged breach of the duty of good faith and fair dealing in handling his claim. Respondent rendered a total and permanent incapacity judgment for Hill. The breach of good faith and fair dealing was severed from the

worker's compensation claim and tried separately in a bench trial. On September 7, 1988, respondent signed the judgment awarding damages to Hill. The City was unaware of the judgment until May 1989, when Hill made a demand for payment.

The City filed a bill of review on June 19, 1989. In its petition the City made several specific and serious allegations that "Hill, acting by and through Hill's attorney of record, Mr. James R. Spradlin, fraudulently, wrongfully, knowingly, and intentionally, or accidentally and mistakenly" committed several wrongful acts. On August 1, 1989, Hill subpoenaed Ball, an attorney for the City, to testify by deposition. On August 2, 1989, Hill filed a motion for sanctions under TEX.R.CIV.P. 13. At the deposition, Hill sought to discover what inquiries Ball made into the bill of review allegations before signing and filing the petition. Ball refused to answer these questions contending the information is privileged. Respondent ordered her to answer the questions and found her in contempt of court for failing to answer.

Hill noticed the deposition of Collins. At the deposition, Collins refused to answer questions, similar to the ones asked of Ball, claiming the information is privileged. Respondent ordered Collins to answer the questions and found him in contempt of court for refusing to answer.

**\*918** TEX.R.CIV.P. 13 provides: The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed *after reasonable inquiry* the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Sanctions are available for the violation of this rule.

[1] [2] It is clear that the questions propounded sought to discover what reasonable inquiry had been made before the bill of review was filed. Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916 (Tex.1985). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.* A relator who attacks the ruling of a trial court as an abuse of discretion labors under a heavy burden. *Id.* The relator must establish, under the circumstances of the case, that the facts and law permit the trial court to make but one decision. *Id.* This the relators have failed to do. We find respondent did not abuse its discretion in ordering Ball and Collins to answer certain questions and in holding Ball and Collins in contempt for their failure to do so.

Accordingly, we overrule relators' motion for leave to file petition for writ of mandamus.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 7

305 S.W.3d 849
Court of Appeals of Texas,
Houston (14th Dist.).

In re CONTINENTAL
AIRLINES, INC., Relator.

No. 14–09–00952–CV. | Feb. 4, 2010.

**Synopsis**
**Background:** After plaintiffs in negligence suit involving airline crash noticed deposition of airline's chief executive officer (CEO), airline moved to quash the deposition, and plaintiffs moved to compel it. The 11th District Court, Harris County, Mike Miller, J., granted motion to compel. Airline field petition for writ of mandamus.

**Holdings:** The Court of Appeals, Charles W. Seymore, J., held that:

[1] plaintiffs failed to arguably show that the CEO had any unique or superior knowledge of discoverable information, and

[2] plaintiffs failed to show that less intrusive methods of discovery were inadequate to obtain information they were seeking.

Writ conditionally granted.

West Headnotes (8)

[1]     **Mandamus**
        Remedy by Appeal or Writ of Error
        **Mandamus**
        Matters of discretion
        To be entitled to extraordinary relief in a writ of mandamus, the relator must show the trial court clearly abused its discretion and there is no adequate remedy by appeal.

Cases that cite this headnote

[2]     **Appeal and Error**
        Abuse of discretion
        A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law, or if it clearly fails to correctly analyze or apply the law.

Cases that cite this headnote

[3]     **Mandamus**
        Proceedings in civil actions in general
        Mandamus is an appropriate remedy when a trial court allows an apex deposition to go forward in violation of the standard governing such discovery.

Cases that cite this headnote

[4]     **Pretrial Procedure**
        Corporate officers, agents. and employees
        If the party seeking the apex deposition of a high-level corporate official cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should not allow the deposition to go forward without a showing, after a good faith effort to obtain the discovery through less intrusive means, (1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate.

1 Cases that cite this headnote

[5]     **Pretrial Procedure**
        Corporate officers, agents, and employees

Plaintiffs in negligence suit arising from airline accident failed to arguably show that, following airline's chief executive officer's (CEO) public statements, he had any unique or superior knowledge of discoverable information, as required to support motion to compel his deposition; CEO stated that information he gave at press conference was provided to him by other airline employees, that he did not discuss with "deadheading" pilots what occurred before, during, and after accident, and that he had not received information about cause of accident in executive briefs.

1 Cases that cite this headnote

[6] **Pretrial Procedure**
 Corporate officers, agents, and employees

The testimony that a corporate executive possesses knowledge of company policies does not, without more, satisfy arguable showing that executive has unique or superior knowledge of discoverable information, as required to support motion to compel deposition of such official.

1 Cases that cite this headnote

[7] **Pretrial Procedure**
 Corporate officers, agents, and employees

Requirement that party seeking deposition of a corporate president or other high level corporate official must first attempt to obtain discovery through less obtrusive means is not perfunctorily met by any showing that the party employed less-intrusive discovery methods, but by whether discovering party made a reasonable effort to obtain discovery through less-intrusive methods; merely completing some less-intrusive discovery does not trigger an automatic right to depose the apex official.

1 Cases that cite this headnote

[8] **Pretrial Procedure**
 Corporate officers, agents, and employees

Plaintiffs in negligence suit arising from airline accident failed to show that less intrusive methods of discovery were inadequate to obtain information they were seeking regarding negligence, proximate cause, or damages, as required to support motion to compel deposition of airline's chief executive officer (CEO); although plaintiffs had deposed some crew members, they had not noticed depositions of airline's corporate representative, other individuals present in meetings where CEO received information about accident, other employees who were more directly involved in supporting ongoing National Transportation Safety Board (NTSB) investigation, or those described by CEO in his affidavit as having responsibility in particular areas of inquiry.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*850 George Lucas Ashley, John H. Martin, Dallas, TX, Juan Carlos Garcia, Sr., Morgan Lindsey Gaskin, Houston, TX, for Relator.

Jason A. Gibson, Houston, TX, for Real Party in Interest.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

**OPINION**

CHARLES W. SEYMORE, Justice.

November 12, 2009, relator, Continental Airlines, Inc., filed a petition for writ of *851 mandamus in this

Court. *See* Tex. Gov't Code Ann. § 22.221 (Vernon 2004); *see also* Tex.R.App. P. 52. In the petition, relator asks this Court to compel the Honorable Mike Miller, presiding judge of the 11th District Court of Harris County, to set aside his October 26, 2009 order compelling the deposition of Larry Kellner, Chief Executive Officer and Chairman of the Board of Directors of Continental. We conditionally grant the petition.

## BACKGROUND

On December 20, 2008, Continental Flight 1404 was involved in an accident when it departed from the runway during takeoff from the Denver International Airport. There were no fatalities, but 37 passengers and crew were transported to the hospital.

Larry Kellner, Continental's Chief Executive Officer and Chairman of the Board of Directors, gave a statement and answered questions at a press conference following the accident. On December 22, 2008, Kellner sent a letter to the passengers expressing his concern for the accident. The plaintiffs brought suit against Continental for negligence. [1]

On October 6, 2009, the plaintiffs noticed the deposition of Kellner for November 5, 2009. On October 9, 2009, Continental filed a motion to quash the deposition, arguing that Kellner has no unique or superior knowledge of discoverable information and the plaintiffs have not attempted to obtain discovery through less intrusive methods. *See Crown Cent. Petroleum Corp. v. Garcia,* 904 S.W.2d 125 (Tex.1995) (orig. proceeding). Continental also objected to the time and place set forth in the notice because Kellner had prior commitments requiring him to be out of town on that date.

On October 9, 2009, the plaintiffs moved to compel Kellner's deposition, arguing that he has unique or superior knowledge of discoverable information as shown by the following: (1) Kellner immediately briefed media members on details of the crash; (2) Kellner stated, on numerous occasions, he would learn the cause of the crash to prevent future crashes; (3) Kellner sent personal letters to Flight 1404 passengers after the crash; (4) Kellner interviewed the deadheading pilots aboard Flight 1404 and personally awarded commendation plaques to crew and flight members; and (5) Kellner, who serves on the Board of Directors for Air Transport Association of America ("ATA"), an airline industry organization dedicated to ensuring the safety of airline passengers, has superior knowledge as to Continental's implementation of ATA's policies. On October 19, 2009, Continental filed a motion for protective order and response to the motion to compel, with Kellner's affidavit in which he testified that he has no unique or superior knowledge.

On October 26, 2009, the trial court held a hearing on the plaintiff's motion to compel and Continental's motion for protection. The trial court granted the motion to compel Kellner's deposition, and orally stated that the deposition was limited to two hours and to actions and statements by Kellner relating to the crash of Flight 1404. On October 26, 2009, the trial court signed the order granting the motion to compel, denying the motion for protective order, and granting the motion to quash. *852 However, the trial court did not mention the above limitation on the deposition in its order. [2]

## MANDAMUS STANDARD OF REVIEW

[1] [2] [3] To be entitled to extraordinary relief in a writ of mandamus, the relator must show the trial court clearly abused its discretion and there is no adequate remedy by appeal. *In re Team Rocket, L.P.,* 256 S.W.3d 257, 259 (Tex.2008) (orig. proceeding). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law, or if it clearly fails to correctly analyze or apply the law. *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex.2005) (orig. proceeding) (per curiam); *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). Mandamus is an appropriate remedy when a trial court allows an apex deposition to go forward in violation of the standard governing such discovery. *E.g., In re Prods. N. Am., Inc.,* No. 01–06–00613–CV, 2006 WL 2192546, at *2–3 (Tex.App.-Houston [1st Dist.] Aug. 4, 2006. orig. proceeding) (mem. op.).

## CROWN CENTRAL GUIDELINES

The standard governing apex depositions originates in *Crown Central Petroleum Corporation*, 904 S.W.2d at 128. The *Crown Central* guidelines apply "[w]hen a party seeks to depose a corporate president or other high level corporate official and that official (or corporation) files a motion for protective order to prohibit the deposition accompanied by the official's affidavit denying any knowledge of facts...." *Id.* A party initiates the *Crown Central* guidelines by moving for protection and filing the corporate official's affidavit denying any knowledge of relevant facts. *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 175 (Tex.2000) (orig. proceeding).

[4] [5] "The trial court evaluates the motion first by deciding if the party seeking the deposition has 'arguably shown that the official has any unique or superior knowledge of discoverable information.' " *Id.* at 175–76 (quoting *Crown Cent. Petroleum Corp.*, 904 S.W.2d at 128). " 'If the party seeking the deposition cannot show that the official has any unique or superior knowledge of discoverable information, the trial court should' not allow the deposition to go forward without a showing, after a good faith effort to obtain the discovery through less intrusive means, '(1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery *853 are unsatisfactory, insufficient or inadequate.' " *Id.* at 176 (quoting *Crown Cent. Petroleum Corp.*, 904 S.W.2d at 128).

In *In re Alcatel USA*, the Texas Supreme Court recognized that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders. *Id.* "We recognize that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders: First, a hearing on whether to grant a protective order and, if one is granted, then a second hearing, after less intrusive methods of discovery have been explored, to determine whether the protective order should be dissolved." *Id.* Therefore, a "mechanical" application of the *Crown Central* guidelines is not necessary when the parties have already undertaken extensive

discovery and the court has sufficient information to consider both prongs of the guidelines. *Id.*

## ANALYSIS

### Unique or Superior Knowledge

Continental asserts that it met its burden for invoking the apex procedure set forth in *Crown Central*. In his affidavit, Kellner testified, in relevant part:

> ... While I have knowledge of some facts relating to the accident by reason of my position as CEO, I do not possess any unique or superior personal knowledge beyond that of other senior management personnel at Continental who are involved in the day-to-day management of the airline's operations generally and who were involved in the response activities as a result of the accident specifically.

The plaintiffs claim they seek to depose Kellner because he has first-hand knowledge of relevant facts such as information about the events leading up to and during the crash of Flight 1404, and how Continental planned to handle passengers' claims and prevent similar crashes in the future. Continental argues that it is not sufficient to show that Kellner has unique or superior knowledge of some facts or matters concerning the subject matter, but of facts or matters relevant to the contested fact issues of the litigation, i.e., whether Continental's negligence, if any, proximately caused the accident, and what injuries and damages, if any, each plaintiff sustained.

The plaintiffs contend that Kellner began his hands-on involvement when he held a press conference just hours after the crash at which he stated that Continental "will do whatever we can to learn the cause of this accident so that we can prevent a recurrence at Continental or at any other airline."

At the press conference, Kellner generally stated that Continental "will do everything we can for the passengers, their families, and our coworkers." Kellner further recited the basic facts of the accident, that a number of injuries had been reported, and passengers and crew had been transported to area hospitals. Kellner also stated that Continental was mobilizing its "Accident Go Team," which is comprised of Continental experts—people from safety, air traffic control, engineering, maintenance, and flight operations—to assist in the investigation. Kellner concluded his statement by saying: "We will continue to do everything we can for the passengers, crew, and their families. We will also do whatever we can to learn the cause of this accident so that we can prevent a reoccurrence at Continental...."

In response to questions at the press conference, Kellner stated:

• "We'll work with each of the passengers individually to do what's best for them. Obviously this has been a very difficult evening for them, even if they weren't injured and didn't go to the hospital, and so we'll address that on a passenger-by-passenger basis."

*854 • "I know at this time, I've given you all the facts I know. As I mentioned, we'll have our Go Team going up there later this morning. A few hours, they'll leave here. We'll work with the NTSB and there'll be a full and thorough investigation."

• "Again, all we know is that it was taking off[.] It was about 6:00 p.m. Mountain Standard Time and that it veered off the runway, slides were deployed, but we're not really ... Again, we'll do a full investigation. NTSB will do a full—will lead a full investigation. We'll assist with that; and as those facts come out, we'll give them to you."

• "I don't want to go into too much of it and what was in the weather there. There's nothing specific that's come up on the weather as far as snow or those type [sic] of items. But I really want to let the investigation more [sic] forward to figure out what happened as far as the cause of the accident. But there's nothing specific I'd comment on the weather at this moment."

In his affidavit, Kellner stated that the information he provided at the press conference was not unique or superior individual knowledge because it was given to him by other individuals at Continental. Moreover, Continental argues that none of Kellner's public statements made after the accident have anything to do with whether the flight crew acted negligently, or whether the passengers actually sustained any injuries in the accident.

The plaintiffs further assert that the December 22, 2008 letter sent after the crash to each passenger reiterates Kellner's involvement. The December 22, 2008 letter states:

Let me begin by expressing my deep personal concern for the distressing experience you had as a passenger aboard our flight 1404 on December 20, 2008. We regret that you had to go through this experience and are working diligently with the National Transportation Safety Board to determine the cause of the accident and to help make sure that something like this never again occurs at Continental or any other airline.

I would like to personally thank you for your quick response during the evacuation of the aircraft and apologize for what you had to go through. The safety of our passengers and crew is our highest priority.

On behalf of my co-workers at Continental, please allow me to express once again my deepest regret for your experience on board flight 1404.

The plaintiffs contend that the information Kellner states he intends to uncover while working with the NTSB is discoverable because it pertains directly to the basis of their claims. In this affidavit, however, Kellner stated that he has no unique or personal knowledge of the investigation into the cause of the accident. Kellner explained that the NTSB, not Continental, is conducting the official investigation into the cause of the accident, and Continental continues to cooperate with the NTSB investigation.

Federal law provides that the NTSB, not Continental, is to conduct the investigation of the accident, and will determine the cause or probable cause of the accident.[3] Continental, as a party designated *855 by the NTSB to participate in the investigation, is

prohibited from conducting its own investigation into the cause of the accident during the pendency of the NTSB investigation.[4] Here, Continental is not conducting the investigation to determine the probable cause of the accident.

Moreover, Kellner stated that Toby Carroll is Continental's representative relative to the NTSB investigation. The plaintiffs have not stated whether they have taken Carroll's deposition or, if so, that they were unable to elicit the information they are seeking. Therefore, Kellner has shown that he does not have unique or superior knowledge relative to the cause of the accident.

The plaintiffs further argue that the information and facts Kellner has learned about the cause of the accident in executive briefs provide him with unique and superior knowledge. They assert that the deposition testimony of Continental's chief pilot shows that based on Continental's standard operating procedure, Kellner received executive briefs about "what's going on and what's happening in this case." Andrew Jost testified:

Q. Do you know anybody that's talked to Mr. Kellner personally about this crash?

A. No.

Q. Not that it hasn't happened; you just don't know about it?

A. Correct.

Q. Would Mr. Kellner—based on the policies and procedures that you know that are in place internally at Continental Airlines, Mr. Kellner would have a pretty good idea of what's going on and what's happened in this case, don't you think?

* * *

A. Well, I'm sure Mr. Kellner has received a executive brief or—or some briefing in some fashion.

Q. (BY MR. GIBSON) It is standard operating procedure of Continental for—for Mr. Kellner or the CEO of—of the airline to receive an—executive summary—

* * *

Q. (BY MR. GIBSON)—when something like this happens?

A. I—I'm sure it is.

Q. And what does an executive summary consist of?

* * *

A. Well, in my opinion, it would be just the—the facts as we know them and the circumstances surrounding the—the incident, accident, whatever the situation was.

*856 Q. (BY MR. GIBSON) Do you know who's responsible for preparing that brief?

A. No.

Q. Have you reviewed the executive brief in this case that was given to Mr. Kellner?

* * *

A. I—I have—I can't even say that it exits. I'm just thinking it does, so....

In his affidavit, Kellner states, in the days immediately following the accident, that he received briefing about the accident, "primarily related to the status and effectiveness of the passenger and family assistance efforts in Denver and Houston, the general health and well-being of the passengers and crew, and Continental's media response to the accident."[5] Therefore, he did not acquire any unique or superior knowledge about the cause of the accident as a result of post-accident briefings. A review of Jost's testimony shows that he has never reviewed an executive brief and that he does not know what information an executive brief contains. Therefore, Jost's testimony does not contradict Kellner's statement that no unique or superior personal knowledge has been acquired through these briefings.

The plaintiffs further claim that Kellner continued to take an active role in learning the details of what caused the accident when he interviewed the deadheading pilots on Flight 1404, Richard Lowe and

Richard Green.[6] According to the plaintiffs, when Lowe and Green arrived back in Houston, Kellner met with them to discuss what occurred before, during, and after the crash. Kellner also awarded recognition plaques to the crew and pilot members, which evidences Kellner's "hands on" involvement.

Todd Green testified regarding the identity of those who attended the meeting, but did not recite what was said at the meeting:

> A. And there was a—a brief—I should say a short debrief that was agreed upon there at the airport.
>
> \* \* \*
>
> Q. Let's talk about that meeting when you got back to Houston. When was that?
>
> \* \* \*
>
> Q. And Mr. Kelleher [sic]?
>
> A. He was there briefly. He was there—met the flight, and he did come in and—and talk to us once or twice. He talked to everyone on the airplane initially.
>
> But I did meet with him. There may have been some other people, also. I don't remember the ALPA representatives that were there. There weren't any ALPA lawyers, but there—an—an ALPA from our—
>
> Q. Pilots.
>
> A. union. Pilots, yes.
>
> And Richard and I, Kelly, those two gentlemen—oh, Kip Commodore, one of our assistant chiefs—chief pilots, and I believe that was all in the room when were based—when we were talking.

*857 Richard Lowe testified about what occurred at the meeting:

> Q. In this meeting, were they asking all of you what happened?
>
> A. It—it wasn't geared towards that. It was more of, you know, how are you doing? How are you feeling?

Are you okay? Wow, great job. What do you need? What can we do for you?

> Q. Not what happened.
>
> A. I—I really don't recall that.... And I—I think more than anything there was a concern for—for our wellbeing and—and more along the lines of, hey, we'll figure out what happened later. What can we do for you? And so that's—that's what I seem to recall.

Green's and Lowe's testimony refute the plaintiffs' claim that Kellner interviewed them to discuss what occurred before, during, and after the accident. Moreover, consistent with Lowe's testimony, Kellner stated, in his affidavit, that he spoke briefly with each crew member and the deadheading pilots after the accident, "but the purpose of these conversations was to express my concern for their health and wellbeing.... I did not seek to uncover any details about activities in the cockpit or what may have caused the accident, and none were provided."

Lowe's testimony confirms the plaintiffs' claim that recognition plaques were awarded to the crew and pilot members. Lowe received "a recognition-type plaque that was—that was given to me at the CEO exchange as well as the other crew members, pilot members that were there." It is difficult to see how awarding recognitions plaques to the crew and member pilots is evidence of hands-on involvement in determining the cause of the crash or that Kellner has unique or superior personal knowledge of the events surrounding the accident.

The plaintiffs further argue that Kellner, as a board-member for the Air Transport Association of America ("ATA"), has superior and unique knowledge as to Continental's implementation of operational and safety practices. The plaintiffs rely on the following ATA mission statement:

> ATA serves its member airlines and their customers by assisting the airline industry in continuing to provide the world's safest system of transportation; transmitting technical expertise and operational knowledge to

improve safety, service and efficiency ...

The plaintiffs contend that Kellner has unique and superior knowledge of how Continental works with the ATA to provide the "world's safest" system of transportation and how Continental implements technical expertise and operational knowledge to ensure the safety of its passengers.

In his affidavit, Kellner states that his position "on the Board does not give me any 'superior or unique knowledge as to Continental's implementation of operational and safety practices' as alleged by the plaintiffs." Kellner further explained that Captain Don Gunther has direct responsibility for implementation of operational and safety practices at Continental and also serves as Continental's representative on the ATA's safety committee. The plaintiffs have not stated whether they have deposed Gunther or that he has not or will not be able to provide the information they seek. Kellner has demonstrated that he does not have unique or superior knowledge regarding of Continental's implementation of operational and safety practices.

The plaintiffs also rely on Kellner's statement about individual passengers and how Continental will handle each case on a passenger-by-passenger basis:

> We'll work with each of the passengers individually to do what's best for them. Obviously this has been a very difficult *858 evening for them, even if they weren't injured or didn't go to the hospital, and so we'll address that on a passenger-by-passenger basis.

In support of their mental anguish claims, the plaintiffs contend it is vital to know what Kellner meant by this statement, particularly in consideration of those passengers who suffer from mental anguish, but did not sustain serious physical injuries. They argue that Kellner is the only person who knows what he meant by that statement, which imbues him with unique knowledge regarding how Continental will handle the claims of each passenger. However, the relevant

inquiry is what effect, if any, the statement has on a particular passenger, not what Kellner subjectively intended by the utterance.

[6] In addition, the testimony that a corporate executive possesses knowledge of company policies does not, without more, satisfy the first *Crown Central* test because such evidence does not show that the executive has unique or superior knowledge of discoverable information. *In re Alcatel USA, Inc.*, 11 S.W.3d at 177; *see also AMR Corp. v. Enlow*, 926 S.W.2d 640, 641 (Tex.App.-Fort Worth 1996, orig. proceeding) (holding testimony that AMR's president, CEO, and chairman of board would have ultimate authority over any policy because he had "about all the authority he needs on most issues in business" amounted to "nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has the ultimate responsibility for all corporate decisions and falls far short of the [*Crown Central*] standard"). [7]

Here, Kellner has shown that he does not have unique or superior knowledge regarding what occurred before and during the accident or the cause of the accident. Kellner stated that the information he gave at the press conference was provided to him by other Continental employees; he provided the name of the Continental employee who is its party representative to the NTSB investigation; he did not discuss with the deadheading pilots what occurred before, during, and after the accident; he has not received information about the cause of the accident in the executive briefs; and he named the Continental employee who has direct responsibility for the implementation of operational and safety practices at Continental and serves as Continental's representative on the ATA safety committee. *See In re Daisy Manufacturing Company*, 17 S.W.3d 654, 659 (Tex.2000) (orig. proceeding) (per curiam) (explaining that even if Daisy Manufacturing's CEO were deposed, he had little first-hand information about areas of inquiry).

### Less Intrusive Methods

[7] The plaintiffs argue, even if they failed to show that Kellner has unique or superior knowledge, that there are no less intrusive methods or other discovery

has been insufficient to gain information regarding what Kellner meant by his public statements or what he has learned about the cause of the accident. The requesting party's burden is not perfunctorily met by any showing that the party employed less-intrusive discovery methods. *Id.* at 658. *Crown Central Petroleum Corporation* instructs the courts to measure whether the discovering party made a reasonable effort to obtain discovery through less-intrusive methods. *Id.* "Merely completing some *859 less-intrusive discovery does not trigger an automatic right to depose the apex official." *Id.*

[8] The plaintiffs assert that, in trying to find evidence about the cause of the accident and Kellner's statements, they have conducted the following discovery: (1) 110 requests for production; (2) 74 interrogatories; and (3) 11 depositions of pilots, crew and management of personnel of Continental, totaling over 50 hours of deposition testimony.

Continental asserts that while the plaintiffs have deposed some crew members and other field personnel, they have not noticed the depositions of Continental's corporate representative, other individuals present in any meetings where Kellner received information about the accident, other employees who are more directly involved in supporting the ongoing NTSB investigation, or those employees described by Kellner in his affidavit as having responsibility in the particular areas of inquiry.

*See id.* ("Merely completing some less-intrusive discovery does not trigger an automatic right to depose the apex official."). Here, the plaintiffs have not shown that less intrusive methods are inadequate to obtain the information they are seeking.

With regard to the plaintiffs' assertion that there is no one other than Kellner who could testify as to what he meant by his various public statements, Continental concedes that Kellner is best able to address his own subjective intent in making his generalized public statements following the accident. However, Kellner's subjective intent in making the subject public statements does not establish anything regarding negligence, proximate cause, or damages. The plaintiffs have not shown a reasonable indication that deposing Kellner would lead to the discovery of admissible evidence.

## CONCLUSION

The trial court abused its discretion by compelling the apex deposition of Larry Kellner. Accordingly, we conditionally grant Continental's petition and direct the trial court to set aside its October 26, 2009 order compelling Kellner's deposition. The writ will issue only if the trial court fails to act in accordance with this opinion.

## Footnotes

1      On March 12, 2009, Continental moved for transfer and consolidation of all pending and future cases pursuant to Texas Rule of Judicial Administration 13. On May 7, 2009, the Multidistrict Litigation Panel granted Continental's motion, and designated the 11th District Court of Harris County as the Pretrial Court. The underlying proceeding is styled *In re Continental Airlines Flight 1404*, MDL No. 2009–33036. There are 29 plaintiffs in 14 cases consolidated into the MDL proceeding.

2      The order states verbatim:

On the 26th day of October 2009, the Court considered Plaintiffs' Motion to Compel the Deposition of Larry Kellner, Continental Airlines, Inc.'s Motion for Protective Order, and Continental Airline, Inc.'s Motion to Quash the Deposition of Larry Kellner. All parties appeared by and through their representative counsel. The Court, after considering the pleadings, the motions, the sworn affidavit of Larry Kellner, and the arguments by counsel, finds as follows:

IT IS ORDERED that Plaintiffs' Motion to Compel the Deposition of Larry Kellner is GRANTED, Defendant Continental Airlines, Inc.'s Motion for Protective Order is DENIED, and Defendant Continental Airlines, Inc.'s Motion to Quash is GRANTED.

The Court acknowledges that Continental Airlines, Inc. may seek appellate review of this order by way of mandamus. In the event that Continental Airlines, Inc. files a petition for writ of mandamus on or before November 16, 2009[,] then this Court's order granting Plaintiffs' Motion to Compel the deposition of Larry Kellner shall be

stayed until the final disposition of all mandamus proceedings related to this order. In the event no petition for mandamus is filed on or before November 16, 2009, then the deposition of Larry Kellner shall occur by December 30, 2009.

3      Federal law provides that the NTSB investigates the accident:

(a) General.—(1) The National Transportation Safety Board shall investigate or have investigated (in detail the Board prescribes) and establish the facts, circumstances, and cause or probable cause of—

(A) an aircraft accident the Board has authority to investigate under section 1132 of this title or an aircraft accident involving a public aircraft as defined by section 40102(a)(37) of this title other than an aircraft operated by the Armed Forces or by an intelligence agency of the United States; ...

49 U.S.C.A. § 1131(a)(1)(A) (West 2007).

4      Federal regulations provide:

(a) *All investigations, regardless of mode.* (1) The investigator-in-charge designates parties to participate in the investigation. Parties shall be limited to those persons, government agencies, companies, and associations whose employees, functions, activities, or products were involved in the accident or incident and who can provide suitable qualified technical personnel actively to assist in the investigation. Other than the FAA in aviation cases, no other entity is afforded the right to participate in Board investigations.

(b) Participants in the investigation (*i.e.,* party representatives, party coordinators, and/or the larger party organization) shall be responsive to the direction of Board representatives and may lose party status if they do not comply with their assigned duties and activity proscriptions or instructions, or if they conduct themselves in a manner prejudicial to the investigation.

49 C.F.R. § 831.11(a), (b).

5      Kellner further stated, in his affidavit, that he continued to receive periodic "privileged" briefings from Continental's General Counsel, Vice President of Safety and other senior management and legal personnel about the accident, status of the NTSB investigation, and the status of passenger claims and litigation.

6      "Deadheading" refers to those crew members who are travelling on an aircraft free of charge but not working because they are located in the wrong place and need to travel to take up their duties.

7      At the hearing on the plaintiffs' motion to compel, the trial court opined that "it is reasonable to be able to ask the person in charge of the enterprise ultimate questions about responsibility and safety issues and so forth. That doesn't seem to have been what the Supreme Court has done in these cases." This statement indicates that the trial court acknowledged controlling authority.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 8

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by** State ex rel. Ford Motor Co. v. Messina, Mo., April 9, 2002

904 S.W.2d 125
Supreme Court of Texas.

CROWN CENTRAL PETROLEUM
CORPORATION and Crown Central
Pipe Line Company, Relators,
v.
The Honorable Carolyn
GARCIA, Judge, Respondent.

No. 95–0174. | Argued March 23, 1995. | Decided June 29, 1995. | Rehearing Overruled Aug. 1, 1995.

Estate of deceased employee sued corporations for negligence, in connection with death of employee allegedly caused by asbestos exposure. Plaintiff noticed deposition of CEO and chairman of the board of corporations, and trial court ordered CEO to attend deposition. Corporations petitioned for writ of mandamus to Supreme Court. The Supreme Court, Hightower, J., held that writ would be denied without prejudice to allow trial court to reconsider its order denying corporations' motion to quash deposition in light of new guidelines.

Writ denied without prejudice.

Gammage, J., dissented.

West Headnotes (5)

[1] **Pretrial Procedure**
⸺ Protective Orders Before
Examination

While Rules of Civil Procedure permit a party to take the deposition of "any person," person noticed for deposition also has the right to protection from undue burden, unnecessary expense, harassment or annoyance, or invasion of personal, constitutional, or property rights. Vernon's Ann.Texas Rules Civ.Proc.. Rules 166b. subds. 1, 2, par. a, 5, 200.

2 Cases that cite this headnote

[2] **Pretrial Procedure**
⸺ Protective Orders Before
Examination

"Apex depositions," i.e., depositions of persons in upper level management of corporations often involved in lawsuits, present problems which should reasonably be accommodated in discovery process. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b, subds. 1, 2, 5, 200.

1 Cases that cite this headnote

[3] **Pretrial Procedure**
⸺ Protective Orders Before
Examination

When party seeks to depose corporate president or other high level corporate official, and that official, or the corporation, files motion for protective order to prohibit deposition accompanied by officer's affidavit denying any knowledge of relevant facts, trial court should first determine whether party seeking deposition has arguably shown that official has any unique or superior personal knowledge of discoverable information; if showing is not made, the trial court should grant motion for protective order and first require party seeking deposition to attempt to obtain discovery through less obtrusive measures, such as the depositions of lower level employees, deposition of corporation itself, and interrogatories and requests for production of documents directed to corporation. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b. subds. 1, 2, par. a, 5, 200.

40 Cases that cite this headnote

[4] **Pretrial Procedure**
⮞ Protective Orders Before Examination

After making good faith effort to obtain discovery through less intrusive methods, party seeking to take apex deposition of corporate president or other high level corporate official may attempt to show that there is reasonable indication that official's deposition is calculated to lead to the discovery of admissible evidence, and that less intrusive methods of discovery are unsatisfactory, insufficient, or inadequate; if party seeking deposition makes this showing, trial court should modify or vacate protective order as appropriate. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b, subds. 1, 2, 5, 200.

40 Cases that cite this headnote

[5] **Pretrial Procedure**
⮞ Protective Orders Before Examination

**Pretrial Procedure**
⮞ Time and place of, and procedure for, taking

**Pretrial Procedure**
⮞ Limiting scope of examination

As with any deponent, trial court retains discretion to restrict duration, scope, and location of apex deposition of corporate president or other high level corporate officials. Vernon's Ann.Texas Rules Civ.Proc., Rules 166b, subds. 1, 2, 5, 200.

18 Cases that cite this headnote

**Attorneys and Law Firms**

*126 Jack G. Carnegie, James L. Moore and M. Michael Meyer, Houston, for relators.

John E. Williams, Jr., Eric Bogdan, John E. Williams, Jr. and Richard N. Countiss, Houston, for respondent.

HIGHTOWER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, CORNYN, ENOCH, SPECTOR and OWEN, Justices, join.

**Opinion**

GAMMAGE, Justice, notes his dissent.

In this original proceeding, we consider the propriety of an "apex" deposition, the deposition of a corporate officer at the apex of the corporate hierarchy. Relators Crown Central Petroleum Corporation and Crown Central Pipe Line Company seek a writ of mandamus directing the trial court to vacate its orders of January 18 and 25, 1995 concerning the deposition of Henry Rosenberg, Jr., the chairman of the board and chief executive officer of Crown Central Petroleum Corporation (Crown Central). Today this court adopts guidelines for depositions of persons at the apex of the corporate hierarchy.[1] Because these guidelines had not been adopted prior to the trial court's orders, we deny the writ of mandamus without prejudice so that the trial court may reconsider its ruling in light of today's opinion.[2]

Otto L. Carl, Jr. was employed by Crown Central at its Pasadena refinery for many years. Carl retired in 1981. In 1992, Carl died of lung cancer allegedly as the result of asbestos exposure. In late 1992, Margaret Carl, individually and as representative of the estate of Otto L. Carl, Jr., deceased, Otto L. Carl, III and Margaret E. Nowak (Plaintiffs) sued Crown Central and Crown Central Pipe Line Company for gross negligence. In July 1994, Plaintiffs filed a motion to require Crown Central to produce Rosenberg for a video deposition. The motion also included a subpoena duces tecum for Rosenberg to produce sixteen categories of documents. Crown Central responded with a motion to quash deposition accompanied by Rosenberg's affidavit. Among other things, the affidavit stated: "I have no personal knowledge of Mr. Carl or his job duties, job performance, or any facts concerning alleged exposure to asbestos by Mr. Carl. I was not involved in the day-to-day maintenance decisions made at the Refinery. I have no expertise in industrial hygiene, toxicology, or the health effects of asbestos exposure."[3] Crown Central complained that Plaintiffs had not exhausted less intrusive means of discovery

before attempting to depose Rosenberg and that the motion to produce Rosenberg for a video deposition was filed solely for *127 harassment purposes. Concerning the subpoena duces tecum, Crown Central asserted that Rosenberg was not the custodian of the requested documents and that a substantially identical request was made by the Plaintiffs in a request for production to which Crown Central had responded and filed objections. Neither motion was heard or acted upon. In mid-December 1994, Plaintiffs filed a notice of intention to take the oral deposition of Rosenberg. The notice also included a subpoena duces tecum for Rosenberg to produce thirty-two categories of documents. Crown Central responded with a motion to quash deposition and motion for protective order. Crown Central continued to complain about Rosenberg's lack of personal knowledge, the harassment of Rosenberg and the subpoena duces tecum for Rosenberg to produce thirty-two categories of documents. In late December 1994, Plaintiffs filed their first amended notice of intention to take the oral deposition of Rosenberg which reset the date for Rosenberg's deposition. The notice also included the same subpoena duces tecum concerning production of thirty-two categories of documents. Crown Central again responded with a motion to quash deposition and motion for protective order. Crown Central continued to complain about Rosenberg's lack of personal knowledge, the harassment of Rosenberg and the subpoena duces tecum for Rosenberg to produce thirty-two categories of documents.

On January 18, 1995, after a telephone hearing, the trial court granted Plaintiffs' motion to produce Rosenberg for video deposition and denied Crown Central's motion to quash. The trial court ordered Crown Central to produce Rosenberg for deposition and that Rosenberg produce all documents requested in the subpoena duces tecum.[4] On January 20, 1995, Crown Central filed an emergency motion for reconsideration requesting that the trial court quash the deposition, compel the Plaintiffs to serve Rosenberg with written interrogatories concerning the extent of his knowledge concerning this action which would be answered within five days, limit the duration of Rosenberg's deposition to one hour, reconsider its ruling concerning the production of documents in the subpoena duces tecum, and amend its prior order so that neither Crown Central nor Rosenberg would be required to produce

any documents requested in the subpoena duces tecum until after they are afforded a reasonable opportunity to have their objections to the production considered by the court. On January 25, 1995, the trial court denied the emergency motion for reconsideration.

## I.

Crown Central argues that the trial court abused its discretion when it granted Plaintiffs' motion to produce Rosenberg for video deposition and denied Crown Central's motion to quash.

[1] It is undisputed that a "party is entitled to discovery that is relevant to the subject matter of the claim, and which appears reasonably calculated to lead to the discovery of admissible evidence." *Monsanto Co. v. May*, 889 S.W.2d 274, 276 (Tex.1994) (Opinion on denial of leave to file petition for writ of mandamus) (Gonzalez, J., joined by Hecht, J., dissenting) (citing Tex.R.Civ.P. 166b(1), (2)(a)). Rule 200 of the Texas Rules of Civil Procedure permits a party to take the deposition of "any person." However, the person noticed for deposition also has the right to protection "from undue burden, unnecessary expense, harassment or annoyance, or invasion of personal, constitutional, or property rights." Tex.R.Civ.P. 166b(5); *Monsanto Co. v. May*, 889 S.W.2d at 276.

Although not previously addressed by this court, the propriety of "apex" depositions—depositions of a corporate officer at the apex of the corporate hierarchy —has been addressed by other courts. *See Liberty Mutual Ins. Co. v. Superior Court of San Mateo County*, 10 Cal.App.4th 1282, 13 Cal.Rptr.2d 363 (1992); *Broadband Communications Inc. v. Home Box Office, Inc.*, 157 A.D.2d 479, 549 N.Y.S.2d 402 (1990); *Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir.1979); *Baine v. General Motors Corp.*, 141 F.R.D. 332 (M.D.Ala.1991); *128 *Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140 (D.Mass.1987); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I.1985); *Mitchell v. American Tobacco Co.*, 33 F.R.D. 262 (M.D.Pa.1963); *Armstrong Cork Co. v. Niagara Mohawk Power Corp.*, 16 F.R.D. 389 (S.D.N.Y.1954); *M.A. Porazzi Co. v. The Mormaclark*, 16 F.R.D. 383 (S.D.N.Y.1951).

*Liberty Mutual Ins. Co. v. Superior Court of San Mateo County* is particularly instructive. In *Liberty Mutual Ins. Co.*, the court held:

> that when a plaintiff seeks to depose a corporate president or other official at the highest level of corporate management, and that official moves for a protective order to prohibit the deposition, the trial court should first determine whether the plaintiff has shown good cause that the official has unique or superior personal knowledge of discoverable information. If not, as will presumably often be the case in the instance of a large national or international corporation, the trial court should issue the protective order and first require the plaintiff to obtain the necessary discovery through less-intrusive methods. These would include interrogatories directed to the high-level official to explore the state of his or her knowledge or involvement in plaintiff's case; the deposition of lower-level employees with appropriate knowledge and involvement in the subject matter of the litigation; and the organizational deposition of the corporation itself, which will require the corporation to produce for deposition the most qualified officer or employee to testify on its behalf as the specified matters to be raised at the deposition. Should these avenues be exhausted, and the plaintiff make a colorable showing of good cause that the high-level official possesses necessary information to the case, the trial court may then lift the protective order and allow the deposition to proceed.

13 Cal.Rptr.2d at 367 (citation omitted).

## II.

[2]  As virtually every court which has addressed the subject has observed, depositions of persons in the upper level management of corporations often involved in lawsuits present problems which should reasonably be accommodated in the discovery process. From the decisions of these other courts, we distill the following guidelines for addressing the problems.

[3]  [4]  [5]  When a party seeks to depose a corporate president or other high level corporate official and that official (or the corporation) files a motion for protective order to prohibit the deposition accompanied by the official's affidavit denying any knowledge of relevant facts, the trial court should first determine whether the party seeking the deposition has arguably shown that the official has any unique or superior personal knowledge of discoverable information. If the party seeking the deposition cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should grant the motion for protective order and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods. Depending upon the circumstances of the particular case, these methods could include the depositions of lower level employees, the deposition of the corporation itself, and interrogatories and requests for production of documents directed to the corporation. After making a good faith effort to obtain the discovery through less intrusive methods, the party seeking the deposition may attempt to show (1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate. If the party seeking the deposition makes this showing, the trial court should modify or vacate the protective order as appropriate. As with any deponent, the trial court retains discretion to restrict the duration, scope and location of the deposition. If the party seeking the deposition fails to make this showing,

the trial court should leave the protective order in place.

Because these guidelines had not been adopted prior to the trial court's orders, we deny the writ of mandamus without prejudice so that the trial court may reconsider its order denying Crown Central's motion to quash Rosenberg's deposition. The stay order previously issued by this court remains *129 in effect only so long as necessary to allow the trial court to act.

## Footnotes

1    This court has sought to address the propriety of "apex" depositions on several previous occasions, but the cases were mooted by settlement or withdrawal of the notice of deposition. *See State Farm Mutual Auto Ins. Co. v. Hon. Jerry A. Dellana,* No. D–3489, 36 Tex.Sup.Ct.J. 661 (March 24, 1993) (plaintiff withdrew the deposition notice before argument, and the petition was dismissed as moot); *Cessna Aircraft Co. v. Hon. Eugene Chambers,* No. 94–0079, 37 Tex.Sup.Ct.J. 759 (May 11, 1994) (settlement by the parties). *But see Monsanto Co. v. Hon. Robert May,* 889 S.W.2d 274 (Tex.1994) (motion for leave to file petition for writ of mandamus overruled).

2    *See Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831 (Tex.1994); *National Tank Co. v. Brotherton,* 851 S.W.2d 193 (Tex.1993).

3    Rosenberg's complete affidavit stated:

My name is Henry A. Rosenberg, Jr. I am over the age of 18 years, of sound mind, have never been convicted of a felony, and am fully competent to make this affidavit.

I have personal knowledge of the facts stated herein and they are true and correct.

I am Chairman of the Board and Chief Executive Officer of Crown Central Petroleum Corporation ("Crown Central"). Crown Central employs approximately three thousand employees; therefore, I do not have personal knowledge of each employee's job duties or performance.

I was a member of the American Petroleum Institute in 1987, which I understand was several years after Otto Carl retired from Crown Central. The letter to Mr. Carl dated June 24, 1980, a copy of which was attached to the Plaintiffs' *Motion to Produce Mr. Henry Rosenberg, Jr. for Video Deposition,* was a form letter sent to all employees who worked during a work stoppage which occurred at Crown Central's Pasadena refinery (the "Refinery"). I have no personal knowledge of Mr. Carl or his job duties, job performance, or any facts concerning alleged exposure to asbestos by Mr. Carl.

I was not involved in the day-to-day maintenance decisions made at the Refinery. I have no expertise in industrial hygiene, toxicology, or the health effects of asbestos exposure.

4    Apparently, the trial court did not consider Crown Central's objections to production of the documents described in the subpoena duces tecum.

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 9

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Miscavige. Tex.App.-Austin, July 17, 2014

## 950 S.W.2d 439
## Court of Appeals of Texas,
## Waco.

Melvin SIMON and Herbert Simon, Relators,

v.

Honorable Wayne BRIDEWELL,
Judge, 249th Judicial District Court,
Johnson County, Texas, Respondent.

No. 10–97–213–CV. | Aug. 6, 1997.

Plaintiff sued, among others, general partners in limited partnership that allegedly owned, managed, and provided security for shopping mall at which fatal shooting occurred, claiming negligence, gross negligence, breach of contract, and Deceptive Trade Practices Act (DTPA) violations. The 249th District Court, Johnson County, Wayne Bridewell, J., denied partners' motion for protective order from notices of deposition served by plaintiff. After granting partners' motion for leave to file petition for mandamus relief, the Court of Appeals held that partners were not entitled to protective order under apex deposition doctrine on ground that they were cochairs of board of directors of corporation that was not party to suit.

Petition denied.

West Headnotes (10)

**[1]** **Mandamus**
⟜ Presumptions and burden of proof
Relator in mandamus proceeding bears burden of showing it has no adequate remedy by appeal and that court abused its discretion in taking action of which relator complains.

Cases that cite this headnote

**[2]** **Mandamus**

⟜ Scope of inquiry and powers of court
With respect to disputed factual issues, court ruling on mandamus petition may not substitute its judgment for trial court's.

Cases that cite this headnote

**[3]** **Mandamus**
⟜ Matters of discretion
Relators in mandamus proceeding must establish that trial court could reasonably have reached only one decision.

Cases that cite this headnote

**[4]** **Pretrial Procedure**
⟜ Corporate officers, agents, and employees
Apex deposition doctrine applies in suits where party seeks to depose corporate president or other high level corporate official, and is invoked when corporate official files motion for protection accompanied by affidavit denying any knowledge of relevant facts.

1 Cases that cite this headnote

**[5]** **Pretrial Procedure**
⟜ Motions for protective orders and proceedings thereon
Once apex deposition doctrine is invoked by corporate official, burden of persuasion shifts to party seeking deposition to show that official possesses some pertinent personal knowledge of relevant facts; if party seeking discovery does not make this showing, court should grant motion for protection and first require party seeking deposition to attempt to obtain discovery through less intrusive methods.

1 Cases that cite this headnote

**[6]** **Pretrial Procedure**

Corporate officers, agents, and employees

Cochairs of board of directors of corporation were not entitled to protective order under apex deposition doctrine in civil case arising out of fatal shooting at shopping mall which partnership, in which cochairs were general partners, allegedly owned and managed and for which partnership allegedly provided security; positions with corporation had no bearing on amenability to deposition as corporation had no ownership interest in mall at time of shooting, plaintiff seeking discovery had already exhausted other avenues for conducting discovery, and cochairs were named parties in lawsuit.

1 Cases that cite this headnote

[7] **Pretrial Procedure**
Corporate officers, agents, and employees

Corporate officer is not exempt from deposition by apex doctrine merely because he is corporate official; rather, doctrine may be invoked only when deponent has been noticed for deposition because of his corporate position.

3 Cases that cite this headnote

[8] **Pretrial Procedure**
Corporate officers, agents, and employees

If protective order under apex deposition doctrine is issued, party seeking deposition may, after making good faith effort to obtain discovery through less intrusive methods, attempt to show that there is a reasonable indication that official's deposition is calculated to lead to discovery of admissible evidence, and that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate; if party seeking deposition makes this showing, trial court should modify or vacate protective order as appropriate.

1 Cases that cite this headnote

[9] **Pretrial Procedure**
Corporate officers, agents, and employees

Apex official cannot find safe harbor in apex deposition doctrine when record shows that party seeking deposition has previously attempted less intrusive means of discovery.

3 Cases that cite this headnote

[10] **Pretrial Procedure**
Persons Who May Be Examined

General partners of limited partnership are subject to deposition in legal actions involving partnership.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*440** Scott Patrick Stolley, John A. Mackintosh & Rachelle H. Glazer, Thompson & Knight, P.C., Dallas, Angus E. McSwain, Fulbright, Winniford, Bice & Marable, P.C. Waco, for Relators.

Kathryn J. Gilliam, Waco, John Holman Barr, M. Forrest Nelson & John Howell House, Burt Barr & Associates, L.L.P., Dallas, John R. MacLean, Dan Boulware & Sydney Hewlett, MacLean & Boulware, Cleburne, for Real Parties in Interest.

Dennis W. Bridewell, Cleburne, pro se.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## MEMORANDUM OPINION

PER CURIAM.

Relators Melvin Simon and Herbert Simon filed a motion seeking leave to file a petition for writ of mandamus against Respondent, the Honorable

Wayne Bridewell, Judge of the 249th Judicial District Court, Johnson County. Cynthia Joy Bacon ("Bacon"), individually, as personal representative of the Estate of Kevin Reuss Bacon, and as next friend of Amber Gayle Bacon and Robyn Nicole Bacon, minors, is the real party in interest. Relators seek a writ of mandamus to require Judge Bridewell to vacate his order of May 30, 1997, denying Relators' motion for a protective order from notices of deposition served on them by Bacon.

On July 18, we granted Relators' motion for leave to file the petition for mandamus relief. After having considered Relators' petition, Bacon's reply, the exhibits, and arguments of counsel, we will deny the petition.

## FACTUAL BACKGROUND

Bacon filed suit against Relators Melvin and Herbert Simon and others. The factual basis of Bacon's suit stems from the fatal shooting of her husband Kevin in the food court of the Irving Mall on December 27, 1993. Relators were general partners of Irving Mall Development Company, L.P (the "Irving partnership"), a Texas limited partnership. They collectively owned a 73.99 percent interest in the Irving partnership.

The two other general partners of the Irving partnership, Irving Mall, Inc., and M.S.A. § Shopping Malls, Inc. ("MSA"), collectively owned a 1.1 percent interest in the partnership. Irving Mall, Inc., was a wholly-owned subsidiary of MSA. M.S.A. § is a closely-held corporation with Relators each owning a fifty percent interest in the corporation.

Bacon sued Relators and the Irving partnership for negligence, gross negligence, DTPA violations, and breach of contract. The suit alleges that the Irving partnership owned and managed the Irving Mall at the time of the shooting and that Relators were then general partners of the Irving partnership. Bacon also alleges that the Irving partnership provided security for the mall at the time of the shooting. Bacon began pretrial discovery by serving Relators and the Irving partnership on August 29, 1995, with interrogatories, requests for admission, and requests for production.

Relators filed their initial objections and responses to these discovery requests on December 1. Bacon continued to conduct discovery for over a year. She considered Relators' responses to her discovery inadequate. Thus, she noticed Relators for oral depositions on April 14, 1997.

Relators filed a motion to quash their depositions on the same day,[1] alleging that *441 Bacon sought them solely for purposes of harassment and that the information Bacon sought could be obtained "from other readily available sources who have closer contact and more personal knowledge of any subject matters that could be relevant to this litigation." Judge Bridewell set the matter for hearing on May 30.

Relators filed a supplemental motion for protection on May 23, which asserts that because they are co-chairs of the board of directors of Simon DeBartolo Group, Inc.[2] the depositions sought by Bacon "are necessarily 'apex' depositions...." *See Crown Cent. Petroleum Corp. v. Garcia,* 904 S.W.2d 125, 128 (Tex.1995). Relators also argued in the motion that the "apex" deposition doctrine applies "[b]ecause of the relative positions that they held in their respective companies in 1993 and the comparable positions that they hold today...."

According to Relators' mandamus petition the Irving partnership owned Irving Mall until December 20, 1993, seven days before the fatal shooting. Relators allege that on that date they and their other partners transferred their respective interests in the Irving partnership to a newly formed entity known as Simon Property Group, L.P ("SPGLP").[3] SPGLP in turn transferred ownership of the mall to Simon Property Group (Texas), L.P., a Texas limited partnership (the "Texas partnership"). Relators allege that the Irving partnership dissolved in December 1994 by the filing of a certificate of cancellation of the certificate of limited partnership with the office of the Secretary of State.[4] *See* TEX.REV.CIV. STAT. ANN.. art. 6132a-1, § 2.03(a) (Vernon Supp.1997).

Golden Ring Mall Company, L.P. ("Golden Ring"), is the sole general partner of the Texas partnership. Simon Property Group (Delaware), Inc. ("SPG Delaware"), is the sole general partner of Golden

Ring. Relators are co-chairmen of the board of SPG Delaware. SPGLP is the sole limited partner of Golden Ring. Bacon has named SPGLP, the Texas partnership, Golden Ring, and SPG Delaware as defendants in her suit.

Bacon asserts that the Irving partnership continued to exercise ownership and management responsibilities over the mall after December 20, 1993. As evidence she cites a lease amendment between the Irving partnership and Frozen Fox, Inc. dated August 4, 1994. However, because Bacon did not offer this document in evidence at the hearing, Relators have filed a motion to strike or disregard it. We may not consider evidence which the proponent did not present to the trial court.[5] *Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex.1979); *Intercity Management Corp. v. Chambers*, 820 S.W.2d 811, 813 n. 4 (Tex.App.—Houston [1st Dist.] 1991, orig. proceeding). Thus, we grant Relators' motion to strike.

Bacon also contends that regardless of the ownership of the mall, the Irving partnership continued to provide security for the mall after December 20, 1993. Relators claim that "[t]he responsibility for security at [the] mall rests with the mall manager and the director of security at the ... mall [ ]." They allege that after December 20, 1993, SPG Texas owned and managed the mall and thus was responsible for mall security.

At the hearing, Bacon introduced an April 1994 request by the Irving partnership to renew its security license with the Texas Board of Private Investigators and Private Security Agencies. Bacon also introduced a certificate of license issued by the Board to the Irving partnership on March 1, 1996. This certificate renewed the partnership's security *442 license through February 28, 1997. In addition, Bacon offered a July 1993 lease signed by Relator Herbert Simon as president of Irving Mall, Inc. with La Fata, Inc. The lease expressly provides that the Irving partnership "will operate, manage, [and] maintain ... the Common Area of the [mall]." Among other things, the partnership agreed in the lease to provide "police protection [and] security and security patrol" for the common area.

The security license constitutes some evidence that the Irving partnership continued to exist after December 23, 1994, the date on which Relators allege it dissolved.[6] It also is evidence that the partnership continued to provide security for the mall after the alleged date of dissolution. Thus, Bacon produced some evidence that the Irving partnership was responsible for mall security on the date of the fatal shooting.

At the hearing on Relators' motion, the court reviewed the pleadings, accepted documentary evidence, and heard argument of counsel before ruling. The court denied Relators' request to quash the deposition notices.

[1] [2] [3] The relator in a mandamus proceeding bears the burden of showing it has no adequate remedy by appeal and that the court abused its discretion in taking the action of which the relator complains. *Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 305 (Tex.1994). With respect to disputed factual issues, we may not substitute our judgment for the trial court's. *Easter v. McDonald*, 903 S.W.2d 887, 889–90 (Tex.App.—Waco 1995, orig. proceeding). Relators "must establish that the trial court could reasonably have reached only one decision." *Id.* at 890.

## THE "APEX" DEPOSITION DOCTRINE

[4] [5] Our Supreme Court adopted the "apex" deposition doctrine in 1995. *Crown Cent. Petroleum*, 904 S.W.2d at 126. The doctrine applies in suits where "a party seeks to depose a corporate president or other high level corporate official...." *Id.* at 128. The "apex" doctrine is invoked when the corporate official files a motion for protection accompanied by an "affidavit denying any knowledge of relevant facts...." *Id.* The burden of persuasion then shifts to the party seeking the deposition to show that the official possesses some pertinent personal knowledge of relevant facts. *Id.* If the party seeking discovery does not make this showing, the court should grant the motion "and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods." *Id.*

[6] From the record before us, we conclude that the "apex" doctrine does not apply to this case for a number of reasons.

## THE CORPORATE OFFICIAL'S "APEX" STATUS MUST BE RELEVANT TO THE DEPOSITION

[7] A corporate officer is not exempt from deposition by the "apex" doctrine merely because he is a corporate official. Rather, the doctrine may be invoked only when the deponent has been noticed for deposition because of his corporate position. For example, if the president of a Fortune 500 corporation personally witnesses a fatal car accident, he cannot avoid a deposition sought in connection with a resulting wrongful death action because of his "apex" status. Thus, Relators' positions with Simon DeBartolo Group, Inc. have no bearing on their amenability to deposition because that corporation had no ownership interest in the mall at the time of the shooting.

## THE "APEX" DOCTRINE IS UNAVAILABLE IF LESS INTRUSIVE MEANS OF DISCOVERY HAVE ALREADY BEEN EMPLOYED

Bacon attempted to conduct discovery for over eighteen months by means of interrogatories, requests for production, and requests *443 for admission before noticing Relators for oral depositions. Although Relators filed numerous objections to these discovery requests, they did not object to them on the basis of their "apex" status, and they attempted to answer many of the discovery requests subject to their stated objections. [7]

[8] Ordinarily, once a court grants an "apex" protective order, the party seeking discovery can return to the court after attempting other avenues of discovery and seek to have the order overturned.

> After making a good faith effort to obtain the discovery through less intrusive methods, the party seeking the deposition may attempt to show (1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate. If the party seeking the deposition makes this showing, the trial court should modify or vacate the protective order as appropriate.

*Id.*

[9] In this case, the record suggests that Bacon attempted less intrusive means of discovery prior to seeking Relators' depositions. Judicial economy is not served by granting a protective order where the record affirmatively reflects that the party seeking discovery has already exhausted other avenues for conducting discovery. Thus, we conclude that an "apex" official cannot find safe harbor in the "apex" doctrine when the record shows that the party seeking the deposition has previously attempted less intrusive means of discovery. *Cf. id.*

## APPLICABILITY OF THE "APEX" DOCTRINE TO PARTNERSHIPS

Relators filed affidavits denying personal knowledge with their motion for protection. However, by introducing evidence of the continued existence of the Irving partnership at least for security purposes, Bacon has raised a potential fact issue with respect to what organization was truly responsible for security at the mall on the date of the fatal shooting. If the Irving partnership was responsible for security, as Bacon's evidence suggests, then it might be liable to Bacon under one or more of the theories asserted in her suit.

Relators essentially controlled over 75 percent of the Irving partnership as general partners. Relators' evidence suggests that the partnership continued its existence for at least twelve months after the fatal shooting. The records of the Texas Board of Private Investigators and Private Security Agencies reflect that the partnership renewed its security license after the shooting and continued to possess the license through February 1997.

|10| As general partners, Relators are liable for the obligations of the Irving partnership. TEX.REV.CIV. STAT. ANN.. art. 6132a–1. § 4.03 (Vernon Supp.1997); *Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 247 (Tex.App.—Amarillo 1994, no writ). The general partners of that partnership are likewise subject to deposition in legal actions involving the partnership. *See, e.g., Kelly Assoc., Ltd. v. Aetna Casualty & Sur. Co.*, 681 S.W.2d 593, 595 (Tex.1984).

Relators have cited no cases where the "apex" doctrine has been extended to general partners in a limited partnership. Although we do not preclude the possibility that the doctrine might be so extended under appropriate facts, the facts presented in this case do not warrant such an extension.

Moreover, Relators are named parties to Bacon's suit. Rule 200 of the Rules of Civil Procedure provides that "any party may take the testimony of any person, including a party, by deposition upon oral examination." TEX.R. CIV. P. 200. Thus, because Relators are defendants in this lawsuit, Bacon may depose them.

## *444 CONCLUSION

Relators have failed to show that the court abused its discretion in denying their motion for protective order. They have not demonstrated that "the trial court could reasonably have reached only one decision." *Easter*, 903 S.W.2d at 890. Thus, we deny the petition.

## THE "APEX" DOCTRINE DOES NOT PROTECT NAMED PARTIES

Footnotes

1. Bacon had notified counsel for Relators by letter dated March 24, 1997, that she intended to depose them and sought mutually agreeable times to conduct the depositions. Relators apparently filed their motion in anticipation of Bacon's deposition notices.

2. Simon DeBartolo Group, Inc. is not a party to Bacon's suit.

3. In 1993, Relators were limited partners of SPGLP. They exchanged their interests in SPGLP in August 1996 for similar interests in another limited partnership known as Simon DeBartolo Group, L.P.

4. Relators did not offer a copy of the certificate of cancellation in evidence at the hearing.

5. At the hearing on Relators' motion for protection, Bacon sought to introduce over twenty lease agreements signed by Herbert Simon as president of Irving Mall, Inc. and various tenants of the mall. These lease agreements were all apparently signed by the respective parties between 1990 and 1993. Relators stipulated that Herbert Simon signed all these leases in his capacity as president of Irving Mall, Inc.

6. The date of the filing of a certificate of cancellation does not necessarily equate to the date of dissolution of a limited partnership. According to section 2.03(b)(4) of the Texas Revised Limited Partnership Act, a limited partnership can designate a future effective date of dissolution in a certificate of cancellation. TEX.REV.CIV. STAT. ANN.. art. 6132a–1, § 2.03(b)(4) (Vernon Supp.1997). Because Relators have not provided a copy of the certificate of cancellation, we cannot say whether the certificate of cancellation was effective on the date it was filed or on some future date.

7. Relators commonly objected to the propounded interrogatories on the basis that they were "overbroad, unduly burdensome, unnecessarily expensive and meant solely for the purpose of harassment."

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 10

228 S.W.3d 674
Supreme Court of Texas.

Patricia WILZ, Guardian of Jon Patrick
Flournoy, an Incapacitated Person, Petitioner,

v.

Kenneth W. and June
FLOURNOY, Respondents.

No. 06–0913. | June 29, 2007.

### Synopsis

**Background:** Former wife, as guardian for incompetent son, brought action against former husband and his new wife, asserting claims for conversion, breach of fiduciary duty, constructive fraud, and imposition of constructive trust, relating to former husband's handling, when he had been son's guardian, of proceeds of settlement of son's personal injury action. At close of evidence, former husband and new wife moved for an instructed verdict, which motion was denied. The 77th District Court, Limestone County, Deborah Oakes Evans, J., entered judgment on jury's verdict against former husband and new wife, denied their motion for judgment notwithstanding the verdict (JNOV), and imposed a constructive trust on former husband's and new wife's entire farm. Former husband and new wife appealed. The Waco Court of Appeals, 201 S.W.3d 833, affirmed in part and reversed and rendered in part. Review was granted.

[Holding:] The Supreme Court held that former husband and new wife, by failing to obtain a jury finding on their affirmative claim, regarding imposition of constructive trust, that funds for down payment for farm purchased by former husband and new wife came from former husband's personal funds rather than from settlement proceeds, waived the claim on appeal.

Court of Appeals reversed; judgment rendered.

## West Headnotes (6)

[1] **Trusts**
⟜ Presumptions and burden of proof

A party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered.

7 Cases that cite this headnote

[2] **Trusts**
⟜ Trust Property or Funds Mingled with Property or Funds of Trustee

Once the party seeking to impose a constructive trust has satisfied his or her initial burden of tracing funds to the specific property sought to be recovered, the entire property will be treated as subject to the trust, except in so far as the trustee may be able to distinguish and separate that which is his own.

6 Cases that cite this headnote

[3] **Appeal and Error**
⟜ Sufficiency of Presentation of Questions

Affirmative claim of former husband and his new wife, as defendants in former wife's action, as guardian for incompetent son, asserting claims for conversion, breach of fiduciary duty, constructive fraud, and imposition of constructive trust, relating to former husband's handling, when he had been son's guardian, of proceeds of settlement of son's personal injury action, that funds for down payment for farm purchased by former husband and new wife came from former husband's personal funds rather than from settlement proceeds, so that entire farm was not subject to constructive trust, was waived on appeal unless former husband and new wife conclusively established the claim under the evidence,

where former husband and new wife failed to obtain a jury finding on that affirmative claim. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

3 Cases that cite this headnote

**[4]  Appeal and Error**
  Sufficiency of Presentation of Questions

Affirmative claim of former husband and his new wife, as defendants in former wife's action, as guardian for incompetent son, asserting claims for conversion, breach of fiduciary duty, constructive fraud, and imposition of constructive trust, relating to former husband's handling, when he had been son's guardian, of proceeds of settlement of son's personal injury action, that funds for down payment for farm purchased by former husband and new wife came from former husband's personal funds rather than from settlement proceeds, so that entire farm was not subject to constructive trust, was not conclusively established under the evidence, and thus, former husband and new wife, by failing to obtain a jury finding on that affirmative claim, waived the claim on appeal; the only evidence supporting the claim was former husband's deposition testimony, former husband was interested witness, former wife attempted to contradict his testimony, and jury was entitled to draw negative inferences from former husband's and new wife's repeated invocations of Fifth Amendment privilege against self-incrimination when questioned at trial about truth of former husband's deposition testimony. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rule 279; Rules of Evid., Rule 513(c).

1 Cases that cite this headnote

**[5]  Evidence**
  Testimony of interested persons

The factfinder may treat an interested witness's testimony as conclusive if it is clear, direct, and positive and there are no circumstances tending to discredit or impeach the same.

Cases that cite this headnote

**[6]  Witnesses**
  Effect of refusal to answer

In action brought by former wife, as guardian for incompetent son, against former husband and his new wife, asserting claims for conversion, breach of fiduciary duty, constructive fraud, and imposition of constructive trust, relating to former husband's handling, when he had been son's guardian, of proceeds of settlement of son's personal injury action, jury was entitled to draw negative inferences from former husband's and new wife's repeated invocations of Fifth Amendment privilege against self-incrimination when questioned at trial about truth of former husband's deposition testimony that funds for down payment for farm purchased by former husband and new wife came from former husband's personal funds rather than from settlement proceeds. U.S.C.A. Const.Amend. 5; Rules of Evid., Rule 513(c).

9 Cases that cite this headnote

**Attorneys and Law Firms**

*675 Percy L. Isgitt, C. Zan Turcotte, Isgitt & Associates, P.C., Houston, Edward T. McFarland, Lufkin, for petitioner.

John Porter Mabry, Vance Dunnam, Dunnam & Dunnam, Waco, for respondents.

**Opinion**

PER CURIAM.

On behalf of her son, Jon Flournoy, Patricia Wilz sought to impose a constructive trust on property purchased by her ex-husband and his new wife. The trial court imposed a constructive trust on the entire property, but a divided court of appeals limited the trust to a 35 percent undivided interest. Given the evidence presented at trial and the jury's findings, the court of appeals erred in limiting the constructive trust, and we reverse.

Patricia Wilz and Kenneth Flournoy divorced in 1973, and Kenneth was awarded custody of their son, Jon. In 1987, Jon suffered incapacitating injuries in an automobile accident. Kenneth, individually and on Jon's behalf, sued Ford Motor *676 Company. In a 1991 settlement, Kenneth received $379,300 on Jon's behalf and $95,000 personally. As guardian of Jon's person and estate, Kenneth purchased stocks and bonds for Jon's benefit. Subsequently, Kenneth and his new wife, June, purchased a 110-acre farm for $153,049, paying $49,365.50 in cash and executing a note for the balance. The note called for monthly payments of $961. Between 1991 and 1999, the Flournoys withdrew several thousand dollars from Jon's account, many installments of which were roughly $960. By the end of 2001, the Flournoys had depleted Jon's account, and they institutionalized him in a state mental health facility.

In 2005, Jon's biological mother, Patricia Wilz, became his guardian, and she sued the Flournoys on Jon's behalf for conversion, breach of fiduciary duty, and constructive fraud.

Patricia traced several checks drawn on Jon's account to the Flournoys' personal account. When questioned about these checks, the handling of Jon's funds, and the source of the funds used to purchase the farm, the Flournoys each invoked the Fifth Amendment privilege against self-incrimination. The Flournoys' sole evidence regarding the funds consisted of Kenneth's pretrial deposition, where he said he used his settlement money for the farm's down payment and that $50,000 remained outstanding on the note. When questioned about the truth of this testimony, Kenneth again invoked the Fifth Amendment.

The jury found that Kenneth breached his fiduciary duty and committed constructive fraud and that the Flournoys converted Jon's property with malice. The trial court therefore imposed a constructive trust on the entire farm.

The court of appeals agreed that Wilz had met her burden to impose a constructive trust on the entire farm, and the burden shifted to the Flournoys to show which funds came from their own accounts. 201 S.W.3d 833, 836–37. Nonetheless, it held that the trial court abused its discretion because Kenneth's deposition testimony proved he paid the down payment from personal settlement funds and that $50,000 was outstanding on the note. The court of appeals estimated Jon's interest in the farm as the initial purchase price minus the down payment minus the amount outstanding. Thus the court of appeals concluded that Jon was entitled to a constructive trust on an undivided 35 percent of the farm.

[1] [2] A party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered. *Meyers v. Baylor Univ.*, 6 S.W.2d 393, 394–95 (Tex.Civ.App.-Dallas 1928, writ ref'd); *see Eaton v. Husted*, 141 Tex. 349, 172 S.W.2d 493, 498 (1943) ( "[T]he beneficiary may follow the trust property, and claim every part of the blended property *which the trustee cannot identify as his own.*") (emphasis in original). Once that burden is met, "the entire ... property will be treated as subject to the trust, *except in so far as the trustee may be able to distinguish and separate that which is his own." Eaton*, 172 S.W.2d at 498–99 (emphasis in original). The trial court and court of appeals agreed that Patricia traced Jon's funds to the farm; thus, the burden shifted to the Flournoys to demonstrate what portion of the farm's purchase price came from their own funds. *See* 201 S.W.3d at 839.

[3] [4] [5] [6] The Flournoys bet the farm (as it were) when they failed to obtain a jury finding on their affirmative claim that part of the purchase money came from personal funds. Therefore, this claim is waived on appeal unless they "conclusively established" it. *See* *677 *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222–23 (Tex.1992) (citing TEX.R. CIV. P. 279). The Flournoys' only evidence on this point was Kenneth's deposition testimony. Kenneth, however, was an "interested witness," so his testimony, even if uncontradicted, "presents an

issue to be determined by the trier of fact." *Gevinson v. Manhattan Constr. Co.,* 449 S.W.2d 458, 467 (Tex.1969). The factfinder may treat an interested witness's testimony as conclusive if it is "clear, direct, and positive and there are no circumstances tending to discredit or impeach the same." *Id.* But here, Wilz attempted to contradict Kenneth's testimony, and the jury in this civil case was free to draw negative inferences from the Flournoys' repeated invocations of the Fifth Amendment. *See* TEX.R. EVID. 513(c); *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton,* 897 S.W.2d 757, 760 (Tex.1995) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). The Flournoys failed to secure a jury finding on their claim, and the jury was free to disregard Kenneth's deposition testimony as not credible. Therefore, the trial court did not abuse its discretion in imposing a constructive trust on the entire farm.

Accordingly, we grant Patricia Wilz's petition for review, and without hearing oral argument, TEX.R.APP. P. 59.1, reverse the court of appeals' judgment and render judgment that the entire farm is subject to a constructive trust, *see* TEX.R.APP. P. 60.2(c).

**Parallel Citations**

50 Tex. Sup. Ct. J. 975

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.